**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 0:15-cv-61165-WPD**

DR. JASSIN JOURIA

        Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,

        Plaintiff/Counter-Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Third Party Plaintiff,

v.

Elite Continuing Education, Inc. and Alpine
Management Services III, LLC,

        Third Party Defendants.

**RESPONSE IN OPPOSITION TO ELITE'S MOTION TO DISMISS**
**THIRD PARTY CLAIMS**

## I.      INTRODUCTION

NetCE prides itself on conducting the diligence required to produce high quality CLE materials for medical professionals.  Since NetCE's inception, it has welcomed healthy and fair market competition.  Elite is no honest competitor.

Elite cynically capitalized on Dr. Jouria's relationship with NetCE and NetCE's relationship with Alpine to circumvent the time, effort, and resources required to cultivate materials suitable for fair competition in the CLE market.  Elite stole NetCE's work product and purloined NetCE's head start in the market for the courses in question.  Attempting to escape consequences for its impermissible and tortious behavior, Elite ignores the plain words of the First Amended Answer, Amended Counterclaims, and Third Party Complaint ("FAA") (ECF No. 36) and presents strained and poorly reasoned arguments supporting its contentions that NetCE's claims for misappropriation of trade secrets and tortious interference should be dismissed.  After fits and starts and a year's delay, all catalyzed by Dr. Jouria's bad faith bankruptcy filings, NetCE respectfully requests that this Court allow NetCE to finally have its day in court and, with the exception of NetCE's concession regarding statutory damages, deny Elite's Motion to Dismiss or, in the alternative, permit NetCE to amend the FAA.

## II.      FACTS

### A.      NetCE

California-based NetCE specializes in developing Continuing Medical Education ("CME") courses and materials for a variety of medical professionals in multiple subjects.  Since 1991, NetCE has curated, edited, and marketed continuing education materials for healthcare professionals, including courses for nurses, doctors, dental professionals, social workers, counselors, and psychologists.  FAA at ¶ 19.  In order to develop CME materials, NetCE

1

contracts with independent authors ("Contributing Faculty Members"), almost all of whom are licensed medical professionals, credentialed medical scholars and academics, or both. *Id.* at ¶ 21.  Contributing Faculty Members who submit CME course materials to NetCE do so under standard template agreements ("Freelance Writer Agreements").  *Id.* at ¶ 22.

### B.       Freelance Writer Agreements

These Freelance Writer Agreements are identical—except for the name of the author, deadlines for course completion, and subject-matter areas—to the seven (7) contracts between NetCE and Dr. Jouria at issue in this case.  *Id.*

Under the terms of the Freelance Writer Agreements, Contributing Faculty Members, including Dr. Jouria, agreed to draft and submit to NetCE CME articles on a specific subject, in a specific format, and by a specific deadline.  *Id.* at ¶ 23.  Contributing Faculty Members, including Dr. Jouria, agreed also that articles submitted to NetCE were and are "works for hire" and that all copyrights associated with the submitted materials belong and belonged exclusively to NetCE unless and until NetCE rejects the materials.  *Id.*; Freelance Writer Agreements, attached as Exhibit B to FAA (ECF No.36-2).[1]  The type of writer-publisher arrangement agreed to by NetCE and Contributing Faculty Members is common in the publishing industry, if not industry standard.  FAA at ¶ 24.

---

[1] NetCE has federally registered copyrights for the seven courses at issue, effective May 15, 2015.  A PDF of these certificates is attached to the FAA as Exhibit A (ECF No. 36-1).

C.    **Elite**

Elite, also a continuing education company, and one of NetCE's direct competitors, was founded in 1999 as a continuing education resource for cosmetologists.  *Id.* at ¶ 26-27.  Around 2006 or 2007, Elite began offering limited continuing education courses in the field of nursing.  *Id.* at ¶ 26.[2]  Presently, Elite offers roughly 60 CME courses for nursing professionals, including a number of courses by Dr. Jouria regarding pharmacology and internal medicine.  *Id.* at ¶ 28.

D.    **Contributing Faculty Member Dr. Jouria's Ten Freelance Writer Agreements**

In 2012 and 2013, NetCE and Dr. Jouria executed ten Freelance Writer Agreements, commissioning Dr. Jouria to write ten courses in the area of general medicine, internal medicine, and pharmacology.  *Id.* at ¶¶ 34, 35.  Each of these Freelance Writer Agreements explicitly states that NetCE is the author of the materials under the work for hire doctrine, that NetCE had full leeway to edit and revise submissions, that Dr. Jouria reserves the rights to the articles only in the event of NetCE's explicit refusal of the tendered product, and that California law governs the agreements.   *Id.* at ¶¶ 35, 48; see also Freelance Writer Agreements (attached as Exhibit B to FAA (ECF No. 36-2) at ¶ 10.

NetCE ultimately only published three of these contracted-for courses—none of these three published courses are at issue in this litigation.  *Id.* at ¶ 36.

As part of its normal diligence on prospective new Contributing Faculty Members, NetCE conducted online research to ensure that Dr. Jouria was not already working with its competitors to market and publish CME articles.  *Id.* at ¶ 33.   Dr. Jouria confirmed to NetCE

---

[2] Elite's initial nursing course offerings were not as extensive then as they are presently.  See FAA at ¶ 27.

that he was not working for NetCE's competitors.  *Id.*  Dr. Jouria also confirmed to NetCE that

he had reviewed the Faculty Guide and had understood the document and the process of

submission for courses.  *Id.* at ¶ 34.  Throughout 2012 and early 2013, Dr. Jouria submitted

drafts for each of the ten contracted-for courses, and NetCE paid Dr. Jouria for each course

according to the explicit terms of the applicable Freelance Writer Agreements.  *Id.* at ¶ 35.  At

the time payment was rendered to Dr. Jouria, pursuant to his contract and the terms of the

Faculty Guide, ownership of the ten articles transferred to NetCE.  *Id.*

      **E.**      **Alpine's Negotiations and Non-Disclosure Agreement with NetCE**

      Alpine, an investment firm founded in 2001, has invested in and helped cultivate roughly

thirty companies in a variety of industries.  In early 2012, Alpine[3] approached NetCE to discuss

the possibility of purchasing NetCE.  *Id.* at ¶ 40.  In July of 2012, Alpine and NetCE executed a

Non-Disclosure Agreement ("NDA") NDA in order to facilitate the exchange of confidential,

proprietary, and sensitive information entailed in such discussions.  *Id.* at ¶ 41.  In the NDA,

Alpine promised that it would not share confidential information shared by NetCE with other

unauthorized parties.[4]  *Id.* at ¶ 42.

      Throughout 2012, NetCE and Alpine engaged in communications and negotiations,

including several days of in-person meetings among NetCE and Alpine representatives and other

---

[3] Alpine and NetCE have executed a settlement agreement, and this Court has dismissed Alpine with prejudice.

[4] One particularly pertinent passage of the contract reads: "The Information [shared by NetCE] will be kept confidential and shall not, without prior written consent of [NetCE], be disclosed by [Alpine] or its Representatives, other than in connection with the transaction between the parties or as permitted herein…. [Alpine] *shall not transmit the Information to any third parties*, including any agents or contractors."  The NDA is attached to the FAA as Exhibit C (ECF No. 36-3) (emphasis added)  The NDA was dated July 2012 and, as Alpine and NetCE reached no definitive agreement with respect to the transaction, was effective for three years from the date of its execution.  In other words, the NDA was in effect until July 2015.  *Id.*

authorized parties.  FAA at ¶¶ 41-44.   NetCE, believing itself protected by the NDA, shared

non-public, proprietary and confidential information with Alpine that Alpine claimed was

necessary to determine NetCE's value.  *Id.* at ¶ 43.  This information included NetCE's market

strategies, industry reports, financial performance data, and generally proprietary information

concerning the type of content and products NetCE furnished, developed, and was planning to

develop.  *Id.*  NetCE shared its plans to develop and commission courses (including, but not

limited to, the seven courses at issue ("Seven Courses") in this lawsuit) and other details about

courses and materials, including Dr. Jouria's involvement and the timing of planned rollouts.  *Id.*

at ¶¶ 43, 45.   NetCE also shared drafts of courses already in progress with Alpine.  *Id.* at ¶ 45.[5]

Some of this information constituted trade secrets.

### F.   Termination of Discussions Between Alpine and NetCE , Alpine's Interest in Elite, and Wrongful Publication of the Seven Courses

In late 2012, NetCE terminated its discussions with Alpine. FAA at ¶ 46.  Roughly a year

later, NetCE discovered that Alpine had purchased an interest in Elite very shortly after Alpine

and NetCE broke off negotiations.  *Id.*  Indeed, Alpine's investment in Elite heralded a number

of troubling developments.  Shortly thereafter, Elite hired Dr. Jouria as a physician author and

planner, a new position, one Elite had not advertised or held before its relationship with Alpine

and its awareness of Dr. Jouria.  *Id.* at ¶ 77.   Elite also rapidly moved into the medical and

pharmacologic space—a space it had heretofore not occupied.  *Id.*

---

[5] Four of the Freelance Writer Agreements were executed in 2012.  Three were executed in 2013—two in January and one in April.  *Id.*; Freelance Writer Agreements (Exhibit B to FAA, ECF No. 36-2).

### G.    Elite and Dr. Jouria Infringe NetCE's Copyrights

Elite was able to move so quickly and aggressively into a new field because it did not have to take the time or resources to solicit or develop its own course materials.  Instead of commissioning its own courses, Elite published courses curated by and belonging to NetCE.  In February of 2015, NetCE discovered that Dr. Jouria had submitted and Elite had published— without NetCE's permission—the Seven Courses.  *Id.* at ¶ 67.  These courses belonged to NetCE by the explicit terms of the Freelance Writer Agreements and U.S. Copyright Law.  *Id.* at ¶ 84.

### H.    NetCE's Wasted Resources on Seven Courses

At the time NetCE discovered Elite's publication of the Seven Courses, NetCE was precipitously close to publishing two of the Seven Courses—Gastroesophageal Reflux Disease and Cancer and Chemotherapy (estimated release date: March 1, 2015).  *Id.* at ¶ 59.[6]  By February 2015, NetCE had expended resources locating the original sources for internal images, graphics, and tables, requesting permission to reprint from the copyright holders, and paying reprinting fees for these courses.[7]  *Id.* at ¶¶ 60-63.  NetCE also expended time and effort fact-checking, editing, and re-working portions of the courses.  *Id.* at ¶¶ 55-57.  The Cancer and Chemotherapy course in particular required significant improvements and substantive edits: at the time NetCE discovered Dr. Jouria and Elite's infringement, NetCE had paid an independent editor to revise the course.  *Id.*

---

[6] NetCE was still in the process of editing and revising the remaining five courses, which required significant remedial attention.  *Id.* at ¶ 63.  NetCE hoped these courses could be published sometime in 2015.  *Id.*

[7] In Elite's publication of these courses, the tables were published remain without attribution or permission.  *Id.* at ¶ 62.

By early 2015, NetCE had also incurred significant costs—time, money, editing, physical resources, use of plagiarism-detecting software licenses, and the opportunity costs of foregoing other projects—developing the other five courses.  *Id.* at ¶¶ 54-65.  Due to Elite's and Dr. Jouria's actions, NetCE was unable to market or use the content of the Seven Courses; Elite and Dr. Jouria deprived NetCE of a crucial first-to-market advantage.  *Id.* at ¶¶ 61, 65.

## I.      Pre-Litigation Communication with Elite

In April of 2015, upon discovery Elite's and Dr. Jouria's bad acts, NetCE sent a cease-and-desist letter to Elite, which initiated a prolonged conversation (via email and phone calls) between Elite and NetCE.  *Id.* at ¶ 81; Declaration of John Kern ("Kern Decl.") at ¶ 3.  Yet, despite Elite's repeated assurances that it would remove the infringing content from its website, Elite failed to successfully remove the offending material from its website or block internet users' access to it.  FAA at ¶ 81.  Indeed, until April of 2016, links to the courses remained live, and it was still possible to purchase the Seven Courses (alone or bundled with other courses) through Elite's website.  *Id.*

## J.      Pre-Litigation Communication with Dr. Jouria

On April 9, 2015, NetCE sent a cease-and-desist letter to Dr. Jouria.  The letter summarized the contracts and provisions and asked that Dr. Jouria provide an accounting of his profits from his infringing activity. Kern Decl. at ¶ 4. The letter closed by offering to enter into a settlement agreement with Dr. Jouria, if he satisfied the conditions in the letter, stating that, if Dr. Jouria did not comply, NetCE would pursue all available legal remedies. *Id*. at ¶ 5.  An extensive email and phone exchange ensued between attorneys for Dr. Jouria and NetCE.  *Id.* at ¶ 6 .

Dr. Jouria pretended to be conciliatory, and NetCE believed a settlement agreement was at least possible, if not probable.  *Id.* at ¶ 7.  At one point, Dr. Jouria's attorney made a settlement offer and then threatened to put his client through bankruptcy if the offer were rejected.  *Id.* at ¶ 8.  After weeks of intransigence, Dr. Jouria's attorney's delayed responsiveness, and missed deadlines, NetCE concluded Dr. Jouria was stalling in order to stave off a lawsuit.  Id. at ¶ 9.

### K.      Dr. Jouria's Anticipatory Lawsuit in Florida

At this time, NetCE discovered Dr. Jouria had engaged in infringing activities with yet another CME provider ("NurseCE4Less").  *Id.* at ¶ 10.  Thus, NetCE began preparing its complaint to be filed in the Eastern District of California where its place of business is located ("California Lawsuit").  Id. at ¶ 11.  Unbeknownst to NetCE (and while NetCE and Dr. Jouria's attorney were still communicating), Dr. Jouria filed the instant declaratory judgment action in this Court in June of 2015 ("Florida Lawsuit").[8]  FAA at ¶ 1; Kern Decl. at ¶ 12.  NetCE, meanwhile, filed the California lawsuit on September 4, 2015 and made several attempts to serve Dr. Jouria before succeeding on September 22, 2015.  Kern Decl. at ¶ 13.[9]

After being served the Florida Lawsuit, NetCE filed a motion to dismiss, transfer, or stay that action on October 6, 2015.  ECF No. 11.  This motion was based primarily on the premise that Dr. Jouria's Florida Lawsuit was an anticipatory lawsuit, and that Dr. Jouria "filed first" in order to secure a forum more favorable and convenient for himself.  Kern Decl. at ¶ 14.  In response, and in keeping with threats Dr. Jouria's counsel had made to NetCE mere months earlier, Dr. Jouria filed for bankruptcy in the Bankruptcy Court for the Southern District of

---

[8] Dr. Jouria did not serve NetCE until September 15, 2015. FAA at ¶ 3.

[9] NetCE believes Dr. Jouria was actively avoiding process servers at his home.  *Id.*  Dr. Jouria's attorney also refused to accept service for him.  *Id.*

Florida on October 23, 2015, and applied for a stay.  *Id.* at ¶ 15.  This Court granted Dr. Jouria's stay.  ECF No. 18.

On May 16, 2016, NetCE discovered that Dr. Jouria's first Chapter 13 bankruptcy filing had been dismissed with prejudice for 180 days on May 10, 2016.  Kern Decl. at ¶ 16.  Knowing that this Court would lift its stay, the judge presiding over the California Lawsuit, Judge Shubb, stayed the California Lawsuit pending the outcome of NetCE's impending motion to dismiss, transfer, or stay in the Florida Court.  Kern Decl. at ¶ 17.  The Florida Court lifted its stay on June 15, 2016.  ECF No. 25.

NetCE suddenly found itself in a classic Catch-22: the California Lawsuit was stayed, and at the time NetCE's motion to dismiss, transfer, or stay in the Florida District Court was revived, did not list Dr. Jouria as a defendant.  NetCE believed that the Florida District Court would not grant a motion to dismiss, transfer, or stay to the Eastern District of California if Dr. Jouria were not a named party to the operative complaint there.  All of this disruption and delay was caused by Dr. Jouria's first bad faith bankruptcy filing.

Accordingly, NetCE determined it would litigate the case in Florida and voluntarily dismiss the California action and, on September 23, 2016, filed a motion for leave to file an amended answer and counterclaims and to file a third party complaint and then, on October 21, 2016 filed its amended pleadings.  ECF No. 36.  Alpine and Elite filed motions to dismiss on December 22, 2016.  ECF Nos. 41, 43.  On December 30, 2016, before NetCE filed its Oppositions, Dr. Jouria filed for Chapter 13 bankruptcy again—his second bad faith filing.  ECF Nos. 48, 48-1, 58.  On January 24, 2017, Dr. Jouria reported to this Court that he had received an extension of the automatic stay from Bankruptcy Court.  ECF No. 59, 59-1.  This Court again stayed the case as to all parties on January 25, 2017.  ECF No. 60.

NetCE filed for relief from the order extending the stay and, after oral argument on April 6, 2017, convinced the Bankruptcy Court that Dr. Jouria was a bad faith filer.  Kern Decl. at ¶¶ 18, 19.  NetCE applied to this Court to lift the second bankruptcy stay, and this Court complied on April 21, 2017.  ECF No. 63.

## III.   ARGUMENT

### A.     NetCE Has Properly Alleged All Claims Under the Appropriate Standard

To survive a motion to dismiss, a complaint need not provide detailed factual allegations, but needs to allege more than threadbare recitals of the elements of a cause of action.  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  All facts alleged must be interpreted in the light that is most favorable to the non-moving party, and the factual allegations, when assumed to be true, "must be enough to raise a right to relief above the speculative level ...."  *Mills v. Foremost Ins. Co*., 511 F.3d 1300, 1303 (11th Cir. 2008) (citation omitted).  Allegations must contain enough fact to raise a reasonable expectation that discovery will reveal evidence of the defendant's liability.  *Chaparro v. Carnival Corp*., 693 F.3d 1333, 1337 (11th Cir. 2012).

Where the complaint contains sufficient facts to allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct, this threshold is reached.  *Iqbal*, 556 U.S. at 678.  Finally, if a court should find that an operative complaint is lacking in specificity, leave to amend should be freely granted.  Fed.R.Civ.P. 15(a); *In re Pegasus Wireless Corp. Sec. Litig*., 657 F. Supp. 2d 1320, 1328 (S.D. Fla. 2009).

The FAA contains sufficient factual allegations for each of the causes of action against Elite to survive a motion to dismiss. In the event, however, that this Court finds that the

Amended Complaint requires additional specificity, NetCE requests this court grant it leave to amend and supplement the FAA.

**B.     NetCE's Tortious Interference Claim is Not Pre-Empted by Copyright Law**

The Eleventh Circuit conducts a two-pronged test to determine whether the Copyright Act preempts a state law claim, examining (1) whether the rights at issue fall under the subject matter of copyright and (2) whether the rights at issue are equivalent to the exclusive rights under § 106 of the Copyright Act. *Treiber v. StorCOMM, Inc.*, No. 303CV1040J32MMH, 2005 WL 2012275, at *3–5 (M.D. Fla. Aug. 16, 2005). To determine whether the competing rights are equivalent, the Eleventh Circuit employs the "extra element" test. *Id.* Where, then, a claim for tortious interference (or any other state law claim) involves a different or additional element for recovery than elements required under copyright law, it is not preempted. *Telecom Technical Services Inc. v. Rolm Co.*., 388 F.3d 820, 833 (11th Cir. 2004) (holding copyright law did not preempt claim for tortious interference with contract). To avoid preemption, the state law claim must be qualitatively different from a copyright claim: courts look to what the plaintiff seeks to protect, the rights it seeks to enforce, and the theories thought to protect the its rights. *Bollea v. Clem*, 937 F. Supp. 2d 1344, 1354-56 (11th Cir. 2013) (no copyright law preemption where state law claims require additional inquiries).

NetCE's claim for tortious interference necessitates an examination of elements and rights not encompassed by Copyright Law and is therefore not preempted. *See* FAA at ¶¶ 100-105, 114-116. Four elements are required to establish tortious interference with a contractual relationship: (1) the existence of a contract; (2) Elite's knowledge of the contract; (3) Elite's intentional and unjustified interference with Dr. Jouria's compliance with the terms of the contract; and (4) damage to NetCE as a result. *Howard v. Murray*, 184 So. 3d 1155, 1166 (Fla.

11

Dist. Ct. App. 2015), *reh'g denied* (Feb. 26, 2016).  By contrast, a successful claim for copyright infringement has no knowledge requirement, requires no examination into whether the copyright holder was damaged, and does not require the existence of a contract.  *See Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1326–27 (11th Cir. 2010) (holding no preemption where existing contract requirement is "extra element" beyond copyright law).  The overlap between these two claims is minimal, and Elite's inducement of Dr. Jouria to breach the Freelance Writer Agreements is separately actionable.  FAA at ¶¶  100-105, 114-116 (NetCE alleges existence of Freelance Writer Agreements, Elite's awareness of the Agreements, Elite's purposeful inducement of Dr. Jouria's breach, and damage).

Courts in this Circuit, under similar facts, have found no preemption.  In *Telecom Technical*, the plaintiff held a copyright for software and accused the defendants of infringing that software *and* of tortious interference with contract.  388 F.3d at 833.  The Eleventh Circuit held that because the tortious interference claim required the copyright holder to show that the infringers violated terms of its software licenses with customers—documents chiefly concerned with delineating and protecting the plaintiff's copyrights—there was no preemption.  *Id.*

In *Bollea*, the plaintiff alleged copyright infringement, intrusion upon seclusion, and publication of private facts.  937 F. Supp. 2d at 1355.  The Eleventh Circuit found that, "even though [plaintiff sought] to regulate and control the distribution and display" of a work, the additional claims required inquiries into privacy and were therefore not preempted by copyright law.  *Id.*  NetCE's allegations of tortious interference require inquiries far removed from those required by copyright infringement: into Elite's knowledge of the Freelance Writer Agreements, NetCE's damages, and Elite's purposeful encouragement of Dr. Jouria to breach the terms.  There is no preemption.

12

Moreover, while there is no question that the seven Freelance Writer Agreements address and protect NetCE's ownership of the copyright for the Seven Courses,[10] the Freelance Writer Agreements *also* give NetCE's rights beyond those protected by copyright law.  Under the explicit terms of the Agreements, Dr. Jouria, and indeed all Contributing Faculty Members, agree not to "submit the [Course] to any other party for publication unless and until [NetCE] expressly rejects the Article…"  Freelance Writer Agreement s. 5(d) (attached as Exhibit B to the FAA).  In other words, the explicit terms of the Freelance Writer Agreements entitle NetCE to a right of first refusal, a right not addressed or encompassed by copyright law.

The allegations in the FAA reflect this distinction: in addition to alleging the "extra elements" of tortious interference, NetCE's claim of tortious interference alleges that Elite intentionally interfered with the Freelance Writer Agreements between Dr. Jouria and NetCE "by *soliciting and* publishing" the Seven Courses and "prevent[ing] Dr. Jouria from *performing his obligations* pursuant to the Freelance Writer Agreements."  FAA at ¶ 104 (emphasis added).  Dr. Jouria's obligations under the Freelance Writer Agreements included presenting the Seven Courses to NetCE and awaiting NetCE's rejection before offering each of the Seven Courses to another party.  A right of first refusal is not a right protected under U.S. Copyright Law.  Elite's actions both truncated NetCE's contractual rights *and* infringed its copyrights.

Finally, even if it is not "entirely clear" that the state law allegations are "materially different" than the copyright claims at issue here, Eleventh Circuit precedent and the liberal pleading standards dictate that NetCE has sufficiently pled an "extra element" in order to survive

---

[10] "These Contributing Faculty Members also agree that the articles they submit to NetCE are 'works for hire' and that all copyrights associated with these materials belong exclusively to NetCE."  FAA at ¶ 23; Freelance Writer Agreement ¶ 9 (Exhibit B to FAA, ECF No. 36-2).

a motion to dismiss.  *See Treiber*, 2005 WL 2012275, at *3–5.  NetCE's claim for tortious interference is not preempted by copyright law.

### C.    NetCE's Tortious Interference Claim is Not Pre-Empted by FUTSA[11]

The Florida Uniform Trade Secrets Act ("FUTSA") displaces conflicting tort, restitutory, and other law providing civil remedies for the misappropriation of a trade secret.  Fla. Stat. § 688.008.  Preemption does not apply to contractual remedies, whether based on trade secret misappropriation or not, or to "other civil remedies that are not based upon misappropriation of a trade secret."  *Id.* at § 688.008(2)(a) & (b).  In other words, the FUTSA preempts a state law claim where the allegations of trade secret misappropriation alone comprise the underlying state law wrong.  *American Honda Motor Co. v. Motorcycle Info. Network, Inc*., 390 F. Supp2d 1170, 1181 (M.D.Fla.2005).  State law claims may contain nearly identical allegations to trade secret misappropriation, but if there are additional underlying wrongs alleged in the state law claim, preemption does not apply.  *See Id.*

The FAA's allegations of tortious interference (with respect to the NDA with Alpine) certainly overlap with NetCE's trade secret misappropriations allegations, but are distinct. NetCE alleges that Elite was aware of the NDA, a valid and enforceable contract, and that Elite acted intentionally to induce a breach of that contract.  FAA at ¶¶ 111-113.  Therefore, there is no preemption.

In *American Honda*, the court opined that non-FUTSA state law claims (for deceptive and unfair trade practices, fraud, and negligent misrepresentation) were closely related—even

---

[11] If this Court dismisses without leave to amend NetCE's claim for misappropriation of trade secret, Elite's argument that FUTSA preempts NetCE's tortious interference claim to the extent it overlaps with protections afforded by the FUTSA no longer applies.

nearly identical to—the FUTSA claims alleged. *Id.* Yet, the court found that preemption did not apply due to the additional allegations of misrepresentation and inducement underlying the state law claims. *Id.* ("It appears at this stage that these three claims are not entirely dependent upon the FUTSA claim. Accordingly, because these claims are materially distinct from the misappropriation of trade secrets claim…they are not preempted.") *See also Mortg. Now, Inc. v. Stone*, No. 3:09CV80/MCR/MD, 2009 WL 4262877, at *6–8 (N.D. Fla. Nov. 24, 2009) (no preemption where other rights and facts implicated apart from FUTSA claim). Here, the FAA states that Elite was aware of and induced a breach of a contract—allegations distinct from its misappropriations claims.

Indeed, at this stage of the litigation, a determination of FUTSA preemption would be premature. In *Healthcare Appraisers, Inc. v. Healthcare FMV Advisors, LLC*, this Court found that the plaintiff's FUTSA claim did not preempt a claim for unjust enrichment because of the necessity of determining whether a trade secret existed (a matter of fact) during the discovery process. No. 10-80293-CIV, 2011 WL 4591960, at *10 (S.D. Fla. Sept. 30, 2011). "If it is determined at a later time that there are no trade secrets, then it would follow that the unjust enrichment claim would not be based on a misappropriation of trade secrets and should not be displaced. [Preemption] is more properly asserted at summary judgment." *Id.* At this early stage, and given the nature of the allegations in the pleadings, it is simply too early to tell whether and to what extent the FUTSA claims displace NetCE's claims for tortious interference. Accordingly, NetCE's claim for tortious interference is not preempted by FUTSA.

### D.     Misappropriation of Trade Secrets Claim Is Adequately Pled

Elite attacks NetCE's claims of misappropriation of trade secrets by arguing (a) NetCE did not allege trade secrets in sufficient detail and (b) NetCE's courses were not secret because

15

NetCE applied to copyright them in spring of 2015.  In so arguing, Elite mischaracterizes the explicit allegations of the FAA.  NetCE adequately pled—certainly more than the "threadbare recitals" of which it is accused—the required elements of trade secret misappropriation: that (1) NetCE possessed secret information; (2) took reasonable steps to protect its secrecy; (3) the secret was misappropriated (4) either by one who knew or had reason to know that the secret improperly obtained or by one who used improper means to obtain it; and (5) NetCE was damaged by the misappropriation.  Fla. Stat. § 688.001 *et seq*; *see VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1358 (S.D. Fla. 2012).  FAA at ¶¶ 126-38.

NetCE describes in detail Elite's complicity in the misappropriation—that Elite was not planning to develop courses in the same field as the Seven Courses, that Elite obtained information from Alpine while knowing it should not surreptitiously gather or use NetCE's trade secrets (part of the information protected by the NDA), that NetCE's trade secrets derived value from being secret (and, indeed, were part of the reason Alpine was interested in acquiring NetCE), that NetCE required employees to refrain from disseminating the trade secrets to non-essential personnel, and that NetCE required unaffiliated third parties to sign non-disclosure agreements before being made privy to the trade secrets.  FAA at ¶¶ 126-138.  This is far more than mere "conclusory allegations" or bare recitals of the required elements.  NetCE's FUTSA claim is more than adequately pled.

### 1.    NetCE's Trade Secrets Are Alleged With Requisite Particularity

Trade secrets must be alleged with reasonable particularity to permit the defendant to ascertain at least the boundaries within which the secret lies.  *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1285–88 (S.D. Fla. 2010) (trade secrets alleged with sufficient particularity).  Where trade secrets are not highly technical, less specificity is required.  *Compare New Lenox*

16

*Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908–09 (M.D. Fla. 2007) (highly technical trade secret pled with sufficient particularity where plaintiff described a proprietary airbag inflation system that uses a "microdetonator with a scored diaphragm to open a helium filled, high pressure vessel, thereby inflating the airbag with helium") *with Am. Registry, LLC v. Hanaw*, No. 2:13-CV-352-FTM-29CM, 2014 WL 12606501, at *1, 3–4 (M.D. Fla. July 16, 2014) (trade secrets adequately pled where plaintiff listed its "business plan; customer lists; system architecture; financial data; profits and profit margins; statistical history with its customers and vendors; computer programs and software concerning its entire business operations; research and development information related to its customers and products offered for sale; information about its strategic partners and relationships with them; and data and information on its employees, independent contractors, and third party vendors") *and Lighthouse List Co., LLC v. Cross Hatch Ventures Corp.*, No. 13-60524-CIV, 2013 WL 11977916, at *7–8 (S.D. Fla. Aug. 13, 2013) (trade secrets adequately pled where plaintiff listed its "business and corporate strategies, business plans, product strategies, product cost and pricing information, customer lists and information, rate and data cards, vendor lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, technical processes, manuals, and other information pertaining to the financial condition, [and] business affairs or business prospects").  A key consideration is whether the description given is adequate to permit the defendant to ascertain the boundaries of the claimed secret so as to prepare available defenses and to permit the court to determine the scope of relevant discovery.  *See DynCorp Int'l v. AAR Airlift Group, Inc.*, 664 Fed. Appx. 844, 848 (11th Cir. 2016).

The FAA identifies multiple trade secrets with the requisite particularity and supports its claim with factual—not conclusory—allegations.  *See* FAA at ¶¶ 43, 127.  NetCE lists market

17

strategies, industry reports, financial performance data (including history and projections), content for planned courses, industry reports regarding competitors, information about competitive landscape and consumer needs, and the process for curating courses.  *Id.*  NetCE has alleged that it derives economic power from this information remaining secret because the secret information gave NetCE an advantage over its competitors, particularly competitors who had not made inroads into the subject matter in which NetCE offered courses, including Elite.  FAA at ¶¶ 127, 129.  *See Lighthouse List*, 2013 WL 11977916, at *7-8 (finding other elements of misappropriation properly alleged).  Given the non-technical nature of the trade secrets, NetCE has described its trade secrets with this requisite particularity required.  *See Am. Registry*, 2014 WL 12606501, at *1, 3–4.  *See also Lighthouse List*, 2013 WL 11977916, at *7-8.

If this Court finds that the trade secrets are not alleged with sufficient particularity, NetCE should be given leave to amend the FAA with additional details.  *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1293 (S.D. Fla. 2001) (leave to amend granted to allege additional specificity).

## 2.    NetCE's Trade Secrets Were Not Publicly Available

NetCE treated its trade secrets—described in the complaint as NetCE's strategies for the marketplace; industry reports regarding competitors; the competitive landscape; consumer needs; NetCE's process for curating courses; NetCE's financial performance data, histories, and projections—as confidential.  FAA at ¶ 128.

Elite appears to argue that, because NetCE applied to receive copyrights for the Seven Courses in 2015 that NetCE is unable to bring a claim for trade secrets misappropriation.  This assertion is patently absurd.

First, NetCE has never alleged that the scientific facts contained in the courses are actionable trade secrets.  Second, NetCE applied for copyright registration in spring of 2015. The misappropriation occurred between 2012, when NetCE executed the NDA with Alpine, and February of 2015, when NetCE discovered Elite's publication of the Seven Courses.  To the extent Elite argues that any trade secrets contained in the Seven Courses would have been made public at the time NetCE published the courses itself or applied for copyright registration, Elite remains liable, at minimum, for disgorgement of profits to the extent the misappropriation has allowed it to bring a finished product to market sooner than it would otherwise have been able. *See Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008) (trade secrets plaintiff is entitled to damages reflected the head start defendant obtained from use of the contested information).  In other words, Elite is liable for its unearned head start.  Finally, NetCE's trade secrets—as alleged explicitly in the complaint—are far more than the content of the Seven Courses, which Elite conveniently ignores for the bulk of its argument.  FAA at ¶ 127.[12]

### F.      Elite's Argument on Statutory Damages and Attorney's Fees

NetCE has evaluated Elite's assertions with respect to statutory damages and does not oppose its argument.  NetCE maintains that its copyright claims for actual damages are well-pled and should be determined by an expert in discovery and at trial, but NetCE concedes that

---

[12] Elite also appears to argue that, because CME standards were publicly available, any of NetCE's business strategies or concepts developed internally as a *result* of those new standards are also public and therefore not protectable as trade secrets. This argument is, of course, preposterous.  Businesses routinely develop trade secrets (such as business strategies) as a result of public events, and such trade secrets are actionable in a court of law when misappropriated.

statutory damages and attorney's fees (only regarding allegations of copyright infringement) may be stricken from the FAA.

### G.      Leave to Amend Should Be Freely Granted

In the event this Court finds any of NetCE's arguments unavailing, NetCE respectfully requests leave to amend the FAA to correct deficiencies identified by the Court.   *See* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely granted when justice so required"); *Bruhl v. Price Waterhousecoopers Int'l*, No. 03-23044-CIV, 2007 WL 983263, at *10 (S.D. Fla. Mar. 27, 2007) ("Therefore, in accordance with the usual practice upon granting a motion to dismiss, leave to re-plead those counts that are dismissed herein without prejudice will be permitted.")

## III.      CONCLUSION

For the reasons argued above, NetCE respectfully requests this Court deny Elite's Motion to Dismiss (with the exception of NetCE's claim for statutory damages).  In the event this Court grants any portion of Elite's Motion to Dismiss, NetCE requests leave to amend the FAA.


Dated: May 22, 2017                                              Respectfully submitted,


                                                                HOLLAND & KNIGHT LLP


                                                                /s/ Philip E. Rothschild
                                                                Philip E. Rothschild
                                                                Florida Bar No. 0088536
                                                                Email: phil.rothschild@hklaw.com
                                                                HOLLAND & KNIGHT LLP
                                                                515 East Las Olas Blvd., 12th Floor
                                                                Fort Lauderdale, FL 33301
                                                                Telephone: (954)525-1000
                                                                Facsimile: (954)463-2030


                                                                /s/ John P. Kern
                                                                John P. Kern, Esq. (pro hac vice)
                                                                Email: john.kern@hklaw.com

20

Jessica E. Lanier, Esq. (pro hac vice)
Email: Jessica.Lanier@hklaw.com
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Telephone: (415)743-6918
Facsimile: (415)743-6910
Attorneys for CE RESOURCE, INC.
d/b/a
CME RESOURCE and NetCE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 22, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Philip E. Rothschild
Philip E. Rothschild

## SERVICE LIST

Richard S. Ross, Esq.
4801 S. University Drive
Suite 237
Fort Lauderdale, FL 33328
Email:  prodp@ix.netcom.com
*Attorneys for Plaintiff Dr. Jassin Jouria*
*[VIA E-MAIL]*

Peter A. Chiabotti, Esq.
Akerman LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Email: peter.chiabotti@akerman.com
*Attorneys for Elite Continuing Education, Inc.*
*[VIA E-MAIL]*

J. Mark Wilson, Esq.
Kathryn G. Cole, Esq.
Moore & Van Allen PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Email:  markwilson@mvalaw.com; katecole@mvalaw.com
*Attorneys for Elite Continuing Education, Inc.*
*[VIA E-MAIL]*

21