UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 0:15-cv-61165-WPD

DR. JASSIN JOURIA

          Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

          Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

          Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,

          Plaintiff/Counter-Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

          Defendant/Third Party Plaintiff,

v.

Elite Continuing Education, Inc. and Alpine
Management Services III, LLC,

          Third Party Defendant.

_____

**DECLARATION OF JESSICA LANIER IN SUPPORT OF CE RESOURCE, INC. D/B/A
CME RESOURCE AND NETCE'S PARTIAL APPEAL OF
MAGISTRATE JUDGE SNOW'S OMNIBUS ORDER (DKT. 145)**

I, Jessica E. Lanier, declare as follows:

1.       I am an attorney with the law firm of Holland & Knight LLP, and I am duly licensed to practice law in the State of California.  I am one of the attorneys representing defendant CE Resource, Inc. d/b/a CME Resource and NetCE (hereafter, "NetCE").  I, along with my colleague John Kern, am admitted pro hac vice in the United States District Court for the Southern District of Florida in the above-captioned case. Through this litigation, we have been accompanied by local counsel Phil Rothschild.

2.       I have personal knowledge of the circumstances described below and, if so called, can testify under oath regarding these events.

3.       Attached hereto as **Exhibit A** is a true and correct copy of  excerpts of the deposition of Dr. Jassin Jouria, taken on September 28, 2017.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 29th day of November, 2017.                    By: _____

                                                                                    Jessica E. Lanier

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:15-CV-61165-WPD

DR. JASSIN JOURIA,

Plaintiff,

v.

CE RESOURCE, INC. d/b/a
CME RESOURCE and NetCE,

Defendant.
_____/

CE RESOURCE, INC. d/b/a
CME RESOURCE and NetCE,

Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,
Plaintiff/Counter-Defendant.
_____/

CE RESOURCE, INC. d/b/a
CME RESOURCE and NetCE,

Defendant/Third Party Plaintiff,

v.

Elite Continuing Education, Inc.
and Alpine Management Services, III,
LLC,

Third Party Defendants.
_____/

VIDEOTAPE DEPOSITION OF
DR. JASSIN JOURIA
Pages 1 through 297
Confidential, Attorneys' Eyes Only

Thursday, September 28, 2017
9:49 a.m.
515 East Las Olas Blvd., 12th Floor
Fort Lauderdale, Florida
Stenographically Reported By:
Debra L. Stark, Notary Public State of Florida

2

```
 1    APPEARANCES:
 2     ON BEHALF OF THE PLAINTIFF: DR. JASSIN JOURIA
 3        RICHARD S. ROSS, ESQ.
          4801 S. University Drive
 4        Suite 237
          Ft. Lauderdale, Florida  33328
 5        PRODP@IX.NETCOM.COM
 6     ON BEHALF OF THE DEFENDANT/
       COUNTER-PLAINTIFF/THIRD PARTY DEFENDANT CE
 7     RESOURCE, INC. d/b/a CEM RESOURCE and NetCE:
 8        HOLLAND & KNIGHT, LLP
          50 California Street
 9        Suite 2800
          San Francisco, CA  94111
10        415-743-6918
          JOHN.KERN@HKLAW.COM
11        BY: JOHN P. KERN, ESQ.
                  and
12           JESSICA E. LANIER, ESQ.
13     ON BEHALF OF THE THIRD PARTY DEFENDANT:
       ELITE CONTINUING EDUCATION, INC.
14
          MOORE & VAN ALLEN, PLLC
15        100 North Tyron Street
          Suite 4700
16        Charlotte, NC  28202
          MARKWILSON@MVALAW.COM
17        BY: J. MARK WILSON, ESQ.
                  and
18           KATHRYN G. COLE, ESQ.
19
20    ALSO PRESENT:
21        Jason Cooper, Videographer
22
23
24
25
```

57

1    revenue they made; how did it work?

2        A.    Sure.    From what I remember, it's based

3    on word count and every company has a different

4    formula for how they award credit hours.    So I

5    don't remember Elite's exactly, but I do know that

6    it is related to word counts.

7        Q.    And when Elite paid you, do you remember

8    the form in which that pay took, direct deposit,

9    did they send you a check, did you --

10       A.    If I remember correct, I think it was a

11   check most of the time.    I don't know if it was

12   every time, but I believe most of the time it

13   was a live check.

14       Q.    And to the extent that they paid you by

15   check, what type of -- what type of record would

16   you keep that would indicate that?    Would it be

17   -- do you keep, for instance, you make copies of

18   your checks or do you have a system like many of

19   us do where your bank scans and shows it to you on

20   your statement?

21            MR. ROSS:    Objection, foundation.

22            THE WITNESS:    I'll be honest, I have poor

23   recordkeeping.

24   BY MR. KERN:

25       Q.    Okay.    I mean, so you may not have a

1   record of --

2       A.   I don't have a record.

3       Q.   Did you look for and produce, in this

4   case, all records of payments from Elite to you?

5       A.   Yes.   That was one of the requests.   I

6   remember looking back in my online bank documents,

7   which only go back so far, and I wasn't able to

8   -- I don't think I was able to come up with many,

9   if any.

10      Q.   But you did look for that?

11      A.   I did.

12      Q.   Can I show you Exhibit 10, which is your

13  response to NetCE's interrogatories?

14          (Thereupon, Deposition Exhibit No. 10,

15      Plaintiff's Resonse to NetCE's Interrogatories,

16      were marked for identification.)

17  BY MR. KERN:

18      Q.   Take a close look at this one.   We are

19  going to grind through this one a bit and cause

20  everyone a heartache.

21          MR. ROSS:   Maybe we will take five minutes

22      then.

23          MR. KERN:   Is this a good time?

24          MR. ROSS:   It's going to take five minutes

25      to look at the document.

1     THE TECHNICIAN:  We're going to go off the

2     record.  The time is 10:46.

3          We are off.

4          (A recess was had in the proceedings

5     after which the following proceedings were

6     had:)

7          THE TECHNICIAN:  We are back on the video

8     record.  The time is 11:02.

9  BY MR. KERN:

10     Q.   Dr. Jouria, can you look at Exhibit 10,

11  please --

12     A.   Yes, sir.

13     Q.   -- and tell me what is Exhibit 10?

14     A.   This is my response to your client's set

15  of interrogatories.

16     Q.   And in looking at this more closely I

17  probably won't have a tremendous amount of

18  questions, but I do have a few.

19     A.   Yes, sir.

20     Q.   First, did you assist in the preparation

21  of these responses?

22     A.   Yes.

23     Q.   And then if I ask you some questions

24  about these, I want to make it clear, two things

25  clear.  One is that I don't want you to reveal

124

1   the contract came before or after a submission

2   of a proposal.  I don't remember having official

3   proposals done.

4        I think a lot of it was set up either

5   in direct e-mail communication or even as a

6   project on Elance.  So it was a little

7   different.

8        Q.   Okay.  And so Elance is, this may seem

9   obvious to you, but Elance is not affiliated with

10  Elite; correct?

11       A.   Not that I know of, no.

12       Q.   You are not affiliated with Elance other

13  than you used a service?  You're not an owner or

14  something?

15       A.   Correct.

16       Q.   If you know, how does Elance benefit or

17  how does Elance make money?

18       A.   From what I understand, they kind of

19  serve as a middle ground between client and

20  contractor.  Anytime a project is set through

21  there, they can hold the money in an escrow

22  account, and there's -- a percentage of that

23  project assesses a fee that goes to them.

24       Q.   Do you know if in all the work you

25  performed for Elite, if at any point Elance was

125

1    getting points on the package or, you know, a

2    percentage?

3           MS. COLE:   Object to the form.

4    BY MR. KERN:

5       Q.   Haven't you seen the wire?   It's --

6       A.   I don't know.

7       Q.   Did they have an economic stake, as far

8    as you know, in your relationship with Elite?

9       A.   Not that I know of.

10       Q.   How did Elite pay you?

11       A.   I think it was live check.   I think it

12    was live checks, if I remember correctly.

13       Q.   And what was the methodology, was it by

14    the course, by the number of hours; the CEU

15    requirements met; how did it work?

16       A.   They had a pay format based on word

17    count and per credit hour.   I think they used

18    ANCC guidelines, but the exact numbers I don't

19    recall.

20       Q.   Okay.   And are you currently working for

21    Elite?

22       A.   No.

23       Q.   When's the last time, to the best of your

24    ability to remember, that you were paid by Elite?

25       A.   I don't remember.   I would have to go

126

1  back to old bank statements.  It's been several

2  years.

3      Q.   So is it -- well, so, in 2016, did you

4  receive any money from Elite?

5      A.   No.

6      Q.   2015?

7      A.   I don't think so.

8      Q.   I think that gives us a basic range.

9      A.   A range, yes.

10     Q.   That's fine for now.

11          Do you recall how many articles or

12 courses in total you drafted for Elite?

13     A.   I don't remember.

14     Q.   Putting aside for a second, I should have

15 asked this a little bit better.  Putting aside

16 whether what Elite did with it, whether they

17 published or moth-balled it --

18     A.   How many --

19     Q.   -- how many do you recall working on and

20 submitting to them?

21     A.   Would it suffice to say several?

22     Q.   Well, I mean, if that's the best you can

23 estimate.

24     A.   I don't have a number.  I know it's not

25 20 and I know it's not five.

1    Q.   Okay.  So more than five and it's fewer

2    than 20?

3    A.   That's what I'm saying.

4    Q.   I'll take it.  Do you recall the subject

5    matter of the courses you provided for Elite, and

6    I know that can be kind of technical so I will

7    just jot down to the best of your ability to

8    recall?

9    A.   There were several.  Going back, I

10   think emerging viruses was maybe the last one I

11   did.  Then going back chronologically, basics of

12   pathophysiology.

13        Give me a second, I'll remember them.

14        It gets hairy because there are several

15   articles in that two to three-year period.  I

16   don't remember the name specifically.  I know

17   that -- I know the depression versus dementia in

18   elderly.

19        I'm trying to remember the rest of

20   them.

21        Yeah, I don't remember the rest of

22   them.

23   Q.   And, do you know who owns Elite?

24   A.   No.

25   Q.   Do you have any ownership interest in

1    e-mail down on October 10th, at 3:32 P.M. is from

2    you and you say, "I have written courses for Iris

3    Medical Ed, NetCE, CE for Less, nurse.com, and

4    several others."

5         Do you see that?

6    A.   Yes, yes.

7    Q.   That was the first time that you made

8    Elite aware that had you written for NetCE; isn't

9    that right?

10   A.   That's correct.

11        MR. ROSS:  What page are you on there?

12        THE WITNESS:  The second to last page.

13        MR. ROSS:  Thank you.

14   BY MS. COLE:

15   Q.   If you go down a little bit a that same

16   page to an e-mail from you on October 10th at

17   2:40 P.M., the second paragraph said, "I have

18   sold portions, some small, some significant, of

19   all of the above old courses to other providers";

20   correct?

21   A.   Yes.

22   Q.   Is that because you have sold courses to

23   other providers on the same topics?

24   A.   Is that because -- is what because?

25   Q.   Well --

1   A.   Why do I say that?

2   **Q.   Sure.**

3   A.   Yeah, just to be totally transparent,

4   that the courses, the same -- similar topics

5   were sold and I wanted to make her aware of

6   that.

7   **Q.   And would it be accurate to say that**

8   **different courses, to the extent there are**

9   **different courses written on the same topic,**

10  **there will be some overlap in the scientific**

11  **content?**

12  A.   There should be tons of overlap, if it's

13  scientific.

14  **Q.   Why is that?**

15  A.   Because it's evidence-based research.

16  There shouldn't be two ways about it.  It

17  shouldn't be ambiguous.  That's just the nature

18  of the medical field.  It's not a creative story,

19  it's research.

20       These are medical education courses, I

21  take my professional very seriously, and so

22  while I am not really teaching to my peers as

23  doctors, the nurses that work directly in the

24  field and I feel to provide the best information

25  and knowledge possible, they should only be using

1    peer-reviewed evidence-based medical research,

2    absolutely.  Yes.

3        Q.   And all your articles are based on

4    scientific facts?

5        A.   I aim to do that, absolutely.  Yeah.

6        Q.   In fact, all the content of your articles

7    is based on scientific facts?

8        A.   Extensive references, I think anybody

9    who looks at it can see I use several hundred

10   references to compile the information.

11       Q.   Isn't it true that you have citations to

12   medical literature resources for nearly every

13   sentence or every paragraph?

14       A.   On some topics, almost -- yes.

15            Absolutely.  Sure.

16       Q.   In all of the courses that you have

17   written for CE providers?

18       A.   Yes.  That's a fair overall assessment.

19   Yes, I would have to agree.

20       Q.   That would be true also for the courses

21   you have written for NetCE?

22       A.   For all of them.

23       Q.   NetCE and Elite?

24       A.   And Elite and any other medical provider

25   I have sold courses to, yeah.

1    shared content of various courses.

2        A.   Uh-huh.

3        Q.   Just to be clear for the record, that is

4    not based on any kind of technical comparison,

5    that would be where a software was employed; this

6    was essentially you doing a very close -- close

7    analysis yourself?

8        A.   This was a self-analysis.

9             MR. KERN:   Okay.   Thanks very much.

10   That's my final question.   Thank you.

11            MS. COLE:   Nothing else from me, either.

12            THE TECHNICIAN:   We are going off the

13   record.   The time is -- excuse me.

14            MR. ROSS:   We will read.

15            THE TECHNICIAN:   Going off the record, the

16   time 6:02.   Excuse me.

17            MR. ROSS:   Thank you.

18            MR. KERN:   This is the key, I am in charge

19   of the official ones, right?   I am going to

20   redact -- we are done.

21            MS. COLE:   We want an e-tran.

22

23            (Thereupon, a discussion was had off the

24   record after which the following proceedings

25   were had:)

1

2        (Reading and signing of the deposition

3    was not waived by the witness and all of the

4    parties.)

5

6        (Thereupon, the above proceedings were

7    concluded at 6:08 p.m.)

8

9            ----------

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   October 1, 2017

2

3

4   DR. JASSIN JOURIA
    c/o RICHARD ROSS
5   4801 S. University Drive
    Suite 237
6   Ft. Lauderdale, Florida  33328

7   In Re: DR. JASSIN JOURIA

8   Deposition/Statement, taken on
    September 28, 2017

9

10

11  The transcript of the above-referenced
    proceeding has been prepared and is ready to
12  be reviewed at the below office of US Legal
    Support.

13

14  we respectfully request that the witness
    complete their review within 30 days or date
15  of contact.

16

17  Sincerely,

18

19  Debra L. Stark, Court Reporter
    U.S. Legal Support, Inc.
20  100 Northeast Third Avenue
    Fort Lauderdale, Florida  33301
21  (954) 463-2933

22

23

24

25

294

ERRATA SHEET
DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS PAGE
IN RE: DR. JASSIN JOURIA

DR. JASSIN JOURIA


|Page  |Line  |Change                              |Reason

_____

_____

_____

_____

_____

_____

_____


            Under penalties of perjury, I
declare that I have read the foregoing
document and that the facts stated in it are
true.



_____

DR. JASSIN JOURIA

295

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

296

1          CERTIFICATE OF OATH

2

3    STATE OF  FLORIDA:

4    COUNTY OF BROWARD:

5

6          I, DEBRA L. STARK, Court Reporter and

7    Notary Public, in and for the State of Florida

8    at  Large, do hereby certify that DR. JASSIN JOURIA

9    personally appeared before me on

10   September 28, 2017, and was duly sworn.

11          Signed and sealed heretofore on this

12   day of October 1, 2017.

13

14

15

16

17

18

19

20                       ------------------------------
                         DEBRA L. STARK, Court Reporter
21                       and Notary Public, State of
                         Florida at Large
22

23

24   MY COMMISSION EXPIRES:
     March 28, 2017
25

297

CERTIFICATE

STATE OF  FLORIDA:

COUNTY OF  BROWARD:

        I, DEBRA L. STARK, Registered
Professional Reporter, certify that I was
authorized to and did stenographically report
the deposition of DR. JASSIN JOURIA; duly
sworn by me; pages 1 through 297; and that
the transcript      is a true record of my
stenographic notes.

        I further certify that I not a relative,
employee, attorney, or counsel of any of the
parties, nor am I a relative or employee of
any of the parties' attorneys or counsel connected
with the action, nor am I financially interested
in the action.

        Signed and sealed on this date of,
October 1, 2017.


                _____
                DEBRA L. STARK, Court Reporter
                and NOTARY PUBLIC, State of Florida
                at Large

MY COMMISSION EXPIRES:
MARCH 28, 2021