**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 0:15-61165-WPD**

| | |
|---|---|
| DR. JASSIN JOURIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME | ) |
| RESOURCE and NetCE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME | ) |
| RESOURCE and NetCE, | ) |
| | ) |
| Defendant/Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DR. JASSIN JOURIA, | ) |
| | ) |
| Plaintiff/Counter-Defendant. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME | ) |
| RESOURCE and NetCE, | ) |
| | ) |
| Defendant/Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Elite Continuing Education, Inc. and Alpine | ) |
| Management Services III, LLC, | ) |
| | ) |
| Third-Party Defendants. | ) |

**THIRD-PARTY DEFENDANT ELITE PROFESSIONAL EDUCATION, LLC'S
MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a) and S.D. Fla. Local Rule 56.1, Third-Party Defendant Elite Professional Education, LLC ("Elite") respectfully moves this Court for summary judgment on Claim One: Copyright Infringement, Claim Six: Misappropriation of Trade Secrets under Florida's Uniform Trade Secrets Act (Civil Code §§ 688.001 *et seq*.), and CE Resource, Inc. d/b/a CME Resource and NetCE's ("NetCE") claim for lost profit damages, as set forth in NetCE's Third-Party Complaint against Elite (DE 36), for the reasons as set forth in the supporting memorandum of law which follows.

## MEMORANDUM OF LAW

### I.     INTRODUCTION

Elite is caught in the crossfire of a breach of contract dispute between NetCE and Dr. Jassin Jouria.[1] NetCE contends that Dr. Jouria, who drafted certain continuing education articles ("Jouria Articles") for NetCE pursuant to certain Freelance Writer Agreements ("FWAs"), breached the FWAs by submitting similar articles to NetCE's competitors, including, but not limited to, Elite. (Statement of Undisputed Facts ("SUF") ¶¶ 7, 13, 26, 28, 55, 58-59; DE 36 ¶¶ 47, 67).   In contracting with Elite, Dr. Jouria represented and warranted that "[a]ll materials created by [Dr. Jouria] during the course of engagement by [Elite], do not, and will not infringe the trademark, copyright, patent or other rights of any third-party; and [Dr. Jouria] is the sole and exclusive author and owner of each Curriculum." (SUF ¶ 27). As has been evident throughout this litigation, Elite is stuck in the middle. Rather than limit its legal claims to Dr. Jouria, however, NetCE perceived an opportunity to attack Elite, who it viewed as a "chief competitor" (SUF ¶ 3), in a no-holds-barred litigation.   Upset that Elite had published continuing education courses authored by Dr. Jouria ("Elite Courses"), and without actually reviewing all of the courses before filing suit or ensuring that its claims were supported by the facts and the law, NetCE named Elite as a third-party defendant in this lawsuit, and brought three claims for relief against Elite: copyright infringement, tortious interference with contractual relations, and misappropriation of trade secrets. (SUF ¶¶ 28-30, 62, 64-67). In its kitchen-sink approach to pleading, NetCE was guilty of

---

[1] Dr. Jouria is a medical doctor, medical researcher, and writer.  Dr. Jouria promotes his research and writing services by selling and/or offering for sale continuing education articles to entities engaged in the business of providing continuing education services.  (SUF ¶¶ 1, 2).

overpleading, a reality that NetCE acknowledged by the close of discovery when it agreed to dismiss its copyright infringement claims for two of the seven articles in which NetCE claims copyright rights,[2] and also agreed to dismiss its tortious interference claim due to a lack of evidence. (SUF ¶¶ 8-10, 68).

Despite Elite's pleas that NetCE also dismiss its trade secrets claim, NetCE has refused, even though there is absolutely no evidence to support this claim. NetCE's theory is that, because NetCE shared some purported trade secret information with Alpine Management Services III ("Alpine") as part of a potential acquisition, and because Alpine had a relationship with Elite's parent company, Alpine must have shared NetCE's information with Elite, including information about Dr. Jouria and his contracts with NetCE. (SUF ¶¶ 69-72; DE 36 ¶¶ 40-43, 46, 130-132; DE 41-1 ¶¶ 17-19).[3] To this day, however, NetCE still has no evidence that Elite ever improperly acquired, disclosed, or used any information from NetCE. Indeed, the evidence in this case actually shows the opposite. Alpine has denied ever disclosing any such information to Elite. (SUF ¶ 76). NetCE has admitted that it does not have any evidence to refute Alpine's sworn denials, and further has no evidence that anyone else shared any information provided by NetCE with Elite. (SUF ¶¶ 73-75, 77). This utter dearth of evidence mandates summary judgment on the trade secrets claim in favor of Elite.

Elite is also entitled to summary judgment on NetCE's claim of copyright infringement because the evidence shows that whatever copyright rights might exist in the articles drafted by Dr. Jouria were not transferred to NetCE. NetCE's FWAs are standard, template agreements prepared by NetCE with identical terms, except for the name of the author, deadlines, and subject-matter areas. (SUF ¶ 11). These agreements all state that "Writer hereby understands and agrees

---

[2] After years of litigation in two different courts, and after opposing Elite's motion for judgment on the pleadings directed to this exact issue, NetCE finally admitted that two of the Elite Courses did not violate any copyright rights in the Jouria Articles, and dismissed those copyright claims against Elite. (SUF ¶¶ 52, 54). NetCE should never had made claims against these courses in the first instance, given that NetCE admittedly never even saw these courses before filing suit. (SUF ¶¶ 61, 63). Notably, NetCE is still pursuing infringement claims for these same two articles against Dr. Jouria. As between NetCE and Elite, five courses remain in dispute ("Accused Courses"). (SUF ¶ 53).

[3] In granting in part and denying in part Elite's Motion to Dismiss, the Court deemed NetCE's pleaded theory as adequate to survive dismissal (DE 88); however, NetCE has no evidence to support this claim and can no longer rely on its pleadings.

that all Articles <u>approved for publication</u> by CME under this Agreement shall belong exclusively to CME."  (SUF ¶ 12).  NetCE has admitted that the articles at issue were never approved for publication.  (SUF ¶¶ 17-19).  As a result, the FWAs did not confer on NetCE the copyright rights to the articles Dr. Jouria drafted pursuant to the plain language of the intellectual property ownership term of the FWAs.

Finally, NetCE has asserted that it is entitled to an outlandish award of $35 million dollars in lost revenue (SUF ¶ 51)—and millions upon millions of dollars in lost profits—even though Elite's accused sales resulted in <u>gross revenues</u> (not profits) of approximately $86,000, and even though NetCE has admitted that (i) NetCE cannot point to a single sale that it did not make because it decided not to offer any of the articles; (ii) NetCE does not know whether its revenues were impacted in any way by NetCE's decision not to continue developing the articles at issue in this case; (iii) it would require speculation to determine lost sales of the articles at issue given that the articles were not published by NetCE; (iv) it would require speculation to determine whether any of the articles would have increased or decreased NetCE's revenue if the articles were included in any catalogs; and (v) NetCE did not publish any partial catalogs, no articles were missing from any catalogs, and all catalogs offered by NetCE between 2013-2017 had the full assortment of courses for its customers to review and take.  (SUF ¶¶ 40-45).  Pursuant to copyright law, NetCE may be entitled to recover any profits of Elite that are attributable to any proven infringement; however, NetCE is not entitled to recover any supposed "lost profits" of its own, given this overwhelming, and admitted, speculation and lack of evidence showing any actual damages suffered by NetCE.[4]

The lack of evidence to support NetCE's claims, coupled with the evidence that directly refutes NetCE's allegations, shows that summary judgment is warranted.

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Summary judgment is warranted "if the pleadings, depositions, answers to

---

[4] Although the Copyright Act provides for an award of statutory damages and attorney's fees under certain circumstances, NetCE is not entitled to either of these forms of relief.  After Elite was forced to file several motions to dismiss directed to the issue, NetCE finally admitted that it is not entitled to an award of statutory damages or attorney's fees for its copyright claim.  (DE 66 pp. 21-22).

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal citation omitted). Where the non-moving party bears the burden at trial, summary judgment is proper if the non-moving party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

In response to a properly supported motion for summary judgment, the opposing party cannot survive summary judgment by resting on the allegations of its pleadings or by relying on speculation, subjective belief or conjecture. *Id.* at 323-324. Instead, "the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Lil' Joe Wein Music, Inc. v. Jackson*, 245 Fed. Appx. 873, 876 (11th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The opposing party must "'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 593-594 (11th Cir. 1995) (quoting *Celotex*, 477 U.S. at 324).

There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50. The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *Id.* at 252.

**III.   ARGUMENT**

    **A.   There is No Evidence that Elite Acquired, Disclosed, or Used Any of NetCE's Alleged Trade Secrets.**

In Claim Six of the Third-Party Complaint, NetCE alleges trade secret misappropriation against Elite. (DE 36 p. 36). "Under the FUTSA, the elements of a misappropriation claim include: '(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret was misappropriated, either by one who knew or had reason to know

that the secret was improperly obtained or by one who used improper means to obtain it.'" *XTec,*
*Inc. v. Hembree Consulting Servs.*, 183 F. Supp. 3d 1245, 1253 (S.D. Fla. 2016) (quoting *Axiom*
*Worldwide, Inc. v. HTRD Grp. Hong Kong Ltd.*, No. 8:11-CV-1468-T-33TBM, 2013 U.S. Dist.
LEXIS 82539, 2013 WL 2712787, at \*4 (M.D. Fla. June 12, 2013).

In its Third-Party Complaint, NetCE alleges that it disclosed various purported trade secrets
to Alpine pursuant to a mutual non-disclosure agreement (DE 36 ¶¶ 40-45), and further alleges
that these so-called trade secrets must have been passed by Alpine to Elite. (*Id.* at ¶¶ 127-134).
The essence of NetCE's allegations pertaining to Elite are that "Alpine disclosed this information
to, at least, Elite, and Elite, even knowing that the information was confidential and proprietary
and being shared impermissibly, exploited it, and even claimed some of the information as its own
work product." (DE 36 ¶ 130). NetCE further alleged that "Elite obtained the proprietary and
confidential information described above . . . from Alpine and not from generally available
information or from Elite's own independent efforts." (*Id.* at ¶ 132).

During discovery, Elite asked NetCE to "[i]dentify and describe in detail all trade secrets
[NetCE] allege[s] were misappropriated by Elite." (SUF ¶ 71). NetCE responded as follows:

> During the course of 2012 negotiations between NetCE and Alpine, and pursuant
> to the explicit terms of the Non-Disclosure Agreement in effect between the two
> parties, NetCE provided Alpine with its market strategies, industry reports
> regarding competitors and market need, information regarding the competitive
> landscape and consumer need, internal financial performance data (histories and
> projections), NetCE's process for curating courses, and proprietary information
> concerning the type of content NetCE furnished, developed, and was planning to
> develop (including without limitation the schedule for the upcoming catalog
> mailing year). NetCE provided Alpine with a list of courses currently in
> development, including their status, number of hours of credit, probable target
> audience(s), and faculty. NetCE further shared its accreditation schedule, listing
> all current accreditations and approvals. NetCE also shared its return-on-
> investment statistics ("ROI"), areas of future business development beyond
> (pharmacology credits, outreach to allied health professionals, etc.), and direct
> mailing information.
>
> NetCE made Alpine aware of its existing faculty (in other words, faculty who had
> already authored courses that NetCE published and whose names were therefore
> publicly available) and authors with whom NetCE had executed, or was close to
> executing, Freelance Writer Agreements for the first time. Dr. Jouria was one such
> author. During these negotiations, NetCE shared drafts of certain of Dr. Jouria's
> courses…with Alpine. NetCE also shared with Alpine information related to
> courses in various stages of development (in other words, pre-publication): its
> future products.

(*Id.*).  It is NetCE's burden to show that whatever trade secrets it claims to have given Alpine were then acquired, used, or otherwise misappropriated by Elite.

Section § 688.002(2), Fla. Stat., defines "Misappropriation" as follows:

(a) <u>Acquisition</u> of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(b) <u>Disclosure or use</u> of a trade secret of another without express or implied consent by a person who:
  1. Used improper means to acquire knowledge of the trade secret; or
  2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
      a. Derived from or through a person who had utilized improper means to acquire it;
      b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
      c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
  3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

§ 688.002(2), Fla. Stat. (emphasis added).  "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  § 688.002(1), Fla. Stat.

NetCE dismissed its claims against Alpine on April 21, 2017, pursuant to a settlement reached by NetCE and Alpine.  (DE 64).  However, Elite subsequently sought discovery from Alpine, through a subpoena for the production of documents and Rule 30(b)(6) deposition testimony.[5]  Alpine's designated witness, Mr. Dan Cremons (SUF ¶ 6), repeatedly confirmed under

---

[5] As part of Alpine's document production, Alpine produced an email dated November 6, 2012, sent from Erin Meinyer, Executive Director of NetCE, to Dan Cremons, at the time a senior associate of Alpine, containing information about NetCE and attaching various financial documents.  (SUF ¶ 72).  Elite later took the deposition of Alpine pursuant to Fed. R. Civ. P. 30(b)(6).  During that deposition, Elite designated Ms. Meinyer's email, along with its attachments and other documents, as Exhibit 73.  (SUF ¶ 78).  NetCE's Rule 30(b)(6) witness testified that Ms. Meinyer's November 6, 2012 email and its attached financial documents, all contained in Exhibit 73, were the only documents received by Alpine from NetCE containing any non-public, confidential, or proprietary information.  (*Id.*).  Mr. Cremons testified that much of the information contained in Ms. Meinyer's email was publicly available (SUF ¶ 79), and therefore not confidential or subject to protection as trade secrets.  Mr. Cremons also testified that NetCE never even disclosed to Alpine several of the categories of trade secrets alleged by NetCE in this case,

oath, without equivocation, that Alpine did not share any of NetCE's alleged trade secrets or confidential information with Elite:

> Q.  Looking at the information that's included in Exhibit 73 and, in particular, the pages Alpine 1 to Alpine 61, which comprise the e-mail that we just went through in great detail, and the financial information that was mentioned in that e-mail, did Alpine share any of that information with Elite?
> A.  No.
>
> *          *          *
>
> Q.  Did Alpine share any of the information, whether it's included in Exhibit 73 or was discussed over the telephone, that NetCE disclosed to Alpine to anyone else, including Elite?
> A.· Information, capital I, no.  There's information that's publicly available about the industry.· That would have been a natural part of conversations that we would have with other parties, but at no point did we share any information, capital I, with Elite or any other party.
> Q.· Do you recall sharing any information, lower case I, that might have been shared with Alpine by NetCE with Elite?
> A.· No.
> Q.· Do you believe that occurred in any form or fashion?
> A.· I have no reason to believe that that occurred in any form or fashion.
>
> *          *          *
>
> Q.  Alpine did not improperly disclose any proprietary and confidential information from NetCE to any additional parties, correct?
> A.· That's correct.
> Q.··Indeed Alpine didn't disclose any information at all, correct?
> A.· That's correct.

(SUF ¶ 76) (emphasis added).

Mr. Cremons was also asked about NetCE's specific allegations of trade secret misappropriation set forth in Paragraphs 39-46, 77-79, and 127-133 of the Third-Party Complaint (SUF ¶ 72), and testified that NetCE's allegations are false:

> Q. ·I'm going to read you some of the -- I'm going to read you a few more statements and ask you if you believe it's true or not, as the representative from Alpine here, testifying today.
> A. ·Okay.
> Q.· The courses NetCE owns, parenthesis, the seven courses at issue in this lawsuit, end parenthesis, were wrongly provided to Elite by Alpine.· True or false?

---

including NetCE's process for curating courses, course content or materials, scheduling for the upcoming catalog mailing year, courses currently in development, accreditation information, return on investment statistics, information on pharmacology credits and outreach to allied health professionals, existing or soon-to-be faculty (including Dr. Jouria), or freelance writer agreements. (SUF ¶ 76).

A.· False.

Q.· Elite learned of Dr. Jouria's identity from Alpine.  True or false?

A.··False.

Q.· Is it more likely than not that Elite obtained information about NetCE's planned areas of course development, parenthesis, and indeed course drafts belonging to NetCE, end parenthesis, from Alpine?· True or false?

A.· False.

*       *       *

Q.· In paragraph 78, second sentence states:· Upon information and believe, Alpine and Elite impermissibly used the confidential and proprietary knowledge Alpine obtained from NetCE under the NDA and then wrongfully passed this information along to Elite to give Elite a competitive advantage in the marketplace.  Is that true or false?

A. ·That is false.

Q. ·Alpine did not impermissibly use the confidential and proprietary knowledge obtained from NetCE, any proprietary and confidential information obtained from NetCE, correct?

A. ·That's correct.

Q.· And Alpine did not pass any information obtained from NetCE along to Elite, correct?

A.· That's correct.

*       *       *

Q.· Turn to paragraph 130 in Exhibit 42.· It's on page 37.· Excuse me.· Paragraph 130 of Exhibit 42 --

A. ·Uh-huh.

Q.· ·-- on page 37, the first few sentences talk, again, about confidential and proprietary information from NetCE.  And then near the end, there's a sentence that says: Nevertheless, Alpine disclosed this information to at least Elite, and Elite, even knowing that the information was confidential and proprietary, and being shared impermissibly, exploited it.  Do you see that?

A.··I do see that, yes.

Q.··Is that true or false?

A.· That is false.

*       *       *

Q.· ·Paragraph 132 states:· Elite obtained the proprietary and confidential information described above, parenthesis, including without limitation NetCE's plans for future courses and NetCE's development work for courses to reach the market in a short time, end parenthesis, from Alpine.  True or false?

A.· False.

Q.··Paragraph 133:· By their actions, Alpine and Elite have usurped NetCE's competitive advantage and stolen NetCE's market strategy, riding on NetCE's coattails in order to beat it to market with a series of products.  True or false?

A.· ·False.

*       *       *

Q.· ·The last sentence of paragraph 133 says:· But for·Alpine's knowledge of NetCE's strategy, Elite would have not had the notion to publish, for they certainly

did not develop, the seven courses at issue.  But for Alpine's knowledge of NetCE's strategy, Elite would not have had the notion to publish the seven courses at issue. Do you agree with that?

A.· Alpine didn't have any knowledge of specific courses.

*        *        *

Q.· We went through, in some detail, the factual allegations under claim six that were pled by NetCE in support of that claim for misappropriation of trade secrets. This is your chance, as a representative from Alpine, to tell us, as well as our judge and our jury, whatever you would like to tell them about these allegations here in this complaint.  Is there anything that you haven't shared with us yet today that you would like to share now?

A. ·There's nothing I haven't shared that I want to share except for underscoring the fact that **Alpine has shared no information with Elite.**

(SUF ¶ 76) (emphasis added).

At the subsequent Rule 30(b)(6) deposition of NetCE, NetCE's Rule 30(b)(6) designee,

Ms. Sarah Campbell (SUF ¶ 4), confirmed that NetCE had no reason to dispute Alpine's testimony:

Q.· And you said earlier that you read Dan Cremons's deposition testimony.  He was the deponent from Alpine; is that correct?

A.· I did.

Q.· So you've read that Mr. Cremons from Alpine denied all of the allegations related to Alpine allegedly sharing information with Elite from NetCE; correct?

A.· I did read that.

Q.· I asked him repeatedly if those allegations were true or false, and he looked right in the camera and said they were false.· You read that?

A.· I did.

Q.· Do you have any reason to believe that Mr. Cremons was not telling the truth?

A.· I have no personal reason to believe that, but there --

Q.· Please.

A.· Again, there were some -- the changes that Elite made after the discussions with Dan and Mike gives us some indication that they were influenced by that information, but I can't say for sure if it was Dan Cremons or Mike Duran or McKissock or Alpine.

Q.· But what you have seen, which is the testimony from Alpine through Mr. Cremons, shows that your allegations are false; isn't that correct?

A.· **He testified that he had not shared any information and that Alpine had not, and I don't have a reason to believe that is incorrect.**

Q.· The allegations in this -- in this case as they pertain to NetCE's trade secret claim all relate to Alpine; is that correct?

A.· In this case?· Yes.

*        *        *

Q. So as we sit here today, isn't it true that you have no evidence to support the allegations in the trade tecret claim NetCE has brought against Elite as it pertains to Alpine sharing information with Elite?

A.· We have no hard evidence of Alpine -- specifically Alpine sharing information with Elite.

(SUF ¶¶ 75, 77) (emphasis added).[6]

NetCE's claim is based on nothing more than its belief that Elite's conduct is "highly suspicious," that it is "more likely than not" that Elite obtained NetCE's trade secrets, and that there are "a lot of coincidences" arising from Elite's publication of courses drafted by Dr. Jouria after NetCE had discussions with Alpine.  (SUF ¶ 80).[7]  Discovery is closed, and there is no evidence that Elite ever <u>acquired</u> any of NetCE's alleged trade secrets—by "improper means" or

---

[6] During her deposition, Ms. Campbell claimed that as part of NetCE's discussions with Alpine regarding a potential acquisition, NetCE also provided certain of its trade secrets to Mike Duran of McKissock, LP.  In the Alpine NDA, Mr. Duran of McKissock is listed as a Representative of Alpine, authorized to receive confidential information from NetCE under the NDA.  (DE 36-3 pp. 2, 4).  Leaving aside the fact that NetCE's allegation of misappropriation is that Alpine (not McKissock or anyone else) disclosed NetCE's trade secrets to Elite (DE 36  ¶¶ 127-132), Ms. Campbell testified that NetCE has no evidence to support any claim that McKissock or Mr. Duran shared any of NetCE's information with Elite:

> Q.· And as we sit here today, you have no evidence to support any allegation -- and it hasn't been made, but any additional allegation that Mr. Duran or anyone from McKissock shared any information provided by NetCE with ·Elite; correct?
> A.· We have no evidence from McKissock or Mike Duran either way, as far as I know.
> Q.· So I'll ask it again.  As we sit here today, you have no evidence that Mr. Duran or anyone at McKissock shared any information provided by NetCE with Elite; correct?
> *       *       *
> A.  We do not have evidence of him sharing or not sharing information.

(SUF ¶ 75).

[7] Contrary to NetCE's unsupported suspicions, NetCE acknowledged that the evidence shows that Dr. Jouria approached Elite, not the other way around, when he responded to a job posting Elite posted on a freelance writer website.  (SUF ¶¶ 22, 23, 81).  NetCE also acknowledged that Dr. Jouria suggested the accused courses to Elite, without any indication that he drafted similar articles for NetCE (SUF ¶¶ 24, 25, 82), undermining any claim that Elite somehow acquired course topics from Alpine or was trying to "rid[e] on NetCE's coattails into [sic] order to beat it to market with a series of products."  (DE 36 ¶ 133).  While NetCE claims that "[b]ut for Alpine's knowledge of NetCE's strategy, Elite would have not had the notion to publish (for they certainly did not develop) the seven courses at issue," (*id.*) NetCE's testimony confirms that is simply not true.  NetCE's admissions are consistent with Dr. Jouria's testimony on these issues.  (SUF ¶¶ 5, 81, 82).

otherwise—or that Elite ever <u>disclosed</u> or <u>used</u> any of NetCE's trade secrets (because it did not come into possession of them in the first place), a reality that NetCE has admitted:

> Q.· Isn't it true, as we sit here today, you have no evidence to support the allegations that any information disclosed by NetCE was shared with Elite?
> A.· Not yet.[8]

(SUF ¶ 73).

Elite has satisfied its burden of showing that there is no genuine dispute as to any material fact concerning NetCE's claim of trade secret misappropriation, and Elite is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; *see also Axiom Worldwide, Inc. v. HTRD Group H.K., Ltd.*, 2013 U.S. Dist. LEXIS 82539, at *15-18 (granting summary judgment in defendant's favor on trade secret misappropriation claim, where plaintiff did not "suppl[y] any evidence indicating that [defendant] obtained physical possession of the [alleged trade secrets]…by any 'improper means'….")  Notwithstanding its speculative, conclusory allegations of misappropriation by Elite contained in its pleadings, NetCE has failed to offer any evidence that Elite ever acquired, disclosed, or used any of NetCE's trade secrets sufficient to support its claim.  There is no genuine issue of material fact as to NetCE's Claim Six, and Elite respectfully requests that the Court enter summary judgment in favor of Elite.

### B.   There is No Genuine Issue of Material Fact Regarding NetCE's Lack of Ownership of Copyright Rights in the NetCE Articles.

"To establish copyright infringement, two elements must be proven: ownership of a valid copyright, and copying of constituent elements of the work that are original."  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (citing *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991); *Bellsouth Advertising & Publishing Corp. v. Donnelley Info. Publishing, Inc.*, 999 F.2d 1436, 1440 (11th Cir.1993) (en banc)).

A certificate of registration with the Register of Copyrights is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410 (c).  Thus, the existence of a copyright registration certificate shifts the burden to the alleged infringer to overcome the presumption of the validity of the claimant's copyright rights in the work at issue. *See Bateman, Inc. v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996).  While the registration

---

[8] NetCE's Rule 30(b)(6) deposition was conducted on November 14, 2017, the day before the discovery deadline.  (SUF ¶ 4; DE 76 p. 2).

certificates at issue in this case list NetCE as the owner of the Jouria Articles (DE 36-1 pp. 2-8), the evidence shows that NetCE is not the owner of any copyright rights in the Jouria Articles.

Pursuant to the Copyright Act, copyright rights "initially vest in the author or authors of the work." 17 U.S.C. § 201(a). NetCE contends that Dr. Jouria prepared the Jouria Articles. (DE36 ¶¶ 34-35). Thus, whatever copyright rights exist in the Jouria Articles initially vested with Dr. Jouria. However, 17 U.S.C. § 201(d)(1) provides that "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law...."[9] *See also Superchips, Inc. v. Street & Performance Elecs., Inc.*, 2001 U.S. Dist. LEXIS 5108, *19 (M.D. Fla. Apr. 24, 2001) ("To establish an ownership interest in the copyright, the plaintiff must show personal authorship, a transfer of rights, or some other relationship between the author and the plaintiff evidencing ownership.").

NetCE claims ownership of the Jouria Articles pursuant to the terms of the FWAs executed by Dr. Jouria. (SUF ¶ 14). The copyright ownership terms of each FWA are identical. (SUF ¶ 11). Paragraph 9 of each FWA states the following:

> 9. **Ownership and Assignment of Intellectual Property:** <u>Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME.</u> Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If an to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use

---

[9] Importantly, 17 U.S.C. § 204(a) provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed...."

in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every publication. Writer acknowledges and understands that at no time shall Writer have any rights to block publication of an Article provided that CME removes Writer's name from said Article.

(DE 36-2 ¶ 9) (emphasis added).

Paragraph 9 of the FWAs establishes that NetCE only owns Articles written by Dr. Jouria that are "approved for publication by [NetCE]." This is unambiguously stated in the first sentence of Paragraph 9 of each FWA. The remaining sentences in this paragraph set forth the mechanics of how ownership of articles approved for publication will be assigned to NetCE, either by the work-made-for-hire doctrine (sentence two) or through a simple written assignment (sentence three); however, the requirement remains that only articles "approved for publication" shall belong to NetCE, as stated in sentence one.

NetCE did not publish any of the Jouria Articles. (SUF ¶ 15). Indeed, the evidence in this case shows that none of the NetCE Articles were ever "approved for publication." In Elite's Second Set of Requests for Production, Elite requested that NetCE produce "all Documents related to whether the [Jouria Articles (also referred to by NetCE as the "Seven Courses")] were approved for publication by NetCE." (SUF ¶ 17) In response, NetCE stated the following:

NetCE objects as this Request is ambiguous as to the phrase "approved for publication." **NetCE never had the opportunity to approve the publication of the Seven Courses originally at issue in this lawsuit**—NetCE discovered Elite's infringing publications **before NetCE was able to approve and publish these courses**. To the extent Elite requests documents discussing the decision whether to publish NetCE Courses, NetCE shall produce non-privileged documents responsive to this Request that are in its possession, custody, and control and to the extent it has not already produced such documents.

(SUF ¶ 19). Similarly, in its Interrogatory No. 15 to NetCE, Elite asked the following: "Please state whether the [Jouria Articles] were approved for publication by NetCE, and if so, when they were approved for publication, how they were approved for publication, and who at NetCE approved them for publication." (SUF ¶ 18). In its verified response to Interrogatory No. 15, NetCE stated the following:

Dr. Jouria and NetCE entered into ten (10) Freelance Writer Agreements ("FWAs"), each of which governed a course or single topic. Pursuant to these ten (10) FWAs, Dr. Jouria submitted ten (10) courses to NetCE, and NetCE remitted

payment to Dr. Jouria for each of the ten (10) courses. (Dr. Jouria proposed an additional course, called "Heart Disease in Women." NetCE did not approve this course topic or execute a FWA regarding this topic because it already offered a similar course.)

NetCE finalized and published three of the courses developed pursuant to FWAs ("Multiple Sclerosis: A Comprehensive Review," "Pressure Ulcers: Pathogenesis and Management," and "COPD: An Overview of Pathophysiology and Treatment").

NetCE approved subject matter proposals for the Seven Courses (now five) at issue in this lawsuit with respect to NetCE's case against Elite, accepted manuscripts from Dr. Jouria on each topic, and remitted payment to Dr. Jouria for each manuscript on each topic. Dr. Jouria accepted each payment and never returned the payments or monies in the amount of such payments to NetCE (and he testified as much at his deposition). NetCE was in the process of editing, fact-checking, and curating these Seven Courses when it discovered Elite had infringed its copyrights and had published these courses without NetCE's permission. NetCE never explicitly rejected these courses or told Dr. Jouria it was not going to publish them. In fact, NetCE assured Dr. Jouria it was still editing and reviewing the courses he submitted to NetCE.

(SUF ¶ 19). While NetCE states that it "approved subject matter proposals" for the NetCE Articles, NetCE does not state that any of the NetCE Articles themselves were ever "approved for publication." (SUF ¶¶ 18, 20). Of course, this is consistent with NetCE's objection and response to Elite's Request for Production No. 32, directed to the same issue.

Finally, consistent with NetCE's written discovery responses, NetCE's Rule 30(b)(6) designee testified as follows:

Q.· We can take them one at a time if we have to.  I just want to make sure that I'm clear on the development of these various courses.  None of them have been fully edited; is that correct?
A.· None of them were ready for publication.· That's correct.
Q.· None of them had been approved for publication by NetCE or anyone else; correct?
A.· Well, they were accepted for publication when we received the drafts from Dr. Jouria, but none of them were ready to be printed and presented to the public. That's correct.

(SUF ¶ 16).

There is no genuine issue of material fact as to whether any of the Jouria Articles were ever "approved for publication."  NetCE admitted that it maintains documents for articles not at issue in this case showing that such other articles have been approved for publication by a NetCE

division planner; however, there are no documents showing that any of the Jouria Articles at issue in this case were approved for publication.  (SUF ¶ 21).  Both the absence of evidence of any such approvals along with NetCE's own discovery responses confirm that the Jouria Articles were never approved for publication.  As such, NetCE does not own the Jouria Articles under the express terms of paragraph 9 of the FWAs.  Given that ownership of valid copyright rights is a required element for a claim of copyright infringement, Elite requests that the Court grant summary judgment in Elite's favor on NetCE's Claim One.

C.     **NetCE Has Failed to Present Evidence of Lost Profits.**

In the event either of NetCE's claims for trade secret misappropriation or copyright infringement survive summary judgment, Elite requests that NetCE be precluded from seeking actual damages in the form of lost profits.  NetCE has alleged that it suffered "$35 million dollars of lost revenue attributable entirely to Elite's infringement for the first year of circulation of each course alone."  (SUF ¶ 50).[10]  NetCE has based its lost profits claim on the notion that Elite's publication of the Accused Courses deprived NetCE of the opportunity to publish the Jouria Articles and earn revenue on those materials.  (DE ¶¶ 69, 70, 133).  In its written discovery responses, NetCE contends as follows:

> A featured NetCE continuing education course yields approximately $5 million dollars in income in its first year of circulation (including updates and revision) from sales as an individual course and bundled with other courses. . . .  NetCE believes—and there is no available fact to contradict this belief—that each of the [Accused Courses] would have earned as much, if not more, in its lifetime of circulation.

(SUF ¶ 50).[11]  NetCE's "belief" is not supported by any actual evidence.  NetCE stopped development of the Jouria Articles after discovering the Elite Courses in February 2015.  (SUF ¶¶

---

[10] NetCE contends that each Article would have sold exactly the same as NetCE's "Multiple Sclerosis" article published "in booklets for nurses in various states."  (*Id.*).  NetCE "believes" that since it earned $4.7 million in revenue for catalogs containing that article, it would have earned the same revenue for each of the Articles at issue in this case, and is therefore entitled to an award of lost profits based on $35 million in alleged lost revenues.  (*Id.*)  NetCE takes this position even though it admitted that it does not know whether any of the Jouria Articles would have done better or worse than the Multiple Sclerosis article.  (SUF ¶ 49).

[11] Elite's interrogatory requests asked NetCE to explain its damages position for all of the claims asserted against Elite in this case.  NetCE's response is directed to its claim for alleged copyright infringement, and does not provide any calculation of damages for alleged trade secret misappropriation.  (*See id.*).

31, 32).  NetCE has merely assumed that, but for Elite's publication of the Accused Courses, NetCE would have developed, finalized, approved for publication, and published all five of the Articles.  NetCE has also assumed that each of those articles would have been published in the exact same catalogs for the exact same states, and would have realized the exact same sales, as other articles written by Dr. Jouria and published by NetCE.  As provided below, NetCE's Rule 30(b)(6) witness confirmed that NetCE's position on lost profits is based on nothing more than unsupported speculation.

The Copyright Act provides that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her **as a result of the infringement**, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."  17 U.S.C. §504(b) (emphasis added).  To prove actual damages, a copyright claimant must "demonstrate a 'causal connection' between the defendant's infringement and an injury to the market value of the plaintiff's copyrighted work at the time of infringement."  *Montgomery v. Noga*, 168 F.3d 1282, 1294 (11th Cir. 1999) (citing *Key West Hand Print Fabrics, Inc. v. Serbin, Inc.*, 269 F. Supp. 605, 613 (S.D. Fla. 1966)).  This injury is usually "measured by the revenue that the plaintiff lost as a result of the infringement."  *Montgomery*, 168 F.3d at 1295 n. 19; *see also Key West*, 269 F. Supp. at 612 ("The threshold question is, of course, whether the infringements caused damage.")  The leading copyright treatise has explained:

> The basic rule for computing injury to the market value of a copyrighted work arising from infringement is to inquire what revenue would have accrued to plaintiff but for the infringement.  Plaintiff bears the burden "of establishing with reasonable probability the existence of a causal connection between defendant's infringement and loss of anticipated revenue." . . . [P]laintiff's damages may be said to equal the profits that plaintiff might have accrued but for defendant's infringement. . . . **In the absence of convincing evidence as to the volume of sales that plaintiff would have obtained but for infringement, the measure of lost profits under the Copyright Act may be rejected as too speculative.**

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.02 (2017) (citing *Montgomery*, 168 F.3d at 1294, 1295) (emphasis added).

Summary judgment is properly entered on a claim for actual damages resulting from alleged copyright infringement where there is no evidence that the plaintiff "suffered any actual damages attributable to the infringement."  *Pronman v. Styles*, 645 Fed. Appx. 870, 873 (11th Cir. 2016); *see also Fey v. Panacea Mgmt. Grp. LLC*, 2017 U.S. Dist. LEXIS 75637, at *24 (N.D. Ga.

May 18, 2017) (granting motion for partial summary judgment on damages where the plaintiff failed to offer any supporting evidence of actual damages); *Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1379 (N.D. Ga. 2010) (same); *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1277 (M.D. Fla. 2008) (same).   Summary judgment is likewise proper when the plaintiff's "attempt to show a causal link is too speculative." *Latimer v. Roaring Toyz, Inc.*, 2010 U.S. Dist. LEXIS 98702, at *14 (M.D. Fla. Sept. 21, 2010).[12] This, of course, flows from the legal standards applicable at the summary judgment stage, pursuant to which speculation does not constitute actual evidence.   *Gadsby v. Am. Golf Corp. of Cal.*, 557 Fed. Appx. 837, 840 (11th Cir. 2014) ("We have said repeatedly that speculation about a fact or result is insufficient to survive summary judgment."); *Cordell Consultants, Inc. Money Purchase Plan v. Abbott*, 2015 U.S. Dist. LEXIS 188285, at *11-12 (S.D. Fla. Nov. 8, 2015) ("To create an issue for trial, an inference must rest on actual evidence and be a reasonable conclusion from that actual evidence.   An inference cannot be built upon another inference, nor can it be built upon speculation.").

First, there is no evidence to support the assumption that NetCE would have published any of the Articles.   Ms. Campbell testified that there is "no guarantee" that any article written by a professional writer (such as Dr. Jouria) will be featured in a catalog.   (SUF ¶ 36, 37).   She further testified that none of the Articles, with the exception of GERD, was ever scheduled to be published in any catalogs from NetCE.   (SUF ¶¶ 33, 38).   And while GERD was originally scheduled to be featured in one catalog, for nurses in Ohio in 2015, the use of GERD in that catalog was ultimately not possible due to length (a reason unrelated to any alleged conduct by Elite), and was replaced with another article by NetCE.   (SUF ¶¶ 34, 35).   In view of the foregoing, it is unreasonable to simply assume that all of the Articles would have been published (*and* would have been published as many times and in as many catalogs and for as many states as the Multiple Sclerosis article or any other article), such that NetCE may reasonably claim to have lost any profits it otherwise would have earned.

---

[12] The requirement that a claim for lost profits be supported by actual evidence rather than mere speculation applies not only to NetCE's claim for damages arising from copyright infringement, but also to its claim for lost profits based on trade secret misappropriation. *See AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1337 (S.D. Fla. 2006) (collecting cases).

Even if it could be assumed that NetCE would have published the Articles, there is no evidence that NetCE would have earned additional profits beyond what it otherwise earned on sales during the relevant timeframe.  (SUF ¶ 47).  While claiming $35 million in lost profits resulting from its decision not to publish the Articles, NetCE has testified that it actually "[does not] know" whether its revenues were impacted in any way by not having published the Articles. (SUF ¶ 41).  This is due to the fact that each NetCE catalog published in the relevant timeframe included the necessary number of courses for a catalog.  (SUF ¶ 40).  Indeed, NetCE confirmed that it would have to speculate to determine whether the inclusion of one of the Articles in those catalogs (in place of a different article) would have <u>increased</u> <u>or</u> <u>decreased</u> the resulting revenue:

> Q.  Were NetCE's revenues impacted, in any way, by the decision by NetCE not to continue developing the five courses at issue in this case?
> A.  **I don't know.**
> Q.  Can you point to a single sale that NetCE didn't make because it decided not to offer any of these five courses?
> A.  **I can't point to one that was lost or one that was gained. They weren't released –as we discussed, they weren't released; to do that would require speculation.**
>
>              *        *        *
>
> Q.  Did NetCE offer any catalogs in 2013 through 2017 that were missing courses?
> A.· I'm not sure what you mean by "missing courses."
> Q.· That didn't include the number of courses that·that catalog called for?
> A.· We did not publish any partial catalogs.
> Q.· So every catalog from 2013 to the present published by NetCE had the full assortment of courses in it for NetCE's customers to review and take; is that correct?
> A.· We did not publish any catalogs with a course missing.
> Q.  Can you point to any revenue that NetCE lost because of the decision by NetCE not to publish the five courses at issue in this case?
> A.· In terms of lost revenue?
> Q.· Yes, ma'am.
> A.· We can only calculate that based on the example of already-released courses.
> Q.· But you just told me that all of your catalogs had their full allotment of courses in them; right?
> A.· All of the catalogs that we published between 2013 and 2017 included the number of courses that we found necessary.
> Q.· And so are you able to point to any revenue that NetCE lost because one of these five courses wasn't in one of those catalogs?
> A.· **That would require me to speculate about the value of those courses in relation to other courses, and I'm not able to do that.**
>
>              *        *        *
>
> Q.  The five courses at issue between NetCE and Elite, you can't predict with any certainty if those courses were included in any catalogs, whether their presence there might have actually caused a decrease in revenue for NetCE; correct?

A. **I can't speculate as to whether it would have increased or decreased value**.

(SUF ¶¶ 40-45) (emphasis added).

NetCE testified that it does not know whether its revenues were impacted in any way by Elite's alleged conduct. There is no evidence, only admitted speculation, about what lost profits, if any, NetCE might have realized at some unknown point in the future if it had continued its work on the Jouria Articles and sold them to its customers in some undetermined number of catalogs. (SUF ¶¶ 39, 46, 48). According to NetCE's own testimony, it is possible that NetCE actually saw an <u>increase</u> in profits resulting from its decision <u>not</u> to publish the Jouria Articles—that possibility is as equally likely as the notion that NetCE lost profits in this case. As admitted by NetCE, there is no evidence supporting the position that NetCE lost any profits at all. NetCE admitted that it does not know whether its revenues were impacted in any way—either positively or negatively—because of its decision not to continue developing the Jouria Articles. NetCE's witness designated on the topics of sales, revenue, and harm/damages allegedly caused by Elite was not able to testify about any losses, for to do so would have required her to "speculate" about whether NetCE made more or less money by not publishing the Jouria Articles. NetCE should not be allowed to ask the trier of fact to award lost profits when NetCE cannot point to a single lost dollar, and when NetCE might have actually made more profits, not less, in this situation. In view of these admissions from NetCE, and the lack of admissible evidence supporting NetCE's claim that it lost any profits, Elite respectfully requests that the Court enter summary judgment on NetCE's claim for lost profits.

IV.   **CONCLUSION**

For the reasons stated herein, Elite respectfully requests that the Court enter summary judgment in Elite's favor on NetCE's Claim One: Copyright Infringement, Claim Six: Misappropriation of Trade Secrets, and NetCE's claim to lost profit damages, as set forth in NetCE's Third-Party Complaint against Elite.

Dated: December 15, 2017

Respectfully submitted,

/s/ Peter A. Chiabotti
Peter A. Chiabotti
Florida Bar No. 0602671
AKERMAN LLP
peter.chiabotti@akerman.com
777 South Flagler Driver
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313

J. Mark Wilson (*pro hac vice*)
markwilson@mvalaw.com
Kathryn G. Cole (*pro hac vice*)
katecole@mvalaw.com
MOORE & VAN ALLEN PLLCS
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 331-1159

*Attorneys for Third Party Defendant*
*Elite Professional Education, LLC*

## Certificate of Service

I hereby certify that on December 15, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/Peter A. Chiabotti
Peter A. Chiabotti

## Service List

Richard S. Ross, Esq.
Atrium Centre
4801 S. University Drive
Suite 237
Fort Lauderdale, FL 33328
Email: prodp@ix.netcom.com
*Attorneys for Plaintiff Dr. Jassin Jouria*

Philip E. Rothchild, Esq.
Holland & Knight LLP
515 East Las Olas Blvd., 12th Floor
Fort Lauderdale, FL 33301
Email: phil.rothschild@hklaw.com
*Attorneys for CE Resource, Inc. d/b/a*
*CME Resource and NetCE*

John P. Kern, Esq.
Jessica E. Lanier, Esq.
Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Email: john.kern@hklaw.com
       jessica.lanier@hklaw.com
*Attorneys for CE Resource, Inc. d/b/a*
*CME Resource and NetCE*

Peter A. Chiabotti
Florida Bar No. 0602671
Akerman LLP
peter.chiabotti@akerman.com
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313
*Attorney for Third Party Defendant*
*Elite Professional Education, LLC*

J. Mark Wilson (*pro hac vice*)
markwilson@mvalaw.com
Kathryn G. Cole (*pro hac vice*)
katecole@mvalaw.com
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
*Attorneys for Third Party Defendant*
*Elite Professional Education, LLC*