**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 0:15-61165-WPD**

| | |
|---|---|
| DR. JASSIN JOURIA, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME | ) |
| RESOURCE and NetCE, | ) |
| | ) |
|      Defendant. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME | ) |
| RESOURCE and NetCE, | ) |
| | ) |
|      Defendant/Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DR. JASSIN JOURIA, | ) |
| | ) |
|      Plaintiff/Counter-Defendant. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME | ) |
| RESOURCE and NetCE, | ) |
| | ) |
|      Defendant/Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Elite Continuing Education, Inc. and Alpine | ) |
| Management Services III, LLC, | ) |
| | ) |
|      Third-Party Defendants. | ) |

**ELITE'S STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

43634818;1

Third-Party Defendant Elite Professional Education, LLC ("Elite") hereby files this Statement of Undisputed Facts in Support of Motion for Summary Judgment, pursuant to Local Rule 56.1. The deposition transcripts, discovery responses, and other evidence cited herein have been filed as exhibits to Elite's Notice of Filing Exhibits in Support of Motion for Summary Judgment.

1.    Plaintiff Dr. Jassin Jouria ("Dr. Jouria") is a medical doctor, medical researcher, and writer. (DE 36 ¶ 29; DE 93 ¶ 11; DE 95 ¶ 11).

2.    Dr. Jouria promotes his research and writing services by selling and/or offering for sale continuing education articles to entities engaged in the business of providing continuing education services. (DE 93 ¶ 14; DE 95 ¶ 14).

3.    Defendant/Third Party Plaintiff CE Resource, Inc. d/b/a CME Resource and NetCE ("NetCE") and Third Party Defendant Elite Professional Education, LLC ("Elite") are competitors in the field of continuing professional educational services and materials. (DE 36 ¶ 101). NetCE considers Elite to be a chief competitor. (DE 36 ¶ 73).

4.    NetCE was deposed on November 14, 2017. Ms. Sarah Campbell was designated by NetCE to testify on all twenty topics included in Elite's notice of deposition. (Declaration of J. Mark Wilson ("Wilson") ¶¶ 1, 8; NetCE 6:24-7:18; NetCE Ex. 74).

5.    Dr. Jouria was deposed on September 28, 2017. (Wilson ¶ 2).

6.    Alpine Management Services III, LLC ("Alpine") was deposed on October 12, 2017. (Wilson ¶ 3).

7.    Dr. Jouria and NetCE entered into seven (7) Freelance Writer Agreements ("FWAs") at issue in this case, under which Dr. Jouria submitted draft continuing medical education articles to NetCE. (DE 36 ¶¶ 34, 47).

8.    NetCE admitted that it has no evidence that Elite knew about the terms of the FWAs between NetCE and Dr. Jouria. (Wilson ¶ 1; NetCE 39:13-21).

9.    Dr. Jouria admitted that he declined to provide copies of his FWAs to Elite. (Wilson ¶ 1; Jouria 232:8-24, 275:20-23). NetCE admitted that it has no evidence to dispute this testimony. (Wilson ¶ 1; NetCE 177:22-178:4).

10.    On October 15, 2013, Dr. Jouria told Elite that "I looked through a contract for NetCE, and I did not sign exclusive rights." (Wilson ¶ 5; Jouria Ex. 46).

11.    NetCE's FWAs are standard, template agreements with identical terms, except for the name of the author, deadlines, and subject-matter areas.  (DE 36 ¶ 22).

12.    Paragraph 9 of each FWA between NetCE and Dr. Jouria states the following:

**Ownership and Assignment of Intellectual Property:** Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every publication. Writer acknowledges and understands that at no time shall Writer have any rights to block publication of an Article provided that CME removes Writer's name from said Article.

(DE 36; DE 36-2).

13.    Pursuant to his FWAs with NetCE, Dr. Jouria submitted to NetCE draft articles entitled "The Lymphatic and Immune Systems"; "Traumatic Brain Injury"; "Nonantibiotic Antimicrobial Pharmacology"; "Cardiovascular Pharmacology"; "Gastroesophageal Reflux Disease"; "Cancer and Chemotherapy"; and "Depression vs. Dementia in the Elderly" (collectively, the "Jouria Articles").  (DE 36 ¶ 47).

14.    NetCE claims to be the owner of the copyrights for the Jouria Articles pursuant to the terms of the FWAs, the work for hire doctrine, and the registrations issued by the United States Copyright Office.  (DE 36 ¶ 84).

15.    NetCE did not publish any of the Jouria Articles.  (DE 36 ¶ 69; Wilson ¶ 1; NetCE 82:4-7).

16.    None of the Jouria Articles are ready for publication.  (Wilson ¶ 1; NetCE 75:22-76:9, 82:2-20).

17.    In Elite's Second Set of Requests for Production, Elite requested that NetCE produce "all Documents related to whether the [Jouria Articles (also referred to by NetCE as the "Seven Courses")] were approved for publication by NetCE."  (Wilson ¶ 10; NetCE's Responses to Production Requests, Request No. 32).

18.    In its Interrogatory No. 15 to NetCE, Elite asked the following: "Please state whether the [Jouria Articles] were approved for publication by NetCE, and if so, when they were approved for publication, how they were approved for publication, and who at NetCE approved them for publication."  While NetCE stated in response that it "approved subject matter proposals" for the NetCE Articles, NetCE did not state that any of the NetCE Articles themselves were ever "approved for publication."  (Wilson ¶ 9; NetCE's Responses to Interrogatories, Interrogatory No. 15).

19.    NetCE did not approve for publication any of the Jouria Articles.  (Wilson ¶ 10; NetCE's Responses to Production Requests, Request No. 32 ("NetCE never had the opportunity to approve the publication of the Seven Courses originally at issue in this lawsuit—NetCE discovered Elite's infringing publications before NetCE was able to approve and publish these courses.")).

20.    NetCE admitted that manuscripts from authors, and not proposals from authors, are approved for publication.  (Wilson ¶ 1; NetCE 125:19-21).

21.    NetCE admitted that it maintains documents for articles not at issue in this case showing that such other articles have been approved for publication by a NetCE division planner; however, there are no documents showing that any of the Jouria Articles at issue in this case were approved for publication.  (Wilson ¶¶ 1, 14-17; NetCE 79:12-80:24, 125:22-126:1; NETCEB29016; NETCEB29021; NETCEB30628; NETCEB31355).

22.    On January 24, 2013, Elite posted a request for course writers in the field of nursing through the elance.com website.  The posting was entitled "Writer for Nursing Continuing Education Courses" and stated "Established continuing education company is looking for qualified and experienced course writers in the field of nursing."  Elite's course writing requirements stated,

among other requirements, that courses should not use copyrighted material or pictures.  (DE 93 ¶ 15; DE 93-1; DE 95 ¶ 15).

23.    On January 26, 2013, Dr. Jouria responded to Elite's job posting on the <u>elance.com</u> website, stating "Dear Client: I am a medical doctor and professional freelance medical writer.  I have extensive academic experience in allied health education and clinical medicine.  I have published several CE courses for various CE providers in the field of nursing, medicine, EMT, and others. . . .  I only use current, peer-reviewed medical journals and texts as references. . . .  Please do not hesitate to contact me directly should you have any questions.  Thank you, Jassin M. Jouria, Jr., M.D."  (DE 93 ¶ 16; DE 93-2; DE 95 ¶ 16).

24.    Between January 29, 2013 and February 3, 2013, a representative from Elite and Dr. Jouria discussed Dr. Jouria's potential engagement as a freelance writer for Elite.  In this initial correspondence, Dr. Jouria stated, "I write CE articles for several CE providers.  All of my work is original and of the highest quality."  In response to a request from Elite's representative asking for Dr. Jouria to suggest some course subjects he was willing to write for Elite, Dr. Jouria responded, "A few topics I am interested in writing are the following: Women and Heart Disease, Diabetes Pharmacotherapy, Tuberculosis, Pathophysiology Basics: A review, Multiple Sclerosis, Cancer, Clinical Cardiovascular Pharmacology, The Lymphatic System, Anatomy and Physiology: Review Series, Antimicrobial Pharmacology, Decubitus Ulcers, COPD, Preventable Advese Events."  (DE 93 ¶ 17; DE 93-3; DE 95 ¶ 17).

25.    Dr. Jouria suggested the topics for the Elite Courses without any indication that he submitted courses on the same or similar topics to NetCE.  (DE 93-3 p. 4; Wilson ¶¶ 1, 4; NetCE 171:13-172:22; Jouria Ex. 45).

26.    On November 8, 2013, Dr. Jouria entered into an Independent Contractor Agreement ("ICA") and Assignment of Rights in Curriculum with Elite to render his research and writing services in order to prepare the curriculum for certain of Elite's continuing education courses.  (DE 93 ¶ 18; DE 93-4; DE 95 ¶ 18).

27.    As set forth in Section 8 of the ICA, Dr. Jouria represented and warranted that "[a]ll materials created by [Dr. Jouria] during the course of engagement by [Elite], do not, and will not infringe the trademark, copyright, patent or other rights of any third-party; and [Dr. Jouria] is the sole and exclusive author and owner of each Curriculum."  (DE 93 ¶ 21; DE 93-4; DE 95 ¶ 21).

28.    Dr. Jouria submitted to Elite the following continuing education courses: Cardiovascular Diseases: The Leading Cause of Death in Women, The Basics of Pathophysiology, Traumatic Brain Injury, Depression vs. Dementia in the Elderly Part I, Depression vs. Dementia in the Elderly Part II, Cancer and Chemotherapy: A Comprehensive Review Part I, Cancer and Chemotherapy: A Comprehensive Review Part II, Non-Antibiotic Antimicrobial Pharmacology: A Comprehensive Review Part I, Non-Antibiotic Antimicrobial Pharmacology: A Review—Part II, and Gastroesophageal Reflux Disease (GERD): A Comprehensive Review ("Elite Courses"). (DE 93 ¶ 19).

29.    On October 21, 2016, NetCE filed a Third Party Complaint against Elite for copyright infringement, tortious interference with contractual relations, and misappropriation of trade secrets under Florida's Uniform Trade Secrets Act.  (DE 36).

30.    NetCE accused Elite of infringing NetCE's copyrights in the Jouria Articles by publishing the Elite Courses.  (DE 36 ¶ 86).

31.    NetCE discovered the Elite Courses in February 2015.  (DE 36 ¶ 67; Wilson ¶ 1; NetCE 106:14-18).

32.    NetCE stopped development of the Jouria Articles after discovering the Elite Courses.  (Wilson ¶ 1; NetCE 129:8-12, 191:19-24).

33.    None of the Jouria Articles, with the exception of GERD, was ever scheduled to be published in any catalogs from NetCE.  (Wilson ¶ 1; NetCE 128:24-129:12, 133:16-134:2).

34.    Only one of the Jouria Articles, GERD, was scheduled to be featured in a catalog, for nurses in Ohio in 2015, but the use of GERD in the Ohio nurses 2015 catalog was not possible due to length.  (Wilson ¶¶ 1, 13; NetCE 128:24-129:12, 132:1-9; NETCEB3149).

35.    The GERD article was replaced with another article in the Ohio nurses 2015 catalog. (Wilson ¶¶ 1, 12; NetCE 132:11-20; NETCEB3148).

36.    There is no guarantee that any article written by a professional writer will be featured in a catalog.  (Wilson ¶ 1; NetCE 138:9-12).

37.    There is no guarantee that any of the Jouria Articles would have been in any particular catalog.  (Wilson ¶ 1; NetCE 164:23-25).

38.    NetCE admitted that no determination was made as to how many times the Jouria Articles might have been featured in any catalogs or over what period of time.  (Wilson ¶ 1; NetCE 165:7-20).

39.   NetCE admitted that total revenues for an article are increased if the article is featured in more catalogs and would be less if featured in fewer catalogs.  (Wilson ¶ 1; NetCE 165:1-6).

40.   NetCE admitted that it did not publish any partial catalogs, no articles were missing from any catalogs, and all catalogs offered by NetCE between 2013-2017 had the full assortment of courses for its customers to review and take.  (Wilson ¶ 1; NetCE 151:23-152:8).

41.   NetCE admitted that it does not know whether its revenues were impacted in any way by NetCE's decision not to continue developing the Articles at issue in this case.  (Wilson ¶ 1; NetCE 143:23-144:1, 259:21-260:1).

42.   NetCE admitted that it cannot point to a single sale that NetCE did not make because it decided not to offer any of the Jouria Articles.  (Wilson ¶ 1; NetCE 144:2-8).

43.   NetCE admitted that it would require speculation to determine lost sales of the Jouria Articles given that the Jouria Articles were not published.  (Wilson ¶ 1; NetCE 143:23-144:8).

44.   NetCE admitted that it would require speculation to determine the value of any of the Jouria Articles in relation to any other courses.  (Wilson ¶ 1; NetCE 152:12-153:4, 18-24, 157:13-23).

45.   NetCE admitted that it would require speculation to determine whether any of the Articles would have increased or decreased NetCE's revenue if the Jouria Articles were included in any catalogs.  (Wilson ¶ 1; NetCE 154:7-13, 162:11-23).

46.   NetCE admitted that there are many factors that affect how its catalogs perform, and it is impossible to predict all of the factors that come into play.  (Wilson ¶ 1; NetCE 137:17-140:19, 154:14-19, 163:24-164:6).

47.   NetCE realized revenues for catalog sales between 2013-2017.  (Wilson ¶ 1; NetCE 155:1-4, 161:25-162:9).

48.   NetCE admitted that it does not know whether any of the Jouria Articles would have done better or worse than NetCE's Multiple Sclerosis course.  (Wilson ¶ 1; NetCE 137:4-9).

49.   NetCE admitted that it does not know how much of any of its catalog sales were attributable to the presence of the Multiple Sclerosis course.  (Wilson ¶ 1; NetCE 151:6-15, 163:19-23).

50.   As a basis for its lost revenue claim, NetCE has alleged as follows:

A featured NetCE continuing education course yields approximately $5 million dollars in income in its first year of circulation (including updates and revision) from sales as an individual course and bundled with other courses.  For example, in 2014, NetCE's Multiple

> Sclerlosis course (a 10-hour course NetCE commissioned from Dr. Jouria) was featured (in other words, printed in its entirety) in booklets for nurses in various states. The total revenue (after subtracting the total expense of printing and marketing costs) for these booklets was $4.7 million dollars. . . . NetCE believes—and there is no available fact to contradict this belief—that each of the [Accused Courses] would have earned as much, if not more, in its lifetime of circulation. Multiplying $5 million by seven (7) yields "$35 million dollars of lost revenue attributable entirely to Elite's infringement for the first year of circulation of each course *alone*."

(Wilson ¶ 9; NetCE's Responses to Interrogatories, Interrogatory No. 8).

51.     In its damages estimate, NetCE did not take into account the actual revenue it achieved during the period in question.  (Wilson ¶ 1; NetCE 161:17-24).

52.     On October 20, 2017, NetCE stipulated to the dismissal with prejudice of all claims against Elite concerning the "Cardiovascular Pharmacology" and "The Lymphatic and Immune Systems" articles, including all claims against the Elite Courses entitled "Cardiovascular Diseases: The Leading Cause of Death in Women" and "The Basics of Pathophysiology" ("Dismissed Courses").  (DE 121).

53.     NetCE maintains claims of copyright infringement against Elite for the following courses:  Traumatic Brain Injury, Depression vs. Dementia in the Elderly Part I and II, Cancer and Chemotherapy: A Comprehensive Review Part I and II, Non-Antibiotic Antimicrobial Pharmacology: A Comprehensive Review Part I and II, and Gastroesophageal Reflux Disease (GERD): A Comprehensive Review ("Accused Courses").  (DE 36; DE 93; DE 95).

54.     NetCE admitted that Elite's Dismissed Courses are not substantially similar to any of the Jouria Articles.  (Wilson ¶ 1; NetCE 93:25-94:10).

55.     NetCE admitted that the Accused Courses represent general medical topics that NetCE would expect other providers to have similar offerings on.  (Wilson ¶ 1; NetCE 197:17-20).

56.     NetCE admitted that it does not have evidence of the sales of other articles written by Dr. Jouria being depressed or increased due to the relationship with Elite.  (Wilson ¶ 1; NetCE 219:18-23).

57.     In its damages estimate, NetCE did not take into consideration its settlement with Alpine.  (Wilson ¶ 1; NetCE 220:24-221:3).

58.   One of NetCE's other competitors, NurseCE4Less, published courses that appeared to have the same or similar learning objectives and may have addressed subjects that were the same or similar to the Jouria Articles and Accused Courses.  (Wilson ¶ 1; NetCE 213:14-22).

59.   NetCE accused NurseCE4Less of copyright infringement, and claimed that NetCE had been damaged by NurseCE4Less.  (Wilson ¶ 1; NetCE 214:10-20).

60.   In its damages estimate, NetCE did not take into account the damages caused to NetCE by NurseCE4Less.  (Wilson ¶ 1; NetCE 216:6-10).

61.   NetCE filed copyright infringement claims against Elite without having access to or the ability to review either of the Dismissed Courses.  (Wilson ¶ 1; NetCE 88:15-18, 89:24-90:8).

62.   NetCE did not perform a line-by-line comparison of the Accused Courses before filing suit.  (Wilson ¶ 1; NetCE 87:23-88:1).  Instead, NetCE admitted that it performed "spot checks" of the Accused Courses.  (Wilson ¶ 1; NetCE 88:2-14).

63.   As it pertains to the Dismissed Courses, NetCE's verified interrogatory response discussing alleged copyright infringement by Elite is not true.  (Wilson ¶ 1; NetCE 92:11-94:10).

64.   NetCE has performed only an "initial review" of the Accused Courses, and its findings pertaining to the Accused Courses may not be complete.  (Wilson ¶ 1; NetCE 103:20-104:4).  NetCE stated in its verified interrogatory responses that "[a] second, technical manual analysis of the [Accused Courses] is underway"; yet, NetCE did not produce in discovery the results of any "second, technical manual analysis" of the Accused Courses.  (Wilson ¶ 9; NetCE's Responses to Interrogatories, Interrogatory No. 6).

65.   NetCE does not claim to own content in the Jouria Articles written by someone other than Dr. Jouria.  (Wilson ¶ 1; NetCE 66:2-6).

66.   During its comparison of the Jouria Articles and Accused Courses, NetCE did not take any steps to exclude from its comparison any content that Dr. Jouria did not write.  (Wilson ¶ 1; NetCE 96:23-97:7, 98:5-7, 108:20-109:22).

67.   None of the Accused Courses are identical to any of the Jouria Articles in which NetCE claims copyrights.  (Wilson ¶ 1; NetCE 108:8-12).

68.   On December 5, 2017, NetCE stipulated to the dismissal with prejudice of its claim against Elite for tortious interference with contractual relations.  (DE 168).

69.   NetCE and Alpine executed a Non-Disclosure Agreement in July 2012 ("NDA"). (DE 36-3; Wilson ¶ 7; Alpine Ex. 72).

70.     NetCE shared with Alpine information that NetCE contends constitute trade secrets pursuant to the NDA.  (Wilson ¶ 1; NetCE 24:21-25).

71.     During discovery, Elite asked NetCE to "[i]dentify and describe in detail all trade secrets [NetCE] allege[s] were misappropriated by Elite", and NetCE responded as follows:

> During the course of 2012 negotiations between NetCE and Alpine, and pursuant to the explicit terms of the Non-Disclosure Agreement in effect between the two parties, NetCE provided Alpine with its market strategies, industry reports regarding competitors and market need, information regarding the competitive landscape and consumer need, internal financial performance data (histories and projections), NetCE's process for curating courses, and proprietary information concerning the type of content NetCE furnished, developed, and was planning to develop (including without limitation the schedule for the upcoming catalog mailing year).  NetCE provided Alpine with a list of courses currently in development, including their status, number of hours of credit, probable target audience(s), and faculty.  NetCE further shared its accreditation schedule, listing all current accreditations and approvals.   NetCE also shared its return-on-investment statistics ("ROI"), areas of future business development beyond (pharmacology credits, outreach to allied health professionals, etc.), and direct mailing information.
>
> NetCE made Alpine aware of its existing faculty (in other words, faculty who had already authored courses that NetCE published and whose names were therefore publicly available) and authors with whom NetCE had executed, or was close to executing, Freelance Writer Agreements for the first time.  Dr. Jouria was one such author.  During these negotiations, NetCE shared drafts of certain of Dr. Jouria's courses…with Alpine.  NetCE also shared with Alpine information related to courses in various stages of development (in other words, pre-publication): its future products.

(Wilson ¶ 9; NetCE's Responses to Interrogatories, Interrogatory No. 3).

72.     Elite sought discovery from Alpine through a subpoena for the production of documents and Rule 30(b)(6) deposition testimony.  Alpine designated Dan Cremons to testify regarding the factual allegations by NetCE in Paragraphs 39-46, 77-79, and 127-133 of the Third Party Complaint; communications between Alpine and Elite relating to NetCE from in or around 2012; and the due diligence materials disclosed by NetCE to Alpine relating to Alpine's potential acquisition of NetCE.  As part of Alpine's document production, Alpine produced an email dated November 6, 2012, sent from Erin Meinyer, Executive Director of NetCE, to Dan Cremons, at the time a senior associate of Alpine, containing information about NetCE and attaching various financial documents.  (Wilson ¶¶ 6, 11; Alpine Ex. 71; ALP0001).

73.     NetCE admitted that it has no evidence to support the allegations that any information disclosed by NetCE under the NDA was shared with Elite.  (Wilson ¶ 1; NetCE 30:20-23, 43:22-45:9).

74.     NetCE admitted that it has no evidence to support its allegations pertaining to Alpine sharing information with Elite.  (Wilson ¶ 1; NetCE 33:10-34:4).

75.     NetCE has no evidence that Mr. Mike Duran or anyone from McKissock shared any information provided by NetCE with Elite.  (Wilson ¶ 1; NetCE 33:10-34:4, 180:10-17).

76.     Alpine did not share any information disclosed by NetCE with Elite.  (Wilson ¶ 3; Alpine 44:16-22, 48:6-8, 49:16-50:19, 51:24-52:8, 53:4-54:23, 55:7-9, 56:8-57:23, 60:5-7, 62:4-63:8, 73:21-74:6, 74:15-22, 75:9-14, 76:13-77:21, 80:2-15, 80:25-81:12, 81:25-82:8, 83:7-10, 83:23-85:2).

77.     NetCE admitted that it has no reason to dispute Alpine's testimony.  (Wilson ¶ 1; NetCE 30:24-32:6, 44:22-45:9).

78.     Alpine testified that the documents produced by Alpine marked ALP0001-0061 were the only documents received by Alpine from NetCE containing any non-public, confidential, or proprietary information.  (Wilson ¶ 3; Alpine 25:3-27:24).

79.     Alpine testified that much of the information contained in ALP0001-0061 was publicly available.  (Wilson ¶ 3; Alpine 30:22-42:24).

80.     NetCE believes that Elite's conduct is "highly suspicious," that it is "more likely than not" that Elite obtained NetCE's trade secrets, and that there are "a lot of coincidences" arising from Elite's publication of courses drafted by Dr. Jouria after NetCE had discussions with Alpine. (Wilson ¶¶ 1, 9; NetCE 11:14-12:1; NetCE's Responses to Interrogatories, Interrogatory No. 4).

81.     NetCE acknowledged that the only evidence in this case shows that Dr. Jouria approached Elite, not the other way around, when he responded to a job posting Elite posted on a freelance writer website.  (Wilson ¶ 1; NetCE 8:5-7).  This is confirmed by Dr. Jouria's testimony and his early correspondence with Elite.  (Wilson ¶ 2; Jouria 209:9-211:21; DE 93-1, 93-2, 93-3).

82.     NetCE acknowledged that it was Dr. Jouria who suggested to Elite the topics for the accused courses, without any indication that he drafted similar courses for NetCE.  (Wilson ¶ 1; NetCE 171:13-172:22).  This is confirmed by Dr. Jouria's testimony and early correspondence with Elite.  (Wilson ¶¶ 2, 4; Jouria 211:12-212:2, 222:4-11, 223:7-11, 246:25-247:5, 275:24-276:5; DE 93-3 p. 4; Jouria Ex. 45).

Dated: December 15, 2017

Respectfully submitted,

/s/ Peter A. Chiabotti
Peter A. Chiabotti
Florida Bar No. 0602671
AKERMAN LLP
peter.chiabotti@akerman.com
777 South Flagler Driver
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313

J. Mark Wilson (*pro hac vice*)
markwilson@mvalaw.com
Kathryn G. Cole (*pro hac vice*)
katecole@mvalaw.com
MOORE & VAN ALLEN PLLCS
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
*Attorneys for Third Party Defendant*
*Elite Professional Education, LLC*

## Certificate of Service

I hereby certify that on December 15, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/Peter A. Chiabotti
Peter A. Chiabotti

## Service List

Richard S. Ross, Esq.
Atrium Centre
4801 S. University Drive
Suite 237
Fort Lauderdale, FL 33328
Email: prodp@ix.netcom.com
*Attorneys for Plaintiff Dr. Jassin Jouria*

Philip E. Rothchild, Esq.
Holland & Knight LLP
515 East Las Olas Blvd., 12th Floor
Fort Lauderdale, FL 33301
Email: phil.rothschild@hklaw.com
*Attorneys for CE Resource, Inc. d/b/a*
*CME Resource and NetCE*

John P. Kern, Esq.
Jessica E. Lanier, Esq.
Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Email: john.kern@hklaw.com
        jessica.lanier@hklaw.com
*Attorneys for CE Resource, Inc. d/b/a*
*CME Resource and NetCE*

Peter A. Chiabotti
Florida Bar No. 0602671
Akerman LLP
peter.chiabotti@akerman.com
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313
*Attorney for Third Party Defendant*
*Elite Professional Education, LLC*

J. Mark Wilson (*pro hac vice*)
markwilson@mvalaw.com
Kathryn G. Cole (*pro hac vice*)
katecole@mvalaw.com
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
*Attorneys for Third Party Defendant*
*Elite Professional Education, LLC*