Exhibit 1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                          ---oOo---

 3      DR. JASSIN JOURIA              )
                                       )
 4           Plaintiff,                )
        vs.                            )
 5                                     ) CASE NO:
        CE RESOURCE, INC., d/b/a       ) 0:15-61165-WPD
 6      CME RESOURCE and NetCE,        )
                                       )
 7           Defendant.                )
        _____)
 8      CE RESOURCE, INC., d/b/a       )
        CME RESOURCE and NetCE,        )
 9                                     )
             Defendant/               )
10           Counter-Plaintiff,       )
        vs.                            )
11                                     )
        DR. JASSIN JOURIA,             )
12                                     )
             Plaintiff/               )
13           Counter-Defendant.       )
        _____)
14      CE RESOURCE, INC., d/b/a       )
        CME RESOURCE and NetCE,        )
15                                     )
             Defendant/Third-Party    )
16           Plaintiff,               )
        vs.                            )
17                                     )
        Elite Continuing Education,    )
18      Inc. and Alpine Management     )
        Services III, LLC,             )
19                                     )
             Third-Party              )
20           Defendants.              )

21                   DEPOSITION OF SARAH CAMPBELL
                            30(B)(6)
22
                        November 14, 2017
23


24


25      DEPOSITION REPORTER:  KAYLA KNOWLES, CSR
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1                    I N D E X

 2                                                  PAGE

 3   EXAMINATION BY MR. WILSON                         6

 4   EXAMINATION BY MR. ROSS                         231

 5   FURTHER EXAMINATION BY MR. WILSON              268

 6

 7
     Appearance Page                                  4
 8
     Reporter Certificate                           270
 9
     Declaration Under Penalty of Perjury           272
10

11

12                 E X H I B I T S

13   EXHIBIT            DESCRIPTION               PAGE

14   Exhibit 74  Notice of Deposition               5

15   Exhibit 75  Responses to Interrogatories        5

16   Exhibit 76  Collection of E-mails from NetCE,  19
                 Bates Numbers
17               NETCEB0003109-NETCEB0035072

18   Exhibit 77  E-mails From Dr. Jouria to NetCE,  45
                 Bates Numbers
19               NETCEB0002761-NETCEB0003068

20   Exhibit 78  E-mails from NetCE to Dr. Jouria,  45
                 Bates Numbers
21               NETCEB0004778-NETCEB0005265

22   Exhibit 79  TBI Course, Bates Numbers          51
                 NETCEB0007755-NETCEB0020594
23
     Exhibit 80  Chemotherapy Course, Bates         51
24               Numbers
                 NETCEB0006283-NETCEB0020686
25
     Exhibit 81  GERD Course, Bates Numbers         51
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)        **Sarah Campbell on 11/14/2017**       Page 3

```
 1                     NETCEB0006973-NETCEB0024807

 2    Exhibit 82   Depression vs. Dementia Course,      52
                   Bates Numbers
 3                 NETCEB0002993-NETCEB0022559

 4    Exhibit 83   Nonantibiotic Antimicrobial          52
                   Pharmacology Course, Bates
 5                 Numbers
                   NETCEB0007394-NETCEB0022750
 6
      Exhibit 84   Division Planner, Course             79
 7                 Approval, Bates Numbers
                   NETCEB0029016-NETCEB0029020
 8
      Exhibit 85   Courses Scheduled for Update        149
 9                 2016: Past Revenue, Bates Numbers
                   NAVIGANT00002-NAVIGANT00454
10
      Exhibit 86   E-mail from Erin Meinyer to Sarah   187
11                 Campbell, Bates Number
                   NETCEB0003137
12
      Exhibit 87   E-mail from Sarah Campbell to       188
13                 John Jurica, Bates Number
                   NETCEB0005017
14
      Exhibit 88   Declaration of Tracey Foster        221
15

16

17                         ---oOo---

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3

 4    FOR THE PLAINTIFF DR. JASSIN:

 5                         ATRIUM CENTRE
                          Attorneys at Law
 6                        4801 S. University Drive, Suite 237
                          Fort Lauderdale, FL 33328
 7
                          E-MAIL:  Prodp@ix.netcom.com
 8
                          By:  RICHARD S. ROSS, ESQ.
 9

10    FOR CE RESOURCE, INC., d/b/a CME RESOURCE and NetCE:

11                        HOLLAND & KNIGHT
                          Attorneys at Law
12                        50 California Street, Suite 2800
                          San Francisco, CA 94111
13
                          PHONE:   415.743.6981
14                        E-MAIL:  John.kern@hklaw.com

15                        By:  JOHN P. KERN, ESQ.
                          By:  JESSICA E. LANIER, ESQ.
16

17    FOR ELITE PROFESSIONAL EDUCATION, LLC:

18                        MOORE & VAN ALLEN
                          Attorneys at Law
19                        100 North Tryon Street, Suite 4700
                          Charlotte, NC 28202-4003
20
                          PHONE:   704.331.1177
21                        E-MAIL:  Markwilson@mvalaw.com

22                        By:  J. MARK WILSON, ESQ.
                          By:  KATHRYN G. COLE, ESQ.
23

24    Also Present:  Crystal Cusic, Videographer

25
```

```
 1      Sacramento, California; Tuesday, November 14, 2017

 2                          9:15 a.m.

 3

 4              (Exhibit No. 74 marked for identification.)

 5              (Exhibit No. 75 marked for identification.)

 6              THE VIDEOGRAPHER:  This is the beginning of

 7   media number 1 in the deposition of Sarah Campbell in

 8   the matter of Jassin Jouria vs. CE Resource, Inc.

 9   Today's date is November 14, 2017, and time on the

10   monitor is 9:15 a.m.  My name is Crystal Cusic, and I'm

11   the videographer.  The court reporter is Kayla Knowles.

12   We are here with Huseby Global Litigation Services.

13              Counsel, please introduce yourselves, after

14   which the court reporter will swear in the witness.

15              MR. KERN:  John Kern and Jessi Lanier for

16   the defendant and counter-claimant NetCE and here

17   representing the 30(b)(6) witness, Sarah Campbell.

18              MR. WILSON:  Mark Wilson from Moore & Van

19   Allen here representing Elite Professional Education.

20              MS. COLE:  Katy Cole from Moore & VanAllen

21   also representing Elite.

22              MR. ROSS:  And Richard Ross appearing

23   telephonically by stipulation of the parties on behalf

24   of Plaintiff, Dr. Jassin Jouria.

25
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 6

```
 1                    SARAH CAMPBELL,

 2    having been sworn by the Certified Shorthand Reporter,

 3    Kayla Knowles, to tell the truth, the whole truth, and

 4    nothing but the truth, testified as follows:

 5

 6                       EXAMINATION

 7    BY MR. WILSON:

 8       Q.  Ms. Campbell, my name is Mark Wilson.  I'm an

 9    attorney from Charlotte representing Elite Professional

10    Education.

11           You're aware of Elite Professional Education.

12    Yes?

13       A.  I am.

14       Q.  If I use the word "Elite," you'll know who I'm

15    talking about; right?

16       A.  Yes.

17       Q.  And I understand that you are here as the

18    corporate witness on behalf of CE Resource, Inc., doing

19    business as CME Resource and NetCE; correct?

20       A.  That's correct.

21       Q.  And if I refer to that entity as "NetCE," you'll

22    know who I'm talking about.  Yes?

23       A.  Yes.

24       Q.  In front of you, I've premarked before we arrived

25    this morning what we now call Exhibit 74.  It is the
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                     Sarah Campbell on 11/14/2017                     Page 7

```
 1   30 -- excuse me.  It is the notice of deposition of

 2   NetCE pursuant to federal rule of civil procedure

 3   30(b)(6).

 4          Have you seen Exhibit 74 before?

 5   A.  Yes.

 6   Q.  In Exhibit 74, there are -- at Schedule A, there

 7   are a number of topics for deposition.  I believe there

 8   are 20 of them.

 9          I understand you have been designated as the

10   corporate witness to testify about the subject matters

11   in topics 1 through 20; is that correct?

12   A.  That's correct.

13   Q.  And are you prepared today to testify on topics 1

14   through 20 in Exhibit 74?

15   A.  Yes.

16   Q.  Any reason you cannot testify about one or more

17   of the topics in Exhibit 74 today?

18   A.  No.

19   Q.  Ms. Campbell, why is NetCE pursuing this case

20   against Elite?

21   A.  We believe that they acted badly with content

22   that NetCE owned.

23   Q.  Is there any other reason?

24   A.  We also have some reason to believe that they

25   were in knowledge of trade secrets and used those trade
```

1   secrets to benefit their business.

2       Q.  Any other reason?

3       A.  I think this is included, but infringement of our

4   copyright, but that possibly is included in the first.

5       Q.  Other than the claims that have been asserted

6   against Elite and the -- in court in the lawsuit in the

7   third-part complaint, as we call it, are there any other

8   reasons why Elite is pursuing this case against --

9   excuse me -- why NetCE is pursuing this case against

10  Elite?

11      A.  No.

12      Q.  Isn't it true that NetCE is pursuing this case

13  against Elite to gain access to Elite's financial

14  information?

15      A.  No.

16      Q.  NetCE does not believe -- does not feel that this

17  case is an investment to learn more about Elite's

18  financials?

19      A.  No.

20      Q.  Have you ever had any discussions with anyone

21  about that?

22      A.  I don't recall.

23      Q.  As you sit here today, under oath, your testimony

24  is NetCE is not using this lawsuit to learn more about

25  Elite's financials; is that correct?

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)  Sarah Campbell on 11/14/2017  Page 9

1    A.  That's correct.

2    Q.  Do you know how Elite learned about Dr. Jassin

3    Jouria?

4    A.  I do.

5    Q.  How did Elite learn about Dr. Jassin Jouria?

6    A.  It's my understanding that they posted an ad of

7    some sort looking for authors, and he responded.

8    Q.  If you take a look at what I've premarked in

9    front of you as Exhibit 75, Exhibit 75 is NetCE's

10   responses to Elite's interrogatories.

11        Have you seen this document before?

12   A.  Yes.

13   Q.  You've read it?

14   A.  Yes.

15   Q.  You agree with the responses provided by Elite --

16   excuse me, provided by NetCE in Exhibit 75?

17   A.  Yes.

18   Q.  If you take a look at -- excuse me -- NetCE's

19   response to interrogatory number 2, the second sentence

20   says, "At present, NetCE stands by the allegations in

21   its complaint that Elite learned of Dr. Jouria's

22   identity from Alpine."

23        That's not true, is it?

24   A.  I don't know if that's true.  I believe -- I

25   believe it could be true.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                          Sarah Campbell on 11/14/2017                          Page 10

```
 1      Q.  You just testified that Elite posted something,

 2   and Dr. Jouria responded.  How is it possible then that

 3   Elite learned of Dr. Jouria's identity through Alpine,

 4   as you said here in this interrogatory response?

 5      A.  So I saw discovery documents that indicated that

 6   he had responded to an ad, but I haven't seen any

 7   documentation one way or another if they knew his name

 8   before he responded to that ad.

 9      Q.  Have you read the transcript of Alpine's

10   deposition that we took in this case?

11      A.  Yes.

12      Q.  Do you know a man named Dan Cremons?

13      A.  I know of him.  I haven't met him.

14      Q.  You understand that Mr. Cremons testified on

15   behalf of Alpine that Alpine did not share the name of

16   Dr. Jouria with Elite.  Do you understand that?

17      A.  I do understand that.

18      Q.  So now we've seen -- you've seen evidence that

19   Dr. Jouria reached out to Elite, and you have sworn

20   testimony from Alpine that they did not share

21   Dr. Jouria's name with Elite.

22          Are you still standing behind your statement in

23   interrogatory number 2?

24      A.  Yes.

25      Q.  Explain how that is possible.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)          Sarah Campbell on 11/14/2017          Page 11

1      A.  I don't know the exact relationship between

2    Alpine, McKissock, and Elite.  If McKissock was aware

3    and shared that information with Elite, I'm not sure if

4    that would be covered under Alpine and Dan Cremons's

5    testimony.

6      Q.  Have you seen any documents, read any testimony,

7    or have any evidence to support the notion that Elite

8    learned of Dr. Jouria's identity from Alpine or

9    McKissock?

10     A.  I understand that there's still discovery going

11   on; so I think it's still -- information is still coming

12   in.

13     Q.  That's not what I asked.

14         Do you have any evidence, as you sit here today,

15   to support what you said in interrogatory number 2 about

16   how Elite learned of Dr. Jouria's identity?

17         MR. KERN:  Mark, can you please let her

18   finish the answer in the future?

19         Go ahead, Sarah.

20         THE WITNESS:  So in terms of evidence -- I

21   don't know exactly what evidence would be present -- I

22   know that there is a relationship between Alpine and

23   Elite, and I know that we -- that Alpine was aware of

24   that information.  So if it is coincidental, it would be

25   a lot of coincidences, but I haven't seen hard evidence,

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                     Sarah Campbell on 11/14/2017                     Page 12

```
 1   as of yet.  It's possible it could come in later.

 2   BY MR. WILSON:

 3      Q.  As you sit here today, you have no evidence to

 4   support the statement you make in interrogatory number 2

 5   that Elite learned of Dr. Jouria's identity from Alpine;

 6   isn't that correct?

 7      A.  Not yet.

 8            MR. KERN:  For clarification, Mark, that

 9   question was limited to Alpine?  Because you asked

10   before "Alpine or McKissock."

11   BY MR. WILSON:

12      Q.  As we sit here today, you have no evidence to

13   support the belief that Elite learned of Dr. Jouria's

14   identity from McKissock either; correct?

15      A.  We haven't had discovery with McKissock; so we

16   don't have information from them, as far as I know.

17      Q.  And I know that you want information, and I know

18   that you're desperately hoping for it, but my questions

19   here are pretty straightforward.

20            As you sit here today, you have no evidence to

21   support the belief that Elite learned of Dr. Jouria's

22   identity from anyone other than Dr. Jouria himself;

23   isn't that correct?

24      A.  I don't have the information necessary to make

25   that determination.
```

 1     Q.  So you don't have any evidence?

 2     A.  Not yet.

 3     Q.  How is it that you believe -- excuse me.  Let me

 4  ask it this way.

 5         Given that you have no evidence yet, as you say,

 6  what is the basis for the statement in interrogatory

 7  number 2 that you're standing behind?

 8     A.  Oh, sure.  They -- we had discussions with Alpine

 9  that included information about future faculty including

10  Dr. Jouria, and also about the development of content in

11  the areas that Jouria developed.  And after Alpine's

12  acquisition of Elite or continued relationship with

13  Elite, those courses were published by Elite.  So that

14  indicates to me that they had an interest in entering

15  the market that we had identified as an interest of

16  NetCE's with the --

17     Q.  How -- how did NetCE convey to Alpine the

18  identity of Dr. Jouria?

19     A.  Documents were provided to Alpine during

20  acquisition negotiations that included courses that were

21  in development but not yet published, and that included

22  several of Dr. Jouria's sources that were in

23  development.

24     Q.  But that information was provided in print form?

25     A.  I understand, yes.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1   BY MR. WILSON:

 2       Q.  When?

 3       A.  In the March 2012 meeting that we just discussed,

 4   they had more in-depth conversations about financial

 5   information.

 6           At this October 2013 meeting, I believe that the

 7   discussions about financial information were more high

 8   level and not detailed as the 2012 meeting was because

 9   they had already gone over that information, for the

10   most part.

11       Q.  And a couple times already you've answered the

12   question with "I believe."  "I believe they weren't

13   detailed."  "I believe this."  "I believe that."  I'm

14   not asking for your belief.  I'm asking for the

15   company's testimony on these topics because you're the

16   person I get to talk to; so I'll ask again.

17           Actually, I'll just ask you as you answer these

18   questions.  I don't want your belief.  I want what you

19   know.

20               MR. KERN:  That's a fair request.  Do you

21   understand what he's --

22               THE WITNESS:  I do.

23               MR. KERN:  -- saying, Sarah?

24               THE WITNESS:  Yep.

25   ///
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

```
 1   BY MR. WILSON:
 2       Q.  You mentioned earlier that some, quote,
 3   additional information regarding strategies, end quote,
 4   was provided by NetCE to Mr. Duran.
 5           What are you talking about?
 6       A.  In reference to the 2012 meeting?
 7       Q.  You tell me when it was provided and what you
 8   mean.
 9       A.  I believe my testimony earlier was about the 2012
10   meeting, and the materials provided then in terms of
11   additional market strategies would have been areas of
12   content that we were interested in developing in order
13   to meet a market need or an emerging market need; for
14   example, pharmacology content and more advanced science
15   information for advanced practice nurses.  And also just
16   new verticals such as physical therapy, occupational
17   therapy, and allied health in general.
18       Q.  Was this information conveyed orally or in print?
19       A.  It was conveyed orally and was supported by the
20   course development documentation that was in print.
21       Q.  What information that was shared with Alpine does
22   NetCE contend is a trade secret?
23       A.  We consider all of that information trade secrets
24   in as far as we wouldn't share it with anyone outside of
25   the company unless an NDA was in place.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

Sarah Campbell on 11/14/2017

1    Q.  You believe that the names of authors of courses

2  for NetCE is a trade secret; is that correct?

3    A.  The names of authors for unpublished content is a

4  trade secret.

5    Q.  And what binds the authors from -- what prohibits

6  them from disclosing the fact that they are writing for

7  NetCE?

8             MR. KERN:  I'm sorry.  Can you repeat the

9  question, Mark?

10  BY MR. WILSON:

11    Q.  What prohibits authors for content that is being

12  developed by NetCE from telling anyone else that they're

13  writing for NetCE?

14             MR. KERN:  I'm just going to make a

15  foundation objection.

16             THE WITNESS:  We don't have any way of

17  tracking what authors of courses in development

18  disclose.

19  BY MR. WILSON:

20    Q.  Again, you didn't come even close to answering my

21  question.

22      What prohibits them from disclosing that they're

23  writing for NetCE, if anything?

24             MR. KERN:  Okay.  Vague and ambiguous.  Have

25  not laid a proper foundation.

 1    for our accountants -- accounting contractors.

 2       Q.  And I'm asking specifically about a nondisclosure

 3    agreement or some protection that is equivalent to a

 4    nondisclosure agreement.

 5       A.  Our contractor contracts -- editorial contractor

 6    contracts contain a clause that prohibits disclosure,

 7    but I am not sure the exact details off the top of my

 8    head.

 9       Q.  So just so we're clear, as we sit here today, you

10    can't say for certain that the information that NetCE is

11    relying upon as the basis for its trade secret claim was

12    never disclosed by the company without protections?

13             MR. KERN:  Asked and answered.

14    BY MR. WILSON:

15       Q.  Isn't that correct?

16             MR. KERN:  Asked and answered.

17             THE WITNESS:  I can't give a definitive

18    answer to that.

19    BY MR. WILSON:

20       Q.  What evidence do you have, if any, that Alpine

21    ever disclosed to anyone else any information that NetCE

22    did provide to it under the nondisclosure agreement that

23    you referenced earlier?

24       A.  Well, as we discussed a little bit before, the

25    information that was provided to Alpine and Mike Duran

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 30

```
 1   included some information about market strategies, such
 2   as development of pharmacology continuing education and
 3   the importance of ANCC, which is American Nurses
 4   Credentialing Center, accreditation to meet the needs of
 5   advanced practice nurses.  And not long after Erin and
 6   Dennis's meetings with Dan and Mike and Richard, Elite
 7   made strides in those areas specifically that indicated
 8   to us that they used that information to make some
 9   decisions about where they should be focusing business.
10       Q.  I understand those are your allegations in this
11   case.  I'm asking for evidence, ma'am.
12           What evidence do you have to support those
13   allegations?
14       A.  Again, I don't feel like all of the evidence is
15   in.  I think there's still -- Elite is still providing
16   documents; so, at this time, we don't have that hard
17   evidence, but I think it's still evolving.  I don't know
18   if I could answer that better without their full
19   discovery.
20       Q.  Isn't it true, as we sit here today, you have no
21   evidence to support the allegations that any information
22   disclosed by NetCE was shared with Elite?
23       A.  Not yet.
24       Q.  And you said earlier that you read Dan Cremons's
25   deposition testimony.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                Sarah Campbell on 11/14/2017                Page 31

1       He was the deponent from Alpine; is that correct?

2    A.  I did.

3    Q.  So you've read that Mr. Cremons from Alpine

4  denied all of the allegations related to Alpine

5  allegedly sharing information with Elite from NetCE;

6  correct?

7    A.  I did read that.

8    Q.  I asked him repeatedly if those allegations were

9  true or false, and he looked right in the camera and

10 said they were false.  You read that?

11   A.  I did.

12   Q.  Do you have any reason to believe that

13 Mr. Cremons was not telling the truth?

14   A.  I have no personal reason to believe that, but

15 there --

16   Q.  Please.

17   A.  Again, there were some -- the changes that Elite

18 made after the discussions with Dan and Mike gives us

19 some indication that they were influenced by that

20 information, but I can't say for sure if it was Dan

21 Cremons or Mike Duran or McKissock or Alpine.

22   Q.  But what you have seen, which is the testimony

23 from Alpine through Mr. Cremons, shows that your

24 allegations are false; isn't that correct?

25   A.  He testified that he had not shared any

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

```
 1   information and that Alpine had not, and I don't have a
 2   reason to believe that is incorrect.
 3       Q.   The allegations in this -- in this case as they
 4   pertain to NetCE's trade secret claim all relate to
 5   Alpine; is that correct?
 6       A.   In this case?  Yes.
 7       Q.   So as we sit here today, for the trade secret
 8   claim that NetCE has brought against Elite, you have no
 9   evidence to support the allegations that Alpine shared
10   any information with Elite, and, indeed, the evidence
11   you have read through the testimony of Mr. Cremons at
12   Alpine shows that those allegations are false.
13            MR. KERN:  I'll just object --
14   BY MR. WILSON:
15       Q.   -- isn't that correct?
16            MR. KERN:  -- it's a compound question.
17   Sounds like he's testifying.
18            THE WITNESS:  Can you repeat the question?
19   BY MR. WILSON:
20       Q.   As we sit here today, you have no evidence to
21   support the allegations in NetCE's complaint as they
22   pertain to Alpine sharing information with Elite; isn't
23   that correct?
24       A.   As we sit here today, although there could be
25   additional information that we obtain from Elite in the
```

 1  next week or two, I don't have any hard evidence, other

 2  than the change in Elite's focus.

 3     Q.  And I appreciate the fact that you don't want to

 4  say that I'm right, but this is a yes-or-no question.

 5            MR. KERN:  You can answer the question

 6  however you want, Sarah.

 7  BY MR. WILSON:

 8     Q.  And I'm going to continue to ask it until I get a

 9  yes or no.

10            So as we sit here today, isn't it true that you

11  have no evidence to support the allegations in the trade

12  secret claim NetCE has brought against Elite as it

13  pertains to Alpine sharing information with Elite?

14     A.  We have no hard evidence of Alpine --

15  specifically Alpine sharing information with Elite.

16     Q.  And as we sit here today, you have no evidence to

17  support any allegation -- and it hasn't been made, but

18  any additional allegation that Mr. Duran or anyone from

19  McKissock shared any information provided by NetCE with

20  Elite; correct?

21     A.  We have no evidence from McKissock or Mike Duran

22  either way, as far as I know.

23     Q.  So I'll ask it again.

24            As we sit here today, you have no evidence that

25  Mr. Duran or anyone at McKissock shared any information

 1   provided by NetCE with Elite; correct?

 2               MR. KERN:  Asked and answered.

 3               THE WITNESS:  We do not have evidence of him

 4   sharing or not sharing information.

 5               MR. KERN:  How are you doing?

 6               THE WITNESS:  I'm fine.

 7               MR. KERN:  Let me know if you need a break.

 8   Can you go another 10, 15 minutes?

 9               THE WITNESS:  I can go -- yeah, I'm fine.

10               MR. KERN:  Thank you.

11   BY MR. WILSON:

12     Q.  I'm going to hand you what was previously marked

13   as Exhibit 42.  I am going to put a big "42" on it.

14   That is the third-party complaint filed by NetCE against

15   Elite in Florida.

16         Have you seen that document before?

17     A.  I have.

18     Q.  If you turn to the paragraph numbered 103, it

19   states, "Upon information and belief, Elite was aware of

20   Dr. Jouria's freelance writer agreement with NetCE."

21         Do you see that?

22     A.  "Agreements," yes.

23     Q.  Thank you.

24         "Upon information and belief, Elite was aware of

25   Dr. Jouria's freelance writer agreements with NetCE";

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1   correct?

 2        A.  That's correct.

 3        Q.  What is the information and belief that you rely

 4   upon to make that allegation?

 5        A.  Again, we had shared information about courses in

 6   development, including the author names, with Mike Duran

 7   during meetings with him in the previous several years.

 8            When Elite then worked with Dr. Jouria to publish

 9   the courses that we had already taken ownership of,

10   he -- he -- through discovery, I found that he had

11   disclosed to them that he had already sold them to us as

12   part of the agreement.

13        Q.  What discovery are you talking about?

14        A.  An e-mail between Dr. Jouria and employees of

15   Elite.  I believe Michelle Franchi and another employee.

16   Janice, I believe.

17        Q.  What was the date of that e-mail?

18        A.  I don't recall the exact date.

19        Q.  What else do you remember about this e-mail that

20   you're talking about?

21        A.  I recall that they had discussed his work with

22   other companies, specifically his work with NetCE and

23   the courses that he had already developed for NetCE.

24   And they had asked to see a copy of his contract.

25        Q.  Contracts?
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1    Q.  So how can you say that Elite intentionally

2    interfered with those agreements when there's nothing

3    prohibiting Elite from doing business with Dr. Jouria

4    and they hadn't seen the the terms of his agreements?

5    A.  They were aware that the agreements existed, and

6    they knew that the topics were the same.  And in my

7    opinion, that's intentional interference.

8    Q.  Do you have any evidence that Elite was aware of

9    Dr. Jouria's freelance writer agreements with NetCE when

10   Elite chose the courses that Mr. Jouria suggested?

11   A.  In that same e-mail exchange, my understanding of

12   their conversation was that they -- he had provided a

13   large list of -- of topics.  He had specifically

14   indicated which ones were developed for NetCE, and then

15   he provided the content.

16       It's possible that he provided the content first

17   and then they went back for that, but I -- it was -- I

18   couldn't tell from their exchange.  It was before they

19   had published the courses.

20   Q.  So at the time this complaint in Exhibit 42 was

21   filed against Elite, you hadn't seen those documents;

22   isn't that correct?

23   A.  I had not.

24   Q.  So what was the basis at the time that you filed

25   this complaint for the statements that -- in paragraphs

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Page 39

```
 1   103 and 104 about Elite being aware of Dr. Jouria's

 2   agreements and Elite intentionally, intentionally

 3   interfering with them?

 4      A.  Again, we knew that Mike Duran had information

 5   about our work with Dr. Jouria and specifically about

 6   wanting to develop the content that Dr. Jouria had

 7   worked on for us.  And it was our belief, at the time,

 8   that he had potentially shared that information and that

 9   Elite had used it to develop the same or substantially

10   similar content for the purpose of beating us to market,

11   potentially.  In terms of -- that was our belief at the

12   time.

13      Q.  So as we sit here today, you have no evidence

14   that Elite knew about the terms of the freelance writer

15   agreements between Dr. Jouria and NetCE; correct?

16      A.  Can you repeat the question?

17      Q.  As we sit here today, you have evidence to show

18   that Elite knew about the terms of the freelance writer

19   agreements between Dr. Jouria and NetCE; correct?

20      A.  As we sit here today, that's correct.  I don't

21   know if additional evidence will become available.

22      Q.  And indeed the evidence that is available, namely

23   the deposition of Dr. Jouria, supports the notion that

24   Elite did not know the terms because Dr. Jouria wouldn't

25   share his agreements with Elite; correct?
```

 1    A.  He testified that he did not share that

 2   information.  That's correct.

 3    Q.  So as we sit here today, there is -- you have no

 4   evidence that Elite intentionally interfered with the

 5   freelance writer agreements between Dr. Jouria and

 6   NetCE --

 7              MR. KERN:  Objection.

 8   BY MR. WILSON:

 9    Q.  -- correct?

10              MR. KERN:  Objection.  Asked and answered

11   three times, and misstates her testimony.

12              THE WITNESS:  I do believe that there is

13   evidence in the form of that e-mail exchange that they

14   had specifically solicited content that they knew we had

15   agreements with Dr. Jouria to develop.

16   BY MR. WILSON:

17    Q.  So your support is one e-mail that you've seen in

18   discovery; is that correct?

19              MR. KERN:  Could you please let her complete

20   her answer?  Don't interrupt her.  Thank you.

21              THE WITNESS:  I believe it's an e-mail

22   chain, so several e-mails back and forth.  That's the

23   evidence that comes to mind that they were aware of the

24   relationship and that those topics were the courses that

25   we had worked with Dr. Jouria on and that they moved

1     A.  I do.

2     Q.  Do you know why not?

3     A.  I can't say for sure.  No.

4     Q.  Do you have any reason to believe why those

5   allegations are not made against Elite related to damage

6   and irreparable harm?

7     A.  I could speculate, but I don't have any -- I

8   don't have a hard knowledge of that.

9     Q.  I'm not asking for speculation.

10       I am asking if you have any knowledge as to why

11  damages -- excuse me -- allegations related to damages

12  and irreparable harm are not made against Elite in this

13  claim.

14    A.  I don't know.

15            MR. KERN:  Mark, how about a five-minute

16  break?

17            MR. WILSON:  Hang on one second.  Not quite

18  there yet.

19  BY MR. WILSON:

20    Q.  Take a look at Exhibit 76.  Turn to a document

21  that's Bates labeled -6135.

22            MR. ROSS:  Mark, can you give me that number

23  again, please?

24            MR. WILSON:  Yes, sir.  NETCEB6135.

25            MR. ROSS:  Thank you.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

1    BY MR. WILSON:

2        Q.  We see in this e-mail -- this is from

3    November 12th, 2015, and November 13, 2015.  We see

4    where Erin -- so I don't butcher her last name again --

5    Erin -- you know who I'm talking about.  Yes?

6        A.  I do.

7        Q.  -- is looking for older e-mails that relate to

8    materials provided to Alpine Investments.

9            Do you see that?

10       A.  I do.

11       Q.  And somebody named Michael Pentecost wrote back

12   and said, "No problem.  I'll check our e-mail archive

13   and see what I can find."

14           Was anything located?

15       A.  I know that Erin found e-mails related to her

16   conversations with Dan Cremons and Mike Duran.  I don't

17   know if they were found at that time or at a later

18   point.

19       Q.  And whatever e-mails were located, were those

20   provided to us in this case?

21       A.  Yes.

22       Q.  And did any of those e-mails that you saw contain

23   any information that NetCE claims to be a trade secret?

24       A.  Yes.  There's an extensive e-mail to Dan Cremons

25   outlining the history of NetCE future market plans,

 1    major competitors that was eventually located and is

 2    provided.

 3        Q.  Anything else?

 4        A.  Any other e-mails or anything --

 5        Q.  Any other e-mails that were located that contain,

 6    according to NetCE, trade secret information?

 7        A.  I don't think so.

 8        Q.  When we talked to Mr. Cremons at Alpine, we

 9    marked as an exhibit what we know as Exhibit 73.

10            Is that the e-mail that you were just referring

11    to?

12        A.  Yes.

13        Q.  And are the documents attached to that that go

14    through Alpine 60 -- ALP60 the information that you were

15    referring to?

16            Excuse me.  It goes through Alpine 61 -- ALP61.

17        A.  Yes, that's the information.

18        Q.  So NetCE did not locate any other e-mails where

19    any allegedly trade secret information was shared with

20    Alpine or Mr. Duran; is that correct?

21        A.  I don't know.

22        Q.  You're the one I get to talk to.  You've read

23    Mr. Cremons's deposition testimony as it pertains to the

24    information in the documents in front of you in

25    Exhibit 73.  Yes?

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                        Sarah Campbell on 11/14/2017                    Page 45

1     A.  Yes.

2     Q.  You're aware of the fact that he testified that

3  Alpine did not share that information with Elite;

4  correct?

5     A.  I'm aware of that.

6     Q.  Do you have any reason to dispute that?

7     A.  I have no evidence, as we sit here today, that he

8  shared that information -- that Dan Cremons specifically

9  shared that information.  That's correct.

10              MR. WILSON:  Let's take a break.

11              THE VIDEOGRAPHER:  The time is 10:21 a.m.,

12  and we are off the record.

13              (Off the record.)

14              THE VIDEOGRAPHER:  The time is 10:31 a.m.,

15  and we're back on the record.

16              (Exhibit No. 77 marked for identification.)

17              (Exhibit No. 78 marked for identification.)

18  BY MR. WILSON:

19     Q.  We have to call Richard.

20              THE VIDEOGRAPHER:  Do you want me to go off

21  real quick?  The time is 10:32 a.m., and we are off the

22  record.

23              (Off the record.)

24              THE VIDEOGRAPHER:  The time is 10:32 a.m.,

25  and we are back on the record.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1   BY MR. WILSON:

 2       Q.  I'm going to hand you what we've marked as

 3   Exhibits 77 and 78.  I described these earlier today

 4   when we were talking about documents, but Exhibit 77 is

 5   a collection of e-mails from Dr. Jouria to NetCE, and

 6   Exhibit 78 is a collection of e-mails sent to Dr. Jouria

 7   by NetCE.  I'll ask you the same questions I asked

 8   before.

 9          Take a look at those and see if you have any

10   reason to dispute the accuracy or authenticity of any of

11   those documents, and I'll represent to you they were all

12   produced to us by NetCE as evidenced by the Bates

13   numbers located at the bottom.

14       A.  I have no reason to dispute that.

15       Q.  I know you've only had them in front of you for a

16   very short period of time, but do you recognize the

17   e-mails that are in Exhibit 77 and 78 as e-mails

18   exchanged between NetCE and, I think, primarily, you and

19   Dr. Jouria?

20       A.  Yes, that seems correct.

21       Q.  NetCE learned of Dr. Jouria when Dr. Jouria

22   reached out to NetCE; isn't that correct?

23       A.  That's correct.

24       Q.  And we see that in a document labeled NETCEB3069.

25   Is that one on there?  -3069?

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 65

1   permission from for the GERD course?

2       A.  I don't know the specific number.  I can give you

3   a range, if that would be helpful.  I believe it is

4   between three and ten.  It is -- it is between three and

5   ten.  Excuse me.

6       Q.  So for the GERD course, NetCE doesn't claim

7   ownership to the portions of what Dr. Jouria submitted

8   that includes third-party content from these three to

9   ten third parties; correct?

10      A.  That's correct.

11      Q.  Which parts of the GERD course reflect

12  third-party content?

13      A.  In the case of this course, it would be several

14  of the tables.  We did not seek permission to reprint

15  content.  If there was substantial similarities in the

16  content, it was rewritten by our editors.

17          But if the tables were copied from a source, we

18  went to the source and requested permission to reprint.

19  So several of the tables.

20      Q.  And I understand what you sought permission to

21  use.  My question was a bit different.

22          My question is:  What is it that NetCE claims to

23  own?  And for the GERD article, NetCE does not claim to

24  own content that was in what -- in what Dr. Jouria

25  provided to NetCE where the content was from third

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

Sarah Campbell on 11/14/2017

 1  parties; correct?

 2     A.  We do not claim to own plagiarized content.

 3  That's correct.

 4     Q.  And that applies to all five of the articles at

 5  issue between NetCE and Elite; correct?

 6     A.  That is correct.

 7     Q.  So you sought permission to use some of the

 8  tables in the GERD article, but there was other content

 9  in what Dr. Jouria provided to you that you identified

10  as what you called plagiarized content; correct?

11     A.  There were other sections that appear to be

12  similar or the same as other sources.  It is possible

13  that those sources were free use or that they were not.

14  That would have to be analyzed according to source.

15     Q.  Has NetCE done any sort of analysis for the GERD

16  course or any of the other four to determine what it

17  owns and what it does not vis-à-vis what it sent to the

18  copyright office from Dr. Jouria for each of these

19  courses?

20            MR. KERN:  Objection.  Vague and ambiguous.

21  BY MR. WILSON:

22     Q.  Did you understand my question?  Because if it is

23  vague and ambiguous, I will try my best to reword it.

24     A.  Sure.  Go ahead.

25     Q.  Has NetCE done any analysis to determine which

 1   content was plagiarized content and which content was

 2   from Dr. Jouria -- original to Dr. Jouria for any of the

 3   five courses at issue between NetCE and Elite?

 4       A.  These courses have been run through a program

 5   called iThenticate, which does some analysis in terms of

 6   similar or identical content, and it gives a report that

 7   provides information about the source of those

 8   similarities.  However, iThenticate does not qualify

 9   whether those sources allow for use or not.

10           So, yes, some analysis had been done, but the

11   final decisions in analysis require personal

12   intervention.

13       Q.  So has NetCE performed a final analysis using

14   personal intervention to determine what parts of each of

15   the courses reflected in Exhibit 79 to 83, that NetCE

16   submitted to the copyright office, NetCE owns?

17               MR. KERN:  I am going to object that it

18   assumes facts.

19               MR. ROSS:  What's the objection, John?

20               MR. KERN:  That it assumes facts.

21               MR. ROSS:  Thank you.

22               THE WITNESS:  Can you repeat the question?

23               MR. WILSON:  I'm not sure if I can.

24   BY MR. WILSON:

25       Q.  So has NetCE performed a final analysis using

1    Q.  And so we're clear, the iThenticate program that

2    you're talking about only searches web crawlable text;

3    correct?

4    A.  That is correct.  Yes.

5    Q.  It does not search PDFs or books or print-only

6    materials; correct?

7    A.  I can't answer that for sure.  There may be some

8    books or PDFs that it is able to access.  You would have

9    to -- that's an iThenticate question really how their

10   software works.

11   Q.  The iThenticate process isn't perfect for

12   identifying plagiarized content.  Is that fair to say?

13   A.  It is not perfect.  It's a tool that we use as

14   part of our overall process.

15   Q.  So what part of your overall process was not

16   completed for these five courses?

17   A.  Well, there were different stages in the process;

18   so the three courses -- nonantibiotic antimicrobial

19   pharmacology, depression versus dementia in the elderly,

20   and traumatic brain injury -- had only very minimal work

21   done that included running it through iThenticate and

22   also ensuring that the necessary components were

23   included.  But no additional work was done to identify

24   or remediate copied or plagiarized passages.

25          In the case of cancer and chemotherapy, it was a

Case 0:15-cv-61165-WPD   Document 188-1   Entered on FLSD Docket 12/15/2017   Page 37 of 140

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 75

1    pretty in-depth editorial.  Runthrough was done by one

2    of our independent contractors, and she did some work to

3    rewrite or remediate sections that appeared to be

4    similar with no judgment as to whether it was

5    plagiarized or not.  Whether material is free use and

6    therefore not plagiarized -- we would prefer not to use

7    it in any case.  But I hadn't done the second review or

8    the final review.

9        In the case of the GERD course, it had been

10   substantially rewritten.  We would have done another

11   iThenticate review because the changes were so

12   extensive.  That was not done immediately.  We would

13   usually do that prior to releasing it to the public.

14   And there was one other thing with the GERD course.

15       There were also sections during my editorial

16   process with the GERD course that I thought needed

17   references.  And during that process, I would search for

18   it and potentially find additional matches that weren't

19   identified by iThenticate.  And that happens as part of

20   our normal process, and that happened with the GERD

21   course.

22   Q.  We can take them one at a time if we have to.  I

23   just want to make sure that I'm clear on the development

24   of these various courses.

25       None of them have been fully edited; is that

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 76

 1   correct?

 2      A.  None of them were ready for publication.  That's

 3   correct.

 4      Q.  None of them had been approved for publication by

 5   NetCE or anyone else; correct?

 6      A.  Well, they were accepted for publication when we

 7   received the drafts from Dr. Jouria, but none of them

 8   were ready to be printed and presented to the public.

 9   That's correct.

10      Q.  So they hadn't been fully edited?

11      A.  The editorial process was not complete for any of

12   these five courses.

13      Q.  All permission had not been obtained?

14      A.  Not for all of the courses, no.

15      Q.  Had all of the permissions been obtained for any

16   of the courses?

17      A.  All of the necessary permissions, as far as we

18   knew, were obtained for the GERD course but not for the

19   other four courses.

20      Q.  None of the courses had been returned to

21   Dr. Jouria for final approval; correct?

22      A.  That's correct.

23      Q.  And if you look at -- pick a course.  Exhibit 81,

24   which is the GERD course, at the end, you'll see a

25   development status form.  That one in particular -- I

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

 1    don't see a Bates label on it.

 2       A.  No.

 3       Q.  But I promise you I didn't find that on my own.

 4       A.  Do you want the one right before it?

 5       Q.  That's a checklist for all the steps that have to

 6    be done to get an article from submission to

 7    publication; isn't that correct?

 8       A.  It is a general checklist that we use, yes.

 9       Q.  And for all of the courses in front of you, these

10    five courses, the checklist ends at "draft manuscript

11    received" and "payment issued" with lots of -- lots of

12    blanks; isn't that correct?

13       A.  Can I check all of them?

14       Q.  Please do.

15              MR. ROSS:  Mark, what's the Bates number on

16    that?

17              MR. WILSON:  I don't have a Bates number,

18    Richard.  It was part of the courses.

19              MR. ROSS:  I have the GERD course.  Can you

20    point to it in there?

21              MR. WILSON:  Yeah, for the GERD course, the

22    document immediately preceding it was Bates labeled

23    NETCEB --

24              MR. KERN:  -24582.

25              THE WITNESS:  Oh, this one has one.

```
 1              Okay.  Yes, that's correct.
 2     BY MR. WILSON:
 3        Q.  So what -- what was left to get these courses
 4     approved for publication?
 5              MR. KERN:  Object to the use of the term.
 6     Lacks foundation.  I don't know what that means.  Why
 7     don't you define it.
 8     BY MR. WILSON:
 9        Q.  Go ahead.
10        A.  So all of those courses have been, in essence,
11     approved for publication.  Our intent was to publish
12     them, and we wouldn't undertake these steps unless that
13     was -- they were approved to move forward.  And, in
14     fact -- it's not included in here, but it's part of our
15     checklist.
16        Q.  What's part of your checklist?
17        A.  Approval for publication.
18        Q.  Look for each of those courses and tell me if you
19     see a checklist that reflects that any of these courses
20     were approved for publication.
21        A.  Sure.  On Bates number NETCEB24806 in the GERD
22     course, at the bottom of the manuscript checklist, it
23     says "draft accepted."
24        Q.  That doesn't say "approved for publication," does
25     it?
```

1    A.  That's not terminology that we use as part of the

2    development process.  When we accept a manuscript and

3    issue payment to the author, that is our signal that it

4    has been accepted for publication.

5    Q.  So your testimony is that the words "approved for

6    publication" are not terminology that NetCE uses; is

7    that correct?

8          MR. KERN:  Misstates testimony.

9          THE WITNESS:  No, no, that's not terminology

10   that we use in our development process.  I know that it

11   does appear in our freelance writers' agreements.

12          (Exhibit No. 84 marked for identification.)

13   BY MR. WILSON:

14   Q.  Handing you what's been marked as Exhibit 84.

15   Exhibit 84 is a document that begins on NETCEB29016.

16   It's from NetCE, and it's called "division plan or

17   course approval," and this one, in particular, is for a

18   course entitled "chronic obstruction" -- "obstructive

19   pulmonary disease, COPD."

20          Do you recognize that document?

21   A.  I do.

22   Q.  This is a document from NetCE?

23   A.  It is.

24   Q.  You'll see about midway through the page, there's

25   a box that's checked "approved for publication."

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 80

1          Do you see that?

2      A.  I do.

3      Q.  And this one in particular in front of you, it

4  says, "Approved for publication with changes.  See

5  manuscript pages."  Yes?

6      A.  Yes.

7      Q.  So there is a way where NetCE does actually use

8  the words "approved for publication" as part of the

9  development of courses; isn't that correct?

10     A.  When I was talking about development of courses,

11 I meant our editorial process.  This is actually a

12 planner for reviews and approves for publication for

13 their specific profession.

14         So in terms of accepting a document and moving

15 forward with it, I don't necessarily consider this

16 division planner course approval form to be part of that

17 process.  It's kind of part of our accreditation or

18 designation of credit process.  But we do use that

19 terminology in our evaluations with the planners.

20 That's true.

21     Q.  And are there documents like what's shown in

22 Exhibit 84 -- yes, 84 -- for any of the five courses at

23 issue between NetCE and Elite?

24     A.  No, not yet.

25     Q.  So as it pertains to this step in the preparation

1    of courses by NetCE, the five courses at issue here had

2    not been approved for publication; correct?

3        A.  This only approves the course for publication --

4    this specific example for surgical technologists.  It

5    doesn't -- it's approving it for outreach to a specific

6    audience.  It doesn't decide whether or not it's

7    published in general.

8            This is specific to this planner's profession,

9    and that had not yet been done for the five courses in

10   terms of designation of credit or which professions

11   would receive access.  That's true.

12       Q.  So according to you, when are courses -- when was

13   each of the courses in front of you, to use your words,

14   accepted for publication?

15       A.  We accept courses for publication at the time

16   that the draft is received in its entirety that we --

17   that we are sure that all of the components are present,

18   and we pay the freelance author, which would complete

19   the contract process, as far as I understand it.

20       Q.  Not all accepted courses get published; correct?

21       A.  It is our intent to publish all accepted courses,

22   but there's no timeline in terms of when they will be

23   released.

24       Q.  Please listen to my question.

25           Not all courses get published; correct?

1    A.  Can you be more specific?  All courses --

2    Q.  Not all courses submitted to NetCE get published.

3    A.  That's true.

4    Q.  And the five courses in front of you were never

5    published; correct?

6    A.  We had not yet printed or released them to the

7    public.

8    Q.  And indeed for, at least three of them, there was

9    a whole lot more work that needed to go into preparing

10   the courses for publication; correct?

11   A.  That is correct.

12   Q.  And for the other two, that being GERD and cancer

13   and chemotherapy, there were still significant steps on

14   the checklist that hadn't been satisfied prior to work

15   being stopped on the courses; correct?

16   A.  There was still work to be done on both of those

17   courses.

18   Q.  So there was work to be done on all five courses

19   before these courses could be published; right?

20   A.  That's correct.

21   Q.  Take a look -- if you take back -- take a look

22   back at the complaint, Exhibit 42 and Exhibit A to

23   Exhibit 42, which is the copyright registration

24   certificates for each of the five courses at issue here.

25   Each of them lists a publication date.

```
 1              Do you see that?
 2     A.  I do.
 3     Q.  If none of the five courses had been published,
 4  why did NetCE tell the copyright office that they had
 5  been?
 6     A.  I don't feel like I have a strong enough
 7  knowledge of copyright law to answer that question.
 8     Q.  Where do the dates come from?
 9     A.  Those are the dates that we received final drafts
10  from Dr. Jouria.  It appears that those are the dates.
11  Let me double-check.  That's -- that is what I -- it's
12  in the ballpark of when we received the drafts if it's
13  not the exact date.
14     Q.  I hope you appreciate that "in the ballpark"
15  doesn't work for us.
16              So my question is:  Where do the dates come from?
17     A.  They are the dates on or around the date we
18  received the drafts from Dr. Jouria.
19     Q.  Who selected those dates?
20     A.  They were -- the form was filled out by C.C.
21  Chernev on my instruction.
22     Q.  Looking at the depression versus dementia
23  article -- that's Exhibit 82 -- Dr. Jouria submitted
24  this to NetCE on April 16th of 2013, yet the copyright
25  registration reflects a date of publication of April 18,
```

 1    Ms. Campbell conducted a visual side-by-side comparison

 2    of the NetCE drafts in the impermissibly published Elite

 3    courses."

 4          Do you see that?

 5    A.  I do.

 6    Q.  Did you conduct a side-by-side comparison as

 7    stated in this interrogatory response?

 8    A.  I did.

 9    Q.  Had you concluded, at that time, that there was

10    already infringement?

11    A.  I had done some additional work.  I -- I am not

12    sure if it was before or after I compared the two

13    drafts, but I did not immediately assume that we were

14    necessarily the copyright holders.  I investigated

15    whether or not it was possible that he -- that

16    Dr. Jouria had sold the courses to Elite first and then

17    to us.  But I determined that the dates indicated that

18    we were the first copyright holders.

19          And then I did some additional search to

20    determine if the materials were published somewhere

21    else, if there was possibly another copyright holder,

22    but there was no -- I wasn't able to find another place

23    where the material that I had initially discovered was

24    printed, other than the Elite course.

25          So then, at some point during the investigation,

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                     Sarah Campbell on 11/14/2017                     Page 87

1    I compared the NetCE drafts and the Elite courses in a

2    visual side-by-side comparison.

3        Q.  Where did you get the Elite courses that you used

4    for your side-by-side comparison?

5        A.  From their Web site.

6        Q.  Did you print them?

7        A.  I did print them, yes.

8        Q.  Did you make notes on them?

9        A.  Not that I recall, no.

10       Q.  Whatever you printed, was it produced to us in

11   this case?

12       A.  I do not know.

13       Q.  Where would you need to look to find out?

14       A.  I would have to look at our -- the documents we

15   provided.

16       Q.  Have you looked at the documents you provided?

17       A.  I looked at them in their entirety but not

18   specifically.

19       Q.  Would you be able to tell by that review whether

20   the materials that you printed from Elite were included

21   in the production?

22       A.  Yes.

23       Q.  Was your comparison a line-by-line comparison

24   throughout the entirety of the articles that you were

25   reviewing?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1      A.  No.

 2      Q.  Tell me about your comparison then.

 3      A.  I did a side-by-side comparison of several pages

 4   and sections of the courses that I was able to access.

 5   There were two that I was unable to access but that had

 6   similar topics, but those are no longer in play here.

 7           So of the five that we're talking about here, I

 8   did go through -- and it's additional courses on Elite's

 9   side because some of them are multiple parts.  But of

10   the five NetCE courses, I did go through and do a

11   comparison on several pages, and I would do spot checks

12   throughout to see if there were similarities and found

13   the same or similar content in -- for all five of the

14   courses.

15      Q.  So we're clear, for the two articles that are no

16   longer part of the case, you did not perform a

17   side-by-side comparison; is that correct?

18      A.  For those two, I was not able to.  That's true.

19      Q.  So on what did you base your claims for

20   infringement in this lawsuit on if you hadn't compared

21   the courses published by Elite?

22      A.  The similar topic areas and content and then the

23   background of the -- of the other five courses being

24   apparently copied indicated that those two likely had

25   significant sections that appeared in both.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Page 89

```
 1      Q.  With all do respect, you hadn't even seen them.

 2   How could you even come close to making that kind of a

 3   conclusion?

 4            MR. KERN:  Asked and answered.

 5            THE WITNESS:  I could see the learning

 6   objectives, and the learning objectives are an

 7   indication of the content and the outline.  And the

 8   learning objectives included content that overlapped

 9   with our courses, and that's how I made that

10   determination.

11   BY MR. WILSON:

12      Q.  In this interrogatory response here, number 6,

13   you state, "Significant sections of these courses appear

14   to be featured in what Elite published."  That's for the

15   two courses that are no longer part of the case.

16            What is the basis for that statement if you

17   hadn't even seen the courses?

18      A.  I base that on seeing learning objectives.  The

19   learning objectives would indicate the content that

20   appeared in the course.  And based on our discovery that

21   the other five courses were copied in part or entirely,

22   we had an indication that sections of the courses

23   appeared to be featured in the Elite courses.

24      Q.  You brought claims in a federal lawsuit without

25   knowing whether there were substantial similarities
```

```
 1   between what you were claiming copyright rights in and
 2   what you were suing; isn't that correct?
 3     A.  We made claims based on the information and
 4   knowledge that we had at the time.
 5     Q.  And at the time, you hadn't even reviewed the
 6   course that you were suing, saying that it's
 7   substantially similar; isn't that correct?
 8     A.  We didn't have access or the ability to do that.
 9     Q.  This is a yes-or-no question, ma'am.
10         MR. KERN:  Answer it however you want,
11   Sarah.  Don't let him tell you how to answer it.
12   BY MR. WILSON:
13     Q.  You hadn't even looked at it, and you filed a
14   federal cause of action against Elite; isn't that
15   correct?
16         MR. KERN:  Claim for relief.
17         THE WITNESS:  We were not able to view the
18   contents specifically, but we could view components that
19   gave us an indication that there could have been and
20   appeared to be significant overlap.
21   BY MR. WILSON:
22     Q.  There could have been, but you had no indication
23   that there appeared to be; isn't that correct?
24         MR. KERN:  Mark, this has been asked and
25   answered four times.  This is just theater.
```

```
 1                MR. WILSON:  I am using her words.

 2                MR. KERN:  You've asked and answered --

 3                MR. WILSON:  You may not like it, but I'm

 4      going to continue to ask it as many times as I want.

 5                MR. KERN:  This is just pure theater.  She's

 6      answered it four times.

 7      BY MR. WILSON:

 8        Q.  On what basis can you say there appeared to be

 9      substantial similarities in significant sections when

10      all you saw were the objectives?

11                MR. KERN:  Asked and answered.

12                Go ahead.

13                THE WITNESS:  The two topics in question had

14      overlap, and the components of the course that we were

15      able to see, which included the learning objectives,

16      indicated that the sections of the course had -- could

17      have a significant overlap and appeared to be featured

18      in the Elite courses.

19      BY MR. WILSON:

20        Q.  So you drew your conclusion based off of the

21      title and the headings, isn't that correct?

22        A.  Well, learning objectives aren't headings.

23      They're behavioral -- it's basically an outline of the

24      content driven by behavioral objectives; so we -- that's

25      what it was based on.
```

1    Q.  Is it your testimony that the learning objectives

2  between what NetCE was claiming rights in for these two

3  courses and what Elite published were the same or

4  substantially similar?

5    A.  I am not making that claim right now.  I am

6  saying that the learning objectives gave us some insight

7  into what content would be included in the course, and

8  we were able to use that information to see that

9  significant sections appeared to be featured in the

10  Elite courses.

11    Q.  So in this interrogatory response -- this is

12  interrogatory number 6 -- when it talks about you

13  conducting a visual side-by-side comparison of the NetCE

14  drafts and the impermissibly published Elite courses,

15  that does not pertain to the two courses that were

16  recently dismissed from the case; is that correct?

17    A.  I was not able to do a comparison for those two

18  courses.  That's correct.

19    Q.  And where in this interrogatory response does it

20  say that?

21    A.  I don't believe it's in this response

22  specifically.  It is not.

23    Q.  Indeed, it says that, "The remaining two

24  courses" -- which the two courses are the lymphatic and

25  immune systems and cardiovascular pharmacology -- "were

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                      Page 93

 1   not preprinted verbatim."

 2         Do you see that?

 3    A.  I do.

 4    Q.  How could you make that conclusion when you

 5   hadn't even seen the courses from Elite?

 6    A.  Based on the learning objectives, I could see

 7   that there was some content that was unique to the Elite

 8   courses or was not covered in the drafts that we

 9   received from Jouria, but there appeared to be sections

10   that were the same or similar to sections that were in

11   the course -- the drafts that we received, and that is

12   how we made that determination.

13    Q.  Also in interrogatory number 6 on page 10, you

14   say, "The similarities between the two sets of courses,

15   visible through a side-by-side comparison, were and are

16   apparent, remarkable, and extensive."

17         Do you see that?

18    A.  I do.

19    Q.  That's not true for two of the articles that were

20   previously part of this case, those being the lymphatic

21   and immune systems and cardiovascular pharmacology

22   articles; isn't that true?

23    A.  Those two, we were not able to do the visual

24   side-by-side comparison; so that is true.

25    Q.  You then say, "Each of the infringing courses

 1    exhibit literal and nonliteral similarity, copying of

 2    whole swathes of text from NetCE's copyrighted courses,

 3    copying the organization of the courses, and/or

 4    paraphrasing large passages leaving the essential

 5    expression unchanged."

 6         Do you see that?

 7    A.  I do.

 8    Q.  Again, that's not true for the two dismissed

 9    articles, is it?

10    A.  That is not true for the dismissed articles.

11    When we received additional information, we acknowledged

12    that the two Elite courses appeared to be different, and

13    that's why they were dismissed.

14    Q.  They should have never have been part of the

15    case; isn't that true?

16    A.  Well, we wouldn't have any way of knowing that

17    until we got the information that resulted from this

18    case.

19    Q.  How about you try this next time:  Investigate

20    first and sue later.

21         MR. KERN:  No question.  Ignore him, Sarah.

22    Wait until he asks a question.

23         We're ready to take a lunch break whenever

24    you guys are ready.

25         MR. WILSON:  No.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

 1                    MR. KERN:  Next chance --

 2    BY MR. WILSON:

 3        Q.  So tell us everything you can about the

 4    comparison you performed for each of these five courses.

 5        A.  Can you repeat that?  Sorry.

 6        Q.  Tell us everything you can about the comparison

 7    that you say you performed for the five courses still at

 8    issue in the case.

 9        A.  For these five courses, when we -- when I

10    identified the possibility of copying or similarities, I

11    would take our copy and the Elite copy and went through

12    comparing text specifically.  And I did use the Jouria

13    version that we received -- the draft we received.  If

14    there were edits, for example, to the GERD course or the

15    cancer and chemotherapy course, I used the previous

16    version we had received from Jouria.  And I just went

17    through several pages comparing texts and noting

18    differences, and then I did spot checks kind of flipping

19    forward to see if it continued into the course.

20            Some of these courses are extensively long; so I

21    did not continue to do every single page of every single

22    word, but I did do a visual side-by-side comparison for

23    a significant portion.

24            And we also attempted to run our -- the Jouria

25    drafts through iThenticate to determine if there was a

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1   match caught through that tool.  Unfortunately, the

2   iThenticate tool was not able to access the PDFs that

3   Elite had on their Web site; so that did not return

4   useful information at that time.

5       Q.  So you went through a couple of pages of each of

6   the five courses and went side by side; is that correct?

7       A.  I went through --

8           MR. KERN:  Her testimony speaks for itself.

9   She answered the question.

10          THE WITNESS:  I went through several pages,

11  and then I also did spot checks moving forward in the

12  text to determine if there were additional or if it

13  continued further in the text.

14  BY MR. WILSON:

15      Q.  How many spot checks?

16      A.  It depended on the length of the course.  If it's

17  a longer course, I would have done -- I did do more spot

18  checks just throughout the length of the course.  So it

19  would -- it would depend on the length of the initial

20  course and then also how many parts Elite had published.

21  If they had published multiple parts, then I would start

22  the process again based on when their part started.

23      Q.  Did your comparison include a comparison of the

24  content of Dr. Jouria's submissions that were

25  plagiarized?

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

1    A.  I would not have a way of knowing that.  Again,

2    we had run them through iThenticate, but I can't make a

3    qualitative determination of whether it was plagiarized

4    or not.  It included the draft that he received -- that

5    he submitted to NetCE in its entirety, whether or not

6    there were sections that were copied or plagiarized or

7    not.

8    Q.  So for the -- at least for the GERD article, you

9    had done some plagiarism analysis to see what

10   permissions you needed to receive to continue down the

11   path of trying to get that article ready to be

12   published; correct?

13   A.  We had done additional research for that course,

14   yes.

15   Q.  So when you did a side-by-side comparison of the

16   GERD course submitted to you by Dr. Jouria with the

17   Elite course that you found, did you include in your

18   comparison plagiarized content?

19   A.  The draft that we received from Jouria contained

20   materials that we determined should be edited before

21   publication, whether it was specifically and legally

22   plagiarized or not, and that we would seek permission to

23   reprint.

24       I did not include the tables in my analysis

25   because I knew from my experience with his works that

 1  those tables could have been sought from another source,

 2  whether Elite got permission or not.  They could have

 3  been -- they were not useful to me in the analysis.  So

 4  I did not include the tables.

 5       But in terms of the text itself, I didn't take

 6  any steps to determine if that material had been copied

 7  or plagiarized from another source.

 8  Q.  For the cancer and chemotherapy article where you

 9  had also done some sort of a further work to try to

10  identify plagiarized content, your answer is the same?

11  A.  My answer for that course is the same.

12  Q.  Did you take notes during your side-by-side

13  comparison?

14  A.  No.

15  Q.  How did you determine that the courses

16  included -- excuse me -- exhibit literal and nonliteral

17  similarity copying whole swathes of text from NetCE's

18  copyrighted courses, copying the organization of the

19  courses, and/or paraphrasing large passages, leaving the

20  essential expression unchanged, as alleged in

21  interrogatory response number 6?

22  A.  The question is how did I determine that?

23  Q.  Yes.

24  A.  So the similarities were determined by comparison

25  of text; so I would go through comparing the text, and

```
 1    you could read them and see if it was exactly the same.
 2    That would, to me, exhibit similarity or literal
 3    similarity.
 4            In some cases, it appeared that the entire
 5    paragraph was exactly the same or substantially the same
 6    with potentially some maybe punctuation changes.  I
 7    flipped through the courses in the process of my spot
 8    checking and noted that the outlines were essentially
 9    the same or similar.
10            And there were some sections that I noted --
11    there were some minimal paraphrasing issues where maybe
12    a different word was used or the order of phrasing was
13    switched.  But for the most part, it was through visual
14    analysis.
15    Q.  What standard, if any, did you use to determine
16    whether any particular course was similar or not to the
17    course you were comparing it to?
18    A.  The standard that I would use is the extent to
19    which the similarity appeared.  I don't have a
20    quantitative measure of that in my visual comparison,
21    but it seemed overwhelming when I was doing my review.
22    Q.  For each course, what were the literal
23    similarities that you found?
24    A.  Do -- I don't have the courses in front of me.  I
25    don't have the Elite courses in front of me; so it would
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                    Page 102

```
 1   state -- NetCE states, "A second technical manual

 2   analysis of the versions introduced at Dr. Jouria's

 3   deposition and served on NetCE thereafter is underway."

 4        What is that?

 5   A.   That is the analysis with Plagiarism Checker X

 6   that we just discussed.

 7   Q.   That's not a manual analysis.  Plagiarism Checker

 8   X is a computer program.

 9   A.   So Plagiarism Checker X is a tool that we use,

10   and it provides a report, and then the report is

11   obviously analyzed by a person.

12   Q.   And what were the results of your Plagiarism

13   Checker X analysis for these five articles that are

14   still part of this case between NetCE and Elite?

15   A.   I don't have the exact numbers that came back

16   from this report in front of me, but they showed

17   significant and extensive similarities.

18   Q.   How do you define "significant" and "extensive"?

19   A.   More than 60 percent exact matches.

20   Q.   Based on what criteria?

21   A.   That is criteria that is established by the --

22   actually, I want to back up.  I'm sorry.

23        So you -- when you complete the Plagiarism

24   Checker X analysis, it provides you with a percent

25   similarity.  That percentage can vary, and my
```

 1    understanding is that personal analysis or manual

 2    analysis is necessary to determine the extent of the

 3    copyings -- the extent that the copying was accurately

 4    identified by the program.

 5          So it did provide percentages, but I -- I don't

 6    want to -- I don't want to be boxed in by a number

 7    because you can -- if you have a huge course and a

 8    section of it is copied exactly, it might be a small

 9    percentage, but it's still significant in terms of

10    ownership and plagiarism.  So I don't want to be boxed

11    into a number.  I -- please disregard the 60 percent

12    statement.

13          But you could view the report provided by

14    Plagiarism X, and it demonstrates that the content is

15    materially similar.  It is -- my analysis of those

16    reports found that it could be potentially influenced by

17    formatting; so that is something that needs to be --

18    still be ameliorated, but we're still -- we completed

19    the Plagiarism Checker portion of the analysis.

20    Q.  So there's still more analysis -- a manual

21    analysis that's left to be done; is that correct?

22    A.  Potentially, yes.

23    Q.  What do you mean "potentially"?

24    A.  I mean that we have done an initial review, but I

25    don't know that our findings are complete as of today.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1     Q.  And when do you expect to complete your findings

 2   for the five courses that are still at issue between

 3   NetCE and Elite?

 4     A.  I don't know.

 5     Q.  And when do you expect to produce the Plagiarism

 6   X reports that you've generated using this program,

 7   according to you, two months ago?

 8     A.  Within the last two months, but more likely much

 9   more recently that we were doing the comparison of

10   Plagiarism Checker X.  I understand that there's a

11   deadline in terms of document production; so I would

12   assume that it would be done by that deadline.

13     Q.  What is your understanding of when that deadline

14   is?

15     A.  I believe that it's this week.

16              MR. KERN:  Mark, just so you don't go too

17   far afield on this, in a confused way, the witness

18   performed that analysis at Counsel's direction, and all

19   of the versions of it were exchanged and attached

20   between Counsel and the witness, which is why they

21   haven't been produced.

22              But to the extent that it's helpful in

23   lubricating discussions and moving things along in the

24   case, they can obviously be created anew if it's helpful

25   evidence.  But that -- that answers the question of why

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1  it's not in production.

 2  BY MR. WILSON:

 3    Q.  In response to interrogatory number 6, is the

 4  second technical manual analysis that you reference

 5  there referencing anything else besides the Checker --

 6  Plagiarism Checker X analysis you've just described?

 7    A.  I believe that -- sorry.  We also explored a few

 8  other possible software options, but they were subpar,

 9  and their reports were not useful.  So this is

10  referring, in my understanding, specifically to the

11  Plagiarism X review.

12    Q.  So at the time NetCE filed its claims for

13  copyright infringement against Elite -- you see that in

14  Exhibit 42 -- the only analysis that had been done was

15  the side-by-side analysis that you described earlier

16  where you, for these five courses that are still at

17  issue in the case --

18        MR. KERN:  Misstates testimony.

19        THE WITNESS:  When we initially made the

20  complaint, we had also attempted to do an iThenticate

21  review of the courses, but the software was having

22  difficulty accessing Elite 's PDFs; so the outcome of

23  that review was not particularly helpful for this case.

24  BY MR. WILSON:

25    Q.  So, again, at the time the complaint against

 1   Elite was filed by NetCE, the only comparison that had

 2   been done was your side-by-side comparison; is that

 3   correct?

 4            MR. KERN:  Misstates testimony.

 5            THE WITNESS:  We had done a visual

 6   side-by-side comparison.  I specifically had looked at

 7   the courses and compared them to Elite's courses, and we

 8   attempted to run iThenticate to do some additional

 9   comparison.  That was what I specifically recall

10   completing.

11   BY MR. WILSON:

12      Q.  When did you perform your side-by-side comparison

13   for these five courses still at issue?

14      A.  I determined -- I discovered the similarities

15   with the GERD course first in February of 2015, and that

16   led me to look at the other courses that Dr. Jouria had

17   published with Elite; so the comparison would have been

18   done -- was done in February of 2015.

19      Q.  How long did you take to perform this comparison

20   where you looked at a few pages and did some spot

21   checking?

22      A.  I would say it took me -- I spent an entire day

23   researching and doing comparisons.

24      Q.  And I am not asking about research.  Actual

25   comparisons.

 1    A.  That included the iThenticate scan; so when I

 2  refer to research, I'm including that iThenticate scan

 3  and also determining if this content was potentially

 4  copyrighted from a third party.

 5    Q.  So how much time did you spend doing your

 6  side-by-side comparison for these five courses?

 7    A.  How much time did I spend -- can you be more

 8  specific?

 9    Q.  Doing your side-by-side comparison for these five

10  courses.

11    A.  I did comparisons of these five courses with the

12  Elite course, but I also did comparisons with additional

13  content.  And I spent a day comparing these five courses

14  with the Elite courses in various ways and searching for

15  third party.

16    Q.  What other content did you compare these courses

17  to besides Elite content?

18    A.  I did general Internet searches to determine if

19  passages were published in other places by other

20  publishers and, for the most part, in the sections I was

21  checking, they were only published on the Elite Web

22  site.

23    Q.  What do you mean "for the most part"?  Did you

24  find some passages published for any particular courses

25  by someone else other than Elite?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

```
 1      A.  There were passages that appeared in similarity,
 2  but I couldn't make a qualitative determination of
 3  whether they were a copyright holder.  And, also, they
 4  weren't the extent of the materials in the Elite course.
 5  It was just sections, sentences, or phrases that maybe
 6  appeared somewhere else but didn't appear in works like
 7  a GERD continuing education course, for example.
 8      Q.  None of the courses are identical -- by "none of
 9  the courses," I mean the Dr. Jouria course submitted to
10  NetCE and the course that you did your side-by-side
11  comparison on from Elite -- isn't that correct?
12      A.  They are not identical.
13      Q.  And as you sit here today, you can't tell us --
14  you can't quantify the similarities for any particular
15  article; is that correct?
16      A.  Without having the Elite courses in front of me,
17  I cannot do a side-by-side showing of the similarities,
18  and I don't have a number to give you in terms of
19  percent or proportion of similarity at this time.
20      Q.  And in both the side-by-side comparison that you
21  performed for these five courses and the later computer
22  analysis using Plagiarism Checker X, you included the
23  entirety of the Dr. Jouria courses sent to NetCE in your
24  analysis; correct?
25      A.  That's correct.
```

```
 1      Q.  And you did not endeavor to exclude from that

 2   analysis any content that Dr. Jouria might have

 3   plagiarized from any other source; correct?

 4      A.  I did not try to make that determination.

 5      Q.  And you did not determine whether the portions

 6   that you found to be the same or similar between the

 7   NetCE version of the course and the Elite version of the

 8   course were protected or protectable expression owned by

 9   NetCE; correct?

10      A.  I don't feel like I have the expertise to make

11   that determination.

12      Q.  You didn't endeavor to find out, when you located

13   a similarity or something that you thought was

14   similar -- similar, whether that portion of the article

15   was written by somebody other than Dr. Jouria; correct?

16      A.  I did some searching -- Internet searching to

17   determine if Dr. Jouria had published the courses

18   somewhere else in addition to Elite.  And I also did

19   some searching to determine if the courses were copied

20   in their entirety from another source.

21          But in terms of parts or sections, I didn't

22   attempt to make that determination.

23      Q.  And did you discover in your Internet research

24   any other instances where Dr. Jouria had published any

25   of these five courses with anyone else?
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                                    Page 110

1     A.  Specifically in February?

2     Q.  We will go with February, but you know I am going

3  to ask ever.

4     A.  I don't recall when it was identified, but we

5  were able to find some evidence that Dr. Jouria had

6  published similar topics or content with Ce4Less -- or

7  NurseCe4Less.

8     Q.  What did you find at NurseCe4Less?

9     A.  We found that Dr. Jouria had also been writing

10  continuing education courses for NurseCe4Less, and some

11  of the topics and content in question appeared on the

12  NurseCe4Less site.  The content, as of Elite, was parsed

13  into parts, and I did a visual side-by-side comparison

14  of the drafts we received from Jouria and the

15  NurseCe4Less courses that were potential matches.

16     Q.  How many were there?

17     A.  I don't recall.

18     Q.  Can you identify any of these five courses as

19  potential matches?

20     A.  I remember that there was a NurseCe4Less course

21  entitled "head trauma" that I identified as a possible

22  match for the traumatic brain injury course.  And I know

23  there were additional courses, but I don't recall them

24  specifically right now.

25     Q.  For the NurseCe4Less courses, did you perform the

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1    not a one to one relationship.

 2            So this is specifically, again, in

 3    Exhibit 84, the surgical technologist lead planner, to

 4    review of the COPD course.  She made a recommendation,

 5    but her recommendation is an input for us when we're

 6    deciding to move forward and to what professions we will

 7    move forward with the course for.  But it isn't a

 8    determination of whether or not that course will ever be

 9    released to the public.  And this step 6 is trying to

10    encompass all of that.  "Approve the manuscript," to me,

11    could mean that the manuscript is approved for a

12    specific profession.

13            So you could approve -- you could take --

14    you could approve and reject the manuscript based on

15    feedback from the division planner when you're

16    determining who the audience -- the final audience will

17    be.  So it is slightly different to me.

18    Q.  In NETCEB34857, step 6 says, "The decision is

19    made to do one of the following."  Multiple decisions

20    aren't made in response to that step.  It's one of the

21    following.  And if "approved the manuscript" does not

22    mean "approved for publication," then what else could it

23    mean?

24    A.  So --

25    Q.  Let me ask you this.

```
 1          What else -- that's exactly what it means in
 2   NetCE, doesn't it?
 3      A.   No.
 4      Q.   What's the basis for that?
 5      A.   So these manuscripts that we receive can have a
 6   diverse audience, and they might be published in
 7   different versions for different audiences.  The
 8   versions, for example, for dentists and physicians.  If
 9   this is sent to the dental division planner and rejected
10   and sent to the physician division planner and approved,
11   that would trigger two different actions.
12      Q.   In what audiences were the five courses at issue
13   here allegedly approved for publication?
14      A.   The division planners had not yet reviewed the
15   manuscripts in this case.  They had reviewed the
16   proposals; so none of them had a final decision as to
17   the audience.
18      Q.   And proposals aren't accepted for -- excuse me.
19          Proposals aren't approved for publication;
20   manuscripts are; isn't that correct?
21      A.   Proposals are not published.  That's correct.
22      Q.   And for the five courses at issue here in this
23   case, there are no documents like Exhibit 84 completed
24   by anyone at NetCE; isn't that correct?
25              MR. KERN:  Asked and answered.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1              THE WITNESS:  That is correct.
 2   BY MR. WILSON:
 3      Q.  What did NetCE intend to do with the five courses
 4   at issue between NetCE and Elite?
 5      A.  It was NetCE's intent to develop these courses
 6   and to offer them to healthcare professionals for
 7   continuing education.
 8      Q.  Which audiences?  I think you just said that
 9   hadn't been decided; is that correct?
10      A.  It hadn't been finalized, but we had sent the
11   proposals to the planners.
12      Q.  Which planners did you send proposals to for
13   these five courses?
14      A.  These course proposals were sent to Dr. Jane
15   Norman, and some were also reviewed by Dr. John Leonard
16   that would represent nursing and medicine, respectively.
17           But we reserve the right when we receive the
18   manuscripts to make a decision to include additional
19   division planners based on how the content is developed.
20      Q.  So at the time that NetCE decided not to publish
21   these five courses, NetCE had not determined who they
22   were going to offer these courses to; is that correct?
23      A.  I knew at a minimum that these five courses would
24   be offered to nurses.  If they would be appropriate for
25   other professions was yet to be determined.
```

1      Q.  And without finalizing the courses, how did you

2   make the determination that you were going to offer them

3   to any particular profession?

4      A.  When these courses were contracted, we had a

5   specific need for continuing education content or

6   subject matter -- continuing education subject matter

7   related to pharmacology, specifically.  And these

8   courses would have provided that coverage of those

9   subjects for nursing specifically that we were

10   interested in developing.

11      Q.  What format were you going to offer these five

12   courses?

13      A.  When our courses are released, they're available

14   online, they are available in print, and they're also

15   available as EPUB files for eReader devices.

16      Q.  Are all courses available in all of those

17   formats?

18      A.  All courses are available online and in print.

19   And most but not all are available as EPUB files.

20      Q.  What do you mean when you say "in print"?

21      A.  I mean we have a bound booklet available that can

22   be mailed to learners, and we also have a special offer

23   bundle that we refer to as a catalog that is direct

24   mailed to identified customers.

25      Q.  How do you decide what courses will go in your

 1    booklet or your catalog?

 2        A.  We have -- just for clarity, the booklets are

 3    individual courses that are requested specifically by

 4    learners.

 5        Q.  So it's a situation where somebody who doesn't

 6    want to take it online, you'll send them a booklet?  Is

 7    that how that works?

 8        A.  Yes.  That's how a booklet would work.  They

 9    would order it to be sent to them.

10          In terms of the catalogs or special offer

11    bundles, those are mailed according to our schedule.  We

12    have a committee meeting in the spring that sets the

13    next catalog year.  Our catalog year runs from fall to

14    late spring; so if we had a meeting, for example, in

15    April for the 2000- -- if we had a meeting in

16    April 2017, it would be setting the 2018 schedule, which

17    starts in August of 2017.

18          And at that committee meeting in the spring, we

19    look at courses that we have contracted and courses

20    that -- we have drafts and courses that are currently

21    available, and we make decisions about what courses will

22    be featured in our direct mail booklets -- those

23    catalogs.

24        Q.  Were any of these courses going to be featured in

25    any of your direct mail booklets?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1     A.  Yes.  The GERD course was scheduled to be

2  featured in a special offer booklet to be mailed in the

3  early spring or late winter of 2015.

4     Q.  Is that the only one?

5     A.  That was the only one that we had scheduled that

6  far in advance.  The others were reserved to be

7  considered in the meeting that spring.

8     Q.  And before they were considered, NetCE made a

9  determination not to continue on with any of these other

10  courses; is that correct?

11     A.  Before they were considered, we found the

12  infringement and stopped development on the courses.

13     Q.  And the GERD course was not included in your

14  catalog for reasons that had nothing to do with Elite;

15  isn't that correct?

16     A.  No.

17     Q.  Why was the GERD course not included?

18     A.  We found the infringements and determined that we

19  should stop development of the course before it was

20  released, which disqualified it from being included in

21  the special offer catalog.

22     Q.  Take a look in Exhibit 76, a document number

23  NETCEB3149.

24         Is it in there?

25     A.  I don't see it.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

30(b)(6)                                                    Page 130

1     Q.  I'll show you mine.  I handed you my copy of --

2  there's one.  Apparently, it's in Exhibit 76.

3         However we got there, looking at NETCEB3149, do

4  you see an e-mail from you to Julie Goodwin dated

5  January 14, 2015, that says, "I finished the initial

6  review of the GERD course today, and I wanted to let you

7  know that it is not going to end up being ten hours.  It

8  was 2,000 words short from the author, and after

9  significant editing, I think it is" -- "I think it going

10  to be a five-hour course.  I just thought I would give

11  you a warning that it isn't going to work out for the

12  OH15 feature"?

13         Do you see that?

14     A.  I do.

15     Q.  Is the OH15 feature the catalog that you were

16  talking about where this was going to be published?

17     A.  I -- it was my recollection that it may have been

18  scheduled as a five-hour in a separate booklet.

19     Q.  Does this help refresh your recollection that it

20  was scheduled to be in OH15?

21     A.  I do know that it was originally scheduled as a

22  ten-hour course in the OH15, but I can't discount that

23  it was scheduled for another special offer booklet.

24     Q.  Do you have any documents to support your

25  testimony that maybe it was scheduled for something

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

 1   else?

 2      A.  I do not have them with me right now, but it

 3   would be in the archives of our catalog schedule.

 4      Q.  And did you produce the archives of your catalog

 5   schedule to us in this case?

 6      A.  I -- without going through all the materials that

 7   we provided, I'm not sure.

 8      Q.  Do you recall seeing it in your review of

 9   documents that you produced to Elite in this case?

10      A.  Yes.  I recall seeing the catalog schedule, but I

11   don't recall the context.

12      Q.  Take a look at one document earlier in

13   Exhibit 76, NETCEB3148.  Julie responded to you on

14   January 15th of 2015 and said, "I have replaced GERD

15   with ischemic stroke in the OH15 catalog.  A new PDF of

16   the catalog schedule is available.  Thanks."

17           So the evidence that we have here is that GERD --

18   the only of the five courses that was scheduled to be in

19   any sort of catalog -- appears to have been scheduled in

20   OH15, which I'm guessing is a 15-hour catalog that goes

21   to people in Ohio; is that correct?

22      A.  No.

23      Q.  Okay.  What is OH15?

24      A.  It is a catalog that goes to nurses who are

25   licensed in Ohio and is part of our 2015 catalog year.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

1    Q.  Fair.  So the evidence here is that GERD, the

2  only of the five that was scheduled to be in any

3  catalog, was scheduled to be in a catalog for nurses in

4  Ohio, and that didn't work out for reasons that had

5  nothing to do with Elite; correct?

6    A.  The use of GERD in the Ohio nurses 2015 catalog

7  was not possible due to length.  But whether or not it

8  was scheduled for other catalogs as a five-hour course

9  is not clear.

10    Q.  I would agree with you on that.

11        We saw here with GERD in the Ohio catalog that

12  NetCE replaced it with another course for the Ohio

13  nurses catalog.  Yes?

14    A.  The 2015, yes.

15    Q.  For the unknown/unsure catalogs that maybe GERD

16  was also going to be in, did NetCE also replace the GERD

17  course with a different course?

18    A.  No catalogs were -- all of our catalogs that year

19  were sent; so if GERD was scheduled for another catalog,

20  it was replaced.

21    Q.  I believe this is also in Exhibit 76.  I would

22  like you to take a look at a document labeled

23  NETCEB5322.  This is an e-mail from you to Julie Goodwin

24  in June -- June 16th of this year, 2017.  You say,

25  "Julie, do you have any documentation of the original

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

```
 1   catalog schedule plans," parentheses, "before changes,"

 2   end parentheses, "for 2013 to 2017?  I know we were

 3   planning to feature GERD, but the lawyers are asking if

 4   we have any" -- excuse me -- "any proof/documentation of

 5   this intent," parentheses, in which catalogs the course

 6   was intended for," end parens.

 7       Did you ever find such documentation?

 8   A.  We did find a catalogic schedule that had

 9   notations and did have GERD as one of the featured

10   courses, but I don't know that it was an original

11   catalogic schedule planned before any changes.

12   Q.  Did you produce whatever you found as part of

13   this case?

14   A.  Without going through all of the documents that

15   we provided during discovery, I don't know for sure.

16   Q.  So as we sit here today, we know the GERD course

17   for Dr. Jouria was intended to be in the Ohio nurses

18   catalog in 2015, but it was replaced by a different

19   course for reasons that have nothing to do with Elite,

20   according to the e-mails we just looked at.  And we

21   don't have any other information or evidence supporting

22   GERD or any other course being in any catalog; correct?

23   A.  We do not have any documentation that GERD was

24   planned for any other catalogs before we discovered the

25   infringements, but we also hadn't set the catalog
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 134

 1   schedule for 2016, which we would have done in the next

 2   few weeks.

 3       Q.  Has NetCE done any sort of analysis to understand

 4   what, if any, sales NetCE would have made off any of the

 5   five courses at issue between NetCE and Elite?

 6       A.  Yes.

 7       Q.  What have you done?

 8       A.  We took an example course.  It was a ten-hour

 9   course by Dr. Jouria that was published prior to our

10   discovery of the infringement in these cases.  It was

11   the course "multiple sclerosis."  That ten-hour course

12   was featured in three special offer booklets.

13       Q.  Those are the catalogs you just described

14   earlier?

15       A.  Yes, the special offer catalogs.

16           And also was available online and as a standalone

17   course -- course booklet in print -- and we used the

18   information about the revenue from the sale of that

19   course and associated special offers to estimate the

20   revenue from these outstanding five additional courses.

21       Q.  The revenue that you estimated was based off of

22   the sale of the entirety of the catalogs; is that

23   correct?

24       A.  It was based on revenue from individual course

25   sales as well as the special offer catalogs that

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

Sarah Campbell on 11/14/2017

 1    included that course.

 2        Q.  Did you try to apportion that revenue for the

 3    particular course that you used as an example?

 4        A.  We have estimated the entire amount for the

 5    special offers, and we have also been doing some

 6    additional accounting to apportion the amount of revenue

 7    from an individual course in the special offer booklet.

 8        Q.  You said the course that you used as an example

 9    was a multiple sclerosis course?

10        A.  That the course I used in my example, yes.

11        Q.  And that's a ten-hour course?

12        A.  That's a ten-hour course.

13        Q.  How many hours were the five courses at issue

14    here?

15        A.  The GERD course, before editing, was a ten-hour

16    course.

17        Q.  But we just saw documents that showed that it was

18    not a ten-hour course; correct?

19        A.  We never released that course; so it was never

20    designated an amount of credit.  But based on the amount

21    of work that was done on it after editing, it likely

22    would have ended up being less than ten hours.  But

23    Dr. Jouria was paid for a ten-hour course.

24            The same is true of traumatic brain injury.  That

25    was a ten-hour course.

1    Q.  But we don't know how many it ultimately would

2    have ended up because no one edited at NetCE; correct?

3    A.  It could have been more or less after editing.

4    That is true.

5    Q.  And the same could be said for all of the

6    remaining courses; right?

7    A.  They could have been more or less after editing.

8    Q.  How many hours for the other three courses?

9    A.  The cancer and chemotherapy course was 30 hours.

10   The depression versus dementia course was, I believe,

11   also 30 hours, and the nonantibiotic antimicrobial

12   course was 30 hours.

13   Q.  Before editing?

14   A.  All of those are what Dr. Jouria was contracted

15   to write.

16   Q.  But, again, before editing?

17   A.  No -- yes.  It could have ended up being more or

18   less credit.

19   Q.  Why did you use the multiple sclerosis course as

20   an example for how you think any of -- any other course

21   might perform?

22   A.  I thought that the multiple sclerosis course was

23   actually a conservative choice because the number of

24   hours was on the lower end compared to the 30-hour

25   drafts.  And it had been featured in a few catalogs but

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

**Sarah Campbell on 11/14/2017**

```
 1   not as many as, I believe, the COPD course; so I had
 2   chosen a kind of middle of the road, in my opinion,
 3   option as the example course.
 4       Q.  And what guarantees, if any, are there that any
 5   of these five courses would have done -- performed
 6   equivalently to the multiple sclerosis course?
 7       A.  Because we weren't able to release them, we don't
 8   know if they would have done better or worse than the
 9   multiple sclerosis course.
10       Q.  And for us sitting here today to try to predict
11   that would require us to speculate on what sales might
12   have been if certain things would have occurred; isn't
13   that correct?
14       A.  I think probably you could make an educated
15   prediction, but you can't say for sure the amount of
16   revenue an unreleased product would garner.
17       Q.  There are a number of factors that influence how
18   a course will perform; isn't that correct?
19       A.  That's correct.
20       Q.  One of those is how many catalogs you put it in;
21   right?
22       A.  If a course is featured, it will reach more
23   learners and have a greater revenue, for the most part.
24       Q.  And in this case, we have no evidence that any of
25   these five courses would have been featured in any
```

 1  catalogs; correct?

 2     A.  When I contract courses from a medical writer

 3  like Dr. Jouria, the writer is paid slightly more with

 4  the expectation that we would feature the courses.

 5         When we contract courses from nonprofessional

 6  writers, clinicians or people working in the field, they

 7  are paid slightly less with less expectation that they

 8  would be appropriate for feature.

 9     Q.  Not every course that you contract with a

10  professional writer gets featured in the catalog;

11  correct?

12     A.  There's no guarantee that it will be featured.

13     Q.  And indeed, in NetCE's history, not every course

14  that they have contracted with from a professional

15  writer has ended up in a catalog; correct?

16     A.  I don't know.

17     Q.  We looked earlier at the overview of course

18  development, and one of the things that may happen along

19  the development path is that a manuscript gets rejected;

20  right?

21     A.  That is a possible outcome.

22     Q.  Other factors would lead to how any particular

23  course might perform financially, including how it's

24  priced; right?

25     A.  Potentially, yes.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

1    Q.  And whether or not the subject matter is

2    interesting to your intended audience; right?

3    A.  Yes.

4    Q.  And whether the content is -- is good, according

5    to your intended audience; correct?

6    A.  I hope so.

7    Q.  How the course is marketed or promoted influences

8    how it's going to do financially; isn't that correct?

9    A.  That's the idea, yes.

10   Q.  What competitive offerings are out there in the

11   same or similar subject matters can influence how a

12   course performs financially; correct?

13   A.  Yes, either way.  Yeah.

14   Q.  How the course gets reviewed, meaning is it -- is

15   it -- people that take the course think it's good.

16       That can influence whether other people take the

17   same course; isn't that true?

18   A.  Potentially.

19   Q.  Who the author is can influence whether or not a

20   course sells; isn't that true?

21   A.  Yes.

22   Q.  When a course is made available, meaning timing,

23   can influence how a course performs; isn't that correct?

24   A.  That's correct.

25   Q.  What format you include it in, whether it be in a

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

Sarah Campbell on 11/14/2017

1  catalog or it be just online, can influence how a course

2  performs; right?  I think we covered that one already.

3      A.  Sure.

4      Q.  Where a course is made available, meaning is it

5  in a catalog for nurses in California, or is it in a

6  catalog for nurses in Rhode Island, which I'm guessing

7  has much less nurses, can influence how a course

8  performs; right.

9      A.  Potentially.

10     Q.  And whether or not the course or the offering

11  entity has approvals is an accepted source for

12  continuing education credits can influence how it

13  performs; right?

14     A.  I am not sure I understand.

15     Q.  Who's publishing it.

16     A.  Sure.  Maybe.

17     Q.  Some -- some companies in your business just do

18  better; isn't that correct?

19     A.  For whatever reason, yes.

20     Q.  Isn't it true that you don't know how any course

21  will actually perform sales-wise until you offer it?

22     A.  There is no way of knowing for sure what the

23  revenue for a course is before it is released, but we do

24  have an idea of the amount of interest we have in

25  advertising and featuring courses and using courses to

 1    meet specific market needs.  So you're correct that we

 2    don't have a number, and I'll leave it at that.

 3        Q.  In the Ohio 15 -- OH15 catalog where GERD was

 4    scheduled to appear, absent its word count deficiencies,

 5    when you replaced that course with the ischemic stroke

 6    course, did the OH15 catalog perform better than, worse

 7    than, or the same as expected?

 8        A.  I don't know specifically.

 9        Q.  Do you know generally?  If you don't know -- I am

10    not trying to be difficult, but when you say "I don't

11    know specifically," I have to follow up.  And if you

12    don't know, you don't know, and I'll move on.  But if

13    you do know something, I have to -- I have to know that.

14        A.  I don't know.

15        Q.  During the time period when these courses

16    potentially could have been published by NetCE -- and I

17    know that the courses weren't -- I know they weren't

18    published.  We've talked about that, and I know that we

19    just said there was no decision made by NetCE where to

20    put them.

21            But during the time period when you were

22    considering having these courses to offer, did NetCE

23    still have a full slate of course offerings to provide

24    to its customers around the country?

25        A.  During the period that we were developing these

1    courses or after we decided not to go forward?  Can you

2    clarify?

3        Q.   You know I am going to ask for both.

4        A.   Okay.  We specifically chose to move forward with

5    these topics -- these subjects because we had identified

6    a need or a gap in our offerings to meet a pharmacology

7    requirement for advanced practice nurses and certified

8    nurses.  And this would have substantially closed that

9    gap.

10        We still, to this day, do not offer the amount of

11   pharmacology credit that would have been possible by

12   developing these five courses.

13        And just to clarify, we don't have the amount of

14   pharmacology credit available in courses that have been

15   released since we stopped developing these courses that

16   would have replaced this pharmacology credit.

17        Q.   Has NetCE performed any analysis to find out --

18   well, let me ask it this way.

19        I think we talked earlier that there were two

20   courses out of these five that were

21   pharmacology-oriented; is that correct?  That's the

22   nonantibiotic antimicrobial course and the cancer and

23   chemotherapy course; is that right?

24        A.   Those -- those two courses are purely

25   pharmacology courses.  But all five courses have content

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1   that would allow us to issue partial pharmacology credit

 2   for completion of the full course.

 3     Q.  When did you make that determination, that the

 4   content allows you to issue partial credit?

 5     A.  Based on my knowledge of the standards for

 6   issuing pharmacotherapeutic pharmacology credit and the

 7   subject matter being covered, my -- our intent through

 8   the development process was to ensure that it would meet

 9   those standards.  So upon contracting these courses, I

10   knew that the final drafts would contain pharmacology

11   credit.

12     Q.  Does that have to be approved by someone before

13   you can issue that pharmacology credit?

14     A.  No.

15     Q.  How do you know what the final drafts would have

16   included when you stopped work before you even got close

17   to a final draft?

18     A.  Well, at the contract stage, I know what our

19   editorial intent would be; so I can just say that,

20   through the development process, we would have made sure

21   that the content met those requirements.  That was our

22   intent for all five of the courses.

23     Q.  Were NetCE's revenues impacted, in any way, by

24   the decision by NetCE not to continue developing the

25   five courses at issue in this case?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1    A.  I don't know.

 2    Q.  Can you point to a single sale that NetCE didn't

 3  make because it decided not to offer any of these five

 4  courses?

 5    A.  I can't point to one that was lost or one that

 6  was gained.  They weren't released -- as we discussed,

 7  they weren't released; so that would require

 8  speculation.

 9    Q.  Does NetCE prepare projections for revenues for

10  course sales?

11    A.  No.

12    Q.  Take a look at Exhibit 73.  It was that packet of

13  materials that was provided to Mr. Cremons.  The

14  document labeled ALP61, you see that document is "sales

15  projections 2012"?  Do you see that?

16    A.  I do.

17    Q.  So NetCE, at least at this point in time, did in

18  fact prepare a projection for sales of some form; right?

19    A.  I can't tell from looking at this if this -- you

20  had specifically asked about course sales projections,

21  and I don't know what all is included in this

22  projection.

23    Q.  What else do you sell?

24    A.  We have an unlimited subscription option.

25    Q.  For courses?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1     A.  For activities.  We have a group sales option.

 2         But a sales projection by course, I am not aware

 3    of that.

 4     Q.  Let me see if I can ask it slightly differently.

 5         NetCE provides -- or, excuse me -- prepares

 6    projections for its sales; right?

 7     A.  They have prepared sales projections before, yes.

 8     Q.  Are you aware of any sales projections prepared

 9    by NetCE for any years past 2012?

10     A.  Not without speculating, no.

11     Q.  So you don't know?

12     A.  I don't know.

13     Q.  And I know I've said this a few times today, but

14    you're the person that I get to talk to about this, so

15    as the designated witness, talk about sales projections,

16    which is one of the categories you told me this morning

17    you were prepared to testify about.

18         For any sales projections beyond the one you're

19    looking at here in Exhibit 73, you don't know if any

20    such documents exist; is that correct?

21     A.  That is correct.

22     Q.  You mentioned the multiple sclerosis course and

23    the revenue associated with that.

24         That was in 2014; is that correct?

25     A.  The revenue from that course spans from its
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

 1    Sorry.

 2              MR. WILSON:  Sure.  I am not sure it has a

 3    number.  These were documents provided to us by John in

 4    relation to Navigant, I believe.

 5              THE WITNESS:  Yes, there is a 2015.

 6    BY MR. WILSON:

 7       Q.  Great.  Does that one have a number on it?

 8       A.  Nope.

 9       Q.  Okay.  Can you tell by looking at those two

10    documents how your catalogs performed in California,

11    Texas, and Ohio 2014 versus 2015?

12       A.  In California in 2015, there were slightly more

13    sales for the California booklet -- in 2015 compared to

14    2014.

15              For the Texas nursing booklet, there were more

16    sales -- it looks like more significantly -- I won't

17    qualify it.  There were more sales in 2014 than there

18    were in 2015.

19              And in Ohio, there were almost twice as many

20    sales in 2015 compared to 2014.

21       Q.  Is it fair to say that the sales by NetCE of

22    catalogs in California, Texas, and Ohio during 2014 and

23    2015 had nothing to do with the multiple sclerosis

24    article being present in the catalog in 2015?

25       A.  Could you repeat your question?

 1    Q.  Fair to say that the sales of catalogs in 2014 in

 2  California, Texas, and Ohio had nothing to do with the

 3  presence of the multiple sclerosis article in those

 4  catalogs?

 5    A.  I cannot say that.

 6    Q.  How much of any of the sales in 2014, now that

 7  you've compared them to 2015 sales, were attributable to

 8  the presence of the multiple sclerosis article in the

 9  2014 catalogs in California, Texas, and Ohio?

10    A.  I don't know.

11    Q.  Can't tell, can you?

12    A.  That is not possible for me to determine.

13    Q.  How would anyone determine it?

14    A.  I don't know how someone would try to determine

15  that.

16          MR. KERN:  Calls for speculation.

17          MR. WILSON:  I agree.

18          THE VIDEOGRAPHER:  You don't have your mic

19  on.

20          MR. KERN:  Oh, sorry.

21  BY MR. WILSON:

22    Q.  Did any catalogs -- let me ask it this way.

23          Did NetCE offer any catalogs in 2013 through 2017

24  that were missing courses?

25    A.  I'm not sure what you mean by "missing courses."

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1      Q.  That didn't include the number of courses that

2   that catalog called for?

3      A.  We did not publish any partial catalogs.

4      Q.  So every catalog from 2013 to the present

5   published by NetCE had the full assortment of courses in

6   it for NetCE's customers to review and take; is that

7   correct?

8      A.  We did not publish any catalogs with a course

9   missing.

10            (Reporter clarification.)

11   BY MR. WILSON:

12      Q.  Can you point to any revenue that NetCE lost

13   because of the decision by NetCE not to publish the five

14   courses at issue in this case?

15      A.  In terms of lost revenue?

16      Q.  Yes, ma'am.

17      A.  We can only calculate that based on the example

18   of already-released courses.

19      Q.  But you just told me that all of your catalogs

20   had their full allotment of courses in them; right?

21      A.  All of the catalogs that we published between

22   2013 and 2017 included the number of courses that we

23   found necessary.

24      Q.  And so are you able to point to any revenue that

25   NetCE lost because one of these five courses wasn't in

```
 1   one of those catalogs?

 2       A.  That would require me to speculate about the

 3   value of those courses in relation to other courses, and

 4   I'm not able to do that.

 5       Q.  I know I sound like a broken record, but you're

 6   the person I get to talk to on that point, and you've

 7   been designated on this very topic.

 8           So as you sit here today, you're not able to

 9   provide me any testimony pointing to any revenue that

10   NetCE lost because of -- because one of these five

11   courses was not published by NetCE; correct?

12       A.  The evidence that we have is that similar -- a

13   similar product by the same author, whether it was

14   featured or as a standalone course, generated a certain

15   amount of revenue and to project that that is a good

16   example of what the five courses in question may have

17   brought in.

18       Q.  But in order to lose revenue, you have to not

19   have offered something where you otherwise would have to

20   make the money that you're -- that you're talking about;

21   right?

22       A.  I can't really speculate as to the value that

23   those courses would have brought to or diminished the

24   special offers, but I do know that, as a standalone

25   course, they weren't replaced at all.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

 1     Q.  And in interrogatory response number 8, you state

 2   that, "The individual net course revenue for the

 3   multiple sclerosis course was $84,000 in 2014."  That's

 4   in Exhibit 75.

 5     A.  That is the total individual net course revenue

 6   for the standalone course online and in print.

 7     Q.  The five courses at issue between NetCE and

 8   Elite, you can't predict with any certainty if those

 9   courses were included in any catalogs, whether their

10   presence there might have actually caused a decrease in

11   revenue for NetCE; correct?

12     A.  I can't speculate as to whether it would have

13   increased or decreased the value.

14     Q.  And is that because of the laundry list of

15   factors that affect how courses in catalogs perform in

16   this business?

17     A.  There are many factors that affect how our

18   special offer catalogs perform, and it's impossible to

19   predict all of the factors that come into play.

20     Q.  NetCE achieved revenues for sales of courses in

21   all of its catalogs between the years 2013 and 2017;

22   correct?

23     A.  I am not sure I understand.  Can you restate

24   that?

25     Q.  I think it's a very basic question.

1          NetCE realized revenues had sales, money was sent

2     to NetCE for sales of catalogs between the years 2013

3     and 2017; correct?

4          A.  Yes.

5          Q.  And those revenues are reflected in at least two

6     of the spreadsheets that we look at in Exhibit 85;

7     correct?

8          A.  The cost versus revenue by catalog spreadsheets

9     do reflect the revenue that came in from those catalogs.

10         Q.  And NetCE also realized revenue from individual

11    course sales for the years 2013 to 2017; correct?

12         A.  That's correct.

13         Q.  And which documents reflect those revenues?

14         A.  We have a few different reports that provide

15    information on sales by product and sales by course

16    available to us.

17         Q.  What is the best selling course by individual

18    course revenue that NetCE has ever sold?

19         A.  I don't know.

20         Q.  It would be reflected in those documents that you

21    just described?

22         A.  I'm not sure how far back the sales records -- I

23    am not sure that they go back to the inception of the

24    company.

25         Q.  The $84,000 in individual course revenue for the

1    multiple sclerosis course in 2014 that you've described

2    in interrogatory response number 8 --

3        A.  Yes.

4        Q.  -- is that typical or atypical for NetCE for an

5    individual course sale in a year?

6        A.  I think there may be a -- can I look through

7    these documents?

8        Q.  Yeah, take your time.

9        A.  On the courses scheduled for update 2016

10   document?

11       Q.  That's Navigant 2.  Yes?

12       A.  Yes.  This is only courses that were scheduled to

13   be updated in 2016, and it includes COPD, which was one

14   of the Jouria courses.  And it also includes multiple

15   sclerosis.

16          I just want to point out that this was created at

17   the beginning of 2016; so courses that were scheduled to

18   expire later in the year would gain additional revenue

19   throughout the year.  That was the case with multiple

20   sclerosis.  It was not scheduled to expire until very

21   late in the year.

22          But you can see here our examples of the

23   individual course revenue for courses scheduled to be

24   revised in 2016, and multiple sclerosis appears on the

25   second page, kind of middle -- middle of the -- middle

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                                        Page 157

 1    of the road.

 2        Q.  And it shows a lifetime revenue of $67,272.15; is

 3    that correct?

 4        A.  As of the beginning of 2016, that was correct.

 5        Q.  And that's revenue that's attributable to this

 6    course, even as it's featured in the three catalogs that

 7    we mentioned -- or that you mentioned earlier in your

 8    testimony; correct?

 9        A.  That's right.  This doesn't include completions

10    as part of the special offer or any subscriptions.  If a

11    learner had a subscription and completed the course as

12    part of that, it doesn't include that revenue either.

13        Q.  There's no way for us to predict with any

14    certainty how much revenue any particular course is

15    worth for a special offer like you described; right?

16        A.  As we discussed, I am not able to ascertain the

17    value of the course specific in a special offer.

18        Q.  And if you're not able to, because you're the one

19    here testifying in response to these topics, who is?

20        A.  I'm not sure that anyone could predict or

21    determine the amount of weight that a single course in a

22    bundled course offering had on a participant's decision

23    to complete that special offer.  But there are ways that

24    you could calculate it for ease of determining revenue,

25    either based on the percent that a course is responsible

```
 1   for the overall content of that booklet or some other
 2   means that I'm not aware of.
 3       Q.  Even if you could attribute it like you're
 4   describing by some percentage that that course achieves
 5   in a booklet or a catalog, in order to understand lost
 6   revenue, you'd have to not just look at the revenue,
 7   you'd have to back out of whatever revenue you attribute
 8   to that course -- let me see if -- I'm confusing myself.
 9   Let me see if I could do it a different way.
10           In reading NetCE's response to interrogatory
11   number 8, NetCE seems to be suggesting that it lost
12   $35 million in revenue as a result of what were the
13   seven courses at issue prior to two being dismissed.
14           Did I read that correctly?
15       A.  That is correct.
16       Q.  Now we're at five courses.
17           Is it fair to they that that calculation is now
18   $25 million?
19       A.  That seems reasonable, yes.
20       Q.  During the time period in question, though -- I
21   think we've established this -- NetCE had revenues and
22   achieved sales for all of the catalogs that it offered
23   throughout all of the different jurisdictions; correct?
24       A.  During the period of 2013 to 2017, there were
25   sales of catalogs in all of those years.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                 Sarah Campbell on 11/14/2017                 Page 160

```
 1   BY MR. WILSON:

 2      Q.  So to determine what was actually lost, if

 3   anything, you'd have to back out of the number provided

 4   here, the actual sales achieved by NetCE; otherwise, you

 5   would be double counting; right?

 6              MR. KERN:  Asked and answered.

 7              THE WITNESS:  I don't know.

 8   BY MR. WILSON:

 9      Q.  Well, just --

10      A.  As a non-accountant, I am not totally sure how

11   that could be calculated in a meaningful way.

12      Q.  There would have to be some accounting made for

13   sales actually made during the relevant time period by

14   NetCE so that NetCE wasn't getting rewarded twice for

15   sales that it says it would have made.

16              MR. KERN:  Asked and answered.

17   BY MR. WILSON:

18      Q.  Right?

19              MR. KERN:  Asked and answered.

20              THE WITNESS:  I don't know.

21   BY MR. WILSON:

22      Q.  Does that make sense at all?

23              MR. KERN:  It's not a question.

24              THE WITNESS:  It's not really my area of

25   expertise.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

 1   BY MR. WILSON:

 2      Q.  Well, again, you're the one I get to talk to on

 3   the issue of damages.

 4      A.  Yes, I am.

 5      Q.  What revenue in this case is NetCE claiming it

 6   lost because of Elite's conduct?

 7      A.  NetCE is claiming, based on an example of a

 8   course that we were able to publish that was also

 9   commissioned from Dr. Jouria, that these courses would

10   have made similar amount of revenue to that example

11   course of multiple sclerosis.  That multiple sclerosis

12   course was featured in a few catalogs.  It was sold as a

13   standalone offering, and the total revenue from those

14   available versions of the course was about 4.7 million,

15   a little bit more.  And that's how we are determining

16   the damages insofar as lost revenue in this case.

17      Q.  In promoting that number, has NetCE taken into

18   account the actual revenue that it achieved during the

19   period in question?

20      A.  Have we taken it into consideration?

21      Q.  No.  Have you taken it into account?

22      A.  Into account.

23          I am not sure how that would be done; so, no, I

24   did not.

25      Q.  Well, even if you assume -- even though there's

 1  no evidence to support this -- we've already covered

 2  this -- that any of these five courses would have ended

 3  up in the exact same catalogs as the MS course -- that

 4  being California, Texas, and Ohio -- during the time

 5  period in question, NetCE achieved revenues for sales of

 6  other courses in catalogs in California, Texas, and

 7  Ohio; right?

 8            MR. KERN:  Asked and answered three times.

 9            THE WITNESS:  That's correct.

10  BY MR. WILSON:

11    Q.  Doesn't it make sense that NetCE should have to

12  account for the revenue it actually made from sales in

13  calculating what it alleges it lost by not publishing

14  the five courses in question?

15            MR. KERN:  Asked and answered multiple

16  times, Mark.  You can't just keep grinding on her until

17  you get the answer you like.  We do have an expert

18  witness in this case.  You will have a chance to take

19  their deposition.

20            THE WITNESS:  I am not able to speculate

21  whether the amount of revenue from featured courses

22  would be more or less than that; so I'm not aware of a

23  way of making that calculation.

24  BY MR. WILSON:

25    Q.  And in calculating the $25 million number that

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

1   you testified about, did NetCE take into account the

2   fact that the $4.7 million number included sales of

3   other courses in addition to the MS course?

4       A.  When this calculation was made, it was unclear

5   how to parse out the amount of value for an individual

6   course in the special offer booklet; so the entire

7   booklet revenue was included in that calculation.

8           But, again, I understand that there may be a way

9   that I am not aware of to attribute value to a partial

10  special offer, but I wasn't able to do that accurately

11  with the knowledge that I had.

12      Q.  So you attributed all of the revenue for those

13  catalogs, even though they included additional courses,

14  for purposes of calculating the number that you've

15  promoted here to us?

16      A.  In this calculation, it's the total revenue minus

17  the costs associated with the special offers, regardless

18  of how many courses were in that special offer.

19      Q.  How do you know whether the $4.7 million in

20  revenue -- whether that number was the result of one of

21  the other courses and not the MS course?

22      A.  I don't know the extent to which the revenue is

23  or is not attributable to the multiple sclerosis course.

24      Q.  In calculating the $25 million number that you've

25  promoted here today, did you take into account any of

1   the factors we discussed that influence how a course

2   might perform?

3       A.  I don't think it's possible to predict all of the

4   factors that can influence the components of a special

5   offer; so -- or how to quantify them; so they were not

6   considered in this calculation.

7       Q.  So in promoting the $25 million number that

8   you've talked about today, NetCE assumed that each of

9   these five courses at issue would have performed --

10  excuse me -- would have been included in the California

11  nurses catalog, the Texas nurses catalog, and the Ohio

12  nurses catalog and would have performed comparably with

13  whatever courses were also included in those catalogs as

14  the MS course and its other courses in those same

15  catalogs in 2014; is that correct?

16      A.  The multiple sclerosis course was chosen as the

17  example course because it was featured in three special

18  offers.  The COPD course, for example, was featured in,

19  I believe, two or three more special offers than that.

20  And the pressure ulcers course was featured in, I

21  believe, two special offers.

22          So it seemed to be a good medium ground for

23  determining potential lost revenue.  There's no

24  guarantee of which special offers it could have been in

25  more, it could have been in less.

```
 1      Q.  And that would have directly influenced the
 2   revenue that each of those courses would have achieved;
 3   right?
 4      A.  The total revenue for special offers would be
 5   more if it was featured in more special offers and would
 6   be less if it was featured in fewer special offers.
 7      Q.  And there was no -- there's no evidence before us
 8   that any of these courses would have been in any special
 9   offers at all.
10      A.  The evidence that I have is that our intent, when
11   accepting the courses for development with a medical
12   writer who is paid a higher amount, was to feature each
13   of the courses.
14      Q.  How many times?
15      A.  That would be determined later; so I don't know.
16      Q.  And over what period of time would you feature
17   them?
18      A.  Courses can be featured at any time in their
19   life, and that includes after their revision; so there's
20   no real time period or limitation.
21      Q.  And you've had courses at NetCE that were written
22   by professional authors that performed worse than the
23   $4.7 million that you've talked about with regard to the
24   MS catalogs; correct?
25      A.  I don't know.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

Sarah Campbell on 11/14/2017

1    Q.  Not every course written by a professional author

2    has achieved $4.7 million in revenue at NetCE; right?

3    A.  I don't know.

4    Q.  Well, just looking at the document here, the

5    first page of Exhibit 85, it tells us that --

6    A.  This document includes professional writers and

7    clinicians; so professional writers -- for the most

8    part, the majority of these courses were authored by

9    clinicians, not professional writers.

10    Q.  Well, let's turn to the multiple sclerosis

11    article on page 2 of Exhibit 85.  It's Navigant 3, is

12    the Bates number.

13        It shows a lifetime revenue of $67,272.15 up

14    though, I understand, 2016; right?

15    A.  Early probably December 2015 or January 2016.

16    Q.  How is that number calculated?

17    A.  It was calculated with an internal tool we have,

18    sales by product.

19    Q.  So how do you explain the difference between the

20    $67,000 lifetime revenue figure in Exhibit 85 for

21    multiple sclerosis and your $4.7 million figure that

22    you're promoting here today?

23    A.  This amount is the lifetime revenue as of early

24    2016 for the individual standalone course.  It -- this

25    course expired towards the very end of 2016; so it

 1   attributed to the special offers was over two years, and

 2   the individual net course revenue of 84,000 was over

 3   three years.

 4       Q.  And according to this verified interrogatory

 5   response, NetCE wants $25 million for one year alone,

 6   and "alone" is in italics.  I didn't do that.  NetCE

 7   did.

 8          How do you explain that?

 9       A.  The bulk of the revenue from a special offer

10   booklet occurs in the first year alone.  More than half,

11   and in some cases, substantially more than half.

12          But I can't tell you the percentage of that total

13   two-year revenue that occurred in the first year or

14   occurred in the second year.

15              MR. WILSON:  Let's take a break.

16              MR. KERN:  Thank you.

17              THE VIDEOGRAPHER:  The time is 4:04 p.m.,

18   and we're off the record.

19              (Off the record.)

20              THE VIDEOGRAPHER:  This is the beginning of

21   media number 4 in the deposition of Sarah Campbell.  The

22   time is 4:18 p.m., and we're back on the record.

23   BY MR. WILSON:

24       Q.  Ms. Campbell, I'm going to hand you what has

25   previously been marked as Exhibit 46 -- excuse me, 45.

1        Earlier today in your testimony, you talked about

2   seeing some documents in discovery related to Dr.

3   Jouria's relationship with Elite.  And you mentioned, I

4   believe -- and correct me if I'm wrong -- that you saw

5   some e-mails that showed the topics that Dr. Jouria was

6   going to write on for Elite and also a reference to the

7   agreements that Dr. Jouria had with NetCE.

8        Do you recall that testimony?

9   A.  I do.

10  Q.  Is Exhibit 45 one of the e-mails that you -- or

11  the e-mail that you were referencing in your testimony?

12  A.  This is not the e-mail I was referring to.

13  Q.  Well, if you take a look for a second at

14  Exhibit 45, you see down at the bottom of the first

15  page -- excuse me.  On the second page, you see an

16  e-mail from Tracey Foster to Dr. Jouria, dated

17  February 6, 2013, where Tracey says, "I was trying to

18  find your list of topics that you suggested, but since I

19  closed the job on elance, I cannot access your

20  suggestions.  Will you please send me the subjects

21  again, and then I will put them in the order we wish to

22  receive."

23       Do you see that?

24  A.  I do see that.

25  Q.  Below that e-mail is an e-mail from Dr. Jouria

 1    talking about the women and heart disease course.

 2          There's no reference there to NetCE; right?

 3    A.   There is no reference to NetCE.  That's right.

 4    Q.   Turn to the first page of Exhibit 45.  Dr. Jouria

 5    responds to Tracey Foster and says, "Here's the list."

 6    And you see in that list the five courses at issue here

 7    today:  chemotherapy, GERD, antimicrobial pharmacology,

 8    traumatic brain injuries, and dementia versus depression

 9    in the elderly.

10          Do you see that?

11    A.   I see those five subjects you just listed, yes.

12    Q.   No reference to NetCE; right?

13    A.   There is no reference to NetCE.

14    Q.   And then Ms. Foster responds to Dr. Jouria at the

15    top -- this is now in February -- February 6th

16    of 2013 -- and says, "Your list is perfect.  You can --

17    you can just proceed as listed."

18          Do you see that?

19    A.   I do.

20    Q.   Again, no reference to NetCE to this exhibit at

21    all; right?

22    A.   That's right.

23    Q.   Then you turn to Exhibit 46.

24          Before I get into specific questions, you said

25    earlier today that you had read the transcript from

1    Dr. Jouria's deposition; correct?

2        A.  That's correct.

3        Q.  So you recall that Dr. Jouria confirmed at his

4    deposition that the first time he made Elite aware of

5    the fact that he had written for NetCE was in October of

6    2013.

7            Do you recall that?

8        A.  I don't specifically recall that from his

9    deposition, but I do recall seeing the e-mails in

10   Exhibit 46.

11       Q.  So this is the e-mail that you were talking about

12   earlier in your testimony; is that correct?

13       A.  Yes.

14       Q.  And what we see in Exhibit 46, if you turn to the

15   page that has an e-mail on it dated October 11th, 2013,

16   from Dr. Jouria to Michelle Franchi.

17       A.  Yes.

18       Q.  Middle of the page, there's an e-mail from

19   Dr. Jouria dated October 10, 2013, where, for the first

20   time, he's informing Elite that he's written courses for

21   NetCE.

22           Do you see that?

23       A.  I can see that he's informing them in that e-mail

24   that he's written courses for companies including NetCE.

25       Q.  Any reason to -- and this lines up with his

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 176

```
 1              MR. KERN:  You are testifying, Mark, and
 2    asking her correct --
 3              MR. WILSON:  I am allowed to ask leading
 4    questions of this adverse witness.
 5              MR. KERN:  -- the entire day.
 6              MR. WILSON:  And that's how a deposition
 7    goes, John.  Maybe you should take a look at one
 8    sometime.
 9              MR. KERN:  That's pretty funny.  It's a
10    master class.
11    BY MR. WILSON:
12    Q.  So here what we have is Elite being informed for
13    the first time eight months later that Dr. Jouria is
14    working also with NetCE and other CE providers.
15         Do you see that?
16    A.  I can see that he's disclosing to them in October
17    that he's worked with other providers including NetCE,
18    but I don't know if he had conveyed that information
19    before that date or not.
20    Q.  Do you have any evidence to suggest that he had?
21    A.  In that e-mail that he received from Michelle
22    before that, she specifically inquires about whether the
23    courses in question were sold to NetCE, and I don't know
24    why she's asking that question.  You would have to ask
25    her.
```

1     Q.   I appreciate that.

2          But as you sit here, you have no evidence to

3     dispute what Dr. Jouria testified about and what these

4     documents corroborate, do you?

5     A.   What he testified about in relation to?

6     Q.   Informing Elite about his involvement with NetCE.

7     A.   I don't have evidence either way.  But I

8     understand that we're still receiving documents and

9     information; so it could change.

10    Q.   And then we saw an e-mail here on October 15th

11    from Dr. Jouria to Michelle Franchi where he says, "I

12    did not sign exclusive rights with NetCE."  We also

13    talked earlier today about the fact that Dr. Jouria

14    testified at his deposition that he refused to provide

15    his contracts to Elite.

16         Does this not indicate to you -- excuse me.

17         Do you have any reason to dispute the statement

18    by Dr. Jouria made to Elite about his contract?

19    A.   I'm not sure what you're asking.  Could you

20    rephrase?

21    Q.   Let me see if I can.

22         You recall reading Dr. Jouria's testimony from

23    his deposition that he refused to provide Elite with a

24    copy of his contracts with NetCE; correct?

25    A.   That's correct.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1    Q.  And you have no reason to dispute that testimony;

2   right?

3    A.  I have no evidence, at this time, to dispute

4   that.

5    Q.   Indeed, if you'd flip one page forward in

6   Exhibit 46, Ms. Franchi, on October 28, 2013, writes an

7   e-mail to Dr. Jouria, and the first paragraph says, "I

8   asked you to send me the contracts with these other

9   companies, and you declined."  So we have Dr. Jouria

10   saying I didn't send them to her, and we have a

11   corroborating e-mail from Ms. Franchi saying, "You

12   didn't send them to me."

13        Do you have any reason to dispute what

14   Ms. Franchi is saying here?

15    A.  I have no evidence to dispute it at this time.

16    Q.  So the evidence that we do have, as it pertains

17   to Dr. Jouria's freelance writer agreements with NetCE,

18   is that he didn't inform Elite of his involvement with

19   NetCE until eight months after he started working with

20   them, and when he was asked to provide his contracts, he

21   declined.  And when Elite asked him what's in those

22   contracts, he said, "I did not sign exclusive rights."

23    A.  Are you asking if I acknowledge those things?

24    Q.  Given that evidence, which you don't dispute;

25   correct?

 1    A.  I do not have -- I cannot tell whether or not

 2  they were aware that he had a relationship with NetCE

 3  prior to the dates of this e-mail.

 4    Q.  So given that evidence, what basis do you have to

 5  say that Elite intentionally interfered with any

 6  contracts between Dr. Jouria and NetCE?

 7            MR. KERN:  Asked and answered multiple times

 8  this morning.

 9            THE WITNESS:  So we were aware that there

10  was a relationship between Alpine and Elite.  We knew

11  that Alpine was in receipt of information that we were

12  working with Jouria in plan to develop specific courses

13  with him.  And we knew that Elite then developed these

14  courses in that same time period, and that led us to

15  conclude that they had the prior knowledge -- worked on

16  these courses.

17            And I can't say for sure if they released

18  these courses knowing that he had contracts with us and

19  not knowing what the content of those contracts were --

20  continued to work with them -- sorry.  Elite continued

21  to work with Jouria to develop the content that they

22  knew that he had worked with us to do.

23  BY MR. WILSON:

24    Q.  And the reason you're saying they knew it was

25  through the Alpine connection; is that correct?

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1      A.  We know that Alpine knew of his relationship with
 2   Jouria -- of NetCE's relationship with Jouria and our
 3   intent to develop these subjects.  But, also, this
 4   e-mail indicates that before they published some or all
 5   of these courses, they knew that we had a contract with
 6   Jouria as well.
 7      Q.  Were the freelance writer agreements what
 8   Dr. Jouria provided to Alpine?
 9      A.  I don't think so, no.
10      Q.  And as we sit here today, you have no evidence to
11   support your allegation that Alpine or McKissock shared
12   any information as it pertains to Dr. Jouria with Elite;
13   correct?
14      A.  As we sit here today, the -- we have testimony
15   from Dan Cremons that Alpine did not share the
16   information, but we don't have any evidence one way or
17   another from McKissock or a representative of McKissock.
18      Q.  Has NetCE sought such evidence as part of
19   discovery in this case?
20      A.  Not yet.
21      Q.  Just like we saw in Exhibit 45 with Elite,
22   Dr. Jouria also suggested courses in the subject matter
23   of the five courses at issue in this case to NetCE;
24   isn't that correct?
25      A.  Some of these course topics were suggested by
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1   Jouria to NetCE.

 2      Q.  Which ones were not?

 3          I'm not -- I moved on from here.

 4      A.  I thought you were talking about 45.

 5      Q.  We see in -- let me see if I can make it a little

 6   more simple.

 7          We see in Exhibit 45 that Dr. Jouria suggested to

 8   Elite that he wanted to write on a host of topics,

 9   including the topics that -- that formed the basis of

10   the five courses at issue here between NetCE and Elite;

11   right?

12      A.  There are similar topics on this list, and in

13   question here, yes.

14      Q.  Dr. Jouria said to Elite, "Here is a list of

15   possible topics for future courses," and he suggested

16   chemotherapy, GERD, antimicrobial pharmacology,

17   traumatic brain injuries, and dementia versus depression

18   in the elderly; right?

19      A.  Those are included in this list.  That's correct.

20      Q.  And those are the five courses that Elite

21   published that NetCE is suing on; correct?

22      A.  Not exactly.

23      Q.  What's the difference?

24      A.  The courses in question that differ are cancer

25   and chemotherapy, which includes a component amount of
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1   a nonantibiotic antimicrobial pharmacology course;
 2   right?
 3      A.  Those courses had not entered into the editorial
 4   process to the extent that GERD and cancer and
 5   chemotherapy had.
 6      Q.  It's possible, isn't it, that all three of those
 7   articles are completely filled with plagiarized content?
 8      A.  They may, or they may not.
 9      Q.  You don't know?
10      A.  We haven't vetted the content to that level.
11      Q.  So for those three courses, at least, you haven't
12   undertaken any investigation as to what content NetCE
13   owns?
14      A.  All three of those courses have been run through
15   iThenticate, but we haven't done a manual comparison to
16   determine if the sources of any identified matches would
17   constitute plagiarism.  But we also believe that we own
18   all of the content as it was provided to us by
19   Dr. Jouria.
20      Q.  In NetCE's complaint, in particular, paragraph 71
21   of Exhibit 42, NetCE says that it is unable to use the
22   content Dr. Jouria submitted.
23         Why is that?
24      A.  Just one moment.  There's a lot of papers.
25      Q.  Let me ask it this way.
```

1          Is NetCE able to use the content Dr. Jouria

2    submitted to it?

3      A.   We do not believe that we can use the content in

4    these five courses for the purposes of providing to the

5    public to issue continuing education credit.

6      Q.   Why not?

7      A.   These courses have been published by another

8    company.

9      Q.   And what is the issue with that?  You say you own

10   it.  Why can't you use it?

11     A.   The inherent value of the courses is, in our

12   minds, diminished by them being offered by another

13   company.  And, in addition, it introduces the

14   possibility of customer confusion about whether or not

15   Elite and NetCE are unique entities.  And it potentially

16   overlaps with courses that have beat us to market; so

17   customers could have already completed the same content,

18   making it less valuable to them in general.

19     Q.   It was a business decision made by NetCE not to

20   continue with these five courses; isn't that correct?

21     A.   It was a decision made by NetCE to halt course

22   development on these five courses until we could

23   determine what was going on with Elite and with Jouria,

24   and we are still doing that now.

25     Q.   Has NetCE considered continuing development of

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

1    these five courses?

2       A.  I have not considered that.

3       Q.  I didn't ask if you had.

4           Has NetCE?

5       A.  NetCE has not considered that.

6       Q.  Is it possible that NetCE will consider that?

7       A.  No.

8       Q.  Why not?

9       A.  For the reasons that I detailed before about the

10   diminished value of these courses in light of their

11   already being offered, customer confusion, which is an

12   ongoing issue, and a disinclination to put additional

13   work into these courses when that value is -- inherently

14   already been stripped from them.

15      Q.  And what do you base your testimony that the

16   value has been stripped from these courses?

17      A.  There is a value in being the first to market.

18   There is a value in being the only provider of specific

19   content, and that cannot be regained at this point.

20      Q.  What do you base your belief that there's value

21   in being the first to market with certain content?

22      A.  We have feedback from customers that they have

23   confusion when a course has a similar or same title.

24   But, also, we have feedback from customers that they

25   wanted a specific topic, and they completed it with

```
 1     A.  The evidence that we have is knowledge of the

 2   market in general but also feedback from customers

 3   requesting additional pharmacology credits and

 4   expressing difficulty obtaining all of the credits they

 5   needed.

 6     Q.  In the complaint, which is Exhibit 42, paragraph

 7   69 -- it's on page 25 -- NetCE states, "NetCE's

 8   competitive advantage and profitability for its courses

 9   depends upon a first-to-market posture.  Elite's,

10   Alpine's, and Dr. Jouria's actions deprived NetCE of

11   this hard-fought advantage.  For NetCE to publish the

12   seven articles after Elite had done so would have

13   involved additional expenditures and investments that

14   the prospect for diminishing returns is no longer

15   justified."

16         Do you see that?

17     A.  I do.

18     Q.  And is the basis for that the same as what you

19   just testified about as to why NetCE can no longer use,

20   according to you, the courses Dr. Jouria provided

21   through you?

22     A.  My testimony, yes, would be the same in response

23   to that.

24     Q.  And that's related to the titles, the content,

25   the subject matter of these courses, if NetCE were to
```

 1   publish them now, they would not be the first to market;

 2   is that correct?

 3       A.  That's correct.

 4       Q.  And then in Exhibit -- excuse me -- paragraph 69,

 5   it continues and says, "For NetCE to publish the seven

 6   articles after Elite had done so would have involved

 7   additional expenditures and investments that the

 8   prospect for diminishing returns is no longer

 9   justified."

10           And the basis for that is the same; is that

11   correct?

12       A.  That is correct.

13       Q.  Did NetCE do any analysis of the market prior to

14   contracting with Dr. Jouria to see if others had

15   published courses with the same titles or subject matter

16   as the five courses at issue here?

17       A.  The five courses at issue here represent general

18   medical topics that I would expect that other providers

19   have similar offerings on.  But the credit types and the

20   exact content I would expect to be different.

21       Q.  In your work on at least the GERD and cancer and

22   chemotherapy articles, what Dr. Jouria submitted to you

23   was never going to be published in its submitted form;

24   right?

25       A.  The GERD course and the cancer and chemotherapy

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 198

1   course had been edited, and it was my expectation that

2   the edited versions were the ones that would essentially

3   be released.

4       Q.  I believe you testified earlier that, at least

5   with the GERD course, that the edits were significant;

6   is that correct?

7       A.  The edits --

8               THE VIDEOGRAPHER:  Hold on.  We got to go

9   off record.  The time is 5:12 p.m., and we're off the

10  record.

11              (Off the record.)

12              THE VIDEOGRAPHER:  The time is 5:13 p.m.,

13  and we're back on the record.

14  BY MR. WILSON:

15      Q.  The edits to the GERD course were significant;

16  correct?

17      A.  There were many edits to the GERD course, but

18  whether or not they were extensive is subjective, I

19  guess.

20      Q.  How would you qualify the edits to the GERD

21  course?

22      A.  Let me review.

23              There were many edits to the GERD course, and it

24  required significant work to bring it to NetCE's

25  standards and style, but it's not outside of the realm

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Page 212

 1   similar to the drafts that we receive from Jouria, and

 2   our investigation found that only Elite had published

 3   this content.

 4      Q.  Do you know of any competitors who plan to offer

 5   similar courses or courses with significant overlap?

 6      A.  I don't know any of our competitors' plans for

 7   the future.

 8      Q.  Are you aware of any competitors who did this in

 9   the past?

10      A.  Who did what in the past?  I'm sorry.

11      Q.  Offered or plan to offer similar courses or

12   courses with significant overlap.

13      A.  Again, using my definition of "similar" and

14   "overlap," my investigation found that only Elite had

15   published this content for continuing education credit.

16      Q.  What -- what investigation did you do to

17   determine this?

18      A.  When we first found the infringement, I did some

19   additional investigation to determine if Jouria had

20   possibly sold the content somewhere else or if it had

21   been published by another provider.  And I did

22   additional research in comparing dates of release to

23   determine when Elite had initially provided these

24   courses.  And when I did my research as discussed

25   before, I found that only Elite had published this

1   content for continuing education credit.

2      Q.  You mentioned earlier that NurseCe4Less had

3   published a course called "head trauma."

4      A.  That's correct.

5      Q.  Was that course written by Dr. Jouria?

6      A.  The course that I found on their Web site was

7   written by Dr. Jouria.

8      Q.  Was it similar to or have overlap with the

9   traumatic brain injury course?

10     A.  It had overlap insomuch as the learning

11  objectives were similar or the same, in my recollection.

12  And that was the similarity that I was able to identify

13  based on my visual inspection.

14     Q.  I think you also testified earlier that there

15  were others published by NurseCe4Less -- or NurseCe4Less

16  on similar topics or with overlap in the subject matter;

17  is that correct?

18     A.  There were other courses published by

19  NurseCe4Less that appeared to the same or similar

20  learning objectives and may have addressed subjects that

21  were the same or similar to the five courses in

22  question.

23          But in terms of content, it was unclear whether

24  the degree of similarity matched the degree witnessed in

25  Elite's publications.

1    Q.  Regardless of whether the similarity matched,
2  according to you, the fact that NurseCe4Less had beaten
3  NetCE to market with these courses impacted the value of
4  these courses to NetCE; isn't that correct?
5    A.  I would not say that NurseCe4Less had, in the
6  same way, beaten NetCE to market.  Their courses were
7  shorter, and the content, at least in the case of the
8  head trauma course, was different in a way that Elite's
9  was not.
10    Q.  NetCE accused NurseCe4Less of committing
11  copyright infringement; correct?
12    A.  We sent them a cease and desist.  That's correct.
13    Q.  And you also included allegations against
14  NurseCe4Less in your California lawsuit; isn't that
15  correct?
16    A.  I believe so.
17    Q.  And in making these accusations against
18  NurseCe4Less, NetCE claimed that NurseCe4Less was
19  damaging it by its conduct; isn't that correct?
20    A.  That is correct.
21    Q.  So what was the damage that NurseCe4Less was
22  doing to NetCE?
23    A.  That --
24    Q.  And how was it any different from what you're
25  alleging against Elite?

```
 1     A.  So that was filed before we had additional

 2   information.  We gathered more information in the course

 3   of our suit, and NurseCe4Less took measures to stop

 4   providing the content in question and, therefore,

 5   limited the damages, which were already potentially less

 6   based on the extent of similarity compared to the issue

 7   of these five courses in Elite.

 8     Q.  So you believe that the content being offered by

 9   NurseCe4Less was similar enough to make allegations and

10   send a cease and desist letter, but the damage --

11   whatever that is, because you didn't answer that

12   question -- was less than whatever damage you say Elite

13   was performing on NetCE.  Is that your testimony?

14     A.  I am saying that the extent of similarity did not

15   reach that of Elite's, but there were similarities

16   enough that they had violated our copyright.

17     Q.  So I'll ask you again --

18     A.  So we requested that they cease and desist their

19   publication of our copyrighted materials, which they

20   did, to my knowledge.  And so the damages brought by

21   their providing those learning objectives before NetCE

22   were limited in a way that they were not by Elite's

23   publication of these five courses.

24     Q.  And I'll ask again.

25         What was the damage done to NetCE by
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

**Sarah Campbell on 11/14/2017**

```
 1   NurseCe4Less?

 2      A.  They had violated our copyright.

 3      Q.  Did you put a dollar figure on the harm being

 4   caused?

 5      A.  We had not gotten to that point, no.

 6      Q.  In estimating the damage in this case caused by

 7   Elite to NetCE, have you taken into account the damage

 8   caused to NetCE by NurseCe4Less?

 9      A.  I have not, and I am not sure how I would do

10   that.

11      Q.  So we're clear, the learning objectives that were

12   allegedly published by NurseCe4Less were in the head

13   trauma head injury course; is that correct?

14      A.  I don't recall specifically which course, but

15   my -- but I believe that is true.

16      Q.  If your competitors had competitive course

17   offerings with the same titles, that would impact the

18   value of the courses at issue here to NetCE; correct?

19           MR. KERN:  What's the -- you're asking a

20   hypothetical?  Is that a hypothetical question?

21           MR. WILSON:  If you have an objection, you

22   can make it.

23           MR. KERN:  Speculation.  Foundation.

24   Incomplete hypothetical.

25           THE WITNESS:  I don't know the extent to
```

 1   which it would, but --

 2   BY MR. WILSON:

 3      Q.  You testified earlier that you were aware and are

 4   aware of course offerings by your competitors in the

 5   same subject matters as the five courses at issue here;

 6   correct?

 7      A.  I believe I stated that I would expect that our

 8   competitors would have the same or similar subjects to

 9   the extent that these are general science subjects, and

10   I would expect there to be some overlap.

11          However, I am not aware of any competitors that

12   are offering 30-hour pharmacology courses specifically

13   on, for example, nonantibiotic antimicrobial

14   pharmacology in one activity.

15      Q.  And have you performed a market study to find out

16   if there are competitors offering courses in the same or

17   similar subject matters?

18      A.  We have not conducted a formal market study.

19      Q.  I didn't use the word "formal," but I appreciate

20   your answer.

21          Have you conducted any market study?

22      A.  We generally monitor our competitors at a high

23   level and are aware of the offerings that they have in a

24   general sense.  It's not something that's conducted and

25   documented as part of a formal process.

 1      Q.  Are you aware of competitors offering courses

 2   with the same titles as any of the courses at issue

 3   between NetCE and Elite?

 4      A.  I would, again, expect the point to which these

 5   titles, in some cases, are very basic that there would

 6   be the same or similar titles offered, but I don't think

 7   that reflects the extent of the content offered therein.

 8      Q.  Does the fact that your competitors might have

 9   courses with the same titles impact the worth of the

10   Dr. Jouria courses to NetCE?

11      A.  I don't know.  Not necessarily.

12      Q.  You don't know one way or the other?

13      A.  I don't know the extent that that impact would

14   have on non-released courses, no.

15              MR. WILSON:  Let's take a break.

16              THE VIDEOGRAPHER:  The time is 5:52 p.m.,

17   and we are off the record.

18              (Off the record.)

19              THE VIDEOGRAPHER:  This is the beginning of

20   media number 5 in the deposition of Sarah Campbell.  The

21   time is 6:12 p.m., and we are back on the record.

22   BY MR. WILSON:

23      Q.  If you take a look at the complaint, Exhibit 42,

24   and turn to paragraph 72.  It's on page 26.  NetCE says,

25   "Lastly, upon information and belief, sales of

1    Dr. Jouria's prior courses with NetCE may be depressed

2    due to the high profile character of his relationship

3    with Elite and customer confusion as to source."

4         Do you see that?

5    A.  I do see that.

6    Q.  I believe you've talked a little bit today about

7    your concern about customer confusion; right?

8    A.  I have spoken about that, yes.

9    Q.  And just to confirm, with specific reference to

10   this allegation in the complaint, there's no evidence to

11   support whether or not sales may be depressed because

12   NetCE never tried selling them; correct?

13   A.  We don't know if it -- if they were depressed.

14   This is speaking specifically about, I believe, the

15   prior courses -- the three courses of Dr. Jouria's --

16   Q.  Fair.

17   A.  -- that we have published.

18   Q.  Fair.  Do you have any evidence to support the

19   notion that any sales of prior courses were depressed by

20   any conduct of Elite?

21   A.  We do not have evidence of the sales being

22   depressed or increased due to the relationship with

23   Elite.

24   Q.  In Exhibit 73, which are the Alpine documents --

25   this is your copy here, ma'am -- the last document is a

```
 1   confidential settlement agreement and release between

 2   NetCE and Alpine dated April 18, 2017.

 3           Have you seen this document before?

 4      A.  I have, yes.

 5      Q.  If you turn to the last page -- excuse me.  That

 6   document starts on page ALP- --

 7      A.  -75.

 8      Q.  -- -75.  If you turn to the last page, will you

 9   tell me what page that is numbered?

10      A.  ALP80.

11      Q.  You see some signatures there.

12           Do you recognize the signature Dennis Meinyer?

13      A.  I do.

14      Q.  That's who signed this document on behalf of

15   NetCE?

16      A.  Yes, that's correct.

17      Q.  If you turn to paragraph 11 in the settlement

18   agreement, you'll see a settlement amount paid by Alpine

19   to NetCE of $150,000.

20           Do you see that?

21      A.  I do.

22      Q.  NetCE receive that money?

23      A.  Yes.

24      Q.  In your damage estimates against Elite in this

25   case, has NetCE taken into account the amount paid to it
```

```
 1   by Alpine?

 2     A.   That was not a consideration when analyzing the

 3   damages incurred from Elite.  That's correct.

 4              (Exhibit No. 88 marked for identification.)

 5   BY MR. WILSON:

 6     Q.   I'm handing what I've marked as Exhibit 88.

 7   Exhibit 88 is a declaration of Tracey Foster submitted

 8   to a court in California when this case was in

 9   California -- or at least part of this case was in

10   California.

11              Have you seen this declaration before?

12     A.   Yes.

13     Q.   In paragraph 7, Ms. Foster states, "After

14   learning of NetCE's allegations of infringement directed

15   to the courses listed in paragraph 3 above, Elite

16   removed from the customer-facing portion of its Web site

17   the links to the hosted course content on the Amazon

18   servers for the accused courses.  This means that, after

19   those access links were removed, when a customer

20   performed a search for continuing education courses on

21   either of Elite's Web sites, as described in paragraph 4

22   above, none of the courses listed in paragraph 3

23   appeared.  Specifically, Elite removed such access links

24   to the courses listed in paragraph 3ii to Vii in

25   July 2015 after having received a cease and desist
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

1    letterer from NetCE but before NetCE filed its complaint

2    in this matter."

3           Do you see that?

4    A.  I see that.

5    Q.  Do you have any reason to dispute what Ms. Foster

6    said in this declaration?

7    A.  I don't know specifically how Elite's Web site is

8    structured, but I can tell you that I continued to be

9    able to access those courses after July 2015.

10   Q.  Well, if you look at paragraph nine, Ms. Foster

11   says, "I understand that NetCE believes the accused

12   courses remain available through Elite's Web site

13   because NetCE saved a, quote, direct link, end quote, to

14   those courses hosted on Elite's Amazon servers," and she

15   lists for traumatic brain injury two ways to get to it

16   according to those direct links.

17          Isn't that, in fact, what you had done there?

18   A.  No.

19   Q.  Take a look at NETCEB4498.  It's in Exhibit 76.

20   A.  Can you read the number again, please?

21   Q.  -4498.

22          MR. KERN:  Thank you.

23          THE WITNESS:  Thank you.

24   BY MR. WILSON:

25   Q.  Are those not -- does this document not reflect

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

1   customer?

2      A.  There's -- there's customer confusion in terms of

3   our customers.  There's also customer confusion in terms

4   of their contact with Elite, and I haven't seen all of

5   the information from Elite yet about potential confusion

6   with his publication with them.

7      Q.  So you're not aware of any particular customer

8   who is actually confused, is that true, as you sit here

9   today?

10     A.  I don't know if the customers that we have

11  documented having confusion between NetCE and Elite were

12  triggered by the Jouria course or not.

13     Q.  Okay.  You filed suit in 2015.  It's now the end

14  of 2017.

15         Are you sure you're not aware of any customer

16  confusion resulting from Dr. Jouria's contributions to

17  Elite?

18     A.  I don't have all of the evidence from Elite; so I

19  don't know if they have experienced customer confusion

20  as a result of this publication.

21         And in terms of the information we have from our

22  own customers contacting NetCE, I can't say if the

23  courses that triggered the confusion were Jouria courses

24  or not.

25     Q.  Do you have any evidence that -- of a consumer

1   who purchased an Elite publication authored by

2   Dr. Jouria would otherwise have purchased a publication

3   from NetCE?

4       A.  I don't have evidence that they would or would

5   not have.

6       Q.  Can you point to any loss -- particular loss of

7   sale because a customer purchased a Jouria article from

8   Elite?

9       A.  I don't have any ability to gather that

10  information in terms of lost sales.

11      Q.  So you cannot point to any lost sale; is that

12  true?

13      A.  I don't know.

14      Q.  You don't know if you could point to a lost sale?

15      A.  The -- again, the customer confusion that we have

16  documented between customers who are confused between

17  Elite and NetCE, I don't know if that confusion was

18  triggered by a Jouria course or not; so I'm unable to

19  make the conclusion of whether that resulted in a lost

20  sale or not.

21      Q.  Well, I'm asking you today.

22          So you cannot -- it's true that you cannot today

23  point to a lost sale resulting from a Jouria article

24  that was published by Elite?

25      A.  I don't have evidence of a lost sale or a gained

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 260

 1   sale due to Elite's publications.

 2      Q.  Is it NetCE's contention that it made

 3   $4.7 million in the publication of the multiple

 4   sclerosis Jouria article for it?

 5      A.  We calculated that special offer bundles that

 6   included the multiple sclerosis course were offered

 7   in -- starting in 2014 made a total revenue of

 8   $4.7 million.

 9      Q.  So is that how much money Dr. Jouria generated

10   for NetCE for that one course?  Is that what you're

11   stating?

12      A.  I'm stating that our publications that included

13   the multiple sclerosis course in special offer bundles

14   generated a revenue of $4.7 million between 2014 and the

15   two years that followed it.

16      Q.  And how much of that amount do you ascribe to

17   Dr. Jouria's article?

18      A.  I did not attempt to parse out the courses from

19   the special offer bundle.  But, also, I just -- I want

20   to make a note that those courses were Jouria's works,

21   and they were insomuch that he presented us with the

22   drafts.  But they were NetCE's courses, and we did make

23   changes in formatting to those courses to meet our style

24   requirements.

25      Q.  Well, I don't exactly know what that means, but

```
 1    I'm just trying to find out how much money have you made

 2    off of Dr. Jouria's labor on the three published

 3    articles?

 4        A.   I don't know how to attribute the amount of labor

 5    spent on those articles to Jouria compared to the amount

 6    of labor that other persons spent preparing those

 7    courses -- those courses for release.

 8        Q.   Was it $4.7 million?

 9        A.   The special offer bundles that had the multiple

10    sclerosis course in them --

11        Q.   How many courses were in that bundle?

12        A.   It differed by bundle.

13        Q.   5?  10?  20?

14        A.   It was different in each special; so, for

15    example --

16        Q.   What was the range?

17        A.   The -- two to four.

18        Q.   So would you ascribe Dr. Jouria's contribution to

19    that 4.7 if it was due to be one-half of that and if it

20    was to be 25 percent of that?

21        A.   Again, I don't know what percentage of his work

22    and everyone else at NetCE's work could be attributed to

23    the release of those courses.

24        Q.   So when you claim $4.7 million, did you back out

25    everybody's else's contributions?
```

**Sarah Campbell**
**30(b)(6) CE Resource, Inc., dba CME Resource and NetCE**
*Dr. Jassin Jouria vs. CE Resource, Inc., et al.*
(No. 0:15-61165-WPD)
Date of Deposition: November 14, 2017

| Page | Line | Now Reads | Should Read | Reason for Change |
|------|------|-----------|-------------|-------------------|
| 5 | 15 | Jessi Lanier | Jesse Lanier | Typo |
| 13 | 22 | Dr. Jouria's sources | Dr. Jouria's courses | Typo |
| 14 | 4 | provided it in in-person meeting | provided it in an in-person meeting | Typo |
| 14 | 5 | with Mike Duran in March of 2012 | with Mike Duran in November of 2012 | Error |
| 14 | 9 | Mr. Duran in March of 2012? | Mr. Duran in November of 2012? | Error |
| 14 | 15 | course development marketing | course development and marketing | Typo |
| 14 | 19 | the March 2012 meeting took | the November 2012 meeting took | Error |
| 16 | 20 | meeting of March of 2012? | meeting of November of 2012? | Error |
| 16 | 25 | in-person meeting in March of 2012 | in-person meeting in November of 2012 | Error |
| 17 | 4 | Alpine in March of 2012 regarding | Alpine in November of 2012 regarding | Error |
| 22 | 5 | March of 2012, financial information | November of 2012, financial information | Error |
| 23 | 3 | In the March 2012 meeting that | In the November 2012 meeting that | Error |
| 23 | 8 | level and not detailed as | level and not as detailed as | Typo |
| 39 | 17 | you have evidence to show | you have no evidence to show | Typo |

**Bennett Marks**
**30(b)(6) and personal**
*Patriot Rail Corp., v. Sierra Railroad Co.,*
(No. 2:09-cv-00009-TLN-AC)
Date of Deposition: December 11, 2015

| Page | Line | Now Reads | Should Read | Reason for Change |
|------|------|-----------|-------------|-------------------|
| 79 | 16 | it's called "division plan or | It's called "division planner | Typo |
| 80 | 12 | planner for reviews and approves | planner who reviews and approves | Typo |
| 85 | 13 | With all do respect, you were | With all due respect, you were | Typo |
| 86 | 19 | did some additional search to | did some additional research to | Typo |
| 89 | 1 | With all do respect, you hadn't | With all due respect, you hadn't | Typo |
| 93 | 1 | not preprinted verbatim | not reprinted verbatim | Typo |
| 100 | 10 | We claimed to own the entire course | We claim to own the entire course | Typo |
| 110 | 12 | The content, as of Elite | The content, as with Elite | Typo |
| 124 | 3 | the surgical technologist lead planner, to | the surgical technologist lead planner's | Typo |
| 126 | 15 | also reviewed by Dr. Leonard | also reviewed by Dr. Leonard; | Typo |
| 135 | 10 | That the course I used in | That's the course I used in | Typo |
| 180 | 1 | that Alpine knew of his relationship | that Alpine knew of this relationship | Typo |
| 206 | 19 | Well, we also have ACCNE accreditation | Well, we also have ACCME accreditation | Typo |
| 207 | 4 | technologists, dental psychologists, other | technologists, dental, psychologists, other | Typo |
| 207 | 15 | ACCM accreditation | ACCME accreditation | Typo |

2

**Bennett Marks**
**30(b)(6) and personal**
*Patriot Rail Corp., v. Sierra Railroad Co.,*
(No. 2:09-cv-00009-TLN-AC)
Date of Deposition: December 11, 2015

| Page | Line | Now Reads | Should Read | Reason for Change |
|------|------|-----------|-------------|-------------------|
| 208 | 19 | available from Elite from NurseCe4Less | available from Elite, from NurseCe4Less | Typo |
| 233 | 4 | "Implementation coordinator Cory Camp | "Implementation coordinator Corrie Camp | Typo |
| 233 | 9 | No. Cory Camp had | No. Corrie Camp had | Typo |
| 233 | 12 | Cory Camp then left | Corrie Camp then left | Typo |
| 233 | 15 | all submitted by C.C., not Cory Camp | all submitted by C.C., not Corrie Camp | Typo |
| 233 | 19 | Cory Camp | Corrie Camp | Typo |
| 236 | 15 | states. | dates. | Typo |
| 239 | 3 | identified a David Sains as | identified a David Saenz as | Typo |
| 239 | 5 | David Sains, yes. | David Saenz, yes. | Typo |
| 240 | 9 | publication by CNE and that | publication by CME and that | Typo |
| 240 | 10 | belong exclusively to CNE." | belong exclusively to CME." | Typo |
| 262 | 18 | they'd been revised, | they've been revised, | Typo |

_Ncampbell_ _____
Sarah Campbell

_12.05.17_ _____
Date

#38119311_v1