Exhibit 9

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 0:15-cv-61165-WPD

DR. JASSIN JOURIA

        Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,

        Plaintiff/Counter-Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Third Party Plaintiff,

v.

Elite Continuing Education, Inc. and Alpine
Management Services III, LLC,

        Third Party Defendants.

_____

**CE RESOURCE, INC. d/b/a CME RESOURCE and NETCE RESPONSES TO ELITE CONTINUING EDUCATION, INC.'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, and to Magistrate Snow's Standing Order (DE77), Defendant/Counter-Plaintiff/Third Party Plaintiff CE Resource, Inc. ("NetCE"), submits the following Responses and Objections to Third Party Defendant and Counter-Plaintiff Elite Continuing Education, Inc.'s ("Elite") First Set of Interrogatories.

## PRELIMINARY STATEMENT

NetCE's discovery, internal investigation, and preparation for trial is ongoing and has not been completed at the time of this response. NetCE bases its responses below solely on information it presently knows. Further discovery and investigation may reveal additional facts and evidence not presently known to NetCE. Further discovery and investigation may reveal additional facts and evidence not presently known to NetCE and upon which NetCE may rely at the time of trial. NetCE specifically reserves the right at the time of trial to introduce evidence from any source which it may hereafter discover—and testimony from any witness whose identity it may hereafter discover. If NetCE has unintentionally omitted information from these responses, NetCE reserves the right to rely upon and to present as evidence at trial such additional information as it may discover and/or develop during the course of this litigation. NetCE expressly reserves the right to object to the use of these responses or the subject matter contained herein during any subsequent proceeding, including the trial of this or any other action.

NetCE also reserves the right to amend the responses below: discovery is ongoing and NetCE will be able to provide more fulsome answers to some of the Interrogatories once it has received discovery responses and documents from Dr. Jouria and from Elite.

## INTERROGATORY RESPONSES

### INTERROGATORY NO. 1:

Identify each individual likely to have discoverable information relating to the allegations in the Third Party Complaint, including a description of the relevant knowledge possessed by each.

### RESPONSE TO INTERROGATORY NO. 1:

Sarah Campbell, Director of Development, NetCE; available through Holland & Knight (information regarding course development, course planning, editing, NetCE finances, NetCE's relationship with Dr. Jassin Jouria, NetCE history with Elite, iThenticate, discovery of infringement)

Erin Meinyer, Executive Director, NetCE; available through Holland & Knight (information regarding course development, course planning, NetCE finances, NetCE's relationship with Dr. Jassin Jouria, NetCE history with Elite, discovery of infringement, NetCE's relationship with Alpine, information shared with Alpine)

Julie Goodwin, Director of NetCE, NetCE; available through Holland & Knight (information regarding NetCE processes and systems and NetCE marketing, NetCE history with Elite)

Lisa Patterson, Chief Operating Officer, NetCE; available through Holland & Knight (information regarding NetCE processes and systems and NetCE finances)

Bob Creutz, NetCE Account Manager of iThenticate; 1111 Broadway, 3rd Floor, Oakland, CA 94607, (510) 764-7615 (information regarding functionality of iThenticate, NetCE's relationship with iThenticate)

Dr. John Leonard, NetCE Division Planner and Advisor; available through Holland & Knight (information regarding editing of courses Dr. Jouria submitted to NetCE pursuant to the FWAs, typical editing process for NetCE courses, NetCE's awareness of problems with Dr. Jouria's bona fides)

Dr. John Jurica, NetCE Division Planner and Advisor; available through Holland & Knight (information regarding editing of courses Dr. Jouria submitted to NetCE pursuant to the FWAs, typical editing process for NetCE courses, NetCE's awareness of problems with Dr. Jouria's bona fides)

Jane Norman, NetCE Division Planner; available through Holland & Knight (information regarding editing of courses Dr. Jouria submitted to NetCE pursuant to the FWAs, typical editing process for NetCE courses, NetCE's awareness of problems with Dr. Jouria's bona fides)

Kate McPike, Tek-Ed, Inc. PO BOX 1521 Rancho Cordova, CA 95741, (916) 765-5492 (editing of "Cancer and Chemotherapy" course)

Dr. Jassin Jouria; available through Richard Ross (correspondence with NetCE, Elite, and other continuing education providers not party to this lawsuit)

As yet unidentified personnel at Elite (correspondence and relationship with Dr. Jouria, agreement to publish Infringing Courses, Elite's relationship with Alpine, materials Elite received from Alpine, Elite's course development and curation process)

As yet unidentified personnel at Alpine (correspondence and relationship with Elite, treatment of NetCE's trade secrets and confidential materials)

**INTERROGATORY NO. 2:**

Identify and describe in detail all "proprietary and confidential information" from NetCE that You believe was wrongly provided to Elite. As part of Your response, explain whether it is Your contention that Elite learned of Dr. Jouria's identity from Alpine's alleged "sharing of NetCE's proprietary and confidential information with Elite," as alleged in Paragraph 77 of the Third Party Complaint, in light of the documents provided to Your counsel by Elite's counsel on February 10, 2017, showing Elite's job posting and subsequent correspondence with Dr. Jouria.

**RESPONSE TO INTERROGATORY NO. 2:**

Please see response to Interrogatory No. 3.

4

The courses NetCE owns (the "Seven Courses" at issue in this lawsuit) were wrongly provided to Elite, either by Dr. Jouria or Alpine. At present, NetCE stands by the allegations in its complaint that Elite learned of Dr. Jouria's identity from Alpine. However, discovery is ongoing, and NetCE is entitled to use the discovery process to determine precisely how Elite came to learn of Dr. Jouria's identity.

**INTERROGATORY NO. 3:**

Identify and describe in detail all trade secrets You allege were misappropriated by Elite. For each item identified, explain Your "reasonable efforts under the circumstances to preserve the confidentiality of its information" as alleged in Paragraph 128 of the Third Party Complaint. Also for each item identified, explain how You believe Elite misappropriated the identified trade secret.

**RESPONSE TO INTERROGATORY NO. 3:**

During the course of 2012 negotiations between NetCE and Alpine, and pursuant to the explicit terms of the Non-Disclosure Agreement in effect between the two parties, NetCE provided Alpine with its market strategies, industry reports regarding competitors and market need, information regarding the competitive landscape and consumer need, internal financial performance data (histories and projections), NetCE's process for curating courses, and proprietary information concerning the type of content NetCE furnished, developed, and was planning to develop (including without limitation the schedule for the upcoming catalog mailing year). NetCE provided Alpine with a list of courses currently in development, including their status, number of hours of credit, probable target audience(s), and faculty. NetCE further shared its accreditation schedule, listing all current accreditations and approvals. NetCE also shared its return-on-investment statistics ("ROI"), areas of future business development beyond (pharmacology credits, outreach to allied health professionals, etc.), and direct mailing information.

NetCE made Alpine aware of its existing faculty (in other words, faculty who had already authored courses that NetCE published and whose names were therefore publicly available) *and* authors with whom NetCE had executed, or was close to executing, Freelance Writer

5

Agreements for the first time. Dr. Jouria was one such author. During these negotiations, NetCE shared drafts of certain of Dr. Jouria's courses (Lymphatic and Immune Systems: A Comprehensive Review, Non-Antibiotic Antimicrobial Pharmacology: A Review, Traumatic Brain Injury, Clinical Cardiovascular Pharmacology, and Gastroesophageal Reflux Disease—all courses for which NetCE executed a contract with Dr. Jouria before or during these negotiations) with Alpine. NetCE also shared with Alpine information related to courses in various stages of development (in other words, pre-publication): its future products.

Before sharing the above-described information with Alpine, NetCE negotiated and required Alpine to sign a Non-Disclosure Agreement. (Indeed, NetCE requires all third parties to execute Non-Disclosure Agreements prior to the sharing of NetCE's proprietary information.) Only certain NetCE employees (and, in the case of information regarding courses-in-development, independently contracted editors) were privy to the proprietary information described above. Independently contracted editors, prior to beginning their work on any course, also signed agreements containing confidentiality clauses. NetCE requires all independent contractors to sign Non-Disclosure Agreements before beginning work for NetCE. Finally, NetCE employees privy to the proprietary information described above were instructed not to share such information beyond the company. NetCE keeps confidential and proprietary information on confidential drives of its internal network: special company authorization via a password is required for individual employee access.

**INTERROGATORY NO. 4**

Explain in detail what You mean by "NetCE's plans for future courses and NetCE's development work for courses to reach the market in a short time," as set forth in Paragraph 132 of the Third Party Complaint.

**RESPONSE TO INTERROGATORY NO. 4:**

NetCE plans to commission and solicit courses in certain subjects several months—sometimes years—in advance. NetCE selects subjects for courses based on a number of factors: (i) topicality and newsworthiness, (ii) customer demand, (iii) author interest and/or pitch, (iv) whether NetCE features similar courses in its existing offerings, and (v) whether competitors

have similar offerings (market need).  The process of developing a course can take anywhere from six months up to two years: it takes quite some time for an author to research and write a course and additional time for NetCE to fact-check, edit, revise, obtain reprint permission, and otherwise curate a course.

The Seven Courses at issue in this lawsuit are noteworthy in particular because, at the time NetCE decided to develop these courses, NetCE's continuing education provider competitors, including Elite, did not have similarly constructed courses in the Seven Courses' subject matter.  Indeed, Elite's impermissible publication of the Infringing Courses marked Elite's foray into pharmacologically oriented courses.  To the best of NetCE's knowledge, Elite had not offered pharmacologically oriented courses prior to publishing the Infringing Courses.  In addition to the substantial similarities between the Seven Courses and the Infringing Courses, NetCE thinks it highly suspicious that, after entering the market as a cosmetology continuing education provider and shortly after entering the nursing continuing education market, Elite would select seven (7) courses with identical—*at minimum*—subject matter of the Seven Courses under development at NetCE.  It is more likely than not that Elite obtained information about NetCE's planned areas of course development (and, indeed, course drafts belonging to NetCE) either from Dr. Jouria or from Alpine.

**INTERROGATORY NO. 5:**

Explain in detail all facts supporting or detracting from Your contention that Elite "usurped NetCE's competitive advantage and stole[] NetCE's mark [sic] strategy, riding on NetCE's coattails into [sic] order to beat it to market with a series of products," as alleged in Paragraph 133 of the Third Party Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

One of the factors NetCE weighs when deciding whether to commission or solicit a course is whether the market has need for the same (see NetCE's Response to Interrogatory No. 4, above).  At the time NetCE planners approved concepts for the Seven Courses, there was market need for continuing education courses on the subject matters of the Seven Courses.  In other words, continuing education providers were not offering courses in the subject matter areas

7

of the Seven Courses to the extend demanded by relicensure or recertification needs. According to basic principles of microeconomics, where supply is down (presuming, *ceteris paribus*, that demand exists), value is at a premium. A course's worth, then, depends upon whether continuing education providers offer or plan to offer similar courses or courses with significant overlap. By stealing and then impermissibly publishing the Infringing Courses, Elite deprived NetCE of the first-to-market advantage upon which NetCE depended and planned. Elite further unjustly benefitted from its actions by skirting the development activities and curation in which NetCE engaged before determining there was market need for the Seven Courses; Elite profited from NetCE's labors.

**INTERROGATORY NO. 6:**

Identify and describe in detail all facts and legal theories that support or detract from Your contention that Elite infringed NetCE's copyrights, as alleged in the Third Party Complaint. As part of Your response, please identify all similarities and/or differences that You believe exist between the NetCE Courses and the Accused Courses, on a course-by-course basis. Also as part of Your response, please explain the basis for Your contention that the accused course offered under the title "Cardiovascular Diseases in Women: the Leading Causes of Death" infringes Your purported rights in a course entitled "Cardiovascular Pharmacology," in light of the differences between the two courses as shown by a comparison of Exhibit F and Exhibit G to Elite's Counterclaims.

**RESPONSE TO INTERROGATORY NO. 6:**

Discovery is ongoing and the parties have not completed an exchange of responsive documents or written discovery responses.

Dr. Jouria submitted each of the seven (7) courses at issue in this litigation to NetCE after Dr. Jouria and NetCE executed Freelance Writer Agreements ("FWAs") describing the course subject matter *and* NetCE commissioned the courses.

NetCE owns the copyright for each of the Seven Courses. 17 U.S.C. § 106.

Each of the FWAs Dr. Jouria signed contains this statement: "Writer hereby understands

and agrees that all Articles approved for publication by [NetCE] under this Agreement shall belong exclusively to [NetCE]. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be 'works made for hire' under all relevant copyright laws, and [NetCE] shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute 'works made for hire,' Writer hereby irrevocably assigns and transfers to [NetCE] and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. … [NetCE] has the right to edit the Articles as it deems appropriate for publication or us in accordance with the rights granted by Writer herein, and that Writer will cooperate with [NetCE] in editing, fact checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every republication. Writer acknowledges and understands that at no time shall Writer have any right to block publication of an Article provided that [NetCE] removes Writer's name from said Article." (Paragraph 9, p. 2)

The FWAs also state (Paragraph 7, p. 2): "…[NetCE] has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer."

Finally, the FWAs state (Paragraph 5, p. 1): "…Writer will not submit the Article to any other party for publication unless and until CME expressly rejects the Article…" The Faculty Guide, issued to all individuals who submit content to NetCE for publication pursuant to FWAs, including Dr. Jouria, contain a number of statements regarding the intellectual property rights in courses submitted to NetCE. Page 8 of the Faculty Guide states that "Upon the contributing faculty member's [writer's] receipt of payment, the submitted activity becomes the sole property of NetCE. This will be copyrighted material. There is no guarantee made to the faculty member as to whether, when, or where the activity will be published." and "Accepted manuscripts become the property of NetCE and may not be published elsewhere without the written

9

permission of NetCE."

After Dr. Jouria executed each FWA and submitted a course draft pursuant to each particular FWA, NetCE paid Dr. Jouria the agreed-upon amount. The seven (7) courses at issue in the above-captioned litigation (and, indeed, the three (3) courses not at-issue in the above-captioned litigation) belong to NetCE under both the work for hire doctrine of United States Copyright Law and the explicit terms of the FWAs.

Elite published the Seven Courses without license or permission from NetCE. The versions of the Seven Courses Elite published were substantially similar and/or virtually identical to the Seven Courses, for which NetCE owns the copyright. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (C.A.Ga., 1982); *Letterese and Assoc., Inc. v. World Inst. Of Scientology Enterprises, Int'l*, 33 F.3d 1287 (11th Cir. 2008) (noting that nonliteral similarity *and* literal similarity (exact copying) are actionable as copyright infringement and that paraphrasing an expression may be actionable literal similarity).

When the infringement was discovered, Ms. Campbell conducted a visual side-by-side comparison of the NetCE drafts and the impermissibly published Elite courses. Five (5) rough drafts ("Traumatic Brain Injury," "Non-Antibiotic Antimicrobial Pharmacology: A Review," "Gastroesophageal Reflux Disease," "Cancer and Chemotherapy," and "Depression and Dementia in the Elderly") of the seven (7) courses Dr. Jouria submitted to NetCE had been published almost exactly as the rough drafts submitted to NetCE. The remaining two (2) courses ("The Lymphatic and Immune Systems" and "Cardiovascular Pharmacology") were not reprinted verbatim, but significant sections of these courses appeared to be featured in what Elite published.

Ms. Campbell attempted to run an iThenticate scan comparing the NetCE draft to the courses Elite impermissibly published, but iThenticate had difficulty accessing Elite's content (presented as an online PDF). The similarities between the two sets of courses, visible through a side-by-side comparison, were and are apparent, remarkable, and extensive.

Each of the infringing courses exhibit literal and nonliteral similarity, copying of whole swaths of text from NetCE's copyrighted courses, copying the organization of the courses,

10

and/or paraphrasing large passages, leaving the essential expression unchanged. *See Letterese*, 33 F.3d at 1302-06. Sarah Campbell conducted an initial analysis in 2015, when NetCE discovered the infringement. A second, technical manual analysis of the versions introduced at Dr. Jouria's deposition and served on NetCE thereafter is underway. NetCE will supplement its response(s) to these interrogatories once it completes such analysis.

**INTERROGATORY NO. 7:**

Explain how You have been damaged, if at all, by Elite's alleged conduct as set forth in the Third Party Complaint, including a calculation of any monetary damages You believe You have suffered.

**RESPONSE TO INTERROGATORY NO. 7:**

Discovery is ongoing and NetCE has not yet received discovery responses or documents from Elite. Moreover, NetCE has not yet engaged damages experts to provide the above-requested analysis.

NetCE spent time and resources (personnel, material, monetary and otherwise) soliciting, approving, developing, editing, fact-checking, obtaining reprint approval for copyrighted materials contained in drafts, and otherwise curating seven (7) ultimately unusable courses. Accordingly NetCE seeks recovery of these expenses. NetCE also seeks actual damages for the infringement of seven of its copyrights. NetCE further seeks damages for the opportunity costs of being unable to publish the Seven Courses due to Elite's actions and/or any profits Elite reaped from the sale in any form of the Infringing Courses. NetCE seeks compensatory and actual damages, exemplary damages, punitive damages, and an award reflecting the amount by which Elite (and Dr. Jouria) were unjustly enriched. *See* response to Interrogatory No. 8, below.

NetCE reserves the right to update its calculations as discovery progresses.

**INTERROGATORY NO. 8:**

Explain in detail the basis for Your contention, set forth in Your counsel's letter to Elite's counsel dated February 17, 2017, that "damages from this case based on lost sales, opportunity costs, unrealized investment in marketing and development expenditures, and recovering the

11

profits Elite reaped from its infringing activity are in the tens of millions of dollars." In your response, please include a description of the calculation used to arrive at the "tens of millions" number and an identification of all documents supporting such calculation.

**RESPONSE TO INTERROGATORY NO. 8:**

Please *see* NetCE's Response to Interrogatory No. 7.

*Lost Revenue*

A featured NetCE continuing education course yields approximately $5 million dollars in income in its first year of circulation (including updates and revisions) from sales as an individual course and bundled with other courses.

For example, in 2014, NetCE's Multiple Sclerosis course (a 10-hour course NetCE commissioned from Dr. Jouria) was featured (in other words, printed in its entirety) in booklets for nurses in various states. The total revenue (after subtracting the total expense of printing and marketing costs) for these booklets was $4.7 million dollars. NetCE also sold this course as a standalone offering—online and in print. Individual net course revenue totaled approximately $84,000.

If a course performs well enough (almost all do), after three (3) years, NetCE writers and editors update and revise the information, and NetCE continues to offer the topic under a slightly different course number. Updated courses generally generate less revenue than "original" courses because NetCE does not usually feature them in direct mail booklets. The updated version of the Multiple Sclerosis Course, for example, was released on January 1, 2017, and has generated $9,800.00 in individual sales as of this writing (early October, 2017).

NetCE believes—and there is no available fact to contradict this belief—that each of the Seven Courses would have earned as much, if not more, in its lifetime of circulation. Multiplying $5 million by seven (7) yields $35 million dollars of lost revenue attributable entirely to Elite's infringement for the first year of circulation of each course *alone*.

*Unrealized Costs*

In addition, at the time NetCE discovered Elite's infringement, NetCE had expended considerable costs developing the Seven Courses, including:

| Course Title | Nature of Expense | Amount |
| --- | --- | --- |
| *The Lymphatic and Immune System: A Comprehensive Review* | Payment to Dr. Jouria | $12,000 |
|  | 47 hours of Sarah Campbell's time and miscellaneous NetCE employees | $1,000 |
|  | Proposal Review payment (to Jane Norman) | $50 |
| *Traumatic Brain Injury* | Payment to Dr. Jouria | $4,000 |
|  | 31 hours of Sarah Campbell's time and miscellaneous NetCE employees | $600 |
|  | Proposal Review payment (to Jane Norman and John Leonard) | $100 ($50 each) |
| *Clinical Cardiovascular Pharmacology* | Payment to Dr. Jouria | $10,000 |
|  | 47 hours of Sarah Campbell's time and miscellaneous NetCE employees | $1,000 |
|  | Proposal Review payment (to Jane Norman) | $50 |
| *Non-antibiotic Antimicrobial Pharmacology: A Review* | Payment to Dr. Jouria | $12,000 |
|  | 47 hours of Sarah Campbell's time and miscellaneous NetCE employees | $1,000 |
|  | Proposal Review payment (to Jane Norman) | $50 |
| *Gastroesophageal Reflux Disease* | Payment to Dr. Jouria | $4,000 |

|  | 109 hours of Sarah Campbell's time and miscellaneous NetCE employees | $3000 |
|---|---|---|
|  | Proposal Review payment (to Jane Norman and John Jurica) | $100 ($50 each) |
|  | Licensing fees to Nature Publishing Group | $966 |
| *Cancer and Chemotherapy* | Payment to Dr. Jouria | $12,000 |
|  | 68 hours of Sarah Campbell's time and miscellaneous NetCE employees | $1400 |
|  | Payment to Tek-Ed, Inc. (Kate McPike) for revisions | $10,896.38 |
|  | Licensing fees to Wolters Kluwer Health | $380 |
|  | Licensing fees to Nature Publishing Group | $966 |
|  | Proposal Review payment (to Jane Norman) | $50 |
| *Depression and Dementia in the Elderly* | Payment to Dr. Jouria | $12,000 |
|  | 47 hours of Sarah Campbell's time and miscellaneous NetCE employees | $1,000 |
|  | Proposal Review payment (to Jane Norman) and to additional reviewers (James Trent, Alice Yick Flanagan) | $150 ($50 each) |

In addition, the iThenticate license to which NetCE is party has a cap for number of projects and word count. NetCE deployed iThenticate on each of the Seven Courses it was ultimately unable to publish due to Dr. Jouria's and Elite's infringement. This, of course, means that NetCE used up these "credits" under its iThenticate license for additional course analysis.

NetCE reserves the right to update its calculations as discovery progresses.

14

**INTERROGATORY NO. 9:**

Identify all software programs or other analytical processes You used to compare the Accused Courses with the NetCE Courses or with any works Dr. Jouria submitted to NetCE.

**RESPONSE TO INTERROGATORY NO. 9:**

NetCE used iThenticate to assess works Dr. Jouria submitted to NetCE. NetCE attempted to use iThenticate to assess the Infringing Courses, but had technical difficulties, see Response to Interrogatory No. 6, and therefore conducted a manual comparison of the Seven Courses to the Infringing Courses.

**INTERROGATORY NO. 10:**

Identify any instances of "customer confusion as to source" as alleged in Paragraphs 66 and 72 of the Third Party Complaint. As part of Your response, explain how this allegation is relevant to any claim between the parties.

**RESPONSE TO INTERROGATORY NO. 10:**

Instances of consumer confusion are relevant because they help illustrate a pattern of Elite's purposeful aping of NetCE's content and design. For years, Elite has stylized its materials in a fashion that mimics the appearance of NetCE materials in order to trick consumers into believing they are purchasing NetCE content. This latest instance of infringement is but the latest in a series of Elite's inappropriate and impermissible actions.

Moreover, consumer confusion is relevant as it supports NetCE's allegations of unfair business practices.

NetCE's investigation is ongoing and as it adduces additional evidence related to this Interrogatory, it will supplement its response.

Dated: October 10, 2017 Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ Philip E. Rothschild
Philip E. Rothschild
Florida Bar No. 0088536
Email: phil.rothschild@hklaw.com
HOLLAND & KNIGHT LLP
515 East Las Olas Blvd., 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954)525-1000
Facsimile: (954)463-2030

/s/ John P. Kern
John P. Kern, Esq. (pro hac vice)
Email: john.kern@hklaw.com
Jessica E. Lanier, Esq. (pro hac vice)
Email: Jessica.Lanier@hklaw.com
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Telephone: (415)743-6918
Facsimile: (415)743-6910
Attorneys for CE RESOURCE, INC.
d/b/a
CME RESOURCE and NetCE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 10, 2017, I electronically served the foregoing document this day on all counsel of record or pro se parties identified on the attached Service List via U.S. Mail.

/s/Denise Harmon
Denise Harmon

## SERVICE LIST

Richard S. Ross, Esq.
915 S.E. 2nd Court
Fort Lauderdale, FL 33301
Email: prodp@ix.netcom.com
*Attorneys for Plaintiff Dr. Jassin Jouria*
**[VIA E-MAIL]**

Peter A. Chiabotti, Esq.
Akerman LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Email: peter.chiabotti@akerman.com
*Attorneys for Elite Continuing Education, Inc.*
**[VIA E-MAIL]**

J. Mark Wilson, Esq.
Kathryn G. Cole, Esq.
Moore & Van Allen PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Email: markwilson@mvalaw.com; katecole@mvalaw.com
*Attorneys for Elite Continuing Education, Inc.*
**[VIA E-MAIL]**

## VERIFICATION

I, Erin Meinyer, certify and declare that I have read the foregoing CE RESOURCE, INC. d/b/a CME RESOURCE and NETCE RESPONSES TO ELITE PROFESSIONAL EDUCATION'S FIRST SET OF INTERROGATORIES and know its contents. Based on my personal knowledge and a reasonable and good faith inquiry, I believe the matters stated in the document described above are true.

I declare under penalty of perjury under the laws of the state of Florida and under the United States of America that the foregoing is true and correct.

Executed on October 9, 2017 at Roseville, California.

*Erin Meinyer*

Erin Meinyer
Executive Director
CE Resource, Inc.
d/b/a/ CME Resource and
NetCE