## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 0:15-cv-61165-WPD

DR. JASSIN JOURIA

        Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,

        Plaintiff/Counter-Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Third Party Plaintiff,

v.

ELITE CONTINUING EDUCATION, INC. and ALPINE
MANAGEMENT SERVICES III, LLC,

        Third Party Defendants.

_____/

## **DECLARATION OF SARAH CAMPBELL**

I, Sarah Campbell, declare as follows:

1. I am the Director of Development at CE Resource, Inc. d/b/a CME Resource and NetCE ("NetCE") and held this position during the time period at issue in this lawsuit.

2. I have personal knowledge of the circumstances described below and, if so called, can testify under oath regarding these events.

**NetCE's Course Development Process**

3. In order to develop the continuing education ("CE") courses and materials it offers to its customers, NetCE contracts with independent authors (referred to in NetCE's marketing materials as its "Contributing Faculty Members"), almost all of whom are licensed medical professionals, credentialed medical scholars and academics, or both.

4. The Contributing Faculty Members who draft the CE course materials NetCE edits, markets, and publishes, do so under standard, template agreements (called "Freelance Writer Agreements"), identical—except for the name of the author, deadlines, and subject-matter areas. Currently, NetCE is working with more than 80 Contributing Faculty Members under Freelance Writer Agreements.

5. NetCE's course development process functions in a systematic, linear fashion, involving the following steps: (i) An author presents an initial proposal for a course; (ii) NetCE evaluates the proposal and either accepts or rejects it; (iii) If NetCE accepts the proposal, it sends the author a contract (the Freelance Writer Agreement) to cover the author's drafting of the initial manuscript; (iv) The author submits the draft manuscript; (v) NetCE planners and staff review the draft manuscript, and if it contains the constituent elements set forth in the previously-approved proposal, then it is "approved for publication" (by NetCE's parlance and the terms of the FWAs), although it still must undergo a lengthy curation and editing process before NetCE is ready to print it and sell it to the public; (vi) NetCE pays the author per the terms of the FWA, (vii) NetCE undertakes typically significant editing, fact-checking, and curation of the course, (viii) NetCE

presents the final course for author to sign-off on; and (ix) The course is printed and offered for distribution to clients and prospective clients.

6. Dr. Jouria and/or the courses Dr. Jouria submitted to NetCE went through this exact process (steps (i) through part of step (vii)) for each of the courses entitled "The Lymphatic and Immune Systems: A Comprehensive Review," "Traumatic Brain Injury," "Non-Antibiotic Antimicrobial Pharmacology: A Review," "Clinical Cardiovascular Pharmacology," "Gastroesophageal Reflux Disease," "Cancer and Chemotherapy," and "Depression and Dementia in the Elderly" (hereinafter, the "Seven Courses"). Of particular importance, Dr. Jouria executed the Seven Courses' FWAs, submitted manuscripts for the Seven Courses to NetCE pursuant to those FWAs, and received payment for each of the Seven Courses.

7. Courses that have been "approved for publication" are then, frequently, evaluated in the planning process. In this process, NetCE and its division planners evaluate whether a course designed to suit one market might be tailored to suit additional markets. For example, a division planner might review a course initially proposed and "approved for publication" under the FWA for nurses and determine this course would be suitable to tailor and then make available for physicians. This division planner review of a course is wholly separate from the mechanics of the FWA and has nothing to do with a course's being "approved for publication" under the FWA.

**Dr. Jouria**

8. At the time of Dr. Jouria's proposals, NetCE was looking to expand its course offerings in these areas in response to newly adopted CE requirements for certified and advanced practice nurses across the country, particularly in the areas of pharmacology and internal medicine.

9. As part of its normal diligence on prospective new contributors, NetCE performed online research to ensure that Dr. Jouria was not already working with any of its competitors to market and publish CE articles.

3

#53494987_v2

10. NetCE and Dr. Jouria engaged in discussions which ultimately culminated in the parties entering into ten (10) separate Freelance Writer Agreements, under which Dr. Jouria would prepare draft CE articles in agreed upon areas (hereafter referred to as "Courses"), and NetCE would provide editing, publishing, and marketing services for the Courses.

11. Throughout 2012 and the early part of 2013, Dr. Jouria submitted drafts for each of the ten (10) Courses, and NetCE paid Dr. Jouria for each of the ten (10) Courses, pursuant to the terms of the respective Freelance Writer Agreements. At the time that payment was rendered to Dr. Jouria, pursuant to the explicit terms of the FWAs, ownership of the articles (including the Seven Courses at issue) transferred to NetCE.

**Terms of the FWA**

12. NetCE "approved for publication" (as the term is used in the FWAs) each of the Seven Courses at issue in this case. For each course proposal, NetCE sent FWAs to Dr. Jouria. After executing each FWA, Dr. Jouria submitted manuscripts for the Seven Courses, NetCE checked that the manuscript contained all requisite components, and NetCE paid Dr. Jouria (directly or to his company MedCreds Writing Solutions, LLC) by check or by wire transfer the applicable agreed upon amount. *See* **Exhibits A through G** (copies of checks and wire transfers produced in discovery). NetCE does not pay authors for courses it has not "approved for publication." Dr. Jouria accepted each of the payments, and he did not return these amounts to NetCE. Because Dr. Jouria executed the FWA, submitted a manuscript draft to NetCE, and NetCE remitted payment to Dr. Jouria, NetCE "approved for publication" (per the FWA's terms) each of the Seven Courses.

13. When NetCE "approves" a course "for publication," its intent is to publish the courses after the courses are subjected to additional editing, fact-checking, and curation.

14. NetCE was at various stages of editing and curation at the time it discovered Elite's and Dr. Jouria's infringement, but this does not change the fact NetCE owned the copyrights to the Seven Courses. "Approval for publication" and "publication" under the FWA are two distinct concepts. As I described above, "approved for publication" as that terms appears in the FWAs, does not mean that courses were ready to be sold to the public. NetCE engages in considerable editing and curation—which can take anywhere from mere weeks to several years—after the course is "approved for publication," but before is printed, mailed, included in a catalogue, or is posted online.

### Post Approval Communications with Dr. Jouria—No Explicit Rejection

15. I am aware Dr. Jouria has claimed in this case he believes NetCE had rejected the Seven Courses, and thus that he was free to use them, sell them, or publish them on his own. I don't find this claim credible, however, because of the clear language of the agreements, the nature and substance of my communications with Dr. Jouria after his courses were "approved for publication" and he had been paid, and other evidence I have seen.

16. Dr. Jouria reached out to NetCE twice after receiving payment for courses under the Seven Courses' FWAs. In these emails, Dr. Jouria asked NetCE if I or anyone at NetCE was still working on the courses. I assured Dr. Jouria that we were still editing the courses and planning to publish and make them for sale to the public. *See* **Exhibit H**, email chain from October of 2014. Neither I nor anyone else at NetCE ever "explicitly rejected" any course Dr. Jouria submitted pursuant to any FWA or suggested to him that a lengthy editing process constituted such a rejection.

17. Finally, Dr. Jouria's claim that NetCE's choice to not make the Seven Courses available for sale to the public, after it learned Dr. Jouria sold them to Elite, and after Elite illegally published them, amounts to "express rejection" puts the cart before the horse. It is axiomatic that

#53494987_v2

NetCE would not invest additional resources readying Articles "approved for publication" after a competitor had improperly usurped its first-to-market advantage.

### Registration of Copyrights for the At-Issue Course

18. At the time this Complaint was initially filed, NetCE had pending federal copyrights (applications on file with the U.S. Copyright Office) for an additional 27 courses/articles (including for the Seven Courses at issue). In the fall of 2015, NetCE received confirmation from the U.S. Copyright Office that the copyrights for all Seven Courses at issue are now federally registered, registration effective May 15, 2015.

19. NetCE filed the copyright applications for each of the Seven Courses at issue in this Litigation.. To the best of NetCE's current knowledge, the statements contained in the applications and issuing registrations are true and correct. NetCE filed for copyright electronically, but mailed in specimens (two copies of each course) as required.

### Immediate Impact of Dr. Jouria's and Elite's Infringement

20. As a result of Elite's publication[1], NetCE was unable to publish *any* of the seven (7) at issue articles. NetCE's competitive advantage and profitability for its courses depends upon a first-to-market posture. Elite's, Alpine's, and Dr. Jouria's actions deprived NetCE of this hard-fought advantage. After Dr. Jouria's and Elite's infringements, the prospect for diminishing returns on these courses did not justify NetCE's further investment to get them ready for printing and sale.

21. Because NetCE is unable to use the content Dr. Jouria submitted, Dr. Jouria and Elite's actions (including publication) set NetCE behind its competitors in offering courses in the above-described topics.

---

[1] NetCE also discovered infringing activity by NurseCE4Less, another NetCE competitor. NurseCE4Less, however, took the infringing content down quickly and did not challenge NetCE's copyright ownership.

22. All seven (7) articles fell within the subject matter areas of pharmacology and internal medicine---areas in which Elite, one of NetCE's chief competitors, had not previously published in a significant manner.

### Infringement and Substantial Similarity Analysis

23. In February of 2015, when I discovered the infringement, the Seven Courses at issue in this Litigation were in various stages of development (editing, fact-checking, re-writing and wordsmithing, locating sources for cites to illustrations and certain factual assertions, etc.). At the time I discovered Dr. Jouria's relationship with Elite, two of the NetCE courses—Gastroesophageal Reflux Disease and Cancer and Chemotherapy—were close to publication, with an estimated release date of March 1, 2015.

24. At this time in February of 2015, I was working on "Gastroesophageal Reflux Disease." As part of the editorial review of this course, I was searching for references for statements and statistics in the draft Dr. Jouria submitted that lacked supporting references. In the course of searching the internet for citations for statements in this particular course, I found that a sentence from the operative NetCE draft of the course appeared verbatim in a course (of the same title) published at https://nursing.elitecme.com/CA/course/NCA06GEI15 on Elite's website.

25. Upon further manual review of the published course, I determined that the entire course featured on Elite's website (i) was nearly identical to the draft of the course Dr. Jouria submitted to NetCE in early 2013 and (ii) appeared to have been published after NetCE and Dr. Jouria executed the Gastroesophageal Reflux Disease FWA and NetCE had paid Dr. Jouria for the content.

26. Further review of the Elite website (the same day) revealed that Elite had published on its website, without NetCE's permission, *all Seven Courses at issue in this litigation.*

27. When Dr. Jouria originally submitted drafts of the Seven Courses to NetCE in 2012 and 2013, I conducted Internet searches to ensure that the courses Dr. Jouria submitted were not available or published elsewhere. None of the Seven Courses were available on Elite's website at that time. I also ran drafts of the Seven Courses through iThenticate plagiarism detection software, and, at that time, the software did not detect matches to any Elite courses or any other CE provider's courses.

28. When the infringement was discovered, I conducted a visual side-by-side comparison of the NetCE drafts and the impermissibly published Elite courses. Five (5) rough drafts ("Traumatic Brain Injury," "Non-Antibiotic Antimicrobial Pharmacology: A Review," "Gastroesophageal Reflux Disease," "Cancer and Chemotherapy," and "Depression and Dementia in the Elderly") of the Seven Courses Dr. Jouria submitted to NetCE had been published *almost exactly* as the rough drafts submitted to NetCE. The remaining two (2) courses ("The Lymphatic and Immune Systems" and "Cardiovascular Pharmacology") were not reprinted verbatim, but it appeared that significant sections of these courses may have been featured, based on what I was able to access on Elite's website. I attempted to run an iThenticate scan comparing the NetCE draft to the courses Elite impermissibly published, but iThenticate had difficulty accessing Elite's content (presented as an online PDF). The similarities between the two sets of courses, visible through a side-by-side comparison, were and are apparent, remarkable, and extensive.

29. Each of the Seven Courses was at a different stage in the editing process. We stopped development work (including placement of the courses in catalogs) on the Seven Courses due *entirely* to NetCE's discovery of Elite's infringement. The only reason "Gastroesophageal Reflux Disease" was not included in a special offer catalog was due again to Elite's infringement. When NetCE paid Dr. Jouria for each of the Seven Courses, and approved each of those Seven

8

Courses for publication, it had every intention of editing the courses and making them available to the public for sale.

30.     NetCE has been unable to replace the Seven Courses with standalone offerings.

**Clarifying Deposition Testimony and Damages**

31.     I have read both Elite's and Dr. Jouria's Summary Judgment Motions, and in those Motions I see many instances in which they attempt to over-simplify my testimony or use my words out of context. I would like to clarify a few points from my deposition.

32.     In response to certain questions regarding causal liability and damages, I responded several times that I had no "hard evidence" or that I could not point to "specific evidence." When I testified in this manner, I meant simply to convey that as I sat there in the deposition I could not point to any specific document, or that I could not provide specific dollar figures. When I testified as such, I also reminded counsel for Elite that I deferred to work being undertaken by a damages expert to quantify damages. At no time did I say there was "no evidence."

33.     I repeatedly reminded Elite's counsel during the deposition that I am not a damages expert or an accountant, but that I could (and I did) speak qualitatively about the CE market, and how Dr. Jouria's and Elite's conduct caused problems and significant damages for NetCE. Exhibit I, Deposition of Sarah Campbell at 160-163, 167 (hereinafter "Campbell Dep at")

34.     The CE market is a highly competitive one, and companies like NetCE derive advantage from being first-to-market with course offerings on innovative topics. Dr. Jouria's and Elite's unauthorized distribution, publication, and sales deprived NetCE of this crucial advantage and, as a consequence, the expense of the additional time and resources required to edit, fact-check, gain permission to reprint uncredited illustrations and tables, and otherwise format and finalize the Seven Courses was unjustified.

#53494987_v2

35. I was surprised to read that Elite and Dr. Jouria both described NetCE's lost profits claim as "speculative," because I testified at length at my deposition about the factual bases for our lost profits claim. Among other facts, I testified:

- That "featured" courses reached more learners and have greater revenue (Campbell Dep. at 137);
- That courses authored by medical writers (like Dr. Jouria) are commissioned with the expectation that they will be featured (Campbell Dep. at 138);
- That the model course (Multiple Sclerosis) was a conservative example of sales for the purposes of damages calculation because it was a 10-hour course and was featured in fewer catalogs than one of the other courses by Dr. Jouria NetCE had actually been able to sell (COPD). Two of the Seven Courses were 10- or fewer hours and the remaining three were 30-hour courses (pre-editing) (Campbell Dep. at 136-37);
- That the model course (Multiple Sclerosis) was featured in three special offers (Campbell Dep. at 134);
- That one could make an educated prediction about how a course would sell (Campbell Dep. at 137);
- That NetCE commissioned the Seven Courses to address a market need and a gap in its own offerings to meet pharmacology requirements (Campbell Dep. at 142);
- That Elite's infringement prevented NetCE from being able to sell the Seven Courses *and* was a direct cause of NetCE's being unable to offer the amount of pharmacology credit that would have been otherwise possible;
- That timing, marketing, geography quality, competition, accreditation status of the publisher, and author identity could influence a course's performance;
- That the lifespan of a course before it is updated and revised is three years (Campbell Dec. at 169);
- That, after major revisions, a course can be featured and sold for an indefinite period of time (Campbell Dep. at 169).

36. Moreover, NetCE's damages expert report (which Elite seems to ignore in its Motion) outlines in detail the evidence that NetCE suffered damages due to Elite's and Dr. Jouria's infringement of its copyrights and the methodology used to calculate lost profits.

37. Specifically, I take issue with both Elite's and Dr. Jouria's suggestion that NetCE's lost profits are exaggerated or illusory, because we replaced his pulled courses with courses from other authors. And I also take issue with Elite's suggestion that NetCE somehow benefitted from its infringement. That is preposterous and untrue.

38. While NetCE may literally have replaced the lost Jouria courses with another course for a certain catalogue, the reality is that NetCE *never* replaced the lost pharmacology content, for that catalogue, or that year for that matter, *i.e.,* we did not have other faculty and courses immediately ready to fit that credit niche—an important and growing niche in the CE market.

39. Moreover, we unarguably lost, forever, the opportunity to be the first to market on the Seven Courses' topics—which are important, specific, and lucrative topics—with the depth, focus, and direction we contracted for and intended to provide. This is not fungible content.

40. Since around 2013-14, NetCE considers Elite to be one of its chief competitors in the CE market for the nursing profession.

41. This declaration and the evidence in support of NetCE's claims are further supported by NetCE's Responses to Elite's Second Set of Interrogatories and NetCE's First Supplemental Responses to Dr. Jouria's First Set of Interrogatories, attached as **Exhibits J and K**.

I declare under penalty of perjury and the laws of the United States, California, and Florida, that the foregoing is true and correct.

Dated this 28th day of December, 2017

By: _____
Sarah Campbell
Director of Development, NetCE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 29, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Philip E. Rothschild*
Philip E. Rothschild

## SERVICE LIST

Richard S. Ross, Esq.
RICHARD S. ROSS, ESQ.
915 S.E. 2nd Court
Ft. Lauderdale, Florida 33301
(Attorney for Plaintiff Dr. Jassin Jouria)
**[VIA ELECTRONIC MAIL SERVICE]**

Peter A. Chiabotti, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**

J. Mark Wilson, Esq.
Kathryn G. Cole, Esq.
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**