# EXHIBIT I

Case 0:15-cv-61165-WPD   Document 199-9   Entered on FLSD Docket 12/29/2017   Page 2 of 37

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
30(b)(6)                    **Sarah Campbell on 11/14/2017**

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                          ---oOo---

 3   DR. JASSIN JOURIA                 )
                                       )
 4          Plaintiff,                 )
     vs.                               )
 5                                     ) CASE NO:
     CE RESOURCE, INC., d/b/a          ) 0:15-61165-WPD
 6   CME RESOURCE and NetCE,           )
                                       )
 7          Defendant.                 )
                                       )
     _____  )
 8   CE RESOURCE, INC., d/b/a          )
     CME RESOURCE and NetCE,           )
 9                                     )
            Defendant/                 )
10          Counter-Plaintiff,         )
     vs.                               )
11                                     )
     DR. JASSIN JOURIA,                )
12                                     )
            Plaintiff/                 )
13          Counter-Defendant.         )
     _____  )
14   CE RESOURCE, INC., d/b/a          )
     CME RESOURCE and NetCE,           )
15                                     )
            Defendant/Third-Party      )
16          Plaintiff,                 )
     vs.                               )
17                                     )
     Elite Continuing Education,       )
18   Inc. and Alpine Management        )
     Services III, LLC,                )
19                                     )
            Third-Party                )
20          Defendants.                )

21                  DEPOSITION OF SARAH CAMPBELL
                            30(B)(6)
22
                         November 14, 2017
23


24


25   DEPOSITION REPORTER:  KAYLA KNOWLES, CSR
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Pages 10..13

Page 10

```
1      Q.  You just testified that Elite posted something,
2   and Dr. Jouria responded.  How is it possible then that
3   Elite learned of Dr. Jouria's identity through Alpine,
4   as you said here in this interrogatory response?
5      A.  So I saw discovery documents that indicated that
6   he had responded to an ad, but I haven't seen any
7   documentation one way or another if they knew his name
8   before he responded to that ad.
9      Q.  Have you read the transcript of Alpine's
10  deposition that we took in this case?
11     A.  Yes.
12     Q.  Do you know a man named Dan Cremons?
13     A.  I know of him.  I haven't met him.
14     Q.  You understand that Mr. Cremons testified on
15  behalf of Alpine that Alpine did not share the name of
16  Dr. Jouria with Elite.  Do you understand that?
17     A.  I do understand that.
18     Q.  So now we've seen -- you've seen evidence that
19  Dr. Jouria reached out to Elite, and you have sworn
20  testimony from Alpine that they did not share
21  Dr. Jouria's name with Elite.
22         Are you still standing behind your statement in
23  interrogatory number 2?
24     A.  Yes.
25     Q.  Explain how that is possible.
```

Page 11

```
1      A.  I don't know the exact relationship between
2   Alpine, McKissock, and Elite.  If McKissock was aware
3   and shared that information with Elite, I'm not sure if
4   that would be covered under Alpine and Dan Cremons's
5   testimony.
6      Q.  Have you seen any documents, read any testimony,
7   or have any evidence to support the notion that Elite
8   learned of Dr. Jouria's identity from Alpine or
9   McKissock?
10     A.  I understand that there's still discovery going
11  on; so I think it's still -- information is still coming
12  in.
13     Q.  That's not what I asked.
14         Do you have any evidence, as you sit here today,
15  to support what you said in interrogatory number 2 about
16  how Elite learned of Dr. Jouria's identity?
17         MR. KERN:  Mark, can you please let her
18  finish the answer in the future?
19         Go ahead, Sarah.
20         THE WITNESS:  So in terms of evidence -- I
21  don't know exactly what evidence would be present -- I
22  know that there is a relationship between Alpine and
23  Elite, and I know that we -- that Alpine was aware of
24  that information.  So if it is coincidental, it would be
25  a lot of coincidences, but I haven't seen hard evidence,
```

Page 12

```
1   as of yet.  It's possible it could come in later.
2   BY MR. WILSON:
3      Q.  As you sit here today, you have no evidence to
4   support the statement you make in interrogatory number 2
5   that Elite learned of Dr. Jouria's identity from Alpine;
6   isn't that correct?
7      A.  Not yet.
8         MR. KERN:  For clarification, Mark, that
9   question was limited to Alpine?  Because you asked
10  before "Alpine or McKissock."
11  BY MR. WILSON:
12     Q.  As we sit here today, you have no evidence to
13  support the belief that Elite learned of Dr. Jouria's
14  identity from McKissock either; correct?
15     A.  We haven't had discovery with McKissock; so we
16  don't have information from them, as far as I know.
17     Q.  And I know that you want information, and I know
18  that you're desperately hoping for it, but my questions
19  here are pretty straightforward.
20         As you sit here today, you have no evidence to
21  support the belief that Elite learned of Dr. Jouria's
22  identity from anyone other than Dr. Jouria himself;
23  isn't that correct?
24     A.  I don't have the information necessary to make
25  that determination.
```

Page 13

```
1      Q.  So you don't have any evidence?
2      A.  Not yet.
3      Q.  How is it that you believe -- excuse me.  Let me
4   ask it this way.
5         Given that you have no evidence yet, as you say,
6   what is the basis for the statement in interrogatory
7   number 2 that you're standing behind?
8      A.  Oh, sure.  They -- we had discussions with Alpine
9   that included information about future faculty including
10  Dr. Jouria, and also about the development of content in
11  the areas that Jouria developed.  And after Alpine's
12  acquisition of Elite or continued relationship with
13  Elite, those courses were published by Elite.  So that
14  indicates to me that they had an interest in entering
15  the market that we had identified as an interest of
16  NetCE's with the --
17     Q.  How -- how did NetCE convey to Alpine the
18  identity of Dr. Jouria?
19     A.  Documents were provided to Alpine during
20  acquisition negotiations that included courses that were
21  in development but not yet published, and that included
22  several of Dr. Jouria's sources that were in
23  development.
24     Q.  But that information was provided in print form?
25     A.  I understand, yes.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)    Sarah Campbell on 11/14/2017    Pages 14..17

Page 14

1    Q.  And who provided it to Alpine?
2    A.  Erin Meinyer.
3    Q.  And when did she do this?
4    A.  She provided it in in-person meeting that she had
5  with Mike Duran in March of 2012, and, again, it may
6  have been provided in a second meeting they had in
7  October of 2013.
8    Q.  Exactly what was provided by Ms. Meinyer to
9  Mr. Duran in March of 2012?
10    A.  Documents in person were exchanged or shared that
11  included financial information including P&L, return on
12  investment documents, and cost versus revenue by catalog
13  spreadsheets.  They also provided a history, a catalogic
14  history and a course index, and then processes for
15  course development in marketing and documentation of
16  courses currently in development and additional
17  information related to market strategies.
18    Q.  Where did this meeting take place?
19    A.  It took place -- the March 2012 meeting took
20  place in Roseville at the NetCE office.
21    Q.  Do you have any evidence to support your
22  testimony that any of this information was provided to
23  Mr. Duran in document form?
24    A.  Could you repeat the question?
25    Q.  Do you have any evidence to support what you're

Page 15

1  saying, that this information was provided to Mr. Duran
2  in print form?
3    A.  No.  It was exchanged in person; so there's no
4  proof of transfer.
5    Q.  So as we sit here today, you have no evidence
6  that this exchange ever took place; is that correct?
7        MR. KERN:  Objection.  Misstates --
8  mischaracterizes and misstates her testimony.
9        THE WITNESS:  It was exchanged in person; so
10  I don't have evidence of transfer at this time.
11  BY MR. WILSON:
12    Q.  How do you know what was exchanged?
13    A.  Through conversations with Erin Meinyer and
14  Dennis Meinyer and their information regarding the
15  meeting.
16    Q.  So they told you?
17    A.  They did.
18    Q.  Has the information that you believe was shared
19  in person by Ms. Meinyer or Mr. Meinyer to Mr. Duran --
20  produced in this case?
21    A.  I'm not sure if all of it was produced.
22    Q.  What are you not sure about?
23    A.  I'm not sure if all the course development
24  processes and development documents were provided.  They
25  may have.  I'm not sure.

Page 16

1    Q.  What volume, in print form, would this
2  information have taken that was given to Mr. Duran,
3  allegedly, according to your sworn testimony?
4    A.  Could you be more specific?
5    Q.  How many pages?
6    A.  Of all of the materials?
7    Q.  Yes.  Everything you say that Mr. Duran received
8  at this in-person meeting from the owners of NetCE.  How
9  many pages?
10    A.  I would have to give a range.  Somewhere between
11  maybe 100 and 400 pages.
12    Q.  Pretty big stack of stuff.
13    A.  Maybe.
14    Q.  You weren't at that meeting, though; correct?
15    A.  I was not.
16    Q.  So all you know is what the owners of the company
17  told you; is that correct?
18    A.  That's correct.
19    Q.  What else was discussed at those in-person
20  meetings -- at the in-person meeting of March of 2012?
21    A.  In addition to NetCE's history and future plans
22  and their current approaches, I believe they were
23  discussing the possibility of Alpine acquiring NetCE.
24    Q.  Tell me everything that you know about the
25  in-person meeting in March of 2012.

Page 17

1        MR. KERN:  You want her to repeat the things
2  she's already told you?
3        THE WITNESS:  So -- sure.  NetCE met with
4  Alpine in March of 2012 regarding a possible
5  acquisition.  During that meeting, they provided
6  information regarding NetCE's history, including
7  financial information and return on investment, their
8  current processes and courses in development, and future
9  plans for market advancement and new market entrance.
10  BY MR. WILSON:
11    Q.  What did Mr. Duran say to Mr. and Mrs. Meinyer?
12    A.  Mike Duran expressed interest in moving forward
13  with the acquisition and working to build the
14  relationship, as far as I know.
15    Q.  What do you mean "as far as I know"?
16    A.  That's the information that was provided to me.
17    Q.  Again, by -- I am mispronouncing it, I'm sure.
18    A.  Erin Meinyer.
19    Q.  Meinyer.
20        Did you speak with Mrs. Meinyer or Mr. Meinyer?
21    A.  Both.
22    Q.  Tell me about the meeting in October of 2013.
23  What was discussed?  Tell me everything you know.  What
24  was shared and what was discussed?
25    A.  In October of 2013, Erin and Dennis Meinyer,

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Pages 18..21

Page 18

1  again, met with Mike Duran and Richard Wileczek -- I may
2  be mispronouncing his name -- at an off-site location in
3  Roseville, and they discussed, again, a possible
4  acquisition.
5        And they also let Mike Duran -- Erin and Dennis
6  let Mike Duran and Richard Wileczek know that they were
7  aware that Alpine -- what they believed was Alpine had
8  acquired Elite.
9        They had also, again, provided updated financial
10 information at or immediately before or after that
11 meeting.
12   Q.  And how was that information exchanged?
13   A.  I'm not sure.
14   Q.  You're the only witness I get to talk to about
15 this.
16        I need to know:  How was that information
17 exchanged?
18        MR. KERN:  Asked and answered.
19        Don't speculate.
20        THE WITNESS:  I'm not sure.
21 BY MR. WILSON:
22   Q.  As we sit here today, as of the October 2013
23 meeting, you don't know and you have no evidence to
24 support that any information was given to Mr. Duran;
25 isn't that correct?

Page 19

1        MR. KERN:  Objection.  Misstates testimony.
2  She testified that she was told --
3        MR. WILSON:  I don't need you to speak.
4        THE WITNESS:  I -- I don't know if we have
5  evidence or not.
6  BY MR. WILSON:
7    Q.  And if Mr. Duran were to provide a sworn
8  statement that he never received any printed documents
9  from the Meinyers, do you have any reason to dispute
10 that?
11   A.  I know that there is an e-mail exchange that
12 acknowledges that financial information was sent, but --
13   Q.  Sent by who?  Received by who?
14   A.  By NetCE.  Probably Erin Meinyer.
15   Q.  To?
16   A.  To, I believe, Mike Duran, but I can't -- I don't
17 know for sure the exact e-mail address.
18        (Exhibit No. 76 marked for identification.)
19 BY MR. WILSON:
20   Q.  I'm handing what we've marked as Exhibit 76.
21 It's a collection of e-mails that were provided to us by
22 NetCE.  I know that because down at the bottom
23 right-hand corner is a Bates number that starts with
24 "NETCEB."
25        Do you see that?

Page 20

1    A.  I do.
2    Q.  I'll ask you to take just a second to flip
3  through those documents and see if you can -- see if
4  anything looks out of place to you that isn't a document
5  that is from NetCE, meaning produced to us in this case
6  by NetCE.
7        And I can tell you we're going to be here all day
8  if you don't go faster.  You can take as much time as
9  you need.
10        MR. KERN:  Sarah, I think he's just
11 asking if you can --
12        THE WITNESS:  Oh, sorry.
13        MR. KERN:  -- look at the Bates numbers and
14 confirm that these came from our production.
15        THE WITNESS:  Sure.
16        MR. KERN:  You don't have to confirm,
17 necessarily, that they're all NetCE e-mails, but look at
18 them.
19        THE WITNESS:  Okay.  Yes.
20 BY MR. WILSON:
21   Q.  And these e-mails that are part of Exhibit 76
22 were maintained in the ordinary course of business and
23 produced to us in the ordinary course of NetCE's
24 business as part of this lawsuit; isn't that correct?
25   A.  Yes.

Page 21

1    Q.  And you're responsible for helping in that
2  collection of production effort; isn't that correct?
3    A.  Yes.
4    Q.  If today -- if you see something that doesn't
5  satisfy those questions, will you please let me know?
6    A.  Yes.
7    Q.  Take a look at the last document in Exhibit 76.
8  That's an e-mail that is Bates labeled NETCEB35072.
9  It's an e-mail from Mike Duran in October of 2013 where
10 he's asking Dennis and Erin to send financial
11 information to Dan Cremons at Alpine "in the same way
12 that you did last year," according to Mike.
13        Does that help refresh your recollection as to
14 how information was exchanged between --
15   A.  Yes, it does.
16   Q.  -- Erin and Dennis and Mr. Duran?
17   A.  Yes.
18   Q.  It's fair to say that the financial information
19 was sent to Mr. Cremons; isn't that correct?
20   A.  Yes.
21   Q.  Do you have any reason to believe anything else
22 occurred --
23        MR. KERN:  Objection.  Vague.
24 BY MR. WILSON:
25   Q.  -- with regard to the exchange of information to

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
30(b)(6)                 Sarah Campbell on 11/14/2017                 Pages 22..25

Page 22

1  Mr. Duran?
2      A.  My understanding is that the financials -- the
3  updated financial information was sent to Alpine.
4      Q.  And, indeed, the -- earlier in what you said was
5  March of 2012, financial information was also sent to
6  Alpine, and Mr. Duran confirms that here.  He says,
7  "Please send it to Dan Cremons the same way you did
8  before."
9      A.  It does say that.
10     Q.  Do you have any reason to dispute that that's how
11 the information was exchanged?
12     A.  No.
13     Q.  Do you have any reason to believe that any
14 financial information was provided to Mr. Duran or
15 anyone else related to this potential acquisition by
16 Alpine in any other form?
17     A.  I cannot discount the possibility that they spoke
18 about it at their meeting.
19     Q.  Well, I get to talk to you again.
20     A.  You do.
21     Q.  Did NetCE discuss financial information with
22 Mr. Duran at any in-person meeting?
23         MR. KERN:  Asked and answered.
24         THE WITNESS:  Yes.  At any in-person
25 meeting?  Yes.

Page 23

1  BY MR. WILSON:
2      Q.  When?
3      A.  In the March 2012 meeting that we just discussed,
4  they had more in-depth conversations about financial
5  information.
6          At this October 2013 meeting, I believe that the
7  discussions about financial information were more high
8  level and not detailed as the 2012 meeting was because
9  they had already gone over that information, for the
10 most part.
11     Q.  And a couple times already you've answered the
12 question with "I believe."  "I believe they weren't
13 detailed."  "I believe this."  "I believe that."  I'm
14 not asking for your belief.  I'm asking for the
15 company's testimony on these topics because you're the
16 person I get to talk to; so I'll ask again.
17         Actually, I'll just ask you as you answer these
18 questions.  I don't want your belief.  I want what you
19 know.
20         MR. KERN:  That's a fair request.  Do you
21 understand what he's --
22         THE WITNESS:  I do.
23         MR. KERN:  -- saying, Sarah?
24         THE WITNESS:  Yep.
25 ///

Page 24

1  BY MR. WILSON:
2      Q.  You mentioned earlier that some, quote,
3  additional information regarding strategies, end quote,
4  was provided by NetCE to Mr. Duran.
5          What are you talking about?
6      A.  In reference to the 2012 meeting?
7      Q.  You tell me when it was provided and what you
8  mean.
9      A.  I believe my testimony earlier was about the 2012
10 meeting, and the materials provided then in terms of
11 additional market strategies would have been areas of
12 content that we were interested in developing in order
13 to meet a market need or an emerging market need; for
14 example, pharmacology content and more advanced science
15 information for advanced practice nurses.  And also just
16 new verticals such as physical therapy, occupational
17 therapy, and allied health in general.
18     Q.  Was this information conveyed orally or in print?
19     A.  It was conveyed orally and was supported by the
20 course development documentation that was in print.
21     Q.  What information that was shared with Alpine does
22 NetCE contend is a trade secret?
23     A.  We consider all of that information trade secrets
24 in as far as we wouldn't share it with anyone outside of
25 the company unless an NDA was in place.

Page 25

1      Q.  You believe that the names of authors of courses
2  for NetCE is a trade secret; is that correct?
3      A.  The names of authors for unpublished content is a
4  trade secret.
5      Q.  And what binds the authors from -- what prohibits
6  them from disclosing the fact that they are writing for
7  NetCE?
8          MR. KERN:  I'm sorry.  Can you repeat the
9  question, Mark?
10 BY MR. WILSON:
11     Q.  What prohibits authors for content that is being
12 developed by NetCE from telling anyone else that they're
13 writing for NetCE?
14         MR. KERN:  I'm just going to make a
15 foundation objection.
16         THE WITNESS:  We don't have any way of
17 tracking what authors of courses in development
18 disclose.
19 BY MR. WILSON:
20     Q.  Again, you didn't come even close to answering my
21 question.
22         What prohibits them from disclosing that they're
23 writing for NetCE, if anything?
24         MR. KERN:  Okay.  Vague and ambiguous.  Have
25 not laid a proper foundation.

Case 0:15-cv-61165-WPD   Document 199-9   Entered on FLSD Docket 12/29/2017   Page 7 of 37

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                    Sarah Campbell on 11/14/2017                    Pages 26..29

Page 26

1    If you understand the question, Sarah, go
2 ahead and answer it.
3         THE WITNESS:  I'm not sure what could
4 prohibit an author from doing that.
5 BY MR. WILSON:
6    Q.  So the answer is "nothing"; isn't that correct?
7 NetCE has no agreement or any other -- have nothing in
8 place to prohibit an author who is writing content for
9 NetCE from disclosing the fact that that author is
10 writing for NetCE; isn't that correct?
11        MR. KERN:  Same objections.
12        THE WITNESS:  We do not have an agreement in
13 place with authors to not disclose.
14 BY MR. WILSON:
15    Q.  So how is it possible that that information is a
16 trade secret?
17    A.  I can only say what we consider trade secret that
18 might have legal ramifications that I'm not aware of.
19 But I would not share that information, and people at
20 the company would not share that information.
21    Q.  What's your understanding of the meaning of a
22 "trade secret"?
23        MR. KERN:  Objection.  Calls for a legal
24 opinion.
25        THE WITNESS:  When I refer to a trade

Page 27

1 secret, I'm referring to information that is germane to
2 the company and its plans for future direction and
3 market -- market approaches that we would not want
4 competitors to know.
5 BY MR. WILSON:
6    Q.  Was there anything, to your knowledge,
7 prohibiting Dr. Jouria, in this situation, from telling
8 others that he was writing courses for NetCE?
9    A.  No.
10    Q.  Yet you still maintain that that information is a
11 trade secret of NetCE?
12    A.  I do.
13    Q.  The information that you've described here as
14 shared with Mr. Duran, has NetCE ever disclosed any of
15 that information to anyone else without the protections
16 of an NDA?
17    A.  Are you asking specifically about authors' names?
18    Q.  I'm asking about all of the information that
19 you've talked about as being disclosed to Alpine that,
20 according to NetCE, forms the basis of a trade secret
21 claim against Elite in this case.
22    A.  Well, we have accountants and editorial
23 contractors who may need some of that information; so I
24 can't say a definitive -- I can't give a definitive
25 response.  It's possible, for example, that our planners

Page 28

1 who review courses may have access to the name of the
2 author when they complete their review, which would be
3 immediately prior to publication.
4    Q.  Can you say definitively, sitting here today,
5 that of any of the information that NetCE is claiming is
6 a trade secret, as it forms the basis for the trade
7 secret claim against Elite, that any of that information
8 has never been disclosed absent a nondisclosure
9 agreement with the receiving party?
10        MR. KERN:  Objection.  Vague and ambiguous.
11 I did not understand the question.
12 BY MR. WILSON:
13    Q.  If any of the information -- I want to make sure
14 we're clear -- that was disclosed to Alpine that NetCE
15 is relying upon to form the basis of its trade secret
16 claim, can you say definitively that any piece of that
17 information has never been disclosed by NetCE without
18 the protections of a nondisclosure agreement?
19    A.  To a non-employee?  I cannot definitively say
20 that because we utilize contractors and an accounting
21 firm.
22    Q.  And you don't have agreements to protect your
23 information with these folks; is that correct?
24    A.  We do have agreements with our editorial
25 contractors, but I don't know if we have one in place

Page 29

1 for our accountants -- accounting contractors.
2    Q.  And I'm asking specifically about a nondisclosure
3 agreement or some protection that is equivalent to a
4 nondisclosure agreement.
5    A.  Our contractor contracts -- editorial contractor
6 contracts contain a clause that prohibits disclosure,
7 but I am not sure the exact details off the top of my
8 head.
9    Q.  So just so we're clear, as we sit here today, you
10 can't say for certain that the information that NetCE is
11 relying upon as the basis for its trade secret claim was
12 never disclosed by the company without protections?
13        MR. KERN:  Asked and answered.
14 BY MR. WILSON:
15    Q.  Isn't that correct?
16        MR. KERN:  Asked and answered.
17        THE WITNESS:  I can't give a definitive
18 answer to that.
19 BY MR. WILSON:
20    Q.  What evidence do you have, if any, that Alpine
21 ever disclosed to anyone else any information that NetCE
22 did provide to it under the nondisclosure agreement that
23 you referenced earlier?
24    A.  Well, as we discussed a little bit before, the
25 information that was provided to Alpine and Mike Duran

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Pages 30..33

Page 30

1  included some information about market strategies, such
2  as development of pharmacology continuing education and
3  the importance of ANCC, which is American Nurses
4  Credentialing Center, accreditation to meet the needs of
5  advanced practice nurses.  And not long after Erin and
6  Dennis's meetings with Dan and Mike and Richard, Elite
7  made strides in those areas specifically that indicated
8  to us that they used that information to make some
9  decisions about where they should be focusing business.
10     Q.  I understand those are your allegations in this
11  case.  I'm asking for evidence, ma'am.
12         What evidence do you have to support those
13  allegations?
14     A.  Again, I don't feel like all of the evidence is
15  in.  I think there's still -- Elite is still providing
16  documents; so, at this time, we don't have that hard
17  evidence, but I think it's still evolving.  I don't know
18  if I could answer that better without their full
19  discovery.
20     Q.  Isn't it true, as we sit here today, you have no
21  evidence to support the allegations that any information
22  disclosed by NetCE was shared with Elite?
23     A.  Not yet.
24     Q.  And you said earlier that you read Dan Cremons's
25  deposition testimony.

Page 31

1         He was the deponent from Alpine; is that correct?
2     A.  I did.
3     Q.  So you've read that Mr. Cremons from Alpine
4  denied all of the allegations related to Alpine
5  allegedly sharing information with Elite from NetCE;
6  correct?
7     A.  I did read that.
8     Q.  I asked him repeatedly if those allegations were
9  true or false, and he looked right in the camera and
10  said they were false.  You read that?
11     A.  I did.
12     Q.  Do you have any reason to believe that
13  Mr. Cremons was not telling the truth?
14     A.  I have no personal reason to believe that, but
15  there --
16     Q.  Please.
17     A.  Again, there were some -- the changes that Elite
18  made after the discussions with Dan and Mike gives us
19  some indication that they were influenced by that
20  information, but I can't say for sure if it was Dan
21  Cremons or Mike Duran or McKissock or Alpine.
22     Q.  But what you have seen, which is the testimony
23  from Alpine through Mr. Cremons, shows that your
24  allegations are false; isn't that correct?
25     A.  He testified that he had not shared any

Page 32

1  information and that Alpine had not, and I don't have a
2  reason to believe that is incorrect.
3     Q.  The allegations in this -- in this case as they
4  pertain to NetCE's trade secret claim all relate to
5  Alpine; is that correct?
6     A.  In this case?  Yes.
7     Q.  So as we sit here today, for the trade secret
8  claim that NetCE has brought against Elite, you have no
9  evidence to support the allegations that Alpine shared
10  any information with Elite, and, indeed, the evidence
11  you have read through the testimony of Mr. Cremons at
12  Alpine shows that those allegations are false.
13         MR. KERN:  I'll just object --
14  BY MR. WILSON:
15     Q.  -- isn't that correct?
16         MR. KERN:  -- it's a compound question.
17  Sounds like he's testifying.
18         THE WITNESS:  Can you repeat the question?
19  BY MR. WILSON:
20     Q.  As we sit here today, you have no evidence to
21  support the allegations in NetCE's complaint as they
22  pertain to Alpine sharing information with Elite; isn't
23  that correct?
24     A.  As we sit here today, although there could be
25  additional information that we obtain from Elite in the

Page 33

1  next week or two, I don't have any hard evidence, other
2  than the change in Elite's focus.
3     Q.  And I appreciate the fact that you don't want to
4  say that I'm right, but this is a yes-or-no question.
5         MR. KERN:  You can answer the question
6  however you want, Sarah.
7  BY MR. WILSON:
8     Q.  And I'm going to continue to ask it until I get a
9  yes or no.
10         So as we sit here today, isn't it true that you
11  have no evidence to support the allegations in the trade
12  secret claim NetCE has brought against Elite as it
13  pertains to Alpine sharing information with Elite?
14     A.  We have no hard evidence of Alpine --
15  specifically Alpine sharing information with Elite.
16     Q.  And as we sit here today, you have no evidence to
17  support any allegation -- and it hasn't been made, but
18  any additional allegation that Mr. Duran or anyone from
19  McKissock shared any information provided by NetCE with
20  Elite; correct?
21     A.  We have no evidence from McKissock or Mike Duran
22  either way, as far as I know.
23     Q.  So I'll ask it again.
24         As we sit here today, you have no evidence that
25  Mr. Duran or anyone at McKissock shared any information

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
30(b)(6)                      Sarah Campbell on 11/14/2017                      Pages 34..37

Page 34

1  provided by NetCE with Elite; correct?
2          MR. KERN:  Asked and answered.
3          THE WITNESS:  We do not have evidence of him
4  sharing or not sharing information.
5          MR. KERN:  How are you doing?
6          THE WITNESS:  I'm fine.
7          MR. KERN:  Let me know if you need a break.
8  Can you go another 10, 15 minutes?
9          THE WITNESS:  I can go -- yeah, I'm fine.
10         MR. KERN:  Thank you.
11 BY MR. WILSON:
12     Q.  I'm going to hand you what was previously marked
13 as Exhibit 42.  I am going to put a big "42" on it.
14 That is the third-party complaint filed by NetCE against
15 Elite in Florida.
16         Have you seen that document before?
17     A.  I have.
18     Q.  If you turn to the paragraph numbered 103, it
19 states, "Upon information and belief, Elite was aware of
20 Dr. Jouria's freelance writer agreement with NetCE."
21         Do you see that?
22     A.  "Agreements," yes.
23     Q.  Thank you.
24         "Upon information and belief, Elite was aware of
25 Dr. Jouria's freelance writer agreements with NetCE";

Page 35

1  correct?
2      A.  That's correct.
3      Q.  What is the information and belief that you rely
4  upon to make that allegation?
5      A.  Again, we had shared information about courses in
6  development, including the author names, with Mike Duran
7  during meetings with him in the previous several years.
8          When Elite then worked with Dr. Jouria to publish
9  the courses that we had already taken ownership of,
10 he -- he -- through discovery, I found that he had
11 disclosed to them that he had already sold them to us as
12 part of the agreement.
13     Q.  What discovery are you talking about?
14     A.  An e-mail between Dr. Jouria and employees of
15 Elite.  I believe Michelle Franchi and another employee.
16 Janice, I believe.
17     Q.  What was the date of that e-mail?
18     A.  I don't recall the exact date.
19     Q.  What else do you remember about this e-mail that
20 you're talking about?
21     A.  I recall that they had discussed his work with
22 other companies, specifically his work with NetCE and
23 the courses that he had already developed for NetCE.
24 And they had asked to see a copy of his contract.
25     Q.  Contracts?

Page 36

1      A.  I think they called it a contract, possibly, but
2  it is contracts, yeah.
3      Q.  And have you read Dr. Jouria's deposition
4  testimony?
5      A.  I have, yes.
6      Q.  So you're aware that Dr. Jouria declined to
7  provide copies of his freelance writer agreements to
8  Elite; is that correct?
9      A.  I am aware of that.
10     Q.  Paragraph 1 of 4 of Exhibit -- excuse me,
11 Exhibit 42 says, "Elite intentionally interfered with
12 with the freelance writer agreements between Dr. Jouria
13 and NetCE by soliciting and publishing articles
14 identical or substantially similar to articles
15 Dr. Jouria submitted to NetCE."
16         We already know that Elite didn't solicit these
17 articles given that Dr. Jouria approached Elite;
18 correct?
19     A.  Well, that depends on how you would define
20 "solicit" because they -- you are correct.  My
21 understanding is that he answered an ad that they had
22 placed.  However, he provided them, according to this
23 e-mail, a list of topics for them to choose from, and
24 they chose those topics.  To me, that could be seen as
25 soliciting.

Page 37

1          I'm not a lawyer; so I don't know exactly the
2  legal definition, but in my -- in my view, they did --
3  he contacted them, but they agreed and selected topics,
4  and that, to me, is soliciting.
5      Q.  This paragraph starts with, "Elite intentionally
6  interfered with the freelance writer agreements."
7          What support do you have for the fact -- for the
8  allegation that Elite intentionally interfered?
9      A.  Elite was aware of these agreements and chose to
10 move forward with developing the same content with that
11 knowledge.  In my view, that's intentionally
12 interfering.
13     Q.  Has NetCE ever published articles from an author
14 who had also written for another continuing education
15 provider?
16     A.  Yes.
17     Q.  Nothing wrong with that; right?
18     A.  I have no problem with that.
19     Q.  And when Net- -- excuse me -- when Elite asked to
20 see the terms of Dr. Jouria's agreement with NetCE, he
21 declined.
22         You've seen that; right?
23     A.  I did see that in his testimony.
24     Q.  No reason do dispute that; right?
25     A.  I have no reason to dispute that at this time.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

| 30(b)(6) | Sarah Campbell on 11/14/2017 | Pages 74..77 |

Page 74

1    Q.  And so we're clear, the iThenticate program that
2    you're talking about only searches web crawlable text;
3    correct?
4    A.  That is correct.  Yes.
5    Q.  It does not search PDFs or books or print-only
6    materials; correct?
7    A.  I can't answer that for sure.  There may be some
8    books or PDFs that it is able to access.  You would have
9    to -- that's an iThenticate question really how their
10   software works.
11   Q.  The iThenticate process isn't perfect for
12   identifying plagiarized content.  Is that fair to say?
13   A.  It is not perfect.  It's a tool that we use as
14   part of our overall process.
15   Q.  So what part of your overall process was not
16   completed for these five courses?
17   A.  Well, there were different stages in the process;
18   so the three courses -- nonantibiotic antimicrobial
19   pharmacology, depression versus dementia in the elderly,
20   and traumatic brain injury -- had only very minimal work
21   done that included running it through iThenticate and
22   also ensuring that the necessary components were
23   included.  But no additional work was done to identify
24   or remediate copied or plagiarized passages.
25        In the case of cancer and chemotherapy, it was a

Page 75

1    pretty in-depth editorial.  Runthrough was done by one
2    of our independent contractors, and she did some work to
3    rewrite or remediate sections that appeared to be
4    similar with no judgment as to whether it was
5    plagiarized or not.  Whether material is free use and
6    therefore not plagiarized -- we would prefer not to use
7    it in any case.  But I hadn't done the second review or
8    the final review.
9         In the case of the GERD course, it had been
10   substantially rewritten.  We would have done another
11   iThenticate review because the changes were so
12   extensive.  That was not done immediately.  We would
13   usually do that prior to releasing it to the public.
14   And there was one other thing with the GERD course.
15        There were also sections during my editorial
16   process with the GERD course that I thought needed
17   references.  And during that process, I would search for
18   it and potentially find additional matches that weren't
19   identified by iThenticate.  And that happens as part of
20   our normal process, and that happened with the GERD
21   course.
22   Q.  We can take them one at a time if we have to.  I
23   just want to make sure that I'm clear on the development
24   of these various courses.
25        None of them have been fully edited; is that

Page 76

1    correct?
2    A.  None of them were ready for publication.  That's
3    correct.
4    Q.  None of them had been approved for publication by
5    NetCE or anyone else; correct?
6    A.  Well, they were accepted for publication when we
7    received the drafts from Dr. Jouria, but none of them
8    were ready to be printed and presented to the public.
9    That's correct.
10   Q.  So they hadn't been fully edited?
11   A.  The editorial process was not complete for any of
12   these five courses.
13   Q.  All permission had not been obtained?
14   A.  Not for all of the courses, no.
15   Q.  Had all of the permissions been obtained for any
16   of the courses?
17   A.  All of the necessary permissions, as far as we
18   knew, were obtained for the GERD course but not for the
19   other four courses.
20   Q.  None of the courses had been returned to
21   Dr. Jouria for final approval; correct?
22   A.  That's correct.
23   Q.  And if you look at -- pick a course.  Exhibit 81,
24   which is the GERD course, at the end, you'll see a
25   development status form.  That one in particular -- I

Page 77

1    don't see a Bates label on it.
2    A.  No.
3    Q.  But I promise you I didn't find that on my own.
4    Q.  Do you want the one right before it?
5    Q.  That's a checklist for all the steps that have to
6    be done to get an article from submission to
7    publication; isn't that correct?
8    A.  It is a general checklist that we use, yes.
9    Q.  And for all of the courses in front of you, these
10   five courses, the checklist ends at "draft manuscript
11   received" and "payment issued" with lots of -- lots of
12   blanks; isn't that correct?
13   Q.  Can I check all of them?
14   A.  Please do.
15        MR. ROSS:  Mark, what's the Bates number on
16   that?
17        MR. WILSON:  I don't have a Bates number,
18   Richard.  It was part of the courses.
19        MR. ROSS:  I have the GERD course.  Can you
20   point to it in there?
21        MR. WILSON:  Yeah, for the GERD course, the
22   document immediately preceding it was Bates labeled
23   NETCEB --
24        MR. KERN:  -24582.
25        THE WITNESS:  Oh, this one has one.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

| 30(b)(6) | | Sarah Campbell on 11/14/2017 | Pages 78..81 |

---

Page 78

1   Okay.  Yes, that's correct.
2   BY MR. WILSON:
3   Q.  So what -- what was left to get these courses
4   approved for publication?
5   MR. KERN:  Object to the use of the term.
6   Lacks foundation.  I don't know what that means.  Why
7   don't you define it.
8   BY MR. WILSON:
9   Q.  Go ahead.
10   A.  So all of those courses have been, in essence,
11   approved for publication.  Our intent was to publish
12   them, and we wouldn't undertake these steps unless that
13   was -- they were approved to move forward.  And, in
14   fact -- it's not included in here, but it's part of our
15   checklist.
16   Q.  What's part of your checklist?
17   A.  Approval for publication.
18   Q.  Look for each of those courses and tell me if you
19   see a checklist that reflects that any of these courses
20   were approved for publication.
21   A.  Sure.  On Bates number NETCEB24806 in the GERD
22   course, at the bottom of the manuscript checklist, it
23   says "draft accepted."
24   Q.  That doesn't say "approved for publication," does
25   it?

Page 79

1   A.  That's not terminology that we use as part of the
2   development process.  When we accept a manuscript and
3   issue payment to the author, that is our signal that it
4   has been accepted for publication.
5   Q.  So your testimony is that the words "approved for
6   publication" are not terminology that NetCE uses; is
7   that correct?
8   MR. KERN:  Misstates testimony.
9   THE WITNESS:  No, no, that's not terminology
10   that we use in our development process.  I know that it
11   does appear in our freelance writers' agreements.
12   (Exhibit No. 84 marked for identification.)
13   BY MR. WILSON:
14   Q.  Handing you what's been marked as Exhibit 84.
15   Exhibit 84 is a document that begins on NETCEB29016.
16   It's from NetCE, and it's called "division plan or
17   course approval," and this one, in particular, is for a
18   course entitled "chronic obstruction" -- "obstructive
19   pulmonary disease, COPD."
20   Do you recognize that document?
21   A.  I do.
22   Q.  This is a document from NetCE?
23   A.  It is.
24   Q.  You'll see about midway through the page, there's
25   a box that's checked "approved for publication."

Page 80

1   Do you see that?
2   A.  I do.
3   Q.  And this one in particular in front of you, it
4   says, "Approved for publication with changes.  See
5   manuscript pages."  Yes?
6   A.  Yes.
7   Q.  So there is a way where NetCE does actually use
8   the words "approved for publication" as part of the
9   development of courses; isn't that correct?
10   A.  When I was talking about development of courses,
11   I meant our editorial process.  This is actually a
12   planner for reviews and approves for publication for
13   their specific profession.
14   So in terms of accepting a document and moving
15   forward with it, I don't necessarily consider this
16   division planner course approval form to be part of that
17   process.  It's kind of part of our accreditation or
18   designation of credit process.  But we do use that
19   terminology in our evaluations with the planners.
20   That's true.
21   Q.  And are there documents like what's shown in
22   Exhibit 84 -- yes, 84 -- for any of the five courses at
23   issue between NetCE and Elite?
24   A.  No, not yet.
25   Q.  So as it pertains to this step in the preparation

Page 81

1   of courses by NetCE, the five courses at issue here had
2   not been approved for publication; correct?
3   A.  This only approves for course for publication --
4   this specific example for surgical technologists.  It
5   doesn't -- it's approving it for outreach to a specific
6   audience.  It doesn't decide whether or not it's
7   published in general.
8   This is specific to this planner's profession,
9   and that had not yet been done for the five courses in
10   terms of designation of credit or which professions
11   would receive access.  That's true.
12   Q.  So according to you, when are courses -- when was
13   each of the courses in front of you, to use your words,
14   accepted for publication?
15   A.  We accept courses for publication at the time
16   that the draft is received in its entirety that we --
17   that we are sure that all of the components are present,
18   and we pay the freelance author, which would complete
19   the contract process, as far as I understand it.
20   Q.  Not all accepted courses get published; correct?
21   A.  It is our intent to publish all accepted courses,
22   but there's no timeline in terms of when they will be
23   released.
24   Q.  Please listen to my question.
25   Not all courses get published; correct?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Page 82

1   A.  Can you be more specific?  All courses --

2   Q.  Not all courses submitted to NetCE get published.

3   A.  That's true.

4   Q.  And the five courses in front of you were never

5   published; correct?

6   A.  We had not yet printed or released them to the

7   public.

8   Q.  And indeed for, at least three of them, there was

9   a whole lot more work that needed to go into preparing

10  the courses for publication; correct?

11  A.  That is correct.

12  Q.  And for the other two, that being GERD and cancer

13  and chemotherapy, there were still significant steps on

14  the checklist that hadn't been satisfied prior to work

15  being stopped on the courses; correct?

16  A.  There was still work to be done on both of those

17  courses.

18  Q.  So there was work to be done on all five courses

19  before these courses could be published; right?

20  A.  That's correct.

21  Q.  Take a look -- if you take back -- take a look

22  back at the complaint, Exhibit 42 and Exhibit A to

23  Exhibit 42, which is the copyright registration

24  certificates for each of the five courses at issue here.

25  Each of them lists a publication date.

Page 83

1       Do you see that?

2   A.  I do.

3   Q.  If none of the five courses had been published,

4   why did NetCE tell the copyright office that they had

5   been?

6   A.  I don't feel like I have a strong enough

7   knowledge of copyright law to answer that question.

8   Q.  Where do the dates come from?

9   A.  Those are the dates that we received final drafts

10  from Dr. Jouria.  It appears that those are the dates.

11  Let me double-check.  That's -- that is what I -- it's

12  in the ballpark of when we received the drafts if it's

13  not the exact date.

14  Q.  I hope you appreciate that "in the ballpark"

15  doesn't work for us.

16      So my question is:  Where do the dates come from?

17  A.  They are the dates on or around the date we

18  received the drafts from Dr. Jouria.

19  Q.  Who selected those dates?

20  A.  They were -- the form was filled out by C.C.

21  Chernev on my instruction.

22  Q.  Looking at the depression versus dementia

23  article -- that's Exhibit 82 -- Dr. Jouria submitted

24  this to NetCE on April 16th of 2013, yet the copyright

25  registration reflects a date of publication of April 18,

Page 84

1   2013.

2       Do you know why the difference?

3   A.  I don't know specifically.

4   Q.  If you take a look at the cancer and chemotherapy

5   article -- it's Exhibit 80 -- Dr. Jouria sent this to

6   NetCE on March 11th of 2013, yet the copyright

7   application -- excuse me -- the copyright registration

8   lists a date of first publication of March 21st, 2013.

9       Do you know why the difference?

10  A.  I don't know specifically.

11  Q.  If you take a look at the GERD article,

12  Dr. Jouria submitted it to NetCE on May 9th of 2013, yet

13  the copyright registration lists a date of publication

14  of May 15, 2013.

15      Do you know why the difference?

16  A.  I don't know specifically.

17  Q.  You keep saying the word "specifically."

18  A.  I could speculate, but I would rather not.

19  Q.  So the answer is you don't know?

20  A.  I don't know it without speculation, yes.

21  Q.  If you take a look at the traumatic brain injury

22  course, Dr. Jouria submitted this to NetCE on

23  October 25th of 2012, yet the copyright registration

24  lists a date of first publication of December 20th of

25  2012.

Page 85

1       Do you know why the difference?

2   A.  I don't know specifically.

3   Q.  The last one is the nonantibiotic antimicrobial

4   course.  That enlists a date -- excuse me.  NetCE

5   sent -- excuse me.  Dr. Jouria sent it to NetCE on

6   January 8th of 2013.  And the copyright registration

7   lists a date of first publication of January 17th of

8   2013.

9       Do you know why the difference?

10  A.  I don't know specifically.

11  Q.  Who at the company, if anyone, would know?

12  A.  I would know with additional research.

13  Q.  With all do respect, you were designated to

14  testify about issues related to the copyright

15  registrations, and you're who I get to talk to.

16      So what else would you need to do to educate

17  yourself to testify on this topic?

18  A.  I would need to see the date that the documents

19  were saved from the e-mails and downloaded it to our

20  network.

21  Q.  If you take a look back at Exhibit 75, it's

22  NetCE's interrogatory responses to Elite's

23  interrogatories.  Take a look at NetCE's response to

24  interrogatory number 6.  On page 10, there's a paragraph

25  that states, "When the infringement was discovered,

Page 86

1  Ms. Campbell conducted a visual side-by-side comparison
2  of the NetCE drafts in the impermissibly published Elite
3  courses."
4        Do you see that?
5     A.  I do.
6     Q.  Did you conduct a side-by-side comparison as
7  stated in this interrogatory response?
8     A.  I did.
9     Q.  Had you concluded, at that time, that there was
10 already infringement?
11    A.  I had done some additional work.  I -- I am not
12 sure if it was before or after I compared the two
13 drafts, but I did not immediately assume that we were
14 necessarily the copyright holders.  I investigated
15 whether or not it was possible that he -- that
16 Dr. Jouria had sold the courses to Elite first and then
17 to us.  But I determined that the dates indicated that
18 we were the first copyright holders.
19       And then I did some additional search to
20 determine if the materials were published somewhere
21 else, if there was possibly another copyright holder,
22 but there was no -- I wasn't able to find another place
23 where the material that I had initially discovered was
24 printed, other than the Elite course.
25       So then, at some point during the investigation,

Page 87

1  I compared the NetCE drafts and the Elite courses in a
2  visual side-by-side comparison.
3     Q.  Where did you get the Elite courses that you used
4  for your side-by-side comparison?
5     A.  From their Web site.
6     Q.  Did you print them?
7     A.  I did print them, yes.
8     Q.  Did you make notes on them?
9     A.  Not that I recall, no.
10    Q.  Whatever you printed, was it produced to us in
11 this case?
12    A.  I do not know.
13    Q.  Where would you need to look to find out?
14    A.  I would have to look at our -- the documents we
15 provided.
16    Q.  Have you looked at the documents you provided?
17    A.  I looked at them in their entirety but not
18 specifically.
19    Q.  Would you be able to tell by that review whether
20 the materials that you printed from Elite were included
21 in the production?
22    A.  Yes.
23    Q.  Was your comparison a line-by-line comparison
24 throughout the entirety of the articles that you were
25 reviewing?

Page 88

1     A.  No.
2     Q.  Tell me about your comparison then.
3     A.  I did a side-by-side comparison of several pages
4  and sections of the courses that I was able to access.
5  There were two that I was unable to access but that had
6  similar topics, but those are no longer in play here.
7        So of the five that we're talking about here, I
8  did go through -- and it's additional courses on Elite's
9  side because some of them are multiple parts.  But of
10 the five NetCE courses, I did go through and do a
11 comparison on several pages, and I would do spot checks
12 throughout to see if there were similarities and found
13 the same or similar content in -- for all five of the
14 courses.
15    Q.  So we're clear, for the two articles that are no
16 longer part of the case, you did not perform a
17 side-by-side comparison; is that correct?
18    A.  For those two, I was not able to.  That's true.
19    Q.  So on what did you base your claims for
20 infringement in this lawsuit on if you hadn't compared
21 the courses published by Elite?
22    A.  The similar topic areas and content and then the
23 background of the -- of the other five courses being
24 apparently copied indicated that those two likely had
25 significant sections that appeared in both.

Page 89

1     Q.  With all due respect, you hadn't even seen them.
2  How could you even come close to making that kind of a
3  conclusion?
4        MR. KERN:  Asked and answered.
5        THE WITNESS:  I could see the learning
6  objectives, and the learning objectives are an
7  indication of the content and the outline.  And the
8  learning objectives included content that overlapped
9  with our courses, and that's how I made that
10 determination.
11 BY MR. WILSON:
12    Q.  In this interrogatory response here, number 6,
13 you state, "Significant sections of these courses appear
14 to be featured in what Elite published."  That's for the
15 two courses that are no longer part of the case.
16       What is the basis for that statement if you
17 hadn't even seen the courses?
18    A.  I base that on seeing learning objectives.  The
19 learning objectives would indicate the content that
20 appeared in the course.  And based on our discovery that
21 the other five courses were copied in part or entirely,
22 we had an indication that sections of the courses
23 appeared to be featured in the Elite courses.
24    Q.  You brought claims in a federal lawsuit without
25 knowing whether there were substantial similarities

Case 0:15-cv-61165-WPD   Document 199-9   Entered on FLSD Docket 12/29/2017   Page 14 of 37

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Pages 90..93

**Page 90**

1 between what you were claiming copyright rights in and
2 what you were suing; isn't that correct?
3    A.  We made claims based on the information and
4 knowledge that we had at the time.
5    Q.  And at the time, you hadn't even reviewed the
6 course that you were suing, saying that it's
7 substantially similar; isn't that correct?
8    A.  We didn't have access or the ability to do that.
9    Q.  This is a yes-or-no question, ma'am.
10       MR. KERN:  Answer it however you want,
11 Sarah.  Don't let him tell you how to answer it.
12 BY MR. WILSON:
13    Q.  You hadn't even looked at it, and you filed a
14 federal cause of action against Elite; isn't that
15 correct?
16       MR. KERN:  Claim for relief.
17       THE WITNESS:  We were not able to view the
18 contents specifically, but we could view components that
19 gave us an indication that there could have been and
20 appeared to be significant overlap.
21 BY MR. WILSON:
22    Q.  There could have been, but you had no indication
23 that there appeared to be; isn't that correct?
24       MR. KERN:  Mark, this has been asked and
25 answered four times.  This is just theater.

**Page 91**

1       MR. WILSON:  I am using her words.
2       MR. KERN:  You've asked and answered --
3       MR. WILSON:  You may not like it, but I'm
4 going to continue to ask it as many times as I want.
5       MR. KERN:  This is just pure theater.  She's
6 answered it four times.
7 BY MR. WILSON:
8    Q.  On what basis can you say there appeared to be
9 substantial similarities in significant sections when
10 all you saw were the objectives?
11       MR. KERN:  Asked and answered.
12       Go ahead.
13       THE WITNESS:  The two topics in question had
14 overlap, and the components of the course that we were
15 able to see, which included the learning objectives,
16 indicated that the sections of the course had -- could
17 have a significant overlap and appeared to be featured
18 in the Elite courses.
19 BY MR. WILSON:
20    Q.  So you drew your conclusion based off of the
21 title and the headings, isn't that correct?
22    A.  Well, learning objectives aren't headings.
23 They're behavioral -- it's basically an outline of the
24 content driven by behavioral objectives; so we -- that's
25 what it was based on.

**Page 92**

1    Q.  Is it your testimony that the learning objectives
2 between what NetCE was claiming rights in for these two
3 courses and what Elite published were the same or
4 substantially similar?
5    A.  I am not making that claim right now.  I am
6 saying that the learning objectives gave us some insight
7 into what content would be included in the course, and
8 we were able to use that information to see that
9 significant sections appeared to be featured in the
10 Elite courses.
11    Q.  So in this interrogatory response -- this is
12 interrogatory number 6 -- when it talks about you
13 conducting a visual side-by-side comparison of the NetCE
14 drafts and the impermissibly published Elite courses,
15 that does not pertain to the two courses that were
16 recently dismissed from the case; is that correct?
17    A.  I was not able to do a comparison for those two
18 courses.  That's correct.
19    Q.  And where in this interrogatory response does it
20 say that?
21    A.  I don't believe it's in this response
22 specifically.  It is not.
23    Q.  Indeed, it says that, "The remaining two
24 courses" -- which the two courses are the lymphatic and
25 immune systems and cardiovascular pharmacology -- "were

**Page 93**

1 not preprinted verbatim."
2       Do you see that?
3    A.  I do.
4    Q.  How could you make that conclusion when you
5 hadn't even seen the courses from Elite?
6    A.  Based on the learning objectives, I could see
7 that there was some content that was unique to the Elite
8 courses or was not covered in the drafts that we
9 received from Jouria, but there appeared to be sections
10 that were the same or similar to sections that were in
11 the course -- the drafts that we received, and that is
12 how we made that determination.
13    Q.  Also in interrogatory number 6 on page 10, you
14 say, "The similarities between the two sets of courses,
15 visible through a side-by-side comparison, were and are
16 apparent, remarkable, and extensive."
17       Do you see that?
18    A.  I do.
19    Q.  That's not true for two of the articles that were
20 previously part of this case, those being the lymphatic
21 and immune systems and cardiovascular pharmacology
22 articles; isn't that true?
23    A.  Those two, we were not able to do the visual
24 side-by-side comparison; so that is true.
25    Q.  You then say, "Each of the infringing courses

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                                      Pages 94..97

**Page 94**

1  exhibit literal and nonliteral similarity, copying of
2  whole swathes of text from NetCE's copyrighted courses,
3  copying the organization of the courses, and/or
4  paraphrasing large passages leaving the essential
5  expression unchanged."
6       Do you see that?
7     A.  I do.
8     Q.  Again, that's not true for the two dismissed
9  articles, is it?
10    A.  That is not true for the dismissed articles.
11  When we received additional information, we acknowledged
12  that the two Elite courses appeared to be different, and
13  that's why they were dismissed.
14    Q.  They should have never have been part of the
15  case; isn't that true?
16    A.  Well, we wouldn't have any way of knowing that
17  until we got the information that resulted from this
18  case.
19    Q.  How about you try this next time:  Investigate
20  first and sue later.
21       MR. KERN:  No question.  Ignore him, Sarah.
22  Wait until he asks a question.
23       We're ready to take a lunch break whenever
24  you guys are ready.
25       MR. WILSON:  No.

**Page 95**

1       MR. KERN:  Next chance --
2  BY MR. WILSON:
3     Q.  So tell us everything you can about the
4  comparison you performed for each of these five courses.
5     A.  Can you repeat that?  Sorry.
6     Q.  Tell us everything you can about the comparison
7  that you say you performed for the five courses still at
8  issue in the case.
9     A.  For these five courses, when we -- when I
10  identified the possibility of copying or similarities, I
11  would take our copy and the Elite copy and went through
12  comparing text specifically.  And I did use the Jouria
13  version that we received -- the draft we received.  If
14  there were edits, for example, to the GERD course or the
15  cancer and chemotherapy course, I used the previous
16  version we had received from Jouria.  And I just went
17  through several pages comparing texts and noting
18  differences, and then I did spot checks kind of flipping
19  forward to see if it continued into the course.
20       Some of these courses are extensively long; so I
21  did not continue to do every single page of every single
22  word, but I did do a visual side-by-side comparison for
23  a significant portion.
24       And we also attempted to run our -- the Jouria
25  drafts through iThenticate to determine if there was a

**Page 96**

1  match caught through that tool.  Unfortunately, the
2  iThenticate tool was not able to access the PDFs that
3  Elite had on their Web site; so that did not return
4  useful information at that time.
5     Q.  So you went through a couple of pages of each of
6  the five courses and went side by side; is that correct?
7     A.  I went through --
8       MR. KERN:  Her testimony speaks for itself.
9  She answered the question.
10       THE WITNESS:  I went through several pages,
11  and then I also did spot checks moving forward in the
12  text to determine if there were additional or if it
13  continued further in the text.
14  BY MR. WILSON:
15    Q.  How many spot checks?
16    A.  It depended on the length of the course.  If it's
17  a longer course, I would have done -- I did do more spot
18  checks just throughout the length of the course.  So it
19  would -- it would depend on the length of the initial
20  course and then also how many parts Elite had published.
21  If they had published multiple parts, then I would start
22  the process again based on when their part started.
23    Q.  Did your comparison include a comparison of the
24  content of Dr. Jouria's submissions that were
25  plagiarized?

**Page 97**

1     A.  I would not have a way of knowing that.  Again,
2  we had run them through iThenticate, but I can't make a
3  qualitative determination of whether it was plagiarized
4  or not.  It included the draft that he received -- that
5  he submitted to NetCE in its entirety, whether or not
6  there were sections that were copied or plagiarized or
7  not.
8     Q.  So for the -- at least for the GERD article, you
9  had done some plagiarism analysis to see what
10  permissions you needed to receive to continue down the
11  path of trying to get that article ready to be
12  published; correct?
13    A.  We had done additional research for that course,
14  yes.
15    Q.  So when you did a side-by-side comparison of the
16  GERD course submitted to you by Dr. Jouria with the
17  Elite course that you found, did you include in your
18  comparison plagiarized content?
19    A.  The draft that we received from Jouria contained
20  materials that we determined should be edited before
21  publication, whether it was specifically and legally
22  plagiarized or not, and that we would seek permission to
23  reprint.
24       I did not include the tables in my analysis
25  because I knew from my experience with his works that

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

**Page 106**

1   Elite was filed by NetCE, the only comparison that had
2   been done was your side-by-side comparison; is that
3   correct?
4           MR. KERN:  Misstates testimony.
5           THE WITNESS:  We had done a visual
6   side-by-side comparison.  I specifically had looked at
7   the courses and compared them to Elite's courses, and we
8   attempted to run iThenticate to do some additional
9   comparison.  That was what I specifically recall
10  completing.
11  BY MR. WILSON:
12      Q.  When did you perform your side-by-side comparison
13  for these five courses still at issue?
14      A.  I determined -- I discovered the similarities
15  with the GERD course first in February of 2015, and that
16  led me to look at the other courses that Dr. Jouria had
17  published with Elite; so the comparison would have been
18  done -- was done in February of 2015.
19      Q.  How long did you take to perform this comparison
20  where you looked at a few pages and did some spot
21  checking?
22      A.  I would say it took me -- I spent an entire day
23  researching and doing comparisons.
24      Q.  And I am not asking about research.  Actual
25  comparisons.

**Page 107**

1   A.  That included the iThenticate scan; so when I
2   refer to research, I'm including that iThenticate scan
3   and also determining if this content was potentially
4   copyrighted from a third party.
5   Q.  So how much time did you spend doing your
6   side-by-side comparison for these five courses?
7   A.  How much time did I spend -- can you be more
8   specific?
9   Q.  Doing your side-by-side comparison for these five
10  courses.
11  A.  I did comparisons of these five courses with the
12  Elite course, but I also did comparisons with additional
13  content.  And I spent a day comparing these five courses
14  with the Elite courses in various ways and searching for
15  third party.
16  Q.  What other content did you compare these courses
17  to besides Elite content?
18  A.  I did general Internet searches to determine if
19  passages were published in other places by other
20  publishers and, for the most part, in the sections I was
21  checking, they were only published on the Elite Web
22  site.
23  Q.  What do you mean "for the most part"?  Did you
24  find some passages published for any particular courses
25  by someone else other than Elite?

**Page 108**

1   A.  There were passages that appeared in similarity,
2   but I couldn't make a qualitative determination of
3   whether they were a copyright holder.  And, also, they
4   weren't the extent of the materials in the Elite course.
5   It was just sections, sentences, or phrases that maybe
6   appeared somewhere else but didn't appear in works like
7   a GERD continuing education course, for example.
8   Q.  None of the courses are identical -- by "none of
9   the courses," I mean the Dr. Jouria course submitted to
10  NetCE and the course that you did your side-by-side
11  comparison on from Elite -- isn't that correct?
12  A.  They are not identical.
13  Q.  And as you sit here today, you can't tell us --
14  you can't quantify the similarities for any particular
15  article; is that correct?
16  A.  Without having the Elite courses in front of me,
17  I cannot do a side-by-side showing of the similarities,
18  and I don't have a number to give you in terms of
19  percent or proportion of similarity at this time.
20  Q.  And in both the side-by-side comparison that you
21  performed for these five courses and the later computer
22  analysis using Plagiarism Checker X, you included the
23  entirety of the Dr. Jouria courses sent to NetCE in your
24  analysis; correct?
25  A.  That's correct.

**Page 109**

1   Q.  And you did not endeavor to exclude from that
2   analysis any content that Dr. Jouria might have
3   plagiarized from any other source; correct?
4   A.  I did not try to make that determination.
5   Q.  And you did not determine whether the portions
6   that you found to be the same or similar between the
7   NetCE version of the course and the Elite version of the
8   course were protected or protectable expression owned by
9   NetCE; correct?
10  A.  I don't feel like I have the expertise to make
11  that determination.
12  Q.  You didn't endeavor to find out, when you located
13  a similarity or something that you thought was
14  similar -- similar, whether that portion of the article
15  was written by somebody other than Dr. Jouria; correct?
16  A.  I did some searching -- Internet searching to
17  determine if Dr. Jouria had published the courses
18  somewhere else in addition to Elite.  And I also did
19  some searching to determine if the courses were copied
20  in their entirety from another source.
21      But in terms of parts or sections, I didn't
22  attempt to make that determination.
23  Q.  And did you discover in your Internet research
24  any other instances where Dr. Jouria had published any
25  of these five courses with anyone else?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

30(b)(6)                                                                    Pages 110..113

Page 110

1  A. Specifically in February?

2  Q. We will go with February, but you know I am going

3  to ask ever.

4  A. I don't recall when it was identified, but we

5  were able to find some evidence that Dr. Jouria had

6  published similar topics or content with Ce4Less -- or

7  NurseCe4Less.

8  Q. What did you find at NurseCe4Less?

9  A. We found that Dr. Jouria had also been writing

10 continuing education courses for NurseCe4Less, and some

11 of the topics and content in question appeared on the

12 NurseCe4Less site.  The content, as of Elite, was parsed

13 into parts, and I did a visual side-by-side comparison

14 of the drafts we received from Jouria and the

15 NurseCe4Less courses that were potential matches.

16 Q. How many were there?

17 A. I don't recall.

18 Q. Can you identify any of these five courses as

19 potential matches?

20 A. I remember that there was a NurseCe4Less course

21 entitled "head trauma" that I identified as a possible

22 match for the traumatic brain injury course.  And I know

23 there were additional courses, but I don't recall them

24 specifically right now.

25 Q. For the NurseCe4Less courses, did you perform the

Page 111

1  same side-by-side visual comparison that you've

2  testified about here today?

3  A. I did.

4  Q. You looked at a few pages and did spot checking

5  throughout the article; is that correct?

6  A. That's correct.

7  Q. And what -- and you did this for the head trauma

8  article for NurseCe4Less?

9  A. That's one example, yes.

10 Q. And you don't recall the other examples?

11 A. I don't recall them specifically right now.

12 Q. What did you conclude?

13 A. In my analysis of the NurseCe4Less courses, I

14 found that, in some cases, the learning objectives were

15 exactly the same or very similar to the learning

16 objectives in the courses that Jouria had submitted to

17 us.

18     But in terms of the content, the content itself

19 appeared to be dissimilar, although it followed a same

20 general outline as the courses he had developed for

21 NetCE.

22 Q. There came a point in time when NetCE sent a

23 cease and desist letter to NurseCe4Less; correct?

24 A. Yes.

25 Q. And did that -- was that the result of your

Page 112

1  analysis on -- in conjunction with these courses?

2  A. It was the result of our analysis and continued

3  concern that Jouria may have additional pending courses

4  with NurseCe4Less.

5  Q. Was it your conclusion, based on your

6  side-by-side comparison, that NurseCe4Less had violated

7  some copyright rights belonging to NetCE?

8  A. I am not a lawyer, but I did believe that they

9  had copied content that we owned.

10 Q. And there were some instances when they had not,

11 you determined; is that correct?

12 A. That's correct.

13 Q. How did you draw the line between copying and not

14 copying?

15 A. Essentially, if the material was the same or not

16 the same.

17 Q. Well, we've already determined here that none of

18 them are the same with -- as it pertains to Elite and

19 NetCE for these five courses.

20 A. We agreed that they were not identical.

21 Q. Does "the same" mean something different to you

22 than identical?

23 A. Yes.

24 Q. Okay.  What's the difference for you?

25 A. Again, the literal and nonliteral similarities in

Page 113

1  the NetCE courses and the Elite courses are easily

2  identifiable in -- in my opinion, and extensive to the

3  point that I was able to identify them easily and

4  throughout the courses.

5     That was not the case with NurseCe4Less, but I do

6  acknowledge that, for example, Elite's tests were

7  different than the tests in NetCE's courses.

8  Q. What else was different?

9  A. Without the Elite courses in front of me, I can't

10 really identify specifics.

11 Q. Do you recall any other differences for any of

12 the courses from Elite?

13 A. Not -- aside from layouts and assigning of

14 credit, which I don't think is germane, I don't recall

15 any specifically.

16     MR. KERN: Mark, Kate, we've been going for

17 about 80 minutes.  I am pretty hungry.  If you get a

18 chance, please, I'd like to take a lunch break.

19     (Reporter clarification.)

20 BY MR. WILSON:

21 Q. In your review, looking for where Dr. Jouria

22 might have published the same courses that he submitted

23 to NetCE, where did you look?  You said you did it on

24 the Web site, on the Internet.  Where did you look?

25 A. Specifically on -- just through Google searches

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

Page 122

1    Q.  But on this broad overview provided in
2  NETCEB34857, the step that includes approving a course
3  for publication is in step 6, isn't it?
4    A.  It says "approve the manuscript," but it doesn't
5  say, as far as I can read, "approve for publication."
6    Q.  Take a look back at this exhibit.  I don't
7  remember the name -- I don't remember the number.  Do
8  you have a copy of it still there?
9    A.  I do have it.  84.
10    Q.  Thank you.  Take a look at Exhibit 84.  Exhibit
11  84, again, says at the top "division planner course
12  approval," and there are three boxes midway down that
13  say "approve for publication," "approve for publication
14  with changes, see manuscript pages," and then the third
15  box, "rejected for the following reasons."
16         Those three options line up perfectly with the
17  three bullet points in the "overview of course
18  development" document at NETCEB34857; correct?
19    A.  They are not verbatim, no.
20    Q.  Well, the first bullet point in "the overview of
21  course development" at NETCEB34857 is "approve the
22  manuscript."  The first checked box is "approve for
23  publication."
24         Do you believe that's something different?
25    A.  Yes.

Page 123

1    Q.  Why is that?
2    A.  The word "manuscript" is different than the word
3  "publication."
4    Q.  Other than they use slightly different words, do
5  these three boxes and three bullet points not line up?
6  Because the second bullet point is "approve the
7  manuscript contingent upon the faculty member making
8  requested additions, deletions, corrections, and/or
9  clarifications," whereas in the division planner
10  document at Exhibit 84, the second bullet -- excuse
11  me -- the second box says "approve for publication with
12  changes."
13         In the third bullet point from NETCEB34857 is
14  "reject the manuscript."  The third box in Exhibit 84 is
15  "rejected for the following reasons."
16         Don't those line up, ma'am?
17    A.  The wording is different.  And I just want to
18  make a point that in point -- in step six, it says,
19  "Upon review of the manuscript and the comments of the
20  editor, the lead planner and the reading committee, the
21  decision is made to do one of the following."
22         (Reporter clarification.)
23         THE WITNESS:  So this is the feedback from a
24  division planner, and input from division planners is
25  used to make these decisions, but they aren't -- it's

Page 124

1  not a one to one relationship.
2         So this is specifically, again, in
3  Exhibit 84, the surgical technologist lead planner, to
4  review of the COPD course.  She made a recommendation,
5  but her recommendation is an input for us when we're
6  deciding to move forward and to what professions we will
7  move forward with the course for.  But it isn't a
8  determination of whether or not that course will ever be
9  released to the public.  And this step 6 is trying to
10  encompass all of that.  "Approve the manuscript," to me,
11  could mean that the manuscript is approved for a
12  specific profession.
13         So you could approve -- you could take --
14  you could approve and reject the manuscript based on
15  feedback from the division planner when you're
16  determining who the audience -- the final audience will
17  be.  So it is slightly different to me.
18    Q.  In NETCEB34857, step 6 says, "The decision is
19  made to do one of the following."  Multiple decisions
20  aren't made in response to that step.  It's one of the
21  following.  And if "approved the manuscript" does not
22  mean "approved for publication," then what else could it
23  mean?
24    A.  So --
25    Q.  Let me ask you this.

Page 125

1         What else -- that's exactly what it means in
2  NetCE, doesn't it?
3    A.  No.
4    Q.  What's the basis for that?
5    A.  So these manuscripts that we receive can have a
6  diverse audience, and they might be published in
7  different versions for different audiences.  The
8  versions, for example, for dentists and physicians.  If
9  this is sent to the dental division planner and rejected
10  and sent to the physician division planner and approved,
11  that would trigger two different actions.
12    Q.  In what audiences were the five courses at issue
13  here allegedly approved for publication?
14    A.  The division planners had not yet reviewed the
15  manuscripts in this case.  They had reviewed the
16  proposals; so none of them had a final decision as to
17  the audience.
18    Q.  And proposals aren't accepted for -- excuse me.
19         Proposals aren't approved for publication;
20  manuscripts are; isn't that correct?
21    A.  Proposals are not published.  That's correct.
22    Q.  And for the five courses at issue here in this
23  case, there are no documents like Exhibit 84 completed
24  by anyone at NetCE; isn't that correct?
25         MR. KERN:  Asked and answered.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

**Sarah Campbell on 11/14/2017**

Page 126

1   THE WITNESS: That is correct.
2   BY MR. WILSON:
3   Q. What did NetCE intend to do with the five courses
4   at issue between NetCE and Elite?
5   A. It was NetCE's intent to develop these courses
6   and to offer them to healthcare professionals for
7   continuing education.
8   Q. Which audiences? I think you just said that
9   hadn't been decided; is that correct?
10  A. It hadn't been finalized, but we had sent the
11  proposals to the planners.
12  Q. Which planners did you send proposals to for
13  these five courses?
14  A. These course proposals were sent to Dr. Jane
15  Norman, and some were also reviewed by Dr. John Leonard
16  that would represent nursing and medicine, respectively.
17       But we reserve the right when we receive the
18  manuscripts to make a decision to include additional
19  division planners based on how the content is developed.
20  Q. So at the time that NetCE decided not to publish
21  these five courses, NetCE had not determined who they
22  were going to offer these courses to; is that correct?
23  A. I knew at a minimum that these five courses would
24  be offered to nurses. If they would be appropriate for
25  other professions was yet to be determined.

Page 127

1   Q. And without finalizing the courses, how did you
2   make the determination that you were going to offer them
3   to any particular profession?
4   A. When these courses were contracted, we had a
5   specific need for continuing education content or
6   subject matter -- continuing education subject matter
7   related to pharmacology, specifically. And these
8   courses would have provided that coverage of those
9   subjects for nursing specifically that we were
10  interested in developing.
11  Q. What format were you going to offer these five
12  courses?
13  A. When our courses are released, they're available
14  online, they are available in print, and they're also
15  available as EPUB files for eReader devices.
16  Q. Are all courses available in all of those
17  formats?
18  A. All courses are available online and in print.
19  And most but not all are available as EPUB files.
20  Q. What do you mean when you say "in print"?
21  A. I mean we have a bound booklet available that can
22  be mailed to learners, and we also have a special offer
23  bundle that we refer to as a catalog that is direct
24  mailed to identified customers.
25  Q. How do you decide what courses will go in your

Page 128

1   booklet or your catalog?
2   A. We have -- just for clarity, the booklets are
3   individual courses that are requested specifically by
4   learners.
5   Q. So it's a situation where somebody who doesn't
6   want to take it online, you'll send them a booklet? Is
7   that how that works?
8   A. Yes. That's how a booklet would work. They
9   would order it to be sent to them.
10       In terms of the catalogs or special offer
11  bundles, those are mailed according to our schedule. We
12  have a committee meeting in the spring that sets the
13  next catalog year. Our catalog year runs from fall to
14  late spring; so if we had a meeting, for example, in
15  April for the 2000- -- if we had a meeting in
16  April 2017, it would be setting the 2018 schedule, which
17  starts in August of 2017.
18       And at that committee meeting in the spring, we
19  look at courses that we have contracted and courses
20  that -- we have drafts and courses that are currently
21  available, and we make decisions about what courses will
22  be featured in our direct mail booklets -- those
23  catalogs.
24  Q. Were any of these courses going to be featured in
25  any of your direct mail booklets?

Page 129

1   A. Yes. The GERD course was scheduled to be
2   featured in a special offer booklet to be mailed in the
3   early spring or late winter of 2015.
4   Q. Is that the only one?
5   A. That was the only one that we had scheduled that
6   far in advance. The others were reserved to be
7   considered in the meeting that spring.
8   Q. And before they were considered, NetCE made a
9   determination not to continue on with any of these other
10  courses; is that correct?
11  A. Before they were considered, we found the
12  infringement and stopped development on the courses.
13  Q. And the GERD course was not included in your
14  catalog for reasons that had nothing to do with Elite;
15  isn't that correct?
16  A. No.
17  Q. Why was the GERD course not included?
18  A. We found the infringements and determined that we
19  should stop development of the course before it was
20  released, which disqualified it from being included in
21  the special offer catalog.
22  Q. Take a look in Exhibit 76, a document number
23  NETCEB3149.
24       Is it in there?
25  A. I don't see it.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

| 30(b)(6) | Sarah Campbell on 11/14/2017 | Pages 130..133 |
|---|---|---|

Page 130

1    Q.  I'll show you mine.  I handed you my copy of --
2  there's one.  Apparently, it's in Exhibit 76.
3         However we got there, looking at NETCEB3149, do
4  you see an e-mail from you to Julie Goodwin dated
5  January 14, 2015, that says, "I finished the initial
6  review of the GERD course today, and I wanted to let you
7  know that it is not going to end up being ten hours.  It
8  was 2,000 words short from the author, and after
9  significant editing, I think it is" -- "I think it going
10 to be a five-hour course.  I just thought I would give
11 you a warning that it isn't going to work out for the
12 OH15 feature"?
13        Do you see that?
14    A.  I do.
15    Q.  Is the OH15 feature the catalog that you were
16 talking about where this was going to be published?
17    A.  I -- it was my recollection that it may have been
18 scheduled as a five-hour in a separate booklet.
19    Q.  Does this help refresh your recollection that it
20 was scheduled to be in OH15?
21    A.  I do know that it was originally scheduled as a
22 ten-hour course in the OH15, but I can't discount that
23 it was scheduled for another special offer booklet.
24    Q.  Do you have any documents to support your
25 testimony that maybe it was scheduled for something

Page 131

1  else?
2    A.  I do not have them with me right now, but it
3  would be in the archives of our catalog schedule.
4    Q.  And did you produce the archives of your catalog
5  schedule to us in this case?
6    A.  I -- without going through all the materials that
7  we provided, I'm not sure.
8    Q.  Do you recall seeing it in your review of
9  documents that you produced to Elite in this case?
10   A.  Yes.  I recall seeing the catalog schedule, but I
11 don't recall the context.
12   Q.  Take a look at one document earlier in
13 Exhibit 76, NETCEB3148.  Julie responded to you on
14 January 15th of 2015 and said, "I have replaced GERD
15 with ischemic stroke in the OH15 catalog.  A new PDF of
16 the catalog schedule is available.  Thanks."
17        So the evidence that we have here is that GERD --
18 the only of the five courses that was scheduled to be in
19 any sort of catalog -- appears to have been scheduled in
20 OH15, which I'm guessing is a 15-hour catalog that goes
21 to people in Ohio; is that correct?
22   A.  No.
23   Q.  Okay.  What is OH15?
24   A.  It is a catalog that goes to nurses who are
25 licensed in Ohio and is part of our 2015 catalog year.

Page 132

1    Q.  Fair.  So the evidence here is that GERD, the
2  only of the five that was scheduled to be in any
3  catalog, was scheduled to be in a catalog for nurses in
4  Ohio, and that didn't work out for reasons that had
5  nothing to do with Elite; correct?
6    A.  The use of GERD in the Ohio nurses 2015 catalog
7  was not possible due to length.  But whether or not it
8  was scheduled for other catalogs as a five-hour course
9  is not clear.
10   Q.  I would agree with you on that.
11        We saw here with GERD in the Ohio catalog that
12 NetCE replaced it with another course for the Ohio
13 nurses catalog.  Yes?
14   A.  The 2015, yes.
15   Q.  For the unknown/unsure catalogs that maybe GERD
16 was also going to be in, did NetCE also replace the GERD
17 course with a different course?
18   A.  No catalogs were -- all of our catalogs that year
19 were sent; so if GERD was scheduled for another catalog,
20 it was replaced.
21   Q.  I believe this is also in Exhibit 76.  I would
22 like you to take a look at a document labeled
23 NETCEB5322.  This is an e-mail from you to Julie Goodwin
24 in June -- June 16th of this year, 2017.  You say,
25 "Julie, do you have any documentation of the original

Page 133

1  catalog schedule plans," parentheses, "before changes,"
2  end parentheses, "for 2013 to 2017?  I know we were
3  planning to feature GERD, but the lawyers are asking if
4  we have any" -- excuse me -- "any proof/documentation of
5  this intent," parentheses, "in which catalogs the course
6  was intended for," end parens.
7        Did you ever find such documentation?
8    A.  We did find a catalogic schedule that had
9  notations and did have GERD as one of the featured
10 courses, but I don't know that it was an original
11 catalogic schedule planned before any changes.
12   Q.  Did you produce whatever you found as part of
13 this case?
14   A.  Without going through all of the documents that
15 we provided during discovery, I don't know for sure.
16   Q.  So as we sit here today, we know the GERD course
17 for Dr. Jouria was intended to be in the Ohio nurses
18 catalog in 2015, but it was replaced by a different
19 course for reasons that have nothing to do with Elite,
20 according to the e-mails we just looked at.  And we
21 don't have any other information or evidence supporting
22 GERD or any other course being in any catalog; correct?
23   A.  We do not have any documentation that GERD was
24 planned for any other catalogs before we discovered the
25 infringements, but we also hadn't set the catalog

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Pages 134..137

Page 134

1  schedule for 2016, which we would have done in the next
2  few weeks.
3      Q.  Has NetCE done any sort of analysis to understand
4  what, if any, sales NetCE would have made off any of the
5  five courses at issue between NetCE and Elite?
6      A.  Yes.
7      Q.  What have you done?
8      A.  We took an example course.  It was a ten-hour
9  course by Dr. Jouria that was published prior to our
10 discovery of the infringement in these cases.  It was
11 the course "multiple sclerosis."  That ten-hour course
12 was featured in three special offer booklets.
13     Q.  Those are the catalogs you just described
14 earlier?
15     A.  Yes, the special offer catalogs.
16         And also was available online and as a standalone
17 course -- course booklet in print -- and we used the
18 information about the revenue from the sale of that
19 course and associated special offers to estimate the
20 revenue from these outstanding five additional courses.
21     Q.  The revenue that you estimated was based off of
22 the sale of the entirety of the catalogs; is that
23 correct?
24     A.  It was based on revenue from individual course
25 sales as well as the special offer catalogs that

Page 135

1  included that course.
2      Q.  Did you try to apportion that revenue for the
3  particular course that you used as an example?
4      A.  We have estimated the entire amount for the
5  special offers, and we have also been doing some
6  additional accounting to apportion the amount of revenue
7  from an individual course in the special offer booklet.
8      Q.  You said the course that you used as an example
9  was a multiple sclerosis course?
10     A.  That the course I used in my example, yes.
11     Q.  And that's a ten-hour course?
12     A.  That's a ten-hour course.
13     Q.  How many hours were the five courses at issue
14 here?
15     A.  The GERD course, before editing, was a ten-hour
16 course.
17     Q.  But we just saw documents that showed that it was
18 not a ten-hour course; correct?
19     A.  We never released that course; so it was never
20 designated an amount of credit.  But based on the amount
21 of work that was done on it after editing, it likely
22 would have ended up being less than ten hours.  But
23 Dr. Jouria was paid for a ten-hour course.
24         The same is true of traumatic brain injury.  That
25 was a ten-hour course.

Page 136

1      Q.  But we don't know how many it ultimately would
2  have ended up because no one edited at NetCE; correct?
3      A.  It could have been more or less after editing.
4  That is true.
5      Q.  And the same could be said for all of the
6  remaining courses; right?
7      A.  They could have been more or less after editing.
8      Q.  How many hours for the other three courses?
9      A.  The cancer and chemotherapy course was 30 hours.
10 The depression versus dementia course was, I believe,
11 also 30 hours, and the nonantibiotic antimicrobial
12 course was 30 hours.
13     Q.  Before editing?
14     A.  All of those are what Dr. Jouria was contracted
15 to write.
16     Q.  But, again, before editing?
17     A.  No -- yes.  It could have ended up being more or
18 less credit.
19     Q.  Why did you use the multiple sclerosis course as
20 an example for how you think any of -- any other course
21 might perform?
22     A.  I thought that the multiple sclerosis course was
23 actually a conservative choice because the number of
24 hours was on the lower end compared to the 30-hour
25 drafts.  And it had been featured in a few catalogs but

Page 137

1  not as many as, I believe, the COPD course; so I had
2  chosen a kind of middle of the road, in my opinion,
3  option as the example course.
4      Q.  And what guarantees, if any, are there that any
5  of these five courses would have done -- performed
6  equivalently to the multiple sclerosis course?
7      A.  Because we weren't able to release them, we don't
8  know if they would have done better or worse than the
9  multiple sclerosis course.
10     Q.  And for us sitting here today to try to predict
11 that would require us to speculate on what sales might
12 have been if certain things would have occurred; isn't
13 that correct?
14     A.  I think probably you could make an educated
15 prediction, but you can't say for sure the amount of
16 revenue an unreleased product would garner.
17     Q.  There are a number of factors that influence how
18 a course will perform; isn't that correct?
19     A.  That's correct.
20     Q.  One of those is how many catalogs you put it in;
21 right?
22     A.  If a course is featured, it will reach more
23 learners and have a greater revenue, for the most part.
24     Q.  And in this case, we have no evidence that any of
25 these five courses would have been featured in any

Case 0:15-cv-61165-WPD   Document 199-9   Entered on FLSD Docket 12/29/2017   Page 22 of 37

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017
30(b)(6)                                                    Pages 138..141

**Page 138**

1  catalogs; correct?
2      A.  When I contract courses from a medical writer
3  like Dr. Jouria, the writer is paid slightly more with
4  the expectation that we would feature the courses.
5          When we contract courses from nonprofessional
6  writers, clinicians or people working in the field, they
7  are paid slightly less with less expectation that they
8  would be appropriate for feature.
9      Q.  Not every course that you contract with a
10  professional writer gets featured in the catalog;
11  correct?
12      A.  There's no guarantee that it will be featured.
13      Q.  And indeed, in NetCE's history, not every course
14  that they have contracted with from a professional
15  writer has ended up in a catalog; correct?
16      A.  I don't know.
17      Q.  We looked earlier at the overview of course
18  development, and one of the things that may happen along
19  the development path is that a manuscript gets rejected;
20  right?
21      A.  That is a possible outcome.
22      Q.  Other factors would lead to how any particular
23  course might perform financially, including how it's
24  priced; right?
25      A.  Potentially, yes.

**Page 139**

1      Q.  And whether or not the subject matter is
2  interesting to your intended audience; right?
3      A.  Yes.
4      Q.  And whether the content is -- is good, according
5  to your intended audience; correct?
6      A.  I hope so.
7      Q.  How the course is marketed or promoted influences
8  how it's going to do financially; isn't that correct?
9      A.  That's the idea, yes.
10      Q.  What competitive offerings are out there in the
11  same or similar subject matters can influence how a
12  course performs financially; correct?
13      A.  Yes, either way.  Yeah.
14      Q.  How the course gets reviewed, meaning is it -- is
15  it -- people that take the course think it's good.
16          That can influence whether other people take the
17  same course; isn't that true?
18      A.  Potentially.
19      Q.  Who the author is can influence whether or not a
20  course sells; isn't that true?
21      A.  Yes.
22      Q.  When a course is made available, meaning timing,
23  can influence how a course performs; isn't that correct?
24      A.  That's correct.
25      Q.  What format you include it in, whether it be in a

**Page 140**

1  catalog or it be just online, can influence how a course
2  performs; right?  I think we covered that one already.
3      A.  Sure.
4      Q.  Where a course is made available, meaning is it
5  in a catalog for nurses in California, or is it in a
6  catalog for nurses in Rhode Island, which I'm guessing
7  has much less nurses, can influence how a course
8  performs; right.
9      A.  Potentially.
10      Q.  And whether or not the course or the offering
11  entity has approvals is an accepted source for
12  continuing education credits can influence how it
13  performs; right?
14      A.  I am not sure I understand.
15      Q.  Who's publishing it.
16      A.  Sure.  Maybe.
17      Q.  Some -- some companies in your business just do
18  better; isn't that correct?
19      A.  For whatever reason, yes.
20      Q.  Isn't it true that you don't know how any course
21  will actually perform sales-wise until you offer it?
22      A.  There is no way of knowing for sure what the
23  revenue for a course is before it is released, but we do
24  have an idea of the amount of interest we have in
25  advertising and featuring courses and using courses to

**Page 141**

1  meet specific market needs.  So you're correct that we
2  don't have a number, and I'll leave it at that.
3      Q.  In the Ohio 15 -- OH15 catalog where GERD was
4  scheduled to appear, absent its word count deficiencies,
5  when you replaced that course with the ischemic stroke
6  course, did the OH15 catalog perform better than, worse
7  than, or the same as expected?
8      A.  I don't know specifically.
9      Q.  Do you know generally?  If you don't know -- I am
10  not trying to be difficult, but when you say "I don't
11  know specifically," I have to follow up.  And if you
12  don't know, you don't know, and I'll move on.  But if
13  you do know something, I have to -- I have to know that.
14      A.  I don't know.
15      Q.  During the time period when these courses
16  potentially could have been published by NetCE -- and I
17  know that the courses weren't -- I know they weren't
18  published.  We've talked about that, and I know that we
19  just said there was no decision made by NetCE where to
20  put them.
21          But during the time period when you were
22  considering having these courses to offer, did NetCE
23  still have a full slate of course offerings to provide
24  to its customers around the country?
25      A.  During the period that we were developing these

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Page 142

1  courses or after we decided not to go forward?  Can you
2  clarify?
3      Q.  You know I am going to ask for both.
4      A.  Okay.  We specifically chose to move forward with
5  these topics -- these subjects because we had identified
6  a need or a gap in our offerings to meet a pharmacology
7  requirement for advanced practice nurses and certified
8  nurses.  And this would have substantially closed that
9  gap.
10      We still, to this day, do not offer the amount of
11  pharmacology credit that would have been possible by
12  developing these five courses.
13      And just to clarify, we don't have the amount of
14  pharmacology credit available in courses that have been
15  released since we stopped developing these courses that
16  would have replaced this pharmacology credit.
17      Q.  Has NetCE performed any analysis to find out --
18  well, let me ask it this way.
19      I think we talked earlier that there were two
20  courses out of these five that were
21  pharmacology-oriented; is that correct?  That's the
22  nonantibiotic antimicrobial course and the cancer and
23  chemotherapy course; is that right?
24      A.  Those -- those two courses are purely
25  pharmacology courses.  But all five courses have content

Page 143

1  that would allow us to issue partial pharmacology credit
2  for completion of the full course.
3      Q.  When did you make that determination, that the
4  content allows you to issue partial credit?
5      A.  Based on my knowledge of the standards for
6  issuing pharmacotherapeutic pharmacology credit and the
7  subject matter being covered, my -- our intent through
8  the development process was to ensure that it would meet
9  those standards.  So upon contracting these courses, I
10  knew that the final drafts would contain pharmacology
11  credit.
12      Q.  Does that have to be approved by someone before
13  you can issue that pharmacology credit?
14      A.  No.
15      Q.  How do you know what the final drafts would have
16  included when you stopped work before you even got close
17  to a final draft?
18      A.  Well, at the contract stage, I know what our
19  editorial intent would be; so I can just say that,
20  through the development process, we would have made sure
21  that the content met those requirements.  That was our
22  intent for all five of the courses.
23      Q.  Were NetCE's revenues impacted, in any way, by
24  the decision by NetCE not to continue developing the
25  five courses at issue in this case?

Page 144

1      A.  I don't know.
2      Q.  Can you point to a single sale that NetCE didn't
3  make because it decided not to offer any of these five
4  courses?
5      A.  I can't point to one that was lost or one that
6  was gained.  They weren't released -- as we discussed,
7  they weren't released; so that would require
8  speculation.
9      Q.  Does NetCE prepare projections for revenues for
10  course sales?
11      A.  No.
12      Q.  Take a look at Exhibit 73.  It was that packet of
13  materials that was provided to Mr. Cremons.  The
14  document labeled ALP61, you see that document is "sales
15  projections 2012"?  Do you see that?
16      A.  I do.
17      Q.  So NetCE, at least at this point in time, did in
18  fact prepare a projection for sales of some form; right?
19      A.  I can't tell from looking at this if this -- you
20  had specifically asked about course sales projections,
21  and I don't know what all is included in this
22  projection.
23      Q.  What else do you sell?
24      A.  We have an unlimited subscription option.
25      Q.  For courses?

Page 145

1      A.  For activities.  We have a group sales option.
2      But a sales projection by course, I am not aware
3  of that.
4      Q.  Let me see if I can ask it slightly differently.
5      NetCE provides -- or, excuse me -- prepares
6  projections for its sales; right?
7      A.  They have prepared sales projections before, yes.
8      Q.  Are you aware of any sales projections prepared
9  by NetCE for any years past 2012?
10      A.  Not without speculating, no.
11      Q.  So you don't know?
12      A.  I don't know.
13      Q.  And I know I've said this a few times today, but
14  you're the person that I get to talk to about this, so
15  as the designated witness, talk about sales projections,
16  which is one of the categories you told me this morning
17  you were prepared to testify about.
18      For any sales projections beyond the one you're
19  looking at here in Exhibit 73, you don't know if any
20  such documents exist; is that correct?
21      A.  That is correct.
22      Q.  You mentioned the multiple sclerosis course and
23  the revenue associated with that.
24      That was in 2014; is that correct?
25      A.  The revenue from that course spans from its

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)          Sarah Campbell on 11/14/2017          Pages 146..149

Page 146

1   release to the current day.
2       Q.  When was the course released?
3       A.  That course was released in late 2013.
4       Q.  And is it still being sold today?
5       A.  That course was revised and continues to be
6   offered in its revised form today.
7       Q.  Is it a different course when it's revised?
8       A.  It has a new course number.  It could have
9   changes to the test and the faculty; so there are
10  changes.  We consider it a new course number.  But the
11  content -- the subject is the same.
12      Q.  So the title is the same, but the content may be
13  different depending on the course; is that correct?
14      A.  The content is updated as necessary based on
15  scientific advances.
16      Q.  Do you have courses that you do not update?
17      A.  If a course is no longer valuable to the company,
18  meaning it is not profitable or is no longer useful to
19  the customers, then it is no longer offered.
20      Q.  So you do have courses that are offered
21  originally and then are not offered at some point before
22  they're updated; is that correct?
23      A.  Some courses are allowed to expire without being
24  revised.
25      Q.  An average lifespan of a course is three years;

Page 147

1   correct?
2       A.  The lifespan of a course before major revision is
3   three years.
4       Q.  If you take a look at interrogatory number 8,
5   that's in Exhibit 75.
6           You've seen this before?
7       A.  Yes.
8       Q.  You see in the second paragraph the reference to
9   the multiple sclerosis course?
10      A.  Yes.
11      Q.  It says, "In 2014, that course was featured in
12  booklets for nurses in various states.  Total revenue
13  for these booklets was $4.7 million."
14          Is that revenue over one year?
15      A.  That revenue is for two years.
16      Q.  What years?
17      A.  Since it's from the release of the catalog, the
18  catalogs in question were all released in 2014.
19      Q.  Which catalogs did this course appear in?
20      A.  California Nurses and Various States.  Additional
21  states fall under that cover.  Texas Nurses and Various
22  States, and Ohio Nurses.
23      Q.  In what years?
24      A.  The booklet was -- those three booklets and the
25  various covers were printed and mailed in early 2014,

Page 148

1   and they could be completed at any time until -- they
2   could still be completed today.
3       Q.  And for each of those three jurisdictions, if you
4   you will -- California Nurses in Various States, Texas
5   Nurses in Various States, and Ohio Nurses in Various
6   States -- did you also make available catalogs for the
7   year 2013?
8       A.  We also mailed catalogs in 2013, yes.
9       Q.  And did those catalogs include the multiple
10  sclerosis course?
11      A.  No.
12      Q.  And how did those catalogs perform relative to
13  the 2014 catalog?
14      A.  Without having the spreadsheets in front of me, I
15  can't answer that specifically; so I don't know.
16      Q.  Again, any reason to believe they performed any
17  differently during the years 2013 and the year 2014?
18      A.  I don't have any reason to believe that they
19  performed the same or differently.
20      Q.  What document would you have to look at to make
21  that -- to see how they performed?
22      A.  I would compare the 2014 cost versus revenue by
23  catalog report to the 2013 cost versus revenue by
24  catalog report.
25      Q.  And in 2015, did you have catalogs in those three

Page 149

1   jurisdictions?
2       A.  Yes.
3       Q.  Did they include the MS article?
4       A.  No.
5       Q.  And how did those catalogs perform?
6       A.  Again, I can't say specifically; so I don't know.
7           (Exhibit No. 85 marked for identification.)
8   BY MR. WILSON:
9       Q.  I am going to mark a new lovely packet of
10  information as Exhibit 85.  Exhibit 85 begins with the
11  document labeled "Navigant 2."  And as before, as you
12  flip through this, if you see anything that seems out of
13  whack, you let me know; otherwise, we're going to assume
14  that these documents are what they claim to be.
15          I am going to turn -- take all the time that you
16  want, but I'll turn your attention to the foldout sort
17  of midway through Exhibit 85, which I believe is the
18  cost versus revenue by catalog spreadsheet that you just
19  described; is that correct?
20      A.  This is the 2014 cost versus revenue by catalog
21  spreadsheet, yes.
22      Q.  Do you see a 2013 version?
23      A.  I do not.
24      Q.  Do you see a 2015 version?
25          MR. ROSS:  Mark, what number is that?

**Page 150**

1  Sorry.
2          MR. WILSON:  Sure.  I am not sure it has a
3  number.  These were documents provided to us by John in
4  relation to Navigant, I believe.
5          THE WITNESS:  Yes, there is a 2015.
6  BY MR. WILSON:
7  Q.  Great.  Does that one have a number on it?
8  A.  Nope.
9  Q.  Okay.  Can you tell by looking at those two
10 documents how your catalogs performed in California,
11 Texas, and Ohio 2014 versus 2015?
12 A.  In California in 2015, there were slightly more
13 sales for the California booklet -- in 2015 compared to
14 2014.
15      For the Texas nursing booklet, there were more
16 sales -- it looks like more significantly -- I won't
17 qualify it.  There were more sales in 2014 than there
18 were in 2015.
19      And in Ohio, there were almost twice as many
20 sales in 2015 compared to 2014.
21 Q.  Is it fair to say that the sales by NetCE of
22 catalogs in California, Texas, and Ohio during 2014 and
23 2015 had nothing to do with the multiple sclerosis
24 article being present in the catalog in 2015?
25 A.  Could you repeat your question?

**Page 151**

1  Q.  Fair to say that the sales of catalogs in 2014 in
2  California, Texas, and Ohio had nothing to do with the
3  presence of the multiple sclerosis article in those
4  catalogs?
5  A.  I cannot say that.
6  Q.  How much of any of the sales in 2014, now that
7  you've compared them to 2015 sales, were attributable to
8  the presence of the multiple sclerosis article in the
9  2014 catalogs in California, Texas, and Ohio?
10 A.  I don't know.
11 Q.  Can't tell, can you?
12 A.  That is not possible for me to determine.
13 Q.  How would anyone determine it?
14 A.  I don't know how someone would try to determine
15 that.
16          MR. KERN:  Calls for speculation.
17          MR. WILSON:  I agree.
18          THE VIDEOGRAPHER:  You don't have your mic
19 on.
20          MR. KERN:  Oh, sorry.
21 BY MR. WILSON:
22 Q.  Did any catalogs -- let me ask it this way.
23      Did NetCE offer any catalogs in 2013 through 2017
24 that were missing courses?
25 A.  I'm not sure what you mean by "missing courses."

**Page 152**

1  Q.  That didn't include the number of courses that
2  that catalog called for?
3  A.  We did not publish any partial catalogs.
4  Q.  So every catalog from 2013 to the present
5  published by NetCE had the full assortment of courses in
6  it for NetCE's customers to review and take; is that
7  correct?
8  A.  We did not publish any catalogs with a course
9  missing.
10          (Reporter clarification.)
11 BY MR. WILSON:
12 Q.  Can you point to any revenue that NetCE lost
13 because of the decision by NetCE not to publish the five
14 courses at issue in this case?
15 A.  In terms of lost revenue?
16 Q.  Yes, ma'am.
17 A.  We can only calculate that based on the example
18 of already-released courses.
19 Q.  But you just told me that all of your catalogs
20 had their full allotment of courses in them; right?
21 A.  All of the catalogs that we published between
22 2013 and 2017 included the number of courses that we
23 found necessary.
24 Q.  And so are you able to point to any revenue that
25 NetCE lost because one of these five courses wasn't in

**Page 153**

1  one of those catalogs?
2  A.  That would require me to speculate about the
3  value of those courses in relation to other courses, and
4  I'm not able to do that.
5  Q.  I know I sound like a broken record, but you're
6  the person I get to talk to on that point, and you've
7  been designated on this very topic.
8      So as you sit here today, you're not able to
9  provide me any testimony pointing to any revenue that
10 NetCE lost because of -- because one of these five
11 courses was not published by NetCE; correct?
12 A.  The evidence that we have is that similar -- a
13 similar product by the same author, whether it was
14 featured or as a standalone course, generated a certain
15 amount of revenue and to project that that is a good
16 example of what the five courses in question may have
17 brought in.
18 Q.  But in order to lose revenue, you have to not
19 have offered something where you otherwise would have to
20 make the money that you're -- that you're talking about;
21 right?
22 A.  I can't really speculate as to the value that
23 those courses would have brought to or diminished the
24 special offers, but I do know that, as a standalone
25 course, they weren't replaced at all.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Pages 154..157

Page 154

1  Q. And in interrogatory response number 8, you state
2  that, "The individual net course revenue for the
3  multiple sclerosis course was $84,000 in 2014."  That's
4  in Exhibit 75.
5  A. That is the total individual net course revenue
6  for the standalone course online and in print.
7  Q. The five courses at issue between NetCE and
8  Elite, you can't predict with any certainty if those
9  courses were included in any catalogs, whether their
10 presence there might have actually caused a decrease in
11 revenue for NetCE; correct?
12 A. I can't speculate as to whether it would have
13 increased or decreased the value.
14 Q. And is that because of the laundry list of
15 factors that affect how courses in catalogs perform in
16 this business?
17 A. There are many factors that affect how our
18 special offer catalogs perform, and it's impossible to
19 predict all of the factors that come into play.
20 Q. NetCE achieved revenues for sales of courses in
21 all of its catalogs between the years 2013 and 2017;
22 correct?
23 A. I am not sure I understand.  Can you restate
24 that?
25 Q. I think it's a very basic question.

Page 155

1      NetCE realized revenues had sales, money was sent
2  to NetCE for sales of catalogs between the years 2013
3  and 2017; correct?
4  A. Yes.
5  Q. And those revenues are reflected in at least two
6  of the spreadsheets that we look at in Exhibit 85;
7  correct?
8  A. The cost versus revenue by catalog spreadsheets
9  do reflect the revenue that came in from those catalogs.
10 Q. And NetCE also realized revenue from individual
11 course sales for the years 2013 to 2017; correct?
12 A. That's correct.
13 Q. And which documents reflect those revenues?
14 A. We have a few different reports that provide
15 information on sales by product and sales by course
16 available to us.
17 Q. What is the best selling course by individual
18 course revenue that NetCE has ever sold?
19 A. I don't know.
20 Q. It would be reflected in those documents that you
21 just described?
22 A. I'm not sure how far back the sales records -- I
23 am not sure that they go back to the inception of the
24 company.
25 Q. The $84,000 in individual course revenue for the

Page 156

1  multiple sclerosis course in 2014 that you've described
2  in interrogatory response number 8 --
3  A. Yes.
4  Q. -- is that typical or atypical for NetCE for an
5  individual course sale in a year?
6  A. I think there may be a -- can I look through
7  these documents?
8  Q. Yeah, take your time.
9  A. On the courses scheduled for update 2016
10 document?
11 Q. That's Navigant 2.  Yes?
12 A. Yes.  This is only courses that were scheduled to
13 be updated in 2016, and it includes COPD, which was one
14 of the Jouria courses.  And it also includes multiple
15 sclerosis.
16      I just want to point out that this was created at
17 the beginning of 2016; so courses that were scheduled to
18 expire later in the year would gain additional revenue
19 throughout the year.  That was the case with multiple
20 sclerosis.  It was not scheduled to expire until very
21 late in the year.
22      But you can see here our examples of the
23 individual course revenue for courses scheduled to be
24 revised in 2016, and multiple sclerosis appears on the
25 second page, kind of middle -- middle of the -- middle

Page 157

1  of the road.
2  Q. And it shows a lifetime revenue of $67,272.15; is
3  that correct?
4  A. As of the beginning of 2016, that was correct.
5  Q. And that's revenue that's attributable to this
6  course, even as it's featured in the three catalogs that
7  we mentioned -- or that you mentioned earlier in your
8  testimony; correct?
9  A. That's right.  This doesn't include completions
10 as part of the special offer or any subscriptions.  If a
11 learner had a subscription and completed the course as
12 part of that, it doesn't include that revenue either.
13 Q. There's no way for us to predict with any
14 certainty how much revenue any particular course is
15 worth for a special offer like you described; right?
16 A. As we discussed, I am not able to ascertain the
17 value of the course specific in a special offer.
18 Q. And if you're not able to, because you're the one
19 here testifying in response to these topics, who is?
20 A. I'm not sure that anyone could predict or
21 determine the amount of weight that a single course in a
22 bundled course offering had on a participant's decision
23 to complete that special offer.  But there are ways that
24 you could calculate it for ease of determining revenue,
25 either based on the percent that a course is responsible

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

30(b)(6)                                                              Pages 158..161

Page 158

1  for the overall content of that booklet or some other
2  means that I'm not aware of.
3      Q.  Even if you could attribute it like you're
4  describing by some percentage that that course achieves
5  in a booklet or a catalog, in order to understand lost
6  revenue, you'd have to not just look at the revenue,
7  you'd have to back out of whatever revenue you attribute
8  to that course -- let me see if -- I'm confusing myself.
9  Let me see if I could do it a different way.
10     In reading NetCE's response to interrogatory
11 number 8, NetCE seems to be suggesting that it lost
12 $35 million in revenue as a result of what were the
13 seven courses at issue prior to two being dismissed.
14     Did I read that correctly?
15     A.  That is correct.
16     Q.  Now we're at five courses.
17     Is it fair to they that that calculation is now
18 $25 million?
19     A.  That seems reasonable, yes.
20     Q.  During the time period in question, though -- I
21 think we've established this -- NetCE had revenues and
22 achieved sales for all of the catalogs that it offered
23 throughout all of the different jurisdictions; correct?
24     A.  During the period of 2013 to 2017, there were
25 sales of catalogs in all of those years.

Page 159

1      Q.  And there were individual course sales and
2  special bundle sales and unlimited package sales for all
3  of those course years; correct?
4      A.  We did sell courses in other products those
5  years, yes.
6      Q.  And to find out lost revenues, you'd have to back
7  out of this calculation the revenue that NetCE actually
8  achieved in order to find out what, if anything, NetCE
9  lost; isn't that true?
10     A.  I don't know about that.
11     Q.  Well, to award NetCE $25 million here would be
12 double-counting sales; isn't that correct?
13     A.  I don't know.
14     Q.  Well, that number is based off of a prediction
15 that each of these five courses at issue would have
16 performed the same as the multiple sclerosis course
17 performed in 2014; right?
18     A.  Between 2014 and 2016, yes.
19     Q.  But between 2014 and 2016 when the $5 million
20 number was achieved, because it was in a catalog in
21 three different jurisdictions one year, NetCE still had
22 catalog sales in those three jurisdictions?
23         MR. KERN:  Asked and answered.
24         THE WITNESS:  There were catalog sales in
25 those years.

Page 160

1  BY MR. WILSON:
2      Q.  So to determine what was actually lost, if
3  anything, you'd have to back out of the number provided
4  here, the actual sales achieved by NetCE; otherwise, you
5  would be double counting; right?
6          MR. KERN:  Asked and answered.
7          THE WITNESS:  I don't know.
8  BY MR. WILSON:
9      Q.  Well, just --
10     A.  As a non-accountant, I am not totally sure how
11 that could be calculated in a meaningful way.
12     Q.  There would have to be some accounting made for
13 sales actually made during the relevant time period by
14 NetCE so that NetCE wasn't getting rewarded twice for
15 sales that it says it would have made.
16         MR. KERN:  Asked and answered.
17 BY MR. WILSON:
18     Q.  Right?
19         MR. KERN:  Asked and answered.
20         THE WITNESS:  I don't know.
21 BY MR. WILSON:
22     Q.  Does that make sense at all?
23         MR. KERN:  It's not a question.
24         THE WITNESS:  It's not really my area of
25 expertise.

Page 161

1  BY MR. WILSON:
2      Q.  Well, again, you're the one I get to talk to on
3  the issue of damages.
4      A.  Yes, I am.
5      Q.  What revenue in this case is NetCE claiming it
6  lost because of Elite's conduct?
7      A.  NetCE is claiming, based on an example of a
8  course that we were able to publish that was also
9  commissioned from Dr. Jouria, that these courses would
10 have made similar amount of revenue to that example
11 course of multiple sclerosis.  That multiple sclerosis
12 course was featured in a few catalogs.  It was sold as a
13 standalone offering, and the total revenue from those
14 available versions of the course was about 4.7 million,
15 a little bit more.  And that's how we are determining
16 the damages insofar as lost revenue in this case.
17     Q.  In promoting that number, has NetCE taken into
18 account the actual revenue that it achieved during the
19 period in question?
20     A.  Have we taken it into consideration?
21     Q.  No.  Have you taken it into account?
22     A.  Into account.
23     I am not sure how that would be done; so, no, I
24 did not.
25     Q.  Well, even if you assume -- even though there's

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                                Pages 162..165

---

**Page 162**

1   no evidence to support this -- we've already covered
2   this -- that any of these five courses would have ended
3   up in the exact same catalogs as the MS course -- that
4   being California, Texas, and Ohio -- during the time
5   period in question, NetCE achieved revenues for sales of
6   other courses in catalogs in California, Texas, and
7   Ohio; right?
8        MR. KERN:  Asked and answered three times.
9        THE WITNESS:  That's correct.
10  BY MR. WILSON:
11       Q.  Doesn't it make sense that NetCE should have to
12  account for the revenue it actually made from sales in
13  calculating what it alleges it lost by not publishing
14  the five courses in question?
15       MR. KERN:  Asked and answered multiple
16  times, Mark.  You can't just keep grinding on her until
17  you get the answer you like.  We do have an expert
18  witness in this case.  You will have a chance to take
19  their deposition.
20       THE WITNESS:  I am not able to speculate
21  whether the amount of revenue from featured courses
22  would be more or less than that; so I'm not aware of a
23  way of making that calculation.
24  BY MR. WILSON:
25       Q.  And in calculating the $25 million number that

---

**Page 163**

1   you testified about, did NetCE take into account the
2   fact that the $4.7 million number included sales of
3   other courses in addition to the MS course?
4        A.  When this calculation was made, it was unclear
5   how to parse out the amount of value for an individual
6   course in the special offer booklet; so the entire
7   booklet revenue was included in that calculation.
8        But, again, I understand that there may be a way
9   that I am not aware of to attribute value to a partial
10  special offer, but I wasn't able to do that accurately
11  with the knowledge that I had.
12       Q.  So you attributed all of the revenue for those
13  catalogs, even though they included additional courses,
14  for purposes of calculating the number that you've
15  promoted here to us?
16       A.  In this calculation, it's the total revenue minus
17  the costs associated with the special offers, regardless
18  of how many courses were in that special offer.
19       Q.  How do you know whether the $4.7 million in
20  revenue -- whether that number was the result of one of
21  the other courses and not the MS course?
22       A.  I don't know the extent to which the revenue is
23  or is not attributable to the multiple sclerosis course.
24       Q.  In calculating the $25 million number that you've
25  promoted here today, did you take into account any of

---

**Page 164**

1   the factors we discussed that influence how a course
2   might perform?
3        A.  I don't think it's possible to predict all of the
4   factors that can influence the components of a special
5   offer; so -- or how to quantify them; so they were not
6   considered in this calculation.
7        Q.  So in promoting the $25 million number that
8   you've talked about today, NetCE assumed that each of
9   these five courses at issue would have performed --
10  excuse me -- would have been included in the California
11  nurses catalog, the Texas nurses catalog, and the Ohio
12  nurses catalog and would have performed comparably with
13  whatever courses were also included in those catalogs as
14  the MS course and its other courses in those same
15  catalogs in 2014; is that correct?
16       A.  The multiple sclerosis course was chosen as the
17  example course because it was featured in three special
18  offers.  The COPD course, for example, was featured in,
19  I believe, two or three more special offers than that.
20  And the pressure ulcers course was featured in, I
21  believe, two special offers.
22       So it seemed to be a good medium ground for
23  determining potential lost revenue.  There's no
24  guarantee of which special offers it could have been in
25  more, it could have been in less.

---

**Page 165**

1        Q.  And that would have directly influenced the
2   revenue that each of those courses would have achieved;
3   right?
4        A.  The total revenue for special offers would be
5   more if it was featured in more special offers and would
6   be less if it was featured in fewer special offers.
7        Q.  And there was no -- there's no evidence before us
8   that any of these courses would have been in any special
9   offers at all.
10       A.  The evidence that I have is that our intent, when
11  accepting the courses for development with a medical
12  writer who is paid a higher amount, was to feature each
13  of the courses.
14       Q.  How many times?
15       A.  That would be determined later; so I don't know.
16       Q.  And over what period of time would you feature
17  them?
18       A.  Courses can be featured at any time in their
19  life, and that includes after their revision; so there's
20  no real time period or limitation.
21       Q.  And you've had courses at NetCE that were written
22  by professional authors that performed worse than the
23  $4.7 million that you've talked about with regard to the
24  MS catalogs; correct?
25       A.  I don't know.

---

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Pages 166..169

Page 166

1    Q.  Not every course written by a professional author
2    has achieved $4.7 million in revenue at NetCE; right?
3    A.  I don't know.
4    Q.  Well, just looking at the document here, the
5    first page of Exhibit 85, it tells us that --
6    A.  This document includes professional writers and
7    clinicians; so professional writers -- for the most
8    part, the majority of these courses were authored by
9    clinicians, not professional writers.
10   Q.  Well, let's turn to the multiple sclerosis
11   article on page 2 of Exhibit 85.  It's Navigant 3, is
12   the Bates number.
13       It shows a lifetime revenue of $67,272.15 up
14   though, I understand, 2016; right?
15   A.  Early probably December 2015 or January 2016.
16   Q.  How is that number calculated?
17   A.  It was calculated with an internal tool we have,
18   sales by product.
19   Q.  So how do you explain the difference between the
20   $67,000 lifetime revenue figure in Exhibit 85 for
21   multiple sclerosis and your $4.7 million figure that
22   you're promoting here today?
23   A.  This amount is the lifetime revenue as of early
24   2016 for the individual standalone course.  It -- this
25   course expired towards the very end of 2016; so it

Page 167

1    continued to gain revenue throughout that year.  And it
2    also discounts -- or it does not include any revenue
3    from the special offers in which it was featured or any
4    associated subscription products.
5    Q.  On a course level basis, has NetCE ever tried to
6    calculate revenues by course that take into account all
7    of the various places where a course might be offered?
8    A.  We have not had a need to try to separate
9    individual course revenue out of a total special offer
10   revenue until this time, as far as I know.
11   Q.  And have you done it here for this case?
12   A.  I have not, but we have talked to some experts
13   who may be able to make those calculations.
14       MR. KERN:  Mark, Kate, when you get a
15   chance, we could use a break.
16   BY MR. WILSON:
17   Q.  You're the person I get to talk to on this topic
18   because you've been designated.  No expert has been
19   designated for this topic.
20       So as we sit here today, can you say with any
21   certainty how much revenue NetCE lost because of its
22   decision not to publish these five courses?
23   A.  I can say that we use the multiple sclerosis
24   course as an example to calculate potential lost revenue
25   for each of these five courses, and that took into

Page 168

1    account our intent to feature these courses as well as
2    the individual potential standalone course revenue, and
3    that was our best way of calculating lost revenue in
4    this case.
5    Q.  Have you had catalogs that have performed worse
6    than the catalogs did in California, Texas, and Ohio in
7    2014?
8    A.  Yes.
9    Q.  How much revenue does NetCE achieve on sales in a
10   given year?
11   A.  Our general revenue -- I can give you a range --
12   is -- varies by year.  Do you have a specific year that
13   you're interested in?
14   Q.  '13 through '17.
15   A.  The range would be between 10 and 21.
16   Q.  So according to you, the losses associated with
17   not publishing these five courses are greater than the
18   overall revenue for any given year that NetCE has ever
19   achieved; is that correct?
20   A.  Can you repeat that?
21   Q.  The losses attributed by you to NetCE's decision
22   not the publish these five courses is greater than
23   NetCE's overall revenue for any year between 2013 and
24   2017?
25   A.  No.  My answer was by year.  So the range by year

Page 169

1    for each year annually was 10 to 21.
2    Q.  And here you're saying the loss would be 25
3    million, and that's greater than that range of revenue
4    for an entire year achieved by NetCE.
5    A.  For a single year, these courses would all have a
6    minimum three-year life span, and they would potentially
7    be featured and continue indefinitely.
8    Q.  Can you take a look at NetCE's response to
9    Elite's interrogatory number 8.  It's in Exhibit 75.  At
10   the bottom, it says, "$35 million of lost revenue
11   attributable entirely to Elite's infringement for the
12   first year of circulation of each course alone."
13       I understand that's 25 million now because we've
14   knocked off two articles; right?
15   A.  That's correct.
16   Q.  But that says it's for one year.  Did I read that
17   incorrectly?
18   A.  That is what it says.
19   Q.  And that's not right, is it?
20   A.  I don't know.
21   Q.  You just said that the $5 million was achieved
22   over a three-year period, on average, or maybe even
23   longer.  This says one year.
24       So it's not right, is it?
25   A.  No.  What I said is that the $4.7 million

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

30(b)(6)                                                          Pages 170..173

---

**Page 170**

1  attributed to the special offers was over two years, and
2  the individual net course revenue of 84,000 was over
3  three years.
4      Q.  And according to this verified interrogatory
5  response, NetCE wants $25 million for one year alone,
6  and "alone" is in italics.  I didn't do that.  NetCE
7  did.
8          How do you explain that?
9      A.  The bulk of the revenue from a special offer
10 booklet occurs in the first year alone.  More than half,
11 and in some cases, substantially more than half.
12         But I can't tell you the percentage of that total
13 two-year revenue that occurred in the first year or
14 occurred in the second year.
15         MR. WILSON:  Let's take a break.
16         MR. KERN:  Thank you.
17         THE VIDEOGRAPHER:  The time is 4:04 p.m.,
18 and we're off the record.
19         (Off the record.)
20         THE VIDEOGRAPHER:  This is the beginning of
21 media number 4 in the deposition of Sarah Campbell.  The
22 time is 4:18 p.m., and we're back on the record.
23 BY MR. WILSON:
24     Q.  Ms. Campbell, I'm going to hand you what has
25 previously been marked as Exhibit 46 -- excuse me, 45.

---

**Page 171**

1          Earlier today in your testimony, you talked about
2  seeing some documents in discovery related to Dr.
3  Jouria's relationship with Elite.  And you mentioned, I
4  believe -- and correct me if I'm wrong -- that you saw
5  some e-mails that showed the topics that Dr. Jouria was
6  going to write on for Elite and also a reference to the
7  agreements that Dr. Jouria had with NetCE.
8          Do you recall that testimony?
9      A.  I do.
10     Q.  Is Exhibit 45 one of the e-mails that you -- or
11 the e-mail that you were referencing in your testimony?
12     A.  This is not the e-mail I was referring to.
13     Q.  Well, if you take a look for a second at
14 Exhibit 45, you see down at the bottom of the first
15 page -- excuse me.  On the second page, you see an
16 e-mail from Tracey Foster to Dr. Jouria, dated
17 February 6, 2013, where Tracey says, "I was trying to
18 find your list of topics that you suggested, but since I
19 closed the job on elance, I cannot access your
20 suggestions.  Will you please send me the subjects
21 again, and then I will put them in the order we wish to
22 receive."
23         Do you see that?
24     A.  I do see that.
25     Q.  Below that e-mail is an e-mail from Dr. Jouria

---

**Page 172**

1  talking about the women and heart disease course.
2          There's no reference there to NetCE; right?
3      A.  There is no reference to NetCE.  That's right.
4      Q.  Turn to the first page of Exhibit 45.  Dr. Jouria
5  responds to Tracey Foster and says, "Here's the list."
6  And you see in that list the five courses at issue here
7  today:  chemotherapy, GERD, antimicrobial pharmacology,
8  traumatic brain injuries, and dementia versus depression
9  in the elderly.
10         Do you see that?
11     A.  I see those five subjects you just listed, yes.
12     Q.  No reference to NetCE; right?
13     A.  There is no reference to NetCE.
14     Q.  And then Ms. Foster responds to Dr. Jouria at the
15 top -- this is now in February -- February 6th
16 of 2013 -- and says, "Your list is perfect.  You can --
17 you can just proceed as listed."
18         Do you see that?
19     A.  I do.
20     Q.  Again, no reference to NetCE to this exhibit at
21 all; right?
22     A.  That's right.
23     Q.  Then you turn to Exhibit 46.
24         Before I get into specific questions, you said
25 earlier today that you had read the transcript from

---

**Page 173**

1  Dr. Jouria's deposition; correct?
2      A.  That's correct.
3      Q.  So you recall that Dr. Jouria confirmed at his
4  deposition that the first time he made Elite aware of
5  the fact that he had written for NetCE was in October of
6  2013.
7          Do you recall that?
8      A.  I don't specifically recall that from his
9  deposition, but I do recall seeing the e-mails in
10 Exhibit 46.
11     Q.  So this is the e-mail that you were talking about
12 earlier in your testimony; is that correct?
13     A.  Yes.
14     Q.  And what we see in Exhibit 46, if you turn to the
15 page that has an e-mail on it dated October 11th, 2013,
16 from Dr. Jouria to Michelle Franchi.
17     A.  Yes.
18     Q.  Middle of the page, there's an e-mail from
19 Dr. Jouria dated October 10, 2013, where, for the first
20 time, he's informing Elite that he's written courses for
21 NetCE.
22         Do you see that?
23     A.  I can see that he's informing them in that e-mail
24 that he's written courses for companies including NetCE.
25     Q.  Any reason to -- and this lines up with his

---

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Page 198

1  course had been edited, and it was my expectation that
2  the edited versions were the ones that would essentially
3  be released.
4      Q.  I believe you testified earlier that, at least
5  with the GERD course, that the edits were significant;
6  is that correct?
7      A.  The edits --
8          THE VIDEOGRAPHER:  Hold on.  We got to go
9  off record.  The time is 5:12 p.m., and we're off the
10  record.
11          (Off the record.)
12          THE VIDEOGRAPHER:  The time is 5:13 p.m.,
13  and we're back on the record.
14  BY MR. WILSON:
15      Q.  The edits to the GERD course were significant;
16  correct?
17      A.  There were many edits to the GERD course, but
18  whether or not they were extensive is subjective, I
19  guess.
20      Q.  How would you qualify the edits to the GERD
21  course?
22      A.  Let me review.
23          There were many edits to the GERD course, and it
24  required significant work to bring it to NetCE's
25  standards and style, but it's not outside of the realm

Page 199

1  of possibility in course development for any of our
2  courses.
3      Q.  Fair to say that the edited versions of at least
4  GERD and cancer and chemotherapy were different from the
5  versions of those courses submitted to NetCE by
6  Dr. Jouria; correct?
7      A.  After we edited the courses, they were different
8  than the drafts submitted by Jouria, yes.
9      Q.  And then it makes sense, does it not, that, if
10  NetCE would have continued on and taken those courses
11  through the approval process -- the editing and approval
12  process and ultimately publishing them -- that the
13  courses would have looked -- contained different content
14  than the course -- similar course published by Elite;
15  correct?
16      A.  I would -- yes.  If we had completely edited the
17  content, there would have been more differences.  That's
18  correct.
19      Q.  So if your first-to-market advantage relates
20  specifically to content, the content that NetCE was
21  going to publish was never going to be the same as what
22  Elite published for these five courses; isn't that
23  correct?
24      A.  Well, I can't speak to the three courses that did
25  not go through the editorial process.  I don't know the

Page 200

1  extent of the changes that would have been necessary in
2  those cases.
3          In the case of GERD, even after editorial
4  changes, I would expect that some of the material would
5  be similar and the title and author, of course, would be
6  the same or similar.  And the same is true for cancer
7  and chemotherapy.
8      Q.  So having the same or similar title is a problem?
9  Is that your testimony?
10      A.  It could be part of customer confusion, but it's
11  not the only issue.  If there's a title that's the same
12  and it's a very basic title, that generally wouldn't
13  cause a problem if it was a different author.  But if
14  you have all of those components together -- the same
15  author, the same or similar title, and the same or
16  similar content -- that is a problem in terms of
17  confusion.
18      Q.  Do you have any evidence to support your
19  testimony on this point?
20      A.  Do I have any evidence that customers are
21  confused by the same or similar titles?  Yes.  We have
22  documented cases of customer confusion.
23      Q.  And have you produced that to us in this case?
24      A.  I don't know.
25      Q.  You said for the three courses that NetCE really

Page 201

1  didn't edit from Dr. Jouria that you don't know what
2  would have been involved in getting those courses
3  edited, approved, and published.  Yet in your complaint
4  in paragraph 69, you say, "For all of the courses, it
5  would have involved additional expenditures and
6  investments that the prospect for diminishing returns is
7  no longer justified."
8          Can you explain your testimony in light of this
9  allegation?
10      A.  I believe what I said was that I don't know the
11  extent to which this content would have required changes
12  to ameliorate issues with matches with third-party
13  sources.
14          I do know that the work that it would take to
15  ameliorate similarities between these courses and the
16  Elite courses in question would have been extensive
17  because, based on my review of the documents, the
18  similarities and the work that it would have taken to
19  remove those similarities were great, particularly --
20  particularly in light of the length of the courses and
21  the mass of the content.
22      Q.  And so NetCE made the business decision just to
23  stop; is that correct?  To not make that investment?
24      A.  We made the decision when we found the
25  infringement to stop development of all the Jouria

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Page 202

1   courses in question and to try to determine what was
2   happening with Elite and the copyright, and we're still
3   doing that.
4       Q.  What were the additional expenditures and
5   investments that you would have had to make to get these
6   courses ready to be published?
7       A.  These courses would have had to have been
8   essentially rewritten by editorial contractors or staff
9   to the extent that we do not generally do for course
10  development.
11      Q.  Did you estimate how much that would have taken
12  for any of the five courses at issue?
13      A.  I have not attempted to estimate or speculate
14  about the cost involved.
15      Q.  What were the diminishing returns that you said
16  were no longer justified in the complaint?
17      A.  Because Elite had already gone to market with the
18  courses in question, we had been essentially beaten to
19  market, and the value of these courses, in light of
20  potential customer confusion and customers' lack of
21  interest in content they had already completed, made the
22  courses in question less valuable to NetCE.
23      Q.  Do you have any evidence that would support your
24  testimony that customers may not be interested like you
25  just described?

Page 203

1       A.  We do have evidence that customers experience
2   confusion when there are the same or similar titles
3   and --
4       Q.  I think we covered that; right?  We already
5   talked about that.
6       A.  I thought so.
7       Q.  And you said you didn't -- you don't know if
8   you've produced it to us in this case.
9       A.  I don't know if we have yet.
10      Q.  And mine is related to the second issue that you
11  described, which is that you said customers would not be
12  interested in completing content they've already
13  completed.
14          Do you have any evidence to support that
15  statement?
16      A.  We have had contact with customers who indicate
17  they are not interested in completing courses on topics
18  that they have already completed.
19      Q.  Have you had a situation like this before where
20  you were second to market with a topic?
21      A.  I don't know exactly.  I don't know.
22      Q.  I have to get to the bottom of what you're
23  talking about.
24          So what customer communications are you speaking
25  about then?

Page 204

1       A.  Customers can call us.
2       Q.  I'm not asking if they can.  I know they can.  I
3   am asking what specifically occurred.
4       A.  Customers call us and e-mail us to request
5   topics, and in those conversations, if they have already
6   completed a course with another provider on a same or
7   similar topic, they would not be interested in
8   purchasing it from NetCE; so there are examples of that
9   in our everyday interactions with customers.
10      Q.  And is it your understanding that, at the time
11  you contracted with Dr. Jouria to prepare these five
12  courses at issue between NetCE and Elite, that NetCE
13  would have been the first to market with courses in
14  these -- on these same topics with this same subject
15  matter?
16      A.  We did not have the expectation that these
17  courses -- or the course subjects, specifically -- would
18  be solely offered by NetCE.  However, we did have an
19  expectation that, for our audience, the amount of credit
20  and the value added by our accreditations would make
21  them desirable to our customers.
22      Q.  In NetCE's response to interrogatory number 4,
23  NetCE writes -- it's on page 7 of Exhibit 75 -- "The
24  seven courses at issue in this lawsuit are noteworthy in
25  particular because, at the time NetCE decided to develop

Page 205

1   these courses, NetCE's continuing education provider
2   competitors, including Elite, did not have similarly
3   constructed courses in the seven courses' subject
4   matter."
5          You see that?
6       A.  I do see that.
7       Q.  What is the basis of that statement?  What did
8   you do to confirm that that was true?
9       A.  NetCE generally monitors competitors' offerings
10  and has a high-level knowledge of the areas that are
11  being offered by competitors in general.  And we knew
12  specifically the way that we offer courses and the
13  amount of credit being offered would have made these
14  unique -- unique in the meaning of the entire package
15  among the competitors that we were aware of.
16      Q.  What do you mean "the entire package"?
17      A.  I mean we have a course here, but what we're
18  selling is credit; so we have content, and that's
19  desirable.  We also, because of our accreditations and
20  approvals, are able to offer specific credits to
21  specific audiences.
22      Q.  You have competitors that have the exact same
23  accreditations and approvals; correct?
24      A.  I don't know -- I don't know if that's true.
25      Q.  Then how can you make that statement that

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)   Sarah Campbell on 11/14/2017   Pages 210..213

Page 210

1   Q.  RN.org?
2   A.  I don't know.
3   Q.  RnCeus.com?
4   A.  I don't know.
5   Q.  Uninursety, U-N-I-N-U-R-S-E-T-Y?
6   A.  I don't know.
7   Q.  Western Schools?
8   A.  Yes.
9   Q.  Wild Iris?
10  A.  Yes.
11  Q.  NurseCe4Less?
12  A.  Yes.
13  Q.  On Course Learning?
14  A.  Yes.
15  Q.  Strafford Publications?
16  A.  I don't know.
17  Q.  Gannett?
18  A.  Yes.
19  Q.  Which of these competitors were offering courses
20  on the same or similar topics as the five courses at
21  issue in this case?
22  A.  I don't know specifically by provider.
23  Q.  Tell me whatever you do know.
24  A.  I know that these providers offered continuing
25  education in major areas of healthcare.  Insomuch as

Page 211

1   these courses covered major areas, I would expect that
2   those competitors offered some kind of activity on a
3   similar topic.  But I cannot say the length and breadth
4   of that material -- whether any of the topics or titles
5   appeared on each of them.
6   Q.  And how do you explain your testimony earlier
7   about what competitors were and weren't offering?
8   A.  All of our courses are developed and offered with
9   the benefit of a longer process for more credits, and
10  our knowledge of our competitors and their approvals or
11  accreditations led us to believe that they did not have
12  these courses provided in the same structure as we would
13  have provided them.
14  Q.  Are you aware of any competitors who have offered
15  or plan to offer similar courses or courses with
16  significant overlap as the five courses at issue between
17  NetCE and Elite?
18  A.  The only provider that I know that offered this
19  course content is Elite.
20  Q.  That's not what I asked.  Any competitors who
21  offered or plan to offer similar courses or courses with
22  the significant overlap as the five courses at issue
23  here?
24  A.  I don't know what you mean by "similar."  I am
25  taking that to mean the ways in which these courses are

Page 212

1   similar to the drafts that we receive from Jouria, and
2   our investigation found that only Elite had published
3   this content.
4   Q.  Do you know of any competitors who plan to offer
5   similar courses or courses with significant overlap?
6   A.  I don't know any of our competitors' plans for
7   the future.
8   Q.  Are you aware of any competitors who did this in
9   the past?
10  A.  Who did what in the past?  I'm sorry.
11  Q.  Offered or plan to offer similar courses or
12  courses with significant overlap.
13  A.  Again, using my definition of "similar" and
14  "overlap," my investigation found that only Elite had
15  published this content for continuing education credit.
16  Q.  What -- what investigation did you do to
17  determine this?
18  A.  When we first found the infringement, I did some
19  additional investigation to determine if Jouria had
20  possibly sold the content somewhere else or if it had
21  been published by another provider.  And I did
22  additional research in comparing dates of release to
23  determine when Elite had initially provided these
24  courses.  And when I did my research as discussed
25  before, I found that only Elite had published this

Page 213

1   content for continuing education credit.
2   Q.  You mentioned earlier that NurseCe4Less had
3   published a course called "head trauma."
4   A.  That's correct.
5   Q.  Was that course written by Dr. Jouria?
6   A.  The course that I found on their Web site was
7   written by Dr. Jouria.
8   Q.  Was it similar to or have overlap with the
9   traumatic brain injury course?
10  A.  It had overlap insomuch as the learning
11  objectives were similar or the same, in my recollection.
12  And that was the similarity that I was able to identify
13  based on my visual inspection.
14  Q.  I think you also testified earlier that there
15  were others published by NurseCe4Less -- or NurseCe4Less
16  on similar topics or with overlap in the subject matter;
17  is that correct?
18  A.  There were other courses published by
19  NurseCe4Less that appeared to the same or similar
20  learning objectives and may have addressed subjects that
21  were the same or similar to the five courses in
22  question.
23         But in terms of content, it was unclear whether
24  the degree of similarity matched the degree witnessed in
25  Elite's publications.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

30(b)(6)                                                      Pages 214..217

Page 214

1    Q. Regardless of whether the similarity matched,
2  according to you, the fact that NurseCe4Less had beaten
3  NetCE to market with these courses impacted the value of
4  these courses to NetCE; isn't that correct?
5    A. I would not say that NurseCe4Less had, in the
6  same way, beaten NetCE to market. Their courses were
7  shorter, and the content, at least in the case of the
8  head trauma course, was different in a way that Elite's
9  was not.
10   Q. NetCE accused NurseCe4Less of committing
11 copyright infringement; correct?
12   A. We sent them a cease and desist. That's correct.
13   Q. And you also included allegations against
14 NurseCe4Less in your California lawsuit; isn't that
15 correct?
16   A. I believe so.
17   Q. And in making these accusations against
18 NurseCe4Less, NetCE claimed that NurseCe4Less was
19 damaging it by its conduct; isn't that correct?
20   A. That is correct.
21   Q. So what was the damage that NurseCe4Less was
22 doing to NetCE?
23   A. That --
24   Q. And how was it any different from what you're
25 alleging against Elite?

Page 215

1    A. So that was filed before we had additional
2  information. We gathered more information in the course
3  of our suit, and NurseCe4Less took measures to stop
4  providing the content in question and, therefore,
5  limited the damages, which were already potentially less
6  based on the extent of similarity compared to the issue
7  of these five courses in Elite.
8    Q. So you believe that the content being offered by
9  NurseCe4Less was similar enough to make allegations and
10 send a cease and desist letter, but the damage --
11 whatever that is, because you didn't answer that
12 question -- was less than whatever damage you say Elite
13 was performing on NetCE. Is that your testimony?
14   A. I am saying that the extent of similarity did not
15 reach that of Elite's, but there were similarities
16 enough that they had violated our copyright.
17   Q. So I'll ask you again --
18   A. So we requested that they cease and desist their
19 publication of our copyrighted materials, which they
20 did, to my knowledge. And so the damages brought by
21 their providing those learning objectives before NetCE
22 were limited in a way that they were not by Elite's
23 publication of these five courses.
24   Q. And I'll ask again.
25       What was the damage done to NetCE by

Page 216

1  NurseCe4Less?
2    A. They had violated our copyright.
3    Q. Did you put a dollar figure on the harm being
4  caused?
5    A. We had not gotten to that point, no.
6    Q. In estimating the damage in this case caused by
7  Elite to NetCE, have you taken into account the damage
8  caused to NetCE by NurseCe4Less?
9    A. I have not, and I am not sure how I would do
10 that.
11   Q. So we're clear, the learning objectives that were
12 allegedly published by NurseCe4Less were in the head
13 trauma head injury course; is that correct?
14   A. I don't recall specifically which course, but
15 my -- but I believe that is true.
16   Q. If your competitors had competitive course
17 offerings with the same titles, that would impact the
18 value of the courses at issue here to NetCE; correct?
19       MR. KERN: What's the -- you're asking a
20 hypothetical? Is that a hypothetical question?
21       MR. WILSON: If you have an objection, you
22 can make it.
23       MR. KERN: Speculation. Foundation.
24 Incomplete hypothetical.
25       THE WITNESS: I don't know the extent to

Page 217

1  which it would, but --
2  BY MR. WILSON:
3    Q. You testified earlier that you were aware and are
4  aware of course offerings by your competitors in the
5  same subject matters as the five courses at issue here;
6  correct?
7    A. I believe I stated that I would expect that our
8  competitors would have the same or similar subjects to
9  the extent that these are general science subjects, and
10 I would expect there to be some overlap.
11       However, I am not aware of any competitors that
12 are offering 30-hour pharmacology courses specifically
13 on, for example, nonantibiotic antimicrobial
14 pharmacology in one activity.
15   Q. And have you performed a market study to find out
16 if there are competitors offering courses in the same or
17 similar subject matters?
18   A. We have not conducted a formal market study.
19   Q. I didn't use the word "formal," but I appreciate
20 your answer.
21       Have you conducted any market study?
22   A. We generally monitor our competitors at a high
23 level and are aware of the offerings that they have in a
24 general sense. It's not something that's conducted and
25 documented as part of a formal process.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                                    Pages 238..241

**Page 238**

1    Q.  Yes.  We have works that Dr. Jouria submitted to
2    Elite, and then we have Elite publications.
3         Do you understand those to be two different
4    works, or do you understand those to be the same work?
5         A.  I don't have substantial knowledge of Elite's
6    processes for making changes; so I can't answer that.
7         Q.  Okay.  Does NetCE typically revise -- strike
8    that.
9         Did NetCE revise, in any manner, the three
10   published articles that Dr. Jouria wrote for it?
11        A.  Yes.
12             MR. KERN:  I am going to interpose an
13   objection that Dr. Jouria has not yet in this case
14   produced for NetCE the documents that he submitted to
15   Elite; so this line of questioning is curious and
16   confounding because the witness has not had a chance
17   to -- or Counsel to review those, let alone to compare
18   them to the published versions.
19             MR. ROSS:  Aside from that not being a valid
20   objection, it's just not correct on the facts, but your
21   objection is noted.
22             MR. KERN:  They -- they -- they have not
23   been produced in the -- they have not been produced in
24   the proper format so that we can use them as evidence.
25             MR. ROSS:  Okay.

**Page 239**

1    BY MR. ROSS:
2         Q.  As part of your interrogatory responses, you
3    identified a David Sains as an attorney.
4         Do you know that name?
5         A.  David Sains, yes.
6         Q.  And who is that?
7         A.  He is a lawyer who has advised and worked for
8    NetCE in the past.
9         Q.  Is he the individual who drafted the freelance
10   writer agreement at issue in this case?
11        A.  Yes.
12        Q.  Did Dr. Jouria have any input in drafting any of
13   the freelance writer agreements in this action?
14        A.  He had input insofar as the contract was
15   editable; so his name, how his name appeared, the topics
16   that were contracted, and the estimated deadlines were
17   all open to Dr. Jouria's input.
18        Q.  What about in paragraph 1 through 9 of the
19   freelance writer agreements?  Were those -- strike that.
20        1 through 10.  Were those written exclusively by
21   NetCE's attorney?
22        A.  Yes.
23        Q.  If you go to paragraph 9 in the freelance writer
24   agreements -- we will agree, will we not, Ms. Campbell,
25   that these freelance writer agreements are all the same

**Page 240**

1    in terms of paragraphs 1 through 10?
2         A.  They are with the exception of the amount of
3    compensation.
4         Q.  Turn to paragraph number 9.  You have that
5    available to you?
6         A.  I do.
7         Q.  Thank you.  The first sentence states, "The
8    writer hereby understands and agrees that all articles
9    approved for publication by CNE and that this agreement
10   shall belong exclusively to CNE."
11        What does "approved for publication" mean to
12   NetCE in this sentence?
13        A.  So we consider an article approved for
14   publication when we receive all of the components, we
15   verify that they're all present, and we confer payment
16   to the writer.
17        Q.  Did you pay Dr. Jouria upon submission of the
18   draft articles or upon publication?
19        A.  We paid Dr. Jouria when we were able to verify
20   that all the components were present, and that was an
21   indication that the articles were approved for
22   publication.
23        Q.  And that was in advance of publication; correct?
24        A.  That was before the courses were released to the
25   public.

**Page 241**

1         Q.  During Mr. Wilson's testimony, he directed you to
2    a division planner document, and I can give you the
3    Bates number if you want.
4         A.  I have it here.
5         Q.  Okay.  Thank you.  The one that he identified is
6    titled "COPD"; correct?
7         A.  That is correct.
8         Q.  And that was one of the published articles that
9    was authored by Dr. Jouria; correct?
10        A.  That's correct.
11        Q.  Okay.  In that document, which is the Bates
12   NETCEB29016 to -29020, you see a checkmark in the box
13   where it says "approved for publication with changes."
14        A.  I see that.
15        Q.  Correct?
16        A.  Yes.
17        Q.  Are there similar division planners for the other
18   two published articles that Dr. Jouria wrote, MS and
19   pressure ulcers?
20        A.  There are division planner evaluations and course
21   approval forms for all three of the published courses.
22        Q.  And do those division -- other two division
23   planner course approval forms have checkmarks that
24   indicate either "approved for publication" or "approved
25   for publication with changes"?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                                    Pages 242..245

Page 242

1      A. So this specimen or example is specifically for
2   our surgical technologist division planner, and she has
3   indicated that this course is approved for CSTs based on
4   her evaluation. That doesn't mean that it will be
5   available to surgical technologists. That requires
6   additional work. But it's her expert opinion that this
7   content would be appropriate with her noted changes for
8   surgical technologists.
9      Q. Thank you. My question was, however: For the
10  other two articles that were published, were those boxes
11  checked, either one, for "approved for publication" or
12  "approved for publication with changes"?
13     A. I don't have all of the course approval forms in
14  front of me; so I don't want to speculate as to how they
15  were filled out by the planners.
16     Q. Okay. Do you have any documents for the seven
17  courses at issue where the boxes were checked "approved
18  for publication" or "approved for publication with
19  changes"?
20     A. None of these courses were developed to the point
21  that they were presented to division planners to
22  determine if they were appropriate for those
23  professions. We have --
24     Q. So is that a no?
25     A. We don't have any course approval forms for

Page 243

1   unreleased courses.
2      Q. So the the answer is no, you don't have any
3   documents. You can't point to any documents that show
4   these boxes checked "approved for publication" for the
5   seven courses at issue. I just want to understand if
6   those documents exist or not.
7      A. I don't have any of these course approval forms
8   for any of the seven courses in question.
9      Q. Also, in Mr. Wilson's direct testimony, he
10  identified another document, "overview of course of
11  development," and I believe that your testimony was that
12  the five articles that he was talking about were
13  somewhere between numbers 4 and 5.
14        Do you remember that testimony?
15     A. I do.
16     Q. And would the same be true for all seven
17  articles?
18     A. The same would be true for all seven.
19     Q. And I see on number 8, if you look at that
20  document, if you have it in front of you, that it says,
21  "Payment will be issued at this time," which is after
22  the faculty member -- in this case, Dr. Jouria -- signed
23  off on the manuscript -- an edited manuscript.
24        But Dr. Jouria was paid well before this time;
25  correct?

Page 244

1      A. That's correct.
2      Q. Okay. When was Dr. Jouria paid relative to the
3   overview of course development? What number was he paid
4   at?
5      A. Dr. Jouria, in the cases of his drafts, was paid
6   between steps 4 and 5.
7      Q. Okay. And this is NETCEB Bates number 34857 and
8   -8; correct?
9      A. That's correct.
10     Q. You understand, do you not, that NetCE has sued
11  Dr. Jouria in part for breach of contracts?
12     A. I understand that.
13     Q. Okay. What are the factual bases or factual
14  basis upon which NetCE claims that Dr. Jouria has
15  breached any of his seven contracts?
16     A. When Dr. Jouria signed this freelance author
17  agreements with NetCE, he agreed that the works he was
18  creating were to be the property of NetCE. But he also
19  provided the same or similar -- substantially similar
20  content to another company.
21     Q. Any other basis?
22     A. Not off the top of my head, no.
23     Q. Well, this is your chance to speak. You're
24  speaking for NetCE. Top of the head, you know, works
25  for today, but I don't know what the top of your head

Page 245

1   will be tomorrow.
2         So as you sit here today, is there any other
3   basis upon which you contend that Dr. Jouria breached
4   any of the other seven freelance writer agreements at
5   issue in this case?
6         I'm sorry. Are you thinking?
7      A. I am reviewing the document.
8      Q. Okay. Thank you.
9      A. I don't have reason to believe, based on the
10  evidence that I have, that he breached the content --
11  I'm sorry -- breached the contract in ways other than
12  those that I described.
13     Q. You've only described one way. You said that he
14  provided the same or substantially similar content to
15  another company. Was there another way? You just said
16  "those," and I just thought it was one way. Did I
17  misunderstand?
18     A. It's only that one way.
19     Q. Okay. Do you understand from the contracts that
20  Dr. Jouria was free to write similar topics for other
21  companies with different content?
22     A. I understand from the agreement that Jouria could
23  write on similar topics that did not infringe upon
24  NetCE's copyright.
25     Q. And what does NetCE believe the copyright covers?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                          Pages 246..249

**Page 246**

1    A.  The copyright covers all of the materials that
2  Jouria produced as a result of the writer agreement.
3    Q.  Going back to the freelance writer agreements,
4  paragraph 9 where we spoke about the first sentence
5  approved for publication, has that language been changed
6  in new freelance writer agreements, or do you still
7  maintain that same language?
8    A.  We haven't made any changes to that paragraph
9  with the exception of updating the company name to
10  NetCE.
11    Q.  For the three published articles that Dr. Jouria
12  wrote for NetCE -- multiple sclerosis, COPD, and
13  pressure ulcers -- you had a communication relationship
14  whereby you edited the drafts that he submitted and then
15  sent those back to him for his approval and signoff; is
16  that correct?
17    A.  Copies of the course were sent to Dr. Jouria in
18  the weeks immediately prior to release to the public.
19  That's correct.
20    Q.  And you -- did you ask him to sign off on the
21  final edited version before you published to the
22  consumer public?
23    A.  We did ask him to review the content to sign off
24  and to note any changes that he recommended prior to
25  release.

**Page 247**

1    Q.  Did you ask Dr. Jouria to do that for any of the
2  seven articles at issue in this case?
3    A.  None of the seven courses in question had gotten
4  to the point that they were imminently being released;
5  so they had not been provided to Jouria for his final
6  review and approval.
7    Q.  Dr. Jouria asked you in e-mails, did he not, why
8  haven't you sent the edited versions to him so that he
9  could approve them finally?
10    A.  I don't recall that question specifically.
11    Q.  Did you ever tell Dr. Jouria that -- you or NetCE
12  of any of the qualms or questions that you had regarding
13  his medical certification or alleged plagiarism?
14    A.  No, I did not.
15    Q.  Why not?
16    A.  I chose not to discuss that with Dr. Jouria
17  because we had already made the decision that we would
18  move forward with the seven courses and, in fact, ten
19  courses in total, and I did not feel that that
20  information would improve the relationship or the
21  products as --
22    Q.  What do you mean "move forward"?
23    A.  I mean, even after our discovery of his issues
24  with the licensing, we had decided we would continue to
25  develop all of the courses we currently had.

**Page 248**

1    Q.  But there was a point in time where you decided
2  not to develop the courses that you had; correct?
3    A.  That's correct.
4    Q.  And when you say "licensing," what do you mean by
5  that?
6    A.  We had knowledge of the legal issues that
7  Dr. Jouria had with the governing body for
8  foreign-educated physicians and his continued seeking of
9  or -- I don't want to speculate that he continued to
10  seek it, but he had not yet been licensed at that time
11  to practice in the United States.
12    Q.  NetCE dismissed two of the courses against Elite,
13  cardiovascular pharmacology and lymphatic immune system
14  articles; correct?
15    A.  That is correct.
16    Q.  Did NetCE dismiss those against Elite because
17  there was a determination made by NetCE that the
18  articles were not substantially similar to the articles
19  that Dr. Jouria wrote for NetCE?
20    A.  When we were able to evaluate the courses more
21  fully, we determined that the similarities, if there
22  were any, were not to the extent that they violated a
23  copyright.
24    Q.  Why haven't you dismissed those two articles
25  against Dr. Jouria?

**Page 249**

1    A.  I don't know.
2    Q.  Well, if you determine that they're not
3  substantially similar enough to support a claim for
4  copyright infringement, are you going to dismiss those
5  claims against Dr. Jouria --
6    MR. KERN:  Objection --
7  BY MR. ROSS:
8    Q.  Please.
9    Are you going to continue to prosecute those
10  against Mr. Jouria?
11    MR. ROSS:  Go ahead and state your
12  objection.
13    MR. KERN:  Sorry.  Objection.  Misstates
14  testimony, and vague as to you keep referring to the
15  course and not defining whether you're talking about
16  Elite's published course or the ones that Dr. Jouria
17  submitted.
18    If you --
19    MR. ROSS:  I am talking about --
20    MR. KERN:  If you understand the question.
21  BY MR. ROSS:
22    Q.  Do you understand the question, Ms. Campbell?
23    A.  Could you repeat it?  I'm sorry.
24    Q.  Sure.  I want to know if you're going to continue
25  to prosecute your claims of copyright infringement