**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 0:15-cv-61165-WPD**

DR. JASSIN JOURIA

                       Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

                       Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

                       Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,

                       Plaintiff/Counter-Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

                       Defendant/Third Party Plaintiff,

v.

ELITE CONTINUING EDUCATION, INC. and ALPINE
MANAGEMENT SERVICES III, LLC,

                       Third Party Defendants.

_____

**CE RESOURCE, INC. d/b/a CME RESOURCE and NetCE's OPPOSITION TO ELITE
CONTINUING EDUCATION, INC.'S MOTION FOR SUMMARY JUDGMENT**

## I.   <u>INTRODUCTION</u>

Elite Continuing Education's ("Elite") perpetual refrain before this Court is that it is "stuck in the middle" of a conflict between NetCE and Dr. Jouria.[1]  If indeed Elite is "stuck in the middle," it is in this position entirely of its own making.  Elite knew that Dr. Jouria had sold the Seven Courses[2] to NetCE.  It knew that Dr. Jouria had signed agreements with NetCE that governed the intellectual property to those courses.  And it *knew* that the similarities between the courses it received from Dr. Jouria and the versions it ultimately published, on the one hand, and the courses NetCE owned, on the other, went well beyond titles and subject matter.  Still, Elite paid Dr. Jouria to purchase the Seven Courses, which were not his to sell, and Elite published the courses and sold them to the public.

Based on the content of Elite's Motion for Summary Judgment and Memorandum in Support (Dkt. 186), it is plain Elite has assessed and accepted the substantial similarity of the five NetCE copyrighted courses at issue against it ("Five Courses") and the five infringing courses it published and sold to customers.  Realizing it cannot prevail on such an argument, and rather than taking responsibility for its blatant infringement, it has revamped its strategy entirely.  Gone, too, are its early arguments about copyrightable subject matter and information in the public domain.  No—Elite, knowing that its earlier pet arguments are completely unwinnable,

---

[1]     Elite spills much ink in its Memorandum carping about NetCE's litigation tactics—specifically the breadth of NetCE's initial claims against Elite (Dkt. 36), NetCE's subsequent winnowing of those claims, and issues long resolved between the parties.  As a preliminary matter, and as Elite should well know, all that the Federal Rules of Civil Procedure require of NetCE at the pleading stage is notice pleading.  Fed. R. Civ. P. 8(a)(2).  Notice pleading requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

        Litigation is, in part, a tool for investigation.  NetCE used all the evidence then at its disposal to make non-frivolous claims in its counter-complaint and third party claims against Elite.  Once it was able to use the tools of discovery and to gather evidence—in other words, after Dr. Jouria's final bad faith bankruptcy filing was dismissed, and this Court lifted the stay—it dropped claims it believed were no longer meritorious.  Specifically, with respect to Elite, those claims were copyright infringement against two courses and tortious interference with contract.  Dr. Jouria's antics in bankruptcy court delayed the inception of discovery in this case by almost two years, and it is disingenuous for Elite to suggest otherwise, as it does in its Memorandum.

[2]     Pursuant to the FWAs, Dr. Jouria submitted to NetCE the following courses: "COPD," "Decubitus Ulcers," "Multiple Sclerosis,"[1] "The Lymphatic and Immune Systems: A Comprehensive Review," "Traumatic Brain Injury," "Non-antibiotic Antimicrobial Pharmacology: A Review," "Clinical Cardiovascular Pharmacology," "Gastroesophageal Reflux Disease," "Cancer and Chemotherapy," and "Depression and Dementia in the Elderly."  NetCE accepted manuscripts from and remitted payment to Dr. Jouria for each course—all courses were "approved for publication," as the term is used in the FWA.  NetCE completed editing "COPD," "Decubitus Ulcers," and "Multiple Sclerosis" and made these courses available to the public for sale.  Following the discovery of the infringement, NetCE ceased developing the remaining seven courses ("Seven Courses").

has retreated from them and has determined that its best chance of prevailing at summary judgment with respect to copyright infringement is to argue that NetCE does not in fact own the intellectual property rights in question. This argument, based on the clear cut language of all agreements, is simply wrong—and it is wholly inconsistent with the record.

Elite's intense regret for accepting Dr. Jouria's assurances that he was free and clear to re-sell the Five Courses will not bail them out of this mess. The language of the Freelance Writer Agreements is crystal clear—once NetCE received the manuscripts for the Seven Courses from Dr. Jouria, NetCE owned *all* copyright rights to the Seven Courses as "works made for hire," and this Court should deny summary judgment to Elite on NetCE's claims of copyright infringement.

There are multiple, discrete disputes of material fact regarding whether Elite misappropriated NetCE's trade secrets. Elite's key witness on this score is Dan Cremons. His account of the meetings, communications, and exchanges between Alpine Management Service III ("Alpine") and NetCE and between McKissock, LLC ("McKissock") and NetCE are directly contradicted by Erin Meinyer's prior declaration submitted in support of a Motion to Compel, and her Declaration submitted in support of this opposition. Had Elite taken Ms. Meinyer's deposition, as NetCE offered and Elite agreed (see below), she would have testified consistently with and to her declaration. Moreover, the timeline of McKissock's and Alpine's meetings with NetCE and their acquisition of Elite and Elite's subsequent business tactics demonstrates that Elite used the knowledge and strategies Alpine and McKissock gained during their information gathering from NetCE to compete unfairly. A reasonable jury could and would find Elite culpable for misappropriating trade secrets obtained by Alpine and/or McKissock.

Finally, this Court must reject Elite's allegations that NetCE's claim for lost profits is too speculative to sustain. First, NetCE's damage claims are supported by evidence, testimony, and an expert report. Second, Elite's argument—despite its attempts to dress it otherwise—is ultimately about a factual dispute as to whether to apply its model for damages calculation or NetCE's damages model and evidence. Dueling expert calculations, competing models, are not suitable for adjudication at this stage and must go to the jury.

This Court should completely deny Elite's Motion for Summary Judgment.

## II.    FACTS

### A.    State of the Record

NetCE has sufficient evidence to create a dispute of material fact for its copyright infringement claims and for its misappropriation of trade secrets claims against Elite.  NetCE has no doubt it would have additional evidence were it not for the antics of both Elite and Dr. Jouria. Dr. Jouria, as detailed in a Motion for Terminating Sanctions before this Court (hearing scheduled for January 11, 2017), destroyed his laptop computer—the only computer he used to work on the courses at issue in this lawsuit—just after this Court lifted its automatic stay in place due to his bad faith bankruptcy filing.  (Dkts. 149, 150.)  Following Dr. Jouria's destruction of evidence, Dr. Jouria and his counsel misled NetCE about the status of the computer, implying that additional documents were recoverable.  *Id.*

NetCE expects, based in part on Dr. Jouria's testimony, that this was the only laptop he used for his work for NetCE and Elite, that this laptop contained multiple responsive documents that only Dr. Jouria would have (for example, his drafts and edits of the infringing courses), documents that would have further shored up NetCE's claims in this case.

Elite has also contributed to the state of the record.  Elite has refused to produce documents regarding its ANCC-accreditation—documents plainly relevant to NetCE's trade secret claims.  (Based on its knowledge of the accreditation process, NetCE believes Elite submitted NetCE materials to ANCC in order to secure accreditation.)  Elite's refusal to turn over relevant documents is the subject of a Motion to Compel pending before this court.  (Dkt. 143.)  The hearing is scheduled to take place on January 9, 2017.  Finally, Elite breached an attorney agreement to allow NetCE to take Elite's 30(b)(6) witness deposition outside the discovery period.[3]  Respone Statement of Facts in Opposition to Elite's Motion ("RMF") at ¶ 83.

---

[3] NetCE also had agreed to allow Elite to conduct the deposition of Erin Meinyer outside the discovery cutoff.  RMF at ¶ 83.  The day before her deposition, Ms. Meinyer was hospitalized due to an illness.  *Id.*  NetCE therefore asked to reschedule the deposition.  *Id.*  Elite refused, and cancelled the deposition of its 30(b)(6) witness (which NetCE had agreed to take in Charlotte, North Carolina, as an accommodation for Elite's convenience).  *Id.*  The day before Ms. Meinyer's deposition was to take place, Ms. Meinyer submitted a declaration, executed very shortly after she was released from the hospital, in support of NetCE's Motion to Compel itemizing the trade secrets she shared with McKissock and Alpine and the timeline of events surrounding the exchange of such information and McKissock's purchase of Elite.  *Id.*

Had Elite followed through on its agreement, NetCE would have additional evidence bolstering the disputes of material fact already evident.

Elite should not benefit from its effort to obstruct proper development of the record.

### B.      Misappropriation of NetCE's Trade Secrets

From 2012 to 2013, NetCE was involved with Alpine (and one of the investment firm's affiliate or "portfolio" investment companies, McKissock), regarding its potential acquisition of NetCE.  RMF at ¶ 84.  At the time, McKissock was a CE provider for real estate and related professions.  *Id.*[4]

In 2012, Dan Cremons (of Alpine) and Mike Duran (of McKissock) first approached NetCE with the intention of purchasing NetCE.  Erin Meinyer, NetCE's Executive Director, was aware that Mr. Duran was affiliated with McKissock, but was under the impression that Alpine owned McKissock.

In the course of evaluating the viability of this proposed transaction, and before NetCE turned over sensitive and proprietary documents, NetCE, Dan Cremons, and Mike Duran (on behalf, NetCE believed, of Alpine) entered into a Non-Disclosure Agreement.  RMF at ¶ 86.  Following the execution of the NDA, and in furtherance of discussions to sell NetCE, Ms. Meinyer provided confidential and proprietary information about NetCE to Dan Cremons and Mike Duran by phone, email, physical mail, and in-person meetings.  RMF at ¶¶ 86-87.  The parties also engaged in multiple phone conversations concerning the confidential and proprietary information and NetCE's plans and future prospects.  *Id.*

In November 2012, Ms. Meinyer met with Mr. Duran and Richard Wileczek (both of McKissock) in person (Mr. Cremons from Alpine was scheduled to attend, but could not attend at the last minute), and Ms. Meinyer shared significant, additional proprietary documents and information with them.  RMF at ¶ 88.  In preparation for this meeting, Ms. Meinyer had mailed to them NetCE's profit and loss statements.  *Id.*  These profit and loss statements were not available to the public and were highly confidential.  *Id.*

---

[4] During this litigation, NetCE has learned that Alpine divested its stake in McKissock, and that McKissock is now owned in whole or part by a company called "The Colibri Group," which based on public information is a holding company for continuing education providers in a variety of fields, including real estate, property appraisal, engineering, nursing, mental health, massage therapy, and cosmetology.  RMF at ¶ 85.

At this November 2012 meeting, Ms. Meinyer provided and reviewed with Mr. Duran and Mr. Wileczek financial information, including return-on-investment documents and cost versus revenue by catalog spreadsheets.  RMF at ¶ 89  She also provided to them documentation of NetCE's historical course and catalog offerings, a course index, catalog history, and documentation of NetCE's processes for course development, implementation, and evaluation, marketing strategies (including but not limited to new verticals and social media), documentation of courses then in-development, and information related to NetCE's market strategies (including detailed discussion of the limitations and deficiencies of a company called Elite, which was then one of NetCE's small, Florida-based competitors.  *Id.*  At the time of this meeting, neither Alpine nor McKissock had disclosed any relationship whatsoever with Elite.  RMF at ¶ 90.

Further, at this meeting, Ms. Meinyer outline specific deficiencies in Elite's business model.  RMF at ¶ 91.  She explained Elite exhibited competitively crippling inefficiencies, particularly because it insisted on seeking state-by-state accreditation rather than interstate accreditation.  *Id.*  Ms. Meinyer relayed that she believed Elite, without accreditation from the American Nurses Credentialing Center, lacked real credibility.  *Id.*

Over the course of emails, physical mailing, and in-person exchanges, NetCE provided the following documents and information to Alpine and McKissock—none of which was publicly available:

- Profit and loss statements
- Documentation of NetCE's return-on-investment
- Cost versus revenue by catalog spreadsheets
- NetCE's historical course and catalog offerings (including strategies for grouping certain states for single mailings and internal coding processes)
- A course index
- NetCE's processes for course development and maintenance, including but not limited to internal documentation, forms, and flow charts
- Mission statement development and plans for revision and update
- Courses then in development
- NetCE's market strategies
- NetCE's accreditations, application schedule, and timeline for renewal
- Research regarding market need
- Monthly sales
- Sales projections
- Industry reports and research concerning competitor weakness

RMF at ¶¶ 92-93.

No deal materialized between Alpine and NetCE.  Alpine did not make a formal offer, and their promise to issue a Letter of Intent never materialized.  RMF at ¶ 94.  In the fall of 2013, McKissock reached out to NetCE, and the parties resumed conversations.  RMF at ¶ 95.  At McKissock's invitation, NetCE scheduled an in-person meeting in Roseville, California, in October 2013.  *Id.*  In preparation for this meeting, NetCE provided updated financials (for 2013, up to and including September 30).  *Id.*  *After* providing these materials, but *before* the meeting took place, NetCE discovered Alpine or McKissock had purchased Elite—and that this purchase had been completed at least (i) before McKissock reached out to NetCE in 2013 to resume conversations, (ii) before McKissock requested and received additional proprietary and confidential information from NetCE, and (iii) during or very close to McKissock's and Alpine's initial negotiations with NetCE.  RMF at ¶ 96.

### C.  NetCE's Ownership of the Copyrights to the Five[5] Courses At Issue Against Elite

Dr. Jouria executed FWAs for ten courses (including the courses remaining at issue against Elite ("Five Courses")) with NetCE.  RMF at ¶ 101.  Those FWAs contain identical terms, except for the course name, deadlines, signature line and date, and the author's "check mark" responses to a series of questions.  RMF at ¶102.  Each FWA contains the following passages:

- Paragraph 5: "**Representations and Warranties of Writer:** …Writer will not submit the Article to any other party for publication unless and until NetCE expressly rejects the article…"  RMF at ¶ 103 (emphasis in original)

- Paragraph 7: "**Compensation**: …Writer acknowledges and agrees that [NetCE] will only pay writer for Articles that are approved for publication by [NetCE], and that [NetCE] has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer…."  *Id* (emphasis in original).

- Paragraph 9: "**Ownership and Assignment of Intellectual Property**: Writer hereby understands and agrees that all Articles approved for publication by [NetCE] under this Agreement shall belong exclusively to [NetCE].  Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be 'works made for hire' under all relevant copyright laws, and [NetCE] shall be deemd to be the author thereof.  If and to the extent any Article is determined not to constitute

---

[5]Pursuant to the explicit terms of the seven Freelance Writer Agreements ("FWA") governing the seven courses originally at issue ("Seven Courses"), NetCE owns copyrights to all seven courses at issue in this lawsuit.  NetCE has dismissed claims related to two of those courses with respect to Elite only.  Accordingly, in this Opposition memorandum to Elite's motion for summary judgment, NetCE will only address the five courses at issue against Elite.

"works made for hire," writer hereby irrevocably assigns and transfers to [NetCE] and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. … Without limiting the foregoing, [NetCE] has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with [NetCE] in editing, fact checking, and otherwise reviewing the Articles prior to publication…." *Id.* (emphasis in original).

NetCE approved for publication each of the Seven Courses—including the Five Courses at issue against Elite.  RMF at ¶104.  After approval of each course proposal, NetCE sent FWAs to Dr. Jouria.  RMF at ¶¶ 105, 106.  After executing each FWA, Dr. Jouria submitted manuscripts for the Seven Courses, NetCE checked that the manuscript contained all requisite components, and NetCE paid Dr. Jouria (directly or to his company MedCreds Writing Solutions, LLC) by check or by wire transfer the applicable agreed upon amount[6].  *Id.*  NetCE does not pay authors for courses it has not "approved for publication."  RMF at ¶ 107.  Dr. Jouria accepted each of these five payments, and did not return these amounts to NetCE.  RMF at ¶ 108.  Because Dr. Jouria executed the FWA, submitted a manuscript draft to NetCE, and NetCE remitted payment to Dr. Jouria, NetCE "approved for publication" as that term is used in the FWA each of the Seven Courses.

As such, according to the other terms of the FWAs, NetCE owned all intellectual property related to the courses subject to the Seven Courses' FWAs (including the Five Courses at issue against Elite), including derivative works or substantially similar works.

---

[6]

| Course Name (in FWA) | Date FWA Signed | Date of Payment | Amount of Payment |
|---|---|---|---|
| Traumatic Brain Injury | August 24, 2012 | December 6, 2012 | $3,975 ($25 deducted because wire transfer) |
| Cancer and Chemotherapy | January 15, 2013 | March 21, 2013 | $12,000 |
| Gastroesophageal Reflux Disease | January 15, 2013 | May 16, 2013 | $4,000 |
| Depression and Dementia in the Elderly | April 5, 2013 | April 18, 2013 | $12,000 |
| Non-Antibiotic Antimicrobial Pharmacology | October 12, 2012 | January 1, 2013 | $11,975 ($25 deducted because wire transfer) |

RMF at ¶106.

Dr. Jouria reached out to NetCE after receiving payment for courses under the Seven Courses' FWAs. RMF at ¶ 109. Dr. Jouria asked NetCE if it was still working on the courses. *Id.* NetCE assured Dr. Jouria that it was still editing the courses and planning to publish and make them for sale to the public. *Id.* NetCE never "explicitly rejected" any course Dr. Jouria submitted pursuant to any FWA.

In communication between Dr. Jouria and Elite, Elite noted that NetCE owned the intellectual property rights to the Seven Courses ("I now understand that you used some of the materials in the courses developed for us in courses that you sold to other companies.") Elite also noted that Dr. Jouria had refused to produce the FWAs to it, but that it wanted courses that were "unique to Elite." RMF at ¶ 110. Elite also asked Dr. Jouria to "[p]lease specifically call out any courses that have ANY content that were also sold specifically to NetCE"). *Id.* Dr. Jouria listed for Elite multiple other CE providers to which he had sold courses, but Elite was only interested in the courses he had already sold to NetCE. *Id.* Despite knowing Dr. Jouria had multiple contracts with NetCE, despite Dr. Jouria's statement that there was significant overlap, and despite Dr. Jouria's refusal to allow Elite to examine NetCE's FWAs, Elite published the Five Courses.

Simultaneously to the burgeoning conflict between Dr. Jouria, NetCE, and Elite, NetCE contacted another CE Provider, NurseCE4Less, because NurseCE4Less had also published NetCE's intellectual property and infringed NetCE's copyrights. RMF at ¶ 111. NurseCE4Less contacted Dr. Jouria regarding the infringing courses, and Dr. Jouria indicated to NurseCE4Less that he was not sure the courses were, in fact, "rejected." *Id.* Unlike Elite, NurseCE4Less took down the infringing content almost immediately. RMF at ¶ 112.

NetCE applied for and received federal copyright registration for all Seven Courses. RMF at ¶ 113.

## III.   ARGUMENT

### A.   Standard of Review

Summary judgment is authorized *only* if the record—the pleadings, depositions, verified responses, admissions, and affidavits show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To win summary judgment, the moving party, Elite, must prove that no genuine issue of material fact exists for any element of any claim at issue.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In assessing whether Elite has met its burden, a court considers all inferences from the underlying facts in the light most favorable to the NetCE, the nonmoving party, and resolves all reasonable doubts in NetCE's favor. *Anderson*, 477 U.S. at 255; *Posada v. James Cello, Inc.*, 2005 WL 1390133, at *1 (11th Cir. 2005).

Crucially, at the summary judgment stage, a court may not weigh conflicting evidence or weigh the credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citation omitted).  If a reasonable fact finder could draw more than one inference from the facts, and any such inference creates an issue of material fact, then a court must deny summary judgment.  *Id.* (citation omitted).  If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, summary judgment must be denied. *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990) (sufficient evidence raised to show genuine issue of material fact).

Elite has not met its burden to show there is no genuine dispute of material fact with respect to copyright infringement, misappropriation of trade secrets, or actual damages.  This Court should deny, in full, Elite's motion for summary judgment.

**B.      Dispute of Material Fact Exists As to Whether NetCE Conveyed Trade Secrets to Alpine or Elite and Whether Elite Misappropriated Those Trade Secrets**

Mr. Cremons's testimony regarding what NetCE provided to Alpine during the course of the 2012-2013 acquisition negotiations is almost wholly inconsistent with Ms. Meinyer's affidavit[7], submitted in support of a Motion to Compel, and Ms. Meinyer's declaration submitted with NetCE's opposition.  Ms. Meinyer, contrary to Mr. Cremons, remembers providing by email and "snail" mail and handing off in person to Elite's related corporate parent large volumes of documents containing trade secrets and proprietary information not available to the public.  RMF at ¶¶ 84-100.  Whether trade secrets exist and whether those trade secrets were impermissibly passed on is a question of fact to be resolved by the trier of fact.  *Xtec, Inc. v.*

---

[7] Elite declined to depose Ms. Meinyer.  If it had, her testimony would have been consistent with the referenced affidavit.

*Cardsmart Techns., Inc.*, 2014 WL 10268426 (S.D. Fla. May 15, 2014) (denying summary judgment due to issues of fact with respect to existence of trade secret and whether trade secrets actually misappropriated); *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1292-93 (S. D. Fla. 2001); *Camp Creek Hospitality, Inc. v. Sheraton Franchise Corp.*, 139 F. 3d 1396, 1410-11 (11th Cir. 1998); *All Pro Sports Camp v. Walt Disney Co.*, 727 So. 2d 363, 368 (Fla. 5th DCA 1999).  These inconsistencies are material to NetCE's trade secret claims and sufficient for this claim to survive summary judgment, and "full presentation of evidence from each side is required" at trial.  *Furmanite America, Inc v. T.D. Williamson, Inc* 506 F. Supp. 2d 1134, 1139-1142 (2007) (denying summary judgment on trade secret claim where genuine issue of material fact existed as to whether trade secret existed, whether reasonable steps taken to protect trade secrets, and where moving party did not meet its burden of demonstrating it did not use purported trade secrets).

       To bring a claim of trade secrets misappropriation under Florida law against Elite, NetCE must adduce evidence: (i) NetCE had trade secrets; (ii) NetCE subjected those trade secrets to measures to keep them secret and proprietary; (iii) that those trade secrets derived commercial value by being secret; and (iv) that Elite obtained those trade secrets through improper means. *See* Fla. Stat. §. 688.002; *All Leisure Holidays, Ltd. v. Novello*, 2012 WL 5932364 (S.D. Fla. Nov. 27, 2012) (applying Florida law); *Del Monte Fresh Produce Co. v. Dole Foods Co*., 136 F. Supp. 2d 1271, 1291 (S. D. Fla. 2001) (applying Florida law); *Arch Aluminum & Glass Co., Inc. v. Haney*, 964 So. 2d 228 (Fla. 4th DCA 2007).  There is evidence in the record to support each of these requirements.  NetCE possessed trade secrets regarding the health of its business, its market strategies, competitor and market insight, and its plans for the future—itemized in great detail above (p. 5-6).  Such information was not publicly available.  RMF at ¶¶ 86-89, 92-93. These trade secrets derived value from their secrecy because they each gave NetCE a competitive advantage in the marketplace.  RMF at ¶ 93.  NetCE would not and did not disclose such information without proper safeguards in place, including the Non-Disclosure Agreement it executed with Alpine and McKissock. RMF at ¶¶ 86, 87.  NetCE does not share its trade secrets with parties who are not subject to similar confidentiality agreements or have other fiduciary duties of secrecy.  RMF at ¶ 86.

Relying heavily on Mr. Cremons' deposition testimony, Elite claims that NetCE only shared publicly available information with Mr. Cremons and that Alpine did not share trade secrets with Elite.  Ms. Meinyer's Declaration *directly* contradicts this assertion.

For good reason, courts are "extremely hesitant" to grant summary judgment regarding the "fact-intensive questions" of a trade secret claim.  *Furmanite America,* 506 F. Supp. 2d at 1141.  In a matter such as this, where there are multiple factual discrepancies regarding fundamental elements of the claim, the questions of fact regarding allegations of trade secret misappropriation are best resolved "by a fact finder after full presentation of evidence from each side."  *Id.* (citation omitted) ("Summary judgment is likewise inappropriate in the instant case, as issues of fact exist regarding [the] claims.").

Ms. Meinyer's account is at odds with that of Mr. Cremons in almost every respect.  Ms. Meinyer contends she sent Mr. Cremons in November of 2012 multiple documents containing NetCE's highly sensitive, proprietary, and *secret* financial information and that none of this information was publicly available.  RMF at ¶¶ 88, 89.  Ms. Meinyer also contends that, believing the company she and her husband Dennis built from scratch was protected by the Non-Disclosure Agreement in place, she conveyed NetCE's business strategies, development plans, and market observations (including information about Elite's deficiencies) to Mr. Cremons *and* Mr. Duran during the course of the 2012 negotiations and discussions.  RMF at ¶¶ 88-92.[8]  Ms. Meinyer contends that this information was not publicly available.  RMF at ¶ 93.  Ms. Meinyer has sworn she met with Mr. Duran and Mr. Wileczek in November of 2012 and shared documents and information—including profit and loss statements, return-on-investment documents, cost versus revenue by catalog spreadsheets, documentation of NetCE's processes for course development, implementation, and evaluation, marketing strategies, and Elite's competitive deficiencies—in person and, by mail, in preparation for this meeting.  RMF at ¶¶ 91, 92.[9]  Mr. Cremons, of course, insisted he did not receive such proprietary information from NetCE and that the information he received was in the public domain.

---

[8] According to Ms. Meinyer, she communicated this information over the phone and in-person meetings in Roseville.  RMF at ¶ 87.

[9] Sarah Campbell, NetCE's 30(b)(6) witness, also testified at length regarding the nature of information transmitted to McKissock and Alpine *and* the fact that the information transmitted was a trade secret.  RMF at ¶¶ 84-100.

NetCE provided all of the information Ms. Meinyer and Ms. Campbell described believing—due to the Non-Disclosure Agreement and to Alpine's and McKissock's assurances—that the information it shared would be treated as trade secrets.  Then, in 2013, when McKissock again contacted NetCE and set up a meeting for October, NetCE, still believing it was protected by the Non-Disclosure Agreement and unaware that McKissock had already purchased Elite, provided updated proprietary financials—also trade secrets.  RMF at ¶¶ 95, 96.

There is, at minimum, circumstantial evidence that Alpine and/or McKissock passed NetCE's trade secrets onto Elite.  *See DS Waters of America, Inc. v. Fontis Water, Inc.*, 2012 WL 12873620, at *2-3 (N.D. GA Dec. 4, 2012) (denying summary judgment where circumstantial evidence at odds with direct evidence creating dispute of material fact).  Very shortly after this meeting, *Elite began addressing the same multiple deficiencies* Ms. Meinyer painstakingly itemized for McKissock and began using the trade secret information NetCE passed to Alpine and McKissock to improve its competitive prospects and conform its business to that of NetCE's model.  RMF at ¶ 97.  Elite also applied for accreditation through the American Nurses Credentialing Center ("ANCC")—*exactly the action which Ms. Meinyer had pointed out to McKissock* was crucial to efficiency and the ability to reach a broad array of consumers in discrete markets.  *Id.*  NetCE suspects that Elite used the Five Courses to apply for ANCC accreditation, but Elite has refused to produce all documents regarding its ANCC application.  RMF at ¶¶ 98, 99.[10]

The evidence in the record strongly suggests (i) that Alpine and McKissock used NetCE trade secrets to "tip off" its subsidiary Elite and help it become more competitive in highly desirable markets and (ii) to gather "inside track" information on a competitor.  It is for a jury to decide whether the evidence is sufficient to find Elite liable.

Given the multiple, distinct disagreements of fact between Mr. Cremons' account and Ms. Meinyer's, there are *multiple* disputes of material fact with respect to NetCE's trade secret claim against Elite—including the competing credibility of witnesses, whether information

---

[10] NetCE subpoenaed records from the ANCC via a Rule 45 subpoena and is currently negotiating with ANCC regarding the production of such records.  RMF at ¶ 99.  This Court granted an extension of the discovery period in order to encompass the return of documents responsive to this subpoena.  (Dkt. 147.)  NetCE's discovery requests to Elite and Elite's objections to NetCE's subpoena of ANCC are currently before Magistrate Judge Snow on a Motion to Compel (hearing scheduled for January 9, 2018).  *Fernandez v. Bankers Nat. Life Ins. Co.*, 906 F.2d 559, 570 (11th Cir. 1990) (a court errs in deciding summary judgment if the record is incomplete: "summary judgment may only be decided upon an adequate record.").

transferred constitutes trade secrets, and whether Elite received those trade secrets.  This claim should survive summary judgment and proceed to trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge."); *Furmanite America, Inc.*, 506 F. Supp. at 1139-1142.[11]

### C.   Under Express Terms of FWAs, NetCE Owns All Copyright Rights in the Seven Courses

Elite does not dispute that it published and sold the Five Courses or that the courses it published are substantially similar to those to which NetCE owns the copyright.  Instead, in a last ditch strategy to subvert the damning evidence of infringement, Elite presents a brand new, albeit preposterous, argument, that NetCE does not own the rights to the Seven Courses because NetCE never "approved [them] for publication."  The plain language of the contract, and NetCE's and Jouria's actions pursuant to its terms demonstrate otherwise.

### 1.   NetCE's Course Development Process

NetCE's course development process functions in a systematic, linear fashion.[12]  An author asks NetCE if NetCE is interested in a course on a particular topic.  RMF at ¶ 117.

---

[11]    At her deposition, NetCE's 30(b)(6) witness Sarah Campbell testified that there was a lack of "evidence."  She was referring to the fact that NetCE did not have documentation (beyond emails and email attachments) of trade secrets exchanged with Alpine and McKissock.  RMF at ¶ 100.  NetCE   In other words, she was equating "evidence" or "hard evidence" with documents and not including witness accounts.

[12]    Elite cites in part to NetCE's written responses to its Requests for Production.  First, a written response to a Request for Production is not verified and therefore is not "evidence."  *McCaskill v. Ray*, 279 Fed. Appx. 913, 914-15 (11th Cir. 2008) ("Unsworn statements … should not be considered in determining the proprietary of summary judgment.  Federal law…requires the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury."); *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n. 26 (11th Cir. 2003) ("Unsworn statements do not meet the requirements of Fed. Rule Civ. Proc. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion.") (present Rule 56(c)(1)(A) clearly omits responses to requests for production as allowable summary judgment evidence).

Second, NetCE's Interrogatory responses, also cited to by Elite, are entirely consistent with NetCE's having approved the courses for publication.  In NetCE's Response to Interrogatory No. 15, which asks about the process of approval for publication, NetCE describes approving Dr. Jouria's proposals, subsequently receiving manuscripts, and remitting money to him for each topic after the receipt of the manuscript.  RMF at ¶ 114.  NetCE also describes the editing process that followed the approval for publication and payment to Dr. Jouria—exactly consistent with "approval for publication" as described in the FWAs and consistent with the order of operations of course development described in Sarah Campbell's declaration and in NetCE's first supplemental response to Dr. Jouria's Third and Fourth Interrogatories.  *Id.*

This response is also consistent with NetCE's Response to Interrogatory No. 6: "After Dr. Jouria executed each FWA and submitted a course draft pursuant to each particular FWA, NetCE paid Dr. Jouria the agreed-upon amount.  The seven (7) courses at issue in the above-captioned litigation (and, indeed, the three (3) courses not at-issue in the above-captioned litigation) belong to NetCE under both the work for hire doctrine of United States Copyright Law and the explicit terms of the FWAs."  RMF at ¶ 116.  Pursuant to the explicit terms of the FWAs,

NetCE then turns the author down or requests a full proposal. *Id.* The author creates and submits a proposal, including an abstract and outline of the prospective course. *Id.* After that, the Development Committee determines whether a course on such a topic would meet consumer need. *Id.* Once a proposal is approved or accepted, NetCE sends a FWA to the author for his or her execution. *Id.* After NetCE and the author execute the FWA, the author submits a full manuscript of the course. *Id.* Once NetCE receives the course, it ascertains whether all the required components are present and then, if the manuscript is complete, NetCE remits payment to the author and considers the course "approved for publication" under the FWA. *Id.* After the course is "approved for publication," NetCE begins curating, fact-checking, revising, and editing the course, and securing permissions for reprinted materials contained within it. *Id.* Finally, after this often lengthy process, NetCE sends a curated manuscript to the author for his or her final signoff. *Id.* Then, NetCE makes the course available for sale to the public. *Id.*[13]

Dr. Jouria went through this exact process (except for signing off on a curated manuscript) with the Seven Courses. Of particular importance, Dr. Jouria executed the Seven Courses' FWAs, submitted manuscripts for the Seven Courses to NetCE pursuant to those FWAs, and received payment for each of the Seven Courses. RMF at ¶¶ 101-106.

## 2. Terms of the FWA

Under the explicit terms of the FWAs, receipt of manuscript and remittance of payment constitute "approval for publication" and trigger the transfer of ownership of all copyright rights (and, indeed, all intellectual property rights) of the courses to NetCE. Paragraph 7 states that a writer, such as Jouria, will not be paid unless an article is approved for publication ("Writer acknowledges and agrees that [NetCE] will only pay writer for Articles that are approved for

---

after the issuance of payment, the course was "approved for publication." This is also entirely consistent with NetCE's other written discovery responses (Dr. Jouria submitted draft manuscripts of each course and payment was remitted to him.). RMF at ¶¶ 115, 116.

[13]     At the deposition of NetCE's 30(b)(6) witness, Elite confused the processes for course development and course marketing (or division planning). The course development process concerns editorial decisions, including whether a course is "approved for publication" and the ensuing curation and editing of that course. RMF at ¶ 118. The course marketing (or division planning) process entails evaluating a course that has already been approved for publication, and determining whether to tailor the course for different customer markets. *Id.*

For example, a division planner might review a course initially proposed and "approved for publication" under the FWA for nurses and determine that this course would be suitable to tailor and then make available for physicians. *Id.* The division planner review of a course is wholly separate from the mechanics of the FWA and has nothing to do with a course's being "approved for publication" under the FWA. *Id.*

publication by [NetCE].")  RMF at ¶ 103.  As NetCE testified at deposition, it does not pay authors for courses it has not "approved for publication."  RMF at ¶ 107.  That Dr. Jouria was paid for each of the Seven Courses signifies that NetCE had "approved" each of the courses for "publication" under the FWA.

That NetCE was at various stages of editing and curation at the time it discovered Elite's and Dr. Jouria's infringement is immaterial to a determination of whether NetCE owned the copyright rights to the Seven Courses.  "Approval for publication" and "publication" under the FWA are two distinct concepts.  NetCE has never argued, and does not now argue, that "approved for publication" as that terms appears in the FWAs means that courses were ready to be sold to the public.  Paragraph 9 specifically contemplates course editing and revision following approval of publication: "[NetCE] has the right to edit the Articles as it deems appropriate *for publication or use* … and that Writer will cooperate with [NetCE] in editing, fact checking, and otherwise reviewing the Articles *prior to publication*."  RMF at ¶ 103 (emphasis added).  Paragraph 9 also gives NetCE the right to edit the courses after they are "approved for publication."  *Id.*  It is NetCE's practice—for every course it considers—to approve a course for publication, remit payment to the author, and *then* to engage in curating the course.  *Id.*

Under Paragraph 9 of the Agreement (which also states that "all Articles approved for publication by [NetCE] under this Agreement shall belong exclusively to NetCE"), courses "approved for publication" ("such Articles") are to be considered works for hire.  Dr. Jouria even concedes in his Motion for Summary Judgment that the Seven Courses are "works for hire" made for NetCE.  As such, under black letter Copyright Law, NetCE becomes the "author" and has the entire right to the work and Dr. Jouria, the creator, has no ownership rights in the work whatsoever.  *Sterpetti v. E-Brands Acquisition, LLC*, No. 6:04-CV-1843-ORL-3DA, 2006 WL 1046949, at *4 (M.D. Fla. Apr. 20, 2006).  As the "author" of the copyrighted work, all attributes of copyright ownership vest in NetCE.  17 U.S.C. s. 201(b).[14]

Even if the Seven Courses did not constitute "works for hire," Paragraph 9 confers all copyright rights to NetCE—*even for courses submitted to NetCE but not approved for publication*.  The relevant passage states: "If and to the extent *any Article* is determined not to constitute 'works made for hire,' writer hereby irrevocably assigns and transfers to [NetCE]… all

---

[14] These rights include the (applicable) right to reproduce, prepare derivative works, distribute copies to the public by sale, distribute by rental or lease, and perform or display the work.  *Id.* at s. 106.

right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights)… [and] all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article." RMF at ¶ 103 (emphasis added). When referring to courses "approved for publication" earlier in Paragraph 9, the FWA uses the term "such Articles." When discussing circumstances where the courses may not be deemed "works made for hire," the provision of Paragraph 9 that assigns all copyright rights in the Seven Courses encompasses "any Article" submitted to NetCE pursuant the FWA. This broader language plainly covers all submissions to NetCE pursuant the FWA—not only those approved for publication. Further, Paragraph 5 states that an author such as Jouria is not permitted to resell "the Article" unless NetCE "explicitly rejects" it. *Id.*

Moreover, even to the extent this Court does not adopt the plain language interpretation of the FWA, at best Elite raises a question of fact precluding summary judgment. If this Court finds that none of the provisions described above apply to transfer the copyright rights of the Seven Courses to NetCE, at most this Court must hold the FWA ambiguous, which necessitates fact finding as to the contract's meaning. "Where the wording of an agreement is ambiguous, its interpretation involves [a] question of fact, precluding summary disposition." *Nature's Prod., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1314 (S.D. Fla. 2013); *Wolf v. Superior Court*, 114 Cal. App. 4th 1343 (2004).[15]

In summary, NetCE "approved" the Seven Courses "for publication" under the FWA when it accepted manuscripts for the Seven Courses from Dr. Jouria and paid him for those courses. As such, under the terms of the FWA, the Seven Courses were "works for hire" and all copyright rights for the Seven Courses vested in NetCE. *Even if NetCE had not approved the Seven Courses for publication* (it did), NetCE would still have all copyright rights to the Seven Courses under the catchall portion of Paragraph 9, which transfers copyright rights to NetCE for

---

[15] The same is true under California law, which governs the substance of the contract. *See, e.g.*, *Wolf v. Superior Court*, 114 Cal.App.4th 1343, 1351 (2004) ("[w]hen two equally plausible interpretations of the language of a contract may be made ... parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory.").

"any Article" submitted to it pursuant to the FWA.  And, even if none of the foregoing were true, at most Elite has demonstrate the FWAs are ambiguous, precluding summary judgment.

### D.    Lost Profits Calculation

Elite claims that NetCE's lost profits calculation is unsupported by evidence—a claim directly contradicted by the record.[16]  Despite the fact that Elite pretends to ignore the existence of NetCE's expert report, Elite's grievances, in fact, are with NetCE's model for calculating damages, and Elite claims it is entitled to summary judgment because it contests both the amount of NetCE's damages and the method by which such damages were derived.  (Motion at p. 16).  Each of these disputes is a factual issue.  NetCE's damages expert report (which Elite, again, ignores in its Motion) outlines in detail the evidence that NetCE suffered damages due to Elite's and Dr. Jouria's infringement of its copyrights and the methodology used to calculate lost profits.

As NetCE's expert has opined, the most appropriate and reliable methodology for estimating the sales of the Jouria Courses at issue is to analyze the sales of the Jouria Courses

---

[16]    The cases Elite cites are inapposite.

In *Pronman v. Styles*, 645 Fed. Appx. 870 (11th Cir. 2016), the copyright holder stated he did not know whether his photograph would sell and there was no evidence that the infringer's activities impaired the copyright holder's offerings.  Here, of course, NetCE has presented ample evidence of the individual courses' values and market potential (based on a model course), has evidence of a ready-made market for sales, and a demonstrated ability to market and make those sales.  NetCE has also presented evidence that but for Elite's activities it would have brought the courses to market.  NetCE has further presented evidence that because Elite usurped it of its first to market advantage, the value of the copyright it had diminished.

In *Fey v. Panacea Mgmt. Grp.*, 2017 WL 2180672, at *4–5 (N.D.Ga., 2017), the court granted a Daubert motion because it held an expert's methodology and her explanation for that methodology were insufficient.  Elite, of course, has only referenced NetCE's 30(b)(6) deposition in his Motion.  There is no discussion of the Jim Pampanella's expert report or the soundness of its methodology, and this Court has made no determination as to the reliability of Mr. Pampinella's expert report.  NetCE has offered to make Mr. Pampanella available for such examination.  NetCE suspects Elite has not attempted to schedule this deposition because it does not want to create a more unfavorable record for itself.  The Court granted summary judgment in *Fey* only because the nonmoving party had no other evidence of damages.  That is not the case here.

In *Atlanta Allergy and Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1379 (N. D. Ga. 2010), the rights holder proffered no evidence of actual damages or profits attributable to infringement.  NetCE has proffered evidence of both—in Ms. Campbell's testimony, documents produced to Elite demonstrating NetCE's revenues, course sales for model courses, documentation of the expenses NetCE invested in to unusable materials, and in the expert report of Jim Pampanella (and supporting documents), which Elite refuses to acknowledge.  In *Thornton v. J. Jargon Co.*, 580 F. Supp. 2d 1261 (M.D. Fla. 2008), the plaintiff introduced no evidence—"expert testimony or otherwise."

Finally, in *Latimer v. Roaring Toyz, Inc.*, 2010 WL 3747148, at *5–6 (M.D.Fla. 2010), the infringement at issue was of photographs in a media kit used to sell a product.  In other words, the infringement was tangential to the revenue, and the owner of the copyright of the photographs did not sufficiently explain how the use of his works contributed to the revenue of an entirely separate product.  Here, of course, the infringement *is the product*.  NetCE has proffered evidence that it was not able to sell courses, and Elite did sell those courses.  This causal link is anything but attenuated.

17

that were published by NetCE.  The topics of the Jouria Courses at issue were responsive to newly issued state CME requirements.  Accordingly, NetCE believed there would be enormous demand for these courses.  RMF at ¶ 120.  NetCE has lost permanently the opportunity to be the first-to-market in the topic areas covered by the five Jouria Courses at issue.  RMF at ¶ 50. NetCE's competitive advantage rests on its ability to be the first-to-market with relevant content. NetCE was planning to market the Jouria Courses at issue as premium, or "marquee," courses. *Id.*

NetCE's expert report explains that, in order to calculated the lost profits for the Five Course, NetCE's expert James Pamipinella used two of the Dr. Jouria courses NetCE was able to publish and sell as the basis for a "Benchmark Jouria Course."  RMF at ¶ 120.  The report also explains that the "Benchmark Jouria Course" was marketed to nurses, pharmacists, and physicians, much as the Seven Courses would have been.  *Id.*  The expert report explains that it calculated the revenue the "Benchmark Jouria Course" earned by multiplying the credit hour per catalog ratio by the revenue generated from each catalog, and the report and lays out its calculations for incremental profits and its reasoning for the calculation.  *Id.*  The only "assumptions" the expert report made (which the report also lays out in detail) are the kind of assumptions made with any statistical, economic, or scientific analysis—the bedrock of any predictive model.  *Id.*  If Elite disagrees with NetCE's expert's approach to calculating damages, it is only appropriate to hash out such disagreements of fact before a jury, at trial.

NetCE's testimony is replete with evidence supporting NetCE's claims for lost profits. NetCE testified:

- That "featured" courses reached more learners and have greater revenue;
- That courses authored by medical writers (like Dr. Jouria) are commissioned with the expectation that they will be featured;
- That the model course (Multiple Sclerosis) was a conservative example of sales for the purposes of damages calculation because it was a 10-hour course and was featured in fewer catalogs than one of the other courses by Dr. Jouria NetCE had actually been able to sell (COPD).  Two of the Five Courses were 10- or fewer hours and the remaining Three were 30-hour courses (pre-editing);
- That the model course (Multiple Sclerosis) was featured in three special offers;
- That one could make an educated prediction about how a course would sell;

18

- That NetCE commissioned the Seven Courses to address a market need and a gap in its own offerings to meet pharmacology requirements;

- That Elite's infringement prevented NetCE from being able to sell the Five Courses *and* was a direct cause of NetCE's being unable to offer the amount of pharmacology credit that would have been otherwise possible;

- That timing, marketing, geography quality, competition, accreditation status of the publisher, and author identity could influence a course's performance;

- That the lifespace of a course before it is updated and revised is three years;

- That, after major revisions, a course can be featured and sold for an indefinite period of time;

- NetCE has been unable to replace the Five Courses with standalone offerings.

RMF at ¶ 119.  Elite's statements that NetCE's damages calculation is too speculative are not supported by the record.

Moreover, Elite's Motion completely mischaracterizes the record.[17]  NetCE testified that it was in the process of curating the Five Courses at the time it discovered Elite's infringement[18] and that it had every intention of publishing the Five Courses at issue.  RMF at ¶ 121.  NetCE also testified that development work (including placement of the courses in catalogs) stopped on the Five Courses due *entirely* to NetCE's discovery of Elite's infringement and that the only reason GERD was not included in the special offer catalog was due again to Elite's infringement.  RMF at ¶ 122.  Intending to trap Ms. Campbell into its preferred soundbites, Elite also ignores NetCE's 30(b)(6) witness's multiple statements that she was not a damages expert or an accountant.  RMF at ¶ 45.  Indeed, Elite prefers to pretend there are no damage experts at all in this case—examining Ms. Campbell about the methodology of the expert calculation.

In cases of copyright infringement, it is not uncommon for the copyright owner to decline to bring his work to market when the infringer went to market first.  As NetCE explains in its expert report on damages report, its damages calculations are not speculative because it bases its calculation on its demonstrated sales history in the market with similarly situated courses.

---

[17] It is utterly preposterous for Elite to suggest that NetCE benefitted from Elite's infringement.

[18] Each of the Five Courses was at a different stage in the editing process.  RMF at ¶ 33.

Elite's dispute of NetCE's damages calculation or methodology is ultimately a dispute of material fact—and simply one more reason summary judgment is unwarranted.[19]  Under settled 11th Circuit precedent, summary judgment in favor of a defendant on the question of damages is not appropriate where a plaintiff submits expert affidavits that "present credible theories and measures of damages attributable to the [defendant]."  *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp*., 139 F.3d 1396, 1405 (11th Cir. 1998); *cf. Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, 2015 WL 427817, at *11 (S.D. Fla. Feb. 2, 2015) (in a copyright case, the "presence of competing expert opinions sometimes causes courts to deny summary judgment motions").

At best, Elite's Motion raises triable issues of fact regarding the amount of damages at issue due to its infringement and misappropriation of NetCE's trade secrets, precluding summary judgment.  *See Home Design Servs., Inc. v. Hibiscus Homes of Florida, Inc.*, 2005 WL 3445522, at *14 (M.D. Fla. Dec. 14, 2005) (proffer of evidence regarding damages prevented "summary judgment on the issue of the scope of damages").

## IV.    <u>CONCLUSION</u>

Elite has completely failed to meet its burden to show there are no genuine issues of material fact with respect to misappropriation of trade secrets, copyright infringement, and NetCE's claims for damages.  Elite's evidence that purports to undermine NetCE's misappropriations claim is directly contradicted by Ms. Meinyer's sworn statement, creating multiple issues of fact.  The plain language of the FWAs transferred all copyright rights in the Five Courses to NetCE.  At most, this Court can conclude the FWAs are ambiguous, which is an issue not suitable for summary judgment.  And finally, conflicting expert assessments of damages are nothing more that disputes of fact, suitable only for the trier of fact to assess.

This Court should deny Elite Motion for Summary Judgment on all claims.

Dated: December 29, 2017                           Respectfully submitted,

                                                   HOLLAND & KNIGHT LLP

                                                   */s/ Philip E. Rothschild*
                                                   Philip E. Rothschild

---

[19] NetCE, as this Court might expect, certainly disagrees with the methodology and conclusions of Elite's own damages expert.

Florida Bar No. 0088536
Email: phil.rothschild@hklaw.com
HOLLAND & KNIGHT LLP
515 East Las Olas Blvd., 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954)525-1000
Facsimile: (954)463-2030

*/s/ John P. Kern*
John P. Kern, Esq. (pro hac vice)
Email: john.kern@hklaw.com
Jessica E. Lanier, Esq. (pro hac vice)
Email: Jessica.Lanier@hklaw.com
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Telephone: (415)743-6918
Facsimile: (415)743-6910
Attorneys for CE RESOURCE, INC.
d/b/a CME RESOURCES and
NetCE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 29, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Philip E. Rothschild*
Philip E. Rothschild

21

**<u>SERVICE LIST</u>**

Richard S. Ross, Esq.
RICHARD S. ROSS, ESQ.
915 S.E. 2nd Court
Ft. Lauderdale, Florida 33301
(Attorney for Plaintiff Dr. Jassin Jouria)
**[VIA ELECTRONIC MAIL SERVICE]**

Peter A. Chiabotti, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**

J. Mark Wilson, Esq.
Kathryn G. Cole, Esq.
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**

#54813873_v4