UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 0:15-cv-61165-WPD

DR. JASSIN JOURIA

        Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA

        Plaintiff/Counter-Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Third Party Plaintiff,

v.

ELITE CONTINUING EDUCATION, INC. and ALPINE
MANAGEMENT SERVICES III, LLC,

        Third Party Defendants.

_____

**CE RESOURCE, INC. d/b/a CME RESOURCE and NetCE's STATEMENT OF FACTS
IN OPPOSITION TO ELITE CONTINUING EDUCATION, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant, Counter-Plaintiff, and Third Party Plaintiff CE Resource, Inc. d/b/a CME Resource and NetCE ("NetCE") submits its Response Statement of Facts ("RSF").  The evidence cited herein has been filed either as exhibits to NetCE's RSF or as separately filed Declarations.

### A. Responsive Paragraphs to Third Party Defendant Elite Continuing Education, Inc.'s ("Elite") "Statement of Material Facts"[1]

3.  NetCE considers Elite to be *one of* its chief competitors since 2014, in the area of CE for the nursing profession.  Declaration of Sarah Campbell ("Campbell Decl.") at  ¶ 22, 40.

7.  Dr. Jouria and NetCE entered into seven (7) Freelance Writer Agreements ("FWA") at issue in this case. Each FWA governs an individual course.  Under the terms of those FWAs NetCE owned all copyright rights to each course Dr. Jouria submitted to NetCE (including without limitation the rights to any derivative works) pursuant to the FWAs.  Only five of the FWAs—those governing courses called "Gastroesophageal Reflux Disease" ("GERD"), "Non-Antibiotic Antimicrobial Pharmacology: A Review" ("NAAP"), "Traumatic Brain Injury" ("TBI"), "Depression and Dementia in the Elderly" ("Depression") and "Cancer and Chemotherapy" ("Cancer") ("Five Courses") remain at issue against Elite. Dkt. 36-2 (Freelance Writer Agreements for Seven Courses), *e.g.*, at p. 7; Deposition of Dr. Jassin Jouria ("Jouria Dep."), attached as Exhibit E to Declaration of John Kern ("Kern Decl.") at 75:22–77:20, 101:20–106:15; Dkt. 121 at p. 2.

8.  Elite was aware, however, that FWAs between Dr. Jouria and NetCE existed.  In October of 2013, Elite asked Dr. Jouria if he "sign[ed] off exclusive rights?" and if it could examine the contracts.  Elite also asked Dr. Jouria about the degree of overlap.  Dr. Jouria replied: "I don't think I signed exclusive rights...Approximately 40 to 50% of the content is the same." Dr. Jouria later elaborated that he did not sign exclusive rights, but that he signed an NDA with NetCE.  Elite replied it could not "use courses ... sold to other competitors, specifically NetCE...."  Dr. Jouria replied that he had indeed "sold the material" to NetCE.  Elite replied: "Elite hired and paid you to develop courses with the understanding that we would own all rights to the courses.... [Y]ou used some of the materials in the courses developed for us in courses that you sold to other companies.... I asked you to send me the contracts with these other companies and you declined." Despite knowing that Dr. Jouria sold the rights to the courses to NetCE, Dr. Jouria's refusal to

---

[1] Pursuant to Local Rule 56.1(a), these numbers correspond with the order and paragraph numbering scheme used by Elite in its Statement.

provide the FWAs to them, and never seeing the FWAs, Elite purchased the courses from Dr. Jouria, published them, and sold them. Dkt. 188-5 at p. 7–9 (emails between Dr. Jouria and Elite).

9. NetCE's testimony speaks for itself. Dr. Jouria's testimony speaks for itself.

10. *See* Paragraph 8, above. The text of the exhibit otherwise speaks for itself.

12. The text of Paragraph 9 of the FWA speaks for itself.

13. Pursuant to the FWAs, Dr. Jouria submitted to NetCE following courses: "COPD," "Decubitus Ulcers," "Multiple Sclerosis[2]," "The Lympathic and Immune Systems: A Comprehensive Review," "Traumatic Brain Injury," "Non-antibiotic Antimicrobial Pharmacology: A Review," "Clinical Cardiovascular Pharmacology," "Gastroesophageal Reflux Disease," "Cancer and Chemotherapy," and "Depression and Dementia in the Elderly." NetCE accepted manuscripts from and remitted payment to Dr. Jouria for each course—all courses were "approved for publication," as the term is used in the FWA. NetCE completed editing "COPD," "Decubitus Ulcers," and "Multiple Sclerosis" and made these courses available to the public for sale. Following the discovery of the infringement, NetCE ceased developing the remaining seven courses ("Seven Courses"). Dkts. 36-2, 188-9 at p. 8–11; Ex. J to Campbell Decl. (NetCE's Responses to Elite's Second Set of Interrogatories) at p. 4–5; Ex. K to Campbell Decl. (NetCE's First Supplemental Responses to Dr. Jouria's First Set of Interrogatories) at p. 3–12; NetCEB0020682, NetCEB0022138, NetCEB0022150, NetCEB0023711, NetCEB0024158, NetCEB0024581, NetCEB0020621[3], attached as Ex. A-G to Campbell Decl.; Deposition of Sarah Campbell ("Campbell Dep."), attached as Ex. I to Campbell Decl., at 76:4–9, 78:3–79:11, 80:7–81:19, 129:8–21, 239:23–243:22; Jouria Dep. at 75:22–77:20, 101:20–106:15.

14. NetCE has federal registrations for copyright for each of the Seven Courses. NetCE owns all copyright rights for the courses (including without limitation the rights to any derivative works) Dr. Jouria submitted to NetCE under the explicit terms of at least Paragraph 5, 7, and 9 of the FWAs, the work for hire doctrine (as articulated in the FWAs and conceptually), the uncontested federal copyright registrations for the courses and United States Copyright law. Dkts. 36-1 (Federal Copyright Registrations for the Seven Courses), 36-2, *e.g.*, at p. 2–3.

---

[2] The final course titles as made available for sale to the public were: "COPD: An Overview of Pathophysiology and Treatment," "Multiple Sclerosis: A Comprehensive Review," "Pressure Ulcers: Pathogenesis and Management."

[3] These documents were produced to Dr. Jouria as Bates numbered NetCE0000360, NetCE0002710, NetCE0002722, NetCE0005109, NetCE0005556, NetCE0006402, NetCE0000299.

15. NetCE did not make available for sale the following courses submitted by Dr. Jouria pursuant to the FWAs: "The Lymphatic and Immune Systems: A Comprehensive Review," "Traumatic Brain Injury," "Non-antibiotic Antimicrobial Pharmacology: A Review," "Clinical Cardiovascular Pharmacology," "Gastroesophageal Reflux Disease," "Cancer and Chemotherapy," and "Depression and Dementia in the Elderly." Ex. K to Campbell Decl. (NetCE's First Supplemental Responses to Dr. Jouria's First Set of Interrogatories), at p. 3–10.

16. When NetCE discovered Dr. Jouria's and Elite's infringement, NetCE ceased editing, curating, fact-checking, and permission seeking (for reprint of discrete copyrighted elements Dr. Jouria included in his submissions) work for the Seven Courses. Campbell Dep. at 129:8–21, 201:22–202:3.

17. The text of Elite's Second Set of Requests for Production speaks for itself.

18. Elite mischaracterizes the content of NetCE's Response to Interrogatory No. 15, in that NetCE first approved Dr. Jouria's proposal, then accepted each manuscript, and then paid Dr. Jouria for each manuscript.

19. NetCE's response to Request for Production No. 32 is not verified and is therefore not useable as evidence. NetCE "approved for publication" all courses Dr. Jouria submitted to NetCE under the FWAs, including the Seven Courses. "Approved for publication" as the term is used in the FWAs (for the course development editorial process) is an internal NetCE term which represents the stage of development where the initial manuscript is submitted and NetCE (which has already approved the proposal for the course) verifies the initial draft manuscript contains required components, pays the author, and begins fact-checking, editing, and requesting permission to reprint copyrighted materials (tables, drawings, etc.). *See* Paragraph 13, above.

20. NetCE testified that proposals are not published. Campbell Dep. at 125:21.

21. Elite is confusing NetCE's editorial processes (which concern "approval for publication" as used in the FWAs) with a process used by faculty division planners as part of their review (a detailed scholarly analysis which occurs long after—sometimes months or years—the initial manuscript had been "approved for publication" per the FWAs). NetCE's testimony explains this distinction. Campbell Dep. at 80:7–82:20; 122:10–127:10.

22–24. The documents cited speak for themselves.

25. In communications with Elite in October of 2013, Dr. Jouria indicated that he submitted courses on the same or similar topics to NetCE and that there were significant

3

proportions of overlapping content.  *See* Paragraph 8.

  27 and 30.  The documents cited speak for themselves.

  31 and 32.  NetCE discovered Elite had published the Five Courses in February 2015. NetCE ceased editing, fact-checking, curating, and requesting permission to reprint copyrighted tables and images included in the manuscripts for the Five Courses after discovering Elite's infringement.  Campbell Dep. at 106:12–18, 129:8–21, 201:22–202:3; Exhibit K to Campbell Decl. (NetCE's First Supplemental Responses to Dr. Jouria's Interrogatories) at p. 13–15.

  33.  Editing changes course length.  Course placement in catalogs depends on length (in other words, the number of credit hours each course confers).  When NetCE discovered Elite's infringement, the Seven Courses were at different stages of development.  NetCE, in ceasing development of the courses due to the discovery of infringement, did not have an opportunity to schedule the Seven Courses for catalog placement: the lengths of the courses (apart from GERD) had not been finalized.  Campbell Dep. at 74:15–75:21, 129:8–21, 133:16–134:2, 135:13–136:18, 201:22–202:3.

  34.  *See* Paragraph 33.  NetCE discovered Elite's infringement of the Seven Courses before the next scheduled catalog planning meeting.  When NetCE removed GERD from the Ohio nurses' 2015 catalog, it planned to insert it in another, more suitable catalog.  Campbell Dep. at 74:15–75:21, 78:10–15, 81:20–23, 126:3–21, 133:16–134:2, 135:13–136:18, 201:22–202:3.

  36.  NetCE "approve[s] for publication" courses it intends to publish—based on a number of factors including the relevance and timeliness of subject matter, and the strength of the proposal and the initial draft manuscript.  When NetCE "approve[s] for publication" a manuscript and pays the author for his submission, NetCE fully intends to print the course in catalogs or stand alone, to use them in NetCE's marketing and outreach to existing and prospective clients, and ultimately to sell such courses over the internet.  NetCE commissions courses from practicing medical professionals (and "approves" such courses "for publication") intending to make such courses "featured."  For this reason, such authors (authors like Dr. Jouria) are paid more.  Campbell Dep. at 78:10–15, 81:20–23, 126:3–7, 165:7–13, 167:20–168:4.

  38.  NetCE's testimony speaks for itself.  *See* Paragraphs 33 and 34.

  39.  NetCE's testimony speaks for itself.

  40.  NetCE's 30(b)(6) witness testified multiple times that she was not the expert witness on damages and that she was not an accountant. Campbell Dep., 160:10, 24–25, 162:15–

19. Nevertheless, NetCE provided qualitative testimony regarding the damage caused by Elite's copyright infringement, including without limitation why "Multiple Sclerosis" was chosen as a benchmark course for calculating actual damages, the typical financial performance for such a course, special offer versus standalone course revenue, catalog performance, NetCE's revenue from 2013 to 2017, and course lifespan and relative performance. NetCE published its catalogs on schedule (i) because it was a business imperative to do so and (ii) in order to mitigate the damage from Elite's infringement. *Id.* at 134:3–170:16; Ex. K to Campbell Decl. (NetCE's First Supplemental Responses to Dr. Jouria's Interrogatories) at p. 20; Dkt. 188-9 at p. 6–8, 11–14.

41–44. NetCE's testimony speaks for itself. *See* Paragraph 40.

45. NetCE's 30(b)(6) witness—having acknowledged that she was not an accountant or the damages expert NetCE had hired an expert damages to examine and quantify the financial data, qualified that *she* would be "speculating" to answer the question regarding specific damages right then and there. *See* Paragraph 40; Campbell Dep. at 160:1–25, 162:11–23, 167:11–13.

46. NetCE testified that a number of factors influence a course's performance: the number of catalogs in which that course is placed, whether a course is featured (and that courses written by practicing medical professionals were commissioned in order to be featured), pricing, consumer interest, quality, marketing, competition, author, timing, format, availability, and brand recognition. Campbell. Dep. at 137:17–138:8, 138:22–140:19.

48–49. NetCE does not track sales by individual course in the ordinary course. The most appropriate and reliable method to estimate sales by individual course is to prorate total catalog sales by the ratio of the credits/units of the individual courses as a proportion of the total credits/units offered by the catalog. Ex. A to Kern Decl. (Expert Report of James Pampinella ("Pampinella Expert Report")) at p. 16.

50. The most appropriate and reliable methodology for estimating the sales of the courses at issue is to analyze the sales of the courses created by Dr. Jouria that NetCE was able to make available for sale to the public (in other words, the non-infringed courses). NetCE's competitive advantage rests on its ability to be the first-to market with relevant content, and it permanently lost the opportunity to be the first-to-market in Five Courses' topic areas. NetCE was planning to market the courses Dr. Jouria created as premium courses. *Id.* at p. 10, 13–16.

51. *See* Paragraphs 40, 50. NetCE's position is that its lost revenue is additive to its actual revenue. Campbell Dep. at 160:1–25, 162:11–23, 167:11–13.

52. The stipulation included an Elite course called "Women and Heart Disease."

54. NetCE's testimony speaks for itself.

55. NetCE's witness testified while she might expect other providers to offer "similar" topics, that "the credit types and the exact content I would expect to be different."

56. NetCE's testimony speaks for itself.

57. NetCE's 30(b)(6) witness testified multiple times she was not the expert witness on damages and that she was not an accountant.  Campbell Dep. at 160:1–162:23, 167:11–13.

58. Unlike Elite, NurseCE4Less took remedial steps (including removing infringing materials from the NurseCE4Less website) and never contested ownership of the courses NetCE accused it of infringing.  Campbell Dep. at 213:14–215:13.

60. NetCE's 30(b)(6) witness testified multiple times that she was not the expert witness on damages and that she was not an accountant.  Campbell Dep. at 160:1–162:23, 167:11–13.

61. NetCE could not access the entire course content during its initial assessment, but was able to view the learning objections of the Dismissed Courses (Elite's phrasing).  Based on NetCE's discoveries that the Five Courses were copied, NetCE concluded Elite also infringed the Dismissed Courses.  Campbell Dep. at 87:23–90:8, 95:6–96:22.

62. Ms. Campbell conducted a "side-by-side" comparison of several pages and sections of the courses that she was able to access as well as "spot checks."  Campbell Dep. at 95:6–96:22.

63. *See* Paragraph 61.

64. Elite is disingenuous in suggesting it is awaiting additional substantial similarity analysis.  Neither Dr. Jouria nor Elite contest substantial similarity for the Five Courses.  *See generally* Dr. Jouria's and Elite's Motions for Summary Judgment.  NetCE's 30(b)(6) witness testified that her side-by-side comparison and "spot check" unequivocally confirmed substantial similarity and, in fact, often word-for-word copying.  Campbell Dep. 88:3–89:3  The additional analysis about which Ms. Campbell testified concerns NetCE's preparation for trial.

65. Elite misunderstands copyright law.  NetCE owns all copyright rights to the Seven Courses.  That NetCE's copyrighted works contain passages, excerpts, or visuals originally created by another party in no way diminishes NetCE's ownership of the copyrights to the *entire works, individually, as a whole* of the Seven Course, including those portions created by another party.  Prior to making courses available to the public for sale, had Elite's infringement not stymied

6

#54813961_v4

NetCE's development of the Seven Courses approved for publication, NetCE would have sought and received from the author permission to re-print such portions. Campbell Dep. at 97:19–23, 106:12–107:15.

66. Ms. Campbell spent a full day comparing the infringing courses with the Seven Courses, including using an iThenticate scan to determine if any of the Seven Courses' content was copyrighted by a third party and internet searches designed to determine if passages from the Seven Courses were published elsewhere. Campbell Dep. at 106:12–107:15.

67. All of Elite's infringing courses contain identical *passages and language* to their NetCE counterparts; none of Elite's infringing courses are identical start to finish to their NetCE counterparts. Campbell Dep. at 112:17–113:15.

71. Elite's Interrogatory No. 3 and NetCE's Response Interrogatory No. 3 speak for themselves.

73–75. NetCE testified that it had no "hard" evidence, by which the deponent meant documentation. Campbell Dep. at 11:20–12:2, 30:10–34:4. Erin Meinyer's sworn account of meetings, conversations, and document exchanges (in person and via snail mail) is, of course, evidence that information under the NDA was disclosed impermissibly to Elite—by Alpine and/or McKissock. Declaration of Erin Meinyer ("Meinyer Decl."); Campbell Decl. at ¶ 32.

76. There is circumstantial evidence Elite received NetCE's trade secrets—from either Alpine or McKissock—as identified herein. Campbell Dep. at 11:20–12:2, 30:10–34:4; Meinyer Decl. at ¶¶ 9–31.

77. NetCE testified it had not received all documentation from Elite, that it was aware Elite was withholding materials, that Elite's 30(b)(6) deposition—which Elite later cancelled— might have useful information, and that third parties like McKissock might have useful information. Campbell Dep. at 11:20–12:2, 30:10–34:4.

78-79. NetCE contends that much of the information it shared with Alpine and McKissock were trade secrets, including internal financial snapshots; NetCE's processes for course development and maintenance; mission statement development and plans for revision and update; courses then in development; market strategies; accreditations, application schedule, and timeline for renewal; market need research; monthly sales; sales projections; and industry reports and research concerning competitor weakness. Meinyer Decl. at ¶¶ 13, 20, 22, 24.

80. After McKissock purchased Elite, Elite began increasing their nursing CE offerings

and focusing more on advanced nursing disciplines. Elite also received its ANCC accreditation. Meinyer Decl. at ¶ 25; Campbell Dep. at 29:24–30:9, 31:17–21, 32:24–33:2.

81. NetCE's and Dr. Jouria's testimonies speak for themselves.

82. Elite absolutely had multiple explicit indications that the copyright rights to several of the courses Dr. Jouria proposed were already sold to NetCE. Dkt. 188-5; Campbell. Dep. at 173:18–176:25; Jouria Dep. at 225:18–227:10, 231:11–232:24, 236:8–237:9, 290:24–291:8.

### B. Additional Uncontested Material Facts Related to the State of the Record

83. Due to both parties' busy schedules, Elite and NetCE agreed to hold Elite's 30(b)(6) deposition on November 17, 2017, two days outside the discovery cutoff of November 15, 2017. In turn, NetCE agreed to allow Elite to conduct Erin Meinyer's deposition outside the discovery cutoff. Elite produced new documents on November 14, 2017, therefore the parties agreed to reschedule Elite's deposition. The day before her deposition, Ms. Meinyer was hospitalized, and NetCE asked to reschedule her deposition. Elite refused and cancelled the deposition of its 30(b)(6) witness. The day before Ms. Meinyer's scheduled deposition, Ms. Meinyer submitted a declaration, executed shortly after her release from the hospital, in support of NetCE's Motion to Compel itemizing the trade secrets she shared with McKissock and Alpine and the timeline of events surrounding the exchange of such information. Kern Decl. at ¶¶ 8–21; Meinyer Decl. at ¶¶ 32–37; Dkt 164.

### B. Additional Uncontested Material Facts Related to Misappropriation of Trade Secrets

84. From 2012 to 2013, NetCE was involved with Alpine and McKissock regarding potential acquisition of NetCE. McKissock was then a CE provider for real estate and related professions. Meinyer Decl. at ¶ 10.

85. During this litigation, NetCE learned that Alpine divested its stake in McKissock, and that McKissock is now owned in whole or part by a company called "The Colibri Group," apparently a holding company for CE providers in a variety of fields, including real estate, engineering, nursing, mental health, massage therapy, and cosmetology. Meinyer Decl. at ¶ 11.

86. NetCE executed the NDA before turning over sensitive and proprietary documents to Dan Cremons or Mike Duran. NetCE does not share its trade secrets with parties unless protected by similar confidentiality agreements or other fiduciary duties of secrecy (specifically, accountants and attorneys). Meinyer Decl. at ¶ 12; Campbell Dep. at 27:10–29:8.

8

87. Ms. Meinyer provided and discussed confidential and proprietary information about NetCE to Cremons and Duran in phone calls, by email, by regular mail, and in-person meetings. Meinyer Decl. at ¶ 13; Campbell Dep. at 13:5–24:20.

88. In November 2012, Ms. Meinyer met with Mr. Duran and Richard Wileczek (both McKissock) in person (Mr. Cremons from Alpine was scheduled to attend, but could not at the last minute), and Ms. Meinyer shared significant, additional proprietary documents and information with them. In preparation for this meeting, Ms. Meinyer had mailed to them NetCE's profit and loss statements, which here highly confidential. Meinyer Decl. at ¶ 14.

89. At the November 2012 meeting, Ms. Meinyer provided and reviewed with Mr. Duran and Mr. Wileczek financial information, including return-on-investment documents and cost versus revenue by catalog spreadsheets. She also provided documentation of NetCE's historical course and catalog offerings and documentation of NetCE's processes for course development, implementation, and evaluation, marketing strategies (including but not limited to new verticals and social media), documentation of courses then in-development, and information related to NetCE's market strategies (including detailed discussion of Elite's deficienciese, which was then one of NetCE's small, Florida-based competitors. Meinyer Decl. at ¶¶ 14, 15.

90. Neither Alpine nor McKissock disclosed a relationship with Elite. Meinyer Decl. at ¶ 14.

91. At the November 2012 meeting, Ms. Meinyer relayed her opinion of Elite's deficiencies. She stated she believed Elite exhibited competitively crippling inefficiencies, particularly by seeking state-by-state accreditation rather than interstate accreditation. Ms. Meinyer relayed that she believed Elite, without accreditation from the American Nurses Credentialing Center ("ANCC") lacked credibility. Meinyer Decl. at ¶¶ 17, 18.

92. Over the course of emails, physical mailing, and in person exchanges, NetCE provided the following highly confidential and proprietary documents and information to Alpine and McKissock—none of which was publicly available: profit and loss statements; return-on-investment documents; cost versus revenue by catalog spreadsheets; NetCE's historical course and catalog offerings (including strategies for grouping certain states for single mailings and internal coding processes); a course index; NetCE's processes for course development and maintenance, including but not limited to internal documentation, forms, and flow charts; mission statement development and plans for revision and update; courses then in development; NetCE's market

strategies; NetCE's accreditations, application schedule, and timeline for renewal; market need research; monthly sales; sale projections; and industry reports and research concerning competitor weakness.  Meinyer Decl. at ¶ 19; Campbell Dep. at 27:10–29:8.

93. These documents and information were valuable because they provided: insights into the health of NetCE's business and areas of profitability; insights into NetCE's strategies for future growth (information critical to NetCE's competitive edge); and insights into NetCE's contemporary success.  Meinyer Decl. at ¶ 20.

94. Ultimately, Alpine did not make NetCE a formal offer or send a Letter of Intent (as they had promised to do).  No deal was reached.  Meinyer Decl. at ¶ 21.

95. In fall of 2013, McKissock reached out to NetCE, and the parties resumed conversations, including, at McKissock's invitation, an in-person meeting in Roseville, California, in October 2013.  Prior to this meeting, NetCE provided updated financials (for 2013, up to and including September 30).  Meinyer Decl. at ¶¶ 23, 24; Campbell Dep. at 14:4–7, 17:22–23:10.

96. After providing these materials, but before meeting, NetCE discovered Alpine/McKissock had purchased Elite—and that this purchase was complete at least before McKissock reached out to NetCE in 2013; before McKissock requested and received additional trade secrets information from NetCE; and during or very close to McKissock/Alpine's initial negotiations with NetCE.  Meinyer Decl. at ¶ 22 ; Campbell Dep. at 13:3–34:2.

97. Very shortly after the October 2013 meeting, Elite began addressing the same multiple deficiencies Ms. Meinyer itemized for McKissock, including applying for accreditation through the ANCC.  Meinyer Decl. at ¶ 25; Campbell Dep. at 29:24–30:9, 31:17–21, 32:24–33:2.

98. NetCE suspects that Elite used the Five Courses to apply for ANCC accreditation, but Elite has refused to produce all documents regarding its ANCC application.  Meinyer Decl. at ¶¶ 28–31; Campbell Dep. at 29:24–30:9.

99.  NetCE subpoenaed records from the ANCC via a Rule 45 subpoena and is currently negotiating with ANCC regarding the records, Kern Decl. at ¶ 9,  for which the Court granted an extension of the discovery period to encompass the return of documents. Dkt. 147.

100. NetCE's witness's testimony regarding the evidence of  Alpine's involvement in Elite's misappropriation of NetCE's trade secrets equated "evidence" or "hard evidence" with documents beyond emails and email attachments, and did not include witness accounts.  Campbell Dep. at 11:20–12:2, 30:10–34:4; Campbell Decl. at ¶ 32.

10

### C. Additional Uncontested Material Facts Related to NetCE's Ownership of the Copyrights to the Five Courses At Issue Against Elite

101. Dr. Jouria executed FWAs for ten courses (including the Seven Courses) with NetCE. Ex. J to Campbell Decl. (NetCE's Responses to Elite's Second Set of Interrogatories) at p. 4–5; Ex. K to Campbell Decl. (NetCE's First Supplemental Responses to Dr. Jouria's First Set of Interrogatories), at p. 3–12; Dkt. 36-2.

102. Those FWAs contain identical terms, except for the course name and deadlines. Dkt. 36-2.

103. Each FWA contains the following passages:

- Paragraph 5: "**Representations and Warranties of Writer:** …Writer will not submit the Article to any other party for publication unless and until [NetCE] expressly rejects the article…" (emphasis in original).

- Paragraph 7: "**Compensation**: …Writer acknowledges and agrees that [NetCE] will only pay writer for Articles that are approved for publication by [NetCE], and that [NetCE] has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer…." (emphasis in original).

- Paragraph 9: "**Ownership and Assignment of Intellectual Property**: Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be 'works made for hire' under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. … Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with [NetCE] in editing, fact checking, and otherwise reviewing the Articles prior to publication…."

Dkt. 36-2, *e.g.*, at p. 2–4 (emphasis in original).

104. Because Dr. Jouria executed the FWA and submitted a manuscript draft to NetCE, and NetCE remitted payment to Dr. Jouria, NetCE "approved for publication" as that term is used in the FWA each of the Seven Courses. Dkt. 36-2; Campbell Dep. at 75:22–76:19, 77:9–82:20,

11

118:15–126:28, 239:23–243:25.

105. After approval of each course proposal, NetCE sent FWAs to Dr. Jouria. After executing each FWA, Dr. Jouria submitted manuscripts for the Five Courses, NetCE checked that the manuscript contained all requisite components, and NetCE paid Dr. Jouria (directly or to his company MedCreds Writing Solutions, LLC) by check or by wire transfer the applicable agreed upon amount. Dkt. 188-9 at p. 8–11; Ex. J to Campbell Decl. (NetCE's Responses to Elite's Second Set of Interrogatories) at p. 4–5; Ex. K to Campbell Decl. (NetCE's First Supplemental Responses to Dr. Jouria's First Set of Interrogatories), at p. 3–12; Ex. A-G to Campbell Decl. (NetCEB0020682, NetCEB0022138, NetCEB0022150, NetCEB0023711, NetCEB0024158, NetCEB0024581, NetCEB0020621); Campbell Dep. at 78:3-79:11; Jouria Dep. at 75:22–77:20, 101:20–106:15.

106. Below is a table of the Five Courses' FWA date of execution and the amount NetCE paid Dr. Jouria for each course:

| Course Name (in FWA) | Date FWA Signed | Date of Payment | Amount of Payment |
|---|---|---|---|
| Traumatic Brain Injury | August 24, 2012 | December 6, 2012 | $3,975 ($25 deducted because wire transfer) |
| Cancer and Chemotherapy | January 15, 2013 | March 21, 2013 | $12,000 |
| Gastroesophageal Reflux Disease | January 15, 2013 | May 16, 2013 | $4,000 |
| Depression and Dementia in the Elderly | April 5, 2013 | April 18, 2013 | $12,000 |
| Non-Antibiotic Antimicrobial Pharmacology | October 12, 2012 | January 1, 2013 | $11,975 ($25 deducted because wire transfer) |
| Clinical Cardiovascular Pharmacology | October 12, 2012 | December 6, 2012 | $10,000 |
| Lymphatic and Immune System | May 10, 2012 | September 6, 2012 | $12,000 |

Dkts. 36-2; 188-9 at p. 13–14; Ex. A-G to Campbell Decl. (NetCEB0020682, NetCEB0022138, NetCEB0022150, NetCEB0023711, NetCEB0024158, NetCEB0024581, NetCEB0020621).

107. NetCE does not pay authors for courses it has not "approved for publication." Campbell Decl. at ¶ 12; Campbell Dep. 79:1–4, 81:15–19.

108. Dr. Jouria accepted each of these five payments, and did not return these amounts to NetCE. Jouria Dep. at 75:22–77:20, 101:20–106:15.

109. Dr. Jouria reached out to NetCE after submitting manuscripts and receiving payment for courses under the FWAs, asking if NetCE was still working on the courses. NetCE assured Dr. Jouria that it was still editing the courses and planning to publish and make them for

12

sale to the public. Ex. H to Campbell Decl. (Ex. 40 to Jouria Dep.).

110. In communication with Dr. Jouria, Elite noted that NetCE owned the intellectual property rights to the Five Courses ("I now understand that you used some of the materials in the courses developed for us in courses that you sold to other companies.") Dkt. 188-5 at p. 8. Elite also noted that Dr. Jouria had "declined" to produce the FWAs to it. *Id.* Elite also asked Dr. Jouria to identify any courses also sold to NetCE. Dr. Jouria listed for Elite multiple other CE providers to which he had sold courses, but Elite only asked Dr. Jouria to itemize the courses he had already sold to NetCE. Dkt. 188-5 at 8-11.

111. In early 2015, NetCE contacted another CE Provider, NurseCE4Less, because NurseCE4Less had also infringed NetCE's copyrights by publishing courses Dr. Jouria authored that NetCE had purchased. NurseCE4Less contacted Dr. Jouria regarding the infringing courses, and Dr. Jouria indicated to NurseCE4Less that he was not sure the courses were, in fact, "rejected." Ex. F to Kern Decl. (Ex. 47 to Jouria Dep.) at p. 1–2, 4; Campbell Dep. 110:8–112:12, 213:14–215:23.

112. Unlike Elite, NurseCE4Less took down the infringing content almost immediately. Campbell Decl. at ¶ 20 FN 1; Campbell Dep. at 215:18–23.

113. NetCE received federal copyright registration for all Five Courses. Dkt. 36-1.

114. NetCE's response to Interrogatory No. 15 states NetCE approved subject matter proposals for the Five Courses, accepted manuscripts from and remitted payment to Dr. Jouria and that Dr. Jouria accepted each payment. Ex. J to Campbell Decl. (NetCE's Responses to Elite's Second Set of Interrogatories) at p. 4–5.[4]

115. NetCE's first supplemental response to Dr. Jouria's Fourth Interrogatory states that the Seven Courses were NetCE's under the work for hire doctrine because Dr. Jouria submitted manuscripts to NetCE pursuant to the executed FWAs, and NetCE paid Dr. Jouria. Ex. K to Campbell Decl. (NetCE's First Supplemental Responses to Dr. Jouria's Interrogatories) at p. 10–12.

116. NetCE's response to Elite's Interrogatory No. 6 and NetCE's First Supplemental Response to Dr. Jouria's Interrogatory No. 2 state Dr. Jouria executed each FWA, then submitted a course draft pursuant to each FWA, then received individual payments from NetCE, after he

---

[4] Mr. Wilson mistakenly attached NetCE's responses to Elite's first set of Interrogatories as Exhibit 9 to his declaration. This includes only NetCE's responses to Elite's Interrogatories Nos. 1-10.

submitted each individual manuscript.  Dkt. 188-9 at p. 10; Ex. K to Campbell Decl. at 3–10.

117.   An author asks NetCE if NetCE is interested in a course on a topic.  If NetCE is interested and requests a full proposal, the author submits the proposal, including an abstract and outline.  If the Development Committee then determines the course topic would meet consumer need, the Committee approves the proposal.  Then NetCE sends a FWA to the author for his execution.  After NetCE and the author execute the FWA, the author submits a full manuscript.  Once NetCE receives the manuscript, it ascertains whether the manuscript contains all required components and, if so, NetCE remits payment to the author and considers the course "approved for publication" under the FWA.  Then, NetCE begins curating and editing the course, and securing permissions for reprinted materials contained within it.  After this lengthy process, NetCE sends a curated manuscript to the author for his final signoff.  Then, NetCE makes the course available for sale to the public. Campbell Decl. at ¶ 5; Campbell. Dep. 79:1–4, 125:12–128:23, 186:1–12.

118.   The course development process concerns editorial decisions, including whether a course is "approved for publication" and the ensuing curation.  The course *marketing (or division planning) process* entails evaluating a course already approved for publication, and determining whether to tailor the course for different markets of consumers (for example, a course originally written for nurses might be adapted for physicians).  *Division planner review of a course* has nothing to do with a course's being "approved for publication."  Campbell Decl. at ¶ 7;  Campbell. Dep. 79:1–4, 80:10–81:11, 123:17–124:17, 125:12–128:23, 186:1–12, 242:1–23.

D. **Additional Uncontested Material Facts Related to NetCE's Lost Profits Calculation**

119.   NetCE testified: (i) "featured" courses have greater revenue; (ii) courses authored by medical practitioners (like Dr. Jouria) are commissioned with the expectation they will be featured; (iii) the model course (Multiple Sclerosis) was a conservative example of sales for the purposes of damages because it was a 10-hour course and was featured in fewer catalogs than one of the other courses by Dr. Jouria NetCE had actually been able to sell; (iv) two of the Five Courses were 10- or fewer hours and the remaining three were 30-hour courses (pre-editing); (v) the model course was featured in three special offers; (vi) one could make an educated prediction about how a course would sell; (vii) NetCE commissioned the Five Courses to address a market need and to meet pharmacology requirements; (viii) Elite's infringement prevented NetCE from being able to sell the Five Courses *and* directly caused NetCE's inability to offer the amount of pharmacology

14

credit otherwise possible; (ix) timing, marketing, geography quality, competition, publisher accreditation, and author identity could influence course performance; (x) the lifespan of a course before it is updated is three years; (xi) a course can be updated, featured, and sold for an indefinite period of time; and (xii) NetCE has been unable to replace the Five Courses with standalone offerings.  Campbell Dep. at 133:23–147:3.

120. NetCE's expert report explains that, in order to calculate the lost profits for the Five Courses, NetCE's expert used two of the Dr. Jouria courses NetCE was able to publish and sell as the basis for a "Benchmark Jouria Course."  The report also explains the "Benchmark Jouria Course" was marketed to nurses, pharmacists, and physicians, as the Five Courses would have been.  The report explains it calculated the revenue the "Benchmark Jouria Course" earned by multiplying the credit hour per catalog ratio by the revenue generated from each catalog, and lays out its reasoning and calculations for incremental profits.  The only "assumptions" the expert report made (which the report also lays out in detail) are the kind of assumptions made with any statistical, economic, or scientific analysis.  *See* Ex. A to Kern Decl. (Pampinella Expert Report ) p. 13–22.

121. Before discovering the infringement, NetCE intended to publish the Five Courses. Campbell Dep. 126:3–7.

122. NetCE also testified that development work (including placement of the courses in catalogs) stopped on the Five Courses due *entirely* to NetCE's discovery of Elite's infringement and that the only reason GERD was not included in the special offer catalog was due again to Elite's infringement.  Campbell Dep. at 128:24–134:2.

123. Ms. Campbell testified that GERD was cut from the Ohio nurses catalog due to length, but also testified that there were other catalogs for which the course would have been suitable. Campbell Dep. at 74:15–75:21, 78:10–15, 81:20–23, 126:3–21, 133:16–134:2, 135:13–136:18. Unfortunately, Elite's infringement was a direct catalyst of NetCE's withdrawal of the Five Courses from consideration and deprived NetCE of the opportunity.  *Id.* at 201:22–202:3.

Dated:  December 29, 2017

Respectfully submitted,

HOLLAND & KNIGHT LLP

*/s/ Philip E. Rothschild*
Philip E. Rothschild
Florida Bar No. 0088536
Email: phil.rothschild@hklaw.com

15

        HOLLAND & KNIGHT LLP
515 East Las Olas Blvd., 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954)525-1000
Facsimile: (954)463-2030

*/s/ John P. Kern*
John P. Kern, Esq. (pro hac vice)
Email: john.kern@hklaw.com
Jessica E. Lanier, Esq. (pro hac vice)
Email: Jessica.Lanier@hklaw.com
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Telephone: (415)743-6918
Facsimile: (415)743-6910
Attorneys for CE RESOURCE, INC.
d/b/a CME RESOURCES and
NetCE

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on December 29, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

        */s/ Philip E. Rothschild*
        Philip E. Rothschild

16

#54813961_v4

## SERVICE LIST

Richard S. Ross, Esq.
RICHARD S. ROSS, ESQ.
915 S.E. 2nd Court
Ft. Lauderdale, Florida 33301
(Attorney for Plaintiff Dr. Jassin Jouria)
**[VIA ELECTRONIC MAIL SERVICE]**

Peter A. Chiabotti, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**

J. Mark Wilson, Esq.
Kathryn G. Cole, Esq.
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**