UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 0:15-cv-61165-WPD

DR. JASSIN JOURIA

        Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,

        Plaintiff/Counter-Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Third Party Plaintiff,

v.

ELITE CONTINUING EDUCATION, INC. and ALPINE
MANAGEMENT SERVICES III, LLC,

        Third Party Defendants.

_____/

**DECLARATION OF ERIN MEINYER IN SUPPORT OF
CE RESOURCE, INC. D/B/A CME RESOURCE AND NETCE'S OPPOSITION TO
<u>ELITE CONTINUING EDUCATION, INC.'S AND JASSIN JOURIA'S MOTIONS FOR
SUMMARY JUDGMENT</u>**

1

1. My name is Erin Meinyer, and I am the Executive Director of CE Resource, Inc. d/b/a CME Resource and NetCE ("NetCE").

## Company Background

2. I founded NetCE in 1991. My husband, Dennis, and I were the only investors. When I first started the company, we only offered courses for California-licensed nurses, residing in and out of state. We initially employed one person. Our goal was to provide mandated continuing education and to present it direct to participants, by mail, printed in its entirety (including tests), to nurses as an alternative to time-consuming and expensive continuing education courses that were, at the time, exclusively offered in person. NetCE was the first company to provide an evaluation tool as an alternative to an open-book exam. Twenty-six years later, NetCE has grown into a company with thirty-nine (39) full-time employees and which solicits course offerings from nearly ninety (90) independent contracting authors in a number of professions, including nurses, physicians, dental professionals, social workers, counselors, and psychologists. Dennis and I were the only shareholders—now our sons also own a small percentage of shares. Academic integrity and independence are—and always have been—very important to our business philosophy: NetCE does not accept commercial support from pharmaceutical companies or device manufacturers.

3. I am proud of founding and nurturing a small, family-owned-and-operated business in Roseville, California, into livelihood and sustenance for over forty (40) families, including my own. Many of NetCE's leaders and managers started in entry-level positions at the company and worked their way up. Sarah Campbell is one such employee. NetCE was her first job, and she still works here as our Director of Development.

## Accreditation in the Continuing Education Industry

4. Accreditation is critically important for continuing education ("CE") providers. Practicing professionals in fields requiring licensure must complete a certain number of CE credits in designated time periods. The amount of credits and the time period in which a practitioner must complete those credits varies by profession and by licensing body. For many professions, nursing, pharmacy, and medicine included, a certain number of those credits must come from an accredited CE provider. Without national accreditation, then, a CE provider is limited in its ability to permeate the market for CE courses.

5. NetCE has been granted accreditation or approval by the American Nurses

Credentialing Center ("ANCC") Commission on Accreditation, the Association of Social Work Boards, the National Board for Certified Counselors, the American Psychological Association, the International Association for Continuing Education and Training, and the Accreditation Council for Continuing Medical Education ("ACCME"), as well as accreditations/approvals for surgical technologists, dental professionals, other mental health boards, and state boards in a variety of medical- and mental health-related professions.  In 2012, NetCE received accreditation with commendation through 2017, from ACCME.  This is the highest possible award status, placing NetCE in the same category with the nation's top medical schools and medical societies.  In 2017, NetCE achieved Joint Accreditation by the ANCC, the ACCME, and the Accreditation Council for Pharmacy Education (ACPE).

6. Many accrediting bodies exist, including state-specific bodies and bodies for other professions.  Each accrediting body has different requirements for submission.  An accreditation from the ANCC Commission on Accreditation is a critical and important credential for the CE community.  For certain nursing specialties, a fixed percentage of their CE credits must come from ANCC-accredited providers.  Moreover, as with other cross-state accreditation bodies, an accreditation from ANCC allows a CE provider to bypass applying for accreditation or approval from many individual state licensing or accrediting bodies.

7. When a CE provider applies for accreditation, it must submit extensive documentation of its research, curation, and development process of its course offerings, as well as a list of its past and current course offerings, process for determining and issuing credit, and process for collection of fees from customers and professionals.  Accreditation bodies confer extensively with applicants in order to ensure the veracity of the materials and the consistency of the CE provider's internal processes and procedures.  The accreditation process can be incredibly onerous, time-consuming, and expensive.

8. It took NetCE two years to acquire its first accreditation from the ANCC.  The time-intensive process of receiving nursing and other healthcare and medical accreditation causes many CE providers to focus on non-intensive industries, such as cosmetology.  Since its founding, NetCE has invested hundreds of thousands of dollars in acquiring and maintaining accreditations.

### NetCE's 2012-2013 Acquisition Discussions with Alpine and McKissock

9. During the 2012-13 timeframe, NetCE was involved with an investment firm (and, as it turns out, one of its affiliate or "portfolio" investment companies) regarding their potential acquisition of our business.

10. San Francisco-based Alpine Management Service III, LLC ("Alpine") was the investment firm. McKissock, LLC ("McKissock"), a CE provider for real estate and related professions, was its affiliate in these acquisition discussions.

11. For information and background, during the course of this litigation we have learned that Alpine divested its stake in McKissock, and that McKissock is now owned in whole or part by a company called "The Colibri Group," which based on public information is a holding company for continuing education providers in a variety of fields, including real estate, property appraisal, engineering, nursing, mental health, massage therapy, and cosmetology. We do not yet know when "The Colibri Group" acquired McKissock.

12. In 2012, Dan Cremons (Alpine) and Mike Duran (McKissock) approached NetCE with the intention of purchasing NetCE. I was aware that Mr. Duran was affiliated with McKissock, but was under the impression that Alpine owned McKissock. In the course of evaluating the viability of this proposed transaction, and before NetCE turned over sensitive and proprietary documents and information, NetCE, Dan Cremons, and Mike Duran (on behalf, we believed, of Alpine or McKissock) entered into a Non-Disclosure Agreement.

13. Following the execution of the NDA, and in furtherance of discussions to sell NetCE, I provided confidential and proprietary information about NetCE to Dan Cremons and Mike Duran by phone, email, physical mail, and during in-person meetings. We also engaged in multiple phone conversations concerning the confidential and proprietary information and NetCE's plans and future prospects.

14. In November 2012, I met with Mr. Duran and Richard Wileczek (both of McKissock) in person (Mr. Cremons from Alpine was scheduled to attend, but could not at the last minute), and I shared significant, additional proprietary documents and information with them. Prior to this meeting, I mailed NetCE's profit and loss statements to them. At the meeting, I provided and reviewed with them financial information, including return-on-investment documents and cost versus revenue by catalog spreadsheets. I also provided to them documentation of NetCE's historical course and catalog offerings, a course index, catalog

history, and documentation of NetCE's processes for course development, implementation, and evaluation, marketing strategies (including but not limited to new verticals and social media), documentation of courses then in-development, and information related to NetCE's market strategies.  I also had a detailed discussion with them about the limitations and deficiencies of one of NetCE's small, Florida-based competitors at that time—Elite Continuing Education .  At that time, neither Alpine nor McKissock had disclosed any relationship with Elite.

15. I had no hesitation sharing the large volume of proprietary information with the McKissock reps, because Mike Duran had personally executed the NDA on the company's behalf, and because the information I was disclosing needed to be exchanged for there to be any hope of getting the deal done.

16. At these meetings we discussed McKissock's failures with regard to social work and counselor/therapist continuing education. McKissock's decision to abandon social work CE may have been the result of McKissock's impending acquisition of Elite.

17. Further, I discussed my opinion of Elite's deficiencies in detail.  I stated that I believed Elite exhibited competitively crippling inefficiencies: Elite was forced to seek state-by-state accreditation rather than interstate accreditation (for example, from ANCC), and I opined that the reason for this was that Elite copied key elements of NetCE's model without investing the resources to revamp its internal processes and apply for and maintain ANCC accreditation.

18. I stressed the fact that NetCE did not just produce reformatted content from public health organizations (for example, the Centers for Disease Control and Prevention or the National Institutes of Health), and that we aimed to supply professionals with educational materials to supplement the education they obtained in pursuit of their degree.  I explained, in painstaking detail, why NetCE works with professional caregivers rather than professional writers: we want their clinical expertise, even if they lacked literary finesse, and we are committed to helping professionals advance in their educational and professional goals (through publication, when appropriate).  I provided examples of planner input from all professions.  (I suspect this comment may have led to their later temporary promotion of Dr. Jouria to Lead Planner on the Elite website.)  I relayed that I believed Elite, without ANCC accreditation, lacked real credibility, that Elite had copied our Mission Statement, and that Elite had copied elements of our catalog trade dress.  I also discussed the fact that we had authorized the sending of a cease and desist letter to Elite as a result of this copying.  Finally, I stated that Elite's copying of

NetCE's model (including trade dress and the Mission Statement) had resulted in consumers calling NetCE and expressing confusion.

19.   Over the course of emails, physical mailing, and in-person exchanges, NetCE provided the following documents and information to Alpine and McKissock:

- Profit and loss statements
- Documentation of NetCE's return-on-investment
- Cost versus revenue by catalog spreadsheets
- NetCE's historical course and catalog offerings (including strategies for grouping certain states for single mailings and internal coding processes)
- A course index
- NetCE's processes for course development and maintenance, including but not limited to internal documentation, forms, and flow charts
- Mission statement development and plans for revision and update
- Courses then in development
- NetCE's market strategies
- NetCE's accreditations, application schedule, and timeline for renewal
- Research regarding market need
- Monthly sales
- Sales projections
- Industry reports and research concerning competitor weakness

20.   These documents and information were not publicly available and were valuable because they provided insights into the health of NetCE's business and areas of profitability; insights into NetCE's strategies for future growth (information critical to NetCE's competitive edge); and insights into NetCE's contemporary success (also critical to NetCE's competitive edge).

21.   Ultimately, Alpine did not make NetCE a formal offer or send a Letter of Intent (as they had promised to do). No deal was reached.

### Alpine/McKissock's Secret, Undisclosed Deal with Elite

22.   Shortly thereafter, unbeknownst to me at the time, McKissock (under Alpine's direction and with Alpine's financing) acquired a controlling ownership interest in Elite. That acquisition had been underway—or even had concluded—at the time they were meeting with

6

NetCE.  ***In other words, in 2012 and 2013, while Alpine/McKissock were collecting confidential, strategic information from NetCE, they were in the process of—or already had completed—the secret purchase of Elite, NetCE's competitor.***

**Alpine/McKissock Resume Conversations with NetCE—Without Disclosing Elite Deal**

23. In the fall of 2013, at McKissock's initiation, we resumed conversations with McKissock/Alpine and scheduled an in-person meeting in Roseville, California, in October 2013.  Like the conversations and information exchanged the prior year, these conversations were governed by and protected by the NDA Alpine and McKissock had executed with NetCE.

24. In preparation for this meeting, we provided updated financials (for 2013, up to and including September 30).  After we provided these materials and before the meeting took place, we discovered that Alpine/McKissock had purchased Elite—and that this purchase had taken place *at least* before McKissock reached out to us in 2013 to resume conversations and before McKissock requested and received additional proprietary and confidential information from us.

25. After being purchased by McKissock, Elite began increasing their nursing CE offerings and focus in more advanced nursing disciplines. Elite has since supplanted NetCE as the Number One provider of CE to nurses in Florida, one of the largest markets for nursing CE in the nation.

26. Prior to the McKissock acquisition, Elite had copied and mimicked our model and trade dress.  In 2008, Elite began featuring language from NetCE's mission statement on its catalogs and on its website.  In 2012, Elite redesigned its catalog to mimic the look and feel of NetCE's course catalogs.  Sometime after the McKissock acquisition of Elite—even though it takes years for CE providers to receive accreditations—Elite began featuring ANCC accreditation language on its course catalogs.  Elite also added a company disclosure statement that used language NetCE developed, included a block of individual state approvals, and revised their evaluation tool to mimic NetCE's products.

27. These alterations resulted in customer confusion.  For example, on several occasions, Elite customers attempted to apply for credit for Elite courses to NetCE.  Several customers called NetCE with questions about an Elite-issued catalog.  In addition, customers have contacted NetCE indicating they had returned NetCE materials to Elite, under the mistaken impression the two were the same company.

28. Elite's representations about materials it submitted to the ANCC in particular as part of its accreditation process (namely that Elite did not submit any of the courses at issue in this lawsuit to ANCC) is not consistent with NetCE's knowledge of the accreditation process. ANCC requires applicant CE providers to submit a list of *all* courses. ANCC then chooses which courses to review in depth as exemplars.

29. Based on an email contained in Elite's production, Elite submitted at least one application to ANCC in early January 2016, after the infringing courses were in Elite's possession and after NetCE discovered the infringement and contacted Elite about the same. We have reason to believe this 2016 application to ANCC may not have been Elite's first. According to the ANCC: "Provided the applicant meets the ANCC Accreditation Program criteria set forth herein, accreditation is awarded for a period of up to two years to new applicants and up to four years to currently accredited organizations reapplying to maintain their accreditation stats." The 2016 application, by virtue of the acknowledgment email Elite produced, is a four-year accreditation, indicating this may not have been Elite's first application to ANCC.

30. I cannot overstate the value of accreditation to CE providers. Without it, CE providers' value to clients drops precipitously, as described above. CE providers rely on internal course development and documentation processes, course offerings, and faculty expertise to receive that accreditation. Even if Elite, as it would be required by the ANCC (and other accreditors), only submitted Dr. Jouria's name and the titles of the infringing courses at issue in this lawsuit to the ANCC, or the Elite catalogs ANCC reviewed contained course listings including the infringing courses, Elite's ANCC accreditation could be based in some part upon Elite's improper acquisition and publishing of the infringing courses. It is also unclear if Elite used any of NetCE's internal course development procedures, processes, or forms to obtain accreditation. And Elite's expansion into the lucrative CE field of advance practice nursing, not to mention future Joint Accreditation, if Elite obtains it, would have been predicated upon infringement and improper use of NetCE's intellectual property and proprietary information.

31. Understanding whether Elite used NetCE materials for its accreditation applications is key to understanding the breadth of harm NetCE suffered due to Elite's bad actions.

**Scheduled December 5, 2017 Deposition in San Francisco**

8

32. As part of this case, Elite was scheduled to take my deposition in San Francisco, on December 5, 2017.

33. Two days prior, on December 3, 2017, I flew back to Sacramento from Ketchikan, Alaska (where I had been visiting my family). During the return flight, I became very ill. When we landed in Sacramento, I collapsed at the baggage claim and vomited. My husband Dennis had to help me to our car and immediately drove me home.

34. At home, my condition deteriorated to a point where I could not even stand to get to the car to go to the hospital. Dennis called 911, and an ambulance arrived and transported me to a nearby Kaiser Permanente Hospital in Roseville, California.

35. While at first the medical staff suspected I was suffering from food poisoning, they later diagnosed me as suffering from a severe and unspecified virus. I spent most of the night in the emergency room receiving (via IV) fluids, anti-virals, and an anti-nausea medication. Very early Monday morning (after 2 am) I was feeling stable enough for the 20-minute drive home. Upon discharge, my doctor advised to stay in bed for several days at minimum.

36. As a result of my illness, I was not able to appear for deposition on December 5th, or anytime that week. Through my counsel, we offered to fly to Charlotte, North Carolina (where we understand that both Elite's operations and its attorneys now are located), the following week, so that it would be convenient for Elite to take my deposition, either one day before or after the scheduled Elite corporate representative deposition.

37. Unfortunately, Elite refused to reset my deposition, and they also refused to produce a witness of their own, thus denying us an opportunity to collect evidence about what specific information McKissock provided to Elite, what information and courses Elite provided to accreditation organizations, and how it went from a cosmetology CE provider to a leading nursing CE provider practically overnight.

I declare under penalty of perjury and the laws of the United States and of Florida that the foregoing is true and correct.

Dated December 28, 2017        By:        _Erin Meinyer_
                                                  Erin Meinyer

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 29, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Philip E. Rothschild*
Philip E. Rothschild

## SERVICE LIST

Richard S. Ross, Esq.
RICHARD S. ROSS, ESQ.
915 S.E. 2nd Court
Ft. Lauderdale, Florida 33301
(Attorney for Plaintiff Dr. Jassin Jouria)
**[VIA ELECTRONIC MAIL SERVICE]**

Peter A. Chiabotti, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**

J. Mark Wilson, Esq.
Kathryn G. Cole, Esq.
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**