# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA
# CASE NO. 0:15-61165-WPD

| | |
|---|---|
| DR. JASSIN JOURIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME RESOURCE and NetCE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME RESOURCE and NetCE, | ) |
| | ) |
| Defendant/Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DR. JASSIN JOURIA, | ) |
| | ) |
| Plaintiff/Counter-Defendant. | ) |
| | ) |
| CE RESOURCE, INC. d/b/a CME RESOURCE and NetCE, | ) |
| | ) |
| Defendant/Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Elite Continuing Education, Inc. and Alpine Management Services III, LLC, | ) |
| | ) |
| Third-Party Defendants. | ) |

**ELITE'S *DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY
AND INCORPORATED MEMORADUM OF LAW**

43767012;1

**MOTION TO EXCLUDE**

Pursuant to Federal Rules of Evidence 403, 702 and 703, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), Elite Professional Education, LLC ("Elite") respectfully moves to exclude the expert testimony of CE Resource, Inc. d/b/a CME Resource and NetCE's ("NetCE") proposed damages expert, James E. Pampinella, for the reasons set forth in the following memorandum.

**MEMORANDUM OF LAW**

**INTRODUCTION**

The proposed expert testimony of Mr. James E. Pampinella ("Pampinella") is unreliable and unhelpful under *Daubert* and Federal Rule of Evidence 702. Mr. Pampinella's methodology is not reliable, his opinion consist of unadorned acceptance of NetCE's position without any independent expert analysis that might assist the trier of fact, and his opinion is too speculative to establish NetCE's damages with reasonable certainty. This Court would not be the first to exclude Mr. Pampinella for the same reasons argued by Elite.

In essence, Mr. Pampinella took an unreliable sample size, consisting of two courses among over a thousand sold by NetCE, and opined that each of the five courses remaining in this case would have performed exactly the same as the two cherry-picked for him by NetCE, without considering any factors other than that the courses share the same author. In so doing, Mr. Pampinella relied upon assumptions that are contradicted by the evidence in this case, including binding corporate testimony directly from NetCE itself. Mr. Pampinella simply accepts NetCE's pie-in-the-sky fancies about what it wished its alleged sales and lost income might have been, without consideration of the evidence in the case or any critical study to determine whether NetCE's position had any basis in reality, and thereby gives NetCE's position the imprimatur of an "expert" opinion when it is not. Even more troubling, Mr. Pampinella does not account for the actual sales made by NetCE of the exact catalogs upon which he basis his opinion. As a result, Mr. Pampinella has proposed a damages opinion that amounts to an unlawful windfall for NetCE.

Elite has filed a Motion for Summary Judgment showing that it is entitled to judgment as a matter of law on all claims brought against it by NetCE. (DE 186). Dr. Jouria has also filed a Motion to Strike Mr. Pampinella's report and testimony. (DE 156). To the extent this Court does not grant Elite's Motion for Summary Judgment or Dr. Jouria's Motion to Strike, Elite respectfully

1

submits that this Court should prohibit Mr. Pampinella from testifying at trial as part of its gatekeeping role, for the reasons discussed below.

## FACTUAL BACKGROUND

The Court is well aware of the facts of this case through Elite's Motion for Summary Judgment (DE 186) and Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (DE 187). Elite and NetCE are competitors in the field of continuing professional educational services and materials. (DE 202 ¶ 3). NetCE claims to be the owner of the copyrights for seven articles submitted to it by Dr. Jouria ("Jouria Articles"), five of which are involved in this case against Elite. (DE 187 ¶¶ 14). NetCE offers courses to its customers through catalogs and individually as stand-alone offerings. NetCE did not publish any of the Jouria Articles in a catalog or individually. (DE 187 ¶ 15). Indeed, to this day, none of the Jouria Articles are ready for publication. (DE 187 ¶ 16). NetCE has accused Elite of infringing NetCE's copyrights in the Jouria Articles by publishing five courses submitted to Elite by Dr. Jouria ("Accused Courses"). (DE 187 ¶ 53). NetCE discovered the Accused Courses from Elite in February 2015, and stopped development of the Jouria Articles at that time. (DE 187 ¶¶ 31-32). NetCE never scheduled the Jouria Articles for catalog placement. (DE 202 ¶ 33).

Elite deposed NetCE on November 4, 2017, and Ms. Sarah Campbell was designated to testify on all topics for NetCE, including the topics related to any harm/damages allegedly suffered by NetCE. (DE 187 ¶ 4). As part of this deposition, Ms. Campbell made the following admissions on behalf of NetCE related to its damages claim:

- NetCE admitted that there is no guarantee that any of the Jouria Articles would have been in any particular catalog. (NetCE Depo. 164:23-25).

- NetCE admitted that no determination was made as to how many times the Jouria Articles might have been featured in any catalogs or over what period of time. (NetCE Depo. 165:7-20).

- NetCE admitted that total revenues for an article are increased if the article is featured in more catalogs and would be less if featured in fewer catalogs. (NetCE Depo. 165:1-6).

- NetCE admitted that it did not publish any partial catalogs, no articles were missing from any catalogs, and all catalogs offered by NetCE between 2013-2017 had the full assortment of courses for its customers to review and take. (NetCE Depo. 151 23-152:8).

- NetCE admitted that it does not know whether its revenues were impacted in any way by NetCE's decision not to continue developing the Jouria Articles at issue in this case. (NetCE Depo. 143:23-144:1, 259:21-260:1).

- NetCE admitted that it cannot point to a single sale that NetCE did not make because it decided not to offer any of the Jouria Articles. (NetCE Depo. 144:2-8).

- NetCE admitted that it would require speculation to determine lost sales of the Jouria Articles given that the Jouria Articles were not published. (NetCE Depo. 143:23-144:8).

- NetCE admitted that it would require speculation to determine the value of any of the Jouria Articles in relation to any other courses. (NetCE Depo. 152:12-153:4, 18-24, 157:13-23).

- NetCE admitted that it would require speculation to determine whether any of the Jouria Articles would have increased or decreased NetCE's revenue if the Jouria Articles were included in any catalogs. (NetCE Depo. 154:7-13, 162:11-23).

- NetCE admitted that there are many factors that affect how its catalogs perform, and it is impossible to predict all of the factors that come into play. (NetCE Depo. 137:17-140:19, 154:14-19, 163:24-164:6).

- NetCE admitted that it does not know whether any of the Jouria Articles would have done better or worse than NetCE's Multiple Sclerosis course. (NetCE Depo. 137:4-9).

- NetCE admitted that it does not know how much of any of its catalog sales were attributable to the presence of the Multiple Sclerosis course. (NetCE Depo. 151:6-15, 163:19-23).

- In its damages estimate, NetCE did not take into account the actual revenue it achieved for catalog sales during the period in question. (NetCE Depo. 161:17-24).

(DE 187 ¶¶ 37-51).

NetCE served Mr. Pampinella's expert report ("Pampinella Report", attached hereto at Exhibit A), on November 16, 2017, one day after the close of discovery in this case. Despite being served after NetCE's Rule 30(b)(6) deposition, Mr. Pampinella apparently did not consider or even review any of this deposition testimony from NetCE before rendering his opinion. The "Information Considered" in Attachment B of his report does not list NetCE's deposition transcript.

Before NetCE served the Pampinella Report, NetCE was asked about its alleged damages in an interrogatory served by Elite. NetCE claimed that its losses could be measured using the revenue generated by NetCE's catalogs that included courses from Dr. Jouria, with specific reference to Dr. Jouria's Multiple Sclerosis course. (DE 188-9, NetCE's Response to Interrogatory No. 8). In his report, Mr. Pampinella adopted this same theory, when he stated "[i]n order to determine NetCE's lost revenue arising from Elite's alleged misconduct related to the five Jouria Courses at issue, I analyzed the revenue generated by the two courses authored by Dr. Jouria that were also published by NetCE", namely "COPD and "Multiple Sclerosis". (Ex. A ¶ 38). Mr. Pampinella used the revenue from these two courses "as the basis for a 'benchmark' Jouria Course . . . which will represent each of the five Jouria Courses." (Ex. A ¶ 38). Mr. Pampinella used only two courses to create his "Benchmark Jouria Course" despite having revenue information from NetCE for all of its course sales. Indeed, NetCE's materials produced in discovery included a course listing showing over a thousand courses offered by NetCE.

Mr. Pampinella opined that each of the Jouria Articles would have been published in the exact same catalogs, over a multi-year period, as the two Dr. Jouria courses he relied upon to create his "Benchmark Jouria Course." (Ex. A ¶¶ 39, 41-45, 49-50). Mr. Pampinella used purported "Release Dates" supposedly provided to him by NetCE for when the Jouria Articles allegedly would have been offered by NetCE. (Ex. A ¶ 45). After NetCE stopped development of the Jouria Articles (DE 187 ¶ 32), NetCE published the catalogs cited by Mr. Pampinella with alternate articles, and admitted that it did not publish any partial catalogs, no articles were missing from any catalogs, and all catalogs offered by NetCE between 2013-2017 had the full assortment of courses for its customers to review and take. (DE 187 ¶¶ 40, 47). NetCE admittedly sold all of its catalogs (without including any Jouria Articles), and received substantial revenues, over the same period of time upon which Mr. Pampinella bases his damages opinion; however, Mr. Pampinella did not take into consideration the actual revenues received by NetCE for the catalogs in which Mr. Pampinella stated the Jouria Articles would have been published.

Finally, Mr. Pampinella admitted that his opinion was then one of simple math, when he stated "[i]n order to determine NetCE's lost profits, I first quantified NetCE's lost revenue related to the five Jouria Courses at issue. I then applied an incremental profit margin to this lost revenue in order to determine NetCE's lost profits." (Ex. A ¶ 37).

4

Mr. Pampinella made a number of assumptions in reaching his opinion on lost profits, including:

> As discussed above, NetCE alleges, among other things, that Elite has infringed NetCE's copyrights by publishing the articles Dr. Jouria submitted to NetCE. As a result of Elite's publication of these courses, NetCE was unable to publish any of the remaining Jouria Courses. I also understand that NetCE's competitive advantage rests on its ability to be the first-to-market with relevant content. Indeed, I understand that NetCE was planning to market the seven Jouria Courses as premium, or "marquee," courses. As discussed in more detail below, the vast majority of revenue related to a course is generated in the first year of publication. Elite's publication of courses authored by Jouria ahead of NetCE's scheduled release dates deprived NetCE of the opportunity to earn this revenue. Moreover, NetCE's ability to be the first to market reduces the effect of potential price erosion and other losses caused by NetCE's competitors' comparable course offerings. Finally, NetCE would not be able to recoup the additional expense required to publish the remaining Jouria Courses, as Elite has deprived NetCE of the ability to generate revenue related to these courses that would offset the additional expenses and result in NetCE realizing a profit on these courses.

(Ex. A ¶ 34).

Notably, for support for these assumptions, which cover market conditions and competitive conclusions, Mr. Pampinella cited only to NetCE's discovery responses, and his discussions with Sarah Campbell, Erin Meinyer, and Lisa Patterson, all employees of NetCE. (Ex. A ¶ 34 n.71). Apparently, Mr. Pampinella did not perform any independent analysis to verify that any of these assumptions were accurate.

Even though NetCE admitted that: (i) NetCE cannot point to a single sale that it did not make because it decided not to offer any of the Jouria Articles; (ii) NetCE does not know whether its revenues were impacted in any way by NetCE's decision not to continue developing the Jouria Articles at issue in this case; (iii) it would require speculation to determine lost sales of the Jouria Articles given that the articles were not published by NetCE; (iv) it would require speculation to determine whether any of the Jouria Articles would have increased or decreased NetCE's revenue if the articles were included in any catalogs; and (v) NetCE did not publish any partial catalogs, no articles were missing from any catalogs, and all catalogs offered by NetCE between 2013-2017 had the full assortment of courses for its customers to review and take, (DE 187 ¶¶ 40-45), Mr. Pampinella nevertheless concluded that NetCE's lost profits related to the five Jouria Articles were in the amount of $7.1 million. (Ex. A ¶¶ 32, 49-50).

5

**LEGAL STANDARD**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the *Daubert* factors. *See Banta Props., Inc. v. Arch Specialty Ins. Co.*, 2011 U.S. Dist. LEXIS 152930, *3-4 (S.D. Fla. Dec. 23, 2011). Pursuant to Rule 702 and *Daubert*, district courts "perform the critical 'gatekeeping' function concerning the admissibility of expert *scientific* evidence, as well as *technical* expert evidence." *Torres v. Carnival Corp.*, 635 Fed. Appx. 595, 599 (11th Cir. 2015) (quoting *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (en banc)) (internal citations and quotations omitted). The *Daubert* standard applies equally to nonscientific expert testimony as well. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167 (1999). The purpose of the court's gatekeeper role is "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony'." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (internal quotations omitted). The admissibility of expert testimony is determined using "a rigorous three-part inquiry: (1) the expert must be 'qualified to testify competently' concerning the subject matter he addresses, (2) the expert's methodology must be 'sufficiently reliable,' and (3) the expert's testimony must 'assist the trier of fact' in understanding scientific or technical evidence." *Torres*, 635 Fed. Appx. at 599. "The proponent of expert testimony always bears the burden to show" that its expert satisfies all three prongs by a preponderance of the evidence. *Id.* at 599-600 (affirming exclusion of expert testimony; *see also Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (same).

**ARGUMENT**

**I.   The Methodology Underlying Mr. Pampinella's Damages Opinion is Unreliable.**

Courts consider the following non-exclusive factors in evaluating the reliability of an expert's methodology: "(1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Nature's Prods. v. Natrol, Inc.*, 2013 U.S. Dist. LEXIS 185676, at *6-7 (S.D. Fla. Oct. 7, 2013). As explained in further detail below, "there is simply too great an analytical gap between the data and the opinion[s] proffered" by Mr. Pampinella. *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014). Accordingly, Mr. Pampinella's damages opinion "is the product of an unreliable and inadmissible methodology," and should be excluded as "nothing more than his own *ipse dixit*." *Martinez v. Rabbit Tanaka Corp.*, 2006 U.S. Dist. LEXIS 97084, at *40

(S.D. Fla. Jan. 5, 2006) (excluding damages expert); *see also Banta*, 2011 U.S. Dist. LEXIS 152930, at *14 (same); *Gastaldi v. Sunvest Resort Cmtys., LC*, 709 F. Supp. 2d 1299, 1304 (S.D. Fla. 2010) (same); *First Premium Servs. v. Best Western Int'l, Inc.*, 2004 U.S Dist. LEXIS 32474, at *13 (S.D. Fla. Jan. 8, 2004) (same).[1]

### A.   Mr. Pampinella's Damages Opinion Is Based On Speculative Assumptions That Are Unsupported By The Evidence.

Mr. Pampinella's lost profits opinion rests on his regurgitation of NetCE's claim that it would have published the Jouria Articles but for Elite's alleged conduct, and its assumption that it would have generated sales and revenues above and beyond what it otherwise generated during the relevant time period. However, Elite has shown through discovery that these allegations and assumptions are not supported by the evidence. Mr. Pampinella's adoption of these speculative assumptions renders his damages opinion unreliable.

At the outset, Mr. Pampinella assumes that, but for Elite's publication of the Accused Courses, NetCE would have developed, finalized, approved for publication, and published all five of the Jouria Articles. (Ex. A ¶¶ 24, 26). Mr. Pampinella goes so far as to state that "NetCE was planning to market the [Jouria Articles] as premium, or 'marquee,' courses." (*Id.* at ¶ 24). His analysis also necessarily assumes that each of those articles would have been published in the exact same catalogs for the exact same states, and would have realized the exact same sales, as the COPD and Multiple Sclerosis articles. NetCE's own testimony shows that these assumptions are based on pure speculation rather than any evidence. NetCE's Rule 30(b)(6) witness testified that there is "no guarantee" that <u>any</u> article written by a professional writer (such as Dr. Jouria) will be featured in a catalog. (DE 187 ¶¶ 36, 37). Even if Elite had never published the Accused Courses, it is speculative to assume that all five of the Jouria Articles would have been published. In view of the foregoing, Mr. Pampinella's assumption that all of the Jouria Articles would have been published (*and* would have been published as many times and in as many catalogs and for as many states as the COPD and Multiple Sclerosis articles) is unreliable. Furthermore, NetCE admitted that none of the Jouria Articles <u>was ever scheduled to be published in any catalogs from NetCE</u>. (DE 202 ¶ 33) ("NetCE, in ceasing development of the courses due to the discovery of [alleged] infringement, did not have an opportunity to schedule the [Jouria Articles] for catalog

---

[1] Because Mr. Pampinella's testimony should be excluded under Rule 702, Elite does not address Mr. Pampinella's qualifications in this Motion.

7

placement."). It is unfathomable to think that Mr. Pampinella would be permitted to testify about losses for specific catalog sales over specific date ranges that are pulled out of thin air by Mr. Pampinella.

Of course, NetCE contends that Elite is to blame for NetCE's business decision not to publish the Jouria Articles (*see id.*), and Mr. Pampinella blindly accepts that premise without performing any market research himself to determine whether NetCE may still have generated revenue from the Jouria Articles notwithstanding Elite's publication of allegedly similar courses. For example, Mr. Pampinella states that "NetCE's competitive advantage rests on its ability to be the first-to-market with relevant content," that this ability to be first to market "reduces the effect of potential price erosion and other losses caused by NetCE's competitors' comparable course offerings," and that "NetCE would not be able to recoup the additional expense required to publish the remaining Jouria Courses, as Elite has deprived NetCE of the ability to generate revenue related to these courses that would offset the additional expenses and result in NetCE realizing a profit on these courses." (Ex. A ¶ 24). Mr. Pampinella cites nothing more than NetCE's own discovery responses for these conclusions; he has performed no research or analysis of the continuing education provider market to support this proposed testimony.

Such unsupported expert testimony was excluded in *Martinez v. Rabbit Tanaka Corp.*, where the expert's report rested "entirely on his recapitulation of the facts (some of which find support in the record and some of which do not), and a wide variety of assumptions about the marketability of Plaintiffs' products…." 2006 U.S. Dist. LEXIS 97084, at *37-38. Finding that the expert "simply assume[d] the viability of Plaintiffs' products," and "reli[ed] on a number of unsupported and unverified assumptions," his opinion on damages was "the product of an unreliable and inadmissible methodology." *Id.* at *37, *40. As noted in *Estate of Arama v. Winfield*, expert testimony that "merely regurgitates the testimony of…witnesses so as to lend further credibility to that testimony" is inadmissible pursuant to Rule 702(a). 2017 U.S. Dist. LEXIS 71712, *9 (N.D. Ind. May 11, 2017) (an expert is not allowed "under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion"); *see also Natrol, Inc.*, 2013 U.S. Dist. LEXIS 185676, at *11 (where expert does not "draw upon [his or her] own education and experience" but instead "reiterate[es] the unverifiable viewpoint or experience of another individual, expert's resulting opinion is not admissible); *Martinez,* 2006 U.S. Dist. LEXIS 97084, at *38 (finding none

of expert's conclusions were "'testable' or independently verifiable as envisioned by a *Daubert* inquiry because [expert's] assumptions [were] almost entirely unsupported by market data or research").

Mr. Pampinella has also assumed that NetCE "would have generated revenue and profits related to these five courses but for Elite's alleged misconduct." (Ex. A ¶ 26). However, NetCE has testified that it actually "[does not] know" whether its revenues were impacted in any way by not having published the Articles. (DE 187 ¶ 41). This is due to the fact that each NetCE catalog published in the relevant timeframe included the necessary number of courses for a catalog. (*Id.* at ¶ 40). Indeed, NetCE confirmed that it would have to speculate to determine whether the inclusion of one of the Articles in those catalogs (in place of a different article) would have <u>increased</u> or <u>decreased</u> the resulting revenue. (*Id.* at ¶¶ 40-45). The testimony of NetCE's Rule 30(b)(6) witness undermines the reliability for Mr. Pampinella's assumption:

> Q. Were NetCE's revenues impacted, in any way, by the decision by NetCE not to continue developing the five courses at issue in this case?
> A. **I don't know.**
> Q. Can you point to a single sale that NetCE didn't make because it decided not to offer any of these five courses?
> A. **I can't point to one that was lost or one that was gained. They weren't released –as we discussed, they weren't released; to do that would require speculation.**
>
> \* \* \*
>
> Q. Did NetCE offer any catalogs in 2013 through 2017 that were missing courses?
> A. I'm not sure what you mean by "missing courses."
> Q. That didn't include the number of courses that that catalog called for?
> A. We did not publish any partial catalogs.
> Q. So every catalog from 2013 to the present published by NetCE had the full assortment of courses in it for NetCE's customers to review and take; is that correct?
> A. We did not publish any catalogs with a course missing.
> Q. Can you point to any revenue that NetCE lost because of the decision by NetCE not to publish the five courses at issue in this case?
> A. In terms of lost revenue?
> Q. Yes, ma'am.
> A. We can only calculate that based on the example of already-released courses.
> Q. But you just told me that all of your catalogs had their full allotment of courses in them; right?
> A. All of the catalogs that we published between 2013 and 2017 included the number of courses that we found necessary.
> Q. And so are you able to point to any revenue that NetCE lost because one of these five courses wasn't in one of those catalogs?

9

> A.·  **That would require me to speculate about the value of those courses in relation to other courses, and I'm not able to do that.**
>
> \* \* \*
>
> Q. The five courses at issue between NetCE and Elite, you can't predict with any certainty if those courses were included in any catalogs, whether their presence there might have actually caused a decrease in revenue for NetCE; correct?
>
> A.  **I can't speculate as to whether it would have increased or decreased value**.

(DE 187 ¶¶ 40-45) (emphasis added).

Given NetCE's admission that it does not know whether its revenues were impacted in any way—either positively or negatively—because of its decision not to continue developing the Jouria Articles, Mr. Pampinella's reliance on this type of speculation renders his opinion unreliable. *See R&R Int'l, Inc. v. Manzen, LLC*, 2010 U.S. Dist. LEXIS 94550, at *40 (S.D. Fla. Sept. 10, 2010) (finding proposed expert testimony unreliable it was based on "speculat[ion] with regard to fundamental aspects of [expert's] lost profits projections" and noting that "there is nothing scientific or reliable about pure speculation and conjecture").

Even if it could be assumed that NetCE would have published all five of the Jouria Articles, and that its publication of these articles would have resulted in additional sales to NetCE, Mr. Pampinella did not consider a number of factors identified by NetCE as impacting the performance of a course, such as whether it is featured in a catalog (and if so, how many catalogs), its price, subject matter, quality of content, competitive offerings in similar subject matter, customer reviews, timing of publication, and the states for which it is offered.  (DE 187 ¶ 46).  Mr. Pampinella has assumed that the Jouria Articles would have been published in the same manner and to the same extent as the COPD and Multiple Sclerosis courses, without any consideration of how any of the foregoing variables might impact the sales and revenue that could have been generated from the Jouria Articles.  It appears that the only factor Mr. Pampinella considered was the name of the author.  These essential defects defy the requirements for experts to testify at trial.

> B.      **Mr. Pampinella Did Not Review Sufficient Data Points To Determine Lost Profits Based On A "Benchmark Course"**

Mr. Pampinella calculates the expected revenue and profit margin for his "Benchmark Jouria Course" by cherry-picking two data points—"COPD: An Overview of Pathophysiology and Treatment" and "Multiple Sclerosis: A Comprehensive Review"—from the same three years, 2014

through 2016, despite having over 1,000 data points spanning across two decades from NetCE.[2] A sample size of two is hardly "sufficient data points" upon which to reliably predict with any certainty how any of the Jouria Articles might have performed if actually published by NetCE. *Natrol*, 2013 U.S. Dist. LEXIS 185676, at *15-16 (Dimitrouleas, J.) (excluding damages expert because there was no "indication that [expert] reviewed sufficient data points to reach his conclusions"). The only commonality between the Jouria Articles and the two data point courses utilized by Mr. Pampinella is the author. Methodology limited in this manner—where the "selection of sample[s]'" is from a self-selected and "limited universe"—not only fails to "comport with an accepted, scientific method of collecting information," it produces wildly unreliable results given the extremely small sample size. *Manzen*, 2010 U.S. Dist. LEXIS 94550, at *37. Mr. Pampinella's method of selection does not "assure[] the samples are appropriately representative", nor did Mr. Pampinella consider the "comparability of [his] sample[s]" to the Jouria Articles. *Id.*

Furthermore, while the two data point courses contain information for the years 2014 through 2016 only, Mr. Pampinella applies his conclusions derived from this information to opine on the performance of the Jouria Articles from 2015 through 2019. Yet again, Mr. Pampinella offers no explanation for this "leap of faith," nor does he even opine that "there is not enough differences to render the [Benchmark Course] inapplicable to the period from [2015] to [2019]." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1333 (S.D. Fla. 2012) ("This type of 'leap of faith' is condemned by *Daubert*.").

Despite using such a limited sample size from a self-selected pool, Mr. Pampinella imputes his "Benchmark Course" revenue and profit margin onto all five Jouria Articles without "offer[ing] [any] criteria by which he arrives at his conclusion" that each Jouria Article would perform the same. *United States v. Levinson*, 2011 U.S. Dist. LEXIS 44694, at *13-14 (S.D. Fla. Mar. 17, 2011). Absent an explanation, "only the slimmest reed [is left] to assess his conclusion—that he mentally compared (with little or no clue as to how the comparison were drawn)" the Benchmark Course to the five Jouria Articles, despite the fact that the Jouria Articles only existed in incomplete, rough-draft forms, which were not ready to be offered to the public. *Id.* NetCE admitted that there are many factors that affect how its catalogs perform, and it is impossible to predict all of the factors that come into play. (DE 187 ¶ 46). Mr. Pampinella did not consider any

---

[2] NetCE's Course Index (*see* Attachment B ("Information Considered") to the Pampinella Report) lists 1,376 course titles from 1997 through 2017.

other factors in reaching his conclusion that each of the Jouria Articles, which cover wide-ranging subject matters, would have performed the same as the two other courses on which the Benchmark Course is based. Mr. Pampinella did not even identify "relevant market conditions" that could affect his analysis, much less consider them. *Dolgencorp*, 862 F. Supp. 2d at 1322 (citing *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir. 1988), for the holding that a study "where the expert witness did not confirm that relevant market conditions were the same before and after the time the injury was alleged to have occurred" is "hopelessly flawed"). Even NetCE admitted that it does not know whether any of the Jouria Articles would have done better or worse than the Benchmark Course (DE 187 ¶ 48); yet, Mr. Pampinella opines that each would have performed <u>exactly the same</u>.

The problems with Mr. Pampinella's methodology do not stop there. The data point courses were published in seven specific catalogs, and Mr. Pampinella opines—again, contrary to the testimony from NetCE—that NetCE lost sales for the Jouria Articles for each of the same seven catalogs. This is particularly problematic given that NetCE admitted that none of the Jouria Articles were scheduled to be published in any particular catalog. (DE 202 ¶ 33). It is outrageously speculative for Mr. Pampinella to guess which catalogs the Jouria Articles might have been published in, much less assume they would be in all seven, then base his damages opinion on his own guesswork. It is just as likely that the Jouria Articles might have been published in none of the seven catalogs cited by Mr. Pampinella given that no decision was ever made by NetCE to publish them at all.[3]

---

[3] Notably, Mr. Pampinella calculated the per-course revenue by apportioning total catalog revenues, pro-rated by the credit hours offered (which is determined by course length) by the data point courses. (Ex. A ¶ 41). Each of the data point courses were 10 credit hours. (Ex. A, Schedule 6). Pursuant to the FWAs, only one of the Jouria Articles (the GERD article) was contracted to be 10 hours. (DE 36-2; DE 199-11, Supplemental Response to Interrogatory No. 2). Courses can be shorter than what was contracted for, whether due to the editorial process or the author submitting fewer words, or both; for example, GERD was contracted for 10 hours, but Dr. Jouria submitted his draft 2,000 words short, and NetCE predicted it would be a 5-hour course after editing. (*See* 200-3, NETCEB0003149). None of the Jouria Articles have completed the editorial process. (DE 187 ¶ 32). There is no evidence to support that the 10-hour Benchmark Course is applicable to all five Jouria Articles of unknown lengths.

The data point courses were also published in some of NetCE's best-selling catalogs over a several year period.[4] Given that no decision had been made about where or when to publish any of the Jouria Articles, Mr. Pampinella's unilateral decision to rely upon some of the highest grossing catalogs, to the exclusion of other lower-revenue catalogs, inappropriately skews his calculations upwards. Mr. Pampinella's so-called calculations of expected revenue per course is nothing more than a "manufactured best case scenario", without adequate data to support such projections. *First Premium*, 2004 U.S. Dist. LEXIS 32474, at *10 (finding best case scenario predictions to be "inadmissible rank speculation"); *MasForce*, 2013 U.S. Dist. LEXIS 200138, at *15-18 (finding expert testimony without competent evidence to be "mere best case scenario predictions" and inadmissible); *McMahan*, 2007 U.S. Dist. LEXIS 14921, at *15 (excluding expert testimony holding that unsupported "best case scenario prediction … cannot support [] lost profits claim"). Mr. Pampinella's lost profits "opinion is connected to precious little data only by his *ipse dixit* and is not adequately supported." *Levinson*, 2011 U.S. Dist. LEXIS 44694, at *13-14 (excluding expert opinion because it is "essentially unverifiable"). An opinion such as this is the "product of an unreliable and inadmissible methodology," and Mr. Pampinella's proposed testimony should be excluded. *Martinez*, 2006 U.S. Dist. LEXIS 97084, at *40.

### C. Mr. Pampinella's Lost Profits Opinion Gives NetCE An Unlawful Windfall.

In addition to relying on unsupported assumptions, Mr. Pampinella "ignor[es] inconvenient evidence" fundamental to a lost profits analysis—such as evidence of the mitigation of damages. *First Premium*, 2004 U.S Dist. LEXIS 32474, at *13. Indeed, Mr. Pampinella "did no analysis and failed to consider [NetCE's] efforts or opportunities to mitigate damages," despite indisputable evidence demonstrating such efforts. *Id*. NetCE admitted in its summary judgment filings that it sold complete catalogs in all states during the time period in question, without the Jouria Articles, in order to mitigate its alleged damages. (DE 202 ¶ 40). Yet, Mr. Pampinella did not consider, subtract from his calculations, or even acknowledge, any of this actual revenue received by NetCE in reaching his opinion on NetCE's alleged lost profits. *Cf. Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1218 (11th Cir. 2006) (approving lost profits calculation that "deducted from the gross lost profit figure the amount of net income [ ] earned" from product developed to mitigate damages); *Natrol*, 2013 U.S. Dist. LEXIS 185676, at *18-19 (finding certain expert damages

---

[4] Mr. Pampinella selected catalogs from large states, including California, which had sales that are exponentially larger than any other state catalog.

testimony admissible where expert "subtract[ed] any mitigation of damages"). This is double counting. Mr. Pampinella's lost profits opinion provides NetCE with a "windfall, which is forbidden by law." *Gastaldi*, 709 F. Supp. 2d at 1302. Consequently, Mr. Pampinella's expert opinion is contrary to the law, and should be excluded. *Martinez*, 2006 U.S. Dist. LEXIS 97084, at *42-43 ("[E]xpert opinions that are contrary to law are inadmissible."); *see also Gastaldi*, 709 F. Supp. 2d at 1305 (excluding damages expert where reliance on unreliable methodology resulted in "forbidden windfall").

### D. Other District Courts Have Also Excluded Mr. Pampinella Finding The Same Methodology Used Here Unreliable.

This will not be the first time Mr. Pampinella has been excluded from testifying in court about lost profits. The exclusion of Mr. Pampinella by other courts is noteworthy. Indeed, in excluding expert testimony in *Leroux v. NCL (Bah.) Ltd.*, 2017 U.S. Dist. LEXIS 94156 (S.D. Fla. Jun. 19, 2017), this Court observed that other courts had likewise excluded the same expert's "testimony based on their conclusion that the methodology utilized by [the expert] was not reliable, and that the opinions offered by [the expert] were not helpful to the trier of fact." *Id.* at *24-25.

Similar to the damages opinion proffered by Mr. Pampinella in this case, Mr. Pampinella testified as a damages expert regarding lost profits in *Flying J v. DOT*, 2012 Cal. App. Unpub. LEXIS 392 (Cal. App. 5th Dist. Jan. 19, 2012). The plaintiff in *Flying J* sought lost profits damages based on the profits it claimed it would have made operating a highway travel plaza, but-for the defendant's actions, which precluded plaintiff from ever building or operating the travel plaza. *Id.* at *6-10. In *Flying J*, Mr. Pampinella formed his lost profits opinion based on the same flawed methodology used here: to predict the potential profits that the plaintiff supposedly would have realized from the unbuilt travel plaza, Mr. Pampinella used financial data from five other travel plazas, "and averaged the gross profits that those sites had made over the past several years for use as a benchmark on how the [plaintiff's] site would have operated." *Id.* at *28. Mr. Pampinella then simply imputed this benchmark onto the unbuilt travel plaza, and quantified the lost profits as being approximately $13 million. *Id*. He followed this same methodology in this case.

Like Elite, the defendant in *Flying J* moved to exclude Mr. Pampinella's expert testimony because his lost profits opinion was based on his unsupported assumption that the unbuilt travel plaza would perform the same as the five data point travel plazas. *Id.* In *Flying J*, Mr. Pampinella used five data points—five travel plazas—provided to him by another expert; here, he used two

14

data points—two courses authored by Dr. Jouria—selected for him by NetCE. In *Flying J*, the court held that Mr. Pampinella's projections regarding lost profits had no probative value because "his assumption that the sites were comparable [was not] supported by evidence in the record." *Id.* at *29. Here, there likewise is no evidence in the record to support Mr. Pampinella's assumption that any of the Jouria Articles—nevertheless all five of them—would have performed comparably to the two data point courses. Indeed, the evidence in the record in this case directly contradicts his assumptions, as set forth above. In *Flying J*, the court found "[t]oo many conjectures were built into the calculations of the profits alleged to have been lost," as opined by Mr. Pampinella, and, therefore, the court excluded the plaintiff's lost profits claim from the case. *Id.* at *34.[5] Here, the Court should exclude Mr. Pampinella's proposed testimony, for exactly the same reasons.

Mr. Pampinella has been excluded in other cases based on the same deficiencies outlined by Elite in this Motion, such as proffering opinions contrary to law and failing to analyze whether the assumptions underlying his opinions are supported by the record. In *Immersion Corp. v. HTC Corp.*, 2015 U.S. Dist. LEXIS 21555 (D. Del. Feb. 24, 2015), a patent infringement case, Mr. Pampinella's lost profits damages opinion was based on sales of both patented and unpatented products without showing a functional relationship between them, as required by law. *Id.* at *11-12. The court found that "Mr. Pampinella has neither shown nor attempted to show that … [the] products have a functional relationship," and as such, "Mr. Pampinella's method for calculating lost profits is based on a non-viable lost profits legal theory." *Id.* at *12.

In *Via Techs., Inc. v. ASUS Comp. Int'l*, 2017 U.S. Dist. LEXIS 112681 (N.D. Cal. 2017), a trade secrets misappropriation case, Mr. Pampinella was offered to rebut expert testimony regarding unjust enrichment damages. *Id.* at *10-11. The court excluded Mr. Pampinella's rebuttal opinion that the expert should have apportioned her damages because the law does not require such apportionment, stating "Mr. Pampinella's opinion to the contrary is neither relevant nor reliable, and, if anything, could confuse the jury's deliberations on damages." *Id.*

Finally, in *Sukumar v. Nautilus, Inc.*, 2013 U.S. Dist. LEXIS 172005 (W.D. Va. 2013), in response to a motion for summary judgment based on the argument that the plaintiffs "have

---

[5] Elites notes that although California follows the more rigid *Frye* standard, the requirement to show "lost profits with reasonable certainty" is the same, which Mr. Pampinella has failed to show in either instance. *Id.*

15

insufficient evidence of damages caused by [the defendant's] conduct," Mr. Pampinella submitted an affidavit and expert report opining on the estimated damages as a result of false marking. *Id.* at *2. After considering Mr. Pampinella's expert testimony, the court "conclude[d] that it does not provide any competent evidence that [the] alleged injuries were caused by [the] false marking," and is insufficient to prevent summary judgment. *Id.* at *15-16 n.6.

## II.     Mr. Pampinella's Expert Testimony Is Not Helpful to A Jury.

Expert testimony that is not adequately supported, not verifiable, and not reliable is not helpful to the factfinder and should be excluded under Rule 702. *Levinson*, 2011 U.S. Dist. LEXIS 44694, at *14; *see also Manzen*, 2010 U.S. Dist. LEXIS 94550, at *47 (finding "lost profits testimony and Report fail to satisfy the helpfulness prong because they rest on inadequate data"); *Craig v. Orkin Exterminating Co.*, 2000 U.S. Dist. LEXIS 19240, at *18 (S.D. Fla. Nov. 21, 2000) (Dimitrouleas, J.) (finding expert testimony "would not be helpful" because underlying research and information "did not have a reliable basis"). Moreover, "in order to be helpful to the jury, as is required under Rule 702(a), an expert must actually draw on their expertise in reaching their conclusions and must testify to something more than what the jury can understand or decide for itself." *Winfield*, 2017 U.S. Dist. LEXIS 71712, at *9 (citing *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998)); *see also United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (affirming exclusion where "the expert could offer nothing beyond the understanding and experience of the average citizen"). For his damages opinion, Mr. Pampinella does nothing more than reiterate the assumptions and conclusions of NetCE and its witnesses (many of which assumptions are actually contradicted by the record), and perform simple math based on the two data points selected by NetCE itself. *See Winfield*, 2017 U.S. Dist. LEXIS 71712, at *10-11 ("Because [expert's] second and third conclusions merely parrot what [defendant] and other eyewitnesses have said and construct a factual narrative based upon record evidence, his testimony would not assist the trier of fact any more than the jury's hearing from those witnesses on whom [expert's] opinions rely.").

Mr. Pampinella's expert testimony on damages fails to meet either the reliability or helpfulness prongs. Nor are there any "countervailing factors that would operate in favor of admissibility" of Mr. Pampinella's expert testimony. *Craig*, 2000 U.S. Dist. LEXIS 19240, at *18. Even if, *arguendo*, Mr. Pampinella's expert testimony was otherwise admissible under Rule 702 and *Daubert*, it should still be excluded under Rule 403 because of the "powerful and potentially

16

misleading effect" of evidence submitted to a jury—especially large damages numbers such as Mr. Pampinella's $7.1 million figure—under the appellation of expert testimony. *Frazier*, 387 F.3d at 1263.  As set forth above, Mr. Pampinella made assumptions that are contrary to the record; accepted as true, without any independent analysis, NetCE's position on the market for the Jouria Articles; used an unreliable methodology to calculate alleged lost profits that was based on only two data points out of the thousand-plus available to him; and failed to account for the sales of the same catalogs actually made by NetCE upon which Mr. Pampinella claimed losses, thus resulting in an unlawful windfall for NetCE.

Given the foregoing, Mr. Pampinella's opinion on damages is nothing more than a "manufactured best case scenario" of what NetCE wishes it is entitled to for purposes of seeking a monstrous, and entirely outsized, damages award from Elite at trial. *First Premium*, 2004 U.S. Dist. LEXIS 32474, at *10.  There is no probative value to Mr. Pampinella's proffered damages opinion, and his testimony will only lead to (i) misleading the jury into believing that NetCE's damages position is backed by an "expert", and (ii) unduly prejudicing Elite by suggesting that NetCE is entitled to any lost profits for the reasons set forth in the Pampinella Report. Accordingly, Mr. Pampinella's testimony should additionally be excluded under Rule 403. *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1368 (S.D. Fla. 2009) (excluding even probative expert testimony under Rule 403 because it was "unduly prejudicial"); *Dolgencorp*, 862 F. Supp. at 1332 (excluding expert testimony on damages under Rule 403 finding any "probative value of her evidence is substantially outweighed by the danger of misleading the jury").

## CONCLUSION

For the reasons stated herein, Elite respectfully requests that the Court exclude Mr. James E. Pampinella, and prohibit him from testifying.

## Certificate of Good Faith Conference

Pursuant to Local Rule 7.1(a)(3)(A), counsel for Elite conferred with counsel for NetCE and Dr. Jouria about this Motion on January 4-8, 2018, in person and via email.  The parties understand that NetCE is unwilling to withdraw the Pampinella Report.

17

Dated: January 8, 2018

Respectfully submitted,

/s/ Peter A. Chiabotti
Peter A. Chiabotti
Florida Bar No. 0602671
AKERMAN LLP
peter.chiabotti@akerman.com
777 South Flagler Driver
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313

J. Mark Wilson (*pro hac vice*)
markwilson@mvalaw.com
Kathryn G. Cole (*pro hac vice*)
katecole@mvalaw.com
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
*Attorneys for Third Party Defendant*
*Elite Professional Education, LLC*

## Certificate of Service

I hereby certify that on January 8, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Peter A. Chiabotti
Peter A. Chiabotti

## Service List

Richard S. Ross, Esq.
Atrium Centre
4801 S. University Drive
Suite 237
Fort Lauderdale, FL 33328
Email: prodp@ix.netcom.com
*Attorneys for Plaintiff Dr. Jassin Jouria*

Philip E. Rothchild, Esq.
Holland & Knight LLP
515 East Las Olas Blvd., 12th Floor
Fort Lauderdale, FL 33301
Email: phil.rothschild@hklaw.com
*Attorneys for CE Resource, Inc. d/b/a CME Resource and NetCE*

John P. Kern, Esq.
Jessica E. Lanier, Esq.
Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Email: john.kern@hklaw.com
       jessica.lanier@hklaw.com
*Attorneys for CE Resource, Inc. d/b/a CME Resource and NetCE*

Peter A. Chiabotti
Florida Bar No. 0602671
Akerman LLP
peter.chiabotti@akerman.com
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313
*Attorney for Third Party Defendant Elite Professional Education, LLC*

J. Mark Wilson (*pro hac vice*)
markwilson@mvalaw.com
Kathryn G. Cole (*pro hac vice*)
katecole@mvalaw.com
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
*Attorneys for Third Party Defendant Elite Professional Education, LLC*

43767012;1