Page 1

1                    UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF FLORIDA
2

3

4

5    IN RE:                        CASE NO. 16-27150-RBR

6    JASSIN M. JOURIA,

7              Debtor.
     _____/

8

9

10                           ECF # 20

11                        April 6, 2017

12

13              The above-entitled cause came on for hearing

14   before the Honorable RAYMOND B. RAY, one of the Judges in

15   the UNITED STATES BANKRUPTCY COURT, in and for the

16   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

17   Fort Lauderdale, Broward County, Florida on April 6, 2017,

18   commencing at or about 1:30 p.m., and the following

19   proceedings were had.

20

21

22

23              Transcribed from a digital recording by:
                   Cheryl L. Jenkins, RPR, RMR

24

25

Page 2

APPEARANCES:


IMAN I. ABOUELAZM, Esquire
On behalf of the Debtor


HOLLAND & KNIGHT, by
JOAQUIN ALEMANY, Esquire
JOHN KERN, Esquire
On behalf of CE Resource, Inc.



ALSO PRESENT

ECRO - Electronic Court Reporting Operator

- - - - - - -

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RE-CROSS |
|---|---|---|---|---|
| Jassin Jouria | | | | |
| Ms. Abouelazm | 35 | | 76 | |
| Mr. Alemany | | 54 | | |

EXHIBITS

Page
Exhibits 1-46        4

- - - - - - -

1               THE COURT:  Court calls the matter of

2     Jassin Jouria.

3                    Appearances for the record.

4               MR. ALEMANY:  Good afternoon, your Honor.

5     Joaquin Alemany, with Holland & Knight, on behalf of CE

6     Resource, doing business as NatCE, and in the courtroom

7     with me today is John Kern, from our San Francisco office.

8               THE COURT:  How do you spell his last name?

9               MR. ALEMANY:  K-e-r-n.

10              MR. KERN:  Good afternoon, your Honor.

11              MS. ABOUELAZM:  Iman Abouelazm for the

12    debtor.

13              THE COURT:  Motion for entry of an order

14    vacating the order extending the automatic stay.

15              MR. ALEMANY:  That's correct, your Honor.

16    It's our motion at Docket Entry 20.

17                    As a preliminary matter I have ---

18              THE COURT:  It supplemented Docket Entry 32.

19              MR. ALEMANY:  Correct, your Honor, and I

20    have an exhibit binder, along with an exhibit register.

21                    If I may approach?

22              THE COURT:  You may.

23              MR. ALEMANY:  A copy of the exhibit binder

24    has been provided to debtor's counsel.  It references ---

25              THE COURT:  You've overwhelmed them with

Case 0:15-cv-61165-WPD  Document 239-1  Entered on FLSD Docket 03/30/2018  Page 4 of 81
Case 16-2750-RBR  Doc 35  Filed 05/09/17  Page 4 of 81

Page 4

1   words.

2              MR. ALEMANY:  It references 46 exhibits,

3   which are all pleadings of record with this Court.  About

4   half of them are from a 2015 Chapter 13 that the debtor

5   filed in Miami, Florida before Judge Isicoff, and the

6   balance of them are pleadings from this Court.  We would

7   ask that the Court take judicial notice of those

8   pleadings.  They all bear the ECF number on the header,

9   and we would move to have those pleadings admitted into

10  evidence.

11             THE COURT:  Any objections?

12             MS. ABOUELAZM:  I have not had a chance to

13  review them, so I don't really know what they ---

14             THE COURT:  All right.  Take a moment to

15  look at them.

16             MS. ABOUELAZM:  Well, in that case no

17  objection, your Honor, as long as they're all pleadings

18  actually filed with the Court.

19             MR. ALEMANY:  I can certify to the Court

20  that they are all filed, and they all bear the ECF banner

21  on the top.

22             THE COURT:  All right.  They're admitted.

23             (Thereupon, Exhibits 1 - 46 were admitted

24        into evidence.)

25             MR. ALEMANY:  Thank you, your Honor.

```
 1                    Your Honor, if I can give you a little bit
 2    of background.  We represent NetCE, which specialized in
 3    publishing continuing medical education, similar to
 4    attorneys needing CLE, doctors need CME, so it's in the
 5    business of publishing courses for doctors.
 6                    It commissions medical school graduates and
 7    doctors to write those courses, and in this case our
 8    debtor, which is here present today, is a medical school
 9    graduate that was commissioned by my client to write 10
10    courses.
11                    The debtor did, in fact, write those
12    courses, but unfortunately he went ahead and also sold
13    those courses to two of our on-line competitors.
14                    Litigation ensued in California and in
15    Florida, not only against the debtor, but also against the
16    companies that published those courses.
17                    In a bad faith effort to delay the lawsuits
18    a series of bankruptcy filings were made by the debtor
19    which have been effective at staying those proceedings,
20    both in California and in Florida.
21                    Right now there is a District Court order
22    preventing the continuation of that litigation in the
23    Florida Court against any of the parties, not just the
24    debtor.  That was entered on January 27th of this year.
25                    The bankruptcy filings have been
```

1    strategically filed by the debtor at opportune times.

2                    We filed a supplemental declaration, as

3    your Honor noted, at Court Paper 32.  It's also Exhibit 46

4    of the binder, and that supplemental declaration

5    essentially outlines how the bankruptcy process has

6    thwarted and prevented that litigation from ensuing.

7                    I'm not going to go through every single

8    event, but I'll highlight to the Court that an exhibit to

9    that supplemental declaration, it's basically a

10   three-column table, and it basically just has the Florida

11   litigation on that first column.  On the second it's got

12   the California litigation.  On the third it's got the

13   bankruptcy, and it really just kind of temperly shows how

14   throughout the course of the litigation the bankruptcy

15   filings have disrupted that litigation.

16                   There is three bankruptcy filings that have

17   been filed.  There was a Chapter 7 in 2010, and then what

18   I would call the first Chapter 13 was filed October 23 of

19   2015.  Four plans, Chapter 13 plans were filed in that

20   case.  That was the one before Judge Isicoff.  None of

21   them were confirmed.

22                   At one point that matter was dismissed for

23   failure to provide financial info and file a confirmable

24   plan.  The debtor moved to reinstate that case, succeeded

25   in getting that, only to have it dismissed again, and the

Page 7

1    recurring pattern that you'll see is basically that the

2    trustee was requesting information, documents, that it

3    simply wasn't provided, and ultimately, I think plan

4    payments weren't made as well.

5              So on May 10th of 2016 that first Chapter 13

6    was dismissed, and then on December 30, 2015 the debtor

7    filed its third bankruptcy case, and its second Chapter 13

8    before your Honor.

9              It filed a motion to continue the automatic

10   stay within the 30-day period, but it failed to serve my

11   client with a copy of the motion or with the notice of

12   hearing.

13             So essentially my client got notice of the

14   hearing after the hearing, and notice of the motion after

15   the hearing, and basically that's self-evident from the

16   certificate of service that was filed by debtor's counsel.

17   I don't think that that's in dispute.

18             The Court's docket, as well as Exhibits 13,

19   14, 17 and 25 show that the debtor's second bankruptcy

20   case was dismissed due to debtor's failure to provide

21   repeatedly requested information, so that the trustee

22   would ask for information repeatedly after each plan was

23   filed, and this is not out of the ordinary information,

24   this is information that any Chapter 13 should be able to

25   provide, such as bank statements, information about

Case 0:15-cv-61165-WPD  Document 239-1  Entered on FLSD Docket 03/30/2018  Page 8 of 81
Case 16-27150-RBR  Doc 35  Filed 05/09/17  Page 8 of 81

Page 8

```
 1   business dealings, transfers made by the debtor, why did
 2   the debtor have four vehicles for one household, you know,
 3   questions like that, just throughout the pendency of this
 4   case just went unanswered, information wasn't provided,
 5   and ultimately that led to the dismissal of that cause.
 6              It's well established law that when a debtor
 7   files two bankruptcy cases within a one-year period, which
 8   is what happened here, and the preceding case, which would
 9   be the Isicoff case, Judge Isicoff case, is dismissed due
10   to failure to provide information, documents, or failure
11   to amend documents, Section 362(c)(3) of the Bankruptcy
12   Code expressly creates a presumption of bad faith -- of
13   bad faith filing as to all creditors against the debtor,
14   and it can only be rebutted by clear and convincing
15   evidence.
16              Therefore, the burden of proof is on the
17   debtor today, and that burden of proof has to be met
18   through clear and convincing evidence that it did not
19   proceed in bad faith.
20              We would submit that the debtor cannot meet
21   this burden, in light of the court file in this case,
22   which includes all of the notices of deficiency, the
23   multiple dismissals, the timing of the filings, the
24   blatant disregard for orders, local rules of this Court,
25   and the Bankruptcy Court rules as well.
```

1           We've moved for a dismissal of this case for

2   cause and/or for relief from the automatic stay.  Under

3   Section 1307(c), and the cases interpreting, this case

4   should be dismissed for cause as a bad faith filing

5   because the four factors established by the Levitt case

6   have been met, in that the petition and the plans were

7   filed in an equitable manner, the long history of filings

8   and dismissals, the filing was made to defeat

9   non-bankruptcy litigation, the egregious behavior of the

10  debtor, all of those things are present in addition to the

11  362 presumption.  So there is an independent basis under

12  1307(c).

13          In addition to those factors, there is --

14  this is essentially a two party dispute.  The significant

15  creditors in this case are student loans, which are

16  non-dischargeable, and my client's claim, those are the

17  significant creditors.  So essentially this is a two

18  party dispute, dealing with non-core issues, in another

19  forum that has been dealing with this for almost two years

20  now.

21          So in addition to 362, and in addition to

22  1307, there is also an independent cause for dismissal

23  under 305(a) for the Court to abstain here.

24          Alternatively we've also requested, to the

25  extent that the Court is not inclined to dismiss the case,

1   that the automatic stay be lifted or modified for cause,

2   since in addition to the 362 presumption, the following

3   factors delineated by the 11th Circuit in the Kitchen's

4   case, have been met; the motivation of the debtor in its

5   filing to defeat litigation; the degree of effort that the

6   debtor put forth, or lack thereof; the frequency that the

7   debtor has sought relief from the bankruptcy forum; the

8   circumstances under which the debtor contracted these

9   debts.

10          Your Honor has applied 362 and the Kitchen

11  factors in the Makozy case, which is also cited in our

12  papers, and you were appealed and affirmed on appeal.  In

13  the Makozy case your Honor found the debtor was using the

14  Bankruptcy Court as a sword to run from litigation, and

15  the Court declined to extend the automatic stay in that

16  instance.

17          To the extent the Court is not inclined to

18  dismiss the case, which -- or to grant leave from stay,

19  which we feel there is a strong legal basis to do so, we

20  would ask at a minimum that if full relief from stay

21  cannot be granted, that partial relief be granted so that

22  a determination can be made as to liability against the

23  debtor.

24          As I noted, the District Court has prevented

25  us from litigating against any of the parties in District

Page 11

1     Court.  So essentially we've been ---

2                 THE COURT:  That's the District Court in

3     California?

4                 MR. ALEMANY:  That's the District Court of

5     Florida.

6                 THE COURT:  Of Florida?

7                 MR. ALEMANY:  Florida.  Yes.

8                 THE COURT:  And the judge's reasoning?

9                 MR. ALEMANY:  The judge's reasoning is that

10    it's -- that Mr. Jouria is a necessary party, and that

11    because he's a necessary party, that he doesn't want to,

12    for judicial economy purposes, and to the extent there is

13    comparative fault, which are, I think, affirmative

14    defenses that have been raised, the Court doesn't want to

15    determine that comparative fault without having ---

16                THE COURT:  I assume that the co-defendants

17    are raising the same issues?

18                MR. ALEMANY:  Absolutely, briefing it and

19    arguing it, and they succeeded in the California

20    proceeding when they briefed it over there.

21                THE COURT:  Proceed.

22                MR. ALEMANY:  So, your Honor, in closing, my

23    position would be that the Court's analysis has been

24    simplified and streamlined through the debtor's own

25    actions.  The multiple filings in a one-year period create

1    that presumption of bad faith, right expressly in the

2    Code, and more importantly that presumption is wholly

3    supported by the Court file and the evidence that's been

4    presented here today, and we would ask that the Court

5    either dismiss the case, or that the Court grant relief

6    from say so that the proceeding can continue.

7                    THE COURT:  Counsel, for your information, I

8    have the docket sheet in both Laurel Isicoff's case and

9    the prior Chapter 7 in front of me, and I note that you

10   were the attorney for the debtor, your firm was both

11   times.

12                   MS. ABOUELAZM:  Yes, I was.

13                   THE COURT:  All right.  Let me hear from

14   you.

15                   MS. ABOUELAZM:  I'm sorry?

16                   THE COURT:  Let me hear from you.

17                   MS. ABOUELAZM:  Oh, okay.  So first to

18   clarify, your Honor, the debtor filed this Chapter 7 in

19   2010.  This was completely before any involvement with the

20   creditor, or any of these issues came about.

21                   THE COURT:  But the student loans were in

22   existence, and they weren't subject to a discharge.

23                   MS. ABOUELAZM:  They were not, but he had

24   other debts then in 2010.

25                   THE COURT:  All right.  So he filed a

1    Chapter 7, got a discharge?

2                MS. ABOUELAZM:  Yes.  So in 2010 he had just

3    graduated from medical school and he wasn't able to find a

4    residency position, so he wasn't working.  He was drowning

5    in debt, and that's why he filed that Chapter 7.  Again,

6    this was seven years ago, and the other unsecured debts

7    were discharged.

8                Of course the student loans he was able to

9    defer until he started working, and now he's on a payment

10   plan with the student loans.  So there was nothing there.

11               Now, I just want to make clear for the Court

12   today that the issues we're here today ---

13               THE COURT:  Was the student loans payments

14   reflected in the Chapter 13 plan that he has filed in my

15   proceeding, Docket Entry, it looks like, 13?

16               MS. ABOUELAZM:  Well, he's not making them

17   since the bankruptcy case was filed.  He's not making them

18   now.  Since this Chapter 13 case was filed he stopped

19   making those payments in order to incorporate them.

20               THE COURT:  And what are the total amounts

21   of the student loans?

22               MR. JOURIA:  Approximately 220,000.

23               MS. ABOUELAZM:  About 220,000.

24               THE COURT:  220,000.  So at the end of this

25   36-month plan, at $315 a month, it will have paid 3, 4,

Page 14

1  $5,000 on 220,000 student loans that are nondischargeable

2  and a debt to CE Resource of approximately 200,000, is

3  what the claimed amount is?

4  MR. ALEMANY:  Your Honor, our claim would

5  actually be in the millions, and the only payments that

6  are scheduled right now are to a lease that the debtor had

7  two vehicles ---

8  THE COURT:  Only one is subject to a finance

9  agreement.

10  MR. ALEMANY:  One is owned outright, and the

11  other one is a lease, and then there is the small amount

12  of payments for unsecured creditors.  We have objected to

13  confirmation.

14  THE COURT:  I saw that.

15  MS. ABOUELAZM:  And we will be amending the

16  plan because the trustee has also objected to certain

17  exemptions and the expenses in the CMI.

18  THE COURT:  How is this debt dischargeable?

19  MS. ABOUELAZM:  Which debt?

20  THE COURT:  CE Resource.  For example, they

21  can object to discharge.

22  MS. ABOUELAZM:  Well, first of all, they

23  haven't filed a claim yet.  So we're not sure --

24  eventually, if this case proceeds, we're going to need a

25  hearing before your Honor to value their -- it's a

Page 15

1    contingent claim.  There is no liability yet, nor is there

2    a value amount to the claim.  So we'll need to value that

3    claim somehow.

4                    Now, your Honor, let me just clarify.  So

5    this civil litigation case has been going on ---

6                    THE COURT:  Well, if he was on a student

7    loan program and he was current in that program, they

8    weren't due debts.  He had a payment arrangement.  Why did

9    he file the new 13?

10                   MS. ABOUELAZM:  For this debt that's pending

11   with the civil litigation.

12                   THE COURT:  So you're not disputing the fact

13   that the sole reason for the filing of the new 13 is the

14   CE Resource's debt?

15                   MS. ABOUELAZM:  No, your Honor, we're not,

16   but it's not to evade litigation.  It's just, he's

17   accepting to pay them what he can afford to pay.  The

18   reason we're seeking bankruptcy protection is he can't --

19   he's drowning in the litigation costs and expenses, and

20   he's not, he's not able to reach a settlement with them.

21   So this case is going to be going on for -- it's already

22   been going on for two years, he's trying to settle with

23   what he can afford.  Like you heard, they're asking for 15

24   -- 10, $15 million.  They're really going after the two

25   corporate co-defendants.  Those are -- that's where the

1    money is for their case.  Not -- my client is not working

2    yet.  He's still in residency.  Once he secures a

3    position, he's got another two or three years in a

4    residency position.  He's making maybe $50,000 a year.

5    He's not going to be able to meet that liability.

6                    So actually for the protection of the

7    creditor and for himself he's seeking bankruptcy

8    protection, and he's willing to pay what his income allows

9    for, and the creditor, and creditor's counsel ---

10                   THE COURT:  He doesn't dispute the fact that

11   he signed the agreement, produced the programs, and then

12   resold the programs?

13                   MS. ABOUELAZM:  He does dispute that.  Those

14   issues are in dispute, which is why litigation is still

15   ongoing.

16                   THE COURT:  So the litigation needs to

17   continue to resolution to determine whether or not the

18   debt exists.

19                   MS. ABOUELAZM:  Well, whatever the debt is

20   going to be, again, whatever the debt is going to be, he's

21   only going to be able to pay back what he can afford,

22   which is why we're seeking bankruptcy.

23                   THE COURT:  Well, what dispute do you have

24   with Docket Entry 20, the motion for relief from the

25   automatic stay or to dismiss the bankruptcy case for a bad

Case 0:15-cv-61165-WPD Document 239-3 Entered on FLSD Docket 03/30/2018 Page 17 of
81
Case 16-27130-RBR Doc 139 Filed 05/09/17 Page 17 of 81

Page 17

1    faith filing?  It's his third bankruptcy.

2                MS. ABOUELAZM:  Well, see, again, and the

3    creditor is making it seem like my client is just a serial

4    filer.  It is the third bankruptcy in actuality, but

5    really he filed this 2015 case, and it was ongoing.  He

6    was making payments.  It's not like he filed this case and

7    sat on it, or continued to file for extensions of time to

8    file the balance of schedules.  Everything was filed.  We

9    were going back and forth with the trustee, and the reason

10   that 2015 case was dismissed is not because of not

11   providing documents.  It's because the payment plan, his

12   DMI, kept going up so high because at that time,

13   your Honor, in 2015 he had two households, he was living

14   in Miami, in the Jackson Memorial residences for the

15   residents there, and he had to maintain his apartment in

16   Hollywood, because that's where his -- number one, his

17   parents lived there, he takes care of his parents, and the

18   lease is in his name in Hollywood.  So he had two

19   households he was maintaining.

20               The business that he has, he works at that

21   business full-time when he's not in residency, like right

22   now, he doesn't have a residency position, so he's

23   maintaining that business full-time, but when he is

24   working as a resident, obviously he has people working for

25   him.

```
 1              The trustee was not allowing for those car

 2    expenses that were being used to market the business, and

 3    they weren't -- and she wasn't allowing for the two

 4    household expenses.

 5              So the expenses at that time were different

 6    from now, and that's why it was to his benefit to try to

 7    settle, and he did, he made a good faith settlement offer

 8    to the creditor, which was denied, and I won't get into

 9    those details, but -- unless they want to, but he tried to

10    settle because the bankruptcy, he couldn't afford the

11    bankruptcy payment as the trustee had it, only because she

12    wasn't allowing for his actual expenses.

13              So that was dismissed, not because of --

14    again, not because of failure to provide documents, and he

15    was making planned payments.  Your Honor can see he was

16    making payments all along, otherwise it would have been

17    dismissed early on.

18              When we filed the second case, it was just

19    because they weren't accepting to settle the case, they

20    weren't accepting what he could afford.  He's not --

21    again, he's not serial filing, or he's not filed like six

22    or seven cases, and all three cases were not within two

23    years.  It was -- the first case was filed in 2015.  It

24    was only dismissed in 2016, almost a year later, which is

25    why when this case was dismissed, we had to seek the
```

Case 0:15-cv-61165-WPD Document 239-1 Entered on FLSD Docket 03/30/2018 Page 19 of 81
Case 16-27130-RBR Doc 139 Filed 05/09/17 Page 19 of 81

Page 19

1    30-day motion for extension.

2                    THE COURT:  Was an offer made in the State

3    Court District Court litigation?

4                    MS. ABOUELAZM:  What was the offer made?

5                    THE COURT:  Was there an offer made --

6                    MS. ABOUELAZM:  Yes.

7                    THE COURT:  -- that if he cooperated they

8    wouldn't look to him for the judgment?

9                    MS. ABOUELAZM:  Yes, of course.

10                    Well, I'm sorry, my client made an offer to

11   the creditor to settle.  Now remember them are two ---

12                    THE COURT:  If the creditor made an offer to

13   the defendant/debtor --

14                    MS. ABOUELAZM:  I believe they did.

15                    THE COURT:  -- that if he cooperated and

16   testified against the two corporations, they would not

17   look to him to recover a large judgment --

18                    MS. ABOUELAZM:  No.

19                    THE COURT:  -- they would limit the

20   recovery?

21                    MS. ABOUELAZM:  No.

22                    MR. KERN:  Good afternoon, your Honor.  So

23   my name is John Kern.  I'm counsel in the District Court

24   matters.  Just to give the Court some background, the

25   California action has been dismissed.  So really at this

Page 20

```
1    point we're just dealing with the Southern District of
2    Florida action.
3                    THE COURT:  And that's against the debtor
4    and the two corporations?
5                    MR. KERN:  That's correct, your Honor.  Two
6    corporations, one of them is the on-line competitor,
7    direct competitor of our client, NetCE, (inaudible)
8    continuing education business.  That's the publisher that
9    he shopped the articles that we had spent over a year
10   curating, editing and revising with him and were on the
11   verge of publishing them as courses for our own website.
12                   The other corporate defendant is a venture
13   capital company that was just a company that seeded the
14   on-line publishing company that is our competitor.  We
15   reached a settlement with that client, they no longer
16   participate (inaudible).  They're be -- we'll file a
17   dismissal ---
18                   THE COURT:  So you have pending litigation
19   against your primary competitor --
20                   MR. KERN:  That's correct.
21                   THE COURT:  -- and one of the key witnesses
22   would be the debtor --
23                   MR. KERN:  That's correct, your Honor.
24                   THE COURT:  -- that he sold the patterns to,
25   or gave the ---
```

1          MR. KERN:  That's correct, your Honor.

2          The problem we have, the problem that we

3    face is, counsel has pointed out that the litigation has

4    been going for two years.  Your Honor, nothing has

5    happened in two years.  We have been frustrated at every

6    turn by Dr. Jouria's procedural maneuvers and his use of

7    the bankruptcy filings.

8          We attempted to pursue our case where our

9    client is located, in the Eastern District of California,

10   and it was at that point that Dr. Jouria had filed his

11   first bankruptcy.  The judge in California told us in no

12   uncertain terms that he was not going to allow the case to

13   proceed against the publisher where the key (inaudible)

14   with respect to this Judge, and from my client, was not

15   present.

16         It would be an impossible narrative to

17   explain to a jury why the star of the show was missing,

18   and certainly if we had reached a judgment against the

19   publisher in that case, and Dr. Jouria had come out of

20   bankruptcy, or the bankruptcy had been rejected, we would

21   then have to refile against him either in Sacramento or in

22   Florida, and the judge basically explained to the parties

23   that he had too much respect for the citizens of

24   Sacramento County to -- and resources of the Court, to put

25   them through that.

Page 22

1          We've now (inaudible) the same situation in

2    the Southern District of Florida when he filed bankruptcy,

3    our judge (inaudible).  We sought relief from the stay and

4    were denied, and I think that it's been explained to me by

5    counsel that one of the possibilities would be that your

6    Honor indicates to the Southern District that your

7    recommendation would be that they allow us to proceed in

8    our case against the publisher, and allow this bankruptcy

9    and Dr. Jouria to pay itself.

10          I can tell you that that puts us in a really

11   impossible situation of trying to explain to a jury why

12   they're to find liability against a publisher, who also

13   will be pointing the finger at Dr. Jouria, because the

14   defense of the publisher in this case is he lied to us, he

15   didn't tell us that you owned the copyrights to the

16   material he sold us, it's his fault.

17          So there we are, suing the publisher, whose

18   defense is going to be Dr. Jouria misled us, and our case

19   is Dr. Jouria misled us, and where is he?  He's not a

20   third party witness that provided evidence.  He is the key

21   defendant.

22          Obviously because of his resource situation,

23   we don't anticipate that if there is a judgment, an award,

24   or there is some kind of settlement, that he would be a

25   key contributor, because we're talking about a fairly

1   prominent, now, on-line successful publishing company

2   versus an individual (inaudible).

3           That doesn't, however, diminish his

4   significance as a defendant.  He is the preliminary

5   defendant in this case.

6           MS. ABOUELAZM:  Your Honor, I just think

7   it's important that you hear from the debtor, or at least

8   hear ---

9           THE COURT:  Oh, I'll give you an opportunity

10  to put him on the stand.

11          MS. ABOUELAZM:  And just, and the main

12  reason is so your Honor can understand the liability, I

13  guess, that they're imposing on my client.

14          He didn't take these courses that -- or this

15  material that the creditor paid for and sell it to someone

16  else, and that's the way it's being painted, but that's

17  not what really happened.

18          THE COURT:  Well, how did they get it?

19          MS. ABOUELAZM:  He was paid for research.

20  You can't copyright research.  He was paid for research.

21  So that knowledge that he had, yes, he ended up writing

22  courses, and he didn't sell -- so the creditor -- NetCE

23  paid Mr. Jouria, Dr. Jouria for research and to write 10

24  courses.  They ended up publishing only three of those

25  courses, and there were seven courses that were just

Page 24

1  sitting there, work that he had spent his time on and

2  doing, and he was only paid, I believe, between 40 to

3  $60,000 for all this research, and all this time, and all

4  this work.

5           So, seven courses were just sitting there.

6  Three years, I believe, two or three years had passed, and

7  he can get into the details with your Honor more

8  accurately, three years had passed, and he wanted to make

9  use of that information.

10          He rewrote -- he didn't sell those courses

11 to anyone.  He actually rewrote courses for the other

12 companies that he sold them to.

13          So, the courses that were written for NetCE

14 were not the same courses that were sold to other

15 companies, and that's where the litigation ---

16          THE COURT:  It sounds like an issue that

17 should be decided by a jury.

18          MS. ABOUELAZM:  Well, it is, and that's

19 where they would present it, before a jury.

20          I'm just saying my client doesn't have the

21 funds or the resource, or the -- the resources, or

22 even ---

23          THE COURT:  All he has to do is show up and

24 testify.  He has his story.  He apparently has given a

25 deposition --

Page 25

1                    MS. ABOUELAZM:  And we can ---

2                    THE COURT:  -- sometime -- no?

3                    MR. KERN:  No.  Discovery has not even

4     opened, your Honor.

5                    MS. ABOUELAZM:  And we can subject him to --

6     as a witness, we can subject him to presenting evidence

7     and testimony, but just for his protection, and that's why

8     he's seeking this Court's protection, is he needs to move

9     on.  The creditor needs to move on, and they can move on

10    and pursue the other corporate defendants.

11                   MR. ALEMANY:  Your Honor, if I may, just one

12    point of clarification?  I mean, it is a non-core issue,

13    obviously.  It is a jury trial.  That creates a whole host

14    of issues, but more importantly, if this bankruptcy is

15    being filed in good faith, the amount of the claim at the

16    end of the day is not going to be -- is not going to

17    affect what Mr. Jouria has to contribute.  He has the

18    money that he has to make a contribution, so why not let

19    the litigation go forward?  If they --

20                   THE COURT:  We'll keep the 13 open and let

21    it go forward or dismiss the 13 and let it go forward.

22                   MR. ALEMANY:  Right.  I mean, but at the end

23    of the day, their position is, well, we've got to incur

24    all these litigation bills.  Why is he going to fight

25    something that's ultimately going to be discharged?

Page 26

1          MS. ABOUELAZM:  But even if he's not going

2     to fight it, as a party he's going to have to incur

3     litigation costs to appear in Court and succumb himself.

4          I'm not going to advise a person to go and

5     appear in front of a corporation and their counsel, and

6     subject himself to whatever, 10 $15 million claim that

7     they're claiming.  I mean, they're claiming -- we need to

8     value their claim.  I don't see how they can -- if

9     they ---

10          THE COURT:  Well, that's a jury question.

11          MS. ABOUELAZM:  They compensated -- they

12     gave him about $60,000, between 40 to $60,000 to write

13     these courses.  Yet they're claiming it's a $15 million

14     profit that they missed out on because he rewrote courses

15     completely, and he can show that wrote -- I mean, he

16     rewrote these courses for other companies, and actually

17     what happened was in 2015 there were two companies that he

18     reached out to that accepted his product.

19          One company, Nurse for Less, asked him to

20     rewrite completely different courses, different topics and

21     everything.  That's Nurse for Less.  Elite, which is one

22     of the co-defendants in this case, asked him, because of

23     the pending litigation -- because these courses have

24     something to do with a different company, Elite asked him

25     to rewrite those courses so that it's not the same course

1    anymore, but it was similar topics.  So he rewrote those

2    courses for Elite, and those were the courses that were

3    sold to other companies.

4                    Now in 2015, in April, NetCE sent Dr. Jouria

5    a cease and desist letter, and he'll testify right here,

6    when he got that letter, he was surprised, he didn't know

7    what was it about.  Three years had gone by.  He hadn't

8    heard anything from NetCE, and this has been going on

9    already for three -- that he moved on for three years now,

10   he's been moved on.

11                   The cease and desist letter, when he

12   received it, he actually did stop immediately writing

13   courses for anybody.  He contacted his attorney to ask

14   what this was about, and that's when he understood that

15   this NetCE was claiming that copyright infringement, and

16   that he needs to stop writing these courses.

17                   THE COURT:  What attorney did he have at

18   that time if he wasn't being sued?

19                   MS. ABOUELAZM:  No, no, when he got that

20   letter he contacted an attorney, which is the current

21   attorney for this case.

22                   MR. KERN:  Your Honor ---

23                   MS. ABOUELAZM:  So, and I'm sorry, and that

24   just goes to show that, I mean, had he been going behind

25   their backs and selling things, and trying to make -- you

Page 28

```
 1   know, unjustly enrich himself off of someone else's

 2   rights ---

 3                   THE COURT:  Why don't you let that issue go

 4   to a jury?

 5                   MS. ABOUELAZM:  Again, your Honor, I'm not

 6   stopping them.  He's seeking protection.  If this is a

 7   debt he owes, and if they're successful, he'll pay what he

 8   can afford to pay, whatever their claim is, and we can

 9   value that claim ---

10                   THE COURT:  Well, I can dismiss the 13 now

11   without prejudice to having it refiled when the state

12   court -- or District Court litigation is done.

13                   MS. ABOUELAZM:  But then he's going to incur

14   all those costs in just fighting this case, when he can be

15   paying that to them, and then that's why I say, it goes to

16   their protection, he could be paying whatever -- whatever

17   money he's going to be paying ---

18                   THE COURT:  What money he's paying is going

19   to be going to student loans because this debt is

20   unliquidated.

21                   MR. ALEMANY:  Correct, your Honor.

22                   THE COURT:  And the 220,000 in student loans

23   is apparently an established amount.

24                   MR. ALEMANY:  And he's eligible to refile

25   Chapter 7 at the end of 2018.
```

1          THE COURT:  I saw that.

2          MS. ABOUELAZM:  And, see, and that's another

3    thing is he is eligible, and he knows this, of course, but

4    he's not really trying to run away from -- he's not trying

5    to cheat anybody.  He's just, at this point he needs to

6    move on, he needs to go on with his life.

7          THE COURT:  All right.  Let me ---

8          MS. ABOUELAZM:  At the end of this civil

9    case he's not going to be able to pay them what they're

10   seeking.

11         THE COURT:  All right.  You want the debtor

12   to take the stand and testify.  Is anybody else going to

13   testify?

14         MR. ALEMANY:  We don't have any witnesses,

15   but would reserve the right to cross-examine.

16         THE COURT:  No, you'll have that right.

17         Put the debtor on the stand.

18         ECRO:  Right in front of the microphone,

19   please.  Make sure you're speaking into it, and raise your

20   right hand.

21         Do you solemnly swear or affirm that the

22   testimony you're about to give in the case now before the

23   Court will be the truth, the whole truth and nothing but

24   the truth under penalty of perjury?

25         MR. JOURIA:  Yes, ma'am.

Case 0:15-cv-61165-WPD Document 239-1 Entered on FLSD Docket 03/30/2018 Page 30 of 81
Case 16-27130-RBR Doc 139 Filed 05/09/17 Page 30 of 81

Page 30

 1    Thereupon,

 2                          JASSIN M. JOURIA,

 3    having been first duly sworn, was examined and testified

 4    as follows:

 5                    THE COURT:  State your name once more for

 6    the record.

 7                    THE WITNESS:  Jassin Jouria.

 8                    THE COURT:  And, Counsel, state your name

 9    once more for the record.

10                    MS. ABOUELAZM:  Iman Abouelazm for the

11    debtor.

12                    MR. KERN:  Your Honor, before counsel begins

13    her questioning, could I ask the Court's indulgence to ask

14    for a point of clarification as an outsider?

15                    THE COURT:  Yes.

16                    MR. KERN:  I am concerned, just because of

17    the time that's been allotted to us, and how critical it

18    is that we the key attorneys here in the room, also this

19    is my first time seeing Dr. Jouria, that we use the time

20    productively, and the Court's time productively.  I'm

21    concerned that counsel may intend now to litigate the

22    copyright infringement case and ask him questions about

23    the merit of my client's underlying claim.

24                    I don't think that's at issue today.  Just

25    in her presentation before, I can tell you that there were

1   seven or eight complete misrepresentations of fact that I

2   don't even blame counsel for, because she's not counsel in

3   the underlying copyright infringement case.

4               A gentlemen named Richard Ross, a

5   practitioner here in Fort Lauderdale, is representing him

6   in the copyright infringement case.  He's not here today.

7               So, I'm concerned about the misstatements

8   she's already made about background facts, and I'm more

9   concerned that she's stated two or three facts that we've

10  never been made aware of, because we haven't been -- we

11  haven't even conducted discovery.

12              For instance she said that Elite, the

13  co-defendant, the publisher, our competitor, was aware of

14  his relationship with my client and, therefore, asked him

15  to rewrite the materials so that there would be no

16  conflict.  That's brand new information.

17              THE COURT:  Well, you're probably going to

18  get a transcript of today's testimony.

19              MR. KERN:  Absolutely, no, and it's

20  fantastic information, but I'm just concerned that we're

21  going to litigate the copyright infringement case, and I

22  don't think that's the issue today.

23              Thank you, your Honor.

24              MS. ABOUELAZM:  And, your Honor, and I

25  actually concur very much, that I was hoping today would

Page 32

1  not be about the copyright infringement case, and that it

2  would go to the two issues, which is notice, which -- and

3  whether this is a bad faith filing, and it's obvious that,

4  again, they're claiming serial filings.  He only filed one

5  in 2015.  It was pending.  He was making payments.  We

6  submitted documents to the trustee.  We were working with

7  them, and only because his DMI went up to the

8  circumstances I explained to the Court, that's why we

9  ended up dismissing this case, not because he was just

10  playing games, and when he filed this case, again, it was

11  made in good faith, seeking protection, and he's making

12  payments currently with the trustee.  We haven't gone to

13  confirmation yet.

14              So that's what I'm hoping today is going to

15  be about that

16              THE COURT:  The case was dismissed, Docket

17  Entry 64, on May 10th, 2016 upon the trustee request for

18  an order dismissing the case upon denial of confirmation

19  of the plan.

20              MS. ABOUELAZM:  Yes, and like I said ---

21              THE COURT:  The plan confirmation was

22  denied.

23              MS. ABOUELAZM:  Yes, and like I said,

24  because the plan, she was requesting -- after the

25  adjustments that she was requesting that we make, his DMI

Page 33

```
  1    was so high, when in actuality he had the ---

  2                 THE COURT:  What witness are you going to

  3    have to establish that?

  4                 MS. ABOUELAZM:  I'm sorry?

  5                 THE COURT:  You're going to have the

  6    Chapter 13 trustee testify?

  7                 MS. ABOUELAZM:  Well, no.  Well, we have ---

  8                 THE COURT:  I'll go ahead and take the

  9    Chapter 13 docket.

 10                 MS. ABOUELAZM:  Yes.  Well, we have her

 11    deficiency.  Her deficiency goes into why she's objecting

 12    to our CMI calculation, and the main thing is that, number

 13    one, the second household, and the other one was the four

 14    cars that she's claiming for a household of one, but the

 15    four cars actually belong to the business.

 16                 Now, the business is making those revenues,

 17    but those revenues are going to pay for the independent

 18    contractors and his brothers, who are working with him to

 19    market his business, and using those cars to travel.  He

 20    does a lot of traveling, the debtor, and when he's in a

 21    residency working at the hospital, he has his brothers,

 22    who are working him ---

 23                 THE COURT:  Well, you're not a witness, and

 24    you're not testifying.

 25                 Ask your first question.
```

Page 34

1                    MS. ABOUELAZM:  So that's what I'm hoping

2      today's hearing would be about.

3                    MR. ALEMANY:  Our motion has been on file

4      since February 6th, it's pretty outlined, all these

5      arguments were made in that motion.  You would think that

6      -- and this is our second hearing.  You would think that

7      counsel would have put all this in some kind of response

8      to the Court.  These allegations really haven't changed.

9                    THE COURT:  Well, her argument isn't

10     evidence.

11                   MR. ALEMANY:  Right, right, exactly,

12     your Honor, it's not evidence.

13                   THE COURT:  The evidence is the 51 or 55

14     exhibits in front of me, the docket sheet in the current

15     bankruptcy, and the docket sheet in the two prior

16     bankruptcies.

17                   MR. ALEMANY:  Exactly, your Honor.  Thank

18     you.

19                   MS. ABOUELAZM:  Yes, your Honor, and the

20     evidence that is submitted, and those exhibits show ---

21                   THE COURT:  Oh, yes, if you want a

22     transcript, a copy of today's transcript, they have to

23     request it because it's done by an outside service because

24     it's electronic.

25                   MR. ALEMANY:  Yes, your Honor.

1              THE COURT:  All right.  Ask your first

2    question.

3                   DIRECT EXAMINATION

4    BY MS. ABOUELAZM:

5         Q.    Okay.  Dr. Jouria, are you currently

6    working?

7         A.    I'm currently self-employed.

8         Q.    And what is the name of your business?

9         A.    MedCreds Writing Solutions.

10        Q.    I'm going to go straight into the ---

11             THE COURT:  Say it again.

12             THE WITNESS:  MedCreds Writing Solutions.

13             THE COURT:  Spell it.

14             THE WITNESS:  M-e-d-C-r-e-d-s, one word,

15   MedCreds Writing Solutions.

16             THE COURT:  And what type of business is

17   that?

18             THE WITNESS:  It's under the umbrella of

19   medical marketing, but we mostly just write medical

20   research papers.

21             THE COURT:  Is it a corporation, or is it

22   you doing business?

23             THE WITNESS:  I'm sorry, your Honor, it's an

24   LLC.

25             THE COURT:  Limited liability corporation?

```
 1                    THE WITNESS:  Yes, sir.

 2                    THE COURT:  And who are the corporate

 3   stockholders?

 4                    THE WITNESS:  Myself and my two other

 5   brothers.

 6                    THE COURT:  Has the corporation filed tax

 7   returns?

 8                    THE WITNESS:  Yes, your Honor.

 9                    THE COURT:  For the last 10 years?

10                    THE WITNESS:  We've only been in business

11   since March of 2012.  So since then, yes, your Honor, we

12   have.

13                    THE COURT:  Proceed.

14   BY MS. ABOUELAZM:

15         Q.    Jason, why -- I'm sorry, Mr. Jouria, why did

16   you file bankruptcy in 2010?

17         A.    In 2010 I had just recently graduated from

18   medical school.  I was unable to obtain a medical

19   residency so I was looking for other types work, which are

20   extremely limited for a medical doctor without residency

21   training.

22                    The debt that I accumulated through medical

23   school, the payments that resulted, were way more than I

24   could afford at the time, and while I'm not being in a

25   medical residency, I was able to defer my student loans.
```

1    So the best option at that time was to file for a

2    bankruptcy to get rid of the unsecured debt, and then have

3    the student loans remain and make payments on those.

4              Q.    And were you were working -- you were not --

5    were you working at that time?

6              A.    Initially, right after medical school, I was

7    not.  I soon -- my first paid job as an employer was for

8    Sanford Brown Institute, was a small technical school in

9    Fort Lauderdale.  That was in October of 2008.

10             Q.    Okay.

11                   THE COURT:  Two years before you filed the

12   Chapter 7?

13                   THE WITNESS:  Yes, your Honor.

14                   THE COURT:  Proceed.

15   BY MS. ABOUELAZM:

16             Q.    And then you were able to procure

17   employment?

18             A.    So I was, I was a full-time employee

19   essentially, I was hired as an adjunct professor.  I was

20   teaching several classes each semester.  Some semesters

21   more than others, essentially working over 30 hours per

22   week, and making $22 per hour at the time.

23                   However, the debt that I had obtained prior

24   to medical school, which included all of my private

25   student loans, as well as the federal student loans, as

1    well as all the credit cards that I used to live off of

2    for several years, the resulting payments I was unable to

3    maintain minimum payments on those.

4         Q.    And how did you get into this medical

5    writing courses?

6         A.    Again, while -- I lost one position I was

7    working for, Kaplan College in Pembroke Pines, I was an

8    adjunct professor there, the campus had shut down.  So I

9    lost my position there, and I was looking for any type of

10   work to make ends meet while I was applying for a

11   residency.

12            On-line I found a website called Elends.com

13   (phonetic), and they were looking for a subject matter

14   expert to obtain medical research in order to write and

15   develop courses for their customers, which at the time

16   were paramedics and EMTs.

17            So I was hired as an independent contractor

18   through them, and I wrote several white papers,

19   essentially, that were presented and sold to CE Solutions,

20   and once I saw that I was able to make money from that, I

21   decided to acquire additional help to help me write and

22   research more material.

23            These contracts were all negotiated

24   independent, one at a time, and I decided to incorporate

25   MedCreds Writing Solutions in order to protect myself, and

1    have everything paid through a company legitimately, and

2    then pay my subcontractors through my company as well, and

3    so it seemed to just make sense to legalize it.

4              Q.    Okay, and when did you get involved with

5    NetCE, the creditor here?

6              A.    NetCE would be sometime approximately in

7    2012, I want to say, mid to late 2012.  I think my first

8    point of contact was via e-mail with a Ms. Sara Campbell,

9    who was, I believe, the director of clinical education, or

10   on-line course -- you know, basically she was my point of

11   contact, and ---

12              THE COURT:  What was the date of that, the

13   first contact with CE Resources?

14              THE WITNESS:  Sometime in mid to late 2012,

15   your Honor.

16              THE COURT:  2012?

17   BY MS. ABOUELAZM:

18              Q.    CE Resource is different from NetCE,

19   correct?

20              MR. KERN:  It's a DBA.

21              MS. ABOUELAZM:  Oh, okay, okay.

22              MR. KERN:  The same company.

23              THE WITNESS:  Yes.  No, I understand,

24   your Honor.  NetCE, CE Resource, Ms. Sara Campbell was my

25   point of contact, and that happened sometime in 2012.

Case 0:15-cv-61165-WPD  Document 239-1 Entered on FLSD Docket 03/30/2018  Page 40 of
Case 16-27130-RBR  Doc 139  Filed 05/09/17  Page 40 of 81
81

Page 40

```
 1                    THE COURT:  Proceed.

 2    BY MS. ABOUELAZM:

 3            Q.    Okay, and describe the relationship that you

 4    had, and the work that you were hired for.

 5            A.    So I reached out to Ms. Campbell, and told

 6    her that, you know, I'm a medical doctor, I don't really

 7    have a residency.  I do medical research, and I have been

 8    successful as an independent contractor with another

 9    company, are you guys interested in any material?  She

10    contacted me again via e-mail and said that, yes, we -- if

11    you present what they describe as a proposal, they will

12    review it, and then pay an honorarium based on that

13    proposal.  The first one I believe was a course called

14    multiple sclerosis, which I did the research on and

15    presented it to them to develop into a publication of some

16    sort.

17                    At the time I wasn't sure if it was a

18    medical course, or through writing, or an on-line

19    publication.  That wasn't made -- I wasn't privy to that

20    information.  However, they did end up publishing it into

21    a written course, and they sent me proof of it, and I

22    verified that the information provided in there was my

23    research, and I signed off on it, that I was okay with it,

24    essentially.

25                    There were two more courses like that, that
```

1    happened in similar fashion.  I want to say the other one

2    was decubitus ulcers, and I forget the name of the third

3    one, but around that time I was, on a continuing basis,

4    submitting course proposals to NetCE, and they would pay

5    me an honorarium based on that proposal.

6              The proposal, of course, included an

7    abstract, the medical topic at hand, the objectives, and

8    the list of -- a detailed outline of what I would present

9    that could be used for a course of sorts, and so I was

10   paid based on the word count, a proposed word count.

11             Over the course of approximately an

12   additional year, into 2013, there were seven more courses

13   that were accepted for a proposal.  I presented medical

14   research that was involved.  I was paid an honorarium for

15   those seven courses, which I believe approximated around

16   $60,000.  However, the point of contact, Ms. Sara

17   Campbell, I was no longer receiving any communication from

18   those -- the fourth through the tenth courses.  I asked

19   about a possible publication, I asked about, if there was

20   any edits that were needed, I asked if there was any

21   additional resources they wanted, several e-mail

22   communications went unresponded to, no communication, and

23   I wasn't sure what was happening at that point.

24             So I had access to all this medical research

25   that I had put together, you know, and I contacted another

1    company, at the time was Elite CME, and asked them if they

2    were interested in this medical research.

3                    I knew that they were a continuing medical

4    education course, and that they sold similar courses as

5    NetCE did, and I presented them with some of these courses

6    that weren't published by NetCE.

7                    They asked if that company was publishing

8    them.  I said, I do not know.  They asked me, is this the

9    same research that you've done for them?  I said, yes.

10                    However, I have no problem rewriting this

11    material for you, based on my research.  They thought that

12    that was appropriate, and they contacted me to rewrite

13    those seven courses at no additional payments for them --

14    from them, sorry, so they were paid on rewritten courses,

15    seven rewritten courses.

16                    THE COURT:  And how were they paid?

17                    THE WITNESS:  So they had a different

18    payment structure than NetCE.  Elite paid, I believe --

19    and forgive me, your Honor, but I don't -- there is a

20    couple different payment structures.  It's similar, but

21    it's based on credit hour, and the credit hour is based on

22    words.

23                    So I believe at the time Elite based a

24    credit hour on 3,000 words, and each credit hour I would

25    be paid $350.  So a total of those seven courses, in

Case 0:15-cv-61165-WPD  Document 230-139  Entered on FLSD Docket 03/30/2018   Page 43 of
81
Case 16-2719-RBR  Doc 39  Filed 05/09/17  Page 43 of 81

Page 43

1    short, in essence, in total I was paid approximately

2    $35,000 from Elite, two rewrite those seven courses.

3                    THE COURT:  And how much were you paid for

4    the first three courses?

5                    MS. ABOUELAZM:  From NetCE?

6                    THE COURT:  By Elite.

7                    THE WITNESS:  Nothing, I presented that to,

8    them because that was published work, and I understood

9    that.  So I never intended to send that to them.  That was

10   reviewed, published work.  They were the author.  I was

11   the subject matter expert, and I signed off on the

12   (inaudible) that I did for them, and I was very happy with

13   that.

14                   It was the seven additional courses that I

15   wasn't sure what was happening to, and so I figured, well,

16   someone else could use this material to develop a course

17   out of it, or an on-line campaign.

18                   THE COURT:  So you contacted the --

19   CE Resource's competitor?

20                   THE WITNESS:  One of their many competitors,

21   I assume, yes, I did a search on-line for CME providers,

22   and I contacted several of them.

23                   THE COURT:  Proceed.

24   BY MS. ABOUELAZM:

25         Q.    Well, I'm going to continue.  So you wrote

1    courses for -- you rewrote the courses for Elite?

2             A.    So I rewrote those courses for Elite.  I

3    asked them, do you want completely different medical

4    topics?  They write, no, it's not a problem, these are

5    general medical courses.  Just, you know, rewrite the

6    courses based on the same research, that's fine, and so I

7    did that, I rewrote the courses.  They had copies of the

8    original works, and they had copy of the edited, rewritten

9    work based on the same research.

10            Q.    And when did this relationship start with

11   Elite?

12            A.    I believe this was in 2013, mid to late

13   2013.

14            Q.    Okay.

15            A.    After I haven't heard from Net CE's --

16   communication, I haven't heard from them for a few months,

17   several months.  You know, I contacted -- that's when I

18   started contacting other providers.

19            Q.    Okay, and then -- now, how did this

20   litigation come into play?

21            A.    I came -- you know, my parents live in Fort

22   Lauderdale.  I was at the time, 2015, I was still doing my

23   preliminary surgery residency at Jackson Memorial, I was

24   living in Miami, and I would come home on the weekends, or

25   every other weekend and, you know, my dad usually collects

1    the mail, and he saw something that looked very important

2    to him.  It was a letter, I believe from the legal team of

3    NetCE, it was a cease and desist letter that surprised me.

4    I brought a copy of it today.  This kind of surprised me,

5    and I wasn't really sure where it was coming from.

6    Obviously it scared me.  I was -- it seemed very

7    threatening.  I wasn't sure what it was in regards to, and

8    I contacted a lawyer, Mr. Richard Ross, to seek legal help

9    regarding the matter, and that's how it started.

10           Q.    Do you have any idea what this letter was

11   about or why it was sent to you?

12           A.    Initially, no, but I read through, there are

13   several pages, and then I kind of got a sense of what it

14   was about.

15           Q.    And what did you -- did you actually stop

16   writing courses for ---

17           A.    Oh, yes, absolutely, of course.  At that

18   time I was actually not writing too much.  I was in the

19   middle of residency, so it wasn't nowhere near the amount

20   of time I was putting into it in 2012 and 2013 but, yes, I

21   completely stopped writing all courses at the time because

22   I wasn't sure how much it entailed.

23           Q.    Okay, and then ---

24           A.    And then I was contacted by Elite's legal

25   team, and another CME provider named Nurse CE for less,

1      who received -- must have -- and, again, this is all my

2      assumption, must have received a similar letter from

3      NetCE's legal team, and asked me what I knew about it and

4      how to proceed.  I told them that I was in the process of

5      hiring an attorney and I'll advise you as soon as

6      possible.

7                  I asked them if there was anything that I

8      could do at the time to just kind of solve the situation.

9      Nurse CE for Less actually said, sure, I mean, whatever

10     questions are -- whatever courses were in contact, can you

11     just please rewrite us new ones, completely brand new

12     ones, and so I did, and I did those for free.  I did it as

13     a favor, and I understood that they had to pay for legal

14     counsel for defense purposes, and I wrote several courses,

15     I forget at this time how many, and they were happy with

16     it, to the point where they decided to keep a continuing

17     working relationship and pay me for all future courses,

18     which is what I do now.

19          Q.    Now, do you believe that you actually

20     infringed upon NetCE's copyrights and published their

21     material?

22          A.    No, ma'am, and that's what I'm glad to get a

23     chance to just explain the situation.  I feel like -- you

24     know, forgive me, your Honor, if I'm speaking out of legal

25     term, I just really feel like it got blown out of

1   proportion in the sense that I never meant to bamboozle

2   any company, or question the integrity of any continuing

3   education provider.  I mean, as a doctor myself I

4   understand the importance of it.  I respect the importance

5   of it, absolutely.  That's why those original three

6   courses, I -- they were published, and it was great, and I

7   received credit as an expert, it was wonderful.  I thought

8   it was a great working relationship.  It was only after I

9   lost communication with the company, that I wasn't sure

10  where those courses stood.  So I thought to say, well, you

11  know, I can present this to another company that may want

12  to take this material and publish it for their own.  I

13  wasn't seeking anything done, and I'm not sure if the term

14  is relevant, try to trick anybody, for lack of a better

15  word, and wasn't trying to receive credit for something I

16  hadn't done.

17           MR. ALEMANY:  Your Honor, I'm sorry to

18  interrupt.  We're getting a little bit off topic.  None of

19  the cases, none of the Code sections that I've cited to

20  have as an issue for this Court's consideration the basis

21  of the underlying claim, and that's the only thing that

22  the Court has heard testimony about for the last five to

23  ten minutes, you know, the basis of the underlying claim.

24           The only issues that are on for the Court's

25  determination of whether there was a bad faith filing, and

Case 0:15-cv-61165-WPD  Document 239-1  Entered on FLSD Docket 03/30/2018  Page 48 of 81
Case 16-27130-RBR  Doc 139  Filed 05/09/17  Page 48 of 81

Page 48

1   whether that presumption can be overcome is what the

2   debtor did in bankruptcy.

3                    THE COURT:  Well, I understand that, but the

4   debtor may be establishing a basis for the modification of

5   the stay to allow the proceedings to go forward to resolve

6   these factual questions.

7                    MR. ALEMANY:  But even under that

8   circumstance, your Honor, there is a presumption of a bad

9   faith filing.  So basically it's, has he abused the

10  bankruptcy process and hindering that.

11                   THE COURT:  Well, his explanation is that he

12  didn't, and this is why.

13                   MR. ALEMANY:  Okay.

14                   THE WITNESS:  Your Honor, I'm sorry, I just

15  want to add, just if I may, I had no intention -- I did

16  not want to file a Chapter 13 bankruptcy.  I don't want to

17  destroy my credit.  I had the intent of, you know,

18  finishing my residency, of starting a family and buying a

19  home.

20                   THE COURT:  Well, why did you file two of

21  them?

22                   THE WITNESS:  Well, the initial one was an

23  advisement to protect myself from a possible large lawsuit

24  that we weren't sure what it was going to cost, and I

25  couldn't afford the litigation.  At the time Mr. Richard

```
 1   Ross had advised me that it was going to take several

 2   weeks and/or months and this amount of money to continue

 3   this, and so he said an option is if you can't afford it,

 4   well, then, you know, you have to file for bankruptcy, or

 5   an option is to file for bankruptcy.

 6               I already filed a Chapter 7 back in 2010,

 7   which I'm still suffering from credit-wise, I still don't

 8   really own anything.  Okay.  Everything is leased, and

 9   there is payments on, or -- and I have an apartment.

10   There is no large capital money that's hidden in an

11   account.  I don't own any assets.  I did not want to file

12   a Chapter 13.  I felt like this was the best -- I wanted

13   to settle the -- I wanted to make the easiest, most

14   streamlined way to settle this.  I offered them to pay

15   back up to $40,000 of the money that they initially paid

16   to me.

17               MR. ALEMANY:  Your Honor, I object, it's

18   settlement -- confidential settlement discussions.

19               THE WITNESS:  I'm sorry to ---

20               MS. ABOUELAZM:  Which is in their motion.

21               MR. ALEMANY:  It is not, the amount of any

22   settlement offer is not.

23               THE WITNESS:  I can just -- I don't know

24   what's in the motion, your Honor, but this is what I

25   offered, $40,000 to pay them back over the course of a
```

```
 1    year.

 2                 THE COURT:  Proceed, ask your next question.

 3    BY MS. ABOUELAZM:

 4         Q.    So you filed -- okay.  So, you filed May 15,

 5    2015.

 6         A.    Yes.

 7         Q.    Were you making payments to the trustee?

 8         A.    Yes, ma'am.

 9         Q.    And were you submitting all the information

10    to the trustee that was requested of you?

11         A.    Yes, ma'am.

12         Q.    Why did you dismiss the case in 201 -- the

13    2015 case, why did you dismiss it in 2016, about seven

14    months later?

15                 THE COURT:  Which case, the 15 ---

16                 MS. ABOUELAZM:  The 2015.

17                 MR. ALEMANY:  Object, your Honor.  That's

18    mischaracterizing what happened.  He did not dismiss.

19                 THE COURT:  He did not dismiss the case.

20                 MS. ABOUELAZM:  Yes.  I'm sorry, but it's

21    Case Number 15-28811.

22                 THE COURT:  He did not dismiss.

23                 MS. ABOUELAZM:  I'll rephrase the question.

24                 THE COURT:  All right.

25    BY MS. ABOUELAZM:
```

1          Q.    Why was your Chapter 13, the 2015 case

2    dismissed?

3          A.    I couldn't afford the payments that I was

4    initially making.  I'm assuming that once I did make a

5    payment it was dismissed.

6          Q.    Okay.

7          A.    I missed -- I believe I made three payments,

8    that were approximately nine hundred and change.  By the

9    fourth one I just couldn't come up with money in time, and

10   I believe that's why it was dismissed.

11         Q.    And what was the trustee objecting to -- in

12   other words, your case, why were the payments too high

13   that you couldn't ---

14         A.    Sure.  So it was based on the fact that the

15   business had several cars that were leased out, that were

16   used for marketing to new companies, or potential

17   companies, when the business was up and running, which at

18   that time, of course, after that cease and desist letter,

19   there was no up and running business, I stopped

20   everything, but according to the documents I provided, the

21   tax return and the bank statements to the previous six

22   months, there was a large sum of money coming in every

23   month from those courses.  So I assumed that was, the

24   payments were based on that.  I wasn't making that sum of

25   money any more, or even in the last couple of months, and

1    I just didn't have the reserves, and so I ran out of money

2    and I couldn't make the payment.

3            Q.    And when you decided to -- when you decided

4    that you were not going to be able to go forward with the

5    Chapter 13, what was your alternative, how were you going

6    to address this claim?

7            A.    I offered to settle again, if there was a

8    way to, you know, rewrite the courses, you know, pay back

9    all the money that was paid to me over time, whatever

10   would work for opposing counsel, whatever would work.  I

11   honestly -- I would be happy today if you said, pay the

12   money back and, you know, get out of Chapter 13, just pay

13   them this amount of money, that's perfectly fine.  Happy

14   to do it.

15           Q.    And what prompted you to file this 2016,

16   this ---

17           A.    There was no resolution.  I mean, my

18   attorney, Rich Ross, advised that there was no possible --

19   it seems like very little possibility of settling.  He

20   said you're going to have to continue litigation, and so I

21   paid him whatever retainer I had and filed for the

22   Chapter 13.

23           Q.    Are you trying to defraud the creditor?

24           A.    No, ma'am.  No, I think that's obvious.

25           Q.    Are you trying to run away from the

Page 53

```
 1   liability --
 2           A.     No, ma'am.
 3           Q.     -- that you might have?
 4           A.     No, I think that's very evident.
 5           Q.     And are you willing to pay them back what
 6   you can afford to pay back?
 7           A.     Absolutely, absolutely.
 8                  THE COURT:  Why did you restrict the
 9   payments to 36 months?
10                  MS. ABOUELAZM:  Well, he's under median
11   income, so he's a 36-month -- he's eligible for a 36-month
12   plan.
13                  THE COURT:  But he's not prohibited from a
14   60-month plan.
15                  MS. ABOUELAZM:  No, he's not, and if the
16   creditor would like to object.
17   BY MS. ABOUELAZM:
18           Q.     So my final question is, what are you
19   seeking out of bankruptcy?
20           A.     Honestly, and again, forgive me for lack of
21   -- I just want this problem done with, however, the
22   easiest possible way, if it's through bankruptcy, I'll
23   take it.  If it's through paying them directly, I'll take
24   it.  I just want to finish with the legal proceedings and
25   just move on.  I'm happy working with one CME provider.
```

Page 54

1    It's enough to get me by for now until I obtain my

2    residency and complete the training, and eventually become

3    a board certified physician, and that's it, that's all I

4    want.

5             MS. ABOUELAZM:  No further questions.

6             THE COURT:  All right.  Any cross?

7             MR. ALEMANY:  Yes.

8                  CROSS-EXAMINATION

9    BY MR. ALEMANY:

10        Q.    Mr. Jouria, you testified you were unable to

11   obtain residency in 2010 --

12        A.    Yes, sir.

13        Q.    -- and that's why you filed for bankruptcy?

14        A.    Well, it wasn't because I wasn't able to

15   obtain residency.  It was because I had so much debt at

16   the time, I didn't have a really good paying job, and

17   because it was a residency, I couldn't defer my student

18   loans.

19             Student loans are allowed to be deferred if

20   you're in residency for the three years, and so the loans,

21   coupled with the debt, the credit card debt that I had

22   acquired, was just way too much.  So ---

23        Q.    It was difficult to find a job at that time?

24        A.    It was difficult to find a -- obtain a

25   medical, a residency program.

Page 55

```
 1              Q.     Are you familiar with an entity by the name,
 2      it goes ECFMG?
 3              A.     Yes, your Honor -- yes, sir.
 4              Q.     It stands for Education Commission For
 5      Foreign Medical Graduates?
 6              A.     Absolutely.
 7              Q.     Have you ever had your graduate degree
 8      revoked?
 9              A.     I know what you're asking about, the ECFMG
10      certification.
11                     MS. ABOUELAZM:  Objection, your Honor.
12      There is no relevance to this proceeding.
13                     THE COURT:  Well, I don't know, I haven't
14      heard the answer.
15                     MR. ALEMANY:  Thank you, your Honor.
16      BY MR. ALEMANY:
17              Q.     In fact, it was permanently suspended for a
18      period of time.  I know that that was removed, but it was
19      permanently -- can you tell the Court why your graduate
20      degree as a medical student, the medical graduate was
21      revoked permanently?
22              A.     I'd be happy to clear that up, and I think
23      you're misrepresenting, to be honest.
24                     So, Education Counsel for Foreign Medical
25      Graduates, is a private entity that certifies that medical
```

Page 56

1    education done as a foreigner is equivalent to that done

2    as a U.S. grad.

3                So, after going through medical school and

4    passing the required board exams, the ECFMG grants you a

5    certification that your education is equivalent to a U.S.

6    graduate.   That was awarded to me in March of 2007.

7                In applying for a residency program, the

8    following year, when I was unable to match, I reused a

9    letter of recommendation from the previous year, and I had

10   signed the letter writer's name and submitted it without

11   telling my letter writer that I was resubmitting the

12   letter.

13                When one of the graduate residency programs

14   questioned me about it, I said, yes, guilty, yes, I did

15   not ask permission.   This was provided to me the previous

16   year.   I literally updated the letter and signed it

17   myself.   I was wrong.   I withdraw my application, and I

18   removed myself from the entire application cycle.

19                Shortly thereafter I presented myself in

20   front of the ECFMG.   I admitted to everything that I had

21   done wrong.   I apologized for it.   I spoke with the letter

22   writer, and he forgave me, he wrote me a letter saying it

23   was a simple mistake, and they didn't want to grant the

24   ECFMG recertification process back, so I had to hire an

25   attorney at the time to reinstate my ECFMG certification,

1   which is not a graduate degree.  It's a certificate that

2   your education is equivalent to a U.S. ---

3          Q.    And you appealed that decision and you lost,

4   and there was a determination that there was what they

5   call irregular behavior because you submitted inauthentic

6   letters of recommendation in an effort to get a U.S.

7   residency position in the United States?

8          A.    It was revoked on the assumption that one

9   letter, one letter by Dr. Manuel Suarez, was unverified,

10  and that constituted irregular behavior, and so per their

11  rules, very simply, irregular behavior allows them to

12  revoke your ECFMG application.  Through the appeal I --

13  you know, I presented a letter from that letter writer

14  showing that, you know, I went to him in person,

15  apologized.  He wrote me a letter, and asked them not to

16  do that, not to revoke the certification.  They chose to

17  do so.  So my only other option was to seek legal counsel

18  in an effort to get it back.

19          Q.    And ultimately -- and I'll advise you to

20  choose your words wisely, because you're under oath, there

21  is a court reporter taking everything down, and I know

22  that you filed an injunction in the District of

23  Pennsylvania, they ultimately -- they -- there was never a

24  determination that you did not, in fact, submit that

25  letter, and you're admitting to that today, correct?

1        A.      Yes, sir.

2        Q.      Okay.  All right.  You were employed -- you

3   were employed during 2015, for your first Chapter 13, at

4   Jackson Memorial, you were doing a residency there?

5        A.      Yes, sir.

6        Q.      And what happened to that employment?

7        A.      So, I was hired as what's called a

8   preliminary surgical resident, meaning given a one-year

9   contract to prove your worth, essentially.

10               So I did that.  At the end of the year I was

11  awarded intern of the year, and I was congratulated with a

12  second year, as a second year preliminary surgical

13  resident as a PGY II, and I successfully completed that.

14               At the end of that term, there was no longer

15  any preliminary positions offered to the program.  You

16  have to get what's called a categorical position, meaning

17  you will fulfill out the remainder of the residency.

18  There wasn't a position available for me at the time, and

19  so I couldn't continue employment there.

20       Q.      Okay, and what efforts have you made to

21  reapply for residency?

22       A.      Several.  I've contacted -- right now we're

23  after the match period, which is the period when new

24  medical graduates can apply for a residency program, and

25  they're awarded, obviously, the most sought after

Case 0:15-cv-61165-WPD  Document 239-1  Entered on FLSD Docket 03/30/2018  Page 59 of 81
Case 16-27150-RBR  Doc 139  Filed 05/09/17  Page 59 of 81

Page 59

1   positions, but then again there are positions available

2   after that, which are posted on several websites, which I

3   reach out to and send e-mails out to.  I have my

4   application on electronic file, I submit that.  If I'm

5   granted an interview, they offer me an interview, and so

6   on and so on and so forth until I obtain employment.

7                I reached out to my original program, I

8   actually spoke with the program coordinator this morning.

9   There is no positions available right now.  She advised to

10  come in and volunteer some more, in maybe another

11  department, such as emergency medicine or internal

12  medicine.

13        Q.   How much more residency do you have to

14  complete?

15        A.   So my initial intention was to complete the

16  general surgery residency program, which is a total of

17  five years.  I completed two of those.

18        Q.   And I noted in the schedules that you were

19  hopeful that another residency position would become

20  available, correct?

21        A.   That's what I can hope for, yes, sir.

22             THE COURT:  Have you made application at

23  other hospitals or medical facilities?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Besides Jackson, which ones?

1          THE WITNESS:  Several -- residency programs?

2          THE COURT:  Yes.

3          THE WITNESS:  Yes, sir, several.  A lot of

4    them are out of state, and forgive me, I don't have the

5    names exactly, but they're posted, for example, emergency

6    medicine is another specialty I sought after, on the SAEM

7    website, there is a specific page that has vacant

8    residency positions offering a PGY II, or PGY III.  I've

9    applied to several of those.  One is in Osceola, in

10   Florida.  Kendall Memorial has a general surgery program,

11   I applied to that one.  There are several, there are

12   several, and they pop up on -- sometimes on a daily, or

13   even a weekly basis.  ABDS.org is another website for a

14   general surgical program directors, to post vacant

15   positions, you can apply directly through that.

16          THE COURT:  Proceed.

17   BY MR. ALEMANY:

18      Q.    You filed -- are you aware that in your

19   Chapter 15 -- Chapter 13 case in 2015 you filed four

20   plans ---

21          THE COURT:  Do you have any idea what that

22   noise is next door?

23          THE WITNESS:  I'm sorry, can you repeat

24   that?

25   BY MR. ALEMANY:

Page 61

```
 1              Q.    You filed four Chapter 13 plans.

 2                    (Thereupon, there was a conversation in the

 3     background.)

 4                    THE WITNESS:  Four Chapter 13 plans.

 5                    THE CLERK:  We're trying to solve it.

 6                    THE COURT:  Everybody from my Court -- my

 7     chambers is in this Courtroom.  I don't know who is making

 8     noises in my Chambers.

 9                    ECRO:  It's not in your Chambers.  It's next

10     to that.

11                    MR. ALEMANY:  That could be a problem.

12                    THE WITNESS:  I'm sorry ---

13     BY MR. ALEMANY:

14          Q.    Do you recall your counsel filing four

15     plans, four Chapter 13 plans?

16          A.    No, I ---

17                    THE COURT:  The first 13.

18     BY MR. ALEMANY:

19          Q.    In the first 13.

20          A.    I don't recall.  I'm not sure what that

21     means, four -- we filed one.

22          Q.    Well, there was four -- there was four

23     plans, there was a first -- there was a plan, then there

24     was a first amended plan, then a second amended plan, then

25     a third amended plan, and then the case was dismissed.
```

1          A.    So I'm just being very honest with you, I'm

2     under oath.  I'm not sure where that changed on the lines.

3     All I know is that I was told to pay this amount of money,

4     and that's what I started paying, and I submitted whatever

5     documents were requested of me, and I gathered those as

6     soon as I could and submitted those, and then there was a

7     payment plan, and so I would just send that payment plan

8     in until I couldn't afford it.

9          Q.    So, but what the trustee was almost

10    chronically asking for was information, there is like 11

11    -- like 11 different areas of inquiry.

12         A.    Sure.

13         Q.    Asked about balance sheet, bank statements

14    for your company, evidencing calculation of your income.

15         A.    Sure.

16         Q.    Why did you need three cars, one household,

17    one car, as opposed to owning a car and leasing three?

18    Why weren't you amending your plan to pay at least the

19    calculation of CMI?  Why weren't you explaining wire

20    transfers of $12,500, and $5,600, and $3,000?  Why were

21    you using your business account for personal expenses, et

22    cetera, et cetera?

23         A.    I ---

24         Q.    She asked for that information, and that's

25    documented in the court file.  The first three plans that

1    you filed proposed payments in the thousands -- you know,

2    approximately $1,000 a month, that was what you were --

3              A.    That's what I was paying, yes, sir.

4              Q.    -- proposing to pay?

5              A.    Yes, sir.

6              Q.    But the trustee, she was diligent, she was

7    -- she was on this.  I mean, she was -- every time you

8    filed a plan, she'd say, hey, you're missing this stuff,

9    you're missing this stuff, and eventually she dismissed

10   the case -- she filed a motion to dismiss the case,

11   because you didn't provide the documents.  Your counsel

12   filed a motion to reinstate saying I did submit them.

13   Great.  Judge Isicoff reinstated the case.  Then there is

14   another plan that's filed, and that's the third amended

15   plan, that's actually the last plan, and that one calls

16   for more money to be paid.  That one calls for almost 15

17   or $1,600 to be paid, and then at that point you make a

18   decision, once you're actually paying probably something

19   closer to what you should have been paying under the

20   first, second and third plan, once push came to shove, and

21   you actually had to pay something back that was

22   significant, you were like, well, you know, Chapter 13

23   doesn't suit me anymore, I don't want to do this, and this

24   litigation ---

25              MS. ABOUELAZM:  Objection, your Honor.

Page 64

```
1    BY MR. ALEMANY:

2           Q.    This litigation, slow down, and, you know,

3    now is a good time to get out of this, because it's going

4    to cost me money, and that's why this case ---

5                  MS. ABOUELAZM:  Objection.

6    BY MR. ALEMANY:

7           Q.    That's why that case was dismissed.

8                  THE COURT:  Overruled.  You may answer the

9    questions.  He's already testified ---

10                 THE WITNESS:  Are you asking me a question?

11   BY MR. ALEMANY:

12          Q.    Yes, because you testified that you -- that

13   you dis -- well, that you stopped making payments so the

14   case could be dismissed.

15          A.    I didn't stop making payments.  I couldn't

16   afford the payments.  So I missed one.  I didn't -- and to

17   be honest, I didn't know there was a payment for 1,500.  I

18   had just been paying $1,000, and even that became

19   difficult to afford.

20          Q.    Well, that's the beauty of Chapter 13, that

21   it's not what you can afford.  It's what your disclosures

22   say that you can afford.

23          A.    Right.

24          Q.    So your disclosures that were filed with

25   this Court, after the trustee was on you, and asking you,
```

Case 0:15-cv-61165-WPD Document 239-139 Entered on FLSD Docket 03/30/2018 Page 65 of
81
Case 16-27130-RBR Doc 39 Filed 05/09/17 Page 65 of 81

Page 65

1    hey, I need this, I need that, I need that, led the

2    trustee to basically object to every plan, I think except

3    for this one, and then once you had to pay what you were

4    supposed to pay, even though it still contained a whole

5    bunch of objectionable stuff, like the payment of three

6    leases and whatnot, you said, you know what, I'm not --

7    this doesn't suit me anymore, and interestingly after you

8    filed that plan, the third amended plan, the trustee still

9    filed a notice of deficiency saying that there was still

10   stuff that you hadn't provide.  So you filed a fourth

11   amended plan, I'm sorry, and this one -- I misspoke

12   before, this one called for almost $2,000 payments.

13          A.    I don't know how I would afford that.  So, I

14   can -- I don't know if you're asking me a question, or you

15   just want me to explain.

16          Q.    Well, no, I'm kind of giving -- I'm giving

17   you some perspective, because you told me you didn't even

18   know that four or five plans had been filed.  You told me

19   that you thought it was just one plan, and that it asked

20   for too much money, but in reality what we're seeing here

21   is that it was one plan, and then four amended plans, and

22   then once that plan was filed, and that's Exhibit 26.

23                MR. ALEMANY:  May I approach?

24                THE COURT:  Yes.

25   BY MR. ALEMANY:

1          Q.    This was your last plan.

2          A.    Okay.

3          Q.    And that one called for almost $2,000.

4          A.    This says $1,067.85.

5          Q.    To your secured creditors, your alleged

6    secured creditors, and then underneath that there is also

7    a payment to ---

8          A.    961.

9          Q.    So after -- so then can you read the top

10   banner on that, when that plan was filed?

11                MS. ABOUELAZM:  I'm sorry?

12                THE WITNESS:  Sure, filed 4-29-16.

13   BY MR. ALEMANY:

14         Q.    Okay, and order denying confirmation on

15   May 10th, 2016.  So that was effectively what ended the

16   Chapter 13.

17                MS. ABOUELAZM:  I'm sorry, your Honor, but I

18   need to clarify something.  Counsel is suggesting that he

19   had a $1,900 plan.  The total plan payment was 1,067.  Of

20   the thousand ---

21                THE COURT:  But Exhibit --

22                MS. ABOUELAZM:  26.

23                THE COURT:  -- 26.

24                MS. ABOUELAZM:  Yes, the way the plans are

25   done in the Southern District, is the whole plan payment

Page 67

1    is placed on Line A, and then it breaks it down, and so

2    the unsecured creditors are getting 961 of the 1,067, and

3    the remaining 10 percent goes to the trustee's fees.

4              MR. ALEMANY:  That's right, your Honor.  I

5    apologize.  That's, in fact -- so that's actually worse.

6    That means that he couldn't -- even though, based on his

7    income figures, he was saying that he could only pay a

8    thousand dollars, but that's actually worse.

9              THE WITNESS:  I can ---

10             MS. ABOUELAZM:  A thousand dollars to the

11   unsecureds, and he was paying -- and I don't know if

12   counsel is reading the plan correctly, the unsecured

13   creditors were being paid out of the plan, which is

14   listed ---

15             THE WITNESS:  I was still paying for those.

16   BY MR. ALEMANY:

17        Q.   But ultimately the unsecured creditors

18   didn't get paid anything because the case was dismissed,

19   correct?

20        A.   The case was dismissed, yes, sir.

21        Q.   And then you refiled Chapter 13 now before

22   this Court with a different trustee, and now -- now, even

23   though you filed five plans in the case before, and even

24   though the trustee basically documented all these

25   deficiencies with the information you were providing, now

1   -- and even though the litigation was about to heat up,

2   now, now bankruptcy is something that you can use, and

3   something that you need again, when you could have just

4   made the thousand dollar payments and kind of stayed

5   everything, now you come back and you say, now I need --

6   now I need the protection of the Bankruptcy Court, and

7   that's exactly what the case law prevents.

8            A.    I don't know if that's a question or not.

9            Q.    The question is ---

10           A.    The thousand dollars I can't afford.  I

11  couldn't afford the thousand dollars, that's the problem.

12  I didn't want to stop the bankruptcy.  If I could make

13  those payments, I would have continued from the initial

14  2015.  I had already filed, basically my credit is ruined.

15  I mean, I didn't see any benefit of not continuing at that

16  point.  I thought there was going to be a settlement, and

17  I could solve it, and it would be a lot easier, and not

18  deal with this thing for the next three to five years.

19           Q.    So why did your attorney file a plan saying

20  that could pay it?

21           A.    The initial one?

22           Q.    Yeah, why did she file a plan saying that

23  you could pay a thousand dollars if you couldn't?

24           A.    To be honest, you know, Counsel, I don't

25  know the details that go into calculating these payments.

Case 0:15-cv-61165-WPD Document 239-1 Entered on FLSD Docket 03/30/2018 Page 69 of
81
Case 16-27130-RBR Doc 139 Filed 05/09/17 Page 69 of 81

Page 69

1    I submitted everything that was asked of me.  My bank

2    statements, my tax returns, pay stubs from my employment,

3    there was nothing that was being hidden.  All my -- you

4    know, yes, my monthly expenses were probably poorly

5    managed in the sense that some of my personal spending

6    came out of my business account.  I tried to, you know,

7    fix that.  I would make my own monthly statements to try

8    and, you know, make it look more legitimate, you need to

9    understand, but I provided everything, nothing was hidden

10   or not exposed.  I mean ---

11           Q.    Do you know why your schedules were amended

12   as many times as they were --

13           A.    I don't.

14           Q.    -- in the 2015 case?

15           A.    I'm not sure.  I know there is a question of

16   the vehicles, which weren't leased under my personal

17   credit.  I couldn't do it, because I had poor credit, but

18   my business had decent credit, and we leased out the

19   vehicles to expand our marketing.

20           My brothers are not paid by the business.

21   We don't make that much money, but their vehicles are paid

22   for, essentially, and they use that as the commute and

23   work for the business.

24           I believe that was part of it, and then my

25   mother and father live in Hollywood.  They each -- they're

 1    both retired.  I help with their monthly payments for

 2    their rent.  Actually my mom stays in my Hollywood

 3    apartment, I kept that for her.  At the time I was living

 4    in Jackson Memorial Towers, right across the street from

 5    the hospital, and I would come home every weekend and

 6    check on them.  So I think that was also a question, to

 7    residences, and why was there a need for that, but I can't

 8    speak as to the, quote, unquote, plan.  I did not --

 9    honestly didn't know there was a different plan.  I just

10    knew there was a payment, and that's what I was paying.

11            Q.    So the reason why you filed for bankruptcy,

12    you already testified, was to stop the litigation?

13            A.    It was to solve this as soon as possible.

14            Q.    And you preferred this forum, as opposed to

15    District Court forum?

16            A.    If this would be quicker.

17            Q.    That's what you're proposing, that this

18    would be quicker?

19            A.    It seemed just easier and simple at this

20    point.  I mean, I didn't know what else to offer.  I was

21    happy to pay back the money, rewrite the courses, pay ---

22            Q.    Well, I'm not asking you about the

23    settlement discussions, and about what ---

24            A.    Well, I mean, I'm answering your question

25    about what I thought was easier, and I'm giving you an

1    answer based on my honest, genuine opinion.

2          Q.    So, you didn't think it would be easier to

3    have a Court that's had this matter before, for almost two

4    years, to continue litigating it -- a Court that had set

5    this matter for trial at one point?

6          A.    Do I think it would be easier for them to

7    litigate it?

8          Q.    Yes.

9          A.    I don't think so.

10         Q.    Why?

11               THE COURT:  Well, it could be set for trial

12   immediately, you tell your story, they tell their story

13   and a jury decides it.

14               THE WITNESS:  Sure.  I mean, I was under the

15   premise that it was going to take a certain amount of

16   time, and I'd have to pay more legal fees, which I

17   couldn't afford my other attorney to protect the copyright

18   infringement.  It just -- I just wanted to do whatever was

19   the simplest and most cost effective for me.

20               I'm still struggling.  I mean, I'm not, you

21   know, making a massive amount of money.  I'm getting by

22   with the courses now, and I'm trying to continue my -- you

23   know, like you brought up before, it hasn't been an easy

24   road getting the residency, and it's not an easy road

25   ahead.  I would like to focus all my efforts on that.  I

Page 72

```
 1    don't want to be in and out of Court.  I don't want to be
 2    flying to California over this.  I just want to solve it
 3    in the easiest ---
 4                   THE COURT:  The California case is over.
 5    The only case that's pending is the Florida case.
 6                   THE WITNESS:  Even better.
 7                   THE COURT:  That's Judge ---
 8                   MR. ALEMANY:  Dimitrouleas, I always
 9    mispronounce it, I apologize.
10                   THE COURT:  Dimitrouleas.
11                   THE WITNESS:  So the easy answer is -- I
12    mean, the honest answer is, this was -- this seemed like
13    the quickest resolution, and happy to satisfy all parties.
14    If I was just, you know, to -- all right, I'm filing
15    bankruptcy, I'll pay you whatever I can, and you guys can
16    continue whatever you need to continue.
17    BY MR. ALEMANY:
18         Q.    But we requested a jury trial, and we would
19    not consent to a jury trial in this forum.
20         A.    Okay.
21         Q.    Okay.  So, we're entitled to a jury trial.
22               Similarly, Elite, or the name of the
23    publisher, would probably also not consent to having it
24    tried in this forum.
25         A.    I have no -- I mean, I don't know what the
```

1    difference is, to be honest.  I just ---

2             Q.    And if at the end of the day the ultimate

3    obligation is going to be discharge, whether it's through

4    a Chapter 13 or a Chapter 7, why does it matter what the

5    ultimate amount is?

6             A.    I'm not sure.  I just want it to -- I'll be

7    happy -- you know, I'm paying, I think it's 393 a month

8    right now, for the next 36 months.  Whatever that totals

9    up to be, if you could take that amount and pay it

10   directly to NetCE, that's fine, too, you know.

11            Q.    But if we had an allowed claim ---

12            A.    I'm not trying to choose who is getting the

13   money.

14            Q.    Right, and if we had a $10 million claim, as

15   opposed to a $2 million claim because you defended it, it

16   wouldn't change the ultimate amount that you have to pay

17   into the plan?

18            A.    I don't know.

19            Q.    What is paid in the plan is based on the

20   income that you make.

21            A.    I believe so, yes, sir.

22                  MR. ALEMANY:  You know, because we got into

23   a little bit of the background issues on the District

24   Court case, I know that my partner, John Kern, had a few

25   questions as well.

1                  Is this okay, your Honor?

2                  THE COURT:  All right.  I'll allow it.

3                  MR. ALEMANY:  Thank you, your Honor.

4                  THE COURT:  Be brief.

5                  THE WITNESS:  Your Honor, may I say

6  something before he speaks?

7                  THE COURT:  Yes.

8                  THE WITNESS:  So the reason -- the

9  Chapter 13 essentially, you know, I thought would be just

10  a way to solve this for everybody.  My credit is already

11  ruined.  I filed for it.  Getting out of it now wouldn't

12  really -- I don't know how it would benefit me in any way,

13  or benefit anybody in any way.  I thought this was the

14  easiest, most efficient manner to do this, and if that's

15  not the case, please let me know what our plan is.

16                  MR. KERN:  Your Honor, with respect to

17  counsel's time and the Court's time, I'm not going to ask

18  him any questions about the merits of the underlying case.

19                  Ultimately my client just wants its day in

20  Court, and Dr. Jouria will then have every opportunity to

21  raise meritorious defenses, to tell his side of the story,

22  and there will be ultimately a determination of liability

23  in that case.  That's all we're seeking here, and he's ---

24                  THE COURT:  Well, ask your questions.

25  Don't ---

1          MR. KERN:  I have no questions.  He's

2    admitted to the Court that he -- --

3          THE COURT:  All right.  Thank you.

4          MR. KERN:  That it's easier for him.

5          THE COURT:  All right.  Anything further

6    from the witness?

7          MR. ALEMANY:  Nothing further.

8          MS. ABOUELAZM:  Yes, I would just like to

9    clarify.

10          THE COURT:  All right.

11          MS. ABOUELAZM:  The motion to reinstate,

12    actually it would go to ---

13          THE COURT:  No, you ask your question to the

14    witness.

15          MS. ABOUELAZM:  Well, that's the thing, the

16    motion to reinstate the case in 2015, when it was

17    dismissed for lack of documents, just to clarify, and if

18    you read my motion to reinstate, which is in the exhibits

19    that counsel submitted, it was ---

20          THE COURT:  What's your question for the

21    witness?

22          MS. ABOUELAZM:  Well, your Honor, the

23    question was asked of him, but he won't have this

24    information because it was the counsel who actually

25    submitted that information.

Case 0:15-cv-61165-WPD Document 239 Entered on FLSD Docket 05/03/2018 Page 76 of 81
Case 16-27150-RBR Doc 139 Filed 05/09/17 Page 76 of 81

Page 76

```
  1              THE COURT:  What's your question for the

  2    witness?

  3              MS. ABOUELAZM:  Okay.

  4                    REDIRECT EXAMINATION

  5    BY MS. ABOUELAZM:

  6         Q.    Clarify for the Court what has changed from

  7    2016 -- from 2015, when you had to dismiss the case, and

  8    your circumstance, and what's different now, in 2016, that

  9    would make this more viable for you, why you had to

 10    dismiss the case in 2015?

 11         A.    In 2015 I was still doing my second year of

 12    my residency, and so I wasn't really doing the medical

 13    writing courses, very infrequently, and so I had limited

 14    income based on whatever I was making from the residency.

 15              Now, after restarting up the writing, I'm

 16    able to show, like, exactly what I'm making, and it's

 17    reflective of what my current monthly income is, without a

 18    residency position, and without the prior six months of

 19    income from the medical writing that I had done in the

 20    past.

 21              So, whatever I presented now is a true

 22    reflection of what I'm making at this time, and so the

 23    $393 payment is easier to make.

 24         Q.    And counsel asked you if your payments -- if

 25    your schedules and the information you submitted had you
```

Case 0:15-cv-61165-WPD Document 230-1 Entered on FLSD Docket 03/30/2018 Page 77 of
81
Case 16-27130-RBR Doc 139 Filed 05/09/17 Page 77 of 81

Page 77

```
 1    paying $1,000 a month, or 1,067 a month, why is it that

 2    you could not afford that, where your documents showed

 3    that you could afford it?

 4          A.   I guess they showed that I could afford it

 5    because prior to that I was still working in my residency,

 6    as well as doing some writing courses, and so I had some

 7    money saved up in my bank accounts, I'm guessing that's

 8    why it showed I had so much money, but when I got that

 9    letter, I basically stopped writing, and had no more

10    additional income, and then my residency finished in

11    June of 2016, and so my finances changed tremendously.

12          Q.   So your finances -- you're now financially

13    more stable?

14          A.   Now I'm financially more stable because I'm

15    able to dedicate my time to the writing business, and I

16    have one client, and we -- I propose courses and I sell

17    directly to them, and that's it.

18          Q.   And you believe that with this 2016 case

19    you'll be able to actually afford the payments that are

20    expected of you in the 2016 case?

21          A.   Yes, I have been so far.  I don't see why

22    not.

23                MS. ABOUELAZM:  Nothing further.

24                THE COURT:  May the witness step down?

25                (No verbal response.)
```

Case 0:15-cv-61165-WPD Document 239-1 Entered on FLSD Docket 03/30/2018 Page 78 of 81
Case 16-27150-RBR Doc 139 Filed 05/09/17 Page 78 of 81

Page 78

```
 1                    THE COURT:  You may step down, sir.

 2                    Anything further from the parties in the way

 3     of testimony or evidence?

 4                    MR. ALEMANY:  Your Honor, just in closing, I

 5     think we may have gotten a little bit off topic, but at

 6     the end of the day, if financial circumstances changed,

 7     the way you address that is by filing documents with the

 8     Court and amending your statement of income, your

 9     statement of expenses and amending the plan so you can

10     file a plan that you can pay.

11                    You don't just say, well, that's too high,

12     I'm going to let it get dismissed, unless you're abusing

13     the process and, you know, the back-to-back filings within

14     that one-year period under 362(c)(3), it expressly creates

15     a presumption of bad faith filing.  As to the creditors,

16     it can only be rebutted by clear and convincing evidence,

17     and I don't think that the debtor has provided that clear

18     and convincing evidence.

19                    THE COURT:  Brief closing.

20                    MS. ABOUELAZM:  Actually contrary to what

21     counsel has just stated, your Honor, I believe the debtor

22     has shown the Court that he is in no way trying to defraud

23     the Court or the creditor, that his circumstances in 2015,

24     with certain expenses that were not allowed by the

25     trustee, which resulted in the deficiencies being filed in
```

1    the court file, those have been resolved.  He's no longer

2    supporting two households.  He's managing his business in

3    a more organized manner, where the expenses are going to

4    be allowed and deducted from the revenues, and his income

5    is now available to pay towards the Chapter 13 plan.

6    Whereas before he had expenses that were unfortunately not

7    allowed by the trustee and by the rules of the Court.

8                    He's not evading litigation.  He's not

9    evading the creditors' right.  He's actually, in essence,

10   saying, if you have a claim against me, file the claim, I

11   will pay you as to what I can afford, you're going to be

12   protected because I will be paying you this amount of

13   money for the next 30 to 60 months, and they can proceed

14   against the co-defendants, the corporations, where the

15   money really lies.

16                    THE COURT:  All right.  The Court will

17   proceed as follows:  Pending before me is Docket Entry 20,

18   a motion to vacate the order continuing the automatic

19   stay, motion to dismiss and motion for relief from stay.

20   The Court will proceed as follows:  Based upon the

21   evidence admitted by the Court, as well as the testimony

22   of the debtor, as well as the arguments of counsel, and

23   for the reasons dictated on the record the following

24   action is taken:  The motion is granted to vacate the

25   order extending the automatic stay.  That order by

 1    Mr. Alemany.  The motion for stay relief will be granted,

 2    the parties may proceed to final judgment in the District

 3    Court action for the Southern District of Florida.  The

 4    motion to dis -- and that order by Mr. Alemany.  Then the

 5    motion to dismiss will be continued pending further order

 6    of court.  So the debtor can currently stay in Chapter 13

 7    until we see what happens in the District Court action.

 8    Counsel, see to the orders.

 9                    Court will be in recess.

10

11

12                    (Thereupon, the hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 81

1

2

3                          **CERTIFICATION**

4

5    **STATE OF FLORIDA        :**

6    **COUNTY OF MIAMI-DADE   :**

7

8              **I, Cheryl L. Jenkins, RPR, RMR, Shorthand**

9    **Reporter and Notary Public in and for the State of Florida**

10   **at Large, do hereby certify that the foregoing proceedings**

11   **were transcribed by me from a digital recording held on**

12   **the date and from the place as stated in the caption**

13   **hereto on Page 1 to the best of my ability.**

14              **WITNESS my hand this 6th day of May, 2017.**

15

16

17   _____

18         **CHERYL L. JENKINS, RPR, RMR**

19       **Court Reporter and Notary Public**
       **in and for the State of Florida at Large**
20           **Commission #FF064003**
              **December 27, 2017**

21

22

23

24

25