**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 0:15-cv-61165-WPD**

DR. JASSIN JOURIA

        Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,

        Plaintiff/Counter-Defendant.

_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Third Party Plaintiff,

v.

ELITE CONTINUING EDUCATION, INC.,

        Third Party Defendants.

_____/

**<u>NETCE'S OPPOSITION TO ELITE'S</u>**
**<u>*DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY</u>**

Mr. Pampinella produced his initial expert report using the best available evidence and standard, accepted methodologies. His opinions are well-grounded in the facts of this case, and Elite's objections overwhelmingly are to the substance of Mr. Pampinella's conclusions, not to the fitness or integrity of his model. The time and place for Elite to attack the substance of Mr. Pampinella's opinions is in front of the trier of fact.

## **INTRODUCTION**

NetCE hereby opposes Elite Professional Education, LLC's ("Elite's") Motion to Exclude (ECF No. 217) the testimony of James E. Pampinella. All of Elite's objections are to the substance of Mr. Pampinella's opinions—not the methodology of his economic model—and thus should be resolved by the trier of fact. Second, to the extent the opinions expressed in Mr. Pampinella's report are based—as Elite contends—on insufficient data, this is due to factors entirely outside Mr. Pampinella's control, including: (1) the transcript for NetCE's 30(b)(6) witness was not available until weeks after the report was produced; (2) the deposition of Elite's 30(b)(6) witness had not occurred (and never did, due to Elite's last minute cancellation of it); (3) Elite failed to produce its own financial statements until weeks after the discovery cut-off in this case; and (4) only weeks after discovery in this case was re-opened (after Dr. Jouria's bankruptcy case was dismissed), Dr. Jouria—by his own admission—destroyed the only computer containing his repository of potentially relevant evidence.[1] Finally, Elite's Motion to Exclude is mooted by Mr. Pampinella's March 21, 2018 Supplement to his original report, which relies on and incorporates significant data points not available at the time his original report was produced.

---

[1]    On March 22, 2018, Magistrate Judge Snow granted NetCE's motion for sanctions against Dr. Jouria. Magistrate Judge Snow agreed that Dr. Jouria's intentional spoliation of evidence prejudiced NetCE and recommended sanctions in the form of a negative inference jury instruction.

## STATEMENT OF FACTS

From the beginning of this case, Elite and Dr. Jouria have undermined NetCE's ability to discover evidence relating to damages by refusing to produce relevant documents and testimony. Elite produced records late on the afternoon of November 14, 2017 (a day before Mr. Pampinella produced the original report), and on December 4, 2017 and December 15, 2017—well *after* the November 15, 2017 discovery cut-off.   These late productions came more than three months after Elite's RFP response deadline, and weeks after counsel for Elite had claimed its production was complete.   Worst yet, these late productions (at the close and *after* the close of discovery) contained Elite's financial statements—critical documents NetCE had sought all along.  Plainly, it was impossible for Mr. Pampinella to review, consider, and incorporate these records in an expert report produced by November 15, 2017.

Elite's conduct with respect to NetCE's deposition of its 30(b)(6) witness was equally cavalier.  The deposition originally was scheduled, by agreement of the parties, for November 15, 2017, but since Elite had made only a partial production of documents, the parties rescheduled for December 12, 2017.[2]  The deposition did not take place.  Elite unilaterally cancelled it, citing what NetCE believes are pre-textual reasons.   Elite still refuses to allow NetCE to take the deposition of Elite's 30(b)(6) witness.  Elite now seeks to profit from its discovery foot-dragging and malfeasance by alleging NetCE lacks the weight of evidence and testimony needed to make its case for damages.

Dr. Jouria's discovery conduct is even more egregious.[3]  At his deposition Dr. Jouria flatly refused to answer questions he found uncomfortable or had personally determined to be "irrelevant."

---

[2]     To comply notice requirements under the Federal Rules of Civil Procedure, NetCE circulated on November 30, 2017, an updated deposition notice with the appropriate date and location.

[3]     Dr. Jouria's discovery conduct is relevant because he filed a Notice of Joinder with Elite's Consent to Elite's Daubert Motion (ECF No. 219).

And as far as documents, he destroyed the laptop computer that he admits contained his potentially relevant records in this matter.  Magistrate Judge Snow agreed with NetCE that Dr. Jouria spoliated evidence by destroying this computer, and then lying about its status and whereabouts for months during discovery.  As a result of Dr. Jouria's misdeeds, Magistrate Judge Snow ruled that an adverse inference jury instruction is appropriate at trial.

Elite's and Dr. Jouria's discovery conduct obstructed NetCE's right to a full and fair exploration of the evidence relating to damages.  Neither should benefit from its discovery misdeeds by precluding Mr. Pampinella from testifying based on the best evidence available to him.

Despite these facts—many unknown to NetCE at the close of discovery—and in the absence of relevant evidence from Elite and Dr. Jouria, Mr. Pampinella nevertheless issued his initial report based on the best available evidence.  Mr. Pampinella reviewed extensive information from NetCE in making his initial report.  He interviewed several prominent persons at NetCE with relevant knowledge including Erin Meinyer, NetCE's Executive Director, Sarah Campbell, NetCE's Director of Development, Lisa Patterson, NetCE's Chief Operating Officer, and Julie Goodwin, NetCE's Director.  Initial Report, p. 3 (filed under seal at ECF No. 218).  He also reviewed and analyzed voluminous written records including filings in this matter, the respective websites of NetCE, Elite, and the American Nurses Credentialing Center ("ANCC"), numerous Excel spreadsheets detailing NetCE's costs and revenues, NetCE's course index and catalogues, and professional articles by other experts.  Initial Report, Attachment B.  NetCE produced all of these documents to Elite, as required, and Elite's expert relied on them in his Rebuttal Report.

Elite, by contrast, refused to meet its discovery obligations until after the close of discovery.  Even without aid of information exclusively in Elite's possession, Mr. Pampinella's expert report applied sound methodologies to a scientifically valid subset of facts.  Now that Elite has belatedly

met some of its discovery obligations, and the transcript from NetCE's 30(b)(6) deposition is

available, Mr. Pampinella has supplemented his initial report.  NetCE served this Supplement to the

November 15, 2017 Report on March 22, 2018.  The Supplement to the Report relies on and

incorporates data points the expert did not have in the initial report and supports the expert analysis.

## ARGUMENT

### I.      Standard of Review

When a party challenges an expert under *Daubert v. Merrill Dow Pharmaceuticals, Inc*., 509

U.S. 579 (1993), and Fed. R. Evid. 702, the Court must make an inquiry into whether: "(1) the

expert is qualified to testify competently regarding the matters he intends to address (2) the

methodology by which the expert reaches his conclusions is sufficiently reliable as determined by

the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the

application of scientific, technical, or specialized expertise, to understand the evidence or to

determine a fact in issue."  *Rink v. Cheminova, Inc*., 400 F.3d 1286, 1291–92 (11th Cir. 2005).

Under the United States Supreme Court decision in *Daubert v. Merrill Dow*

*Pharmaceuticals, Inc*., 509 U.S. 579 (1993):

> scientific expert testimony is admissible when "(1) the expert is qualified to testify
> competently regarding the matters he intends to address; (2) the methodology by
> which the expert reaches his conclusion is sufficiently reliable as determined by the
> sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact,
> through the application of scientific, technical, or specialized expertise, to understand
> the evidence or to determine a fact in issue".

*Allison v. McGhan Medical Corp*., 184 F.3d 1300, 1309 (11th Cir. 1999).

### II.     Mr. Pampinella is an Expert Under the 3-part *Daubert* Test

#### A.      Mr. Pampinella is Qualified to Testify Competently

##### 1.      Mr. Pampinella Has The Experience, Credentials, and Qualifications to Testify Competently in this Case.

Mr. Pampinella is manifestly qualified to testify competently in this case.  He is a Managing Director at Navigant Consulting, specializing in the provision of consultation services in the area of complex commercial litigation and specifically intellectual property consulting and disputes.  Initial Report, Attachment A.  He is a licensed Certified Public Accountant and serves on the planning committees of the Advanced Patent Law Institute and the Intellectual Property Institute held by the Berkeley Center for Law & Technology/Stanford Law School, and the University of Southern California Gould School of Law.  *Id.*  Prior to rejoining Navigant Consulting, he led the Northern Pacific Intellectual Property group for Deloitte Financial Advisory Services LLP.  He has successfully qualified as an expert in dozens of cases, both state and federal.  *Id.*  Elite does not even contest Mr. Pampinella's qualifications, which make up the first prong to the *Daubert* inquiry.  *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

### 2.    No Court Has Rejected Mr. Pampinella's Testimony Based on His Qualifications or the Integrity His Opinions

Mr. Pampinella is a qualified expert who may competently present testimony to a jury and has done so dozens of times.  Of the dozens of cases, Elite identifies four where it claims he was excluded for the same reasons Elite brings up here.  This is not accurate.  A simple reading of the cases shows that each case involved either (1) errors *by others*, which errors were incorporated into Mr. Pampinella's reports, or (2) legal issues entirely divorced from Mr. Pampinella's methodology.  Consider the actual circumstances of the few cases Elite discusses:

- In *Flying J, Inc. v. Dep't of Transp.*, No. F060545, 2012 WL 147925 (Cal. Ct. App. Jan. 19, 2012), the court excluded Mr. Pampinella.  Elite claims that the court did so because he improperly chose his data points in a benchmark analysis. Elite's Motion to Exclude ("Mtn. to Exclude"), pp. 14-15.  In fact, his exclusion had nothing to do with his analysis.  As Elite concedes, Mr. Pampinella worked on data "provided to him by another expert." *Id.* at 14.

5

The California Court of Appeal noted the same: "Pampinella testified that he looked at five comparable sites that *Baker identified*." *Flying J*, 2012 WL 147925 at *10 (emphasis added). And again: "Pampinella acknowledged that he was not a travel plaza expert and indicated that he relied on *Baker's choice* of the five representative sites…" *Id.* (emphasis added). When the Superior Court excluded *Baker's* testimony, and the Court of Appeal affirmed, it necessarily excluded Mr. Pampinella's testimony too. *Id.* ("Pampinella's projections regarding lost profits will have probative value only if his assumption that the sites were comparable is supported by evidence in the record….Consequently, we next consider the basis for Pampinella's assumption—the testimony of Baker regarding the comparability of the sites.") (citation omitted).  The Court had no issue with Mr. Pampinella's testimony other than that it derived from Baker's.

- In *Immersion Corp. v. HTC Corp*., No. CV 12-259-RGA, 2015 WL 834209 (D. Del. Feb. 24, 2015), Elite omits from its brief that the District Court actually rejected similar arguments to those they make now.  For example, the *Immersion* court rejected an argument that "Mr. Pampinella arbitrarily cherry-picked the most favorable license to use as a starting point." *Id.* at *3.  Elite makes an identical argument. Mtn. to Exclude, p. 10.  The *Immersion* court reasoned that "Mr. Pampinella provided support for why he [chose certain licenses]…. Those assessments are not the unsupported speculation that Rule 702 guards against.  It is the province of the jury to determine whether they find Mr. Pampinella credible and his analysis persuasive.  Defendants' concerns are matters properly addressed on cross-examination." *Immersion*, 2015 WL 834209, at *3.  The *Immersion* court therefore permitted Mr. Pampinella to testify on reasonable royalties.  With respect to the question of lost profits, the district court excluded Mr. Pampinella for reasons totally unrelated to his methodology.

*Immersion* involved sales of devices containing both patented and unpatented technology. *Id.* at *4. To prove damages, the patented and unpatented products must "constitute a functional unit." *Id.* Mr. Pampinella is a damages expert, not a patent expert.  As in *Flying J*, he was forced to rely on others to determine the functional relationship. Pampinella Declaration at ¶ 7 (attached as Exhibit 1).  As in *Flying J*, the court rejected the underlying premise and therefore took Pampinella's testimony with it.  *Immersion*, 2015 WL 834209 at *4.  This case does not involve any such highly-technical question of functionality.  It is—in economic terms—relatively straightforward as a damages analysis.

- In *VIA Techs., Inc. v. ASUS Computer Int'l*, No. 14-CV-03586-BLF, 2017 WL 3051048 (N.D. Cal. July 19, 2017), Elite again fails to mention the District Court **permitted Mr. Pampinella to testify**. *Id.* at *3 ("The Court finds that Mr. Pampinella's comparison of Defendants' alleged avoided R&D expenses to U.S. sales should not be excluded"). The District Court rejected Mr. Pampinella's testimony regarding another expert's methodology on a legal basis, citing *Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1305 (2010), not due to any flaw in Mr. Pampinella's methodology.[4]

- Finally, Elite cites to *Sukumar v. Nautilus, Inc.*, No. 7:11-CV-00218, 2013 WL 6408351, (W.D. Va. Dec. 6, 2013).  It is not entirely clear why the *Sukumar* court rejected Mr. Pampinella's report calculating damages because *plaintiffs*, not Mr. Pampinella, failed to demonstrate causation.  *Id.* at *14 ("Plaintiffs have not shown how this is a competitive injury or affected their ability to compete.").  Mr. Pampinella's report did not attempt to

---

[4]      Specifically, the District Court grounded its decision on language from *Ajaxo* that "[t]here is no standard formula to measure [damages]" and therefore that Mr. Pampinella should not opine as to a proper method.  *Id.*  Elite alleges nothing of the kind here.

prove causation—which was beyond its scope—and thus obviously did not constitute "competent evidence" of causation.  *Id.* at n.6; Pampinella Decl. ¶ 8.

The true picture of Mr. Pampinella's expertise is shown best through the many cases in which he qualified to testify as an expert.  Although he has done so dozens of time, in the interests of brevity here are a select few: *Academy of Motion Picture Arts & Sciences v. GoDaddy.com, Inc.*, No. 13-cv-03738-AB-CS (C.D. Cal. 2013); *Circle Click Media LLC, et al. v. Regus Mgmt. Grp. LLC*, No. 12-cv-04000-EMC (N.D. Cal. Oct. 30, 2015) (ECF No. 335); *Mobile Telecomm. Techs., LLC v. Blackberry Corp.*, No. 3:12-cv-01625-M (N.D. Tex. July 18, 2016) (ECF No. 549); *BASF Corp. v. SNF Holding Co.*, No. 14-cv-02733, (S.D. Tex. Oct. 13, 2017) (ECF No. 272); *Oracle Am., Inc. v. Serv. Key, LLC*, 12-cv-0790 SBA (N.D. Ca. 2013); *Asetek Holdings, Inc. v. Cooler Master Co. Ltd.*, 3:12-cv-04498-EMC (N.D. Ca. 2014); *Johnstech International Corp. v. JF Microtechnology SDN BHD*, 3:14-cv-02864-JD (N.D. Ca. 2016); and *Synthes, Inc. & DePuy Synthes Sales, Inc. v. Gregory Knapp*, 2:13-cv-02261-MCD-db (E.D. Ca. 2017).

## B.    Mr. Pampinella Used Reliable Methods and His Opinions are Relevant

### 1.    Mr. Pampinella's Methodologies Are the Same as Elite's Proposed Expert

Elite complains that Mr. Pampinella used improper methodology in deriving the findings in his initial report.  Mtn. to Exclude, p. 6.  In fact, Elite's proposed expert, John Bone, used precisely the same methodology.  As stated in Mr. Bone's rebuttal, Mr. Pampinella "should not have attempted to demonstrate only the absolute revenue (and profit) associated with a 'benchmark' course authored by Dr. Jouria, but rather the incremental revenue (and profit) of a 'benchmark' Jouria course over and above the course it would be likely to replace in the catalog."  Rebuttal Report of John Bone ("Rebuttal Rep.") ¶ 49.

In other words, Elite's rebuttal expert does not argue Mr. Pampinella's selection of a benchmark analysis was improper, but quibbles that Mr. Pampinella failed to subtract a value.  This is not an attack on methodology, but instead an argument about proper mitigation of damages.

Moreover, despite agreeing with Mr. Pampinella on the proper methodology, Mr. Bone makes a number of errors in applying it.  He fails to consider that the revenues from the Jouria courses might be *additive*, rather than replacements.  *Id.* ¶ 48.  Elite makes this same mistake.  Mr. Bone further misunderstands what constitutes a "catalog" when he argues that "NetCE was still able to offer complete catalogs."  *Id.* ¶ 54. In fact, catalogs contain as many or as few courses as NetCE wishes.  In NetCE's business model, a catalog is a special offer bundle of selected courses provided to the identified target audience.  Declaration of Sarah Campbell, ¶ 9, attached as Exhibit 2.  Elite again repeats its expert's error.  Elite's proposed expert objection, therefore, is really to the substance of Mr. Pampinella's findings.  That is a question for the jury.  *United States v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004) ("As the ultimate fact-finder, it is the jury that must determine, finally, where the truth in any case lies, and the district judge as gatekeeper may not usurp this function").

### 2.    Mr. Pampinella's Opinions are Reliable and Relevant

The fundamental question before the Court is whether Mr. Pampinella's testimony "is both reliable and relevant."  *Rink v. Cheminova, Inc*., 400 F.3d at 1291.  In making this determination, "[d]istrict courts 'have substantial discretion in deciding how to test an expert's reliability….'"  *Id*. at 1292 (quoting *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999)).  This "test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  The Eleventh Circuit has suggested several nonexclusive factors in making the inquiry.  The Court

may look to "whether the expert's theory can be and has been tested… and, whether the technique is generally accepted in the [] community."  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  In this case, Mr. Pampinella used reliable methodology that, as Elite's expert proves, can be tested.  His techniques are widely accepted in both the economic damages community and the courts.

Elite's attempt to impugn Mr. Pampinella's methodology is really Elite's attempt to escape his conclusions.  While Elite derides his reliance on witness testimony, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Hendrix ex rel. G.P. v. Evenflo Co*., 609 F.3d 1183, 1193 (11th Cir. 2010).  Benchmark analysis, as used by Mr. Pampinella, is a common tool accepted within the Eleventh Circuit.  Even Elite's rebuttal expert agrees that benchmark analysis is proper.  Rebuttal Rep.¶ 49.  At heart, therefore, Elite's argument is an argument about Mr. Pampinella's conclusions.  The answers to those questions are for the trier of fact.

### a)      Mr. Pampinella Made No Assumptions Not Required by Elite

Elite complains that Mr. Pampinella makes a number of assumptions in his report.  While Elite groups them all together, a careful analysis shows Elite actually alleges two different kinds of assumptions.  Neither provides support for their motion to exclude.  In fact, the first kind of alleged assumption is just Elite's disagreement with substantive conclusions.  The second kind is that which Elite forced Mr. Pampinella to make by its refusal to comply with its discovery obligations.

Elite first  protests that Mr. Pampinella "assumes that, but for Elite's publication of the Accused Courses, NetCE would have developed, finalized, approved for publication, and published all five of the Jouria Articles."  Mtn. to Exclude, p. 7.  Elite alleges that he further assumes that the Jouria Courses would be marketed "as premium, or 'marquee,' courses."  *Id.*  Elite's basis for

claiming that these "assumptions" are unfounded is the undisputed fact that "none of the Jouria

Articles <u>was ever scheduled to be published in any catalogs from NetCE.</u>"  *Id.* (emphasis original).

Of course, Elite makes no mention of how Mr. Pampinella actually came by his

"assumptions."   As stated in his Initial Report, he based his "assumptions" on NetCE's answers

given in interviews with the relevant NetCE employees who had firsthand knowledge of the facts

upon which he based his report.   Specifically, he interviewed Erin Meinyer, NetCE's Executive

Director; Sarah Campbell, NetCE's Director of Development; Lisa Patterson, NetCE's Chief

Operating Officer; and Julie Goodwin, NetCE's Director.  Initial Report, p. 3.  It is not entirely clear

how Elite thinks an expert should obtain information on what people plan to do other than asking

them.  Moreover, the fact NetCE still had planned to undertake certain steps before Jouria Articles

"went to print" is simply further proof of NetCE's damages.

NetCE hired Dr. Jouria to produce his articles to meet increased market demand due to

changes in continuing education requirements by the ANCC and others.  Campbell Declaration, ¶ 3.

When Elite infringed, NetCE was still refining the articles and readying them for publication.

Campbell Declaration, ¶ 6.  When Elite stole the courses out from under NetCE, NetCE was forced

to abandon post-production efforts.  NetCE's contention that it had not finalized the Jouria Articles

is a substantive question for the jury, not a fact indicating some flaw in an expert's methodology.

Elite also questions what it terms Mr. Pampinella's first-to-market "assumption."  Mtn. to

Exclude, p. 8.  Mr. Pampinella discussed the revenue generation of specific courses over time, noting

a sharp decline after the first year of publication.  Initial Report, p. 10.  Elite says that it was possible

that NetCE could "still have generated revenue from the Jouria Articles notwithstanding Elite's

publication of allegedly similar courses."  *Id.*  Mr. Pampinella erred, Elite claims, in making that

"assumption" without performing his own market research.  *Id.*  However, as Mr. Pampinella details

11

in footnote 69 to his initial report (all evidentiary citations are in footnotes), he relied on NetCE's internal documents and discussions with Sarah Campbell, Erin Meinyer, and Lisa Patterson.  Initial Report, p. 13 n.69.  Ms. Campbell provided all of the data necessary for Mr. Pampinella to determine the revenue decline over time.  Campbell Decl. ¶ 7.

Moreover, Elite's concern really has nothing to do with Mr. Pampinella's methodology. Instead, it is with Mr. Pampinella's ultimate damages figure.  That figure would be less, Elite claims, had Mr. Pampinella considered the mitigation NetCE might have done by completing and publishing the Jouria Articles.[5]  Mtn. to Exclude, p. 8.  NetCE was not obliged to mitigate damages in the way that Elite, post hoc, thinks may have been best.  *Marine Transp. Servs. Sea-Barge Grp., Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1140 (11th Cir. 1994) ("the injured party knows what reasonable efforts to use to mitigate damages").  NetCE's obligation was reasonable attempts at mitigation, which it accomplished.

Even if Elite were correct that the Jouria Articles could have still generated revenues, the best evidence for that would be Elite's own books and records.  Elite has actual data since it actually published these articles.  Mr. Pampinella did not have access to that information, however, because Elite refused to timely provide it.  Declaration of John Kern, ¶¶ 12 & 13, attached as Exhibit 3. Moreover, it is unreasonable of Elite to argue that "Mr. Pampinella apparently did not consider or even review any of [Ms. Campbell's] deposition testimony…"  Mtn. to Exclude, p. 3.  They claim that "Elite deposed NetCE on November 4, 2017" (Mtn. to Exclude, p. 2) and that "NetCE served Mr. Pampinella's expert report … on November 16, 2017" (Mtn. to Exclude, p. 3).  In fact, Ms. Campbell's deposition was on November 14, 2017.  Kern Decl. 20.[6]  Elite's contention, that Mr.

---

[5]   In any event, NetCE could not market and sell courses now associated with a competitor and related to subject matter where NetCE no longer would be the first to market.

[6]   November 4, 2017, was a Saturday.

Pampinella erred by not reformulating his entire expert report on November 15th, to take into account (without a transcript) testimony from November 14th in time to serve by November 16th, is absurd. This is especially the true because Dr. Jouria threatened to seek to exclude the initial report for lateness if NetCE did not serve it on the 16th. Kern Decl. ¶ 14. Moreover, Elite's dispute with the ultimate damages figure is a question for the fact finder.

Elite's final alleged "assumption" deals with whether NetCE would generate revenues and profits from the Jouria Articles. Mtn. to Exclude, p. 9. Elite claims that "NetCE may still have generated revenue from the Jouria Articles notwithstanding Elite's publication of allegedly similar courses." Mtn. to Exclude, p. 8. It is not an error in Mr. Pampinella's method of calculation that Elite thinks that NetCE could have better mitigated damages in a particular way.

Elite compounds this error in citing deposition testimony by NetCE's 30(b)(6) witness that there is "'no guarantee' that <u>any</u> article written by a professional writer (such as Dr. Jouria) will be featured in a catalog." Mtn. to Exclude, p. 7. (emphasis original). Elite further alleges that the witness testified that she "actually '[does not] know' whether its revenues were impacted in any way by not having published the Articles." Mtn. to Exclude, p. 9. Once again, these arguments are simply disputes on the values of the underlying data.

But what is not clear is why Elite thinks either of these two snippets of testimony matter. Of course NetCE's 30(b)(6) witness cannot guarantee that *any* article is guaranteed a feature in a catalog. It is always possible that some technical failure, or failure by the author, or theft by competitor, might crop up and prevent publication. The mere existence of some trivial uncertainty regarding the specific amount of damages does not invalidate an expert's analysis. *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1530 (11th Cir. 1985) ("However, uncertainty as to the precise amount of . . . damages does not preclude recovery if there is some reasonable basis in the

evidence for the amount awarded"). Similarly, it is not clear why Elite thinks NetCE's 30(b)(6) witness should have been able to determine the revenues NetCE would have obtained from the publication of the Jouria Articles and the comparison of those revenues to the revenues actually obtained. That kind of advanced economic analysis is why both NetCE—and the jury—need an expert. Moreover, Elite's claims are nothing but attacks on the underlying data. Unless "an expert's testimony is so 'fundamentally unreliable that it can offer no assistance to the jury ... the factual basis of the testimony goes to the weight of the evidence.'" *Lary v. Boston Sci. Corp.*, No. 11-CV-23820, 2014 WL 7152769, at *12 (S.D. Fla. Dec. 15, 2014).

### b) Mr. Pampinella Properly Relied on Jouria Courses to Analyze Other Jouria Courses

Elite's next attack on Mr. Pampinella's methodology is that he improperly selected his data points. Instead of relying on the two published Jouria courses, which share the same author and contain similar content, Elite says Mr. Pampinella should have randomly picked courses from NetCE's catalog. Mtn. to Exclude, p. 11. Its own cited cases hold the opposite.

For example, in *R & R Int'l, Inc. v. Manzen, LLC*, No. 09-60545-CIV, 2010 WL 3605234, at *13 (S.D. Fla. Sept. 12, 2010), the court noted that "sampling choice lies at the heart of an expert's methodology." *Id.* at *13. Unlike Mr. Pampinella, the expert in *Manzen* "admitted that he did nothing to consider the comparability of the 'sample…'" *Id.* The threshold was relatively low, since all the expert had to do to "satisfy the scientific sampling standard [was choose them] using some method that assures the samples are appropriately representative." *Id.*

Here, Mr. Pampinella did just that. His task was to determine the economic loss to NetCE of not publishing the Jouria Articles due to Elite's infringement. To select an appropriate benchmark for the Jouria Articles, he selected the courses most closely aligned with them: other Jouria courses. As the *Manzen* court cautioned, Mr. Pampinella properly determined that the Jouria courses are good

predictors of the Jouria Articles because they share target audience, featured course designations, author, content, target geography, timing, and pricing.  Supplement to the Expert Report of James Pampinella ("Supp. Report"), pp. 6-7.  This is a far cry from Elite's claim that the only "commonality…is the author." Mtn. to Exclude, p. 11.  Moreover, had Mr. Pampinella actually followed Elite's recommendation and selected random courses from NetCE's then-current 400 course catalog, Mr. Pampinella would likely have had to compare the Jouria Articles with courses sharing few or none of the factors identified above.  Campbell Decl. ¶ 8.

Absent from Elite's analysis, but critical to this Court's determination, is that Mr. Pampinella rejected from his analysis a course by Dr. Jouria that was "only offered to physicians."  Initial Report, p. 15.  In other words, because it did not have the same audience as the Jouria Articles, Mr. Pampinella excluded it.  This is evidence of a clear method to ensure a representative sample.

Elite's comments on timing are similarly inapposite.  Elite complains that the benchmark courses have data from 2014-2016, but this is applied to predicted performance from 2015-2019. Mtn. to Exclude, p. 11.  It is not clear why Elite thinks data from 2015 and 2016 does not apply to evaluating the market in 2015 and 2016.  Limiting their accusations to 2017-2019, Elite fares no better.  For example, their sole-cited case on this point, *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322 (S.D. Fla. 2012), concerned an expert who used sales data from "2009 and 2010 to calculate its damages from 2005 through 2008."  *Id.* at 1333.  The *Winn-Dixie* court noted the wide disparity in market conditions those years represented: "the economic conditions in 2009 and 2010, during the worst recession since the Great Depression, were remarkably different than they were from 2005 through 2008."  *Id.*  Not so, here.

Elite's arguments, though framed in terms of methodology, are actually nothing but arguments as to the credibility of Mr. Pampinella, a question for the jury.  Even Elite does not cite

any actual difference in market conditions. *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1131 (M.D. Fla. 2007) is instructive. In *Furmanite*, Furmanite put forward a damages expert who used an income capitalization method based on one quarter (3 months) of financial data. *Id.* T.D. Williamson, Inc. ("T.D.") brought a *Daubert* motion, claiming that "use of only one quarter of unaudited financial data in calculating the Orlando office's worth is not professionally acceptable….[and] that this damages calculation is unreliable in that it assumes without justification that the income of the office would have remained constant." *Id.* The court decisively rejected this argument, holding that T.D.'s arguments that the "findings are speculative and lead to an unreliable estimate of worth are arguments as to the credibility of [the expert's] findings rather than the general acceptance of his methods." *Id.* Further evidence of the *Furmanite* court's ruling, the court said, was that T.D. focused "on the amount of financial data" relied on by the expert. *Id*. at 1132. The same is true here.

Elite argues in the same vein as T.D. Like T.D., it claims that Mr. Pampinella relied on insufficient data when projecting damages. Mtn. to Exclude, p. 11. Like T.D., Elite makes the argument that Mr. Pampinella's results are therefore unreliable. And like T.D., Elite's arguments are really nothing but criticisms of Mr. Pampinella's credibility that should be properly resolved by the trier of fact.[7] Elite makes no claims that benchmark analysis itself is suspect.[8]

---

[7]     *See, e.g*., Elite's argument that Mr. Pampinella should not have used averages, because it means that courses appear to "have performed <u>exactly the same</u>." Mtn. to Exclude, p. 12 (emphasis original). Setting aside the misunderstanding of how averages work—they are supposed to be the same, balancing out both peaks and troughs—this is just a criticism about the amount of damages.

[8]     Taken to its logical conclusion, Elite's argument is against the existence of damages experts as to future damages entirely. Elite argues, essentially, that one cannot use the past to predict the future because the future might change. There is no way to reconcile its position with the right to recover for future damages.

Eleventh Circuit courts routinely rely on experts proffering benchmark analyses.  For example, in *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001), the Eleventh Circuit affirmed the District Court's qualification of a damages expert that relied on benchmark analysis.  *Id.* at 662.  In that case the expert used a real estate investment trust as a benchmark to determine "the amount of money that Plaintiffs would have earned if the proceeds that Defendants pocketed through their frauds had been invested." *Id.*  Defendants appealed, claiming that the expert's testimony was too speculative.  *Id.*  The Eleventh Circuit disagreed, holding that "while damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference." *Id.* at 664.  Benchmark analysis qualified, and thus, the District Court properly permitted the expert to testify.

Finally, Elite argues Mr. Pampinella's reliance on the Jouria courses to evaluate the probable success of the Jouria Articles constitutes some form of cherry-picking.  Mtn. to Exclude, p. 10.  Elite's basis for this argument is that the catalogs containing the Jouria courses were "some of NetCE's best-selling catalogs over a several year period."  Mtn. to Exclude, p. 13.  Exactly.  The Jouria courses addressed a narrow market—pharmacotherapeutics—in which few other courses were available at the time.  Campbell Decl. ¶ 3.  This increase in demand was one of the reasons NetCE hired Jouria in the first place to make the Jouria Articles into courses.  Campbell Decl. ¶ 3.  It is entirely unclear why Elite thinks Mr. Pampinella should have picked random, lower-grossing courses in his benchmark analysis.

### c)      NetCE's Recovery of Its Damages Is Not a Windfall

Elite claims that NetCE mitigated its damages, and that Mr. Pampinella erred in not considering that mitigation in his calculation of NetCE's damages.  *Id.*  In fact, Mr. Pampinella did evaluate the issue of mitigation, but his evaluation ultimately did not lead him making an offset to

his revenue calculations.  Mr. Pampinella determined *there was no offset*, because the lost revenue from the Jouria Articles was *additive* to the revenue from courses NetCE actually published, not *replaced by* such revenue. Campbell Decl. ¶ 9.

Elite spends a lot of time claiming, *inter alia*, that "NetCE admitted that it did not publish any partial catalogs…" (Mtn. to Exclude, p. 2) or that "NetCE published the catalogs cited by Mr. Pampinella with alternate Articles" (Mtn. to Exclude, p. 4).  Rather than supporting Elite's position, this merely shows how Elite misunderstands what constitutes a "catalog."  There is no set definition of a catalog.  Campbell Decl. ¶ 9.  NetCE publishes course catalogs with as many or as few course hours as NetCE determines best suit the market for such courses.  Campbell Decl. ¶ 9.  Nor is there any limit to how many catalogs NetCE may publish, particularly in the online publishing medium that now dominates the market.  Campbell Decl. ¶ 9.  Its choices are based entirely on market demands and content availability.  Campbell Decl. ¶ 9.  Actions impacting either of these factors, such as the loss of content through theft of a competitor, prevent NetCE from issuing as many courses and recovering revenues it could have obtained.

### C.  Mr. Pampinella's Testimony is Essential to the Jury's Understanding

In addition to reliability, the Court must "consider whether the expert's opinion will be helpful to the trier of fact.  By doing so, the Court 'ensures that expert witnesses will not testify about lay matters which a jury is capable of understanding and deciding without the expert's help.'" *Hendrix v. Evenflo Co*., 255 F.R.D. 568, 579 (N.D. Fla. 2009).  There is no dispute that in this case, Mr. Pampinella will not testify about lay matters.

To determine damages pursuant to copyright infringement, the finder of fact must consider economics in a nonexistent world.  That is, he or she must look to how sales would have been made had the infringement not occurred (or alternatively, the profits earned from infringement).  There is

no dispute that this is a task well beyond the lay witness or juror.  Even Elite, when claiming Mr. Pampinella would not be helpful, makes no claims regarding the need for experts in this matter.  On the contrary, Elite's only argument against Mr. Pampinella's helpfulness is to reiterate its claim that Mr. Pampinella simply assumed what NetCE told him.  Even if this were true, it would make no difference with regard to helpfulness.

The only case Elite cites to support the proposition that Mr. Pampinella merely "reiterate[s] the assumptions and conclusions of NetCE and its witnesses…"—*Estate of Arama v. Winfield*, No. 2:13-CV-381-JD, 2017 WL 1951462 (N.D. Ind. May 11, 2017)—is not helpful.  Mtn. to Exclude, p. 16.  Elite concedes that an expert is helpful when they "draw on their expertise in reaching their conclusions and [] testify to something more than what the jury can understand or decide for itself." Mtn. to Exclude, p. 16.  That is precisely what Mr. Pampinella does here.  Mr. Pampinella undoubtedly relies on NetCE for some of his evidence.  But that is not the test, and that in no way disqualifies his opinion.  The test, rather, is whether Mr. Pampinella takes that evidence and applies his expertise to generate conclusions a jury could not make on its own.  Even Elite does not contend that a jury can take NetCE's testimony and construct their own benchmark analysis.

By contrast, the witness in *Winfield* simply "regurgitates the testimony of defense witnesses so as to lend further credibility to that testimony based solely on [the expert's] credentials." *Winfield*, 2017 WL 1951462 at \*4.  In *Winfield*, the proposed expert offered no expert opinion at all. The *Winfield* court noted that "he did not use any sort of specialized knowledge or reliable methodology to reach conclusions." *Id.* at \*3.  For example, when "asked about the basis for his second conclusion" the *Winfield* expert "testified that there was 'no testing' conducted or 'scientific method' employed in making this conclusion."  *Id.*  Even Elite, despite citing to *Winfield,* does not make these claims regarding Mr. Pampinella.  He obtained data from detailed sources then used that

19

data to construct a benchmark analysis.  *See* Initial Report, pp. 13-22.  Mr. Pampinella applies his expertise to the facts—he does not merely repeat them.  Thus, his testimony would be helpful to a jury.

### III.    Elite's Motion to Exclude is Mooted by Mr. Pampinella's Supplemental Report

Many of Elite's complaints regarding Mr. Pampinella's Initial Report were caused by its own refusal to comply with its discovery obligations.  Kern Decl.¶ 9.  Once it finally complied, Mr. Pampinella was able to supplement his report.  That report meets every one of Elite's complaints, proving that Mr. Pampinella both relied on the methodology Elite thinks is required as well as proving Mr. Pampinella's helpfulness to the trier of fact.  For example, Elite complains that NetCE sold all of its catalogs.  Mtn. to Exclude, p. 4.  Mr. Pampinella's Supplement to his Expert Report addresses that complaint, noting that the lost sales related to the Jouria Articles are additive.  Supp. Rep. p. 15.  As another example, Elite also complains that Mr. Pampinella relies on too few data points.  Mtn. to Exclude, pp. 10-11.  But, as Mr. Pampinella explains, he intentionally chose courses most similar to the Jouria Courses in terms of audience, featured course designation, author, content, geography, pricing, customer reviews, and timing of publication.  Supp. Rep. pp. 6-7.  As a final example, Elite complains that Mr. Pampinella "has also assumed that NetCE 'would have generated revenue and profits related to these five courses but for Elite's alleged misconduct.'"  Mtn. to Exclude p. 9.  Mr. Pampinella, however, assumes no such thing.  He bases his reasoning on his interviews with the NetCE personnel and the documents they provided.  Supp. Rep. p. 4.  The issuance of Mr. Pampinella's Supplement to his Expert Report, by meeting all of Elite's objections, moots their motion to exclude.  The Court should therefore deny it.

Dated: March 26, 2018                                  Respectfully submitted,

                                                       HOLLAND & KNIGHT LLP

*/s/ Philip E. Rothschild*
Philip E. Rothschild
Florida Bar No. 0088536
Email: phil.rothschild@hklaw.com
HOLLAND & KNIGHT LLP
515 East Las Olas Blvd., 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954)525-1000
Facsimile: (954)463-2030

*/s/ John P. Kern*
John P. Kern, Esq. (pro hac vice)
Email: john.kern@hklaw.com
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Telephone: (415)743-6918
Facsimile: (415)743-6910
Attorneys for CE RESOURCE, INC.
d/b/a CME RESOURCE and NetCE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 26, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Philip E. Rothschild*
Philip E. Rothschild

## SERVICE LIST

Richard S. Ross, Esq.
RICHARD S. ROSS, ESQ.
915 S.E. 2nd Court
Ft. Lauderdale, Florida 33301
(Attorney for Plaintiff Dr. Jassin Jouria)
**[VIA ELECTRONIC MAIL SERVICE]**

Peter A. Chiabotti, Esq.
Kristen M. McKinney, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**

J. Mark Wilson, Esq.
Kathryn G. Cole, Esq.
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
(Attorneys for Elite Continuing Education, Inc.)
**[VIA ELECTRONIC MAIL SERVICE]**