UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 0:15-cv-61165-WPD

DR. JASSIN JOURIA

        Plaintiff,

v.

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant.
_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Counter-Plaintiff,

v.

DR. JASSIN JOURIA,

        Plaintiff/Counter-Defendant.
_____/

CE RESOURCE, INC. d/b/a CME RESOURCE
and NetCE,

        Defendant/Third Party Plaintiff,

v.

ELITE CONTINUING EDUCATION, INC. and ALPINE
MANAGEMENT SERVICES III, LLC,

        Third Party Defendants.
_____/

**DECLARATION OF SARAH CAMPBELL**

        I, Sarah Campbell, declare as follows:

1

#54813709_v5

1. I am the Director of Development at CE Resource, Inc. d/b/a CME Resource and NetCE ("NetCE") and held this position during the time period at issue in this lawsuit.

2. I have personal knowledge of the circumstances described below and, if so called, can testify under oath regarding these events.

3. NetCE hired Dr. Jassin Jouria to produce articles to meet increased market demand due to changes in continuing education requirements by the ANCC and some states with regard to pharmacology credits. The Jouria courses addressed a narrow market, pharmacotherapuetics, in which certain credentialing organizations and states were expanding their continuing education requirements. While NetCE was offering pharmacology credit for older courses, the amount was insufficient to meet the growing and ongoing needs of its audience. NetCE required new courses, updated to reflect modern medicine, and focusing specifically in the subject area.

4. NetCE requires all articles it publishes, including those of Dr. Jouria, to go through an extensive post-production process. The publishing process involves the following steps: (i) An author presents an initial proposal for a course; (ii) NetCE evaluates the proposal and either accepts or rejects it; (iii) If NetCE accepts the proposal, it sends the author a contract (the Freelance Writer Agreement ("FWA")) to cover the author's drafting of the initial manuscript; (iv) The author submits the draft manuscript; (v) NetCE staff review the draft manuscript and determines if the draft contains all of the necessary components as required by contract. If it contains the constituent elements set forth in the previously-approved proposal, then it is "approved for publication" (by NetCE's parlance and the terms of the FWAs), although it still must undergo a lengthy curation and editing process before NetCE is ready to print it and sell it to the public; (vi) NetCE pays the author per the terms of the FWA; (vii) NetCE undertakes typically significant editing, fact-checking, and curation of the course; (viii) The course draft is presented to experts and planners for review and approval for their

specific professions; (ix) NetCE presents the final course for author to sign-off on; and (x) The course is printed and offered for distribution to clients and prospective clients.

5. Dr. Jouria and/or the courses Dr. Jouria submitted to NetCE went through this exact process (steps (i) through part of step (vii)) for each of the courses entitled "The Lymphatic and Immune Systems: A Comprehensive Review," "Traumatic Brain Injury," "Non-Antibiotic Antimicrobial Pharmacology: A Review," "Clinical Cardiovascular Pharmacology," "Gastroesophageal Reflux Disease," "Cancer and Chemotherapy," and "Depression and Dementia in the Elderly."

6. At the time of Elite Continuing Education, Inc.'s ("Elite") publication of the courses listed in ¶ 5, NetCE was still at the post-production stage, stage (vii). When NetCE learned of the infringement, it was forced to halt its process. NetCE was unable to "go to print" or sell *any* of the articles at issue. NetCE's competitive advantage and profitability for its courses depends upon a first-to-market posture. After Dr. Jouria's and Elite's infringements, the courses would now be associated with competitor, and the prospect for diminishing returns on these courses did not justify NetCE's further investment to get them ready for printing and sale.

7. NetCE retained an expert, James Pampinella, to advise it on the damage NetCE incurred due to the actions of Elite and Dr. Jouria. As part of his analysis, Mr. Pampinella and I had extensive discussions. During those discussions, when applicable, I provided all relevant internal data from NetCE. This included internal financial documents, documents detailing NetCE's production process, and documents detailing the events with Dr. Jouria and Elite.

8. NetCE has offered hundreds of courses. These courses vary across multiple factors, including target audience, featured course designations, author, content, target geography, timing, and pricing. A random sampling of these courses would likely share no more than a couple of these variables, and possibly none.

3

#54813709_v5

9. NetCE offers its courses both alone ("book courses") and in catalogs both online and printed, though most of its customers purchase online. "Catalog," in NetCE's business model, is a special offer bundle of selected courses printed in their entirety and provided to the identified target audience. There is no limit to the number of catalogs NetCE can publish or to the number of course hours in a particular catalog. NetCE designs its catalogs to profitably meet market demand, and not due to any other requirements. Consequently, the loss of any course reduces the total number of possible combinations NetCE has available to produce catalogues a produce. It is always true that NetCE could produce another catalog or expand its content library and offerings.

10. On November 14, 2017, I served as NetCE's witness pursuant to a Fed. R. Civ. P. 30(b)(6) deposition conducted by Elite.

11. Elite quotes from my deposition in their motion to exclude Mr. Pampinella as NetCE's expert. Elite does not understand, or mischaracterizes, my testimony.

12. In the deposition I stated that "There's no guarantee of which special offers—it could have been in more, it could have been in less." Deposition of Sarah Campbell, 30(b)(6) ("Campbell Depo."), p. 164:23-25. Elite interprets this as my saying "there is no guarantee that any of the Jouria Articles would have been in any particular catalog." Motion to Exclude, p. 2. It is correct to state that there is no guarantee, that is, absolute certainty, as to which catalogs would contain the articles Dr. Jouria produced for NetCE. It is always possible that a course will not be published due to some critical and unresolvable error in the course, or due to outside, unforeseen circumstances. However, had Elite not published the courses, NetCE fully intended to market the courses in catalogs. NetCE engaged in its post-production process precisely for this reason. NetCE would have published the courses widely to maximize initial revenue.

13. In the deposition the following exchange took place:

4

> Q. And there was no -- there's no evidence before us that any of these courses would have been in any special offers at all.
> A. The evidence that I have is that our intent, when accepting the courses for development with a medical writer who is paid a higher amount, was to feature each of the courses.
> Q. How many times?
> A. That would be determined later; so I don't know.
> Q. And over what period of time would you feature them?
> A. Courses can be featured at any time in their life, and that includes after their revision; so there's no real time period or limitation. [Campbell Depo., p. 165:7-20]

14. Elite interprets the exchange in ¶ 13 to mean that "no determination was made as to how many times the Jouria articles might have been featured in any catalogs or over what period of time." Mtn. to Exclude, p. 2. It is correct that NetCE had not yet determined precisely in which catalogs to feature the Jouria courses. This determination is made after NetCE's post-production process and based on market demand. Elite interrupted this process with their infringement.

15. In the deposition the following exchange took place:

> Q. And that would have directly influenced the revenue that each of those courses would have achieved; right?
> A. The total revenue for special offers would be more if it was featured in more special offers and would be less if it was featured in fewer special offers. [Campbell Depo., p. 165:1-6.]

16. Elite interprets the exchange in ¶ 15 to mean that "total revenues for an article are increased if the article is featured in more catalogs and would be less if featured in fewer catalogs." Mtn. to Exclude, p. 2.[1]

17. In the deposition, the following exchange took place:

> Q. […] Did NetCE offer any catalogs in 2013 through 2017 that were missing courses?
> A. I'm not sure what you mean by "missing courses."
> Q. That didn't include the number of courses that that catalog called for?
> A. We did not publish any partial catalogs.
> Q. So every catalog from 2013 to the present published by NetCE had the full assortment of courses in it for NetCE's customers to review and take; is that correct?

---

[1] For clarity, I was referring to the total revenue for articles that appear in special offers.

5

      A. We did not publish any catalogs with a course missing. [Campbell Depo., p. 151:23-152:9.]

18. Elite interprets the exchange in ¶ 17 to mean that "NetCE admitted that it did not publish any partial catalogs, no articles were missing from any catalogs, and all catalogs offered by NetCE between 2013-2017 had the full assortment of courses for its customers to review and take." Mtn. to Exclude, p. 2. Elite's understanding is not correct. It is true that NetCE did not publish "partial" catalogs or catalogs with courses "missing" because there is no such thing. As noted above in ¶ 9, there is no set definition of a "catalog." A catalog is whatever NetCE decides it will be. Catalogs include as many or as few courses as NetCE believes will meet market demand. Consequently, it is incoherent to discuss "partial" catalogs or catalogs with courses "missing." Moreover, it is simply false that this means that there was a "full assortment" of courses. Mtn. to Exclude, p. 2. The courses NetCE had to offer did not include the courses it would have offered had it been able to publish the Jouria courses.

19. In the deposition, the following exchanges took place:

      Q. Were NetCE's revenues impacted, in any way, by the decision by NetCE not to continue developing the five courses at issue in this case?
      A.· I don't know. [Campbell Depo., p. 143:23-144:1.]

      Q. Well, I'm asking you today. So you cannot -- it's true that you cannot today point to a lost sale resulting from a Jouria article that was published by Elite?
      A. I don't have evidence of a lost sale or a gained sale due to Elite's publications. [Campbell Depo., p. 259:21-260:1.]

20. Elite interprets the exchanges in ¶ 19 to mean that NetCE "does not know whether its revenues were impacted in any way by NetCE's decision not to continue developing the Jouria Articles at issue in this case." Mtn. to Exclude, p. 3. This is not correct. NetCE knows that, regardless of the number of catalogs it published, it could have published additional catalogs with the Jouria content had Elite not published that same content first. Further, while NetCE did not know the revenue impact of mitigating its damages by stopping production on the infringed courses, it is not

correct to presume that I meant that such number is unattainable. I meant only that I did not yet have a means for calculating lost sales. That is why NetCE had hired Mr. Pampinella, whose report would be issued soon after the deposition.

21. In the deposition, the following exchange took place:

> Q.  Were NetCE's revenues impacted, in any way, by the decision by NetCE not to continue developing the five courses at issue in this case?
> A.  I don't know.
> Q.  Can you point to a single sale that NetCE didn't make because it decided not to offer any of these five courses?
> A.  I can't point to one that was lost or one that was gained.  They weren't released -- as we discussed, they weren't released; so that would require speculation. [Campbell Depo., p. 143:23-144:8.]

22. Elite interprets the exchange in ¶ 21 to mean that "it would require speculation to determine lost sales of the Jouria Articles given that the Jouria Articles were not published." Mtn. to Exclude, p. 3. Elite misinterprets or mischaracterizes my statement. I could not point to any specific sale that was lost or gained. To do so would require speculation on my part. I did not say and did not mean that, as a universal statement, no person could determine lost sales—only that I personally would have to speculate to identify an individual lost sale.

23. In the deposition, the following exchanges took place:

> Q.  Can you point to any revenue that NetCE lost because of the decision by NetCE not to publish the five courses at issue in this case?
> A.  In terms of lost revenue?
> Q.  Yes, ma'am.
> A.  We can only calculate that based on the example of already-released courses.
> Q.  But you just told me that all of your catalogs had their full allotment of courses in them; right?
> A.  All of the catalogs that we published between 2013 and 2017 included the number of courses that we found necessary.
> Q.  And so are you able to point to any revenue that NetCE lost because one of these five courses wasn't in one of those catalogs?
> A.  That would require me to speculate about the value of those courses in relation to other courses, and I'm not able to do that [Campbell Depo., p. 152:12-153:4.]

7

#54813709_v5

> Q. But in order to lose revenue, you have to not have offered something where you otherwise would have to make the money that you're -- that you're talking about; right?
> A. I can't really speculate as to the value that those courses would have brought to or diminished the special offers, but I do know that, as a standalone course, they weren't replaced at all [Campbell Depo., p. 153:18-25.]

> Q. There's no way for us to predict with any certainty how much revenue any particular course is worth for a special offer like you described; right?
> A. As we discussed, I am not able to ascertain the value of the course specific in a special offer.
> Q. And if you're not able to, because you're the one here testifying in response to these topics, who is?
> A. I'm not sure that anyone could predict or determine the amount of weight that a single course in a bundled course offering had on a participant's decision to complete that special offer. [Campbell Depo., p. 157:13-23.]

24. To clarify, first when I spoke of the "number of courses necessary" I did <u>not</u> mean: (1) the number that would have been the most profitable, or (2) the amount and type of credit most useful to customers.

25. Second, Elite's interpretation misunderstands or mischaracterizes my testimony when it interprets the exchanges in ¶ 23 to mean that "it would require speculation to determine the value of any of the Jouria Articles in relation to any other courses." Mtn. to Exclude, p. 3. I made clear that answering Elite's questions would require *me* to speculate. I made and make no claims that Elite's question would require *everyone* to speculate. NetCE hired Mr. Pampinella precisely for the purpose of calculating the value of the Jouria courses.

26. In the deposition, the following exchanges took place:

> Q. The five courses at issue between NetCE and Elite, you can't predict with any certainty if those courses were included in any catalogs, whether their presence there might have actually caused a decrease in revenue for NetCE; correct?
> A. I can't speculate as to whether it would have increased or decreased the value. [Campbell Depo., p. 154:7-13.]

> Q. Doesn't it make sense that NetCE should have to account for the revenue it actually made from sales in calculating what it alleges it lost by not publishing the five courses in question?

8

    MR. KERN:  Asked and answered multiple times, Mark.  You can't just keep grinding on her until you get the answer you like.  We do have an expert witness in this case.  You will have a chance to take their deposition.
    THE WITNESS:  I am not able to speculate whether the amount of revenue from featured courses would be more or less than that; so I'm not aware of a way of making that calculation. [Campbell Depo., p. 162:11-23.]

27. Elite interprets the exchanges in ¶ 26 to mean that "it would require speculation to determine whether any of the Jouria Articles would have increased or decreased NetCE's revenue if the Jouria Articles were included in any catalogs." Mtn. to Exclude, p. 3. Elite's interpretation misunderstands or mischaracterizes my testimony.  I made clear that answering Elite's questions would require *me* to speculate.  I made and make no claims that Elite's question would require *everyone* to speculate. NetCE hired Mr. Pampinella precisely for the purpose of calculating the change to NetCE's revenues as a result of including the Jouria articles in any catalogs.

28. In the deposition, the following exchanges took place:

  Q.  There are a number of factors that influence how a course will perform; isn't that correct?
  A.  That's correct.
  Q.  One of those is how many catalogs you put it in; right?
  A.  If a course is featured, it will reach more learners and have a greater revenue, for the most part.
  Q.  And in this case, we have no evidence that any of these five courses would have been featured in any catalogs; correct?
  A.  When I contract courses from a medical writer like Dr. Jouria, the writer is paid slightly more with the expectation that we would feature the courses. When we contract courses from nonprofessional writers, clinicians or people working in the field, they are paid slightly less with less expectation that they would be appropriate for feature.
  Q.  Not every course that you contract with a professional writer gets featured in the catalog; correct?
  A.  There's no guarantee that it will be featured.
  Q.  And indeed, in NetCE's history, not every course that they have contracted with from a professional writer has ended up in a catalog; correct?
  A.  I don't know.
  Q.  We looked earlier at the overview of course development, and one of the things that may happen along the development path is that a manuscript gets rejected; right?
  A.  That is a possible outcome.
  Q.  Other factors would lead to how any particular course might perform financially, including how it's priced; right?
  A.  Potentially, yes.

9

#54813709_v5

    Q. And whether or not the subject matter is interesting to your intended audience; right?
    A. Yes.
    Q. And whether the content is -- is good, according to your intended audience; correct?
    A. I hope so.
    Q. How the course is marketed or promoted influences how it's going to do financially; isn't that correct?
    A. That's the idea, yes.
    Q. What competitive offerings are out there in the same or similar subject matters can influence how a course performs financially; correct?
    A. Yes, either way. Yeah.
    Q. How the course gets reviewed, meaning is it – is it -- people that take the course think it's good. That can influence whether other people take the same course; isn't that true?
    A. Potentially.
    Q. Who the author is can influence whether or not a course sells; isn't that true?
    A. Yes.
    Q. When a course is made available, meaning timing, can influence how a course performs; isn't that correct?
    A. That's correct.
    Q. What format you include it in, whether it be in a catalog or it be just online, can influence how a course performs; right? I think we covered that one already.
    A. Sure.
    Q. Where a course is made available, meaning is it in a catalog for nurses in California, or is it in a catalog for nurses in Rhode Island, which I'm guessing has much less nurses, can influence how a course performs; right.
    A. Potentially.
    Q. And whether or not the course or the offering entity has approvals is an accepted source for continuing education credits can influence how it performs; right?
    A. I am not sure I understand.
    Q. Who's publishing it.
    A. Sure. Maybe.
    Q. Some -- some companies in your business just do better; isn't that correct?
    A. For whatever reason, yes. [Campbell Depo., p. 137:17-140:19.]

    Q. And is that because of the laundry list of factors that affect how courses in catalogs perform in this business?
    A. There are many factors that affect how our special offer catalogs perform, and it's impossible to predict all of the factors that come into play. [Campbell Depo., p. 154:14-19.]

    Q. In calculating the $25 million number that you've promoted here today, did you take into account any of the factors we discussed that influence how a course might perform?

10

#54813709_v5

A. I don't think it's possible to predict all of the factors that can influence the components of a special offer; so -- or how to quantify them; so they were not considered in this calculation. [Campbell Depo., p. 163:24-164:6.]

29. Elite interprets the exchanges in ¶ 28 to mean that "that there are many factors that affect how its catalogs perform, and it is impossible to predict all of the factors that come into play." Mtn. to Exclude, p. 3. Elite's interpretation misunderstands or mischaracterizes my testimony. I made clear that answering Elite's questions was impossible for *me*, given the number of variables and levels of detail required to evaluate. I made and make no claims that Elite's question would be impossible for *everyone*. NetCE hired Mr. Pampinella precisely for the purpose of calculating the various factors that go into how catalogs perform.

30. In the deposition, the following exchange took place:

Q. And what guarantees, if any, are there that any of these five courses would have done – performed equivalently to the multiple sclerosis course?
A. Because we weren't able to release them, we don't know if they would have done better or worse than the multiple sclerosis course. [Campbell Depo., p. 137:4-9.]

31. Elite interprets the exchanges in ¶ 30 to mean that "it does not know whether any of the Jouria Articles would have done better or worse than NetCE's Multiple Sclerosis course." Mtn. to Exclude, p. 3. Elite's interpretation misunderstands or mischaracterizes my testimony. I made clear that *I* did not know if the other Jouria courses would have performed better than the multiple sclerosis course. I made and make no claims that this information was unattainable by an expert such as Mr. Pampinella.

32. In the deposition, the following exchanges took place:

Q. How much of any of the sales in 2014, now that you've compared them to 2015 sales, were attributable to the presence of the multiple sclerosis article in the 2014 catalogs in California, Texas, and Ohio?
A. I don't know.
Q. Can't tell, can you?
A. That is not possible for me to determine.
Q. How would anyone determine it?

11

> A. I don't know how someone would try to determine that. [Campbell Depo., p. 151:6-15.]
>
> Q. How do you know whether the $4.7 million in revenue -- whether that number was the result of one of the other courses and not the MS course?
> A. I don't know the extent to which the revenue is or is not attributable to the multiple sclerosis course. [Campbell Depo., p. 163:19-23.]

33. Elite interprets the exchanges in ¶ 32 to mean that "it does not know how much of any of its catalog sales were attributable to the presence of the Multiple Sclerosis course." Mtn. to Exclude, p. 3. It is true that I did not know how much of NetCE's catalog sales were attributable to the presence of the multiple sclerosis course. I did not and do not claim that this information could not be calculated by a proper expert, such as Mr. Pampinella.

34. In the deposition, the following exchange took place:

> Q. In promoting that number, has NetCE taken into account the actual revenue that it achieved during the period in question?
> A. Have we taken it into consideration?
> Q. No. Have you taken it into account?
> A. Into account. I am not sure how that would be done; so, no, I did not.
> [Campbell Depo., p. 161:17-24.]

35. Elite interprets the exchanges in ¶ 34 to mean that in "its damages estimate, NetCE did not take into account the actual revenue it achieved for catalog sales during the period in question." Mtn. to Exclude, p. 3. Elite's interpretation misunderstands or mischaracterizes my testimony. It is not that NetCE has not taken the revenue into account, it is that the number is irrelevant. As I explained in ¶ 9, there is no limit to how many courses or how many catalogs NetCE can offer. Regardless of how much revenue the catalogs NetCE actually published brought in, it is always true that it could have published additional catalogs with the Jouria articles.

I declare under penalty of perjury and the laws of the United States, California, and Florida, that the foregoing is true and correct.

Dated this 26th day of March, 2018

By: _____
Sarah Campbell
Director of Development, NetCE

#54813709_v5