1

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA.**

**FORT LAUDERDALE DIVISION**

**CASE NO.:  15-cv-61165-WPD**

```
 1

 2

 3

 4

 5
     DR. JASSIN JOURIA,
 6            Plaintiff,
     v.
 7   CE RESOURCE, INC. d/b/a CME RESOURCE        March 22, 2018
     And NetCE,
 8            Defendant.
     _____/    Pages 1 - 63
 9   CE RESOURCE, INC. d/b/a CME RESOURCE
     And NetCE,
10            Defendant/Counter-Plaintiff,
     v.
11   DR. JASSIN JOURIA,

12   Plaintiff/Counter-Defendant.
     _____/
13   CE RESOURCE, INC. d/b/a CME RESOURCE
     and NetCE,
14            Defendant/Third Party Plaintiff,
     v.
15   ELITE CONTINUING EDUCATION, INC.,
              Third Party Defendants.
16   _____/

17

18                    HEARING PROCEEDINGS

19            BEFORE THE HONORABLE LURANA S. SNOW
                 UNITED STATES MAGISTRATE JUDGE
20

21
     APPEARANCES:
22
     On behalf of the Plaintiff
23   Dr. Jassin Jouria:
                         LAW OFFICES OF RICHARD S. ROSS
24                       915 SE 2 Court
                         Fort Lauderdale, FL 33301
25                       BY:  RICHARD ROSS, ESQ.
```

```
 1   APPEARANCES CONTINUED:

 2
     On behalf of the Counter-Plaintiff NetCE:
 3
                         HOLLAND & KNIGHT, LLP.
 4                       50 California Street
                         Suite 2800,
 5                       San Francisco, CA 94111
                         BY:  JOHN P. KERN, ESQ.
 6

 7                       HOLLAND & KNIGHT
                         515 E Las Olas Boulevard
 8                       Suite 1200,
                         Fort Lauderdale, FL 33301
 9                       BY:  PHILIP E. ROTHSCHILD, ESQ.
                         BY:  DAN KAPPES, ESQ.
10

11

12   On behalf of Third Party Defendant
     Elite Continuing Education, Inc.:
13
                         MOORE & VAN ALLEN PLLC
14                       100 North Tryon Street
                         Suite 4700,
15                       Charlotte, NC 28202
                         BY:  KATHRYN G. COLE, ESQ.
16

17

18   Transcribed By:

19
                         BONNIE JOY LEWIS, R.P.R.
20                       7001 SW 13 Street
                         Pembroke Pines, FL  33023
21                       954-985-8875
                         caselawrptg@gmail.com
22

23

24

25
```

1          (Thereupon, the following proceeding was held:)

2          THE COURTROOM DEPUTY:  Calling Case Number 15-61165;

3    Jassin Jouria versus CE Resource Incorporated, et al.

4          THE COURT:  All right.  May I have counsel's

5    appearances, please.

6          MR. KERN:  John Kern for the Counter-Plaintiff NetCE.

7          I am joined today by my colleagues Phil Rothschild and

8    Dan Kappes.

9          MR. ROSS:  Good afternoon, Your Honor.

10         Richard Ross on behalf of the Plaintiff, Dr. Jassin

11   Jouria.

12         THE COURT:  All right.  We're here with --

13         MS. COLE:  Your Honor --

14         THE COURT:  Yes.

15         MS. COLE:  If I may be heard?

16         THE COURT:  I'm sorry.

17         MS. COLE:  That's okay right.  Kathryn Cole on behalf

18   of the third party Elite.

19         THE COURT:  All right.  We are here on a whole series

20   of motions.  NetCE's motion to compel production of documents

21   by Elite;

22         The Plaintiff's motion for protective order on a

23   nonparty subpoena;

24         Elite's motion for protective order concerning a

25   subpoena to a nonparty;

1        Plaintiff's motion to strike the expert witness;

2        Plaintiff's motion to quash nonparty subpoena, which I

3   guess goes with the protective order.

4        And Defendant's motion for judicial notice.  And I

5   also have NetCE's motion for war sanctions.

6        So I guess we will just take them one at a time.  And

7   I will start with NetCE's motion to compel the production of

8   documents by Elite.

9        MR. KERN:  Thank you, Your Honor.

10       Again, my name is John Kern with Holland and Knight

11   here for NetCE today.

12       I can relieve the Court with some burden by letting

13   you know that of the six categories of documents we moved to

14   compel, three of them counsel has resolved.

15       And really this motion now comes down to three

16   specific categories of documents, specifically requests 26, 61,

17   62, all of which relate to a common core issue, which is

18   NetCE's desire to collect evidence from Defendant Elite related

19   to accreditation, which as set forth in our moving papers and

20   in the supporting declaration of our founder and director Erin

21   Meinyer is a very critical aspect of running a successful

22   business in the continuing education publishing space.

23       Elite makes -- so first of all for background, there

24   is no dispute in this case that the discovery requests were

25   properly propounded and timely objected by Elite.  We did

1   engage in a fairly thorough meet and confer process and all

2   them just came to a point where they were not willing to

3   produce the scope of documents that we wanted them to produce.

4            And have argued now to the Court that it is not

5   necessary for them to produce the documents.  That they are

6   limited to relevance.  That, in any event, they are under oath

7   declaration from their client about what types of accreditation

8   they sought and what documents they relied on.

9            Seeking that accreditation answers the question and

10  makes any other explanation into accreditation moot.  So I just

11  want to explain briefly why it is that NetCE is seeking

12  documents about accreditation above and beyond what is apparent

13  from reading Miss Meinyer supporting declaration.

14           Elite points out, but questions the seriousness of our

15  suggestion that the extent to which Elite relied on what we

16  call the sort of -- we call the at issue courses.  These are

17  the courses that Dr. Jouria, we claim, published through Elite

18  in violation of my client's copyrights.

19           Their entire argument in opposition to our motion is

20  based on the fact that they did not rely on Dr. Jouria's

21  courses when they submitted to certain accrediting bodies and

22  therefore, there is no other explanation or discovery

23  necessary.

24           On that issue, we have a couple of points we would

25  like to raise.  The first is that their explanation, for

1  instance, that the primary accrediting organization for people

2  seeking to publish continuing education resources for nurses.

3  It's called the ANCC.

4          At some point during the meet and confer, as we talked

5  about, would be sufficient just to get the materials you

6  submitted to the ANCC since that plays a pretty critical role

7  in the professions they sell to and we sell to.  And thus, it

8  is a fairly important accrediting body.

9          They claim that in their application of the ANCC, they

10  never submitted Dr. Jouria's courses.  And so whatever else

11  they submitted to become accredited by the ANCC, which they

12  are, is irrelevant.

13          That explanation is at odds with our understanding of

14  how the ANCC accreditation process works.  We have been

15  accredited through the ANCC for more than half a decade and

16  have been re-accredited multiple times, as is required.

17          And in each instance, their application process

18  requires that we provide them access electronically or through

19  manually, but of course it is easier for us to do it

20  electronically, to our entire library of content.  To our

21  entire stable of authors.

22          And to, essentially, all of the nuts and bolts of the

23  details and protocols of how we choose authors, draft courses,

24  develop Jouria courses, and ultimately take them to

25  publication.

1    Their explanation that Dr. Jouria's courses were not a

2  factor in the ANCC extending them accreditation is not

3  consistent with our understanding of how the ANCC accredits

4  publishers.  So they may be right.  We may have a different

5  process than what they had.  The ANCC may have changed the

6  accreditation protocols in the year that they applied.

7    That is what discovery is for.  We are entitled to see

8  what they submitted to the ANCC and judge for ourselves whether

9  that, in fact, included reference and the content of courses

10  Dr. Jouria authored.

11    So on the very first and most important point they

12  make in defense of their unwillingness to produce documents, I

13  would simply say it's an open question.  And we have very

14  legitimate reasons to disbelieve, not that they are not telling

15  the truth, but just their understanding of how the process

16  works.

17    To our understanding, the ANCC would have access to

18  all of their courses.  And given that they applied and received

19  accreditation in a year where they included, among their

20  courses of Dr. Jouria, by axiomatic definition the ANCC would

21  have in part relied on courses that Dr. Jouria authored that

22  are at issue in this case.

23    Putting that aside, though, something that will be, I

24  think, doesn't seem to grasp in its response to our motion,

25  this case is not merely about copyright infringement.  This

1  case is also a trade secret misappropriation case.

2          And as you will read in the declaration of Erin

3  Meinyer the issue of accreditation is a critical aspect of our

4  trade secret misappropriation case.

5          In 2012 and 2013, Elite's former parent company was

6  engaged in a many month-long process of evaluating whether they

7  would acquire my client, NetCE, during the course of the

8  diligence and the communications revolving around that proposed

9  transaction, the parties exchanged voluminous materials.

10          Included among the materials that we produced was all

11  of our accreditation applications.  Not just to the ANCC, but

12  to all of the 22 different professional accrediting bodies for

13  the 22 professions that we serve.

14          Not only do we produce all of our application

15  materials, we also shared with them what we consider to be

16  valuable information about our strategies for acquiring

17  accreditation.

18          For instance, acquiring joint accreditation, which is

19  explained in technical detail in Miss Meinyer's declaration,

20  but to summarize for you as succinctly as I can, is a multiyear

21  long process whereby, if you can achieve this flexible

22  accreditation, you can save yourself the trouble of having to

23  go state by state every year.

24          NetCE began the process of trying to achieve this type

25  of accreditation in 2009 and completed it in 2014.  We shared

1  with them the details of that process and how we felt that at

2  the time Elite was competitively at a disadvantage because they

3  did not have this type of joint accreditation.

4         When the acquisition discussions broke down and the

5  parties went their separate way, Elite had achieved joint

6  accreditation within six months.  At the time those talks began

7  they were not even exploring the idea.

8         So this is a key component of our trade secret

9  misappropriation case.  And we are entitled, I believe, to

10  discovery on what their accreditation applications looked like,

11  which professions they targeted, which courses they were

12  proposing to the accrediting bodies that they offered.

13         Who was in their stable of authors?  And all of the

14  other details that make up the meat and substance of these

15  very, very significant and substantial applications for

16  accreditation.

17         They have raised some concerns about the fact that

18  this information may be confidential and sensitive.  Of course.

19  We have a very excellent order in this case that Your Honor has

20  signed.  And the parties have abided by and used throughout

21  the course of us exchanging with Elite each party 50,000 pages

22  of documents back and forth.

23         There is a two-tier designation . And of course, they

24  are perfectly at liberty, both with respect to this document

25  request and then later in today's proceedings when you deal

1   with the subpoena to the ANCC, the same will apply.

2        We will, of course, want them to have every

3   opportunity to designate material that they think is

4   commercially sensitive as attorney's eyes only if they see fit

5   or the lower level of confidential.

6        But I am happy to answer any questions that you have

7   about the accreditation process or why you think we need this

8   material, but thus is a very, very straightforward issue.

9   These are document requests that Elite took more than 90 days

10  to begin producing documents in response to.

11       When they did in some respects in response to certain

12  categories they did a very fulsome and comprehensive job as far

13  as we could tell in producing documents, but for some reason

14  they have absolutely refused to cooperate and be reasonable

15  with respect to documents related to accreditation, which to us

16  is one of the most critical issues in the case.

17       THE COURT:  So it is your position that because you

18  are looking at trade secrets that relate to the process of

19  accreditation that is why you need the applications other than

20  the ANCC.

21       Is that what you are saying?

22       MR. KERN:  That is correct, your Honor.

23       Another reason is to learn if -- to interrogate the

24  truthfulness of their statement that they did not rely on the

25  copyright infringed courses in submitting to the some of the

1   accrediting organizations.  And then, all of this simply goes

2   to damages.

3          We have a company that went from Elite, a cosmetology

4   company to then serving some pharmacist.  To, then, almost

5   overnight after acquisition discussions of my client broke down

6   becoming a shoulder to shoulder top competitor in a variety of

7   professions; pharmacists, nurses, doctors.

8          And to us it is highly suspicious.  It is the basis

9   for our trade secret claim and I think we are entitled to

10  collect the discovery we need to test that claim.

11          THE COURT:  Okay.  Let's hear from Elite.

12          MS. COLE:  Good afternoon, Your Honor.

13          The three requests for production at issue on this

14  motion are NetCE's requests 26, 61, and 62.  As you can see

15  from looking at them, these requests seek all documents and all

16  communications related to all efforts made by Elite to seek all

17  accreditations for all professions for all of time.

18          Elite has been in this business for almost 20 years

19  and serves more than 26 professions.  Including electricians,

20  barbers, funeral home directors, psychologists, and the like.

21          As you probably know from presiding over this case,

22  this case is about five courses written by one author for one

23  profession, nursing.

24          So on its face this request is grossly overbroad and

25  for that reason we properly objected in our responses served

1    October 5th.  We objected under 26(b) with specificity as the

2    local rules in Your Honor's order require.

3         And we said exactly in those responses what we would

4    produce, which was documents sufficient to show our

5    accreditation with ANCC.  It was unclear to us why this was

6    such an issue in a case about copyright infringement and trade

7    secret misappropriation because this has never been an issue in

8    the case at that time.

9         But, again, we stated our objection.  We stated the

10   basis for it.  And we said exactly what we would produce and

11   that's what we did produce.

12        Almost six weeks later, well beyond the deadline under

13   Rule 26(g) local Rule 26(g), NetCE moved to compel full

14   responses to those RFPs.  These requests would essentially

15   require Elite to turn its offices upsidedown to search for,

16   collect, review, and produce such an overbroad set of

17   documents.

18        This timing issue alone under Rule 26(g) and the

19   breadth of these requests, which we have properly objected to

20   as not having relevance to any issue in the case, particularly

21   under the amended Rule 26(b), that alone serves as a basis to

22   deny the motion.

23        Even narrowing the issues --

24        THE COURT:  Are you stating as an officer of the Court

25   that the other entities with whom you have accreditation have

1  nothing to do with the medical profession?

2          MS. COLE:  Have nothing to do with nursing, with the

3  topics that these courses are directed to, and I don't believe

4  there is any dispute on that point here.

5          THE COURT:  Okay.

6          MR. KERN:  But there is a dispute about the scope of

7  what we have agreed to to request during the meet and confer

8  that is not nearly as broad as you are describing.  I don't

9  want to argue about things that are not at issue anymore.

10         We have agreed only to seek applications in the 22

11  professions that we share that NetCE also presented to them

12  turning our office upsidedown during due diligence; 22 of the

13  26 that you are in the business of that we also are.  And also

14  we've agreed to limit the scope to two years and not 22.

15         THE COURT:  So there are 22?

16         MR. KERN:  22 professions in the two-year period.

17         THE COURT:  And is there any likelihood whatsoever

18  that the courses at issue have to do with any of the others

19  other than ANCC?

20         MR. KERN:  Your Honor, with respect to the copyright

21  claims, yes.  Off the top of my head, it would be pharmacology,

22  pharmacist, nursing, doctors.  There is also advanced nursing

23  which is one of the 22.

24         So any of those five, but the real issue, Your Honor,

25  is the point I made about the fact that this  case is not

1   merely about the nursing and pharmacology and pharmacy courses

2   that are at issue on the copyright side of the case.  It is

3   also about basic misappropriation, which has to do with our

4   business model, our business method.  What we imparted to them

5   during the period of contemplated acquisition.  And what we

6   claim they took the secret sauce and now they run a business

7   which is nearly identical and competing evenly with ours.

8            THE COURT:  Yes, but why do you need all 22 to get

9   that information?  Couldn't you get that, for example, from the

10  five categories that you just mentioned?

11           MR. KERN:  Your Honor, I think you make a very good

12  point.  And I would be happy to step aside with Miss Cole and

13  go over the list of 22 and come up with a smaller list for the

14  reasons you stated.

15           THE COURT:  Go ahead.

16           MS. COLE:  Thank you, Your Honor.

17            In an effort to resolve this issue with NetCE, we have

18  done a couple of things already.  We have provided sworn

19  testimony under penalty of perjury from the director of our

20  operations confirming that none of the Jouria courses were ever

21  submitted to any accrediting body, whether ANCC or any other.

22            We, then, went a step further and produced to NetCE

23  the ANCC application materials that we submitted to the ANCC

24  during the relevant timeframe.  Hundreds of pages of materials.

25  The ones that could have contained Dr. Jouria courses if we

1   ever were to have submitted those.  We produced those.  And

2   yet, NetCE still won't let this go.

3        Today we are hearing argument for the first time, Your

4   Honor, that was not in the briefing and it is not in Miss

5   Meinyer 's declaration.

6        I heard today for the first time that Miss Meinyer

7   contends that she gave us all application materials for

8   something like 22 professions.  That's not supported by any

9   testimony in this case.  Nor is it supported by the document

10  productions we've received.

11       Under the amended Rule 26(b), Your Honor, relevance

12  has to be determined with a focus on proportionality to the

13  issues in the case.  In their briefing, NetCE has cited law

14  about Rule 26 from before their 2015 amendments.

15       In 2015 the rules were revised to provide a list of

16  factors that have to be considered in determining this

17  relevancy analysis.  One of those is the importance of the

18  discovery sought to the issues in the case.

19       This issue about accreditation simply has nothing to

20  do with copyright infringement or the allegations and evidence

21  on trade secret misappropriation.  Particularly, we're hearing

22  arguments today for the first time that simply aren't supported

23  by discovery or the issues in the case.

24       Finally, Your Honor, the post 2015 cases addressing

25  discovery requests like this make abundantly clear that

1    speculation, like what we're hearing today and like what we

2    heard in the motion, cannot be the basis for discovery or for a

3    relevance argument under Rule 26.

4         The *Digital Assurance* case we cited to Your Honor

5    reminds me very much of what we're hearing today.  That was a

6    trade secret case where the Plaintiff just really suspected and

7    believed and was so sure that the Defendant must have had their

8    trade secrets in its possession and issued grossly overbroad

9    requests.

10        In response, the Defendant produced what it had, just

11   as we have done here.  The Plaintiff didn't like it and just

12   didn't believe what the Defendant was saying.  And the Court

13   said that speculation like that just isn't enough.  And what

14   the Plaintiff was asking for is what in pre ESI days would

15   amount to the Defendant having to turn its company upsidedown

16   and just open its doors to everything.  That's exactly what

17   NetCE is doing in this case.

18        NetCE has known about this speculation on their part

19   about the ANCC for years now.  We've seen that in discovery.

20   And the fact that they waited until the very end of discovery,

21   blew through the deadline to file a motion to compel --

22        THE COURT:  How late was it?

23        MS. COLE:  The motion to compel?

24        THE COURT:  Yes.

25        MS. COLE:  The deadline would have been November 5th

1  and it was filed on November 15th, the last day of discovery.

2          THE COURT:  So it is ten days late.

3          MS. COLE:  Your Honor, in sum, I would say that

4  Rule 26 is simply not as broad as NetCE would have it to be

5  here.

6          It does not permit them to have us turn over all of

7  our files.  Particularly as between competitors in this

8  industry and look through what though might be able to find

9  based on nothing more than pure speculation.

10          All we've heard today and all we've seen in their

11  briefs is what they think might have happened.  What they hoped

12  happened.  What they hope they are going to find evidence to

13  show.

14          And that speculation has been directly refuted by

15  sworn testimony from our witness.  And from our own document

16  production where we have handed them everything we submitted to

17  the ANCC during the relevant timeframe.  There is simply no

18  basis for further discovery on this issue at this time.

19          THE COURT:  Okay.

20          MS. COLE:  Thank you.

21          MR. KERN:  Thank you, Your Honor.

22          First, addressing the point about the lateness to the

23  motion to compel, we absolutely resist that characterization of

24  things.

25          You will see in the meet and confer communications and

1   in their initial responses that they continually told us that

2   documents are forthcoming.  Documents are forthcoming.  We will

3   get you more documents.  We need to confer with the client of

4   everything we have and we will get you more documents.

5          And then, there was a proffer made by them that we

6   take their 30(b)(6) deposition and if we didn't get

7   satisfactory answers from the 30(b)(6) witness, then we could

8   revisit the issue of accreditation documents, but we didn't

9   have their 30(b)(6) deposition because -- and there's a dispute

10  about this -- but our contention is because they cancelled it.

11         And we had agreed to take it outside discovery.  The

12  discovery cutoff, which is permitted under Florida Southern

13  District rules, but what is not permitted is for me to then ask

14  the Court to intervene on our behalf  after what I claim is

15  they breached the counsel agreement.

16         But, in all instances, there was assurance from them

17  that the documents were forthcoming and that there were more

18  coming.  And that's why we waited until the last possible

19  minute to burden this Court with a motion to compel, when at

20  all times prior to that it seemed we were going to be able to

21  work on an accommodation with them.

22         On the issue of this --

23         THE COURT:  That changed the deadline?

24         MR. KERN:  It does, Your Honor.

25         I believe that assurances of counsel in this case,

1  just from a policy standpoint, it would seem impractical that

2  the Court would want us to rush to court where the parties had

3  not --

4         THE COURT:  Well, in other instances that is what the

5  lawyers do.  That is why I am asking.

6         They say, hey, I cannot wait anymore because the

7  deadline is coming.  And if you are not going to give me the

8  documents, I am going to file the motion to compel and they do

9  it.

10        MR. KERN:  That's exactly right.

11        THE COURT:  But you did not do that is what I am

12  saying.

13        MR. KERN:  Well, we didn't.

14        We kept working with each other and in almost all

15  respects in this case, working with them they have worked in

16  good faith in almost all aspects of this case.  We had no

17  reason to believe that this would be any different.

18        Your Honor, with respect to the idea that this is the

19  first time that we have raised the issue of what was

20  transmitted during the diligence discussions in 2012 and 2013,

21  is absolutely not true.

22        And you will see in the declaration of Erin Meinyer

23  Paragraphs, I believe it is 6, 14, and 15 in several different

24  locations in her declaration she describes in great detail the

25  issue of accreditation.

1          And what she explained to Elite's former parent

2    company about the disadvantage Elite was out because of the way

3    they went about it and how we did it differently.  And then,

4    details that we produced for them all accreditation

5    applications of NetCE's, which was not turning our office

6    upsidedown.

7          And notwithstanding her characterization that is what

8    constitutes because this can be done electronically.  And in

9    fact, they can be collected and pulled together fairly easily.

10         Finally, Your Honor, they claimed to have produced all

11   materials related to their ANCC application.  And I assume

12   that's what they have attached to their response to our motion

13   as Exhibit B, which is really nothing more than a print-off of

14   the ANCC application as it appears on the ANCC website.  There

15   is no information.  There is no detail in here.

16         If there are other aspects of their document

17   production that they think addresses the ANCC application, I am

18   all ears and I am happy to take a look at it.  But, in any

19   event, that is one accrediting body.

20         And like I explained to Your Honor, Miss Cole calls it

21   speculation.  It is not speculation.  We understand how this

22   industry operates.  We've been in this industry for 26 years

23   and we know that the statements that Miss Franchi on behalf of

24   Elite, has made in her declaration under oath is not consistent

25   with how the ANCC evaluates applications and extends

1   accreditation.

2        So telling us that it's a wild speculative theory when

3   this is our opportunity to explore one of the key theories in

4   our case and we are being denied discovery on the topic.  This

5   is not speculation.  This is basic discovery.

6        We asked for it.  They refused to produce it.  We

7   agreed to narrow it.  And we will agree to narrow it further

8   because I think Your Honor made a good point about maybe the

9   five professions handles the copyright claim, but maybe four or

10  five more would be sufficient to make your point that they

11  stole our accreditation applications, which is really what we

12  are contending.

13        Thank you, Your Honor.

14        MS. COLE:  May I respond briefly?

15        THE COURT:  You may.  And tell me if there is anything

16  more that relates to the motion for the third party subpoena.

17        MS. COLE:  Sure.

18        THE COURT:  Since they are essentially the same thing.

19        MS. COLE:  Not to belabor the issue on this notion of

20  timing, Your Honor, but you asked Mr. Kern a question about

21  whether negotiations between counsel changed the deadline under

22  local Rule 26(g).

23        The answer is, no, they do not.  And in any of them

24  there was never a discussion between counsel about needing to

25  get a motion to compel on file and agreeing to hold that

1    deadline in abeyance or anything of the sort.

2          So, again, I submit that this on its face procedurally

3    this motion is late and should be denied for that reason alone.

4          THE COURT:  Are you saying that they should not have

5    relied on you are saying the documents are forthcoming?

6          MS. COLE:  So that's my next point, Your Honor.

7          In our responses served on October 5th, we said very

8    clearly exactly what we would produce in response to those

9    documents and we did produce them.

10          I do not believe we ever told them during those

11    discussions that we were going to produce additional documents.

12    So we told them what we would produce and we did produce that.

13    There was no bait and switch on our part as to producing

14    additional accreditation documents in some sort of effort to

15    string the deadlines along.

16          THE COURT:  What about their statement that they do

17    not believe what you produced is what you said you were going

18    to produce?

19          MS. COLE:  That was the third note I had on my list.

20          Exhibit B that Mr. Kern is referring to is not at all

21    what I am talking about.  We produced hundreds of pages of

22    documents related to the ANCC.  Including a more than 100-page

23    application document itself.

24          I don't know why there is confusion as to whether or

25    not we produced it, but it was absolutely part of our

1    production.  It has Bate stamps on it.  I have seen my eyes on

2    it.  I double-checked it.  It is not Exhibit B.  It absolutely

3    went out.

4          And I really cannot explain anymore why there is

5    confusion on that point, but we did produce it.  And it

6    demonstrably shows that the Jouria courses were not part of the

7    ANCC application during the relevant timeframe, which of course

8    is also supported by the sworn declaration of our witness.

9    It's a black and white issue.

10          THE COURT:  Well, what about their claim that the

11    entire application process involved use of one of their trade

12    secrets?

13          MS. COLE:  So, yes, that's a new claim that we're

14    hearing, I think, for the first time today.

15          We have asked in discovery for copies of all the

16    documents they say they gave to us that were the trade secrets.

17    I would like to think that if the application materials for 22

18    professions had been disclosed to the principal of our company

19    as they are now claiming, I would like to think that those

20    would have been produced in response to our document request.

21          We've never seen that.  We've never seen a claim in

22    discovery from their 30(b)(6) witness or in their document

23    production that they gave us their application materials.

24          So it's a little bit difficult for me to respond to

25    that now that we are months beyond the close of discovery.  And

1   that simply was not supported by the discovery in their case

2   when we asked them to prove their trade secret claims,

3   including what do you contend are your trade secrets and show

4   us what you supposedly gave to our client.

5        And in any event, I can tell you again to come back to

6   the sworn declaration that we submitted in the briefing here,

7   Miss Franchi testified under oath that the Jouria courses in

8   any event were not used and were not submitted to any

9   accrediting body including the ANCC.

10       THE COURT:  What about their contention that the

11  accrediting body was necessarily given access to all of your

12  course material?

13       MS. COLE:  I don't believe that is supported by the

14  evidence.  That is not my understanding of how the accrediting

15  process works.  I don't believe there is any -- I don't think

16  that's even supported by Miss Meinyer 's declaration.

17       This, again, reminds me of the *Digital Assurance* case

18  I talked about a moment ago where it is speculation upon

19  speculation about what they think must have happened.  What

20  they think might have happened.

21       It is not supported by the evidence in this case.  And

22  it is directly refuted by the documents that we have produced.

23  If we bring it back to Rule 26(b), again, in the

24  proportionality analysis, it just simply doesn't pass muster.

25       THE COURT:  What about the third party subpoena?

1          Anything additional that you wish to add on that?

2    There is no timing issue as to that, correct?

3          MS. COLE:   No.   I don't believe there is a timing

4    issue there, but I think that the good cause analysis that

5    comes into play for a motion for protective order, which is

6    what we filed there really kind of, the issues are very similar

7    as to what we are dealing with here.

8          You know, the Federal Rules give Your Honor the

9    ability to grant a protective order when the information sought

10   is not relevant under that same Rule 26(b) analysis that we

11   have been talking about.   And we maintain that that serves as

12   the basis for a protective order.

13         The rules also require an analysis about whether the

14   discovery sought by the subpoena is unreasonably cumulative of

15   discovery sought from a party to the case.

16         You know, it is clear that we are already addressing

17   these discovery issues through the request for production and

18   motion to compel.   So that provides an additional basis for

19   good cause.

20         And the rules also ask whether the parties seeking the

21   discovery, NetCE seeking discovery from the ANCC, had ample

22   opportunity during the discovery period to try to get that

23   information.

24         Again, NetCE has been speculating and complaining to

25   the ANCC about us for years now.   Back in 2016 they sent the

1   ANCC an e-mail accusing my client of copyright infringement

2   when this case still had not even made it to discovery yet.

3   They have been like circling around this ANCC issue and

4   reporting us to the ANCC for years now.

5           Yet, on the last day of discovery, they decide to

6   serve a subpoena to the ANCC.  So here we are now in pretrial

7   time having a discovery fight about something that could have

8   been addressed months ago.  Discovery in this case opened back

9   in May of last year.

10          So when you layer the timing issues, along with the

11  fact that it is really duplicative of what is going on here

12  with the motion to compel and the discovery requests, there is

13  really no basis to be burdening a third party to seek

14  competitive confidential sensitive information from Elite in

15  what really looks like an end-run around the discovery process.

16          So for the same reasons that we believe that there is

17  no basis for the motion to compel, we would say that there

18  should be a protective order against the subpoena as well.

19          THE COURT:  Okay.

20          MR. KERN:  If I could address briefly the ANCC third

21  party subpoena?

22          THE COURT:  Sure.

23          MR. KERN:  Your Honor, the 2016, I believe my client

24  notified the ANCC that Elite was using the letters ANCC in

25  their URL for their website.  This wasn't an issue of informing

them about the Jouria case or copyright infringement related to

us.

We were simply alerting the primary accrediting body

for nurses in our profession that our competitor was using

their trademark name ANCC in their domain in their URL.  So

that was the issue there.  Not any intent to smear the

reputation or bring this case to the attention of the ANCC.

I am really perplexed by Elite's argument about

duplication and ample opportunity to pursue these issues in the

case-in-chief among the parties before pursuing it from the

third party because as I have explained, they've shut us down

at every turn related to this discovery in our case.

The most critical issue from our perspective to our

trade secret case and to our theory that they used diligence as

a way of understanding our business model and achieving in six

months joint accreditation, something that took us five years

to achieve, by taking our blueprint is something they have

refused to provide even the most modest discovery for it.

She calls it speculation.  It's discovery.  And then,

if we're wrong the documents will show that.  And if the

documents are weak, then she will have an opportunity to point

out how some should be given more weight than others, but it is

simply wrong to suggest that it is duplicative when in the

first instance, we don't believe they have given us a fulsome

production.

1          What she is referring to in the production that is the

2     complete application of the ANCC does not in any way resemble

3     what we understand the ANCC application, responses, and

4     submissions look like.

5          So, again, a one-sided untested, uninterrogated client

6     declaration saying this is what we submitted and I swear that's

7     it, there is nothing more, in this case is not sufficient.

8          What is sufficient is allowing the parties to engage

9     in discovery to collect evidence and to test the credibility of

10    what Miss Franchi has said in her declaration.  And if Miss

11    Franchi is right, then that will be borne out in what the third

12    party produces to us.

13         We already have engaged with counsel for the ANCC.

14    They already have assembled and collected the production at

15    issue.  We will absolutely give Elite an opportunity to

16    designate it attorney's eyes only so they don't have any

17    concerns about our client using it to some competitive

18    advantage.

19         We obviously waited until the last minute, but well

20    within the period of discovery and we sought permission from

21    Judge Dimitrouleas to follow up on the subpoena after discovery

22    closed as long as we served it timely, which we did.

23         We will absolutely give them the opportunity to

24    designate the material as attorney's eyes only so there aren't

25    concerns about how it is used.

1         If you have any questions, Your Honor?

2         THE COURT:  No.

3         MR. KERN:  Okay.

4         THE COURT:  All right.  Well, consistent with my

5    policy in all cases on discovery, they need to be filed in a

6    timely manner.

7         The discussions with attorneys does not extend the

8    deadline.  There is always, if there is concern about this, the

9    ability to file request to the Court to extend the time to see

10   if they produce documents and ten days is just too late.  So

11   the motion to compel is denied, but as untimely.

12        However, the motion for protective order is likewise

13   denied so that the information can be obtained from the ANCC

14   with the first opportunity to designate -- I guess all of it

15   would be subject to the confidentiality order.  And Elite can

16   have the opportunity to designate some of it attorney's eyes

17   only.

18        MS. COLE:  Yes, Your Honor.

19        If I might?  We would request that it all be

20   designated attorney's eyes only as is reflected in the

21   attachments to our filings.

22        Everything submitted to the ANCC is considered by both

23   the ANCC and the submitting entity to be confidential and

24   proprietary in nature.

25        THE COURT:  All right.  Well, let's designate it for

1  attorney's eyes only for now.  And if there is a need to

2  utilize it in some manner during trial, you can ask that it be.

3          MS. COLE:  And I might also ask for some

4  clarification.  I just heard for the very first time today that

5  the ANCC, according to Mr. Kern, has already assembled and

6  gathered a set of documents.  We have not been notified about

7  that.  Nothing has been produced to us.  So I would --

8          THE COURT:  Well, that is between you.

9          MS. COLE:  Thank you.

10         THE COURT:  That is not my concern.

11         MR. KERN:  Thank you, Your Honor.

12         THE COURT:  All right.  Plaintiff's motion for

13 protective order pertaining to the Educational Commission For

14 Foreign Medical Graduates.

15         MR. ROSS:  Thank you, Your Honor.  Richard Ross again

16 on behalf of Dr. Jassin Jouria.

17         If Your Honor will recall, the issue of the ECFMG the

18 Educational Commission, we had a hearing based upon a discovery

19 request by NetCE to Dr. Jouria on the ECFMG in terms of

20 interrogatories, request for production, and deposition, all

21 deposition of Dr. Jouria.

22         Your Honor made a ruling that was on November 9th that

23 the ECFMG matter was irrelevant to the claims and defenses in

24 this case as it pertains to Dr. Jouria.  Those claims and

25 defenses are contract, breach of contract, and copyright

1  infringement.  There is no trade secret misappropriation with

2  respect to Dr. Jouria.

3       On November 15th, NetCE moves for an extension of time

4  with Judge Dimitrouleas under Rule 45 to then subpoena the

5  ECFMG directly for the same information that Your Honor orally

6  ruled on the 9th that they were not permitted to receive

7  because it is not relevant to claims or defenses.

8       In that motion, NetCE does not specifically inform

9  Judge Dimitrouleas of your oral pronouncement and that you

10 found the information sought from the ECFMG to be irrelevant to

11 claims and defenses.

12      On November 16th, Your Honor issues her omnibus order

13 reducing to writing that oral pronouncement.  And again,

14 reiterates that the ECFMG matter is not relevant to claims and

15 defenses.

16      The next day, Judge Dimitrouleas grants the extension

17 and does not comment on your finding in the omnibus order and

18 over the objection of Dr. Jouria.

19      So we take issue with, at this point in time, NetCE

20 intentionally trying to usurp your order and to get from the

21 ECFMG that same information that it sought to get and was

22 rejected by this Court from Dr. Jouria.

23      On November 29th, NetCE appeals your omnibus order to

24 Judge Dimitrouleas.  And on December 18th, Docket Entry 192,

25 Judge Dimitrouleas states that he conducts an independent

1    review of your ruling and he affirms your ruling independently

2    and he denies the appeal in whole, again, stating that ECFMG

3    information is not relevant to claims or defenses.

4           That's December 18th or rather -- yes, December 18th.

5    So, at that point in time, NetCE should have dropped the

6    matter.  Put it to bed, but NetCE did not withdraw its

7    subpoena.  It pressed.  It pressed the ECFMG counsel.

8           When we received the order from Judge Dimitrouleas, I

9    sent it to counsel for the ECFMG letting them know what the

10   status of the request was.  And NetCE, through Mr. Kern,

11   responds I am not going to let this matter die.

12          So he continues to pursue, despite your ruling and

13   despite Judge Dimitrouleas' ruling.  And again, continues to

14   protract, create vexatious litigation, abuse the Court's order

15   for which it was sanctioned once before and continues

16   unabatedly.

17          Under Rule 26, provides productive order is permitted

18   while parties seek discovery that is not relevant to claims and

19   defenses.  This matter has been put to bed.  It is not

20   relevant.

21          NetCE subpoenaed the ECFMG seeking the same

22   information that you and Judge Dimitrouleas said they cannot

23   get.  The subpoena, we submit, was an intentional violation of

24   the Court's orders.  And that what it should have done was, it

25   should have waited until Judge Dimitrouleas ruled on the appeal

1  before it ever served its subpoena.

2          NetCE sought the extension from Judge Dimitrouleas

3  just for this particular purpose and it could have asked for an

4  additional extension until Judge Dimitrouleas ruled upon the

5  appeal.

6          It refused to do so and went ahead strong trying to

7  browbeat Dr. Jouria to get involved with the ECFMG to spend

8  more legal fees to defend and issue that was resolved

9  completely by this Court.  Not on one occasion, but on two

10  occasions.

11          So it was wrong for NetCE not to inform Judge

12  Dimitrouleas of the reasons that you disallowed discovery.  And

13  it was wrong for NetCE not to withdraw its subpoena once Judge

14  Dimitrouleas ruled and affirmed your ruling and denied the

15  appeal.

16          It was wrong, respectfully, for Mr. Kern to then go to

17  the ECFMG attorney and say I am not letting is this matter go

18  and accusing Dr. Jouria of lying to the ECFMG.

19          And it was wrong again for NetCE to attempt to subvert

20  two of the Court's rulings on this very issue.

21          I am dumbfounded by the persistence of NetCE for this

22  information where the Court and the District Judge have been

23  consistent in its orders.

24          I would also like to address, if I may, the request to

25  take judicial notice because that is also apparently related to

1  this very same ECFMG issue.  So it is not just a motion for

2  protective order, but as the Court noted, it is relevant to the

3  motion to quash.  Those are the same issues.

4          But, now, just several days ago NetCE files a request

5  to take judicial notice of testimony that Dr. Jouria gave at

6  one of his bankruptcy hearings.

7          And although the request doesn't state why NetCE wants

8  the Court to take judicial notice of it, but it says

9  specifically you have highlighted a section of that transcript.

10  And in the attachment what the highlight covers is that very

11  same ECFMG matter.  What happened?  Why?  There is no

12  identification of why that is relevant to claims or defenses.

13          Federal Rules of Evidence 201 says it must pertain to

14  an adjudicative fact and what the *Dip and Dots* case says -- and

15  that is submitted with its request, which is an Eleventh

16  Circuit case, is that an adjudicative fact is one that is

17  relevant to claims and defenses.

18          Just the same standard under Rule 26, but it makes no

19  argument why now it should on a third occasion they couldn't

20  get the information from Dr. Jouria.  They're trying to get it

21  now from ECFMG.  Why NetCE is insistent upon still trying to

22  get this ECFMG information into the court record.

23          And we think it was less than candid of NetCE to file

24  the request to take judicial notice without even identifying

25  what the adjudicative fact was that they wanted the Court to

1  take notice of.  And without informing the Court specifically

2  that despite the rulings of the Court, they are still harping

3  on this ECFMG matter.

4       We would request that the Court grant the motion for

5  protective order, quash the subpoena because NetCE refuses to

6  withdraw it, protect Dr. Jouria from continued vexatious

7  litigation by NetCE, and protect the integrity of the Court's

8  rulings that NetCE seems not to adhere to.

9       And we ask that the Court also strike that bankruptcy

10  testimony from the record in this matter.  And finally, due to

11  all of these abuses that we contend, we would request another

12  monetary sanction against NetCE.

13       Thank you.

14       THE COURT:  Tell me how this is different from my

15  prior ruling that this matter was irrelevant?

16       MR. KERN:  Thank you, Your Honor.

17       I will, if I may, just as a narrow procedural matter

18  for the reasons set forth in our response, I wanted to make

19  sure I knew what I was focusing on, I believe the motion to

20  quash was improper because the documents that Dr. Jouria seeks

21  -- or pardon me -- that he seeks to suppress production of are

22  neither privileged or protected under the case law we cite in

23  our response.

24       I believe that this is really about the motion for

25  protective order.  And your question is a valid one and I think

1    I can short-circuit this.

2              In no way, Your Honor, did we or even attempting an

3    end-around, or disrespect, or flout this Court's orders.  The

4    timing Mr. Ross laid out perfectly.  The one aspect of the

5    chronology that he neglected to mention, I don't think through

6    any intention, is that when we sought the extension of time to

7    pursue the third party subpoena from Judge Dimitrouleas, we did

8    not have your written order yet.

9              It was our impression from the hearing that your order

10   was limited to this evidence you seek is not of sufficient

11   relevance to open up the deposition or compel further document

12   productions.

13             We did not think it was as expansive as the written

14   order, which made it clear that you had made a determination

15   that the evidence we thought was irrelevant to the claims and

16   defenses, period.

17             So given that scope and the fact -- so just to be

18   clear, when we sought that and obtained the right to serve that

19   subpoena and prepare the subpoena, we were awaiting your

20   written order.  And then we were hoping that the appeal to

21   Judge Dimitrouleas would succeed.

22             So, then, I think very validly your question is, once

23   Judge Dimitrouleas upheld your order, why then did we not

24   withdraw the subpoena?  And I will tell you, Your Honor, we

25   considered it and discussed it and thought about it at length.

1   And it was not a flippant decision at all and certainly not to

2   be vexatious or to create expense for Dr. Jouria.

3           Here's why.  Because Your Honor, although, you pointed

4   out at the original hearing that it was improper for Mr. Ross

5   not to instruct his client to answer our questions at the

6   deposition, and it was improper for his client not to answer

7   the questions, and it was improper for them not to produce

8   documents, although you acknowledged that, you said that you

9   believed the underlying evidence that we were seeking to

10  collect was not relevant.  And therefore, you would not allow

11  us as an issue of offensive discovery to obtain that.

12          And we hear that and if that were the end of the

13  discussion, then, we would have withdrawn our subpoena.  But we

14  are in the unfortunate situation now of going towards trial

15  with no ability to impeach Dr. Jouria or Elite if they make an

16  issue, as they did at his deposition, of his credentialing, his

17  reputation, his credibility, his standing as a doctor.  We will

18  not have any deposition testimony to impeach him with.  We will

19  not have any documents to impeach him with.

20          This is not about whether he is currently licensed to

21  practice medicine.  It is about presenting him as a witness

22  that is a credentialed medical professional that is a quasi

23  expert.  That is somebody, through the eyes of the jury, may

24  have inherent credibility and inherent ethics.

25          Mr. Jouria, at his deposition, after the series of a

1  questions I asked him about the ECFMG, which he refused to

2  answer, several times mentioned that in his personal ethics as

3  a doctor he would not commit copyright infringement because of

4  an X, Y, and Z.  And he believed that medical research was

5  conducted this way because he was a medical doctor that adhered

6  to certain ethics.

7         Miss Cole, on behalf of Elite, asked him twelve

8  questions after he refused to answer my questions about the

9  ECFMG beginning with:  Do you remember earlier when Mr. Kern

10 was asking you about some controversy with a credentialing

11 body?  And he says, yes, I do.

12         And nobody remembers what the answer was because he

13 didn't answer the questions, but she used that as a setup to

14 walk him through a series of a twelve questions building up his

15 credibility credentials and reputation.

16         To be clear, though, you attended college?  You

17 attended medical school?  Yes, I did.  And you passed your

18 boards?  Yes, I did.  And you have an M.D.?  Yes, I do.  And

19 you completed your internship?  Yes, I did.  And you completed

20 your residency?  Yes.  And you were licensed, in fact, to

21 practice medicine in Florida?  Yes.  And in fact, you were

22 licensed to practice medicine in Indiana and on and on and on.

23         And we are now faced with the very likely possibility

24 because we were unable to collect the evidence and unable to

25 compel it during discovery that this will be repeated at trial.

1   And when it does, I want to have the ability to impeach the

2   credentials, credibility, veracity, trustworthiness of Dr.

3   Jouria's testimony.

4          And so I appreciate how Mr. Ross cast that and why the

5   Court may even be inclined to see that this was an end-around,

6   but what I hope Your Honor understands is that -- and this is

7   why and you asked why we didn't provide any basis.

8          This is why we submitted the request for judicial

9   notice because I believe that transcript really lays bear that,

10  A, this is not a fishing expedition.  The thing we are after is

11  a very real thing that happened;

12         B, I don't need an entire litigation file from ECFMG

13  about Dr. Jouria suing them to have his credentials restored

14  after he committed this fraud on their application process.

15         All I need is that bankruptcy transcript and the

16  ability to impeach his effort, or the effort by Elite's

17  counsel, or his own counsel to build up his credentials in the

18  eyes of the jury as an honest broker, as a licensed medical

19  professional, as a highly credentialed individual whose

20  testimony might have additional weight because of those facts.

21         And as it stands, I have no ability to impeach them

22  making credentials an issue in the case, which I believe based

23  on what happened at the deposition, it will.

24         THE COURT:  Your request for judicial notice was

25  solely for this hearing.

```
1              Is that correct?

2              MR. KERN:  Solely so I could explain to Your Honor

3    what I'm after.

4              I understand that the last thing you want to do is

5    tell Judge Dimitrouleas what evidence is in and what is out.

6    That's for us to fight about in motions in limine and redo this

7    discussion.

8              That's to show you that I am not on a fishing

9    expedition.  I am not a vexatious litigant trying to punish Dr.

10   Jouria, or make him look bad, or embarrass him.

11             I need to protect my client's right to impeach Dr.

12   Jouria's and Elite's efforts to make him a credentialed highly

13   ethical witness.

14             THE COURT:  Anything else?

15             MR. ROSS:  Very briefly, Your Honor.

16             What Mr. Kern states is simply re-argument.  It's the

17   same argument that we heard on November 9th.  Credentialing

18   doesn't go to claims and defenses.  His sole argument is I need

19   it to impeach, but a request to take judicial notice is not for

20   the purpose of impeaching.  It is for the purpose of --

21             THE COURT:  No.  He wants me to see why he has made --

22   as I understand it, he does not want judicial notice for trial.

23   He just wanted to show me why he is acting in good faith.

24             Correct?

25             MR. KERN:  That's correct, Your Honor.
```

1       THE COURT:  So we do not have to worry about that.

2    There is no judicial notice at the trial.  It is just me

3    getting a chance to read it.

4       MR. ROSS:  All right.  Even if you read it, Your

5    Honor, the purpose to which Mr. Kern relies is he wants to have

6    you read it and then determine from Dr. Jouria's conduct before

7    the ECFMG that that conduct is impeachable.

8       Well, under Federal Rules of Evidence 608, you cannot

9    impeach a witness for trustworthiness based upon conduct.  So

10   it is just an immaterial argument.  It is not well-founded in

11   law.

12       The credentialing argument from Mr. Kern is just a

13   rehash of what we have been through before.  Credentialing

14   doesn't go to claims or defenses.  We have a breach of contract

15   claim.  We have a copyright infringement claim.

16       The contracts are in the records.  There was only one

17   set.  No drafts.  NetCE wrote it and the copyright

18   infringement, NetCE has the original articles that Dr. Jouria

19   wrote for NetCE.

20       And NetCE has the original articles in revised form

21   that Dr. Jouria wrote and submitted to Elite.  Nothing to do

22   with credentialing.  Just the third bite at the apple to get at

23   ECFMG.

24       And we respectfully request the granting of our

25   motions in denial of their request to take judicial notice.

1          Thank you.

2          THE COURT:  All right.  Well, I believe that there is

3   a distinction between questions that are proper on a deposition

4   and request for information from third parties.

5          So, in fact, I don't think my prior order precludes

6   this subpoena.  And I also think that there is a difference

7   between -- even though there is an interest in Dr. Jouria in

8   the third party's documents that is different from requiring

9   him to produce them himself -- I believe that it is highly

10  unlikely that these documents are admissible.

11         But I think counsel makes a good point that depending

12  on what bolstering of credibility goes on at trial, it is

13  conceivable that a Judge might allow them to be used.

14         So I am going to deny the motion for protective order

15  and the motion to quash.  I will grant the request to take

16  judicial notice solely for the purpose of me reading it for

17  this hearing.

18         MR. KERN:  Thank you, Your Honor.

19         THE COURT:  But I will instruct the lawyers to --

20  well, I will advise the lawyers that good practice would be to

21  get this matter resolved before it is before a jury if I wish

22  to use any of these documents.

23         I cannot order what goes on in Judge Dimitrouleas'

24  trial, but I can certainly make that suggestion.

25         All right.  Plaintiff's motion to strike expert

 1   witness testimony and exclude his report.

 2          MR. ROSS:  Thank you.

 3          Before we begin, could we have an understanding of the

 4   documents that Mr. Kern is going to seek from the ECFMG, other

 5   than the entire file on the jury of the entire litigation.

 6          THE COURT:  I thought they had already served the

 7   subpoena.  Have they not?

 8          MR. ROSS:  They have served the subpoena, but I think

 9   it's a request for all encompassing, anything involving Dr.

10   Jouria.  Including the litigation files.  Including hearings.

11          If the sole purpose is to attack the credibility of

12   Dr. Jouria, they have the bankruptcy testimony that already

13   states what happened before the ECFMG.

14          So those three pages, Pages 55 to 58, they can use

15   that and attack his credibility if they want to do that.  They

16   have that specific information already.

17          MR. KERN:  Your Honor --

18          THE COURT:  Well, you did not ask me to, as an

19   alternative, to limit what they requested, did you?

20          MR. ROSS:  Well, our position was that in terms of the

21   request to take judicial notice our position was that there are

22   no adjudicative facts that --

23          THE COURT:  No, no, no.  This is irrelevant.

24          As far as the subpoena goes, I did not come in here

25   prepared to figure out a way to limit it.

1      MR. ROSS:  Correct.

2          That is true, but based upon your ruling just now, if

3  it is only for the purpose of impeachment, which was not part

4  of their request --

5      THE COURT:  You need to file another motion.

6          You know, I have enough on my plate without having to

7  deal with something now because you did not think you would

8  lose this one.

9          All right.  Next.

10     MR. ROSS:  We will do so.  Thank you, Your Honor.

11         In terms of our motion to strike the expert testimony

12 of Mr. Pampinella and his report, this is Docket Entry number

13 56, the basis of this motion is specifically timeliness.  The

14 report from Dr. Pampinella and the disclosure of Dr. Pampinella

15 was untimely produced to Dr. Jouria.

16         It was produced --

17     THE COURT:  In 15 minutes?

18     MR. ROSS:  Pardon me?

19     THE COURT:  15 minutes?

20     MR. ROSS:  No.  It was produced 15 minutes late on the

21 16th, but the case law that we cited to Your Honor that states

22 that even if it was produced days before or weeks before, the

23 law is it has to give the parties sufficient time to read it.

24 Engage potential other experts.  The cases that we cite do not

25 just say 15 minutes.  That's not an absolute cutoff, but the

1   history of the discovery is that Judge Dimitrouleas set the

2   discovery toward the end of May.

3       NetCE waited five months to retain, for the first

4   time, their expert.  The retained expert, the name was never

5   produced or provided to Dr. Jouria.  There were no amendments

6   of any of their witness disclosures ever.  This was information

7   that NetCE had from the very beginning because it only relates

8   to NetCE's sales information.

9       The report has to show substantial justification and

10  that it is harmless relative to the delay.  NetCE never

11  articulates why it had a five-month delay in retaining their

12  expert.  NetCE admits that it was late.

13      The cases that we cited from Judge Cohen state even on

14  the day, that day, if it is served on the day of discovery,

15  that's too late.  So the fact that it is 15 minutes late or on

16  the day of discovery it is simply too late.

17      The point of the rules is to give the opposing party

18  an opportunity well in advance to take that information.  To

19  digest it.  To consider hiring a rebuttal.  To take the

20  deposition of.  And Dr. Jouria was denied that opportunity

21  because discovery was cut off on the 15th.

22      As the Court may know, under Rule 26, we were not even

23  permitted to take the deposition of Dr. Pampinella until his

24  report was produced.  It was produced after discovery.  Thus,

25  we have not been able to take his deposition.

1        Mr. Kern says, oh, but we're going to offer to do it

2   now.  Well, then, what they would like us to do is to kind of

3   cure their untimeliness.  This could have been easily resolved.

4   Mr. Kern could have filed a motion for an extension.

5        THE COURT:  But there is no deadline for experts,

6   right?  So we've got to be just talking about the 15 minutes.

7        MR. ROSS:  There are no deadlines for experts.  That

8   is correct.  When the parties submitted their proposed

9   discovery schedule, NetCE asked for a special deadline for a

10  fact witnesses and a special deadline for experts.

11        Judge Dimitrouleas, Dr. Jouria did not.  We ordered

12  just a discovery cutoff.  Elite did not.  They just wanted the

13  discovery cutoff.  Judge Dimitrouleas, in his order, on the

14  pretrial deadlines says I've considered what you said.  This is

15  my order.  Discovery cutoff.

16        If it is Your Honor's position that Judge

17  Dimitrouleas' standard orders for discovery cutoff, quote

18  unquote, does not apply to expert discovery, then, I think a

19  lot of the --

20        THE COURT:  I am just saying that we have to be

21  talking about the 15 minutes.

22        MR. ROSS:  We're talking about the 15 minutes.

23        The late production, but under the case law, even if

24  it was served on the day of the last day of discovery, that is

25  still late, according to Judge Cohen's decision.

47

1        And in the *Reese* case from the Eleventh Circuit, we

2   cite to Your Honor, you know, Rule 26 is not aspirational.  It

3   is mandatory.  If a deadline is a deadline, NetCE had every

4   opportunity to file a motion for extension of time.

5        In fact, they did file a motion for extension of time

6   relative to the subpoenas about which we just spoke.  If they

7   wanted an extension of time for their late retained expert,

8   they easily could have filed a motion.  It was never discussed

9   and the harm is obvious.

10        Now, Dr. Jouria is not in a position to be prepared to

11   cross-examine their expert witness.  Dr. Jouria now has to

12   spend more money to depose their expert.  Dr. Jouria has to

13   spend more money to hire a rebuttal, if he can afford so.

14        Dr. Jouria will need a continuance of trial because it

15   is now surprise at the very last moment.  These are the real

16   harms caused to Dr. Jouria by NetCE's decision not to simply

17   move for an extension of time.

18        THE COURT:  When is trial now?

19        MR. ROSS:  May 29th I think.

20        And it simply could have been cured had NetCE filed

21   for an extension of time.  Why?  We submit it is a strategic

22   decision in order to put Dr. Jouria in this position now, not

23   being able to be prepared for trial.

24        So we submit that NetCE has not provided any

25   justification, let alone a substantial justification for the

1   delay and for failing to file the extension of time.  And that

2   the harm to Dr. Jouria is quite obvious.  He can't be prepared

3   for trial.  It's an expert by surprise.

4         So we would request simply on procedural grounds that

5   Dr. Papinella's report and Dr. Papinella's testimony not be

6   permitted to be introduced at trial and that Your Honor strike

7   it from the record.

8         Thank you.

9         THE COURT:  All right.  Let's hear from NetCE.

10         MR. KERN:  Thank you, Your Honor.

11         First of all, as we argued in our response, there is

12   no expert report deadline in Judge Dimitrouleas' order.  We had

13   suggested one.  He doesn't have one, which means the default is

14   actually in the Federal Rules 90 days before the calendar call

15   26(a)(2)D(1) which is a date in December.

16         We didn't go that far.  I should point out that Judge

17   Dimitrouleas' order also has a Daubert motion deadline in

18   January and we're talking about his order, which is Docket

19   Entry 76.

20         So we didn't wait that long.  Experts are typically

21   retained towards the end of discovery.  We didn't even have all

22   of the documents at that time, but we submitted one admittedly

23   15 minutes late.  We have explained in the declaration.  Mr.

24   Kern is on the west coast.

25         But the point is there is no prejudice to Dr. Jouria.

1  We have consistently offered our expert for deposition.  Dr.

2  Jouria made the strategic decision not to move himself for an

3  extension of time.  And to claim here in March that this is a

4  surprise expert is just not a very good argument, Your Honor.

5          We are still offering Dr. Pampinella for the

6  deposition and we have consistently.  So there is no prejudice

7  to Dr. Jouria.  The prejudice would be pretty harsh on our

8  client for striking it for being 15 minutes late.

9          I would also point out that the Judge Cohen case that

10 was cited, in that case factually only the expert's name was

11 given at the date of the discovery and not the report.  That's

12 *DeArmas v. Miabraz* case.

13         So and the other thing I just point out factually is

14 that Elite went ahead and has a rebuttal witness -- a rebuttal

15 expert.  So if Your Honor has any other questions.

16         THE COURT:  No.

17         MR. KERN:  Thank you.

18         THE COURT:  All right.  Judge Dimitrouleas and I think

19 most of the other judges do not include in their standard

20 scheduling order anything regarding disclosure of experts and

21 production of expert reports.

22         What he does do is if the parties make their own

23 agreement that's fine with him, but the Court does not enforce

24 it.  I have to agree with counsel for NetCE in the absence of a

25 deadline in the scheduling order, then, it does default to the

1  rules.  So I do not believe this was untimely.

2          I also note that Dr. Jouria opposed, including that

3  deadline in the scheduling order.  So I will deny the motion to

4  strike.  However, I will note that there has been an offer for

5  deposition and discovery will be extended for the purposes of

6  taking that deposition.

7          Okay.  We are left with spoliation motion by NetCE.

8          MR. KAPPES:  Your Honor, Dan Kappes for Defendant

9  NetCE.  I will be addressing the terminating sanctions motion,

10  which is Docket Entry 149.

11         The purpose of this motion is simply to level the

12  playing field with Dr. Jouria and ensure that Dr. Jouria does

13  not further undermine the integrity of this proceeding.

14         And for purposes of this motion while Your Honor is

15  deciding it, I think what it is really important is to consider

16  the timeline of events here.

17         In April of 2015, my client NetCE, sent Dr. Jouria a

18  cease and desist letter.  That cease and desist letter was

19  explicit apprising him of his duty to retain and not destroy

20  records.

21         Two months later, in that June of 2015, Dr. Jouria

22  filed this action, this declaratory relief action.  As you are

23  well aware, Dr. Jouria filed bankruptcy not once, but twice and

24  this case was stayed.  Eventually the bankruptcy case was

25  dismissed and this action proceeded.  Discovery obviously did

1  not take place while this case was stayed.

2       A mere three weeks after discovery could begin and

3  this case was no longer stayed, Dr. Jouria took his computer

4  and he threw it in the garbage.  Rather than call us and tell

5  us that he had thrown it in the garbage, Dr. Jouria then

6  engaged in what can only be described as a month's long game of

7  smoke and mirrors.

8       First, in August, in his answers to our request for

9  production of documents, he stated that his computer had merely

10  crashed, quote unquote, and that documents would be

11  forthcoming.  We now know that was untrue.  There was no way

12  documents were forthcoming.  It was buried in the garbage.

13       Worse yet, in his verified interrogatory responses, he

14  stated the exact same thing that his computer had crashed,

15  quote unquote.  He also admitted in his verified interrogatory

16  responses the seven courses at issue in this case, the seven

17  courses that we allege he infringed our copyrights on, were not

18  produced because his computer had crashed.

19       So those interrogatory responses were issued in August

20  and September.  We were obviously concerned to hear that

21  documents were not being produced because of an alleged

22  computer problem.  We met and conferred.  We were rebuffed at

23  that meet and confer and told that this is an issue that you

24  need to issue interrogatories for.

25       We felt our interrogatories addressed that issue.  And

1    so we took the invitation by Dr. Jouria's counsel to ask him

2    about it at his deposition.  On September 28th, for the first

3    time nearly five months after he had thrown away his computer,

4    he disclosed to us that, in fact, his computer had not crashed

5    but rather it was destroyed.  That he had put it in the

6    landfill.

7         We took whatever --

8         THE COURT:  Is that what he said?

9         My understanding was that it had crashed and he could

10   not get any more out of it.  So, at that point, he threw it

11   away?

12        MR. KAPPES:  Well, yes, Your Honor.

13        Prior to September 28th, he had never told us that he

14   had thrown the computer away.  All he referenced was computer

15   crash.

16        And I do not want to belabor the point here, Your

17   Honor, but I think it is very important to read his

18   interrogatory responses, which imply the exact opposite that

19   documents were forthcoming.

20        He stated as Plaintiff's computer has crashed, he

21   might supplement this response with the version of the seven

22   courses he submitted to Elite if the versions are ultimately

23   recovered.

24        Your Honor, the computer was in the garbage.  There

25   was no way that was going to happen.  If it's not an outright

1  lie it is very deceitful.  Okay.  So all those events

2  precipitate us filing this motion.

3          Quickly, we have a burden to prove.  We need to show

4  that Dr. Jouria was under an affirmative duty to retain

5  records.  We think that is not in dispute.  We have to show

6  that the records at one time they existed on his computer.

7          He admits that this was his work computer.  This was

8  the only computer he had since 2007.  He admits that he drafted

9  the courses on this computer.  He admits that any changes he

10  made to NetCE materials were on this computer.

11          He admits that only 70 to 80 percent of what was on

12  the computer were ultimately recovered.  Further, we have no

13  other evidence other than Dr. Jouria's own testimony that the

14  computer actually did, in fact, crash.  We don't know if that

15  is true, Your Honor.

16          The third thing we have to show is bad faith.  We

17  think the timeline events in this case show affirmatively that

18  Dr. Jouria acted with bad faith and anything other than bad

19  faith.

20          The last thing that we need to show is that these

21  records were important to this case for the claims and

22  defenses.

23          Now, Dr. Jouria admits that he has not produced the

24  seven courses at issue in this case.  His computer was

25  destroyed.  How on one hand he can argue we have not met our

1 burden of showing they are important, but then on the other

2 hand, admit that they are not produced is unfathomable to us.

3       The other thing that is at issue that has not been

4 produced is any redlines, any versions, any changes, any

5 metadata that those files and records contained.  We have been

6 unable to obtain it simply because, again, the computer is

7 trashed.

8       So I would respectfully submit, Your Honor, that our

9 burden when a party has affirmatively destroyed a computer is

10 not the same as a party who has inadvertently lost records.

11      This Court is empowered to look at this destruction of

12 evidence and make strong inferences that those documents were

13 imperative and crucial for our case.  And I would respectfully

14 submit that that's what has happened here, Your Honor.

15      The last point I would like to make, if this Court is

16 disinclined to grant terminating sanctions, we think it is very

17 imperative and crucial that this Court grant some other

18 sanctions.

19      Despite the diligence of all parties involved we have

20 been unable to settle this case.  It is going to trial.

21      THE COURT:  We were hoping.

22      MR. KAPPES:  We all were.

23      If we don't get some sanctions of lesser sanctions, we

24 have grave concerns, to put it mildly, Your Honor, that Dr.

25 Jouria's conduct at trial will only continue.

1          So with that, I will rest, Your Honor.

2          THE COURT:  All right.

3          MR. ROSS:  Thank you, Your Honor.

4          A number of statements Mr. Kappes makes is absolutely

5   untrue and a misrepresentation.  As the Court notes, Dr. Jouria

6   did not destroy his computer.

7          It was a ten-year old computer where he had personal

8   and business files on the computer.  It was starting to fail

9   from February to April of 2017.  He made every effort to

10  recover all of the files that he could.  He estimates that he

11  recovered 70 to 80 percent of the documents.  And after April,

12  the computer was no longer operational.

13         In June of 2017, several months later, Dr. Jouria

14  moved to Indiana.  He discarded a number of household items

15  that he didn't need.  He didn't need the computer or laptop

16  anymore.

17         He recovered whatever he could and he discarded the

18  laptop and he never requested a copy of the hard drive.  He

19  only requested records and Dr. Jouria endeavored to get all the

20  records that he could.

21         Only in September, for the first time, or actually it

22  was in August during that meet and confer when I invited NetCE

23  to make a formal request for the hard drive.  We also

24  informally said we would look for it.  We could contact the

25  apartment complex and we would ask them to contact the waste

1   management company to see if we could try to locate the hard

2   drive.

3           That was three weeks after we told NetCE in our

4   discovery response that the computer had crashed and that

5   documents might have been lost and Plaintiff is producing what

6   he has been able to recover.

7           I don't know if NetCE acted more quickly, whether we

8   could have recovered the hard drive, but it did not.  And

9   ultimately, we were not able to recover the hard drive.

10          It is also an untrue statement for Mr. Kappes that

11  NetCE did not receive through discovery a copy of all of the he

12  edited, revised redline versions that Dr. Jouria authored for

13  Elite.  We produced it in two formats.  We produced it in the

14  format requested by NetCE and the metadata and we also produced

15  it in PDF.

16          So where he gets that point that they don't have it,

17  I'm shocked because it has been produced.  And we are happy to

18  produce it again, but they have it already.

19          So in terms of whether or not the evidence is crucial,

20  they have the crucial evidence.  The standard is substantial

21  similarity.  They have the original works that Dr. Jouria

22  authored for NetCE.  They have the revised redlined, edited

23  works that Dr. Jouria authored for Elite.  That's all that they

24  need to establish substantial similarity if they can.

25          They also have the same documents from Elite if they

1  ask for them because Elite had them.  So there is no crucial

2  information that could have been on the computer that would

3  have supported any claim or any defense.

4          In terms of bad faith, which is a requirement, it is

5  more than negligent.  It is more than gross negligence.  You

6  have to have an intent to spoliate evidence relevant to the

7  case.

8          And Dr. Jouria's declaration supports that he made

9  every effort that he could in good faith to recover whatever he

10  did.  When he was able to recover the edited versions we

11  produced them.

12          THE COURT:  When he responded to the interrogatories

13  in the request for production, why didn't he say that the

14  computer no longer existed?

15          MR. ROSS:  That statement was made in a preliminary

16  statement.  NetCE never asked where are the source documents?

17  On what computers are they located?  Do you still have them?

18  That was never requested.  So we volunteered and we said the

19  computer was compromised because it crashed.

20          Specifically number 7:  Plaintiff's records contained

21  on his computer have been compromised and that the computer

22  crashed and documents might have been lost.  Plaintiff is

23  producing what he has been able to recover.

24          That was volunteered.  It was never requested.  And to

25  date, they have never requested it.

1      THE COURT:  I do not know if it was volunteered, but

2  he does talk about the computer having crashed and that would

3  sort of lead someone to believe that it might be available for

4  forensic analysis to see if this could be recovered.

5      MR. ROSS:  Well, if that's the case, then it was

6  inarticulate language to say that the computer hard drive was

7  no longer in the possession of Dr. Jouria, but that does not

8  respond to the issue of the crucialness of the documents.  They

9  have what he recovered.  He was able to recover crucial

10  documents.  He produced them twice.  He did so with every

11  effort that he could obtain on his own.

12      And thus, the standard for terminating sanctions isn't

13  made.  No bad faith intent to spoliate crucial evidence.  Even

14  the cases that we cite to Your Honor, this is not a destruction

15  of a computer.  The computer died.

16      And even in that instance where there is no bad faith

17  intent, it is beyond gross negligence.  The Courts say even

18  adverse jury instructions are not appropriate.

19      So we would suggest that because NetCE, the Defendant,

20  has all the crucial documents it needs to establish its claims

21  or defenses , that the motion to terminate sanctions should be

22  denied.

23      Thank you.

24      THE COURT:  All right.

25      MR. KAPPES:  Your Honor, I will be brief.

1    He could have called us.  He could have told us what

2  had happened.  He didn't do so.  We might not be here today if

3  he had picked up the phone and been honest at the time or in

4  the following five months.

5    The other thing I need to point out is Dr. Jouria is

6  not a computer expert.  He doesn't know if the documents were

7  recoverable or not.

8    I'm sure we've all been in a situation where we

9  thought something was unrecoverable and we call our legal

10  assistant.  Someone smart about these things.  Someone that is

11  our computer expert and they recover a file that we thought was

12  forever lost and saves us three hours at the end of the day.

13    Dr. Jouria is not a computer expert.  It was not his

14  -- he was not entitled to determine that he could throw away

15  his computer.

16    The other thing I just want to address and you brought

17  this up yourself, Your Honor.  It does not matter if we

18  requested the hard drive or not.  Whether we requested his

19  computer.  He was under an obligation to preserve that hard

20  drive and allow us the opportunity at some point to seek and

21  pay for ourselves to have a computer expert recover documents

22  that he was unable to do so himself.

23    One other thing I need to clear up is I believe Mr.

24  Ross accidently quoted his response to request for production

25  of documents.  To quote, he was actually the verified

1  interrogatory responses are more in depth.  There are four

2  answers; August 9th, September 5th, August 14th, and September

3  5th where he made references to computer crashing and records

4  being recompiled and recoverable at some later date.

5          And we know that all four of those original answers in

6  both his supplemental responses, it was untrue.

7          With that, Your Honor, thank you very much.

8          THE COURT:  Anything else?

9          MR. ROSS:  No, Your Honor.

10          THE COURT:  All right.  Well, at this point, I do not

11  believe that there is enough for me to impose terminating

12  sanctions.

13          However, even someone who is not a computer expert

14  ought to know that throwing it in the garbage was not an

15  appropriate thing to do.  So here is what I will order.

16          Although this case will not be dismissed, the jury

17  will be informed -- you know, obviously Judge Dimitrouleas

18  could disagree with this if you object, but the jury will be

19  informed of the following facts.

20          That the cease and desist order was sent to Dr. Jouria

21  on April 9th of 2015.  The lawsuit was filed on June 2nd of

22  2015.  Discovery requests were propounded in August of 2017,

23  but prior to that on June 9th of 2017, or some time before June

24  9th, Dr. Jouria disposed of the computer and that Dr. Jouria's

25  position is he did that because it had crashed and he was

1  unable to recover anything further.

2       Yes?

3       MR. KAPPES:  May I request, Your Honor -- I didn't

4  mean to interrupt if you were not done.

5       THE COURT:  No, I'm done.

6       MR. KAPPES:  If we could request that the jury is also

7  informed that he was under an affirmative duty to retain that

8  hard drive from the computer?

9       MR. ROSS:  Your Honor, that would go into what the

10 whole request said.  That's not before Your Honor.  It is not

11 part of their motion for terminating sanctions and I would

12 request that that offer be denied.

13      MR. KAPPES:  Your Honor, we simply request the adverse

14 jury instruction.  And without letting the jury know that he

15 was under an affirmative duty to retain that computer and the

16 hard drive, or any and all records in this case, it is unclear

17 that the jury would be --

18      THE COURT:  Based on what, the civil rules?  What is

19 the affirmative -- how would you have that couched?

20      MR. KAPPES:  Either -- yes, by the Rules of Civil

21 Procedure, whether it is Rule 36, 24 or 26.

22      THE COURT:  Let me look.

23      I'm not seeing it in 36.  What is the other rule

24 you --

25      MR. KAPPES:  26, Your Honor.  I might have been

```
 1   dyslexic in my numbers.  I apologize.  I am sure one of the
 2   partners in the case will admonish me.
 3          THE COURT:  26 deals with --
 4          MR. KAPPES:  And a general instruction, Your Honor,
 5   simply that he was under an affirmative duty is sufficient for
 6   our purposes.
 7          THE COURT:  No.  I just want to see what the rule
 8   says.  I am not going to say -- well, let me just read the Rule
 9   26.  Do you have a subsection of the rule?
10          MR. KAPPES:  It might be in the notes, Your Honor.
11          THE COURT:  I'm not seeing it.  I am seeing the duty
12   to supplement.
13          Well, here's what I am going to do.  I am not going to
14   say that he had an affirmative duty to retain the computer
15   because that involves more specificity and getting into what
16   was too many factual issues.
17          He did have a general duty to retain discoverable
18   material, but I cannot find the specific rule to that effect.
19   So I am going to leave -- what?
20          MR. KAPPES:  We could leave this specific matter for
21   the trial Judge, Your Honor.
22          THE COURT:  That is what I am saying.
23          If you want to supplement that and the easiest way to
24   do it if Judge Dimitrouleas agrees to go back to the April 19th
25   request and say that this duty continued once the lawsuit was
```

1   filed.

2          MR. KAPPES:  Thank you, Your Honor.

3          THE COURT:  But right now I am not willing to do that

4   without a specific authority.  So there we are.

5          MR. ROSS:  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you all.  Court is in

7   recess.

8          MR. KERN:  Thank you for your time, Your Honor.

9           (Thereupon, the proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              CERTIFICATE

3

4          I hereby certify that the foregoing transcript is an

5   accurate transcript of the audio-taped proceedings in the

6   above-entitled matter.

7

8

9

10
       03/30/18                        Bonnie Joy Lewis,
11                           Registered Professional Reporter
                                 CASE LAW REPORTING, INC.
12                               7001 Southwest 13 Street,
                               Pembroke Pines, Florida 33023
13                                    954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25