# Exhibit B

1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF FLORIDA
2                              ---oOo---

3      DR. JASSIN JOURIA                    )
                                            )
4              Plaintiff,                   )
       vs.                                  )
5                                           ) CASE NO:
       CE RESOURCE, INC., d/b/a             ) 0:15-61165-WPD
6      CME RESOURCE and NetCE,              )
                                            )
7              Defendant.                   )
                                            )
8      CE RESOURCE, INC., d/b/a             )
       CME RESOURCE and NetCE,              )
9                                           )
               Defendant/                   )
10             Counter-Plaintiff,           )
       vs.                                  )
11                                          )
       DR. JASSIN JOURIA,                   )
12                                          )
               Plaintiff/                   )
13             Counter-Defendant.           )
                                            )
14     CE RESOURCE, INC., d/b/a             )
       CME RESOURCE and NetCE,              )
15                                          )
               Defendant/Third-Party        )
16             Plaintiff,                   )
       vs.                                  )
17                                          )
       Elite Continuing Education,          )
18     Inc. and Alpine Management           )
       Services III, LLC,                   )
19                                          )
               Third-Party                  )
20             Defendants.                  )

21                    DEPOSITION OF SARAH CAMPBELL
                              30(B)(6)

22
                         November 14, 2017
23


24


25     DEPOSITION REPORTER:  KAYLA KNOWLES, CSR

```
 1                    I N D E X

 2                                                    PAGE

 3    EXAMINATION BY MR. WILSON                          6

 4    EXAMINATION BY MR. ROSS                          231

 5    FURTHER EXAMINATION BY MR. WILSON                268

 6

 7
      Appearance Page                                   4
 8
      Reporter Certificate                            270
 9
      Declaration Under Penalty of Perjury            272
10

11

12                    E X H I B I T S

13    EXHIBIT                  DESCRIPTION             PAGE

14    Exhibit 74   Notice of Deposition                 5

15    Exhibit 75   Responses to Interrogatories         5

16    Exhibit 76   Collection of E-mails from NetCE,    19
                   Bates Numbers
17                 NETCEB0003109-NETCEB0035072

18    Exhibit 77   E-mails From Dr. Jouria to NetCE,    45
                   Bates Numbers
19                 NETCEB0002761-NETCEB0003068

20    Exhibit 78   E-mails from NetCE to Dr. Jouria,    45
                   Bates Numbers
21                 NETCEB0004778-NETCEB0005265

22    Exhibit 79   TBI Course, Bates Numbers            51
                   NETCEB0007755-NETCEB0020594
23
      Exhibit 80   Chemotherapy Course, Bates           51
24                 Numbers
                   NETCEB0006283-NETCEB0020686
25
      Exhibit 81   GERD Course, Bates Numbers           51
```

| | | | |
|---|---|---|---|
| 1 | | NETCEB0006973-NETCEB0024807 | |
| 2 | Exhibit 82 | Depression vs. Dementia Course, Bates Numbers | 52 |
| 3 | | NETCEB0002993-NETCEB0022559 | |
| 4 | Exhibit 83 | Nonantibiotic Antimicrobial Pharmacology Course, Bates | 52 |
| 5 | | Numbers | |
| | | NETCEB0007394-NETCEB0022750 | |
| 6 | | | |
| | Exhibit 84 | Division Planner, Course | 79 |
| 7 | | Approval, Bates Numbers | |
| | | NETCEB0029016-NETCEB0029020 | |
| 8 | | | |
| | Exhibit 85 | Courses Scheduled for Update | 149 |
| 9 | | 2016: Past Revenue, Bates Numbers | |
| | | NAVIGANT00002-NAVIGANT00454 | |
| 10 | | | |
| | Exhibit 86 | E-mail from Erin Meinyer to Sarah | 187 |
| 11 | | Campbell, Bates Number | |
| | | NETCEB0003137 | |
| 12 | | | |
| | Exhibit 87 | E-mail from Sarah Campbell to | 188 |
| 13 | | John Jurica, Bates Number | |
| | | NETCEB0005017 | |
| 14 | | | |
| | Exhibit 88 | Declaration of Tracey Foster | 221 |
| 15 | | | |
| 16 | | | |
| 17 | | ---oOo--- | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
 1                    A P P E A R A N C E S

 2


 3


 4    FOR THE PLAINTIFF DR. JASSIN:

 5                        ATRIUM CENTRE
                         Attorneys at Law
 6                       4801 S. University Drive, Suite 237
                         Fort Lauderdale, FL 33328
 7
                         E-MAIL:  Prodp@ix.netcom.com
 8
                         By:  RICHARD S. ROSS, ESQ.
 9

10    FOR CE RESOURCE, INC., d/b/a CME RESOURCE and NetCE:

11                        HOLLAND & KNIGHT
                         Attorneys at Law
12                       50 California Street, Suite 2800
                         San Francisco, CA 94111
13
                         PHONE:   415.743.6981
14                       E-MAIL:  John.kern@hklaw.com

15                       By:  JOHN P. KERN, ESQ.
                         By:  JESSICA E. LANIER, ESQ.
16


17    FOR ELITE PROFESSIONAL EDUCATION, LLC:

18                        MOORE & VAN ALLEN
                         Attorneys at Law
19                       100 North Tryon Street, Suite 4700
                         Charlotte, NC 28202-4003
20
                         PHONE:   704.331.1177
21                       E-MAIL:  Markwilson@mvalaw.com

22                       By:  J. MARK WILSON, ESQ.
                         By:  KATHRYN G. COLE, ESQ.
23


24    Also Present:  Crystal Cusic, Videographer

25
```

```
 1            Sacramento, California; Tuesday, November 14, 2017

 2                             9:15 a.m.

 3

 4                 (Exhibit No. 74 marked for identification.)

 5                 (Exhibit No. 75 marked for identification.)

 6                 THE VIDEOGRAPHER:  This is the beginning of

 7    media number 1 in the deposition of Sarah Campbell in

 8    the matter of Jassin Jouria vs. CE Resource, Inc.

 9    Today's date is November 14, 2017, and time on the

10    monitor is 9:15 a.m.  My name is Crystal Cusic, and I'm

11    the videographer.  The court reporter is Kayla Knowles.

12    We are here with Huseby Global Litigation Services.

13                 Counsel, please introduce yourselves, after

14    which the court reporter will swear in the witness.

15                 MR. KERN:  John Kern and Jessi Lanier for

16    the defendant and counter-claimant NetCE and here

17    representing the 30(b)(6) witness, Sarah Campbell.

18                 MR. WILSON:  Mark Wilson from Moore & Van

19    Allen here representing Elite Professional Education.

20                 MS. COLE:  Katy Cole from Moore & VanAllen

21    also representing Elite.

22                 MR. ROSS:  And Richard Ross appearing

23    telephonically by stipulation of the parties on behalf

24    of Plaintiff, Dr. Jassin Jouria.

25
```

```
 1                    SARAH CAMPBELL,

 2    having been sworn by the Certified Shorthand Reporter,

 3    Kayla Knowles, to tell the truth, the whole truth, and

 4    nothing but the truth, testified as follows:

 5

 6                    EXAMINATION

 7    BY MR. WILSON:

 8       Q.  Ms. Campbell, my name is Mark Wilson.  I'm an

 9    attorney from Charlotte representing Elite Professional

10    Education.

11            You're aware of Elite Professional Education.

12    Yes?

13       A.  I am.

14       Q.  If I use the word "Elite," you'll know who I'm

15    talking about; right?

16       A.  Yes.

17       Q.  And I understand that you are here as the

18    corporate witness on behalf of CE Resource, Inc., doing

19    business as CME Resource and NetCE; correct?

20       A.  That's correct.

21       Q.  And if I refer to that entity as "NetCE," you'll

22    know who I'm talking about.  Yes?

23       A.  Yes.

24       Q.  In front of you, I've premarked before we arrived

25    this morning what we now call Exhibit 74.  It is the
```

1  to submit the unedited versions received from the

2  author.

3      Q.  And how do you know that she followed your

4  instructions?

5      A.  She told me that she completed it as I instructed

6  her to.

7      Q.  Did she submit these materials electronically, or

8  did she mail them in?

9      A.  The trademark office requires that we mail the

10  specimens; so the specimens were mailed, but the filing

11  was done electronically.

12      Q.  Who printed and mailed these specimens?

13      A.  C.C. Chernev.

14      Q.  Did you speak with C.C. Chernev before the

15  deposition here today about this issue?

16      A.  Yes.

17      Q.  When did you speak with her?

18      A.  I -- specifically about the copyright issue?  I

19  talked with C.C. about the submission after she sent the

20  materials, which would have been in 2015, and then upon

21  receipt of the registrations, which is generally six to

22  eight months after submission of the registration.

23      Q.  Looking back to Exhibit 42, which is the

24  third-party complaint against NetCE -- do you still have

25  that in front of you?

```
 1      A.  I do.

 2      Q.  If you turn to paragraph 55 -- excuse me,

 3   paragraph 54, the last sentence of the allegations in

 4   paragraph 54 says, "NetCE came to believe that

 5   Dr. Jouria copied sections of his submissions from a

 6   variety of difference sources."

 7          Do you see that?

 8      A.  I do.

 9      Q.  In paragraph 55, the first sentence, it says,

10   "Dr. Jouria's works were littered with plagiarized

11   content."

12          Do you see that?

13      A.  I do.

14      Q.  These are allegations made by NetCE in this case.

15          So my question is:  Which parts of what NetCE

16   submitted to the copyright office does NetCE claim to

17   own?

18      A.  We -- the materials that we submitted to the

19   copyright office are owned by NetCE with the caveat that

20   there may be and likely are materials that we -- that

21   are copied from third sources that we would seek

22   permission and cite appropriately prior to publication

23   but that we weren't able to do.  We generally would do

24   that before filing for copyright, which would happen

25   later in course development, but, in this case, because
```

```
 1    he had already published the materials or tried to
 2    publish them, we sought copyright registration earlier
 3    with the knowledge that we would do the due diligence
 4    for those sections that require permission to reprint.
 5        Q.  For each of the five courses at issue between
 6    Elite and NetCE, as reflected in Exhibit 79 to 83, has
 7    NetCE performed the due diligence that you just
 8    described?
 9        A.  We have for some of them but not all of them.
10        Q.  The courses that NetCE submitted to the copyright
11    office, as evidenced in Exhibit 79 to 83, contain
12    third-party content; isn't that correct?
13        A.  We suspect that it's correct for all of them, but
14    we only know that that's true for some of them.
15        Q.  Which ones do you know it's true, and which ones
16    do you suspect it's true?
17        A.  For cancer and chemotherapy and GERD, we had
18    located the information that we knew had been copied,
19    and it had either been edited to ensure that it wasn't
20    plagiarized, or we had sought permission or were
21    planning to seek permission to reprint.
22            For the other three courses, traumatic brain
23    injury, depression versus dementia in elderly, and
24    nonantibiotic antimicrobial pharmacology, we hadn't
25    gotten that far in the development process.
```

```
 1      Q.   In your applications that NetCE submitted to the

 2   copyright office for registration of these five courses,

 3   did NetCE indicate that there were materials being

 4   submitted that did not belong to NetCE and indeed were

 5   authored by someone else?

 6      A.   I am not sure.

 7      Q.   And NetCE never requested permission from any

 8   third parties to submit materials containing that

 9   third-party information to the copyright office;

10   correct?

11      A.   We sought permissions for the materials located

12   in a GERD course to reprint in our materials and were

13   paid for and were issued that permission.  The

14   information in the cancer and chemotherapy course we had

15   not yet obtained permission, and the other three, we're

16   not aware of specific materials that are plagiarized.

17      Q.   For the courses where you received some

18   permissions, did those third-party content owners, as

19   I'll call them, require that you provide citations to

20   their materials in your courses?

21      A.   I don't recall specifically, but that is the

22   usual process.

23      Q.   Did you add the -- any citations to the materials

24   before they were submitted to the copyright office?

25      A.   No.
```

1   permission from for the GERD course?

2      A.   I don't know the specific number.  I can give you

3   a range, if that would be helpful.  I believe it is

4   between three and ten.  It is -- it is between three and

5   ten.  Excuse me.

6      Q.   So for the GERD course, NetCE doesn't claim

7   ownership to the portions of what Dr. Jouria submitted

8   that includes third-party content from these three to

9   ten third parties; correct?

10      A.   That's correct.

11      Q.   Which parts of the GERD course reflect

12   third-party content?

13      A.   In the case of this course, it would be several

14   of the tables.  We did not seek permission to reprint

15   content.  If there was substantial similarities in the

16   content, it was rewritten by our editors.

17         But if the tables were copied from a source, we

18   went to the source and requested permission to reprint.

19   So several of the tables.

20      Q.   And I understand what you sought permission to

21   use.  My question was a bit different.

22         My question is:  What is it that NetCE claims to

23   own?  And for the GERD article, NetCE does not claim to

24   own content that was in what -- in what Dr. Jouria

25   provided to NetCE where the content was from third

```
 1   parties; correct?

 2      A.  We do not claim to own plagiarized content.

 3   That's correct.

 4      Q.  And that applies to all five of the articles at

 5   issue between NetCE and Elite; correct?

 6      A.  That is correct.

 7      Q.  So you sought permission to use some of the

 8   tables in the GERD article, but there was other content

 9   in what Dr. Jouria provided to you that you identified

10   as what you called plagiarized content; correct?

11      A.  There were other sections that appear to be

12   similar or the same as other sources.  It is possible

13   that those sources were free use or that they were not.

14   That would have to be analyzed according to source.

15      Q.  Has NetCE done any sort of analysis for the GERD

16   course or any of the other four to determine what it

17   owns and what it does not vis-à-vis what it sent to the

18   copyright office from Dr. Jouria for each of these

19   courses?

20              MR. KERN:  Objection.  Vague and ambiguous.

21   BY MR. WILSON:

22      Q.  Did you understand my question?  Because if it is

23   vague and ambiguous, I will try my best to reword it.

24      A.  Sure.  Go ahead.

25      Q.  Has NetCE done any analysis to determine which
```

```
 1   content was plagiarized content and which content was

 2   from Dr. Jouria -- original to Dr. Jouria for any of the

 3   five courses at issue between NetCE and Elite?

 4      A.  These courses have been run through a program

 5   called iThenticate, which does some analysis in terms of

 6   similar or identical content, and it gives a report that

 7   provides information about the source of those

 8   similarities.  However, iThenticate does not qualify

 9   whether those sources allow for use or not.

10         So, yes, some analysis had been done, but the

11   final decisions in analysis require personal

12   intervention.

13      Q.  So has NetCE performed a final analysis using

14   personal intervention to determine what parts of each of

15   the courses reflected in Exhibit 79 to 83, that NetCE

16   submitted to the copyright office, NetCE owns?

17              MR. KERN:  I am going to object that it

18   assumes facts.

19              MR. ROSS:  What's the objection, John?

20              MR. KERN:  That it assumes facts.

21              MR. ROSS:  Thank you.

22              THE WITNESS:  Can you repeat the question?

23              MR. WILSON:  I'm not sure if I can.

24   BY MR. WILSON:

25      Q.  So has NetCE performed a final analysis using
```

```
 1          Do you know why the difference?

 2     A.  I don't know specifically.

 3     Q.  The last one is the nonantibiotic antimicrobial

 4   course.  That enlists a date -- excuse me.  NetCE

 5   sent -- excuse me.  Dr. Jouria sent it to NetCE on

 6   January 8th of 2013.  And the copyright registration

 7   lists a date of first publication of January 17th of

 8   2013.

 9          Do you know why the difference?

10     A.  I don't know specifically.

11     Q.  Who at the company, if anyone, would know?

12     A.  I would know with additional research.

13     Q.  With all do respect, you were designated to

14   testify about issues related to the copyright

15   registrations, and you're who I get to talk to.

16          So what else would you need to do to educate

17   yourself to testify on this topic?

18     A.  I would need to see the date that the documents

19   were saved from the e-mails and downloaded it to our

20   network.

21     Q.  If you take a look back at Exhibit 75, it's

22   NetCE's interrogatory responses to Elite's

23   interrogatories.  Take a look at NetCE's response to

24   interrogatory number 6.  On page 10, there's a paragraph

25   that states, "When the infringement was discovered,
```

1   Ms. Campbell conducted a visual side-by-side comparison

2   of the NetCE drafts in the impermissibly published Elite

3   courses."

4          Do you see that?

5      A.  I do.

6      Q.  Did you conduct a side-by-side comparison as

7   stated in this interrogatory response?

8      A.  I did.

9      Q.  Had you concluded, at that time, that there was

10  already infringement?

11     A.  I had done some additional work.  I -- I am not

12  sure if it was before or after I compared the two

13  drafts, but I did not immediately assume that we were

14  necessarily the copyright holders.  I investigated

15  whether or not it was possible that he -- that

16  Dr. Jouria had sold the courses to Elite first and then

17  to us.  But I determined that the dates indicated that

18  we were the first copyright holders.

19         And then I did some additional search to

20  determine if the materials were published somewhere

21  else, if there was possibly another copyright holder,

22  but there was no -- I wasn't able to find another place

23  where the material that I had initially discovered was

24  printed, other than the Elite course.

25         So then, at some point during the investigation,

 1    I compared the NetCE drafts and the Elite courses in a

 2    visual side-by-side comparison.

 3        Q.   Where did you get the Elite courses that you used

 4    for your side-by-side comparison?

 5        A.   From their Web site.

 6        Q.   Did you print them?

 7        A.   I did print them, yes.

 8        Q.   Did you make notes on them?

 9        A.   Not that I recall, no.

10        Q.   Whatever you printed, was it produced to us in

11    this case?

12        A.   I do not know.

13        Q.   Where would you need to look to find out?

14        A.   I would have to look at our -- the documents we

15    provided.

16        Q.   Have you looked at the documents you provided?

17        A.   I looked at them in their entirety but not

18    specifically.

19        Q.   Would you be able to tell by that review whether

20    the materials that you printed from Elite were included

21    in the production?

22        A.   Yes.

23        Q.   Was your comparison a line-by-line comparison

24    throughout the entirety of the articles that you were

25    reviewing?

```
 1    A.   No.

 2    Q.   Tell me about your comparison then.

 3    A.   I did a side-by-side comparison of several pages

 4  and sections of the courses that I was able to access.

 5  There were two that I was unable to access but that had

 6  similar topics, but those are no longer in play here.

 7         So of the five that we're talking about here, I

 8  did go through -- and it's additional courses on Elite's

 9  side because some of them are multiple parts.  But of

10  the five NetCE courses, I did go through and do a

11  comparison on several pages, and I would do spot checks

12  throughout to see if there were similarities and found

13  the same or similar content in -- for all five of the

14  courses.

15    Q.   So we're clear, for the two articles that are no

16  longer part of the case, you did not perform a

17  side-by-side comparison; is that correct?

18    A.   For those two, I was not able to.  That's true.

19    Q.   So on what did you base your claims for

20  infringement in this lawsuit on if you hadn't compared

21  the courses published by Elite?

22    A.   The similar topic areas and content and then the

23  background of the -- of the other five courses being

24  apparently copied indicated that those two likely had

25  significant sections that appeared in both.
```

```
 1   be difficult for me to point those out specifically.
 2       Q.  Did you find any courses more similar than others
 3   during your side-by-side comparison, as you've testified
 4   about here today?
 5       A.  The amount of similarity varied, but I can't give
 6   you more -- I don't recall more specifics in terms of
 7   variations in the courses.
 8       Q.  Can you identify for us here today which portions
 9   of each course NetCE claims to own copyright rights in?
10       A.  We claimed to own the entire course drafts that
11   Jouria provided to us.
12           (Reporter clarification.)
13   BY MR. WILSON:
14       Q.  Including the plagiarized content; right?
15       A.  Including anything that he may have provided from
16   other sources.
17       Q.  And can you tell us, sitting here today, which
18   portions of the materials that you claim copyright
19   rights in Elite allegedly copied?
20       A.  I don't --
21           MR. KERN:  Asked and answered.
22           THE WITNESS:  I don't have the Elite courses
23   in front of me; so I can't make that specific comparison
24   with the documents that I have.
25   ///
```

```
 1   BY MR. WILSON:
 2      Q.  Have you ever performed an analysis that went all
 3   the way through from beginning to end any of the
 4   courses?
 5      A.  When you say "analysis," do you mean the visual
 6   side-by-side comparison?
 7      Q.  Any analysis.
 8      A.  We -- after we had access to these five
 9   courses -- so we compared the PDFs of these five
10   courses from -- excuse me -- the Word document of these
11   five courses from Jouria to PDFs of the Elite courses --
12   again, there are more than five -- through Plagiarism
13   Checker X or 10 to do some additional analysis to
14   determine the percent of similarity between the courses
15   in question.
16      Q.  And when was that performed with Plagiarism
17   Checker X?
18      A.  That was conducted within the last two months.
19      Q.  And were the documents that you used or the
20   results that were provided produced to us in this case?
21      A.  I am not sure.
22      Q.  What would you need to do to check on that?
23      A.  I would need to look through all of the documents
24   provided during discovery.
25      Q.  In interrogatory number 6, on page 11, you
```

 1    state -- NetCE states, "A second technical manual

 2    analysis of the versions introduced at Dr. Jouria's

 3    deposition and served on NetCE thereafter is underway."

 4         What is that?

 5    A.  That is the analysis with Plagiarism Checker X

 6    that we just discussed.

 7    Q.  That's not a manual analysis.  Plagiarism Checker

 8    X is a computer program.

 9    A.  So Plagiarism Checker X is a tool that we use,

10    and it provides a report, and then the report is

11    obviously analyzed by a person.

12    Q.  And what were the results of your Plagiarism

13    Checker X analysis for these five articles that are

14    still part of this case between NetCE and Elite?

15    A.  I don't have the exact numbers that came back

16    from this report in front of me, but they showed

17    significant and extensive similarities.

18    Q.  How do you define "significant" and "extensive"?

19    A.  More than 60 percent exact matches.

20    Q.  Based on what criteria?

21    A.  That is criteria that is established by the --

22    actually, I want to back up.  I'm sorry.

23         So you -- when you complete the Plagiarism

24    Checker X analysis, it provides you with a percent

25    similarity.  That percentage can vary, and my

```
 1      A.  That included the iThenticate scan; so when I

 2   refer to research, I'm including that iThenticate scan

 3   and also determining if this content was potentially

 4   copyrighted from a third party.

 5      Q.  So how much time did you spend doing your

 6   side-by-side comparison for these five courses?

 7      A.  How much time did I spend -- can you be more

 8   specific?

 9      Q.  Doing your side-by-side comparison for these five

10   courses.

11      A.  I did comparisons of these five courses with the

12   Elite course, but I also did comparisons with additional

13   content.  And I spent a day comparing these five courses

14   with the Elite courses in various ways and searching for

15   third party.

16      Q.  What other content did you compare these courses

17   to besides Elite content?

18      A.  I did general Internet searches to determine if

19   passages were published in other places by other

20   publishers and, for the most part, in the sections I was

21   checking, they were only published on the Elite Web

22   site.

23      Q.  What do you mean "for the most part"?  Did you

24   find some passages published for any particular courses

25   by someone else other than Elite?
```

1      A.  There were passages that appeared in similarity,

2   but I couldn't make a qualitative determination of

3   whether they were a copyright holder.  And, also, they

4   weren't the extent of the materials in the Elite course.

5   It was just sections, sentences, or phrases that maybe

6   appeared somewhere else but didn't appear in works like

7   a GERD continuing education course, for example.

8      Q.  None of the courses are identical -- by "none of

9   the courses," I mean the Dr. Jouria course submitted to

10  NetCE and the course that you did your side-by-side

11  comparison on from Elite -- isn't that correct?

12     A.  They are not identical.

13     Q.  And as you sit here today, you can't tell us --

14  you can't quantify the similarities for any particular

15  article; is that correct?

16     A.  Without having the Elite courses in front of me,

17  I cannot do a side-by-side showing of the similarities,

18  and I don't have a number to give you in terms of

19  percent or proportion of similarity at this time.

20     Q.  And in both the side-by-side comparison that you

21  performed for these five courses and the later computer

22  analysis using Plagiarism Checker X, you included the

23  entirety of the Dr. Jouria courses sent to NetCE in your

24  analysis; correct?

25     A.  That's correct.

1    Q.  And you did not endeavor to exclude from that

2    analysis any content that Dr. Jouria might have

3    plagiarized from any other source; correct?

4    A.  I did not try to make that determination.

5    Q.  And you did not determine whether the portions

6    that you found to be the same or similar between the

7    NetCE version of the course and the Elite version of the

8    course were protected or protectable expression owned by

9    NetCE; correct?

10   A.  I don't feel like I have the expertise to make

11   that determination.

12   Q.  You didn't endeavor to find out, when you located

13   a similarity or something that you thought was

14   similar -- similar, whether that portion of the article

15   was written by somebody other than Dr. Jouria; correct?

16   A.  I did some searching -- Internet searching to

17   determine if Dr. Jouria had published the courses

18   somewhere else in addition to Elite.  And I also did

19   some searching to determine if the courses were copied

20   in their entirety from another source.

21       But in terms of parts or sections, I didn't

22   attempt to make that determination.

23   Q.  And did you discover in your Internet research

24   any other instances where Dr. Jouria had published any

25   of these five courses with anyone else?

```
 1      A.   Specifically in February?

 2      Q.   We will go with February, but you know I am going

 3   to ask ever.

 4      A.   I don't recall when it was identified, but we

 5   were able to find some evidence that Dr. Jouria had

 6   published similar topics or content with Ce4Less -- or

 7   NurseCe4Less.

 8      Q.   What did you find at NurseCe4Less?

 9      A.   We found that Dr. Jouria had also been writing

10   continuing education courses for NurseCe4Less, and some

11   of the topics and content in question appeared on the

12   NurseCe4Less site.  The content, as of Elite, was parsed

13   into parts, and I did a visual side-by-side comparison

14   of the drafts we received from Jouria and the

15   NurseCe4Less courses that were potential matches.

16      Q.   How many were there?

17      A.   I don't recall.

18      Q.   Can you identify any of these five courses as

19   potential matches?

20      A.   I remember that there was a NurseCe4Less course

21   entitled "head trauma" that I identified as a possible

22   match for the traumatic brain injury course.  And I know

23   there were additional courses, but I don't recall them

24   specifically right now.

25      Q.   For the NurseCe4Less courses, did you perform the
```