# EXHIBIT "B"

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                         ---oOo---

 3   DR. JASSIN JOURIA                )
                                      )
 4         Plaintiff,                 )
     vs.                              )
 5                                    ) CASE NO:
     CE RESOURCE, INC., d/b/a         ) 0:15-61165-WPD
 6   CME RESOURCE and NetCE,          )
                                      )
 7         Defendant.                 )
     _____)
 8   CE RESOURCE, INC., d/b/a         )
     CME RESOURCE and NetCE,          )
 9                                    )
           Defendant/                 )
10         Counter-Plaintiff,         )
     vs.                              )
11                                    )
     DR. JASSIN JOURIA,               )
12                                    )
           Plaintiff/                 )
13         Counter-Defendant.         )
     _____)
14   CE RESOURCE, INC., d/b/a         )
     CME RESOURCE and NetCE,          )
15                                    )
           Defendant/Third-Party      )
16         Plaintiff,                 )
     vs.                              )
17                                    )
     Elite Continuing Education,      )
18   Inc. and Alpine Management       )
     Services III, LLC,               )
19                                    )
           Third-Party                )
20         Defendants.                )

21              DEPOSITION OF SARAH CAMPBELL
                         30(B)(6)
22
                     November 14, 2017
23


24


25   DEPOSITION REPORTER:  KAYLA KNOWLES, CSR
```

Case 0:15-cv-61165-WPD   Document 314-2   Entered on FLSD Docket 05/18/2018   Page 3 of 5

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
30(b)(6)        Sarah Campbell on 11/14/2017        Pages 50..53

Page 50

1   Q. And you're aware of the fact that the
2   cardiovascular pharmacology article is no longer part of
3   this case; correct?
4   A. I am aware of that, yes.
5         MR. KERN: Objection to the characterization
6   of it no longer being part of the case. As to
7   Dr. Jouria, it is still part of the case.
8   BY MR. WILSON:
9   Q. As between -- as between the client that I care
10  about, Elite, it's not part of the case; correct?
11  A. It's not part of our, yes, case with Elite.
12  Q. I'm going to place in front of you a series of
13  binders that, though it looks daunting, hopefully will
14  not be. Each of these binders represents a particular
15  course that is at issue in this case between NetCE and
16  Elite; so there are five of them.
17       You understand that there are five courses at
18  issue with Elite; correct?
19  A. I understand that, yes.
20  Q. Each one of these binders includes the versions
21  of the particular course that were produced by NetCE to
22  Elite, and you'll see that by the Bates numbers at the
23  bottom all reflecting a NetCE Bates number. And I'll
24  represent to you this -- each of these binders has in it
25  versions of that particular course that were produced by

Page 51

1   NetCE to Elite, and they're separated by blue pieces of
2   paper.
3   A. Okay.
4   Q. It's going to take me a minute to mark them, and
5   I'm hoping somebody will write these down.
6         (Exhibit No. 79 marked for identification.)
7         (Exhibit No. 80 marked for identification.)
8   BY MR. WILSON:
9   Q. Exhibit 79 is the course known as traumatic brain
10  injury, and I'll ask you as I'm doing this to look
11  through there. And, again, as I said at the beginning,
12  if you have any reason to question the accuracy or
13  authenticity of any of documents included in any of
14  these exhibits, please let me know. Otherwise, we will
15  assume that there is no issue.
16        MR. ROSS: Is there a Bates number on that?
17        MR. WILSON: Richard, there are multiple
18  because they were in various locations in the
19  production. As I -- as I talk about them, I'll try to
20  give you a beginning Bates number. Okay?
21        MR. ROSS: Perfect. Thanks.
22        MR. WILSON: Exhibit 80 is the cancer and
23  chemotherapy course.
24        (Exhibit No. 81 marked for identification.)
25        MR. WILSON: Exhibit 81 is the GERD course,

Page 52

1   gastroesophageal reflux disease.
2         (Exhibit No. 82 marked for identification.)
3         MR. WILSON: Exhibit 82 is the depression
4   vs. dementia in the elderly course.
5         (Exhibit No. 83 marked for identification.)
6         MR. WILSON: You can just rip this page out.
7         Exhibit 83 is the nonantibiotic
8   antimicrobial course.
9   BY MR. WILSON:
10  Q. I know you've only had them in front of you for a
11  brief period of time, but did you see anything in there
12  that would lead you to question the accuracy or
13  authenticity of the material provided to you in each of
14  the exhibits, Number 79 to 83?
15  A. I did not see anything that would lead me to
16  question the authenticity.
17  Q. You've seen the documents included there before?
18  Yes?
19  A. Yes.
20  Q. Did they appear to reflect courses -- course
21  materials related to courses written by Dr. Jouria?
22  A. Yes. These are the drafts that were provided by
23  Dr. Jouria, as well as some of our internal editorial
24  copies.
25  Q. You're aware -- and I think you said it

Page 53

1   earlier -- that NetCE is asserting copyright claims
2   against Elite for infringing NetCE's alleged copyright
3   rights in these five courses; correct?
4   A. That's correct.
5   Q. Attached to the complaint in Exhibit 42 are a
6   series of copyright registration certificates that
7   relate to these five courses, as well as the two
8   courses, I believe, that are no longer part of the case
9   between Elite and NetCE. They're in Exhibit A to
10  Exhibit 42.
11       You've seen those documents before. Yes?
12  A. Yes.
13  Q. And I will take this however we need to do it,
14  but my question for each of the five courses -- course
15  materials in front of you is: Which version of each
16  course did NetCE submit to the copyright office to
17  obtain the registrations being asserted in this case?
18  A. In this case, the version submitted to the
19  copyright office were the drafts received from
20  Dr. Jouria.
21  Q. Can you identify those for us in the exhibits
22  before you?
23  A. For each course?
24  Q. Yes.
25  A. In the case of nonantibiotic antimicrobial

Case 0:15-cv-61165-WPD   Document 314-2   Entered on FLSD Docket 05/18/2018   Page 4 of 5

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                    Sarah Campbell on 11/14/2017                    Pages 54..57

**Page 54**

1 pharmacology, there are two copies of the draft of the
2 course. The first and second sections in the
3 Exhibit 83.
4   Q. Tell us what the first Bates number is.
5   A. Sure.
6   Q. It's going to be right there. Right --
7   A. NETCEB7395, and the second -- the second included
8 course starts at NETCEB22953. These appear to be the
9 same with few, if any, changes; so I would say this
10 first one, starting at NETCEB7395, would have been the
11 one submitted, but I -- I suspect they're the same with
12 no changes.
13   Q. Can you say, as you sit here today, for certain
14 that the document that begins with NETCEB- --
15   A. -7395.
16   Q. -- -7395 is the version of the nonantibiotic
17 antimicrobial pharmacology article submitted to the
18 copyright office?
19   A. Without going through these two courses line by
20 line, I'm not sure if there are -- if there are
21 differences. But just in the time that I have here, it
22 doesn't look like there are; so I would be comfortable
23 saying that this is the copy.
24   Q. How do you know?
25   A. I know this is the copy that we received from him

**Page 55**

1 because the format from Dr. Jouria -- because the
2 formatting has not yet been fixed, and it doesn't have
3 NetCE's style, and then references haven't been
4 formatted. The same is true of the second copy, which
5 is why it is my understanding they are the same without
6 changes.
7       So without speculating, it could have been either
8 one of these, but I suspect that they're the same.
9   Q. You're going to hear this a lot during the day.
10 You're who I get to talk to.
11   A. Yes. I don't know that anyone else could give
12 you a better answer than that. These courses are
13 60,000 words; so it's difficult in the time that I have
14 right now to look through every page.
15   Q. What would you need to do to confirm what was
16 sent to the copyright office?
17   A. I would need to know if there were differences
18 between these two courses provided.
19   Q. As we sit here today, as it pertains to the two
20 versions you look at -- you're looking at the
21 nonantibiotic antimicrobial pharmacology article, the
22 one that began on NETCEB7- --
23   A. -395.
24   Q. -- -395 and the other that begins on NETCE22953,
25 can you tell us which one was sent to the copyright

**Page 56**

1 office, if either one?
2   A. In my brief review, they are the same; so it's
3 unclear to me what the difference would be between the
4 two. So I can't be more specific than that.
5   Q. Let's take a look at the next --
6   A. Sure.
7   Q. Which I think you're going in reverse order; so
8 this will be Exhibit 82 -- which is the --
9   A. Depression versus dementia in the elderly.
10   Q. Again, the question is: Can you tell me what was
11 sent to the copyright office as it pertains to the
12 depression versus dementia in the elderly course?
13   A. In this case, I can tell you that this first
14 version of the course that starts NETCEB22355 is the
15 version that was submitted. I know that it's not the
16 second version, which starts NETCEB22151, because we
17 have added page numbers; so this is an editorial copy.
18 Even if we didn't make any other changes, I know this is
19 the one that we intended to make changes to; so it would
20 have been this first copy.
21   Q. I understand, and I appreciate your testimony
22 that it would have been the first one.
23   A. I'm sorry. You're right.
24   Q. -- "would haves" and "could haves."
25   A. It was the first one.

**Page 57**

1   Q. How do you know that?
2   A. We submitted the version that was received from
3 Jouria. This first version is the unaltered version
4 that we received from Jouria.
5   Q. Let's move on to the next one. In reverse order,
6 that would be Exhibit 81, the gastroesophageal reflux
7 disease article.
8       Is it all right if I call that GERD?
9   A. Sure.
10   Q. Same question: What was submitted to the
11 copyright office?
12   A. In this case, we submitted the first included
13 version, which starts NETCEB6974, to the copyright
14 office.
15   Q. And how do you know that?
16   A. We submitted the version that we received from
17 Jouria, and this is the unedited version of the
18 monograph that we received.
19   Q. When you say "monograph," that's the same thing
20 as a course or an article?
21   A. Yes, sorry. The course.
22   Q. We can use those terms interchangeably? Yes?
23   A. I do, yes.
24   Q. We're going next to Exhibit 80, cancer and
25 chemotherapy.

Case 0:15-cv-61165-WPD   Document 314-2   Entered on FLSD Docket 05/18/2018   Page 5 of 5

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6) — Sarah Campbell on 11/14/2017 — Pages 58..61

**Page 58**

1  What was submitted to the copyright office?
2  A. In the case of this course, the first version,
3  which starts on NETCEB6284, was submitted to the
4  copyright office.
5  Q. And how do you know that?
6  A. This is the unedited version of the course that
7  we received from Jouria, and that's what we submitted.
8  Q. Take a look at the last one, Exhibit 79,
9  traumatic brain injury or TBI.
10  What was submitted to the copyright office?
11  A. In this case, the first version of the course,
12  starting on NETCEB7757, that was the version of the
13  course that was submitted to the copyright office.
14  Q. And how do you know?
15  A. This is the unedited course that we received from
16  Dr. Jouria.
17  Q. Did you submit these courses to the copyright
18  office?
19  A. I did not physically submit them, no.
20  Q. Who did?
21  A. These five courses were submitted by my editorial
22  assistant, C.C. Chernev.
23  Q. And how do you know what C.C. Chernev submitted?
24  A. We have a written process in place for -- for
25  submitting copyright, and I specifically instructed her

**Page 59**

1  to submit the unedited versions received from the
2  author.
3  Q. And how do you know that she followed your
4  instructions?
5  A. She told me that she completed it as I instructed
6  her to.
7  Q. Did she submit these materials electronically, or
8  did she mail them in?
9  A. The trademark office requires that we mail the
10  specimens; so the specimens were mailed, but the filing
11  was done electronically.
12  Q. Who printed and mailed these specimens?
13  A. C.C. Chernev.
14  Q. Did you speak with C.C. Chernev before the
15  deposition here today about this issue?
16  A. Yes.
17  Q. When did you speak with her?
18  A. I -- specifically about the copyright issue?  I
19  talked with C.C. about the submission after she sent the
20  materials, which would have been in 2015, and then upon
21  receipt of the registrations, which is generally six to
22  eight months after submission of the registration.
23  Q. Looking back to Exhibit 42, which is the
24  third-party complaint against NetCE -- do you still have
25  that in front of you?

**Page 60**

1  A. I do.
2  Q. If you turn to paragraph 55 -- excuse me,
3  paragraph 54, the last sentence of the allegations in
4  paragraph 54 says, "NetCE came to believe that
5  Dr. Jouria copied sections of his submissions from a
6  variety of difference sources."
7  Do you see that?
8  A. I do.
9  Q. In paragraph 55, the first sentence, it says,
10  "Dr. Jouria's works were littered with plagiarized
11  content."
12  Do you see that?
13  A. I do.
14  Q. These are allegations made by NetCE in this case.
15  So my question is:  Which parts of what NetCE
16  submitted to the copyright office does NetCE claim to
17  own?
18  A. We -- the materials that we submitted to the
19  copyright office are owned by NetCE with the caveat that
20  there may be and likely are materials that we -- that
21  are copied from third sources that we would seek
22  permission and cite appropriately prior to publication
23  but that we weren't able to do.  We generally would do
24  that before filing for copyright, which would happen
25  later in course development, but, in this case, because

**Page 61**

1  he had already published the materials or tried to
2  publish them, we sought copyright registration earlier
3  with the knowledge that we would do the due diligence
4  for those sections that require permission to reprint.
5  Q. For each of the five courses at issue between
6  Elite and NetCE, as reflected in Exhibit 79 to 83, has
7  NetCE performed the due diligence that you just
8  described?
9  A. We have for some of them but not all of them.
10  Q. The courses that NetCE submitted to the copyright
11  office, as evidenced in Exhibit 79 to 83, contain
12  third-party content; isn't that correct?
13  A. We suspect that it's correct for all of them, but
14  we only know that that's true for some of them.
15  Q. Which ones do you know it's true, and which ones
16  do you suspect it's true?
17  A. For cancer and chemotherapy and GERD, we had
18  located the information that we knew had been copied,
19  and it had either been edited to ensure that it wasn't
20  plagiarized, or we had sought permission or were
21  planning to seek permission to reprint.
22  For the other three courses, traumatic brain
23  injury, depression versus dementia in elderly, and
24  nonantibiotic antimicrobial pharmacology, we hadn't
25  gotten that far in the development process.