# EXHIBIT "A"

```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                              ---oOo---

 3      DR. JASSIN JOURIA                  )
                                           )
 4           Plaintiff,                    )
        vs.                                )
 5                                         ) CASE NO:
        CE RESOURCE, INC., d/b/a           ) 0:15-61165-WPD
 6      CME RESOURCE and NetCE,            )
                                           )
 7           Defendant.                    )
        _____    )
 8      CE RESOURCE, INC., d/b/a           )
        CME RESOURCE and NetCE,            )
 9                                         )
             Defendant/                    )
10           Counter-Plaintiff,            )
        vs.                                )
11                                         )
        DR. JASSIN JOURIA,                 )
12                                         )
             Plaintiff/                    )
13           Counter-Defendant.            )
        _____    )
14      CE RESOURCE, INC., d/b/a           )
        CME RESOURCE and NetCE,            )
15                                         )
             Defendant/Third-Party         )
16           Plaintiff,                    )
        vs.                                )
17                                         )
        Elite Continuing Education,        )
18      Inc. and Alpine Management         )
        Services III, LLC,                 )
19                                         )
             Third-Party                   )
20           Defendants.                   )

21                    DEPOSITION OF SARAH CAMPBELL
                              30(B)(6)
22
                          November 14, 2017
23


24


25      DEPOSITION REPORTER:   KAYLA KNOWLES, CSR
```

Case 0:15-cv-61165-WPD   Document 315-1   Entered on FLSD Docket 05/18/2018   Page 3 of 6

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
30(b)(6) | Sarah Campbell on 11/14/2017 | Pages 98..101

**Page 98**

```
 1  those tables could have been sought from another source,
 2  whether Elite got permission or not.  They could have
 3  been -- they were not useful to me in the analysis.  So
 4  I did not include the tables.
 5       But in terms of the text itself, I didn't take
 6  any steps to determine if that material had been copied
 7  or plagiarized from another source.
 8       Q.  For the cancer and chemotherapy article where you
 9  had also done some sort of a further work to try to
10  identify plagiarized content, your answer is the same?
11       A.  My answer for that course is the same.
12       Q.  Did you take notes during your side-by-side
13  comparison?
14       A.  No.
15       Q.  How did you determine that the courses
16  included -- excuse me -- exhibit literal and nonliteral
17  similarity copying whole swathes of text from NetCE's
18  copyrighted courses, copying the organization of the
19  courses, and/or paraphrasing large passages, leaving the
20  essential expression unchanged, as alleged in
21  interrogatory response number 6?
22       A.  The question is how did I determine that?
23       Q.  Yes.
24       A.  So the similarities were determined by comparison
25  of text; so I would go through comparing the text, and
```

**Page 99**

```
 1  you could read them and see if it was exactly the same.
 2  That would, to me, exhibit similarity or literal
 3  similarity.
 4       In some cases, it appeared that the entire
 5  paragraph was exactly the same or substantially the same
 6  with potentially some maybe punctuation changes.  I
 7  flipped through the courses in the process of my spot
 8  checking and noted that the outlines were essentially
 9  the same or similar.
10       And there were some sections that I noted --
11  there were some minimal paraphrasing issues where maybe
12  a different word was used or the order of phrasing was
13  switched.  But for the most part, it was through visual
14  analysis.
15       Q.  What standard, if any, did you use to determine
16  whether any particular course was similar or not to the
17  course you were comparing it to?
18       A.  The standard that I would use is the extent to
19  which the similarity appeared.  I don't have a
20  quantitative measure of that in my visual comparison,
21  but it seemed overwhelming when I was doing my review.
22       Q.  For each course, what were the literal
23  similarities that you found?
24       A.  Do -- I don't have the courses in front of me.  I
25  don't have the Elite courses in front of me; so it would
```

**Page 100**

```
 1  be difficult for me to point those out specifically.
 2       Q.  Did you find any courses more similar than others
 3  during your side-by-side comparison, as you've testified
 4  about here today?
 5       A.  The amount of similarity varied, but I can't give
 6  you more -- I don't recall more specifics in terms of
 7  variations in the courses.
 8       Q.  Can you identify for us here today which portions
 9  of each course NetCE claims to own copyright rights in?
10       A.  We claimed to own the entire course drafts that
11  Jouria provided to us.
12       (Reporter clarification.)
13  BY MR. WILSON:
14       Q.  Including the plagiarized content; right?
15       A.  Including anything that he may have provided from
16  other sources.
17       Q.  And can you tell us, sitting here today, which
18  portions of the materials that you claim copyright
19  rights in Elite allegedly copied?
20       A.  I don't --
21       MR. KERN:  Asked and answered.
22       THE WITNESS:  I don't have the Elite courses
23  in front of me; so I can't make that specific comparison
24  with the documents that I have.
25  ///
```

**Page 101**

```
 1  BY MR. WILSON:
 2       Q.  Have you ever performed an analysis that went all
 3  the way through from beginning to end any of the
 4  courses?
 5       A.  When you say "analysis," do you mean the visual
 6  side-by-side comparison?
 7       Q.  Any analysis.
 8       A.  We -- after we had access to these five
 9  courses -- so we compared the PDFs of these five
10  courses from -- excuse me -- the Word document of these
11  five courses from Jouria to PDFs of the Elite courses --
12  again, there are more than five -- through Plagiarism
13  Checker X or 10 to do some additional analysis to
14  determine the percent of similarity between the courses
15  in question.
16       Q.  And when was that performed with Plagiarism
17  Checker X?
18       A.  That was conducted within the last two months.
19       Q.  And were the documents that you used or the
20  results that were provided produced to us in this case?
21       A.  I am not sure.
22       Q.  What would you need to do to check on that?
23       A.  I would need to look through all of the documents
24  provided during discovery.
25       Q.  In interrogatory number 6, on page 11, you
```

Case 0:15-cv-61165-WPD   Document 315-1   Entered on FLSD Docket 05/18/2018   Page 4 of 6

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                          Sarah Campbell on 11/14/2017                          Pages 102..105

Page 102

```
 1  state -- NetCE states, "A second technical manual
 2  analysis of the versions introduced at Dr. Jouria's
 3  deposition and served on NetCE thereafter is underway."
 4          What is that?
 5      A.  That is the analysis with Plagiarism Checker X
 6  that we just discussed.
 7      Q.  That's not a manual analysis.  Plagiarism Checker
 8  X is a computer program.
 9      A.  So Plagiarism Checker X is a tool that we use,
10  and it provides a report, and then the report is
11  obviously analyzed by a person.
12      Q.  And what were the results of your Plagiarism
13  Checker X analysis for these five articles that are
14  still part of this case between NetCE and Elite?
15      A.  I don't have the exact numbers that came back
16  from this report in front of me, but they showed
17  significant and extensive similarities.
18      Q.  How do you define "significant" and "extensive"?
19      A.  More than 60 percent exact matches.
20      Q.  Based on what criteria?
21      A.  That is criteria that is established by the --
22  actually, I want to back up.  I'm sorry.
23          So you -- when you complete the Plagiarism
24  Checker X analysis, it provides you with a percent
25  similarity.  That percentage can vary, and my
```

Page 103

```
 1  understanding is that personal analysis or manual
 2  analysis is necessary to determine the extent of the
 3  copyings -- the extent that the copying was accurately
 4  identified by the program.
 5          So it did provide percentages, but I -- I don't
 6  want to -- I don't want to be boxed in by a number
 7  because you can -- if you have a huge course and a
 8  section of it is copied exactly, it might be a small
 9  percentage, but it's still significant in terms of
10  ownership and plagiarism.  So I don't want to be boxed
11  into a number.  I -- please disregard the 60 percent
12  statement.
13          But you could view the report provided by
14  Plagiarism X, and it demonstrates that the content is
15  materially similar.  It is -- my analysis of those
16  reports found that it could be potentially influenced by
17  formatting; so that is something that needs to be --
18  still be ameliorated, but we're still -- we completed
19  the Plagiarism Checker portion of the analysis.
20      Q.  So there's still more analysis -- a manual
21  analysis that's left to be done; is that correct?
22      A.  Potentially, yes.
23      Q.  What do you mean "potentially"?
24      A.  I mean that we have done an initial review, but I
25  don't know that our findings are complete as of today.
```

Page 104

```
 1      Q.  And when do you expect to complete your findings
 2  for the five courses that are still at issue between
 3  NetCE and Elite?
 4      A.  I don't know.
 5      Q.  And when do you expect to produce the Plagiarism
 6  X reports that you've generated using this program,
 7  according to you, two months ago?
 8      A.  Within the last two months, but more likely much
 9  more recently that we were doing the comparison of
10  Plagiarism Checker X.  I understand that there's a
11  deadline in terms of document production; so I would
12  assume that it would be done by that deadline.
13      Q.  What is your understanding of when that deadline
14  is?
15      A.  I believe that it's this week.
16          MR. KERN:  Mark, just so you don't go too
17  far afield on this, in a confused way, the witness
18  performed that analysis at Counsel's direction, and all
19  of the versions of it were exchanged and attached
20  between Counsel and the witness, which is why they
21  haven't been produced.
22          But to the extent that it's helpful in
23  lubricating discussions and moving things along in the
24  case, they can obviously be created anew if it's helpful
25  evidence.  But that -- that answers the question of why
```

Page 105

```
 1  it's not in production.
 2  BY MR. WILSON:
 3      Q.  In response to interrogatory number 6, is the
 4  second technical manual analysis that you reference
 5  there referencing anything else besides the Checker --
 6  Plagiarism Checker X analysis you've just described?
 7      A.  I believe that -- sorry.  We also explored a few
 8  other possible software options, but they were subpar,
 9  and their reports were not useful.  So this is
10  referring, in my understanding, specifically to the
11  Plagiarism X review.
12      Q.  So at the time NetCE filed its claims for
13  copyright infringement against Elite -- you see that in
14  Exhibit 42 -- the only analysis that had been done was
15  the side-by-side analysis that you described earlier
16  where you, for these five courses that are still at
17  issue in the case --
18          MR. KERN:  Misstates testimony.
19          THE WITNESS:  When we initially made the
20  complaint, we had also attempted to do an iThenticate
21  review of the courses, but the software was having
22  difficulty accessing Elite 's PDFs; so the outcome of
23  that review was not particularly helpful for this case.
24  BY MR. WILSON:
25      Q.  So, again, at the time the complaint against
```

Case 0:15-cv-61165-WPD   Document 315-1   Entered on FLSD Docket 05/18/2018   Page 5 of 6

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6) · Sarah Campbell on 11/14/2017 · Pages 106..109

**Page 106**

1  Elite was filed by NetCE, the only comparison that had
2  been done was your side-by-side comparison; is that
3  correct?
4  　　　　MR. KERN:  Misstates testimony.
5  　　　　THE WITNESS:  We had done a visual
6  side-by-side comparison.  I specifically had looked at
7  the courses and compared them to Elite's courses, and we
8  attempted to run iThenticate to do some additional
9  comparison.  That was what I specifically recall
10 completing.
11 BY MR. WILSON:
12   Q.  When did you perform your side-by-side comparison
13 for these five courses still at issue?
14   A.  I determined -- I discovered the similarities
15 with the GERD course first in February of 2015, and that
16 led me to look at the other courses that Dr. Jouria had
17 published with Elite; so the comparison would have been
18 done -- was done in February of 2015.
19   Q.  How long did you take to perform this comparison
20 where you looked at a few pages and did some spot
21 checking?
22   A.  I would say it took me -- I spent an entire day
23 researching and doing comparisons.
24   Q.  And I am not asking about research.  Actual
25 comparisons.

**Page 107**

1   A.  That included the iThenticate scan; so when I
2  refer to research, I'm including that iThenticate scan
3  and also determining if this content was potentially
4  copyrighted from a third party.
5    Q.  So how much time did you spend doing your
6  side-by-side comparison for these five courses?
7    A.  How much time did I spend -- can you be more
8  specific?
9    Q.  Doing your side-by-side comparison for these five
10 courses.
11   A.  I did comparisons of these five courses with the
12 Elite course, but I also did comparisons with additional
13 content.  And I spent a day comparing these five courses
14 with the Elite courses in various ways and searching for
15 third party.
16   Q.  What other content did you compare these courses
17 to besides Elite content?
18   A.  I did general Internet searches to determine if
19 passages were published in other places by other
20 publishers and, for the most part, in the sections I was
21 checking, they were only published on the Elite Web
22 site.
23   Q.  What do you mean "for the most part"?  Did you
24 find some passages published for any particular courses
25 by someone else other than Elite?

**Page 108**

1   A.  There were passages that appeared in similarity,
2  but I couldn't make a qualitative determination of
3  whether they were a copyright holder.  And, also, they
4  weren't the extent of the materials in the Elite course.
5  It was just sections, sentences, or phrases that maybe
6  appeared somewhere else but didn't appear in works like
7  a GERD continuing education course, for example.
8    Q.  None of the courses are identical -- by "none of
9  the courses," I mean the Dr. Jouria course submitted to
10 NetCE and the course that you did your side-by-side
11 comparison on from Elite -- isn't that correct?
12   A.  They are not identical.
13   Q.  And as you sit here today, you can't tell us --
14 you can't quantify the similarities for any particular
15 article; is that correct?
16   A.  Without having the Elite courses in front of me,
17 I cannot do a side-by-side showing of the similarities,
18 and I don't have a number to give you in terms of
19 percent or proportion of similarity at this time.
20   Q.  And in both the side-by-side comparison that you
21 performed for these five courses and the later computer
22 analysis using Plagiarism Checker X, you included the
23 entirety of the Dr. Jouria courses sent to NetCE in your
24 analysis; correct?
25   A.  That's correct.

**Page 109**

1   Q.  And you did not endeavor to exclude from that
2  analysis any content that Dr. Jouria might have
3  plagiarized from any other source; correct?
4    A.  I did not try to make that determination.
5    Q.  And you did not determine whether the portions
6  that you found to be the same or similar between the
7  NetCE version of the course and the Elite version of the
8  course were protected or protectable expression owned by
9  NetCE; correct?
10   A.  I don't feel like I have the expertise to make
11 that determination.
12   Q.  You didn't endeavor to find out, when you located
13 a similarity or something that you thought was
14 similar -- similar, whether that portion of the article
15 was written by somebody other than Dr. Jouria; correct?
16   A.  I did some searching -- Internet searching to
17 determine if Dr. Jouria had published the courses
18 somewhere else in addition to Elite.  And I also did
19 some searching to determine if the courses were copied
20 in their entirety from another source.
21 　　　But in terms of parts or sections, I didn't
22 attempt to make that determination.
23   Q.  And did you discover in your Internet research
24 any other instances where Dr. Jouria had published any
25 of these five courses with anyone else?

Case 0:15-cv-61165-WPD   Document 315-1   Entered on FLSD Docket 05/18/2018   Page 6 of 6

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6) | Sarah Campbell on 11/14/2017 | Pages 254..257

**Page 254**

1  A. In some cases, sections were the same or
2  minimally different than copyrighted materials.
3  Q. And that's what you mean by "plagiarism," that
4  sections were the same or substantially similar?
5  A. That's what my understanding of plagiarism is.
6  Q. Okay. You understand that Dr. Jouria is not a
7  publisher of articles; correct?
8  A. I don't know --
9  Q. He's an -- he's an author.
10 A. I don't know all of Dr. Jouria's activities.
11 Q. Do you know of a single publication that
12 Dr. Jouria published?
13 A. I know that, for a time, he had a Web site where
14 he posted some of his works.
15 Q. And you would consider that publishing -- being a
16 publisher?
17 A. I know that some publishers only publish online.
18 Q. Would you consider that of Dr. Jouria's postings
19 equivalent to being a publisher?
20 A. I don't know.
21 Q. Okay. You also spoke of a Plagiarism X report.
22    Do you recall that during Mr. Wilson's
23 examination?
24 A. Plagiarism Checker X.
25 Q. Okay. Thank you. And you said you ran that

**Page 255**

1  report about two months ago; is that correct?
2  A. It was within the last two months, yes.
3  Q. Okay. Do you remember if it was 30 days or
4  60 days?
5  A. I don't remember specifically.
6  Q. And did you -- and that plagiarism report, did
7  you run those for the two dismissed courses against
8  Elite?
9  A. Yes.
10 Q. And what was the degree of similarity -- the
11 numerical percentage, if you recall, for those two
12 articles?
13 A. I don't remember.
14 Q. Would you know if it was more or less than ten
15 percent similar?
16 A. I don't know.
17 Q. Do you recall the numerical percentages of
18 similarity on the reports for any of the articles?
19 A. Not the specific numbers, no.
20 Q. Okay. Is there a reason why you didn't run that
21 report back in 2015 before you filed suit against
22 Dr. Jouria?
23 A. At the time, I had done the visual side-by-side
24 comparison of the courses that I had access to and
25 determined that the similarities warranted what I

**Page 256**

1  believed to be substantial similarity. The two courses
2  that have since been dismissed in our dealings with
3  Elite were not available to me in that format.
4  Q. Why didn't you run that report before you filed
5  suit against Dr. Jouria, was the question.
6  A. I was not able to run it for the courses that I
7  did not have access to the Elite content.
8  Q. For the two courses, but you had it for five;
9  correct?
10 A. For those two courses.
11    For the five courses that we continue to have an
12 issue with Elite, I believed that my visual side-by-side
13 comparison was sufficient to determine that the
14 similarity was significant.
15 Q. So -- so you knew of the existence of the
16 Plagiarism Checker X software. You simply chose not to
17 utilize it before you filed suit; is that correct?
18 A. I knew that there was software generally
19 available to do plagiarism analysis, but we did not
20 engage that tool at that time.
21 Q. Okay. Why not?
22 A. I believe --
23    MR. KERN: Asked and answered.
24    THE WITNESS: I believed that my
25 side-by-side comparison of the courses that I did have

**Page 257**

1  access to was sufficient to determine that there was
2  significant similarity.
3  BY MR. ROSS:
4  Q. Do you know what the standard is for copyright
5  infringement?
6  A. I don't know the legal standards.
7  Q. You have also alleged against Dr. Jouria a claim
8  under California Unfair Trade Practices and have
9  asserted an element of consumer confusion.
10    Are you aware of that?
11 A. I am aware of that.
12 Q. Are you aware of any actual customers being
13 confused based upon the conduct that Dr. Jouria engaged
14 in in submitting articles to Elite?
15 A. I don't know.
16 Q. You are aware or you're not aware of any actual
17 confusion?
18 A. I -- I don't know specifically the courses that
19 have triggered customer confusion in the past.
20 Q. Well, I am asking you right now.
21    Can you name any particular consumer who was
22 confused due to Dr. Jouria's writing articles for Elite?
23 A. Not with the evidence that I've seen so far.
24 Q. Well, you've seen e-mails. Did you get a phone
25 call from a customer? Did you get an e-mail from a