```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                       ---oOo---

 3   DR. JASSIN JOURIA                )
                                      )
 4         Plaintiff,                 )
     vs.                              )
 5                                    ) CASE NO:
     CE RESOURCE, INC., d/b/a         ) 0:15-61165-WPD
 6   CME RESOURCE and NetCE,          )
                                      )
 7         Defendant.                 )
     _____)
 8   CE RESOURCE, INC., d/b/a         )
     CME RESOURCE and NetCE,          )
 9                                    )
           Defendant/                 )
10         Counter-Plaintiff,         )
     vs.                              )
11                                    )
     DR. JASSIN JOURIA,               )
12                                    )
           Plaintiff/                 )
13         Counter-Defendant.         )
     _____)
14   CE RESOURCE, INC., d/b/a         )
     CME RESOURCE and NetCE,          )
15                                    )
           Defendant/Third-Party      )
16         Plaintiff,                 )
     vs.                              )
17                                    )
     Elite Continuing Education,      )
18   Inc. and Alpine Management       )
     Services III, LLC,               )
19                                    )
           Third-Party                )
20         Defendants.                )

21              DEPOSITION OF SARAH CAMPBELL
                        30(B)(6)
22
                   November 14, 2017
23


24


25   DEPOSITION REPORTER:  KAYLA KNOWLES, CSR
```

1  witness to Mr. Ross.

2                    EXAMINATION

3  BY MR. ROSS:

4    Q.  Thank you, Ms. Campbell.  My name is Richard

5  Ross.  I am, again, counsel for Dr. Jouria.

6        Can you hear me okay?

7    A.  I can, yes.  Can you hear me?

8    Q.  I can.  Thank you.

9        Court reporter, if you cannot hear me, please let

10  me know, and I will restate or rephrase the question.

11        Ms. Campbell, I'm going to continue with the

12  deposition now on behalf of Dr. Jouria.  You're still

13  under oath.  The only instruction I'd like to give you

14  is that I'd like to ask you not to speculate or guess as

15  to your answers or prognosticate as to future

16  conditions.  I'm just trying to seek facts regarding the

17  allegations in the matter and that which goes to claims

18  and defenses.  Do you understand that?

19    A.  I understand.

20    Q.  Thank you.  I might also go back over a little

21  bit what Mr. Wilson did, and please indulge me in doing

22  that, but I will attempt to be quite brief in our direct

23  examination of you.

24        Beginning with the copyright -- that NetCE

25  submitted, I believe it was your testimony that you

1   submitted the unedited draft written by Dr. Jouria on

2   behalf of NetCE; is that correct?

3       A.  We submitted the drafts that we received from

4   Jouria for copyright registration to the office of

5   copyright.

6       Q.  And those were unedited by you.  When I say you,

7   I mean NetCE.

8       A.  We, meaning NetCE, had made no edits to the

9   versions that were submitted as specimens to the

10  copyright office.

11      Q.  Going to -- I think you have Exhibit 42 in front

12  of you, which is the amended counterclaim, and I believe

13  you have, as well, the attachments to that.  Do you have

14  the copyright registration that resulted from your

15  filings?  And that would be Exhibit B to that

16  Exhibit 42.

17      A.  I have the certificate of registration in Exhibit

18  A, yes.

19      Q.  Oh, Exhibit A, yes.  Thank you.

20          All right.  One of the interrogatory questions

21  that we asked of NetCE pertained to those copyright

22  applications, and in response -- supplemental response

23  to interrogatory number 5, NetCE states that

24  implementation --

25          (Reporter clarification.)

```
 1   BY MR. ROSS:

 2      Q.  Yes.  In response to first supplemental response,

 3   interrogatory number 5, NetCE states that,

 4   "Implementation coordinator Cory Camp filed the

 5   copyright applications for each of the seven courses at

 6   issue."

 7           Was that the C.C. person you were referring to

 8   earlier in your testimony?

 9      A.  No.  Cory Camp had submitted the copyright

10   registration for the three courses of Dr. Jouria's that

11   we did publish; so that would have been pressure ulcers,

12   COPD, and multiple sclerosis.  Cory Camp then left

13   NetCE, and that job to file copyright registration was

14   taken on by C.C. Cherev.  And the five -- the seven

15   courses were all submitted by C.C., not Cory Camp.

16      Q.  Okay.  So the response is incorrect in the name

17   of the person who filed the seven courses --

18      A.  The name --

19      Q.  -- Cory Camp?

20      A.  The name of that person is incorrect.

21      Q.  Okay.  Thank you.  The interrogatory response

22   goes on to say that NetCE's current knowledge of the

23   statements contained in the application and

24   registrations are true and correct.

25           So now I'd like to direct you to the certificates
```

1  of registration, and Mr. Wilson pointed out some things

2  that are -- that seemingly are not correct, and I just

3  want to confirm with you on my direct.

4      Number one, I believe you stated on your

5  examination with Mr. Wilson that the works were not

6  published, even though the registrations say they are

7  published; correct?

8    A.  The courses in question were not released to the

9  public.

10   Q.  Okay.  Do you contend that they are published, or

11  do you contend that they were not published?

12          MR. KERN:  I'm just going to object,

13  Richard.  I'm sorry.  It's vague because, in this

14  context of a copyright application, publication is a

15  term of art.  It does not mean released to the public;

16  so your question is vague and ambiguous because we

17  haven't laid a proper foundation or defined what you

18  mean by published.

19  BY MR. ROSS:

20   Q.  Okay.  When NetCE filled out the application and

21  stated that the date of publication was the date on the

22  respective applications, was the -- the work that you

23  submitted published under that -- that legend date of

24  first publication?

25          MR. KERN:  Same objection.

```
 1                    THE WITNESS:  I am not a copyright lawyer,
 2   but our understanding of publication in this context,
 3   those dates were accurate.
 4   BY MR. ROSS:
 5      Q.  Okay.  Were the works -- so it's your position
 6   that the works were published?
 7      A.  We had --
 8                    MR. KERN:  Same objection.
 9                    THE WITNESS:  Sorry.
10                    We had a work that could be copyrighted,
11   and, therefore --
12   BY MR. ROSS:
13      Q.  I'm not asking about copyrighted.  I am asking
14   about published.
15                    MR. KERN:  Let her -- let her finish -- let
16   her finish answering Richard, please.  Thank you.
17                    MR. ROSS:  I will, but I'd like her to
18   answer the question asked.
19                    THE WITNESS:  Based on our understanding of
20   the term "publication" in this context, those dates are
21   accurate.
22   BY MR. ROSS:
23      Q.  Okay.  Where were the works published?
24      A.  Those works were in our -- in our possession in
25   our internal networks.
```

1    Q.  And is that the basis upon which you say the

2  works were published?

3    A.  That is, in essence, what --

4    Q.  Is there any other essence?

5    A.  Based on our understanding of the term

6  publication in this context, yes.  The answer to your

7  question is yes.

8    Q.  So that is the only -- that is the only basis for

9  your contention that the works are published?

10    A.  Based on my --

11    Q.  Am I understanding you correctly?

12    A.  Based on my understanding, we had a work in our

13  possession that met the copyright standards for

14  publication, and that is why we filed it with those

15  states.

16    Q.  Any other reason?

17    A.  No.

18    Q.  Under the section where it states "author,"

19  there's a section that says "author created," and the

20  word next to it says "text."

21        Do you see that?

22    A.  I do.

23    Q.  What does that mean to NetCE?

24    A.  That the specimen being provided is a text-based

25  specimen.

```
1     Q.  Any other reason why it states "text"?

2     A.  No.

3     Q.  Down one more, it states "a work made for hire."

4  It says "yes."

5         Do you know what that means?

6     A.  I have a general understanding of that phrase as

7  it's used in our freelance author agreements, and that's

8  the context --

9     Q.  What -- what is that understanding?

10    A.  That these were works made by an author with the

11 intent of them being the property of CE Resource or

12 NetCE.

13    Q.  Now, you stated that the works that were

14 copyrighted were the unedited drafts that Dr. Jouria

15 offered for NetCE.

16        What does NetCE contend are the works that

17 infringe those copyrights?

18    A.  The courses published by Elite with substantial

19 similarity to the courses that were copyrighted violated

20 the rights conferred as copyright holders.

21    Q.  So the courses published by Elite, is it NetCE's

22 contention that the revised articles that Dr. Jouria

23 submitted to Elite are not those works which NetCE

24 contends are infringing of the copyrighted works?

25    A.  I'm sorry.  Could you repeat that?
```

1     Q.  Yes.  We have works that Dr. Jouria submitted to

2     Elite, and then we have Elite publications.

3          Do you understand those to be two different

4     works, or do you understand those to be the same work?

5     A.  I don't have substantial knowledge of Elite's

6     processes for making changes; so I can't answer that.

7     Q.  Okay.  Does NetCE typically revise -- strike

8     that.

9          Did NetCE revise, in any manner, the three

10    published articles that Dr. Jouria wrote for it?

11    A.  Yes.

12               MR. KERN:  I am going to interpose an

13    objection that Dr. Jouria has not yet in this case

14    produced for NetCE the documents that he submitted to

15    Elite; so this line of questioning is curious and

16    confounding because the witness has not had a chance

17    to -- or Counsel to review those, let alone to compare

18    them to the published versions.

19               MR. ROSS:  Aside from that not being a valid

20    objection, it's just not correct on the facts, but your

21    objection is noted.

22               MR. KERN:  They -- they -- they have not

23    been produced in the -- they have not been produced in

24    the proper format so that we can use them as evidence.

25               MR. ROSS:  Okay.

```
 1   BY MR. ROSS:

 2      Q.  As part of your interrogatory responses, you

 3   identified a David Sains as an attorney.

 4          Do you know that name?

 5      A.  David Sains, yes.

 6      Q.  And who is that?

 7      A.  He is a lawyer who has advised and worked for

 8   NetCE in the past.

 9      Q.  Is he the individual who drafted the freelance

10   writer agreement at issue in this case?

11      A.  Yes.

12      Q.  Did Dr. Jouria have any input in drafting any of

13   the freelance writer agreements in this action?

14      A.  He had input insofar as the contract was

15   editable; so his name, how his name appeared, the topics

16   that were contracted, and the estimated deadlines were

17   all open to Dr. Jouria's input.

18      Q.  What about in paragraph 1 through 9 of the

19   freelance writer agreements?  Were those -- strike that.

20          1 through 10.  Were those written exclusively by

21   NetCE's attorney?

22      A.  Yes.

23      Q.  If you go to paragraph 9 in the freelance writer

24   agreements -- we will agree, will we not, Ms. Campbell,

25   that these freelance writer agreements are all the same
```

1    in terms of paragraphs 1 through 10?

2       A.   They are with the exception of the amount of

3    compensation.

4       Q.   Turn to paragraph number 9.  You have that

5    available to you?

6       A.   I do.

7       Q.   Thank you.  The first sentence states, "The

8    writer hereby understands and agrees that all articles

9    approved for publication by CNE and that this agreement

10   shall belong exclusively to CNE."

11       What does "approved for publication" mean to

12   NetCE in this sentence?

13      A.   So we consider an article approved for

14   publication when we receive all of the components, we

15   verify that they're all present, and we confer payment

16   to the writer.

17      Q.   Did you pay Dr. Jouria upon submission of the

18   draft articles or upon publication?

19      A.   We paid Dr. Jouria when we were able to verify

20   that all the components were present, and that was an

21   indication that the articles were approved for

22   publication.

23      Q.   And that was in advance of publication; correct?

24      A.   That was before the courses were released to the

25   public.

```
 1      Q.  During Mr. Wilson's testimony, he directed you to
 2   a division planner document, and I can give you the
 3   Bates number if you want.
 4      A.  I have it here.
 5      Q.  Okay.  Thank you.  The one that he identified is
 6   titled "COPD"; correct?
 7      A.  That is correct.
 8      Q.  And that was one of the published articles that
 9   was authored by Dr. Jouria; correct?
10      A.  That's correct.
11      Q.  Okay.  In that document, which is the Bates
12   NETCEB29016 to -29020, you see a checkmark in the box
13   where it says "approved for publication with changes."
14      A.  I see that.
15      Q.  Correct?
16      A.  Yes.
17      Q.  Are there similar division planners for the other
18   two published articles that Dr. Jouria wrote, MS and
19   pressure ulcers?
20      A.  There are division planner evaluations and course
21   approval forms for all three of the published courses.
22      Q.  And do those division -- other two division
23   planner course approval forms have checkmarks that
24   indicate either "approved for publication" or "approved
25   for publication with changes"?
```

1     A.  So this specimen or example is specifically for

2  our surgical technologist division planner, and she has

3  indicated that this course is approved for CSTs based on

4  her evaluation.  That doesn't mean that it will be

5  available to surgical technologists.  That requires

6  additional work.  But it's her expert opinion that this

7  content would be appropriate with her noted changes for

8  surgical technologists.

9     Q.  Thank you.  My question was, however:  For the

10  other two articles that were published, were those boxes

11  checked, either one, for "approved for publication" or

12  "approved for publication with changes"?

13     A.  I don't have all of the course approval forms in

14  front of me; so I don't want to speculate as to how they

15  were filled out by the planners.

16     Q.  Okay.  Do you have any documents for the seven

17  courses at issue where the boxes were checked "approved

18  for publication" or "approved for publication with

19  changes"?

20     A.  None of these courses were developed to the point

21  that they were presented to division planners to

22  determine if they were appropriate for those

23  professions.  We have --

24     Q.  So is that a no?

25     A.  We don't have any course approval forms for

1  unreleased courses.

2  Q.  So the the answer is no, you don't have any

3  documents.  You can't point to any documents that show

4  these boxes checked "approved for publication" for the

5  seven courses at issue.  I just want to understand if

6  those documents exist or not.

7  A.  I don't have any of these course approval forms

8  for any of the seven courses in question.

9  Q.  Also, in Mr. Wilson's direct testimony, he

10  identified another document, "overview of course of

11  development," and I believe that your testimony was that

12  the five articles that he was talking about were

13  somewhere between numbers 4 and 5.

14       Do you remember that testimony?

15  A.  I do.

16  Q.  And would the same be true for all seven

17  articles?

18  A.  The same would be true for all seven.

19  Q.  And I see on number 8, if you look at that

20  document, if you have it in front of you, that it says,

21  "Payment will be issued at this time," which is after

22  the faculty member -- in this case, Dr. Jouria -- signed

23  off on the manuscript -- an edited manuscript.

24       But Dr. Jouria was paid well before this time;

25  correct?

 1    A.  That's correct.

 2    Q.  Okay.  When was Dr. Jouria paid relative to the

 3  overview of course development?  What number was he paid

 4  at?

 5    A.  Dr. Jouria, in the cases of his drafts, was paid

 6  between steps 4 and 5.

 7    Q.  Okay.  And this is NETCEB Bates number 34857 and

 8  -8; correct?

 9    A.  That's correct.

10    Q.  You understand, do you not, that NetCE has sued

11  Dr. Jouria in part for breach of contracts?

12    A.  I understand that.

13    Q.  Okay.  What are the factual bases or factual

14  basis upon which NetCE claims that Dr. Jouria has

15  breached any of his seven contracts?

16    A.  When Dr. Jouria signed this freelance author

17  agreements with NetCE, he agreed that the works he was

18  creating were to be the property of NetCE.  But he also

19  provided the same or similar -- substantially similar

20  content to another company.

21    Q.  Any other basis?

22    A.  Not off the top of my head, no.

23    Q.  Well, this is your chance to speak.  You're

24  speaking for NetCE.  Top of the head, you know, works

25  for today, but I don't know what the top of your head

1   will be tomorrow.

2         So as you sit here today, is there any other

3   basis upon which you contend that Dr. Jouria breached

4   any of the other seven freelance writer agreements at

5   issue in this case?

6         I'm sorry.  Are you thinking?

7   A.   I am reviewing the document.

8   Q.   Okay.  Thank you.

9   A.   I don't have reason to believe, based on the

10  evidence that I have, that he breached the content --

11  I'm sorry -- breached the contract in ways other than

12  those that I described.

13  Q.   You've only described one way.  You said that he

14  provided the same or substantially similar content to

15  another company.  Was there another way?  You just said

16  "those," and I just thought it was one way.  Did I

17  misunderstand?

18  A.   It's only that one way.

19  Q.   Okay.  Do you understand from the contracts that

20  Dr. Jouria was free to write similar topics for other

21  companies with different content?

22  A.   I understand from the agreement that Jouria could

23  write on similar topics that did not infringe upon

24  NetCE's copyright.

25  Q.   And what does NetCE believe the copyright covers?

```
1       A.  The copyright covers all of the materials that

2   Jouria produced as a result of the writer agreement.

3       Q.  Going back to the freelance writer agreements,

4   paragraph 9 where we spoke about the first sentence

5   approved for publication, has that language been changed

6   in new freelance writer agreements, or do you still

7   maintain that same language?

8       A.  We haven't made any changes to that paragraph

9   with the exception of updating the company name to

10  NetCE.

11      Q.  For the three published articles that Dr. Jouria

12  wrote for NetCE -- multiple sclerosis, COPD, and

13  pressure ulcers -- you had a communication relationship

14  whereby you edited the drafts that he submitted and then

15  sent those back to him for his approval and signoff; is

16  that correct?

17      A.  Copies of the course were sent to Dr. Jouria in

18  the weeks immediately prior to release to the public.

19  That's correct.

20      Q.  And you -- did you ask him to sign off on the

21  final edited version before you published to the

22  consumer public?

23      A.  We did ask him to review the content to sign off

24  and to note any changes that he recommended prior to

25  release.
```

1     Q.  Did you ask Dr. Jouria to do that for any of the

2     seven articles at issue in this case?

3     A.  None of the seven courses in question had gotten

4     to the point that they were imminently being released;

5     so they had not been provided to Jouria for his final

6     review and approval.

7     Q.  Dr. Jouria asked you in e-mails, did he not, why

8     haven't you sent the edited versions to him so that he

9     could approve them finally?

10    A.  I don't recall that question specifically.

11    Q.  Did you ever tell Dr. Jouria that -- you or NetCE

12    of any of the qualms or questions that you had regarding

13    his medical certification or alleged plagiarism?

14    A.  No, I did not.

15    Q.  Why not?

16    A.  I chose not to discuss that with Dr. Jouria

17    because we had already made the decision that we would

18    move forward with the seven courses and, in fact, ten

19    courses in total, and I did not feel that that

20    information would improve the relationship or the

21    products as --

22    Q.  What do you mean "move forward"?

23    A.  I mean, even after our discovery of his issues

24    with the licensing, we had decided we would continue to

25    develop all of the courses we currently had.

1    Q.  But there was a point in time where you decided

2    not to develop the courses that you had; correct?

3    A.  That's correct.

4    Q.  And when you say "licensing," what do you mean by

5    that?

6    A.  We had knowledge of the legal issues that

7    Dr. Jouria had with the governing body for

8    foreign-educated physicians and his continued seeking of

9    or -- I don't want to speculate that he continued to

10   seek it, but he had not yet been licensed at that time

11   to practice in the United States.

12   Q.  NetCE dismissed two of the courses against Elite,

13   cardiovascular pharmacology and lymphatic immune system

14   articles; correct?

15   A.  That is correct.

16   Q.  Did NetCE dismiss those against Elite because

17   there was a determination made by NetCE that the

18   articles were not substantially similar to the articles

19   that Dr. Jouria wrote for NetCE?

20   A.  When we were able to evaluate the courses more

21   fully, we determined that the similarities, if there

22   were any, were not to the extent that they violated a

23   copyright.

24   Q.  Why haven't you dismissed those two articles

25   against Dr. Jouria?

```
 1     A.  I don't know.

 2     Q.  Well, if you determine that they're not

 3  substantially similar enough to support a claim for

 4  copyright infringement, are you going to dismiss those

 5  claims against Dr. Jouria --

 6          MR. KERN:  Objection --

 7  BY MR. ROSS:

 8     Q.  Please.

 9          Are you going to continue to prosecute those

10  against Mr. Jouria?

11          MR. ROSS:  Go ahead and state your

12  objection.

13          MR. KERN:  Sorry.  Objection.  Misstates

14  testimony, and vague as to you keep referring to the

15  course and not defining whether you're talking about

16  Elite's published course or the ones that Dr. Jouria

17  submitted.

18          If you --

19          MR. ROSS:  I am talking about --

20          MR. KERN:  If you understand the question.

21  BY MR. ROSS:

22     Q.  Do you understand the question, Ms. Campbell?

23     A.  Could you repeat it?  I'm sorry.

24     Q.  Sure.  I want to know if you're going to continue

25  to prosecute your claims of copyright infringement
```

1    against Dr. Jouria for the cardiovascular pharmacology

2    and the lymphatic immune systems course published by

3    Elite.  Having said that, you don't find there is a

4    substantial similarity in the content of the Elite

5    publication -- those two Elite publications?

6        A.  I believe that the titles that you mentioned were

7    actually of the drafts that he had submitted to us, not

8    to the courses that Elite had published.  And I don't

9    know if we'll continue or not.  I don't know.

10       Q.  Well, you're NetCE today; so it's your position

11   that NetCE hasn't determined, as of today, if it's going

12   to continue to prosecute those claims?

13       A.  As of today, NetCE had not determined.

14       Q.  But NetCE, as of today, is continuing to

15   prosecute those claims.

16           You do understand that; correct?

17       A.  I understand.

18       Q.  Okay.  You testified a bit about a plagiarized

19   content.  Do you recall that with Mr. Wilson?

20       A.  Generally, yes.

21       Q.  What do you understand "plagiarized content" to

22   be?

23       A.  My --

24               MR. KERN:  Vague.

25               THE WITNESS:  My definition of plagiarism is

1   content that is copyrightable that is reproduced without

2   permission of the copyright holder.

3   BY MR. ROSS:

4      Q.  And I believe you mentioned that there were some

5   tables or charts that you felt were plagiarized?

6      A.  In our work on the courses that we did do

7   editorial work on, we found that some or all of the

8   tables required permission to reprint in order to

9   legally include them in our published works.

10     Q.  How did you come to that conclusion that you

11   needed permission?

12     A.  When we are doing an editorial review, if there

13   is information that requires citations or sources and it

14   appears that that information is missing sources, our

15   editorial staff will go in search of that.  And during

16   that search, it was determined that the tables were the

17   same or similar to tables in other works to the extent

18   that they required that we contact those copyright

19   holders for permission.

20     Q.  Did you first verify whether or not there was any

21   copyright in those tables or charts?

22     A.  Yes.  As part of seeking copyright -- sorry.  As

23   part of seeking permission to reprint, you -- there is a

24   determination that you're seeking it from the copyright

25   holder.

1    Q.  But you're presuming that there's copyright in

2   tables and charts.  Is that true in your seeking?

3    A.  I am presuming that -- I'm sorry.  What was that?

4    Q.  Do you know whether or not tables or charts are

5   even copyrightable in the first instance?

6    A.  They are.

7    Q.  And how do you know that?

8    A.  We -- I have sought permission to reprint many

9   tables and charts in the past, and we also publish

10  copyrighted tables and charts that are our own work.

11   Q.  Have you ever obtained an opinion from legal

12  counsel on whether or not tables or charts are

13  copyrightable?

14   A.  I have not sought that opinion.

15   Q.  Okay.  And when I say "you," I mean NetCE.

16   A.  That's correct.

17   Q.  Okay.  Now, Dr. Jouria's articles were

18  extensively footnoted.

19       Would you agree with that statement?

20   A.  They're extensive -- they have many references.

21  They're provided in a work cited list at the end of the

22  course.  That is correct.

23   Q.  Okay.  And you do agree that you cannot

24  plagiarize public domain material; correct?

25   A.  If -- if content is free use for commercial

1   entities, then NetCE is able to reprint them without

2   seeking permission or violating a copyright.  But even

3   if materials are generally free use for personal or lay

4   public, they may not be for for-profit publishers.

5       Q.  And did you get a legal opinion on that?

6       A.  I did not seek an opinion on that.

7       Q.  Isn't it true that public domain material is

8   treated to be used for any reason, whether it's for

9   profit or not for profit?

10          MR. KERN:  I am just going say this whole

11  line calls for legal opinion.

12  BY MR. ROSS:

13      Q.  Okay.  What is your understanding?

14      A.  When you -- did you say public domain or free

15  use?

16      Q.  Public domain.

17      A.  I don't want to speculate as to the legal meaning

18  of that term; so I will say I don't know.

19      Q.  Well, you accused my client of plagiarizing,

20  correct, in the complaint?

21      A.  We noted that sections of Jouria's materials were

22  plagiarized, yes.

23      Q.  What you mean, in fact, is that sections of his

24  articles were similar to sections of other references;

25  correct?

1     A.  In some cases, sections were the same or

2  minimally different than copyrighted materials.

3     Q.  And that's what you mean by "plagiarism," that

4  sections were the same or substantially similar?

5     A.  That's what my understanding of plagiarism is.

6     Q.  Okay.  You understand that Dr. Jouria is not a

7  publisher of articles; correct?

8     A.  I don't know --

9     Q.  He's an -- he's an author.

10    A.  I don't know all of Dr. Jouria's activities.

11    Q.  Do you know of a single publication that

12  Dr. Jouria published?

13    A.  I know that, for a time, he had a Web site where

14  he posted some of his works.

15    Q.  And you would consider that publishing -- being a

16  publisher?

17    A.  I know that some publishers only publish online.

18    Q.  Would you consider that of Dr. Jouria's postings

19  equivalent to being a publisher?

20    A.  I don't know.

21    Q.  Okay.  You also spoke of a Plagiarism X report.

22        Do you recall that during Mr. Wilson's

23  examination?

24    A.  Plagiarism Checker X.

25    Q.  Okay.  Thank you.  And you said you ran that

1  report about two months ago; is that correct?

2     A.  It was within the last two months, yes.

3     Q.  Okay.  Do you remember if it was 30 days or

4  60 days?

5     A.  I don't remember specifically.

6     Q.  And did you -- and that plagiarism report, did

7  you run those for the two dismissed courses against

8  Elite?

9     A.  Yes.

10     Q.  And what was the degree of similarity -- the

11  numerical percentage, if you recall, for those two

12  articles?

13     A.  I don't remember.

14     Q.  Would you know if it was more or less than ten

15  percent similar?

16     A.  I don't know.

17     Q.  Do you recall the numerical percentages of

18  similarity on the reports for any of the articles?

19     A.  Not the specific numbers, no.

20     Q.  Okay.  Is there a reason why you didn't run that

21  report back in 2015 before you filed suit against

22  Dr. Jouria?

23     A.  At the time, I had done the visual side-by-side

24  comparison of the courses that I had access to and

25  determined that the similarities warranted what I

1   believed to be substantial similarity.  The two courses

2   that have since been dismissed in our dealings with

3   Elite were not available to me in that format.

4       Q.  Why didn't you run that report before you filed

5   suit against Dr. Jouria, was the question.

6       A.  I was not able to run it for the courses that I

7   did not have access to the Elite content.

8       Q.  For the two courses, but you had it for five;

9   correct?

10      A.  For those two courses.

11          For the five courses that we continue to have an

12  issue with Elite, I believed that my visual side-by-side

13  comparison was sufficient to determine that the

14  similarity was significant.

15      Q.  So -- so you knew of the existence of the

16  Plagiarism Checker X software.  You simply chose not to

17  utilize it before you filed suit; is that correct?

18      A.  I knew that there was software generally

19  available to do plagiarism analysis, but we did not

20  engage that tool at that time.

21      Q.  Okay.  Why not?

22      A.  I believe --

23              MR. KERN:  Asked and answered.

24              THE WITNESS:  I believed that my

25  side-by-side comparison of the courses that I did have

```
 1   access to was sufficient to determine that there was

 2   significant similarity.

 3   BY MR. ROSS:

 4      Q.  Do you know what the standard is for copyright

 5   infringement?

 6      A.  I don't know the legal standards.

 7      Q.  You have also alleged against Dr. Jouria a claim

 8   under California Unfair Trade Practices and have

 9   asserted an element of consumer confusion.

10          Are you aware of that?

11      A.  I am aware of that.

12      Q.  Are you aware of any actual customers being

13   confused based upon the conduct that Dr. Jouria engaged

14   in in submitting articles to Elite?

15      A.  I don't know.

16      Q.  You are aware or you're not aware of any actual

17   confusion?

18      A.  I -- I don't know specifically the courses that

19   have triggered customer confusion in the past.

20      Q.  Well, I am asking you right now.

21          Can you name any particular consumer who was

22   confused due to Dr. Jouria's writing articles for Elite?

23      A.  Not with the evidence that I've seen so far.

24      Q.  Well, you've seen e-mails.  Did you get a phone

25   call from a customer?  Did you get an e-mail from a
```

1   customer?

2      A.   There's -- there's customer confusion in terms of

3   our customers.  There's also customer confusion in terms

4   of their contact with Elite, and I haven't seen all of

5   the information from Elite yet about potential confusion

6   with his publication with them.

7      Q.   So you're not aware of any particular customer

8   who is actually confused, is that true, as you sit here

9   today?

10     A.   I don't know if the customers that we have

11  documented having confusion between NetCE and Elite were

12  triggered by the Jouria course or not.

13     Q.   Okay.  You filed suit in 2015.  It's now the end

14  of 2017.

15         Are you sure you're not aware of any customer

16  confusion resulting from Dr. Jouria's contributions to

17  Elite?

18     A.   I don't have all of the evidence from Elite; so I

19  don't know if they have experienced customer confusion

20  as a result of this publication.

21         And in terms of the information we have from our

22  own customers contacting NetCE, I can't say if the

23  courses that triggered the confusion were Jouria courses

24  or not.

25     Q.   Do you have any evidence that -- of a consumer

```
 1   who purchased an Elite publication authored by

 2   Dr. Jouria would otherwise have purchased a publication

 3   from NetCE?

 4      A.  I don't have evidence that they would or would

 5   not have.

 6      Q.  Can you point to any loss -- particular loss of

 7   sale because a customer purchased a Jouria article from

 8   Elite?

 9      A.  I don't have any ability to gather that

10   information in terms of lost sales.

11      Q.  So you cannot point to any lost sale; is that

12   true?

13      A.  I don't know.

14      Q.  You don't know if you could point to a lost sale?

15      A.  The -- again, the customer confusion that we have

16   documented between customers who are confused between

17   Elite and NetCE, I don't know if that confusion was

18   triggered by a Jouria course or not; so I'm unable to

19   make the conclusion of whether that resulted in a lost

20   sale or not.

21      Q.  Well, I'm asking you today.

22          So you cannot -- it's true that you cannot today

23   point to a lost sale resulting from a Jouria article

24   that was published by Elite?

25      A.  I don't have evidence of a lost sale or a gained
```

```
 1   sale due to Elite's publications.

 2      Q.  Is it NetCE's contention that it made

 3   $4.7 million in the publication of the multiple

 4   sclerosis Jouria article for it?

 5      A.  We calculated that special offer bundles that

 6   included the multiple sclerosis course were offered

 7   in -- starting in 2014 made a total revenue of

 8   $4.7 million.

 9      Q.  So is that how much money Dr. Jouria generated

10   for NetCE for that one course?  Is that what you're

11   stating?

12      A.  I'm stating that our publications that included

13   the multiple sclerosis course in special offer bundles

14   generated a revenue of $4.7 million between 2014 and the

15   two years that followed it.

16      Q.  And how much of that amount do you ascribe to

17   Dr. Jouria's article?

18      A.  I did not attempt to parse out the courses from

19   the special offer bundle.  But, also, I just -- I want

20   to make a note that those courses were Jouria's works,

21   and they were insomuch that he presented us with the

22   drafts.  But they were NetCE's courses, and we did make

23   changes in formatting to those courses to meet our style

24   requirements.

25      Q.  Well, I don't exactly know what that means, but
```

```
 1   I'm just trying to find out how much money have you made

 2   off of Dr. Jouria's labor on the three published

 3   articles?

 4      A.  I don't know how to attribute the amount of labor

 5   spent on those articles to Jouria compared to the amount

 6   of labor that other persons spent preparing those

 7   courses -- those courses for release.

 8      Q.  Was it $4.7 million?

 9      A.  The special offer bundles that had the multiple

10   sclerosis course in them --

11      Q.  How many courses were in that bundle?

12      A.  It differed by bundle.

13      Q.  5?  10?  20?

14      A.  It was different in each special; so, for

15   example --

16      Q.  What was the range?

17      A.  The -- two to four.

18      Q.  So would you ascribe Dr. Jouria's contribution to

19   that 4.7 if it was due to be one-half of that and if it

20   was to be 25 percent of that?

21      A.  Again, I don't know what percentage of his work

22   and everyone else at NetCE's work could be attributed to

23   the release of those courses.

24      Q.  So when you claim $4.7 million, did you back out

25   everybody's else's contributions?
```

```
 1      A.  Did I -- I'm sorry.

 2      Q.  Did you back -- you're claiming $4.7 million for

 3  one article, but now you're saying that that article was

 4  a -- was a contribution of a number of people; correct?

 5      A.  It is our business to develop courses, and so,

 6  yes, other people worked on developing those courses.

 7      Q.  Did you back out those people's contributions --

 8  I assume NetCE employees or independent contractors?

 9      A.  I'm sorry.  What do you mean by "back out"?

10      Q.  Well -- you know, I'll strike the question.

11          As you sit here today, do you know how much money

12  Dr. Jouria's articles made for NetCE?  Just his

13  articles, not bundles.

14      A.  The three courses that we were able to publish?

15      Q.  Yes.

16      A.  We do have information on the individual

17  standalone course revenue for those three courses, but

18  they'd been revised, and they continue to generate

19  revenue.

20      Q.  And in your interrogatory response to Elite's

21  interrogatory number 7, you state that $84,000 for the

22  multiple sclerosis article as an example for that time

23  period.  Although, I understand it might be different

24  today; correct?

25      A.  That estimate is correct for the three years of
```

1    that multiple sclerosis course from the time it was

2    released to the time that it was revised and issued --

3    rereleased with a new course number.

4       Q.  Okay.  And that was for three years of revenue

5    generation; correct?

6       A.  That's correct.

7       Q.  And do you know how long Elite published its

8    articles?

9       A.  I don't know how long the -- all of the courses

10   were available.

11      Q.  Okay.  Do you know that they were not three

12   years?

13      A.  I don't know that.

14      Q.  You don't know at all how long they were

15   published?

16      A.  Honestly, Elite could continue to be accepting

17   payment today, and I would have no knowledge of it.

18      Q.  You have no knowledge whether they are or they're

19   not; correct?

20      A.  I haven't seen that information from Elite; so I

21   can't say whether or not they are.

22      Q.  Okay.  Also, you identified some unrealized costs

23   in the response to interrogatory number 8.  It wasn't 7.

24   It was number 8.  For example, you put 47 hours of your

25   time and miscellaneous NetCE employees, and you have

```
 1   $1,000.

 2        Do you recall that response?

 3   A.  I see that, yes.

 4   Q.  Okay.  You're paid a salary, are you not?

 5   A.  I am paid a salary, yes.

 6   Q.  Okay.  Were you given this $1,000 that you have

 7   ascribed to your 47 hours separate from your salary?

 8   A.  This would include my time but also other NetCE

 9   employees' time, and that information -- I'm sorry.

10   That amount would have been included in their hourly

11   compensation in addition to my receiving a yearly

12   salary.

13   Q.  Okay.  My question was:  Did you receive

14   $1,000 --

15        MR. KERN:  She answered your question.

16   BY MR. ROSS:

17   Q.  -- for your hours of time?

18        MR. ROSS:  She told me about other employees

19   and being --

20        MR. KERN:  She told you what comprised

21   $1,000, Richard.

22        MR. ROSS:  I want to know if she put that

23   $1,000 in her pocket.

24        THE WITNESS:  I did not get a $1,000 bonus

25   in addition to my salary --
```

1   BY MR. ROSS:

2       Q.  Okay.

3       A.  -- for work on the lymphatic immune system

4   course.

5       Q.  Okay.  Did you get any of the amount put into

6   your pocket for any of the time that you have identified

7   in response to interrogatory number 8?

8       A.  When you say "put into my pocket," do you mean in

9   addition to my salary?

10      Q.  Yes.

11      A.  I did not receive any bonuses of compensation in

12  addition to my salary directly related to these courses.

13      Q.  One legend states "licensing fees to Nature

14  Publishing Group," $966 under the GERD heading.

15      A.  Yes.

16      Q.  Do you see that?

17      A.  I do.

18      Q.  What were the licensing fees?

19      A.  The portion of the content that had been already

20  been published by Nature Publishing that required us to

21  seek and pay for permission for reprint cost $966.

22      Q.  And what -- what was reprinted?  Was this a table

23  or a chart?

24      A.  I don't have the specific content in front of me;

25  so I don't want to speculate as to the exact content.

```
 1     Q.  Did you do anything to verify whether or not

 2   Nature Publishing Group had an issued copyright on the

 3   component that you paid $966?

 4     A.  When we -- when we were able to locate the

 5   matching content, it had a copyright claim on it and a

 6   place for us to request permission to reprint, and that

 7   is the usual process we use for determining if

 8   permission to reprint is necessary.

 9     Q.  Did you confirm with any counsel to get legal

10   advice whether or not you had to pay any of these

11   licensing fees?

12     A.  I did not seek legal opinion for our permission

13   requests.

14     Q.  Okay.  You are aware that NetCE has withdrawn its

15   claim for attorneys' fees as damages in this case, are

16   you not?

17            MR. KERN:  Richard?  Richard?

18   BY MR. ROSS:

19     Q.  Certainly for the copyright infringement claim.

20   Let's narrow it to that.

21            MR. KERN:  Richard?  We're losing our

22   location.  We've basically just been kicked out and told

23   we have five minutes to leave.

24            MR. ROSS:  I'm almost done.

25            MR. KERN:  Okay.  Great.  Thank you.
```

```
1              THE WITNESS:  I don't recall that

2    specifically.

3    BY MR. ROSS:

4       Q.  Okay.  You are aware that, even if NetCE prevails

5    on the copyright infringement claimant, it cannot

6    recover the attorneys' fees it's pertaining to its

7    lawyers.  Are you aware of that?

8       A.  I don't know specifically.

9       Q.  Are you aware that, if Dr. Jouria or Elite

10   prevails on the copyright infringement claims, the court

11   may award Dr. Jouria and/or Elite its attorneys' fees in

12   connection with those claims?  Are you aware of that?

13      A.  I don't know.

14      Q.  Okay.  The damages that you claim have lost

15   revenue are based upon your sales records; correct?

16      A.  Yes.

17      Q.  And you had those sales records from when NetCE

18   was making those sales; correct?  So in 2012, 2013,

19   2014, et cetera.

20      A.  We have sales records for those years.

21      Q.  Is there any reason why NetCE waited until four

22   days ago to provide us spreadsheets on all those lost --

23   claims lost revenue based upon records that they've had

24   from the very beginning?

25      A.  I'm not aware of any specific reason.
```

 1              MR. ROSS:  No further questions.  Thank you,

 2   Ms. Campbell.

 3              THE WITNESS:  Thank you.

 4                   FURTHER EXAMINATION

 5   BY MR. WILSON:

 6     Q.  I do have one.  Sorry.

 7          Just so we can clear up any issue, you had

 8   mentioned earlier today that the MS course was sold in

 9   three special bundle catalogs, and I believe you

10   mentioned California and various states, Texas and

11   various states, and was it Ohio in --

12     A.  Ohio, and they're not various states.  That is

13   Ohio only.

14     Q.  Okay.  How many other courses were in the

15   California special bundle catalog?

16     A.  Two other courses.

17     Q.  So three total?

18     A.  Yes.

19     Q.  And how many were in the Texas special bundle

20   catalog?

21     A.  One other, for a total of two.

22     Q.  And how many were in the Ohio special bundle

23   catalog?

24     A.  That catalog varies.  I can look at the

25   documentation.