**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
30(b)(6)          **Sarah Campbell on 11/14/2017**

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                         ---oOo---

 3    DR. JASSIN JOURIA                )
                                       )
 4          Plaintiff,                 )
      vs.                              )
 5                                     ) CASE NO:
      CE RESOURCE, INC., d/b/a         ) 0:15-61165-WPD
 6    CME RESOURCE and NetCE,          )
                                       )
 7          Defendant.                 )
      _____ )
 8    CE RESOURCE, INC., d/b/a         )
      CME RESOURCE and NetCE,          )
 9                                     )
            Defendant/                 )
10          Counter-Plaintiff,         )
      vs.                              )
11                                     )
      DR. JASSIN JOURIA,               )
12                                     )
            Plaintiff/                 )
13          Counter-Defendant.         )
      _____ )
14    CE RESOURCE, INC., d/b/a         )
      CME RESOURCE and NetCE,          )
15                                     )
            Defendant/Third-Party      )
16          Plaintiff,                 )
      vs.                              )
17                                     )
      Elite Continuing Education,      )
18    Inc. and Alpine Management       )
      Services III, LLC,               )
19                                     )
            Third-Party                )
20          Defendants.                )

21                 DEPOSITION OF SARAH CAMPBELL
                           30(B)(6)
22
                       November 14, 2017
23


24


25    DEPOSITION REPORTER:  KAYLA KNOWLES, CSR
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1                    I N D E X

 2                                                    PAGE

 3    EXAMINATION BY MR. WILSON                          6

 4    EXAMINATION BY MR. ROSS                          231

 5    FURTHER EXAMINATION BY MR. WILSON               268

 6

 7
      Appearance Page                                   4
 8
      Reporter Certificate                            270
 9
      Declaration Under Penalty of Perjury           272
10

11

12                    E X H I B I T S

13    EXHIBIT              DESCRIPTION               PAGE

14    Exhibit 74   Notice of Deposition                5

15    Exhibit 75   Responses to Interrogatories         5

16    Exhibit 76   Collection of E-mails from NetCE,   19
                   Bates Numbers
17                 NETCEB0003109-NETCEB0035072

18    Exhibit 77   E-mails From Dr. Jouria to NetCE,   45
                   Bates Numbers
19                 NETCEB0002761-NETCEB0003068

20    Exhibit 78   E-mails from NetCE to Dr. Jouria,   45
                   Bates Numbers
21                 NETCEB0004778-NETCEB0005265

22    Exhibit 79   TBI Course, Bates Numbers           51
                   NETCEB0007755-NETCEB0020594
23
      Exhibit 80   Chemotherapy Course, Bates         51
24                 Numbers
                   NETCEB0006283-NETCEB0020686
25
      Exhibit 81   GERD Course, Bates Numbers          51
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

| 30(b)(6) | Sarah Campbell on 11/14/2017 | Page 3 |
|---|---|---|

```
 1                    NETCEB0006973-NETCEB0024807

 2    Exhibit 82    Depression vs. Dementia Course,        52
                    Bates Numbers
 3                  NETCEB0002993-NETCEB0022559

 4    Exhibit 83    Nonantibiotic Antimicrobial            52
                    Pharmacology Course, Bates
 5                  Numbers
                    NETCEB0007394-NETCEB0022750
 6
      Exhibit 84    Division Planner, Course               79
 7                  Approval, Bates Numbers
                    NETCEB0029016-NETCEB0029020
 8
      Exhibit 85    Courses Scheduled for Update          149
 9                  2016: Past Revenue, Bates Numbers
                    NAVIGANT00002-NAVIGANT00454
10
      Exhibit 86    E-mail from Erin Meinyer to Sarah     187
11                  Campbell, Bates Number
                    NETCEB0003137
12
      Exhibit 87    E-mail from Sarah Campbell to         188
13                  John Jurica, Bates Number
                    NETCEB0005017
14
      Exhibit 88    Declaration of Tracey Foster          221
15

16

17                         ---oOo---

18

19

20

21

22

23

24

25
```

```
 1                        A P P E A R A N C E S

 2

 3

 4     FOR THE PLAINTIFF DR. JASSIN:

 5                         ATRIUM CENTRE
                          Attorneys at Law
 6                        4801 S. University Drive, Suite 237
                          Fort Lauderdale, FL 33328
 7
                          E-MAIL:  Prodp@ix.netcom.com
 8
                          By:  RICHARD S. ROSS, ESQ.
 9

10     FOR CE RESOURCE, INC., d/b/a CME RESOURCE and NetCE:

11                        HOLLAND & KNIGHT
                          Attorneys at Law
12                        50 California Street, Suite 2800
                          San Francisco, CA 94111
13
                          PHONE:   415.743.6981
14                        E-MAIL:  John.kern@hklaw.com

15                        By:  JOHN P. KERN, ESQ.
                          By:  JESSICA E. LANIER, ESQ.
16

17     FOR ELITE PROFESSIONAL EDUCATION, LLC:

18                        MOORE & VAN ALLEN
                          Attorneys at Law
19                        100 North Tryon Street, Suite 4700
                          Charlotte, NC 28202-4003
20
                          PHONE:   704.331.1177
21                        E-MAIL:  Markwilson@mvalaw.com

22                        By:  J. MARK WILSON, ESQ.
                          By:  KATHRYN G. COLE, ESQ.
23

24     Also Present:  Crystal Cusic, Videographer

25
```

```
 1        Sacramento, California; Tuesday, November 14, 2017

 2                              9:15 a.m.

 3

 4              (Exhibit No. 74 marked for identification.)

 5              (Exhibit No. 75 marked for identification.)

 6              THE VIDEOGRAPHER:  This is the beginning of

 7    media number 1 in the deposition of Sarah Campbell in

 8    the matter of Jassin Jouria vs. CE Resource, Inc.

 9    Today's date is November 14, 2017, and time on the

10    monitor is 9:15 a.m.  My name is Crystal Cusic, and I'm

11    the videographer.  The court reporter is Kayla Knowles.

12    We are here with Huseby Global Litigation Services.

13              Counsel, please introduce yourselves, after

14    which the court reporter will swear in the witness.

15              MR. KERN:  John Kern and Jessi Lanier for

16    the defendant and counter-claimant NetCE and here

17    representing the 30(b)(6) witness, Sarah Campbell.

18              MR. WILSON:  Mark Wilson from Moore & Van

19    Allen here representing Elite Professional Education.

20              MS. COLE:  Katy Cole from Moore & VanAllen

21    also representing Elite.

22              MR. ROSS:  And Richard Ross appearing

23    telephonically by stipulation of the parties on behalf

24    of Plaintiff, Dr. Jassin Jouria.

25
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1                    SARAH CAMPBELL,

 2   having been sworn by the Certified Shorthand Reporter,

 3   Kayla Knowles, to tell the truth, the whole truth, and

 4   nothing but the truth, testified as follows:

 5

 6                    EXAMINATION

 7   BY MR. WILSON:

 8      Q.  Ms. Campbell, my name is Mark Wilson.  I'm an

 9   attorney from Charlotte representing Elite Professional

10   Education.

11          You're aware of Elite Professional Education.

12   Yes?

13      A.  I am.

14      Q.  If I use the word "Elite," you'll know who I'm

15   talking about; right?

16      A.  Yes.

17      Q.  And I understand that you are here as the

18   corporate witness on behalf of CE Resource, Inc., doing

19   business as CME Resource and NetCE; correct?

20      A.  That's correct.

21      Q.  And if I refer to that entity as "NetCE," you'll

22   know who I'm talking about.  Yes?

23      A.  Yes.

24      Q.  In front of you, I've premarked before we arrived

25   this morning what we now call Exhibit 74.  It is the
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 7

```
 1    30 -- excuse me.  It is the notice of deposition of

 2    NetCE pursuant to federal rule of civil procedure

 3    30(b)(6).

 4         Have you seen Exhibit 74 before?

 5    A.  Yes.

 6    Q.  In Exhibit 74, there are -- at Schedule A, there

 7    are a number of topics for deposition.  I believe there

 8    are 20 of them.

 9         I understand you have been designated as the

10    corporate witness to testify about the subject matters

11    in topics 1 through 20; is that correct?

12    A.  That's correct.

13    Q.  And are you prepared today to testify on topics 1

14    through 20 in Exhibit 74?

15    A.  Yes.

16    Q.  Any reason you cannot testify about one or more

17    of the topics in Exhibit 74 today?

18    A.  No.

19    Q.  Ms. Campbell, why is NetCE pursuing this case

20    against Elite?

21    A.  We believe that they acted badly with content

22    that NetCE owned.

23    Q.  Is there any other reason?

24    A.  We also have some reason to believe that they

25    were in knowledge of trade secrets and used those trade
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1   secrets to benefit their business.

2       Q.  Any other reason?

3       A.  I think this is included, but infringement of our

4   copyright, but that possibly is included in the first.

5       Q.  Other than the claims that have been asserted

6   against Elite and the -- in court in the lawsuit in the

7   third-part complaint, as we call it, are there any other

8   reasons why Elite is pursuing this case against --

9   excuse me -- why NetCE is pursuing this case against

10  Elite?

11      A.  No.

12      Q.  Isn't it true that NetCE is pursuing this case

13  against Elite to gain access to Elite's financial

14  information?

15      A.  No.

16      Q.  NetCE does not believe -- does not feel that this

17  case is an investment to learn more about Elite's

18  financials?

19      A.  No.

20      Q.  Have you ever had any discussions with anyone

21  about that?

22      A.  I don't recall.

23      Q.  As you sit here today, under oath, your testimony

24  is NetCE is not using this lawsuit to learn more about

25  Elite's financials; is that correct?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                 Sarah Campbell on 11/14/2017                 Page 9

```
 1     A.  That's correct.

 2     Q.  Do you know how Elite learned about Dr. Jassin

 3   Jouria?

 4     A.  I do.

 5     Q.  How did Elite learn about Dr. Jassin Jouria?

 6     A.  It's my understanding that they posted an ad of

 7   some sort looking for authors, and he responded.

 8     Q.  If you take a look at what I've premarked in

 9   front of you as Exhibit 75, Exhibit 75 is NetCE's

10   responses to Elite's interrogatories.

11         Have you seen this document before?

12     A.  Yes.

13     Q.  You've read it?

14     A.  Yes.

15     Q.  You agree with the responses provided by Elite --

16   excuse me, provided by NetCE in Exhibit 75?

17     A.  Yes.

18     Q.  If you take a look at -- excuse me -- NetCE's

19   response to interrogatory number 2, the second sentence

20   says, "At present, NetCE stands by the allegations in

21   its complaint that Elite learned of Dr. Jouria's

22   identity from Alpine."

23         That's not true, is it?

24     A.  I don't know if that's true.  I believe -- I

25   believe it could be true.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                                      Page 10

1      Q.  You just testified that Elite posted something,

2  and Dr. Jouria responded.  How is it possible then that

3  Elite learned of Dr. Jouria's identity through Alpine,

4  as you said here in this interrogatory response?

5      A.  So I saw discovery documents that indicated that

6  he had responded to an ad, but I haven't seen any

7  documentation one way or another if they knew his name

8  before he responded to that ad.

9      Q.  Have you read the transcript of Alpine's

10  deposition that we took in this case?

11      A.  Yes.

12      Q.  Do you know a man named Dan Cremons?

13      A.  I know of him.  I haven't met him.

14      Q.  You understand that Mr. Cremons testified on

15  behalf of Alpine that Alpine did not share the name of

16  Dr. Jouria with Elite.  Do you understand that?

17      A.  I do understand that.

18      Q.  So now we've seen -- you've seen evidence that

19  Dr. Jouria reached out to Elite, and you have sworn

20  testimony from Alpine that they did not share

21  Dr. Jouria's name with Elite.

22          Are you still standing behind your statement in

23  interrogatory number 2?

24      A.  Yes.

25      Q.  Explain how that is possible.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 11

1     A.  I don't know the exact relationship between

2  Alpine, McKissock, and Elite.  If McKissock was aware

3  and shared that information with Elite, I'm not sure if

4  that would be covered under Alpine and Dan Cremons's

5  testimony.

6     Q.  Have you seen any documents, read any testimony,

7  or have any evidence to support the notion that Elite

8  learned of Dr. Jouria's identity from Alpine or

9  McKissock?

10    A.  I understand that there's still discovery going

11  on; so I think it's still -- information is still coming

12  in.

13    Q.  That's not what I asked.

14        Do you have any evidence, as you sit here today,

15  to support what you said in interrogatory number 2 about

16  how Elite learned of Dr. Jouria's identity?

17            MR. KERN:  Mark, can you please let her

18  finish the answer in the future?

19            Go ahead, Sarah.

20            THE WITNESS:  So in terms of evidence -- I

21  don't know exactly what evidence would be present -- I

22  know that there is a relationship between Alpine and

23  Elite, and I know that we -- that Alpine was aware of

24  that information.  So if it is coincidental, it would be

25  a lot of coincidences, but I haven't seen hard evidence,

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1    as of yet.  It's possible it could come in later.

2    BY MR. WILSON:

3       Q.  As you sit here today, you have no evidence to

4    support the statement you make in interrogatory number 2

5    that Elite learned of Dr. Jouria's identity from Alpine;

6    isn't that correct?

7       A.  Not yet.

8              MR. KERN:  For clarification, Mark, that

9    question was limited to Alpine?  Because you asked

10   before "Alpine or McKissock."

11   BY MR. WILSON:

12      Q.  As we sit here today, you have no evidence to

13   support the belief that Elite learned of Dr. Jouria's

14   identity from McKissock either; correct?

15      A.  We haven't had discovery with McKissock; so we

16   don't have information from them, as far as I know.

17      Q.  And I know that you want information, and I know

18   that you're desperately hoping for it, but my questions

19   here are pretty straightforward.

20         As you sit here today, you have no evidence to

21   support the belief that Elite learned of Dr. Jouria's

22   identity from anyone other than Dr. Jouria himself;

23   isn't that correct?

24      A.  I don't have the information necessary to make

25   that determination.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

| 30(b)(6) | Sarah Campbell on 11/14/2017 | Page 13 |
|---|---|---|

```
 1      Q.  So you don't have any evidence?

 2      A.  Not yet.

 3      Q.  How is it that you believe -- excuse me.  Let me

 4  ask it this way.

 5          Given that you have no evidence yet, as you say,

 6  what is the basis for the statement in interrogatory

 7  number 2 that you're standing behind?

 8      A.  Oh, sure.  They -- we had discussions with Alpine

 9  that included information about future faculty including

10  Dr. Jouria, and also about the development of content in

11  the areas that Jouria developed.  And after Alpine's

12  acquisition of Elite or continued relationship with

13  Elite, those courses were published by Elite.  So that

14  indicates to me that they had an interest in entering

15  the market that we had identified as an interest of

16  NetCE's with the --

17      Q.  How -- how did NetCE convey to Alpine the

18  identity of Dr. Jouria?

19      A.  Documents were provided to Alpine during

20  acquisition negotiations that included courses that were

21  in development but not yet published, and that included

22  several of Dr. Jouria's sources that were in

23  development.

24      Q.  But that information was provided in print form?

25      A.  I understand, yes.
```

1     Q.   And who provided it to Alpine?

2     A.   Erin Meinyer.

3     Q.   And when did she do this?

4     A.   She provided it in in-person meeting that she had

5   with Mike Duran in March of 2012, and, again, it may

6   have been provided in a second meeting they had in

7   October of 2013.

8     Q.   Exactly what was provided by Ms. Meinyer to

9   Mr. Duran in March of 2012?

10     A.   Documents in person were exchanged or shared that

11   included financial information including P&L, return on

12   investment documents, and cost versus revenue by catalog

13   spreadsheets.  They also provided a history, a catalogic

14   history and a course index, and then processes for

15   course development in marketing and documentation of

16   courses currently in development and additional

17   information related to market strategies.

18     Q.   Where did this meeting take place?

19     A.   It took place -- the March 2012 meeting took

20   place in Roseville at the NetCE office.

21     Q.   Do you have any evidence to support your

22   testimony that any of this information was provided to

23   Mr. Duran in document form?

24     A.   Could you repeat the question?

25     Q.   Do you have any evidence to support what you're

1   saying, that this information was provided to Mr. Duran

2   in print form?

3      A.  No.  It was exchanged in person; so there's no

4   proof of transfer.

5      Q.  So as we sit here today, you have no evidence

6   that this exchange ever took place; is that correct?

7            MR. KERN:  Objection.  Misstates --

8   mischaracterizes and misstates her testimony.

9            THE WITNESS:  It was exchanged in person; so

10  I don't have evidence of transfer at this time.

11  BY MR. WILSON:

12     Q.  How do you know what was exchanged?

13     A.  Through conversations with Erin Meinyer and

14  Dennis Meinyer and their information regarding the

15  meeting.

16     Q.  So they told you?

17     A.  They did.

18     Q.  Has the information that you believe was shared

19  in person by Ms. Meinyer or Mr. Meinyer to Mr. Duran --

20  produced in this case?

21     A.  I'm not sure if all of it was produced.

22     Q.  What are you not sure about?

23     A.  I'm not sure if all the course development

24  processes and development documents were provided.  They

25  may have.  I'm not sure.

Case 0:15-cv-61165-WPD  Document 337-1  Entered on FLSD Docket 05/26/2018  Page 16 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 16

1      Q.   What volume, in print form, would this

2   information have taken that was given to Mr. Duran,

3   allegedly, according to your sworn testimony?

4      A.   Could you be more specific?

5      Q.   How many pages?

6      A.   Of all of the materials?

7      Q.   Yes.  Everything you say that Mr. Duran received

8   at this in-person meeting from the owners of NetCE.  How

9   many pages?

10      A.   I would have to give a range.  Somewhere between

11   maybe 100 and 400 pages.

12      Q.   Pretty big stack of stuff.

13      A.   Maybe.

14      Q.   You weren't at that meeting, though; correct?

15      A.   I was not.

16      Q.   So all you know is what the owners of the company

17   told you; is that correct?

18      A.   That's correct.

19      Q.   What else was discussed at those in-person

20   meetings -- at the in-person meeting of March of 2012?

21      A.   In addition to NetCE's history and future plans

22   and their current approaches, I believe they were

23   discussing the possibility of Alpine acquiring NetCE.

24      Q.   Tell me everything that you know about the

25   in-person meeting in March of 2012.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1          MR. KERN:  You want her to repeat the things

2    she's already told you?

3          THE WITNESS:  So -- sure.  NetCE met with

4    Alpine in March of 2012 regarding a possible

5    acquisition.  During that meeting, they provided

6    information regarding NetCE's history, including

7    financial information and return on investment, their

8    current processes and courses in development, and future

9    plans for market advancement and new market entrance.

10   BY MR. WILSON:

11      Q.  What did Mr. Duran say to Mr. and Mrs. Meinyer?

12      A.  Mike Duran expressed interest in moving forward

13   with the acquisition and working to build the

14   relationship, as far as I know.

15      Q.  What do you mean "as far as I know"?

16      A.  That's the information that was provided to me.

17      Q.  Again, by -- I am mispronouncing it, I'm sure.

18      A.  Erin Meinyer.

19      Q.  Meinyer.

20          Did you speak with Mrs. Meinyer or Mr. Meinyer?

21      A.  Both.

22      Q.  Tell me about the meeting in October of 2013.

23   What was discussed?  Tell me everything you know.  What

24   was shared and what was discussed?

25      A.  In October of 2013, Erin and Dennis Meinyer,

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1  again, met with Mike Duran and Richard Wileczek -- I may

2  be mispronouncing his name -- at an off-site location in

3  Roseville, and they discussed, again, a possible

4  acquisition.

5       And they also let Mike Duran -- Erin and Dennis

6  let Mike Duran and Richard Wileczek know that they were

7  aware that Alpine -- what they believed was Alpine had

8  acquired Elite.

9       They had also, again, provided updated financial

10  information at or immediately before or after that

11  meeting.

12   Q.  And how was that information exchanged?

13   A.  I'm not sure.

14   Q.  You're the only witness I get to talk to about

15  this.

16       I need to know:  How was that information

17  exchanged?

18          MR. KERN:  Asked and answered.

19          Don't speculate.

20          THE WITNESS:  I'm not sure.

21  BY MR. WILSON:

22   Q.  As we sit here today, as of the October 2013

23  meeting, you don't know and you have no evidence to

24  support that any information was given to Mr. Duran;

25  isn't that correct?

```
 1              MR. KERN:  Objection.  Misstates testimony.
 2   She testified that she was told --
 3              MR. WILSON:  I don't need you to speak.
 4              THE WITNESS:  I -- I don't know if we have
 5   evidence or not.
 6   BY MR. WILSON:
 7      Q.  And if Mr. Duran were to provide a sworn
 8   statement that he never received any printed documents
 9   from the Meinyers, do you have any reason to dispute
10   that?
11      A.  I know that there is an e-mail exchange that
12   acknowledges that financial information was sent, but --
13      Q.  Sent by who?  Received by who?
14      A.  By NetCE.  Probably Erin Meinyer.
15      Q.  To?
16      A.  To, I believe, Mike Duran, but I can't -- I don't
17   know for sure the exact e-mail address.
18              (Exhibit No. 76 marked for identification.)
19   BY MR. WILSON:
20      Q.  I'm handing what we've marked as Exhibit 76.
21   It's a collection of e-mails that were provided to us by
22   NetCE.  I know that because down at the bottom
23   right-hand corner is a Bates number that starts with
24   "NETCEB."
25              Do you see that?
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

| 30(b)(6) | Sarah Campbell on 11/14/2017 | Page 20 |
|---|---|---|

```
 1    A.  I do.
 2    Q.  I'll ask you to take just a second to flip
 3  through those documents and see if you can -- see if
 4  anything looks out of place to you that isn't a document
 5  that is from NetCE, meaning produced to us in this case
 6  by NetCE.
 7        And I can tell you we're going to be here all day
 8  if you don't go faster.  You can take as much time as
 9  you need.
10            MR. KERN:  Sarah, I think he's just
11  asking if you can --
12            THE WITNESS:  Oh, sorry.
13            MR. KERN:  -- look at the Bates numbers and
14  confirm that these came from our production.
15            THE WITNESS:  Sure.
16            MR. KERN:  You don't have to confirm,
17  necessarily, that they're all NetCE e-mails, but look at
18  them.
19            THE WITNESS:  Okay.  Yes.
20  BY MR. WILSON:
21    Q.  And these e-mails that are part of Exhibit 76
22  were maintained in the ordinary course of business and
23  produced to us in the ordinary course of NetCE's
24  business as part of this lawsuit; isn't that correct?
25    A.  Yes.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

1    Q.  And you're responsible for helping in that

2    collection of production effort; isn't that correct?

3    A.  Yes.

4    Q.  If today -- if you see something that doesn't

5    satisfy those questions, will you please let me know?

6    A.  Yes.

7    Q.  Take a look at the last document in Exhibit 76.

8    That's an e-mail that is Bates labeled NETCEB35072.

9    It's an e-mail from Mike Duran in October of 2013 where

10   he's asking Dennis and Erin to send financial

11   information to Dan Cremons at Alpine "in the same way

12   that you did last year," according to Mike.

13        Does that help refresh your recollection as to

14   how information was exchanged between --

15   A.  Yes, it does.

16   Q.  -- Erin and Dennis and Mr. Duran?

17   A.  Yes.

18   Q.  It's fair to say that the financial information

19   was sent to Mr. Cremons; isn't that correct?

20   A.  Yes.

21   Q.  Do you have any reason to believe anything else

22   occurred --

23             MR. KERN:  Objection.  Vague.

24   BY MR. WILSON:

25   Q.  -- with regard to the exchange of information to

```
 1   Mr. Duran?

 2       A.  My understanding is that the financials -- the

 3   updated financial information was sent to Alpine.

 4       Q.  And, indeed, the -- earlier in what you said was

 5   March of 2012, financial information was also sent to

 6   Alpine, and Mr. Duran confirms that here.  He says,

 7   "Please send it to Dan Cremons the same way you did

 8   before."

 9       A.  It does say that.

10       Q.  Do you have any reason to dispute that that's how

11   the information was exchanged?

12       A.  No.

13       Q.  Do you have any reason to believe that any

14   financial information was provided to Mr. Duran or

15   anyone else related to this potential acquisition by

16   Alpine in any other form?

17       A.  I cannot discount the possibility that they spoke

18   about it at their meeting.

19       Q.  Well, I get to talk to you again.

20       A.  You do.

21       Q.  Did NetCE discuss financial information with

22   Mr. Duran at any in-person meeting?

23              MR. KERN:  Asked and answered.

24              THE WITNESS:  Yes.  At any in-person

25   meeting?  Yes.
```

| 30(b)(6) | Sarah Campbell on 11/14/2017 | Page 23 |
|---|---|---|

```
 1   BY MR. WILSON:

 2       Q.  When?

 3       A.  In the March 2012 meeting that we just discussed,

 4   they had more in-depth conversations about financial

 5   information.

 6           At this October 2013 meeting, I believe that the

 7   discussions about financial information were more high

 8   level and not detailed as the 2012 meeting was because

 9   they had already gone over that information, for the

10   most part.

11       Q.  And a couple times already you've answered the

12   question with "I believe."  "I believe they weren't

13   detailed."  "I believe this."  "I believe that."  I'm

14   not asking for your belief.  I'm asking for the

15   company's testimony on these topics because you're the

16   person I get to talk to; so I'll ask again.

17           Actually, I'll just ask you as you answer these

18   questions.  I don't want your belief.  I want what you

19   know.

20               MR. KERN:  That's a fair request.  Do you

21   understand what he's --

22               THE WITNESS:  I do.

23               MR. KERN:  -- saying, Sarah?

24               THE WITNESS:  Yep.

25   ///
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

```
 1   BY MR. WILSON:
 2      Q.  You mentioned earlier that some, quote,
 3   additional information regarding strategies, end quote,
 4   was provided by NetCE to Mr. Duran.
 5           What are you talking about?
 6      A.  In reference to the 2012 meeting?
 7      Q.  You tell me when it was provided and what you
 8   mean.
 9      A.  I believe my testimony earlier was about the 2012
10   meeting, and the materials provided then in terms of
11   additional market strategies would have been areas of
12   content that we were interested in developing in order
13   to meet a market need or an emerging market need; for
14   example, pharmacology content and more advanced science
15   information for advanced practice nurses.  And also just
16   new verticals such as physical therapy, occupational
17   therapy, and allied health in general.
18      Q.  Was this information conveyed orally or in print?
19      A.  It was conveyed orally and was supported by the
20   course development documentation that was in print.
21      Q.  What information that was shared with Alpine does
22   NetCE contend is a trade secret?
23      A.  We consider all of that information trade secrets
24   in as far as we wouldn't share it with anyone outside of
25   the company unless an NDA was in place.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1     Q.  You believe that the names of authors of courses
 2   for NetCE is a trade secret; is that correct?
 3     A.  The names of authors for unpublished content is a
 4   trade secret.
 5     Q.  And what binds the authors from -- what prohibits
 6   them from disclosing the fact that they are writing for
 7   NetCE?
 8          MR. KERN:  I'm sorry.  Can you repeat the
 9   question, Mark?
10   BY MR. WILSON:
11     Q.  What prohibits authors for content that is being
12   developed by NetCE from telling anyone else that they're
13   writing for NetCE?
14          MR. KERN:  I'm just going to make a
15   foundation objection.
16          THE WITNESS:  We don't have any way of
17   tracking what authors of courses in development
18   disclose.
19   BY MR. WILSON:
20     Q.  Again, you didn't come even close to answering my
21   question.
22          What prohibits them from disclosing that they're
23   writing for NetCE, if anything?
24          MR. KERN:  Okay.  Vague and ambiguous.  Have
25   not laid a proper foundation.

```
 1              If you understand the question, Sarah, go

 2    ahead and answer it.

 3              THE WITNESS:  I'm not sure what could

 4    prohibit an author from doing that.

 5    BY MR. WILSON:

 6      Q.  So the answer is "nothing"; isn't that correct?

 7    NetCE has no agreement or any other -- have nothing in

 8    place to prohibit an author who is writing content for

 9    NetCE from disclosing the fact that that author is

10    writing for NetCE; isn't that correct?

11              MR. KERN:  Same objections.

12              THE WITNESS:  We do not have an agreement in

13    place with authors to not disclose.

14    BY MR. WILSON:

15      Q.  So how is it possible that that information is a

16    trade secret?

17      A.  I can only say what we consider trade secret that

18    might have legal ramifications that I'm not aware of.

19    But I would not share that information, and people at

20    the company would not share that information.

21      Q.  What's your understanding of the meaning of a

22    "trade secret"?

23              MR. KERN:  Objection.  Calls for a legal

24    opinion.

25              THE WITNESS:  When I refer to a trade
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)     Sarah Campbell on 11/14/2017     Page 27

```
 1   secret, I'm referring to information that is germane to

 2   the company and its plans for future direction and

 3   market -- market approaches that we would not want

 4   competitors to know.

 5   BY MR. WILSON:

 6       Q.  Was there anything, to your knowledge,

 7   prohibiting Dr. Jouria, in this situation, from telling

 8   others that he was writing courses for NetCE?

 9       A.  No.

10       Q.  Yet you still maintain that that information is a

11   trade secret of NetCE?

12       A.  I do.

13       Q.  The information that you've described here as

14   shared with Mr. Duran, has NetCE ever disclosed any of

15   that information to anyone else without the protections

16   of an NDA?

17       A.  Are you asking specifically about authors' names?

18       Q.  I'm asking about all of the information that

19   you've talked about as being disclosed to Alpine that,

20   according to NetCE, forms the basis of a trade secret

21   claim against Elite in this case.

22       A.  Well, we have accountants and editorial

23   contractors who may need some of that information; so I

24   can't say a definitive -- I can't give a definitive

25   response.  It's possible, for example, that our planners
```

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 28 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                     Sarah Campbell on 11/14/2017                     Page 28

1  who review courses may have access to the name of the

2  author when they complete their review, which would be

3  immediately prior to publication.

4     Q.  Can you say definitively, sitting here today,

5  that of any of the information that NetCE is claiming is

6  a trade secret, as it forms the basis for the trade

7  secret claim against Elite, that any of that information

8  has never been disclosed absent a nondisclosure

9  agreement with the receiving party?

10              MR. KERN:  Objection.  Vague and ambiguous.

11  I did not understand the question.

12  BY MR. WILSON:

13     Q.  If any of the information -- I want to make sure

14  we're clear -- that was disclosed to Alpine that NetCE

15  is relying upon to form the basis of its trade secret

16  claim, can you say definitively that any piece of that

17  information has never been disclosed by NetCE without

18  the protections of a nondisclosure agreement?

19     A.  To a non-employee?  I cannot definitively say

20  that because we utilize contractors and an accounting

21  firm.

22     Q.  And you don't have agreements to protect your

23  information with these folks; is that correct?

24     A.  We do have agreements with our editorial

25  contractors, but I don't know if we have one in place

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

 1   for our accountants -- accounting contractors.

 2      Q.  And I'm asking specifically about a nondisclosure

 3   agreement or some protection that is equivalent to a

 4   nondisclosure agreement.

 5      A.  Our contractor contracts -- editorial contractor

 6   contracts contain a clause that prohibits disclosure,

 7   but I am not sure the exact details off the top of my

 8   head.

 9      Q.  So just so we're clear, as we sit here today, you

10   can't say for certain that the information that NetCE is

11   relying upon as the basis for its trade secret claim was

12   never disclosed by the company without protections?

13            MR. KERN:  Asked and answered.

14   BY MR. WILSON:

15      Q.  Isn't that correct?

16            MR. KERN:  Asked and answered.

17            THE WITNESS:  I can't give a definitive

18   answer to that.

19   BY MR. WILSON:

20      Q.  What evidence do you have, if any, that Alpine

21   ever disclosed to anyone else any information that NetCE

22   did provide to it under the nondisclosure agreement that

23   you referenced earlier?

24      A.  Well, as we discussed a little bit before, the

25   information that was provided to Alpine and Mike Duran

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Page 30

```
 1    included some information about market strategies, such

 2    as development of pharmacology continuing education and

 3    the importance of ANCC, which is American Nurses

 4    Credentialing Center, accreditation to meet the needs of

 5    advanced practice nurses.  And not long after Erin and

 6    Dennis's meetings with Dan and Mike and Richard, Elite

 7    made strides in those areas specifically that indicated

 8    to us that they used that information to make some

 9    decisions about where they should be focusing business.

10        Q.  I understand those are your allegations in this

11    case.  I'm asking for evidence, ma'am.

12            What evidence do you have to support those

13    allegations?

14        A.  Again, I don't feel like all of the evidence is

15    in.  I think there's still -- Elite is still providing

16    documents; so, at this time, we don't have that hard

17    evidence, but I think it's still evolving.  I don't know

18    if I could answer that better without their full

19    discovery.

20        Q.  Isn't it true, as we sit here today, you have no

21    evidence to support the allegations that any information

22    disclosed by NetCE was shared with Elite?

23        A.  Not yet.

24        Q.  And you said earlier that you read Dan Cremons's

25    deposition testimony.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)      Sarah Campbell on 11/14/2017      Page 31

1       He was the deponent from Alpine; is that correct?

2    A.  I did.

3    Q.  So you've read that Mr. Cremons from Alpine

4  denied all of the allegations related to Alpine

5  allegedly sharing information with Elite from NetCE;

6  correct?

7    A.  I did read that.

8    Q.  I asked him repeatedly if those allegations were

9  true or false, and he looked right in the camera and

10  said they were false.  You read that?

11    A.  I did.

12    Q.  Do you have any reason to believe that

13  Mr. Cremons was not telling the truth?

14    A.  I have no personal reason to believe that, but

15  there --

16    Q.  Please.

17    A.  Again, there were some -- the changes that Elite

18  made after the discussions with Dan and Mike gives us

19  some indication that they were influenced by that

20  information, but I can't say for sure if it was Dan

21  Cremons or Mike Duran or McKissock or Alpine.

22    Q.  But what you have seen, which is the testimony

23  from Alpine through Mr. Cremons, shows that your

24  allegations are false; isn't that correct?

25    A.  He testified that he had not shared any

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Page 32

```
 1    information and that Alpine had not, and I don't have a
 2    reason to believe that is incorrect.
 3         Q.  The allegations in this -- in this case as they
 4    pertain to NetCE's trade secret claim all relate to
 5    Alpine; is that correct?
 6         A.  In this case?  Yes.
 7         Q.  So as we sit here today, for the trade secret
 8    claim that NetCE has brought against Elite, you have no
 9    evidence to support the allegations that Alpine shared
10    any information with Elite, and, indeed, the evidence
11    you have read through the testimony of Mr. Cremons at
12    Alpine shows that those allegations are false.
13              MR. KERN:  I'll just object --
14    BY MR. WILSON:
15         Q.  -- isn't that correct?
16              MR. KERN:  -- it's a compound question.
17    Sounds like he's testifying.
18              THE WITNESS:  Can you repeat the question?
19    BY MR. WILSON:
20         Q.  As we sit here today, you have no evidence to
21    support the allegations in NetCE's complaint as they
22    pertain to Alpine sharing information with Elite; isn't
23    that correct?
24         A.  As we sit here today, although there could be
25    additional information that we obtain from Elite in the
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                                    Page 33

```
 1   next week or two, I don't have any hard evidence, other
 2   than the change in Elite's focus.
 3      Q.  And I appreciate the fact that you don't want to
 4   say that I'm right, but this is a yes-or-no question.
 5            MR. KERN:  You can answer the question
 6   however you want, Sarah.
 7   BY MR. WILSON:
 8      Q.  And I'm going to continue to ask it until I get a
 9   yes or no.
10            So as we sit here today, isn't it true that you
11   have no evidence to support the allegations in the trade
12   secret claim NetCE has brought against Elite as it
13   pertains to Alpine sharing information with Elite?
14      A.  We have no hard evidence of Alpine --
15   specifically Alpine sharing information with Elite.
16      Q.  And as we sit here today, you have no evidence to
17   support any allegation -- and it hasn't been made, but
18   any additional allegation that Mr. Duran or anyone from
19   McKissock shared any information provided by NetCE with
20   Elite; correct?
21      A.  We have no evidence from McKissock or Mike Duran
22   either way, as far as I know.
23      Q.  So I'll ask it again.
24            As we sit here today, you have no evidence that
25   Mr. Duran or anyone at McKissock shared any information
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 34

 1    provided by NetCE with Elite; correct?

 2             MR. KERN:  Asked and answered.

 3             THE WITNESS:  We do not have evidence of him

 4    sharing or not sharing information.

 5             MR. KERN:  How are you doing?

 6             THE WITNESS:  I'm fine.

 7             MR. KERN:  Let me know if you need a break.

 8    Can you go another 10, 15 minutes?

 9             THE WITNESS:  I can go -- yeah, I'm fine.

10             MR. KERN:  Thank you.

11    BY MR. WILSON:

12        Q.  I'm going to hand you what was previously marked

13    as Exhibit 42.  I am going to put a big "42" on it.

14    That is the third-party complaint filed by NetCE against

15    Elite in Florida.

16             Have you seen that document before?

17        A.  I have.

18        Q.  If you turn to the paragraph numbered 103, it

19    states, "Upon information and belief, Elite was aware of

20    Dr. Jouria's freelance writer agreement with NetCE."

21             Do you see that?

22        A.  "Agreements," yes.

23        Q.  Thank you.

24             "Upon information and belief, Elite was aware of

25    Dr. Jouria's freelance writer agreements with NetCE";

1   correct?

2      A.  That's correct.

3      Q.  What is the information and belief that you rely

4   upon to make that allegation?

5      A.  Again, we had shared information about courses in

6   development, including the author names, with Mike Duran

7   during meetings with him in the previous several years.

8          When Elite then worked with Dr. Jouria to publish

9   the courses that we had already taken ownership of,

10  he -- he -- through discovery, I found that he had

11  disclosed to them that he had already sold them to us as

12  part of the agreement.

13     Q.  What discovery are you talking about?

14     A.  An e-mail between Dr. Jouria and employees of

15  Elite.  I believe Michelle Franchi and another employee.

16  Janice, I believe.

17     Q.  What was the date of that e-mail?

18     A.  I don't recall the exact date.

19     Q.  What else do you remember about this e-mail that

20  you're talking about?

21     A.  I recall that they had discussed his work with

22  other companies, specifically his work with NetCE and

23  the courses that he had already developed for NetCE.

24  And they had asked to see a copy of his contract.

25     Q.  Contracts?

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                Sarah Campbell on 11/14/2017                Page 36

 1    A.  I think they called it a contract, possibly, but

 2  it is contracts, yeah.

 3    Q.  And have you read Dr. Jouria's deposition

 4  testimony?

 5    A.  I have, yes.

 6    Q.  So you're aware that Dr. Jouria declined to

 7  provide copies of his freelance writer agreements to

 8  Elite; is that correct?

 9    A.  I am aware of that.

10    Q.  Paragraph 1 of 4 of Exhibit -- excuse me,

11  Exhibit 42 says, "Elite intentionally interfered with

12  with the freelance writer agreements between Dr. Jouria

13  and NetCE by soliciting and publishing articles

14  identical or substantially similar to articles

15  Dr. Jouria submitted to NetCE."

16        We already know that Elite didn't solicit these

17  articles given that Dr. Jouria approached Elite;

18  correct?

19    A.  Well, that depends on how you would define

20  "solicit" because they -- you are correct.  My

21  understanding is that he answered an ad that they had

22  placed.  However, he provided them, according to this

23  e-mail, a list of topics for them to choose from, and

24  they chose those topics.  To me, that could be seen as

25  soliciting.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1          I'm not a lawyer; so I don't know exactly the

 2    legal definition, but in my -- in my view, they did --

 3    he contacted them, but they agreed and selected topics,

 4    and that, to me, is soliciting.

 5       Q.  This paragraph starts with, "Elite intentionally

 6    interfered with the freelance writer agreements."

 7          What support do you have for the fact -- for the

 8    allegation that Elite intentionally interfered?

 9       A.  Elite was aware of these agreements and chose to

10    move forward with developing the same content with that

11    knowledge.  In my view, that's intentionally

12    interfering.

13       Q.  Has NetCE ever published articles from an author

14    who had also written for another continuing education

15    provider?

16       A.  Yes.

17       Q.  Nothing wrong with that; right?

18       A.  I have no problem with that.

19       Q.  And when Net- -- excuse me -- when Elite asked to

20    see the terms of Dr. Jouria's agreement with NetCE, he

21    declined.

22          You've seen that; right?

23       A.  I did see that in his testimony.

24       Q.  No reason do dispute that; right?

25       A.  I have no reason to dispute that at this time.
```

1    Q.  So how can you say that Elite intentionally

2   interfered with those agreements when there's nothing

3   prohibiting Elite from doing business with Dr. Jouria

4   and they hadn't seen the the terms of his agreements?

5    A.  They were aware that the agreements existed, and

6   they knew that the topics were the same.  And in my

7   opinion, that's intentional interference.

8    Q.  Do you have any evidence that Elite was aware of

9   Dr. Jouria's freelance writer agreements with NetCE when

10  Elite chose the courses that Mr. Jouria suggested?

11   A.  In that same e-mail exchange, my understanding of

12  their conversation was that they -- he had provided a

13  large list of -- of topics.  He had specifically

14  indicated which ones were developed for NetCE, and then

15  he provided the content.

16      It's possible that he provided the content first

17  and then they went back for that, but I -- it was -- I

18  couldn't tell from their exchange.  It was before they

19  had published the courses.

20   Q.  So at the time this complaint in Exhibit 42 was

21  filed against Elite, you hadn't seen those documents;

22  isn't that correct?

23   A.  I had not.

24   Q.  So what was the basis at the time that you filed

25  this complaint for the statements that -- in paragraphs

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

```
 1   103 and 104 about Elite being aware of Dr. Jouria's
 2   agreements and Elite intentionally, intentionally
 3   interfering with them?
 4     A.  Again, we knew that Mike Duran had information
 5   about our work with Dr. Jouria and specifically about
 6   wanting to develop the content that Dr. Jouria had
 7   worked on for us.  And it was our belief, at the time,
 8   that he had potentially shared that information and that
 9   Elite had used it to develop the same or substantially
10   similar content for the purpose of beating us to market,
11   potentially.  In terms of -- that was our belief at the
12   time.
13     Q.  So as we sit here today, you have no evidence
14   that Elite knew about the terms of the freelance writer
15   agreements between Dr. Jouria and NetCE; correct?
16     A.  Can you repeat the question?
17     Q.  As we sit here today, you have evidence to show
18   that Elite knew about the terms of the freelance writer
19   agreements between Dr. Jouria and NetCE; correct?
20     A.  As we sit here today, that's correct.  I don't
21   know if additional evidence will become available.
22     Q.  And indeed the evidence that is available, namely
23   the deposition of Dr. Jouria, supports the notion that
24   Elite did not know the terms because Dr. Jouria wouldn't
25   share his agreements with Elite; correct?
```

1    A.  He testified that he did not share that

2    information.  That's correct.

3    Q.  So as we sit here today, there is -- you have no

4    evidence that Elite intentionally interfered with the

5    freelance writer agreements between Dr. Jouria and

6    NetCE --

7              MR. KERN:  Objection.

8    BY MR. WILSON:

9    Q.  -- correct?

10             MR. KERN:  Objection.  Asked and answered

11   three times, and misstates her testimony.

12             THE WITNESS:  I do believe that there is

13   evidence in the form of that e-mail exchange that they

14   had specifically solicited content that they knew we had

15   agreements with Dr. Jouria to develop.

16   BY MR. WILSON:

17   Q.  So your support is one e-mail that you've seen in

18   discovery; is that correct?

19             MR. KERN:  Could you please let her complete

20   her answer?  Don't interrupt her.  Thank you.

21             THE WITNESS:  I believe it's an e-mail

22   chain, so several e-mails back and forth.  That's the

23   evidence that comes to mind that they were aware of the

24   relationship and that those topics were the courses that

25   we had worked with Dr. Jouria on and that they moved

 1  forward with development anyway.

 2  BY MR. WILSON:

 3     Q.  If you take a look again at Exhibit 42, we've

 4  been reading from and looking at allegations that are

 5  contained in claim 4 called "tortious interference with

 6  contractual relations," which is asserted against Elite

 7  and Alpine.

 8          Do you see that?

 9     A.  What page?

10     Q.  31.

11     A.  I do.

12     Q.  The allegations that we were looking at, namely,

13  paragraphs 103 and 104 on the next page 32.  If you take

14  a look at the allegations that flow after that in this

15  claim, you'll see a paragraph 108 that says, "As a

16  proximate result of Alpine's conduct, NetCE has suffered

17  damages in an amount to be proven at trial."

18          And paragraph 109 says, "in addition, Alpine's

19  conduct has permanently and irreparably harmed NetCE.

20  NetCE is, therefore, entitled to injunctive relief."

21          Do you see that?

22     A.  I do.

23     Q.  Those same allegations are not made against

24  Elite.

25          Do you see that?

```
 1    A.  I do.

 2    Q.  Do you know why not?

 3    A.  I can't say for sure.  No.

 4    Q.  Do you have any reason to believe why those

 5  allegations are not made against Elite related to damage

 6  and irreparable harm?

 7    A.  I could speculate, but I don't have any -- I

 8  don't have a hard knowledge of that.

 9    Q.  I'm not asking for speculation.

10        I am asking if you have any knowledge as to why

11  damages -- excuse me -- allegations related to damages

12  and irreparable harm are not made against Elite in this

13  claim.

14    A.  I don't know.

15        MR. KERN:  Mark, how about a five-minute

16  break?

17        MR. WILSON:  Hang on one second.  Not quite

18  there yet.

19  BY MR. WILSON:

20    Q.  Take a look at Exhibit 76.  Turn to a document

21  that's Bates labeled -6135.

22        MR. ROSS:  Mark, can you give me that number

23  again, please?

24        MR. WILSON:  Yes, sir.  NETCEB6135.

25        MR. ROSS:  Thank you.
```

1    BY MR. WILSON:

2       Q.  We see in this e-mail -- this is from

3    November 12th, 2015, and November 13, 2015.  We see

4    where Erin -- so I don't butcher her last name again --

5    Erin -- you know who I'm talking about.  Yes?

6       A.  I do.

7       Q.  -- is looking for older e-mails that relate to

8    materials provided to Alpine Investments.

9          Do you see that?

10      A.  I do.

11      Q.  And somebody named Michael Pentecost wrote back

12   and said, "No problem.  I'll check our e-mail archive

13   and see what I can find."

14         Was anything located?

15      A.  I know that Erin found e-mails related to her

16   conversations with Dan Cremons and Mike Duran.  I don't

17   know if they were found at that time or at a later

18   point.

19      Q.  And whatever e-mails were located, were those

20   provided to us in this case?

21      A.  Yes.

22      Q.  And did any of those e-mails that you saw contain

23   any information that NetCE claims to be a trade secret?

24      A.  Yes.  There's an extensive e-mail to Dan Cremons

25   outlining the history of NetCE future market plans,

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Page 44

```
 1   major competitors that was eventually located and is

 2   provided.

 3       Q.  Anything else?

 4       A.  Any other e-mails or anything --

 5       Q.  Any other e-mails that were located that contain,

 6   according to NetCE, trade secret information?

 7       A.  I don't think so.

 8       Q.  When we talked to Mr. Cremons at Alpine, we

 9   marked as an exhibit what we know as Exhibit 73.

10           Is that the e-mail that you were just referring

11   to?

12       A.  Yes.

13       Q.  And are the documents attached to that that go

14   through Alpine 60 -- ALP60 the information that you were

15   referring to?

16           Excuse me.  It goes through Alpine 61 -- ALP61.

17       A.  Yes, that's the information.

18       Q.  So NetCE did not locate any other e-mails where

19   any allegedly trade secret information was shared with

20   Alpine or Mr. Duran; is that correct?

21       A.  I don't know.

22       Q.  You're the one I get to talk to.  You've read

23   Mr. Cremons's deposition testimony as it pertains to the

24   information in the documents in front of you in

25   Exhibit 73.  Yes?
```

1      A.  Yes.

2      Q.  You're aware of the fact that he testified that

3   Alpine did not share that information with Elite;

4   correct?

5      A.  I'm aware of that.

6      Q.  Do you have any reason to dispute that?

7      A.  I have no evidence, as we sit here today, that he

8   shared that information -- that Dan Cremons specifically

9   shared that information.  That's correct.

10              MR. WILSON:  Let's take a break.

11              THE VIDEOGRAPHER:  The time is 10:21 a.m.,

12   and we are off the record.

13              (Off the record.)

14              THE VIDEOGRAPHER:  The time is 10:31 a.m.,

15   and we're back on the record.

16              (Exhibit No. 77 marked for identification.)

17              (Exhibit No. 78 marked for identification.)

18   BY MR. WILSON:

19      Q.  We have to call Richard.

20              THE VIDEOGRAPHER:  Do you want me to go off

21   real quick?  The time is 10:32 a.m., and we are off the

22   record.

23              (Off the record.)

24              THE VIDEOGRAPHER:  The time is 10:32 a.m.,

25   and we are back on the record.

 1    BY MR. WILSON:

 2       Q.  I'm going to hand you what we've marked as

 3    Exhibits 77 and 78.  I described these earlier today

 4    when we were talking about documents, but Exhibit 77 is

 5    a collection of e-mails from Dr. Jouria to NetCE, and

 6    Exhibit 78 is a collection of e-mails sent to Dr. Jouria

 7    by NetCE.  I'll ask you the same questions I asked

 8    before.

 9           Take a look at those and see if you have any

10    reason to dispute the accuracy or authenticity of any of

11    those documents, and I'll represent to you they were all

12    produced to us by NetCE as evidenced by the Bates

13    numbers located at the bottom.

14       A.  I have no reason to dispute that.

15       Q.  I know you've only had them in front of you for a

16    very short period of time, but do you recognize the

17    e-mails that are in Exhibit 77 and 78 as e-mails

18    exchanged between NetCE and, I think, primarily, you and

19    Dr. Jouria?

20       A.  Yes, that seems correct.

21       Q.  NetCE learned of Dr. Jouria when Dr. Jouria

22    reached out to NetCE; isn't that correct?

23       A.  That's correct.

24       Q.  And we see that in a document labeled NETCEB3069.

25    Is that one on there?  -3069?

 1              MR. KERN:  It ends in -3068.

 2              MR. WILSON:  Try the other one.

 3              MR. KERN:  It starts beyond that.

 4              MR. WILSON:  Okay.  Let me look.

 5  BY MR. WILSON:

 6     Q.  I will show you my copy of NETCEB3069 and see if

 7  you recognize that, minus the highlighting, which I

 8  represent is mine.

 9     A.  Yes.

10     Q.  So Dr. Jouria reached out to NetCE; correct?

11     A.  That's correct.

12     Q.  And you saw some documents earlier today where

13  Dr. Jouria -- excuse me.

14          You testified about documents you had seen where

15  Dr. Jouria also reached out to Elite in that same

16  fashion.

17     A.  Not in the same fashion.  He e-mailed us

18  directly.  We don't post ads calling for independent

19  contractors; so he had e-mailed our help -- general help

20  e-mail directly.  My understanding is Elite had posted

21  an ad, and he had responded to it.

22     Q.  And in your early correspondence with

23  Dr. Jouria -- this was in April of 2012 -- you informed

24  Dr. Jouria that, in terms of topics, NetCE generally

25  likes to leave the specific subject matter up to the

1    author.  And I'm referring specifically to a document,

2    NETCEB5264, and I hope it's in there.

3        A.  Uh-huh.

4        Q.  You see there in the top e-mail that you wrote

5    four days after Dr. Jouria sent an e-mail to you all?

6    You wrote him back -- that's from you; right?

7        A.  It is, yes.

8        Q.  -- and said, "In terms of topics, we generally

9    like to leave the specific subject matter" -- excuse

10   me -- "the specific subject up to the author."

11           Do you see that?

12       A.  That's -- I do see that.

13       Q.  And that's generally true for how NetCE acquires

14   content; isn't that correct?

15       A.  It's generally true of authors that contact us

16   interested in becoming authors, yes.

17       Q.  Then we take a look back at the other notebook,

18   the document NETCEB3068, and we see that Dr. Jouria

19   writes to you on April 6, 2012, and says, "I can write

20   on a variety of topics, but my area of preference is the

21   basic medical sciences."

22           Do you see that?

23       A.  I do.

24       Q.  The articles that -- excuse me -- the courses

25   that Dr. Jouria wrote for NetCE were in the basic

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1  medical sciences; isn't that correct?

2      A.  Some of them were, and some of them were focused

3  specifically on pharmacology, which is more of an

4  advanced science, depending on the content.

5      Q.  You wrote back in Document NETCEB3067 and said,

6  "We certainly have a need for basic science courses."

7          Do you see that?

8      A.  I do.

9      Q.  You also said, "If there is something that

10  interests you or that you think could be helpful for

11  other healthcare professionals, it will most likely be a

12  welcome addition to our library."

13          Do you see that?

14      A.  I do.

15      Q.  Which courses that Dr. Jouria wrote for NetCE do

16  you believe are not in the basic science area?

17      A.  I would say that the courses that focus

18  specifically on pharmacology --

19      Q.  I need to know titles.

20      A.  I will tell you the titles.

21          -- would fall outside of that category; so that

22  would be cancer and chemotherapy, cardiovascular

23  pharmacology, and that's what I can think of right now.

24  Excuse me, I'm sorry.  Nonantibiotic antimicrobial

25  pharmacology.  That's it.

1     Q.  And you're aware of the fact that the

2  cardiovascular pharmacology article is no longer part of

3  this case; correct?

4     A.  I am aware of that, yes.

5              MR. KERN:  Objection to the characterization

6  of it no longer being part of the case.  As to

7  Dr. Jouria, it is still part of the case.

8  BY MR. WILSON:

9     Q.  As between -- as between the client that I care

10  about, Elite, it's not part of the case; correct?

11     A.  It's not part of our, yes, case with Elite.

12     Q.  I'm going to place in front of you a series of

13  binders that, though it looks daunting, hopefully will

14  not be.  Each of these binders represents a particular

15  course that is at issue in this case between NetCE and

16  Elite; so there are five of them.

17          You understand that there are five courses at

18  issue with Elite; correct?

19     A.  I understand that, yes.

20     Q.  Each one of these binders includes the versions

21  of the particular course that were produced by NetCE to

22  Elite, and you'll see that by the Bates numbers at the

23  bottom all reflecting a NetCE Bates number.  And I'll

24  represent to you this -- each of these binders has in it

25  versions of that particular course that were produced by

 1    NetCE to Elite, and they're separated by blue pieces of

 2    paper.

 3       A.   Okay.

 4       Q.   It's going to take me a minute to mark them, and

 5    I'm hoping somebody will write these down.

 6                    (Exhibit No. 79 marked for identification.)

 7                    (Exhibit No. 80 marked for identification.)

 8    BY MR. WILSON:

 9       Q.   Exhibit 79 is the course known as traumatic brain

10    injury, and I'll ask you as I'm doing this to look

11    through there.  And, again, as I said at the beginning,

12    if you have any reason to question the accuracy or

13    authenticity of any of documents included in any of

14    these exhibits, please let me know.  Otherwise, we will

15    assume that there is no issue.

16                    MR. ROSS:  Is there a Bates number on that?

17                    MR. WILSON:  Richard, there are multiple

18    because they were in various locations in the

19    production.  As I -- as I talk about them, I'll try to

20    give you a beginning Bates number.  Okay?

21                    MR. ROSS:  Perfect.  Thanks.

22                    MR. WILSON:  Exhibit 80 is the cancer and

23    chemotherapy course.

24                    (Exhibit No. 81 marked for identification.)

25                    MR. WILSON:  Exhibit 81 is the GERD course,

 1    gastroesophageal reflux disease.

 2                    (Exhibit No. 82 marked for identification.)

 3                    MR. WILSON:  Exhibit 82 is the depression

 4    vs. dementia in the elderly course.

 5                    (Exhibit No. 83 marked for identification.)

 6                    MR. WILSON:  You can just rip this page out.

 7                    Exhibit 83 is the nonantibiotic

 8    antimicrobial course.

 9    BY MR. WILSON:

10       Q.  I know you've only had them in front of you for a

11    brief period of time, but did you see anything in there

12    that would lead you to question the accuracy or

13    authenticity of the material provided to you in each of

14    the exhibits, Number 79 to 83?

15       A.  I did not see anything that would lead me to

16    question the authenticity.

17       Q.  You've seen the documents included there before?

18    Yes?

19       A.  Yes.

20       Q.  Did they appear to reflect courses -- course

21    materials related to courses written by Dr. Jouria?

22       A.  Yes.  These are the drafts that were provided by

23    Dr. Jouria, as well as some of our internal editorial

24    copies.

25       Q.  You're aware -- and I think you said it

1    earlier -- that NetCE is asserting copyright claims

2    against Elite for infringing NetCE's alleged copyright

3    rights in these five courses; correct?

4        A.  That's correct.

5        Q.  Attached to the complaint in Exhibit 42 are a

6    series of copyright registration certificates that

7    relate to these five courses, as well as the two

8    courses, I believe, that are no longer part of the case

9    between Elite and NetCE.  They're in Exhibit A to

10   Exhibit 42.

11           You've seen those documents before.  Yes?

12       A.  Yes.

13       Q.  And I will take this however we need to do it,

14   but my question for each of the five courses -- course

15   materials in front of you is:  Which version of each

16   course did NetCE submit to the copyright office to

17   obtain the registrations being asserted in this case?

18       A.  In this case, the version submitted to the

19   copyright office were the drafts received from

20   Dr. Jouria.

21       Q.  Can you identify those for us in the exhibits

22   before you?

23       A.  For each course?

24       Q.  Yes.

25       A.  In the case of nonantibiotic antimicrobial

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 54

```
 1   pharmacology, there are two copies of the draft of the

 2   course.  The first and second sections in the

 3   Exhibit 83.

 4       Q.  Tell us what the first Bates number is.

 5       A.  Sure.

 6       Q.  It's going to be right there.  Right --

 7       A.  NETCEB7395, and the second -- the second included

 8   course starts at NETCEB22953.  These appear to be the

 9   same with few, if any, changes; so I would say this

10   first one, starting at NETCEB7395, would have been the

11   one submitted, but I -- I suspect they're the same with

12   no changes.

13       Q.  Can you say, as you sit here today, for certain

14   that the document that begins with NETCEB- --

15       A.  -7395.

16       Q.  -- -7395 is the version of the nonantibiotic

17   antimicrobial pharmacology article submitted to the

18   copyright office?

19       A.  Without going through these two courses line by

20   line, I'm not sure if there are -- if there are

21   differences.  But just in the time that I have here, it

22   doesn't look like there are; so I would be comfortable

23   saying that this is the copy.

24       Q.  How do you know?

25       A.  I know this is the copy that we received from him
```

 1   because the format from Dr. Jouria -- because the

 2   formatting has not yet been fixed, and it doesn't have

 3   NetCE's style, and then references haven't been

 4   formatted.  The same is true of the second copy, which

 5   is why it is my understanding they are the same without

 6   changes.

 7        So without speculating, it could have been either

 8   one of these, but I suspect that they're the same.

 9   Q.  You're going to hear this a lot during the day.

10   You're who I get to talk to.

11   A.  Yes.  I don't know that anyone else could give

12   you a better answer than that.  These courses are

13   60,000 words; so it's difficult in the time that I have

14   right now to look through every page.

15   Q.  What would you need to do to confirm what was

16   sent to the copyright office?

17   A.  I would need to know if there were differences

18   between these two courses provided.

19   Q.  As we sit here today, as it pertains to the two

20   versions you look at -- you're looking at the

21   nonantibiotic antimicrobial pharmacology article, the

22   one that began on NETCEB7- --

23   A.  -395.

24   Q.  -- -395 and the other that begins on NETCE22953,

25   can you tell us which one was sent to the copyright

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 56

 1   office, if either one?

 2      A.  In my brief review, they are the same; so it's

 3   unclear to me what the difference would be between the

 4   two.  So I can't be more specific than that.

 5      Q.  Let's take a look at the next --

 6      A.  Sure.

 7      Q.  Which I think you're going in reverse order; so

 8   this will be Exhibit 82 -- which is the --

 9      A.  Depression versus dementia in the elderly.

10      Q.  Again, the question is:  Can you tell me what was

11   sent to the copyright office as it pertains to the

12   depression versus dementia in the elderly course?

13      A.  In this case, I can tell you that this first

14   version of the course that starts NETCEB22355 is the

15   version that was submitted.  I know that it's not the

16   second version, which starts NETCEB22151, because we

17   have added page numbers; so this is an editorial copy.

18   Even if we didn't make any other changes, I know this is

19   the one that we intended to make changes to; so it would

20   have been this first copy.

21      Q.  I understand, and I appreciate your testimony

22   that it would have been the first one.

23      A.  I'm sorry.  You're right.

24      Q.  -- "would haves" and "could haves."

25      A.  It was the first one.

1    Q.  How do you know that?

2    A.  We submitted the version that was received from

3    Jouria.  This first version is the unaltered version

4    that we received from Jouria.

5    Q.  Let's move on to the next one.  In reverse order,

6    that would be Exhibit 81, the gastroesophageal reflux

7    disease article.

8        Is it all right if I call that GERD?

9    A.  Sure.

10   Q.  Same question:  What was submitted to the

11   copyright office?

12   A.  In this case, we submitted the first included

13   version, which starts NETCEB6974, to the copyright

14   office.

15   Q.  And how do you know that?

16   A.  We submitted the version that we received from

17   Jouria, and this is the unedited version of the

18   monograph that we received.

19   Q.  When you say "monograph," that's the same thing

20   as a course or an article?

21   A.  Yes, sorry.  The course.

22   Q.  We can use those terms interchangeably?  Yes?

23   A.  I do, yes.

24   Q.  We're going next to Exhibit 80, cancer and

25   chemotherapy.

1          What was submitted to the copyright office?

2     A.   In the case of this course, the first version,

3     which starts on NETCEB6284, was submitted to the

4     copyright office.

5     Q.   And how do you know that?

6     A.   This is the unedited version of the course that

7     we received from Jouria, and that's what we submitted.

8     Q.   Take a look at the last one, Exhibit 79,

9     traumatic brain injury or TBI.

10         What was submitted to the copyright office?

11    A.   In this case, the first version of the course,

12    starting on NETCEB7757, that was the version of the

13    course that was submitted to the copyright office.

14    Q.   And how do you know?

15    A.   This is the unedited course that we received from

16    Dr. Jouria.

17    Q.   Did you submit these courses to the copyright

18    office?

19    A.   I did not physically submit them, no.

20    Q.   Who did?

21    A.   These five courses were submitted by my editorial

22    assistant, C.C. Chernev.

23    Q.   And how do you know what C.C. Chernev submitted?

24    A.   We have a written process in place for -- for

25    submitting copyright, and I specifically instructed her

 1   to submit the unedited versions received from the

 2   author.

 3       Q.  And how do you know that she followed your

 4   instructions?

 5       A.  She told me that she completed it as I instructed

 6   her to.

 7       Q.  Did she submit these materials electronically, or

 8   did she mail them in?

 9       A.  The trademark office requires that we mail the

10   specimens; so the specimens were mailed, but the filing

11   was done electronically.

12       Q.  Who printed and mailed these specimens?

13       A.  C.C. Chernev.

14       Q.  Did you speak with C.C. Chernev before the

15   deposition here today about this issue?

16       A.  Yes.

17       Q.  When did you speak with her?

18       A.  I -- specifically about the copyright issue?  I

19   talked with C.C. about the submission after she sent the

20   materials, which would have been in 2015, and then upon

21   receipt of the registrations, which is generally six to

22   eight months after submission of the registration.

23       Q.  Looking back to Exhibit 42, which is the

24   third-party complaint against NetCE -- do you still have

25   that in front of you?

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                     Sarah Campbell on 11/14/2017                     Page 60

1    A.  I do.

2    Q.  If you turn to paragraph 55 -- excuse me,

3    paragraph 54, the last sentence of the allegations in

4    paragraph 54 says, "NetCE came to believe that

5    Dr. Jouria copied sections of his submissions from a

6    variety of difference sources."

7         Do you see that?

8    A.  I do.

9    Q.  In paragraph 55, the first sentence, it says,

10   "Dr. Jouria's works were littered with plagiarized

11   content."

12        Do you see that?

13   A.  I do.

14   Q.  These are allegations made by NetCE in this case.

15        So my question is:  Which parts of what NetCE

16   submitted to the copyright office does NetCE claim to

17   own?

18   A.  We -- the materials that we submitted to the

19   copyright office are owned by NetCE with the caveat that

20   there may be and likely are materials that we -- that

21   are copied from third sources that we would seek

22   permission and cite appropriately prior to publication

23   but that we weren't able to do.  We generally would do

24   that before filing for copyright, which would happen

25   later in course development, but, in this case, because

Case 0:15-cv-61165-WPD  Document 337-1  Entered on FLSD Docket 05/26/2018  Page 61 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 61

 1   he had already published the materials or tried to

 2   publish them, we sought copyright registration earlier

 3   with the knowledge that we would do the due diligence

 4   for those sections that require permission to reprint.

 5       Q.  For each of the five courses at issue between

 6   Elite and NetCE, as reflected in Exhibit 79 to 83, has

 7   NetCE performed the due diligence that you just

 8   described?

 9       A.  We have for some of them but not all of them.

10       Q.  The courses that NetCE submitted to the copyright

11   office, as evidenced in Exhibit 79 to 83, contain

12   third-party content; isn't that correct?

13       A.  We suspect that it's correct for all of them, but

14   we only know that that's true for some of them.

15       Q.  Which ones do you know it's true, and which ones

16   do you suspect it's true?

17       A.  For cancer and chemotherapy and GERD, we had

18   located the information that we knew had been copied,

19   and it had either been edited to ensure that it wasn't

20   plagiarized, or we had sought permission or were

21   planning to seek permission to reprint.

22            For the other three courses, traumatic brain

23   injury, depression versus dementia in elderly, and

24   nonantibiotic antimicrobial pharmacology, we hadn't

25   gotten that far in the development process.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

**Sarah Campbell on 11/14/2017**

```
1      Q.  In your applications that NetCE submitted to the

2   copyright office for registration of these five courses,

3   did NetCE indicate that there were materials being

4   submitted that did not belong to NetCE and indeed were

5   authored by someone else?

6      A.  I am not sure.

7      Q.  And NetCE never requested permission from any

8   third parties to submit materials containing that

9   third-party information to the copyright office;

10  correct?

11     A.  We sought permissions for the materials located

12  in a GERD course to reprint in our materials and were

13  paid for and were issued that permission.  The

14  information in the cancer and chemotherapy course we had

15  not yet obtained permission, and the other three, we're

16  not aware of specific materials that are plagiarized.

17     Q.  For the courses where you received some

18  permissions, did those third-party content owners, as

19  I'll call them, require that you provide citations to

20  their materials in your courses?

21     A.  I don't recall specifically, but that is the

22  usual process.

23     Q.  Did you add the -- any citations to the materials

24  before they were submitted to the copyright office?

25     A.  No.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

1    Q.  And did you get any permissions from any third

2    parties before submitting materials for these five

3    courses to the copyright office?

4    A.  We obtained some permissions for the -- in the

5    GERD course -- in the case of the GERD course, those had

6    been obtained prior to submission to the copyright

7    office, but not the other -- not the other four courses.

8    Q.  So just so I'm clear, you obtained some

9    permissions for the GERD course, but no citations were

10   added to the materials before they were submitted to the

11   copyright office?

12   A.  Well, we have -- we had submitted Jouria's

13   original draft; so the original draft didn't include the

14   necessary references to the sources of the material.

15   Those were added, and we would have sought an additional

16   copyright after our edits were done.

17         That's not our usual process.  We would usually

18   wait until all the changes were made, but, in this case,

19   it required a deviation from the usual process.

20   Q.  Just so we're clear, you have not sought any

21   additional copyright registrations for any materials

22   related to these five courses in Exhibits 79 to 83;

23   correct?

24   A.  That's correct.

25   Q.  And for those -- and I believe it's only one

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1  course where you received permissions ahead of time --

2  that being the GERD course -- no part of what Dr. Jouria

3  submitted to you was changed before you submitted it to

4  the copyright office; correct?

5      A.  That's correct.  We submitted his drafts to the

6  copyright office.

7      Q.  So I'll come back again to my question earlier,

8  which is:  For each of the five courses before you,

9  which parts of what NetCE submitted to the copyright

10 office does NetCE claim to own?

11     A.  As far as we know, we own the content as it was

12 provided to us under contract by Dr. Jouria.  We would

13 do additional due diligence to determine if any of that

14 content was -- required a permission to reprint from

15 another copyright holder.  But as it was provided to us

16 by Dr. Jouria, there isn't specific notations of those

17 sections.

18     Q.  So let's take them one at a time.

19         For the GERD course, which is in Exhibit 81, you

20 testified that you identified third-party content in

21 what Dr. Jouria submitted to you and sought permission

22 from one or more third parties to use that content;

23 correct?

24     A.  That's correct.

25     Q.  How many different third parties did you seek

 1    permission from for the GERD course?

 2       A.  I don't know the specific number.  I can give you

 3    a range, if that would be helpful.  I believe it is

 4    between three and ten.  It is -- it is between three and

 5    ten.  Excuse me.

 6       Q.  So for the GERD course, NetCE doesn't claim

 7    ownership to the portions of what Dr. Jouria submitted

 8    that includes third-party content from these three to

 9    ten third parties; correct?

10       A.  That's correct.

11       Q.  Which parts of the GERD course reflect

12    third-party content?

13       A.  In the case of this course, it would be several

14    of the tables.  We did not seek permission to reprint

15    content.  If there was substantial similarities in the

16    content, it was rewritten by our editors.

17            But if the tables were copied from a source, we

18    went to the source and requested permission to reprint.

19    So several of the tables.

20       Q.  And I understand what you sought permission to

21    use.  My question was a bit different.

22            My question is:  What is it that NetCE claims to

23    own?  And for the GERD article, NetCE does not claim to

24    own content that was in what -- in what Dr. Jouria

25    provided to NetCE where the content was from third

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 66

```
 1   parties; correct?

 2      A.  We do not claim to own plagiarized content.

 3   That's correct.

 4      Q.  And that applies to all five of the articles at

 5   issue between NetCE and Elite; correct?

 6      A.  That is correct.

 7      Q.  So you sought permission to use some of the

 8   tables in the GERD article, but there was other content

 9   in what Dr. Jouria provided to you that you identified

10   as what you called plagiarized content; correct?

11      A.  There were other sections that appear to be

12   similar or the same as other sources.  It is possible

13   that those sources were free use or that they were not.

14   That would have to be analyzed according to source.

15      Q.  Has NetCE done any sort of analysis for the GERD

16   course or any of the other four to determine what it

17   owns and what it does not vis-à-vis what it sent to the

18   copyright office from Dr. Jouria for each of these

19   courses?

20              MR. KERN:  Objection.  Vague and ambiguous.

21   BY MR. WILSON:

22      Q.  Did you understand my question?  Because if it is

23   vague and ambiguous, I will try my best to reword it.

24      A.  Sure.  Go ahead.

25      Q.  Has NetCE done any analysis to determine which
```

 1    content was plagiarized content and which content was

 2    from Dr. Jouria -- original to Dr. Jouria for any of the

 3    five courses at issue between NetCE and Elite?

 4        A.  These courses have been run through a program

 5    called iThenticate, which does some analysis in terms of

 6    similar or identical content, and it gives a report that

 7    provides information about the source of those

 8    similarities.  However, iThenticate does not qualify

 9    whether those sources allow for use or not.

10            So, yes, some analysis had been done, but the

11    final decisions in analysis require personal

12    intervention.

13        Q.  So has NetCE performed a final analysis using

14    personal intervention to determine what parts of each of

15    the courses reflected in Exhibit 79 to 83, that NetCE

16    submitted to the copyright office, NetCE owns?

17                MR. KERN:  I am going to object that it

18    assumes facts.

19                MR. ROSS:  What's the objection, John?

20                MR. KERN:  That it assumes facts.

21                MR. ROSS:  Thank you.

22                THE WITNESS:  Can you repeat the question?

23                MR. WILSON:  I'm not sure if I can.

24    BY MR. WILSON:

25        Q.  So has NetCE performed a final analysis using

Case 0:15-cv-61165-WPD  Document 337-1  Entered on FLSD Docket 05/26/2018  Page 68 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                             Page 68

```
 1   personal intervention -- those were your words -- to
 2   determine what parts of each of the courses NetCE owns?
 3              MR. KERN:  Assumes facts.
 4              MR. WILSON:  What facts are you talking
 5   about?
 6              MR. KERN:  That personal intervention and
 7   analysis is required to testify about ownership.
 8              MR. WILSON:  Those were her words.
 9              MR. KERN:  No.  She was talking about
10   publication and finding plagiarized content versus
11   original, but NetCE owns a copyright to the entire
12   expressive work that range from the literature; so your
13   questions are assuming facts.
14   BY MR. WILSON:
15     Q.  So has NetCE performed an analysis to determine
16   what parts of the five articles at issue between NetCE
17   and Elite are plagiarized and which parts are original
18   to Dr. Jouria?
19     A.  We have done an analysis, but I can't say that we
20   have come to a conclusion on any of the courses in the
21   drafts that we submitted to copyright.
22     Q.  We talked a lot about -- well, let's take a
23   break.  She has to change the tape.
24              THE VIDEOGRAPHER:  The time is 11:18 a.m.,
25   and we are off the record.
```

```
 1                  (Off the record.)

 2              THE VIDEOGRAPHER:  This is the beginning of

 3     media number 2 in the deposition of Sarah Campbell.  The

 4     time is 11:24 a.m., and we're back on the record.

 5     BY MR. WILSON:

 6       Q.  Before we broke, we were talking about, I think,

 7     in particular, the GERD article in front of you.

 8       A.  Okay.

 9       Q.  I understand that, for the GERD article, NetCE

10     obtained some permissions to reuse some content;

11     correct?

12       A.  That's true.

13       Q.  When requesting permission, did NetCE get

14     permission to file a copyright application for the

15     course containing the third-party materials?

16       A.  Not explicitly, but I have never seen that asked

17     on a copyright.

18       Q.  Were there any other articles of the five that

19     are at issue between NetCE and Elite where NetCE

20     requested permission to use third-party content?

21       A.  We had not yet done that, no.

22       Q.  Turning again to the third-party complaint --

23     it's Exhibit 42, paragraph 55 -- we read the first

24     sentence before.

25              It says, "Dr. Jouria's works were littered with
```

 1   plagiarized content."

 2          The next sentence says, "NetCE utilized a

 3   plagiarism detection program called iThenticate to

 4   identify areas that were copied in essence or exactly

 5   and then removed offending passages, and in some cases,

 6   obtained the original author's permission to reprint

 7   them."

 8          Do you see that?

 9   A.  I do.

10   Q.  We know now that it was for one course where you

11   obtained the original author's permission; correct?  And

12   that was GERD.

13   A.  Of these five courses, yes, that's true.

14   Q.  It also says in paragraph 55 that NetCE removed

15   offending passages.

16          For the five courses at issue between NetCE and

17   Elite, did NetCE remove offending passages as alleged

18   here?

19   A.  In the GERD course and in the cancer and

20   chemotherapy course, offending passages were removed

21   through editorial work.  The other three courses had not

22   yet been edited.

23   Q.  And were the offending passages removed prior to

24   when the five courses were submitted for registration to

25   the copyright office?

1    A.  The drafts submitted to the copyright office did

2  not include NetCE edits.

3    Q.  So we're clear, the offending passages were not

4  removed before NetCE submitted these five courses to the

5  copyright office; correct?

6    A.  The copies submitted to the copyright office had

7  no editorial changes.

8    Q.  So I think my answer is correct.  Yes?

9    A.  Well --

10          MR. KERN:  Mark, she answered the question.

11  The question assumes facts that all five contained

12  plagiarized content, and she testified earlier that she

13  only knew of two.  It may have been all five.

14  BY MR. WILSON:

15    Q.  I'll ask it -- and I'll go one by one if we have

16  to, and I'll ask it in yes-or-no format.

17          NetCE did not remove the offending passages that

18  contained plagiarized content before submitting

19  specimens for registration for these five courses to the

20  copyright office; correct?

21    A.  The specimens that were submitted to the

22  copyright office did not have any changes.  We may have

23  done editorial work for versions not included in those

24  submissions, but the specimens submitted to the

25  copyright office had no editorial changes.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

**Sarah Campbell on 11/14/2017**

```
 1      Q.  So the offending passages for plagiarized content

 2   were included in what NetCE submitted to the copyright

 3   office; correct?

 4      A.  I'm only aware of definite passages in the GERD

 5   course.

 6          In the cancer and chemotherapy course, those were

 7   submitted as we received them from Jouria.

 8          The other three courses, I don't know whether or

 9   not there were offending passages that were -- had not

10   yet been done.

11      Q.  So sitting here today, NetCE does not know

12   whether the traumatic brain injury course, the

13   depression versus dementia in the elderly course, or the

14   nonantibiotic antimicrobial pharmacology course includes

15   content plagiarized by any third parties?

16      A.  From third parties?

17      Q.  From third parties.

18      A.  We do not know for sure.

19      Q.  You suspect that's the case?  Yes?

20      A.  Based on our previous work on Dr. Jouria's

21   courses, I suspect there may be, but I don't know for

22   sure.

23      Q.  So in paragraph 55 of the complaint in

24   Exhibit 42, the first sentence, "Dr. Jouria's works were

25   littered with plagiarized content," are you referring to
```

 1   all of the works or certain works?

 2      A.   I can't quantify "littered."  So I can say that,

 3   on the courses that I specifically read and edited,

 4   there were clearly sections that were plagiarized

 5   content without -- without sourcing.

 6         But on -- in the courses that I've not yet

 7   edited, I don't know whether or not they are littered

 8   with plagiarized content.

 9      Q.   For any of the five courses at issue between

10   NetCE and Elite, did NetCE undertake any sort of

11   analysis to determine how much in each course was

12   plagiarized?

13      A.   Again, so we run the courses through the

14   iThenticate program which identifies similarities, exact

15   or in essence.  But -- and it gives -- and it will

16   provide you with the source information.  Each of these

17   courses is run through the iThenticate program.

18         However, whether or not that content that appears

19   to be similar or the same is plagiarized is dependent on

20   the source, and that requires analysis that wasn't yet

21   done in the case of depression versus dementia in the

22   elderly, nonantibiotic antimicrobial pharmacology, and

23   traumatic brain injury.  So we do get a quantified

24   number, but it doesn't really tell you exactly

25   plagiarism.

1    Q.  And so we're clear, the iThenticate program that

2    you're talking about only searches web crawlable text;

3    correct?

4    A.  That is correct.  Yes.

5    Q.  It does not search PDFs or books or print-only

6    materials; correct?

7    A.  I can't answer that for sure.  There may be some

8    books or PDFs that it is able to access.  You would have

9    to -- that's an iThenticate question really how their

10   software works.

11   Q.  The iThenticate process isn't perfect for

12   identifying plagiarized content.  Is that fair to say?

13   A.  It is not perfect.  It's a tool that we use as

14   part of our overall process.

15   Q.  So what part of your overall process was not

16   completed for these five courses?

17   A.  Well, there were different stages in the process;

18   so the three courses -- nonantibiotic antimicrobial

19   pharmacology, depression versus dementia in the elderly,

20   and traumatic brain injury -- had only very minimal work

21   done that included running it through iThenticate and

22   also ensuring that the necessary components were

23   included.  But no additional work was done to identify

24   or remediate copied or plagiarized passages.

25           In the case of cancer and chemotherapy, it was a

Case 0:15-cv-61165-WPD Document 337-1 Entered on FLSD Docket 05/26/2018 Page 75 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                     Sarah Campbell on 11/14/2017                     Page 75

 1    pretty in-depth editorial.  Runthrough was done by one

 2    of our independent contractors, and she did some work to

 3    rewrite or remediate sections that appeared to be

 4    similar with no judgment as to whether it was

 5    plagiarized or not.  Whether material is free use and

 6    therefore not plagiarized -- we would prefer not to use

 7    it in any case.  But I hadn't done the second review or

 8    the final review.

 9          In the case of the GERD course, it had been

10    substantially rewritten.  We would have done another

11    iThenticate review because the changes were so

12    extensive.  That was not done immediately.  We would

13    usually do that prior to releasing it to the public.

14    And there was one other thing with the GERD course.

15          There were also sections during my editorial

16    process with the GERD course that I thought needed

17    references.  And during that process, I would search for

18    it and potentially find additional matches that weren't

19    identified by iThenticate.  And that happens as part of

20    our normal process, and that happened with the GERD

21    course.

22    Q.  We can take them one at a time if we have to.  I

23    just want to make sure that I'm clear on the development

24    of these various courses.

25          None of them have been fully edited; is that

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

1    correct?

2      A.  None of them were ready for publication.  That's

3    correct.

4      Q.  None of them had been approved for publication by

5    NetCE or anyone else; correct?

6      A.  Well, they were accepted for publication when we

7    received the drafts from Dr. Jouria, but none of them

8    were ready to be printed and presented to the public.

9    That's correct.

10     Q.  So they hadn't been fully edited?

11     A.  The editorial process was not complete for any of

12   these five courses.

13     Q.  All permission had not been obtained?

14     A.  Not for all of the courses, no.

15     Q.  Had all of the permissions been obtained for any

16   of the courses?

17     A.  All of the necessary permissions, as far as we

18   knew, were obtained for the GERD course but not for the

19   other four courses.

20     Q.  None of the courses had been returned to

21   Dr. Jouria for final approval; correct?

22     A.  That's correct.

23     Q.  And if you look at -- pick a course.  Exhibit 81,

24   which is the GERD course, at the end, you'll see a

25   development status form.  That one in particular -- I

 1   don't see a Bates label on it.

 2     A.  No.

 3     Q.  But I promise you I didn't find that on my own.

 4     A.  Do you want the one right before it?

 5     Q.  That's a checklist for all the steps that have to

 6   be done to get an article from submission to

 7   publication; isn't that correct?

 8     A.  It is a general checklist that we use, yes.

 9     Q.  And for all of the courses in front of you, these

10   five courses, the checklist ends at "draft manuscript

11   received" and "payment issued" with lots of -- lots of

12   blanks; isn't that correct?

13     A.  Can I check all of them?

14     Q.  Please do.

15             MR. ROSS:  Mark, what's the Bates number on

16   that?

17             MR. WILSON:  I don't have a Bates number,

18   Richard.  It was part of the courses.

19             MR. ROSS:  I have the GERD course.  Can you

20   point to it in there?

21             MR. WILSON:  Yeah, for the GERD course, the

22   document immediately preceding it was Bates labeled

23   NETCEB --

24             MR. KERN:  -24582.

25             THE WITNESS:  Oh, this one has one.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1              Okay.  Yes, that's correct.
 2    BY MR. WILSON:
 3       Q.  So what -- what was left to get these courses
 4    approved for publication?
 5              MR. KERN:  Object to the use of the term.
 6    Lacks foundation.  I don't know what that means.  Why
 7    don't you define it.
 8    BY MR. WILSON:
 9       Q.  Go ahead.
10       A.  So all of those courses have been, in essence,
11    approved for publication.  Our intent was to publish
12    them, and we wouldn't undertake these steps unless that
13    was -- they were approved to move forward.  And, in
14    fact -- it's not included in here, but it's part of our
15    checklist.
16       Q.  What's part of your checklist?
17       A.  Approval for publication.
18       Q.  Look for each of those courses and tell me if you
19    see a checklist that reflects that any of these courses
20    were approved for publication.
21       A.  Sure.  On Bates number NETCEB24806 in the GERD
22    course, at the bottom of the manuscript checklist, it
23    says "draft accepted."
24       Q.  That doesn't say "approved for publication," does
25    it?
```

1    A.  That's not terminology that we use as part of the

2    development process.  When we accept a manuscript and

3    issue payment to the author, that is our signal that it

4    has been accepted for publication.

5    Q.  So your testimony is that the words "approved for

6    publication" are not terminology that NetCE uses; is

7    that correct?

8            MR. KERN:  Misstates testimony.

9            THE WITNESS:  No, no, that's not terminology

10   that we use in our development process.  I know that it

11   does appear in our freelance writers' agreements.

12           (Exhibit No. 84 marked for identification.)

13   BY MR. WILSON:

14   Q.  Handing you what's been marked as Exhibit 84.

15   Exhibit 84 is a document that begins on NETCEB29016.

16   It's from NetCE, and it's called "division plan or

17   course approval," and this one, in particular, is for a

18   course entitled "chronic obstruction" -- "obstructive

19   pulmonary disease, COPD."

20       Do you recognize that document?

21   A.  I do.

22   Q.  This is a document from NetCE?

23   A.  It is.

24   Q.  You'll see about midway through the page, there's

25   a box that's checked "approved for publication."

1          Do you see that?

2      A.  I do.

3      Q.  And this one in particular in front of you, it

4  says, "Approved for publication with changes.  See

5  manuscript pages."  Yes?

6      A.  Yes.

7      Q.  So there is a way where NetCE does actually use

8  the words "approved for publication" as part of the

9  development of courses; isn't that correct?

10     A.  When I was talking about development of courses,

11 I meant our editorial process.  This is actually a

12 planner for reviews and approves for publication for

13 their specific profession.

14         So in terms of accepting a document and moving

15 forward with it, I don't necessarily consider this

16 division planner course approval form to be part of that

17 process.  It's kind of part of our accreditation or

18 designation of credit process.  But we do use that

19 terminology in our evaluations with the planners.

20 That's true.

21     Q.  And are there documents like what's shown in

22 Exhibit 84 -- yes, 84 -- for any of the five courses at

23 issue between NetCE and Elite?

24     A.  No, not yet.

25     Q.  So as it pertains to this step in the preparation

1    of courses by NetCE, the five courses at issue here had

2    not been approved for publication; correct?

3        A.  This only approves the course for publication --

4    this specific example for surgical technologists.  It

5    doesn't -- it's approving it for outreach to a specific

6    audience.  It doesn't decide whether or not it's

7    published in general.

8            This is specific to this planner's profession,

9    and that had not yet been done for the five courses in

10   terms of designation of credit or which professions

11   would receive access.  That's true.

12       Q.  So according to you, when are courses -- when was

13   each of the courses in front of you, to use your words,

14   accepted for publication?

15       A.  We accept courses for publication at the time

16   that the draft is received in its entirety that we --

17   that we are sure that all of the components are present,

18   and we pay the freelance author, which would complete

19   the contract process, as far as I understand it.

20       Q.  Not all accepted courses get published; correct?

21       A.  It is our intent to publish all accepted courses,

22   but there's no timeline in terms of when they will be

23   released.

24       Q.  Please listen to my question.

25           Not all courses get published; correct?

```
 1      A.  Can you be more specific?  All courses --

 2      Q.  Not all courses submitted to NetCE get published.

 3      A.  That's true.

 4      Q.  And the five courses in front of you were never

 5  published; correct?

 6      A.  We had not yet printed or released them to the

 7  public.

 8      Q.  And indeed for, at least three of them, there was

 9  a whole lot more work that needed to go into preparing

10  the courses for publication; correct?

11      A.  That is correct.

12      Q.  And for the other two, that being GERD and cancer

13  and chemotherapy, there were still significant steps on

14  the checklist that hadn't been satisfied prior to work

15  being stopped on the courses; correct?

16      A.  There was still work to be done on both of those

17  courses.

18      Q.  So there was work to be done on all five courses

19  before these courses could be published; right?

20      A.  That's correct.

21      Q.  Take a look -- if you take back -- take a look

22  back at the complaint, Exhibit 42 and Exhibit A to

23  Exhibit 42, which is the copyright registration

24  certificates for each of the five courses at issue here.

25  Each of them lists a publication date.
```

```
 1          Do you see that?

 2     A.   I do.

 3     Q.   If none of the five courses had been published,

 4   why did NetCE tell the copyright office that they had

 5   been?

 6     A.   I don't feel like I have a strong enough

 7   knowledge of copyright law to answer that question.

 8     Q.   Where do the dates come from?

 9     A.   Those are the dates that we received final drafts

10   from Dr. Jouria.  It appears that those are the dates.

11   Let me double-check.  That's -- that is what I -- it's

12   in the ballpark of when we received the drafts if it's

13   not the exact date.

14     Q.   I hope you appreciate that "in the ballpark"

15   doesn't work for us.

16          So my question is:  Where do the dates come from?

17     A.   They are the dates on or around the date we

18   received the drafts from Dr. Jouria.

19     Q.   Who selected those dates?

20     A.   They were -- the form was filled out by C.C.

21   Chernev on my instruction.

22     Q.   Looking at the depression versus dementia

23   article -- that's Exhibit 82 -- Dr. Jouria submitted

24   this to NetCE on April 16th of 2013, yet the copyright

25   registration reflects a date of publication of April 18,
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

Sarah Campbell on 11/14/2017

1    2013.

2         Do you know why the difference?

3    A.  I don't know specifically.

4    Q.  If you take a look at the cancer and chemotherapy

5    article -- it's Exhibit 80 -- Dr. Jouria sent this to

6    NetCE on March 11th of 2013, yet the copyright

7    application -- excuse me -- the copyright registration

8    lists a date of first publication of March 21st, 2013.

9         Do you know why the difference?

10   A.  I don't know specifically.

11   Q.  If you take a look at the GERD article,

12   Dr. Jouria submitted it to NetCE on May 9th of 2013, yet

13   the copyright registration lists a date of publication

14   of May 15, 2013.

15        Do you know why the difference?

16   A.  I don't know specifically.

17   Q.  You keep saying the word "specifically."

18   A.  I could speculate, but I would rather not.

19   Q.  So the answer is you don't know?

20   A.  I don't know it without speculation, yes.

21   Q.  If you take a look at the traumatic brain injury

22   course, Dr. Jouria submitted this to NetCE on

23   October 25th of 2012, yet the copyright registration

24   lists a date of first publication of December 20th of

25   2012.

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 85 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

1        Do you know why the difference?

2    A.  I don't know specifically.

3    Q.  The last one is the nonantibiotic antimicrobial

4    course.  That enlists a date -- excuse me.  NetCE

5    sent -- excuse me.  Dr. Jouria sent it to NetCE on

6    January 8th of 2013.  And the copyright registration

7    lists a date of first publication of January 17th of

8    2013.

9        Do you know why the difference?

10   A.  I don't know specifically.

11   Q.  Who at the company, if anyone, would know?

12   A.  I would know with additional research.

13   Q.  With all do respect, you were designated to

14   testify about issues related to the copyright

15   registrations, and you're who I get to talk to.

16       So what else would you need to do to educate

17   yourself to testify on this topic?

18   A.  I would need to see the date that the documents

19   were saved from the e-mails and downloaded it to our

20   network.

21   Q.  If you take a look back at Exhibit 75, it's

22   NetCE's interrogatory responses to Elite's

23   interrogatories.  Take a look at NetCE's response to

24   interrogatory number 6.  On page 10, there's a paragraph

25   that states, "When the infringement was discovered,

 1    Ms. Campbell conducted a visual side-by-side comparison

 2    of the NetCE drafts in the impermissibly published Elite

 3    courses."

 4         Do you see that?

 5    A.  I do.

 6    Q.  Did you conduct a side-by-side comparison as

 7    stated in this interrogatory response?

 8    A.  I did.

 9    Q.  Had you concluded, at that time, that there was

10    already infringement?

11    A.  I had done some additional work.  I -- I am not

12    sure if it was before or after I compared the two

13    drafts, but I did not immediately assume that we were

14    necessarily the copyright holders.  I investigated

15    whether or not it was possible that he -- that

16    Dr. Jouria had sold the courses to Elite first and then

17    to us.  But I determined that the dates indicated that

18    we were the first copyright holders.

19         And then I did some additional search to

20    determine if the materials were published somewhere

21    else, if there was possibly another copyright holder,

22    but there was no -- I wasn't able to find another place

23    where the material that I had initially discovered was

24    printed, other than the Elite course.

25         So then, at some point during the investigation,

```
 1    I compared the NetCE drafts and the Elite courses in a
 2    visual side-by-side comparison.
 3        Q.  Where did you get the Elite courses that you used
 4    for your side-by-side comparison?
 5        A.  From their Web site.
 6        Q.  Did you print them?
 7        A.  I did print them, yes.
 8        Q.  Did you make notes on them?
 9        A.  Not that I recall, no.
10        Q.  Whatever you printed, was it produced to us in
11    this case?
12        A.  I do not know.
13        Q.  Where would you need to look to find out?
14        A.  I would have to look at our -- the documents we
15    provided.
16        Q.  Have you looked at the documents you provided?
17        A.  I looked at them in their entirety but not
18    specifically.
19        Q.  Would you be able to tell by that review whether
20    the materials that you printed from Elite were included
21    in the production?
22        A.  Yes.
23        Q.  Was your comparison a line-by-line comparison
24    throughout the entirety of the articles that you were
25    reviewing?
```

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 88 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Page 88

1      A.   No.

2      Q.   Tell me about your comparison then.

3      A.   I did a side-by-side comparison of several pages

4  and sections of the courses that I was able to access.

5  There were two that I was unable to access but that had

6  similar topics, but those are no longer in play here.

7           So of the five that we're talking about here, I

8  did go through -- and it's additional courses on Elite's

9  side because some of them are multiple parts.  But of

10  the five NetCE courses, I did go through and do a

11  comparison on several pages, and I would do spot checks

12  throughout to see if there were similarities and found

13  the same or similar content in -- for all five of the

14  courses.

15      Q.   So we're clear, for the two articles that are no

16  longer part of the case, you did not perform a

17  side-by-side comparison; is that correct?

18      A.   For those two, I was not able to.  That's true.

19      Q.   So on what did you base your claims for

20  infringement in this lawsuit on if you hadn't compared

21  the courses published by Elite?

22      A.   The similar topic areas and content and then the

23  background of the -- of the other five courses being

24  apparently copied indicated that those two likely had

25  significant sections that appeared in both.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                      Page 89

 1    Q.  With all do respect, you hadn't even seen them.
 2  How could you even come close to making that kind of a
 3  conclusion?
 4            MR. KERN:  Asked and answered.
 5            THE WITNESS:  I could see the learning
 6  objectives, and the learning objectives are an
 7  indication of the content and the outline.  And the
 8  learning objectives included content that overlapped
 9  with our courses, and that's how I made that
10  determination.
11  BY MR. WILSON:
12    Q.  In this interrogatory response here, number 6,
13  you state, "Significant sections of these courses appear
14  to be featured in what Elite published."  That's for the
15  two courses that are no longer part of the case.
16        What is the basis for that statement if you
17  hadn't even seen the courses?
18    A.  I base that on seeing learning objectives.  The
19  learning objectives would indicate the content that
20  appeared in the course.  And based on our discovery that
21  the other five courses were copied in part or entirely,
22  we had an indication that sections of the courses
23  appeared to be featured in the Elite courses.
24    Q.  You brought claims in a federal lawsuit without
25  knowing whether there were substantial similarities

1    between what you were claiming copyright rights in and

2    what you were suing; isn't that correct?

3        A.  We made claims based on the information and

4    knowledge that we had at the time.

5        Q.  And at the time, you hadn't even reviewed the

6    course that you were suing, saying that it's

7    substantially similar; isn't that correct?

8        A.  We didn't have access or the ability to do that.

9        Q.  This is a yes-or-no question, ma'am.

10           MR. KERN:  Answer it however you want,

11   Sarah.  Don't let him tell you how to answer it.

12   BY MR. WILSON:

13       Q.  You hadn't even looked at it, and you filed a

14   federal cause of action against Elite; isn't that

15   correct?

16           MR. KERN:  Claim for relief.

17           THE WITNESS:  We were not able to view the

18   contents specifically, but we could view components that

19   gave us an indication that there could have been and

20   appeared to be significant overlap.

21   BY MR. WILSON:

22       Q.  There could have been, but you had no indication

23   that there appeared to be; isn't that correct?

24           MR. KERN:  Mark, this has been asked and

25   answered four times.  This is just theater.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                   Sarah Campbell on 11/14/2017                   Page 91

```
 1              MR. WILSON:  I am using her words.

 2              MR. KERN:  You've asked and answered --

 3              MR. WILSON:  You may not like it, but I'm

 4    going to continue to ask it as many times as I want.

 5              MR. KERN:  This is just pure theater.  She's

 6    answered it four times.

 7    BY MR. WILSON:

 8       Q.  On what basis can you say there appeared to be

 9    substantial similarities in significant sections when

10    all you saw were the objectives?

11              MR. KERN:  Asked and answered.

12              Go ahead.

13              THE WITNESS:  The two topics in question had

14    overlap, and the components of the course that we were

15    able to see, which included the learning objectives,

16    indicated that the sections of the course had -- could

17    have a significant overlap and appeared to be featured

18    in the Elite courses.

19    BY MR. WILSON:

20       Q.  So you drew your conclusion based off of the

21    title and the headings, isn't that correct?

22       A.  Well, learning objectives aren't headings.

23    They're behavioral -- it's basically an outline of the

24    content driven by behavioral objectives; so we -- that's

25    what it was based on.
```

1     Q.  Is it your testimony that the learning objectives

2  between what NetCE was claiming rights in for these two

3  courses and what Elite published were the same or

4  substantially similar?

5     A.  I am not making that claim right now.  I am

6  saying that the learning objectives gave us some insight

7  into what content would be included in the course, and

8  we were able to use that information to see that

9  significant sections appeared to be featured in the

10 Elite courses.

11    Q.  So in this interrogatory response -- this is

12 interrogatory number 6 -- when it talks about you

13 conducting a visual side-by-side comparison of the NetCE

14 drafts and the impermissibly published Elite courses,

15 that does not pertain to the two courses that were

16 recently dismissed from the case; is that correct?

17    A.  I was not able to do a comparison for those two

18 courses.  That's correct.

19    Q.  And where in this interrogatory response does it

20 say that?

21    A.  I don't believe it's in this response

22 specifically.  It is not.

23    Q.  Indeed, it says that, "The remaining two

24 courses" -- which the two courses are the lymphatic and

25 immune systems and cardiovascular pharmacology -- "were

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1    not preprinted verbatim."

 2          Do you see that?

 3    A.  I do.

 4    Q.  How could you make that conclusion when you

 5    hadn't even seen the courses from Elite?

 6    A.  Based on the learning objectives, I could see

 7    that there was some content that was unique to the Elite

 8    courses or was not covered in the drafts that we

 9    received from Jouria, but there appeared to be sections

10    that were the same or similar to sections that were in

11    the course -- the drafts that we received, and that is

12    how we made that determination.

13    Q.  Also in interrogatory number 6 on page 10, you

14    say, "The similarities between the two sets of courses,

15    visible through a side-by-side comparison, were and are

16    apparent, remarkable, and extensive."

17          Do you see that?

18    A.  I do.

19    Q.  That's not true for two of the articles that were

20    previously part of this case, those being the lymphatic

21    and immune systems and cardiovascular pharmacology

22    articles; isn't that true?

23    A.  Those two, we were not able to do the visual

24    side-by-side comparison; so that is true.

25    Q.  You then say, "Each of the infringing courses

 1    exhibit literal and nonliteral similarity, copying of

 2    whole swathes of text from NetCE's copyrighted courses,

 3    copying the organization of the courses, and/or

 4    paraphrasing large passages leaving the essential

 5    expression unchanged."

 6         Do you see that?

 7    A.   I do.

 8    Q.   Again, that's not true for the two dismissed

 9    articles, is it?

10    A.   That is not true for the dismissed articles.

11    When we received additional information, we acknowledged

12    that the two Elite courses appeared to be different, and

13    that's why they were dismissed.

14    Q.   They should have never have been part of the

15    case; isn't that true?

16    A.   Well, we wouldn't have any way of knowing that

17    until we got the information that resulted from this

18    case.

19    Q.   How about you try this next time:  Investigate

20    first and sue later.

21         MR. KERN:  No question.  Ignore him, Sarah.

22    Wait until he asks a question.

23         We're ready to take a lunch break whenever

24    you guys are ready.

25         MR. WILSON:  No.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1          MR. KERN:  Next chance --

2   BY MR. WILSON:

3      Q.  So tell us everything you can about the

4   comparison you performed for each of these five courses.

5      A.  Can you repeat that?  Sorry.

6      Q.  Tell us everything you can about the comparison

7   that you say you performed for the five courses still at

8   issue in the case.

9      A.  For these five courses, when we -- when I

10  identified the possibility of copying or similarities, I

11  would take our copy and the Elite copy and went through

12  comparing text specifically.  And I did use the Jouria

13  version that we received -- the draft we received.  If

14  there were edits, for example, to the GERD course or the

15  cancer and chemotherapy course, I used the previous

16  version we had received from Jouria.  And I just went

17  through several pages comparing texts and noting

18  differences, and then I did spot checks kind of flipping

19  forward to see if it continued into the course.

20          Some of these courses are extensively long; so I

21  did not continue to do every single page of every single

22  word, but I did do a visual side-by-side comparison for

23  a significant portion.

24          And we also attempted to run our -- the Jouria

25  drafts through iThenticate to determine if there was a

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1   match caught through that tool.  Unfortunately, the

2   iThenticate tool was not able to access the PDFs that

3   Elite had on their Web site; so that did not return

4   useful information at that time.

5       Q.  So you went through a couple of pages of each of

6   the five courses and went side by side; is that correct?

7       A.  I went through --

8             MR. KERN:  Her testimony speaks for itself.

9   She answered the question.

10            THE WITNESS:  I went through several pages,

11  and then I also did spot checks moving forward in the

12  text to determine if there were additional or if it

13  continued further in the text.

14  BY MR. WILSON:

15      Q.  How many spot checks?

16      A.  It depended on the length of the course.  If it's

17  a longer course, I would have done -- I did do more spot

18  checks just throughout the length of the course.  So it

19  would -- it would depend on the length of the initial

20  course and then also how many parts Elite had published.

21  If they had published multiple parts, then I would start

22  the process again based on when their part started.

23      Q.  Did your comparison include a comparison of the

24  content of Dr. Jouria's submissions that were

25  plagiarized?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1    A.  I would not have a way of knowing that.  Again,

2    we had run them through iThenticate, but I can't make a

3    qualitative determination of whether it was plagiarized

4    or not.  It included the draft that he received -- that

5    he submitted to NetCE in its entirety, whether or not

6    there were sections that were copied or plagiarized or

7    not.

8    Q.  So for the -- at least for the GERD article, you

9    had done some plagiarism analysis to see what

10   permissions you needed to receive to continue down the

11   path of trying to get that article ready to be

12   published; correct?

13   A.  We had done additional research for that course,

14   yes.

15   Q.  So when you did a side-by-side comparison of the

16   GERD course submitted to you by Dr. Jouria with the

17   Elite course that you found, did you include in your

18   comparison plagiarized content?

19   A.  The draft that we received from Jouria contained

20   materials that we determined should be edited before

21   publication, whether it was specifically and legally

22   plagiarized or not, and that we would seek permission to

23   reprint.

24       I did not include the tables in my analysis

25   because I knew from my experience with his works that

```
 1    those tables could have been sought from another source,

 2    whether Elite got permission or not.  They could have

 3    been -- they were not useful to me in the analysis.  So

 4    I did not include the tables.

 5           But in terms of the text itself, I didn't take

 6    any steps to determine if that material had been copied

 7    or plagiarized from another source.

 8    Q.  For the cancer and chemotherapy article where you

 9    had also done some sort of a further work to try to

10    identify plagiarized content, your answer is the same?

11    A.  My answer for that course is the same.

12    Q.  Did you take notes during your side-by-side

13    comparison?

14    A.  No.

15    Q.  How did you determine that the courses

16    included -- excuse me -- exhibit literal and nonliteral

17    similarity copying whole swathes of text from NetCE's

18    copyrighted courses, copying the organization of the

19    courses, and/or paraphrasing large passages, leaving the

20    essential expression unchanged, as alleged in

21    interrogatory response number 6?

22    A.  The question is how did I determine that?

23    Q.  Yes.

24    A.  So the similarities were determined by comparison

25    of text; so I would go through comparing the text, and
```

 1   you could read them and see if it was exactly the same.

 2   That would, to me, exhibit similarity or literal

 3   similarity.

 4         In some cases, it appeared that the entire

 5   paragraph was exactly the same or substantially the same

 6   with potentially some maybe punctuation changes.  I

 7   flipped through the courses in the process of my spot

 8   checking and noted that the outlines were essentially

 9   the same or similar.

10         And there were some sections that I noted --

11   there were some minimal paraphrasing issues where maybe

12   a different word was used or the order of phrasing was

13   switched.  But for the most part, it was through visual

14   analysis.

15   Q.  What standard, if any, did you use to determine

16   whether any particular course was similar or not to the

17   course you were comparing it to?

18   A.  The standard that I would use is the extent to

19   which the similarity appeared.  I don't have a

20   quantitative measure of that in my visual comparison,

21   but it seemed overwhelming when I was doing my review.

22   Q.  For each course, what were the literal

23   similarities that you found?

24   A.  Do -- I don't have the courses in front of me.  I

25   don't have the Elite courses in front of me; so it would

 1   be difficult for me to point those out specifically.

 2       Q.  Did you find any courses more similar than others

 3   during your side-by-side comparison, as you've testified

 4   about here today?

 5       A.  The amount of similarity varied, but I can't give

 6   you more -- I don't recall more specifics in terms of

 7   variations in the courses.

 8       Q.  Can you identify for us here today which portions

 9   of each course NetCE claims to own copyright rights in?

10       A.  We claimed to own the entire course drafts that

11   Jouria provided to us.

12           (Reporter clarification.)

13   BY MR. WILSON:

14       Q.  Including the plagiarized content; right?

15       A.  Including anything that he may have provided from

16   other sources.

17       Q.  And can you tell us, sitting here today, which

18   portions of the materials that you claim copyright

19   rights in Elite allegedly copied?

20       A.  I don't --

21           MR. KERN:  Asked and answered.

22           THE WITNESS:  I don't have the Elite courses

23   in front of me; so I can't make that specific comparison

24   with the documents that I have.

25   ///

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1   BY MR. WILSON:

 2       Q.  Have you ever performed an analysis that went all

 3   the way through from beginning to end any of the

 4   courses?

 5       A.  When you say "analysis," do you mean the visual

 6   side-by-side comparison?

 7       Q.  Any analysis.

 8       A.  We -- after we had access to these five

 9   courses -- so we compared the PDFs of these five

10   courses from -- excuse me -- the Word document of these

11   five courses from Jouria to PDFs of the Elite courses --

12   again, there are more than five -- through Plagiarism

13   Checker X or 10 to do some additional analysis to

14   determine the percent of similarity between the courses

15   in question.

16       Q.  And when was that performed with Plagiarism

17   Checker X?

18       A.  That was conducted within the last two months.

19       Q.  And were the documents that you used or the

20   results that were provided produced to us in this case?

21       A.  I am not sure.

22       Q.  What would you need to do to check on that?

23       A.  I would need to look through all of the documents

24   provided during discovery.

25       Q.  In interrogatory number 6, on page 11, you
```

```
 1   state -- NetCE states, "A second technical manual

 2   analysis of the versions introduced at Dr. Jouria's

 3   deposition and served on NetCE thereafter is underway."

 4        What is that?

 5   A.   That is the analysis with Plagiarism Checker X

 6   that we just discussed.

 7   Q.   That's not a manual analysis.  Plagiarism Checker

 8   X is a computer program.

 9   A.   So Plagiarism Checker X is a tool that we use,

10   and it provides a report, and then the report is

11   obviously analyzed by a person.

12   Q.   And what were the results of your Plagiarism

13   Checker X analysis for these five articles that are

14   still part of this case between NetCE and Elite?

15   A.   I don't have the exact numbers that came back

16   from this report in front of me, but they showed

17   significant and extensive similarities.

18   Q.   How do you define "significant" and "extensive"?

19   A.   More than 60 percent exact matches.

20   Q.   Based on what criteria?

21   A.   That is criteria that is established by the --

22   actually, I want to back up.  I'm sorry.

23        So you -- when you complete the Plagiarism

24   Checker X analysis, it provides you with a percent

25   similarity.  That percentage can vary, and my
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

```
 1   understanding is that personal analysis or manual
 2   analysis is necessary to determine the extent of the
 3   copyings -- the extent that the copying was accurately
 4   identified by the program.
 5         So it did provide percentages, but I -- I don't
 6   want to -- I don't want to be boxed in by a number
 7   because you can -- if you have a huge course and a
 8   section of it is copied exactly, it might be a small
 9   percentage, but it's still significant in terms of
10   ownership and plagiarism.  So I don't want to be boxed
11   into a number.  I -- please disregard the 60 percent
12   statement.
13         But you could view the report provided by
14   Plagiarism X, and it demonstrates that the content is
15   materially similar.  It is -- my analysis of those
16   reports found that it could be potentially influenced by
17   formatting; so that is something that needs to be --
18   still be ameliorated, but we're still -- we completed
19   the Plagiarism Checker portion of the analysis.
20   Q.  So there's still more analysis -- a manual
21   analysis that's left to be done; is that correct?
22   A.  Potentially, yes.
23   Q.  What do you mean "potentially"?
24   A.  I mean that we have done an initial review, but I
25   don't know that our findings are complete as of today.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1      Q.  And when do you expect to complete your findings

 2   for the five courses that are still at issue between

 3   NetCE and Elite?

 4      A.  I don't know.

 5      Q.  And when do you expect to produce the Plagiarism

 6   X reports that you've generated using this program,

 7   according to you, two months ago?

 8      A.  Within the last two months, but more likely much

 9   more recently that we were doing the comparison of

10   Plagiarism Checker X.  I understand that there's a

11   deadline in terms of document production; so I would

12   assume that it would be done by that deadline.

13      Q.  What is your understanding of when that deadline

14   is?

15      A.  I believe that it's this week.

16          MR. KERN:  Mark, just so you don't go too

17   far afield on this, in a confused way, the witness

18   performed that analysis at Counsel's direction, and all

19   of the versions of it were exchanged and attached

20   between Counsel and the witness, which is why they

21   haven't been produced.

22          But to the extent that it's helpful in

23   lubricating discussions and moving things along in the

24   case, they can obviously be created anew if it's helpful

25   evidence.  But that -- that answers the question of why
```

 1   it's not in production.

 2   BY MR. WILSON:

 3      Q.  In response to interrogatory number 6, is the

 4   second technical manual analysis that you reference

 5   there referencing anything else besides the Checker --

 6   Plagiarism Checker X analysis you've just described?

 7      A.  I believe that -- sorry.  We also explored a few

 8   other possible software options, but they were subpar,

 9   and their reports were not useful.  So this is

10   referring, in my understanding, specifically to the

11   Plagiarism X review.

12      Q.  So at the time NetCE filed its claims for

13   copyright infringement against Elite -- you see that in

14   Exhibit 42 -- the only analysis that had been done was

15   the side-by-side analysis that you described earlier

16   where you, for these five courses that are still at

17   issue in the case --

18            MR. KERN:  Misstates testimony.

19            THE WITNESS:  When we initially made the

20   complaint, we had also attempted to do an iThenticate

21   review of the courses, but the software was having

22   difficulty accessing Elite 's PDFs; so the outcome of

23   that review was not particularly helpful for this case.

24   BY MR. WILSON:

25      Q.  So, again, at the time the complaint against

Case 0:15-cv-61165-WPD  Document 337-1  Entered on FLSD Docket 05/26/2018  Page 106 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 106

 1   Elite was filed by NetCE, the only comparison that had

 2   been done was your side-by-side comparison; is that

 3   correct?

 4            MR. KERN:  Misstates testimony.

 5            THE WITNESS:  We had done a visual

 6   side-by-side comparison.  I specifically had looked at

 7   the courses and compared them to Elite's courses, and we

 8   attempted to run iThenticate to do some additional

 9   comparison.  That was what I specifically recall

10   completing.

11   BY MR. WILSON:

12     Q.  When did you perform your side-by-side comparison

13   for these five courses still at issue?

14     A.  I determined -- I discovered the similarities

15   with the GERD course first in February of 2015, and that

16   led me to look at the other courses that Dr. Jouria had

17   published with Elite; so the comparison would have been

18   done -- was done in February of 2015.

19     Q.  How long did you take to perform this comparison

20   where you looked at a few pages and did some spot

21   checking?

22     A.  I would say it took me -- I spent an entire day

23   researching and doing comparisons.

24     Q.  And I am not asking about research.  Actual

25   comparisons.

```
 1    A.  That included the iThenticate scan; so when I
 2  refer to research, I'm including that iThenticate scan
 3  and also determining if this content was potentially
 4  copyrighted from a third party.
 5    Q.  So how much time did you spend doing your
 6  side-by-side comparison for these five courses?
 7    A.  How much time did I spend -- can you be more
 8  specific?
 9    Q.  Doing your side-by-side comparison for these five
10  courses.
11    A.  I did comparisons of these five courses with the
12  Elite course, but I also did comparisons with additional
13  content.  And I spent a day comparing these five courses
14  with the Elite courses in various ways and searching for
15  third party.
16    Q.  What other content did you compare these courses
17  to besides Elite content?
18    A.  I did general Internet searches to determine if
19  passages were published in other places by other
20  publishers and, for the most part, in the sections I was
21  checking, they were only published on the Elite Web
22  site.
23    Q.  What do you mean "for the most part"?  Did you
24  find some passages published for any particular courses
25  by someone else other than Elite?
```

1      A.  There were passages that appeared in similarity,

2  but I couldn't make a qualitative determination of

3  whether they were a copyright holder.  And, also, they

4  weren't the extent of the materials in the Elite course.

5  It was just sections, sentences, or phrases that maybe

6  appeared somewhere else but didn't appear in works like

7  a GERD continuing education course, for example.

8      Q.  None of the courses are identical -- by "none of

9  the courses," I mean the Dr. Jouria course submitted to

10  NetCE and the course that you did your side-by-side

11  comparison on from Elite -- isn't that correct?

12      A.  They are not identical.

13      Q.  And as you sit here today, you can't tell us --

14  you can't quantify the similarities for any particular

15  article; is that correct?

16      A.  Without having the Elite courses in front of me,

17  I cannot do a side-by-side showing of the similarities,

18  and I don't have a number to give you in terms of

19  percent or proportion of similarity at this time.

20      Q.  And in both the side-by-side comparison that you

21  performed for these five courses and the later computer

22  analysis using Plagiarism Checker X, you included the

23  entirety of the Dr. Jouria courses sent to NetCE in your

24  analysis; correct?

25      A.  That's correct.

1    Q.  And you did not endeavor to exclude from that

2    analysis any content that Dr. Jouria might have

3    plagiarized from any other source; correct?

4    A.  I did not try to make that determination.

5    Q.  And you did not determine whether the portions

6    that you found to be the same or similar between the

7    NetCE version of the course and the Elite version of the

8    course were protected or protectable expression owned by

9    NetCE; correct?

10   A.  I don't feel like I have the expertise to make

11   that determination.

12   Q.  You didn't endeavor to find out, when you located

13   a similarity or something that you thought was

14   similar -- similar, whether that portion of the article

15   was written by somebody other than Dr. Jouria; correct?

16   A.  I did some searching -- Internet searching to

17   determine if Dr. Jouria had published the courses

18   somewhere else in addition to Elite.  And I also did

19   some searching to determine if the courses were copied

20   in their entirety from another source.

21       But in terms of parts or sections, I didn't

22   attempt to make that determination.

23   Q.  And did you discover in your Internet research

24   any other instances where Dr. Jouria had published any

25   of these five courses with anyone else?

1    A.  Specifically in February?

2    Q.  We will go with February, but you know I am going

3    to ask ever.

4    A.  I don't recall when it was identified, but we

5    were able to find some evidence that Dr. Jouria had

6    published similar topics or content with Ce4Less -- or

7    NurseCe4Less.

8    Q.  What did you find at NurseCe4Less?

9    A.  We found that Dr. Jouria had also been writing

10   continuing education courses for NurseCe4Less, and some

11   of the topics and content in question appeared on the

12   NurseCe4Less site.  The content, as of Elite, was parsed

13   into parts, and I did a visual side-by-side comparison

14   of the drafts we received from Jouria and the

15   NurseCe4Less courses that were potential matches.

16   Q.  How many were there?

17   A.  I don't recall.

18   Q.  Can you identify any of these five courses as

19   potential matches?

20   A.  I remember that there was a NurseCe4Less course

21   entitled "head trauma" that I identified as a possible

22   match for the traumatic brain injury course.  And I know

23   there were additional courses, but I don't recall them

24   specifically right now.

25   Q.  For the NurseCe4Less courses, did you perform the

1   same side-by-side visual comparison that you've

2   testified about here today?

3      A.  I did.

4      Q.  You looked at a few pages and did spot checking

5   throughout the article; is that correct?

6      A.  That's correct.

7      Q.  And what -- and you did this for the head trauma

8   article for NurseCe4Less?

9      A.  That's one example, yes.

10     Q.  And you don't recall the other examples?

11     A.  I don't recall them specifically right now.

12     Q.  What did you conclude?

13     A.  In my analysis of the NurseCe4Less courses, I

14  found that, in some cases, the learning objectives were

15  exactly the same or very similar to the learning

16  objectives in the courses that Jouria had submitted to

17  us.

18         But in terms of the content, the content itself

19  appeared to be dissimilar, although it followed a same

20  general outline as the courses he had developed for

21  NetCE.

22     Q.  There came a point in time when NetCE sent a

23  cease and desist letter to NurseCe4Less; correct?

24     A.  Yes.

25     Q.  And did that -- was that the result of your

1   analysis on -- in conjunction with these courses?

2       A.  It was the result of our analysis and continued

3   concern that Jouria may have additional pending courses

4   with NurseCe4Less.

5       Q.  Was it your conclusion, based on your

6   side-by-side comparison, that NurseCe4Less had violated

7   some copyright rights belonging to NetCE?

8       A.  I am not a lawyer, but I did believe that they

9   had copied content that we owned.

10      Q.  And there were some instances when they had not,

11  you determined; is that correct?

12      A.  That's correct.

13      Q.  How did you draw the line between copying and not

14  copying?

15      A.  Essentially, if the material was the same or not

16  the same.

17      Q.  Well, we've already determined here that none of

18  them are the same with -- as it pertains to Elite and

19  NetCE for these five courses.

20      A.  We agreed that they were not identical.

21      Q.  Does "the same" mean something different to you

22  than identical?

23      A.  Yes.

24      Q.  Okay.  What's the difference for you?

25      A.  Again, the literal and nonliteral similarities in

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                                 Page 113

```
 1   the NetCE courses and the Elite courses are easily

 2   identifiable in -- in my opinion, and extensive to the

 3   point that I was able to identify them easily and

 4   throughout the courses.

 5        That was not the case with NurseCe4Less, but I do

 6   acknowledge that, for example, Elite's tests were

 7   different than the tests in NetCE's courses.

 8   Q.  What else was different?

 9   A.  Without the Elite courses in front of me, I can't

10   really identify specifics.

11   Q.  Do you recall any other differences for any of

12   the courses from Elite?

13   A.  Not -- aside from layouts and assigning of

14   credit, which I don't think is germane, I don't recall

15   any specifically.

16        MR. KERN:  Mark, Kate, we've been going for

17   about 80 minutes.  I am pretty hungry.  If you get a

18   chance, please, I'd like to take a lunch break.

19             (Reporter clarification.)

20   BY MR. WILSON:

21   Q.  In your review, looking for where Dr. Jouria

22   might have published the same courses that he submitted

23   to NetCE, where did you look?  You said you did it on

24   the Web site, on the Internet.  Where did you look?

25   A.  Specifically on -- just through Google searches
```

1   and Google Scholar searches.

2       Q.  Did you find any others beside NurseCe4Less?

3       A.  I did not identify any other cases that I recall

4   of Jouria publishing continuing education courses on

5   these topics with other providers.

6       Q.  Did you determine that the head trauma -- head

7   trauma course from NurseCe4Less was problematic in light

8   of the traumatic brain injury course NetCE claimed to

9   own?

10      A.  I don't recall specifically if that was one of

11  the courses that had the same or similar learning

12  objectives or not.

13      Q.  Beyond the learning objectives, was the head

14  trauma course one that you identified as problematic in

15  light of the traumatic brain injury course from NetCE?

16      A.  I don't recall specifically.

17      Q.  Sitting here today, you can't recall any other

18  articles published through NurseCe4Less from Dr. Jouria

19  that you reviewed; is that correct?

20      A.  I don't recall specific titles, no.

21      Q.  Do you remember any general titles or subject

22  matter areas?

23      A.  No.

24      Q.  Based on your review of -- and I'm struggling

25  with how to describe this, but we will say, based on

```
 1   your Internet research related to the courses provided

 2   to you by Dr. Jouria, did you determine one way or the

 3   other whether NetCE was the first to receive the

 4   articles from Dr. Jouria?

 5      A.  Based on the publication dates and the

 6   information that we have from Elite, it was my belief

 7   and understanding that we were the first to receive

 8   these drafts and to contract Dr. Jouria.

 9              (Reporter clarification.)

10   BY MR. WILSON:

11      Q.  As we sit here today, can you say definitively

12   that NetCE was the first to contract with Dr. Jouria for

13   the five courses at issue between NetCE and Elite?

14      A.  Based on conversations documented in the e-mails

15   that I have read, it is my belief that we were the first

16   to contract this content from Dr. Jouria.

17      Q.  Can you definitively say that you were the first?

18      A.  I can say that, in the e-mail exchanges between

19   Dr. Jouria and employees of Elite, he indicates that he

20   was already contracted or had provided drafts of all

21   five of the courses in question, and that was before

22   they discussed their final agreement in the e-mail in

23   terms of contract.

24      Q.  You're aware, are you not, that Dr. Jouria wrote

25   courses for other continuing education providers beyond
```

```
 1   NetCE and Elite.  Yes?
 2       A.  I am aware.
 3       Q.  Did you perform any investigation or analysis to
 4   determine if Dr. Jouria had provided these five courses
 5   to another continuing education provider prior to
 6   providing them to NetCE?
 7       A.  Yes, I did additional research.
 8       Q.  And what did you find?
 9       A.  I found that Jouria had working relationships
10   with several other providers.
11       Q.  Can you name them?
12       A.  I know that he had worked with Wild Iris
13   Continuing Education and --
14       Q.  You already mentioned the NurseCe4Less.
15       A.  Right, NurseCe4Less.
16       Q.  Any others?
17       A.  And Elite.  And there were some providers that
18   were not in the same field specifically as us; so I
19   don't -- I am not familiar with their names, but I know
20   that he had published with some other noncompetitor
21   companies that I just don't know their names.
22       Q.  So do you know for sure whether, for these five
23   articles, Dr. Jouria -- Dr. Jouria provided them to
24   NetCE before any other continuing education provider?
25       A.  In my research and findings with all of the other
```

 1   providers he had worked with, I did not find these five

 2   courses.

 3       Q.  So you believe that your -- that you were first,

 4   but you don't know for sure.  Is that fair?

 5       A.  I believe that we were first, yes.

 6       Q.  But you don't know for sure?

 7       A.  I can just say that I believe that we were first.

 8       Q.  What's the -- what's the problem with the second

 9   part?

10       A.  I don't know that we have all the materials from

11   discovery with Jouria; so I don't know that I can

12   definitively answer.

13       Q.  One way or the other; is that right?

14       A.  I can just say, based on the evidence that we

15   have, we were the first to contract these courses.

16       Q.  But without knowing more, you don't know whether

17   indeed you were first; correct?  You can fight me all

18   day, and I'll stay here all day long.

19       A.  I don't know what overtures Jouria made prior to

20   his relationship with us, but I know that, among the

21   evidence that we've been provided and that I found

22   through my own research, we were the first to contract

23   these courses.

24            MR. WILSON:  Let's take a break.

25            THE VIDEOGRAPHER:  The time is 12:54 p.m.,

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 118 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)        Sarah Campbell on 11/14/2017        Page 118

 1   and we are off the record.

 2             (Lunch break taken.)

 3             THE VIDEOGRAPHER:  This is the beginning of

 4   media number 3 in the deposition of Sarah Campbell.  The

 5   time is 2:12 p.m., and we're back on the record.

 6             MR. WILSON:  Richard?  Hey, answer your

 7   phone now.  I'm calling in.

 8             MR. ROSS:  Hello?

 9             MR. WILSON:  Richard, you there?

10             MR. ROSS:  Yeah.

11             MR. WILSON:  Okay.  We're going back on the

12   record.

13             MR. ROSS:  Very good.  Thank you.

14   BY MR. WILSON:

15     Q.  Ms. Campbell, grab one of the notebooks that has

16   one of the courses on it and turn to the last page,

17   which is the development status -- the yellow page,

18   which is the development status page.

19             I believe before we broke you had agreed that

20   the -- none of the courses at issue here between NetCE

21   and Elite had gone past the "draft manuscript received"

22   part of this checklist; is that correct?

23     A.  In all of these course packets, none of the

24   development statuses are filled out past "draft

25   manuscript received" and "payment issued."  That's

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

 1   correct.

 2      Q.  Did any of the courses continue -- excuse me.

 3   Let's take them one at a time or collectively if you

 4   want, if the answer is the same.

 5         But where in the development process did you stop

 6   for each of the five courses?

 7      A.  So the three courses -- depression and dementia

 8   in the elderly, nonantibiotic antimicrobial

 9   pharmacology, and traumatic brain injury -- were

10   pending; so they were -- they were pending an initial

11   manuscript review when we decided to stop work on them.

12         The cancer and chemotherapy course went on a

13   slightly different course than is usual and is reflected

14   in the "development status" form because we engaged an

15   independent contractor to do some editorial work on the

16   draft before we completed the checklist and the

17   manuscript review.  And that course had gone to our

18   contractor, and she had completed her work, but we

19   hadn't completed the next steps, which would have been

20   the checklists and the manuscript review.

21         The GERD course, we were just finishing the

22   manuscript checklist, compliance checklist and

23   manuscript review, which we complete as a packet

24   together.  We were just completing that when we

25   discovered the infringement.

---

1    Q.  So take a look for me, if you will, at the

2   document labeled NETCEB34857.  It's going to be in --

3    A.  Which exhibit?  This one?

4    Q.  This is in Exhibit 76.  It's a document entitled

5   "overview of course development."

6        For each of the five articles at issue here

7   between NetCE and Elite, where on this overview of

8   course development did each article stop?

9    A.  In this course development overview, the GERD

10   course had been reviewed by the editor.

11    Q.  So that's step number five; correct?

12    A.  Yes.

13    Q.  How about the others?

14    A.  It's possible that it went further.  I'm just

15   reviewing really quickly.

16        Okay.  So in the case of --

17    Q.  Let's take the three easy ones.  The three --

18   TBI, depression and dementia, and traumatic brain

19   injury.

20    A.  Nonantibiotic?

21    Q.  Excuse me.  Nonantibiotic.

22        Dr. Jouria had submitted his man- -- his first

23   draft of those articles; right?

24    A.  Dr. Jouria had completed his work on the courses,

25   had submitted them to us.  We did a cursory review --

```
 1   our editorial staff did what I call an initial review to
 2   determine that all the components were present.  He was
 3   issued an honorarium for his work completing the course.
 4        So in terms of our work with Jouria, he had
 5   completed everything that was required of him in the
 6   contract as -- as our process is in practice, and the
 7   courses were then slated in to the schedule to be
 8   reviewed by the editors, the planners, and the reading
 9   committee based on when we wished to bring the course to
10   the public.
11        So for the three courses that you mentioned --
12   depression and dementia in the elderly, TBI, and
13   nonantibiotic antimicrobial pharmacology -- those
14   courses had been accepted and were waiting for editorial
15   review; so that would be, I guess, between four and
16   five.
17        For the GERD course, it had been reviewed.  We
18   had done editorial work on it, but it also had not been
19   sent to the planners; so, again, for all of these based
20   on this list of the processes, they all stop somewhere
21   between four and five.  The gaps between steps four and
22   five is wide.
23   Q.  What do you mean by that?
24   A.  I mean a lot of work happens between steps four
25   and five.  This is -- this is a very broad overview.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1    Q.  But on this broad overview provided in

2    NETCEB34857, the step that includes approving a course

3    for publication is in step 6, isn't it?

4    A.  It says "approve the manuscript," but it doesn't

5    say, as far as I can read, "approve for publication."

6    Q.  Take a look back at this exhibit.  I don't

7    remember the name -- I don't remember the number.  Do

8    you have a copy of it still there?

9    A.  I do have it.  84.

10   Q.  Thank you.  Take a look at Exhibit 84.  Exhibit

11   84, again, says at the top "division planner course

12   approval," and there are three boxes midway down that

13   say "approve for publication," "approve for publication

14   with changes, see manuscript pages," and then the third

15   box, "rejected for the following reasons."

16         Those three options line up perfectly with the

17   three bullet points in the "overview of course

18   development" document at NETCEB34857; correct?

19   A.  They are not verbatim, no.

20   Q.  Well, the first bullet point in "the overview of

21   course development" at NETCEB34857 is "approve the

22   manuscript."  The first checked box is "approve for

23   publication."

24         Do you believe that's something different?

25   A.  Yes.

1    Q.  Why is that?

2    A.  The word "manuscript" is different than the word

3    "publication."

4    Q.  Other than they use slightly different words, do

5    these three boxes and three bullet points not line up?

6    Because the second bullet point is "approve the

7    manuscript contingent upon the faculty member making

8    requested additions, deletions, corrections, and/or

9    clarifications," whereas in the division planner

10   document at Exhibit 84, the second bullet -- excuse

11   me -- the second box says "approve for publication with

12   changes."

13        In the third bullet point from NETCEB34857 is

14   "reject the manuscript."  The third box in Exhibit 84 is

15   "rejected for the following reasons."

16        Don't those line up, ma'am?

17   A.  The wording is different.  And I just want to

18   make a point that in point -- in step six, it says,

19   "Upon review of the manuscript and the comments of the

20   editor, the lead planner and the reading committee, the

21   decision is made to do one of the following."

22        (Reporter clarification.)

23           THE WITNESS:  So this is the feedback from a

24   division planner, and input from division planners is

25   used to make these decisions, but they aren't -- it's

 1   not a one to one relationship.

 2              So this is specifically, again, in

 3   Exhibit 84, the surgical technologist lead planner, to

 4   review of the COPD course.  She made a recommendation,

 5   but her recommendation is an input for us when we're

 6   deciding to move forward and to what professions we will

 7   move forward with the course for.  But it isn't a

 8   determination of whether or not that course will ever be

 9   released to the public.  And this step 6 is trying to

10   encompass all of that.  "Approve the manuscript," to me,

11   could mean that the manuscript is approved for a

12   specific profession.

13              So you could approve -- you could take --

14   you could approve and reject the manuscript based on

15   feedback from the division planner when you're

16   determining who the audience -- the final audience will

17   be.  So it is slightly different to me.

18       Q.  In NETCEB34857, step 6 says, "The decision is

19   made to do one of the following."  Multiple decisions

20   aren't made in response to that step.  It's one of the

21   following.  And if "approved the manuscript" does not

22   mean "approved for publication," then what else could it

23   mean?

24       A.  So --

25       Q.  Let me ask you this.

```
 1          What else -- that's exactly what it means in

 2   NetCE, doesn't it?

 3       A.  No.

 4       Q.  What's the basis for that?

 5       A.  So these manuscripts that we receive can have a

 6   diverse audience, and they might be published in

 7   different versions for different audiences.  The

 8   versions, for example, for dentists and physicians.  If

 9   this is sent to the dental division planner and rejected

10   and sent to the physician division planner and approved,

11   that would trigger two different actions.

12       Q.  In what audiences were the five courses at issue

13   here allegedly approved for publication?

14       A.  The division planners had not yet reviewed the

15   manuscripts in this case.  They had reviewed the

16   proposals; so none of them had a final decision as to

17   the audience.

18       Q.  And proposals aren't accepted for -- excuse me.

19          Proposals aren't approved for publication;

20   manuscripts are; isn't that correct?

21       A.  Proposals are not published.  That's correct.

22       Q.  And for the five courses at issue here in this

23   case, there are no documents like Exhibit 84 completed

24   by anyone at NetCE; isn't that correct?

25              MR. KERN:  Asked and answered.
```

```
 1              THE WITNESS:  That is correct.

 2   BY MR. WILSON:

 3      Q.  What did NetCE intend to do with the five courses

 4   at issue between NetCE and Elite?

 5      A.  It was NetCE's intent to develop these courses

 6   and to offer them to healthcare professionals for

 7   continuing education.

 8      Q.  Which audiences?  I think you just said that

 9   hadn't been decided; is that correct?

10      A.  It hadn't been finalized, but we had sent the

11   proposals to the planners.

12      Q.  Which planners did you send proposals to for

13   these five courses?

14      A.  These course proposals were sent to Dr. Jane

15   Norman, and some were also reviewed by Dr. John Leonard

16   that would represent nursing and medicine, respectively.

17              But we reserve the right when we receive the

18   manuscripts to make a decision to include additional

19   division planners based on how the content is developed.

20      Q.  So at the time that NetCE decided not to publish

21   these five courses, NetCE had not determined who they

22   were going to offer these courses to; is that correct?

23      A.  I knew at a minimum that these five courses would

24   be offered to nurses.  If they would be appropriate for

25   other professions was yet to be determined.
```

 1    Q.  And without finalizing the courses, how did you

 2   make the determination that you were going to offer them

 3   to any particular profession?

 4    A.  When these courses were contracted, we had a

 5   specific need for continuing education content or

 6   subject matter -- continuing education subject matter

 7   related to pharmacology, specifically.  And these

 8   courses would have provided that coverage of those

 9   subjects for nursing specifically that we were

10   interested in developing.

11    Q.  What format were you going to offer these five

12   courses?

13    A.  When our courses are released, they're available

14   online, they are available in print, and they're also

15   available as EPUB files for eReader devices.

16    Q.  Are all courses available in all of those

17   formats?

18    A.  All courses are available online and in print.

19   And most but not all are available as EPUB files.

20    Q.  What do you mean when you say "in print"?

21    A.  I mean we have a bound booklet available that can

22   be mailed to learners, and we also have a special offer

23   bundle that we refer to as a catalog that is direct

24   mailed to identified customers.

25    Q.  How do you decide what courses will go in your

```
 1   booklet or your catalog?

 2      A.  We have -- just for clarity, the booklets are

 3   individual courses that are requested specifically by

 4   learners.

 5      Q.  So it's a situation where somebody who doesn't

 6   want to take it online, you'll send them a booklet?  Is

 7   that how that works?

 8      A.  Yes.  That's how a booklet would work.  They

 9   would order it to be sent to them.

10         In terms of the catalogs or special offer

11   bundles, those are mailed according to our schedule.  We

12   have a committee meeting in the spring that sets the

13   next catalog year.  Our catalog year runs from fall to

14   late spring; so if we had a meeting, for example, in

15   April for the 2000- -- if we had a meeting in

16   April 2017, it would be setting the 2018 schedule, which

17   starts in August of 2017.

18         And at that committee meeting in the spring, we

19   look at courses that we have contracted and courses

20   that -- we have drafts and courses that are currently

21   available, and we make decisions about what courses will

22   be featured in our direct mail booklets -- those

23   catalogs.

24      Q.  Were any of these courses going to be featured in

25   any of your direct mail booklets?
```

1    A.  Yes.  The GERD course was scheduled to be

2    featured in a special offer booklet to be mailed in the

3    early spring or late winter of 2015.

4    Q.  Is that the only one?

5    A.  That was the only one that we had scheduled that

6    far in advance.  The others were reserved to be

7    considered in the meeting that spring.

8    Q.  And before they were considered, NetCE made a

9    determination not to continue on with any of these other

10   courses; is that correct?

11   A.  Before they were considered, we found the

12   infringement and stopped development on the courses.

13   Q.  And the GERD course was not included in your

14   catalog for reasons that had nothing to do with Elite;

15   isn't that correct?

16   A.  No.

17   Q.  Why was the GERD course not included?

18   A.  We found the infringements and determined that we

19   should stop development of the course before it was

20   released, which disqualified it from being included in

21   the special offer catalog.

22   Q.  Take a look in Exhibit 76, a document number

23   NETCEB3149.

24        Is it in there?

25   A.  I don't see it.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1      Q.  I'll show you mine.  I handed you my copy of --
 2   there's one.  Apparently, it's in Exhibit 76.
 3           However we got there, looking at NETCEB3149, do
 4   you see an e-mail from you to Julie Goodwin dated
 5   January 14, 2015, that says, "I finished the initial
 6   review of the GERD course today, and I wanted to let you
 7   know that it is not going to end up being ten hours.  It
 8   was 2,000 words short from the author, and after
 9   significant editing, I think it is" -- "I think it going
10   to be a five-hour course.  I just thought I would give
11   you a warning that it isn't going to work out for the
12   OH15 feature"?
13           Do you see that?
14      A.  I do.
15      Q.  Is the OH15 feature the catalog that you were
16   talking about where this was going to be published?
17      A.  I -- it was my recollection that it may have been
18   scheduled as a five-hour in a separate booklet.
19      Q.  Does this help refresh your recollection that it
20   was scheduled to be in OH15?
21      A.  I do know that it was originally scheduled as a
22   ten-hour course in the OH15, but I can't discount that
23   it was scheduled for another special offer booklet.
24      Q.  Do you have any documents to support your
25   testimony that maybe it was scheduled for something
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                      Page 131

 1    else?

 2       A.  I do not have them with me right now, but it

 3    would be in the archives of our catalog schedule.

 4       Q.  And did you produce the archives of your catalog

 5    schedule to us in this case?

 6       A.  I -- without going through all the materials that

 7    we provided, I'm not sure.

 8       Q.  Do you recall seeing it in your review of

 9    documents that you produced to Elite in this case?

10       A.  Yes.  I recall seeing the catalog schedule, but I

11    don't recall the context.

12       Q.  Take a look at one document earlier in

13    Exhibit 76, NETCEB3148.  Julie responded to you on

14    January 15th of 2015 and said, "I have replaced GERD

15    with ischemic stroke in the OH15 catalog.  A new PDF of

16    the catalog schedule is available.  Thanks."

17           So the evidence that we have here is that GERD --

18    the only of the five courses that was scheduled to be in

19    any sort of catalog -- appears to have been scheduled in

20    OH15, which I'm guessing is a 15-hour catalog that goes

21    to people in Ohio; is that correct?

22       A.  No.

23       Q.  Okay.  What is OH15?

24       A.  It is a catalog that goes to nurses who are

25    licensed in Ohio and is part of our 2015 catalog year.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 132

1    Q.  Fair.  So the evidence here is that GERD, the

2    only of the five that was scheduled to be in any

3    catalog, was scheduled to be in a catalog for nurses in

4    Ohio, and that didn't work out for reasons that had

5    nothing to do with Elite; correct?

6    A.  The use of GERD in the Ohio nurses 2015 catalog

7    was not possible due to length.  But whether or not it

8    was scheduled for other catalogs as a five-hour course

9    is not clear.

10   Q.  I would agree with you on that.

11       We saw here with GERD in the Ohio catalog that

12   NetCE replaced it with another course for the Ohio

13   nurses catalog.  Yes?

14   A.  The 2015, yes.

15   Q.  For the unknown/unsure catalogs that maybe GERD

16   was also going to be in, did NetCE also replace the GERD

17   course with a different course?

18   A.  No catalogs were -- all of our catalogs that year

19   were sent; so if GERD was scheduled for another catalog,

20   it was replaced.

21   Q.  I believe this is also in Exhibit 76.  I would

22   like you to take a look at a document labeled

23   NETCEB5322.  This is an e-mail from you to Julie Goodwin

24   in June -- June 16th of this year, 2017.  You say,

25   "Julie, do you have any documentation of the original

1   catalog schedule plans," parentheses, "before changes,"

2   end parentheses, "for 2013 to 2017?  I know we were

3   planning to feature GERD, but the lawyers are asking if

4   we have any" -- excuse me -- "any proof/documentation of

5   this intent," parentheses, in which catalogs the course

6   was intended for," end parens.

7        Did you ever find such documentation?

8     A.  We did find a catalogic schedule that had

9   notations and did have GERD as one of the featured

10  courses, but I don't know that it was an original

11  catalogic schedule planned before any changes.

12    Q.  Did you produce whatever you found as part of

13  this case?

14    A.  Without going through all of the documents that

15  we provided during discovery, I don't know for sure.

16    Q.  So as we sit here today, we know the GERD course

17  for Dr. Jouria was intended to be in the Ohio nurses

18  catalog in 2015, but it was replaced by a different

19  course for reasons that have nothing to do with Elite,

20  according to the e-mails we just looked at.  And we

21  don't have any other information or evidence supporting

22  GERD or any other course being in any catalog; correct?

23    A.  We do not have any documentation that GERD was

24  planned for any other catalogs before we discovered the

25  infringements, but we also hadn't set the catalog

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

1    schedule for 2016, which we would have done in the next

2    few weeks.

3       Q.  Has NetCE done any sort of analysis to understand

4    what, if any, sales NetCE would have made off any of the

5    five courses at issue between NetCE and Elite?

6       A.  Yes.

7       Q.  What have you done?

8       A.  We took an example course.  It was a ten-hour

9    course by Dr. Jouria that was published prior to our

10   discovery of the infringement in these cases.  It was

11   the course "multiple sclerosis."  That ten-hour course

12   was featured in three special offer booklets.

13      Q.  Those are the catalogs you just described

14   earlier?

15      A.  Yes, the special offer catalogs.

16          And also was available online and as a standalone

17   course -- course booklet in print -- and we used the

18   information about the revenue from the sale of that

19   course and associated special offers to estimate the

20   revenue from these outstanding five additional courses.

21      Q.  The revenue that you estimated was based off of

22   the sale of the entirety of the catalogs; is that

23   correct?

24      A.  It was based on revenue from individual course

25   sales as well as the special offer catalogs that

1  included that course.

2      Q.  Did you try to apportion that revenue for the

3  particular course that you used as an example?

4      A.  We have estimated the entire amount for the

5  special offers, and we have also been doing some

6  additional accounting to apportion the amount of revenue

7  from an individual course in the special offer booklet.

8      Q.  You said the course that you used as an example

9  was a multiple sclerosis course?

10     A.  That the course I used in my example, yes.

11     Q.  And that's a ten-hour course?

12     A.  That's a ten-hour course.

13     Q.  How many hours were the five courses at issue

14  here?

15     A.  The GERD course, before editing, was a ten-hour

16  course.

17     Q.  But we just saw documents that showed that it was

18  not a ten-hour course; correct?

19     A.  We never released that course; so it was never

20  designated an amount of credit.  But based on the amount

21  of work that was done on it after editing, it likely

22  would have ended up being less than ten hours.  But

23  Dr. Jouria was paid for a ten-hour course.

24         The same is true of traumatic brain injury.  That

25  was a ten-hour course.

1    Q.  But we don't know how many it ultimately would

2  have ended up because no one edited at NetCE; correct?

3    A.  It could have been more or less after editing.

4  That is true.

5    Q.  And the same could be said for all of the

6  remaining courses; right?

7    A.  They could have been more or less after editing.

8    Q.  How many hours for the other three courses?

9    A.  The cancer and chemotherapy course was 30 hours.

10  The depression versus dementia course was, I believe,

11  also 30 hours, and the nonantibiotic antimicrobial

12  course was 30 hours.

13    Q.  Before editing?

14    A.  All of those are what Dr. Jouria was contracted

15  to write.

16    Q.  But, again, before editing?

17    A.  No -- yes.  It could have ended up being more or

18  less credit.

19    Q.  Why did you use the multiple sclerosis course as

20  an example for how you think any of -- any other course

21  might perform?

22    A.  I thought that the multiple sclerosis course was

23  actually a conservative choice because the number of

24  hours was on the lower end compared to the 30-hour

25  drafts.  And it had been featured in a few catalogs but

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1    not as many as, I believe, the COPD course; so I had

2    chosen a kind of middle of the road, in my opinion,

3    option as the example course.

4        Q.  And what guarantees, if any, are there that any

5    of these five courses would have done -- performed

6    equivalently to the multiple sclerosis course?

7        A.  Because we weren't able to release them, we don't

8    know if they would have done better or worse than the

9    multiple sclerosis course.

10       Q.  And for us sitting here today to try to predict

11   that would require us to speculate on what sales might

12   have been if certain things would have occurred; isn't

13   that correct?

14       A.  I think probably you could make an educated

15   prediction, but you can't say for sure the amount of

16   revenue an unreleased product would garner.

17       Q.  There are a number of factors that influence how

18   a course will perform; isn't that correct?

19       A.  That's correct.

20       Q.  One of those is how many catalogs you put it in;

21   right?

22       A.  If a course is featured, it will reach more

23   learners and have a greater revenue, for the most part.

24       Q.  And in this case, we have no evidence that any of

25   these five courses would have been featured in any

1   catalogs; correct?

2      A.  When I contract courses from a medical writer

3   like Dr. Jouria, the writer is paid slightly more with

4   the expectation that we would feature the courses.

5          When we contract courses from nonprofessional

6   writers, clinicians or people working in the field, they

7   are paid slightly less with less expectation that they

8   would be appropriate for feature.

9      Q.  Not every course that you contract with a

10  professional writer gets featured in the catalog;

11  correct?

12     A.  There's no guarantee that it will be featured.

13     Q.  And indeed, in NetCE's history, not every course

14  that they have contracted with from a professional

15  writer has ended up in a catalog; correct?

16     A.  I don't know.

17     Q.  We looked earlier at the overview of course

18  development, and one of the things that may happen along

19  the development path is that a manuscript gets rejected;

20  right?

21     A.  That is a possible outcome.

22     Q.  Other factors would lead to how any particular

23  course might perform financially, including how it's

24  priced; right?

25     A.  Potentially, yes.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

1     Q.  And whether or not the subject matter is

2     interesting to your intended audience; right?

3     A.  Yes.

4     Q.  And whether the content is -- is good, according

5     to your intended audience; correct?

6     A.  I hope so.

7     Q.  How the course is marketed or promoted influences

8     how it's going to do financially; isn't that correct?

9     A.  That's the idea, yes.

10    Q.  What competitive offerings are out there in the

11    same or similar subject matters can influence how a

12    course performs financially; correct?

13    A.  Yes, either way.  Yeah.

14    Q.  How the course gets reviewed, meaning is it -- is

15    it -- people that take the course think it's good.

16         That can influence whether other people take the

17    same course; isn't that true?

18    A.  Potentially.

19    Q.  Who the author is can influence whether or not a

20    course sells; isn't that true?

21    A.  Yes.

22    Q.  When a course is made available, meaning timing,

23    can influence how a course performs; isn't that correct?

24    A.  That's correct.

25    Q.  What format you include it in, whether it be in a

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1   catalog or it be just online, can influence how a course

2   performs; right?  I think we covered that one already.

3        A.  Sure.

4        Q.  Where a course is made available, meaning is it

5   in a catalog for nurses in California, or is it in a

6   catalog for nurses in Rhode Island, which I'm guessing

7   has much less nurses, can influence how a course

8   performs; right.

9        A.  Potentially.

10       Q.  And whether or not the course or the offering

11   entity has approvals is an accepted source for

12   continuing education credits can influence how it

13   performs; right?

14       A.  I am not sure I understand.

15       Q.  Who's publishing it.

16       A.  Sure.  Maybe.

17       Q.  Some -- some companies in your business just do

18   better; isn't that correct?

19       A.  For whatever reason, yes.

20       Q.  Isn't it true that you don't know how any course

21   will actually perform sales-wise until you offer it?

22       A.  There is no way of knowing for sure what the

23   revenue for a course is before it is released, but we do

24   have an idea of the amount of interest we have in

25   advertising and featuring courses and using courses to

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1  meet specific market needs.  So you're correct that we

2  don't have a number, and I'll leave it at that.

3      Q.  In the Ohio 15 -- OH15 catalog where GERD was

4  scheduled to appear, absent its word count deficiencies,

5  when you replaced that course with the ischemic stroke

6  course, did the OH15 catalog perform better than, worse

7  than, or the same as expected?

8      A.  I don't know specifically.

9      Q.  Do you know generally?  If you don't know -- I am

10  not trying to be difficult, but when you say "I don't

11  know specifically," I have to follow up.  And if you

12  don't know, you don't know, and I'll move on.  But if

13  you do know something, I have to -- I have to know that.

14      A.  I don't know.

15      Q.  During the time period when these courses

16  potentially could have been published by NetCE -- and I

17  know that the courses weren't -- I know they weren't

18  published.  We've talked about that, and I know that we

19  just said there was no decision made by NetCE where to

20  put them.

21          But during the time period when you were

22  considering having these courses to offer, did NetCE

23  still have a full slate of course offerings to provide

24  to its customers around the country?

25      A.  During the period that we were developing these

 1   courses or after we decided not to go forward?  Can you

 2   clarify?

 3     Q.  You know I am going to ask for both.

 4     A.  Okay.  We specifically chose to move forward with

 5   these topics -- these subjects because we had identified

 6   a need or a gap in our offerings to meet a pharmacology

 7   requirement for advanced practice nurses and certified

 8   nurses.  And this would have substantially closed that

 9   gap.

10          We still, to this day, do not offer the amount of

11   pharmacology credit that would have been possible by

12   developing these five courses.

13          And just to clarify, we don't have the amount of

14   pharmacology credit available in courses that have been

15   released since we stopped developing these courses that

16   would have replaced this pharmacology credit.

17     Q.  Has NetCE performed any analysis to find out --

18   well, let me ask it this way.

19          I think we talked earlier that there were two

20   courses out of these five that were

21   pharmacology-oriented; is that correct?  That's the

22   nonantibiotic antimicrobial course and the cancer and

23   chemotherapy course; is that right?

24     A.  Those -- those two courses are purely

25   pharmacology courses.  But all five courses have content

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1    that would allow us to issue partial pharmacology credit

2    for completion of the full course.

3        Q.  When did you make that determination, that the

4    content allows you to issue partial credit?

5        A.  Based on my knowledge of the standards for

6    issuing pharmacotherapeutic pharmacology credit and the

7    subject matter being covered, my -- our intent through

8    the development process was to ensure that it would meet

9    those standards.  So upon contracting these courses, I

10   knew that the final drafts would contain pharmacology

11   credit.

12       Q.  Does that have to be approved by someone before

13   you can issue that pharmacology credit?

14       A.  No.

15       Q.  How do you know what the final drafts would have

16   included when you stopped work before you even got close

17   to a final draft?

18       A.  Well, at the contract stage, I know what our

19   editorial intent would be; so I can just say that,

20   through the development process, we would have made sure

21   that the content met those requirements.  That was our

22   intent for all five of the courses.

23       Q.  Were NetCE's revenues impacted, in any way, by

24   the decision by NetCE not to continue developing the

25   five courses at issue in this case?

 1    A.  I don't know.

 2    Q.  Can you point to a single sale that NetCE didn't

 3  make because it decided not to offer any of these five

 4  courses?

 5    A.  I can't point to one that was lost or one that

 6  was gained.  They weren't released -- as we discussed,

 7  they weren't released; so that would require

 8  speculation.

 9    Q.  Does NetCE prepare projections for revenues for

10  course sales?

11    A.  No.

12    Q.  Take a look at Exhibit 73.  It was that packet of

13  materials that was provided to Mr. Cremons.  The

14  document labeled ALP61, you see that document is "sales

15  projections 2012"?  Do you see that?

16    A.  I do.

17    Q.  So NetCE, at least at this point in time, did in

18  fact prepare a projection for sales of some form; right?

19    A.  I can't tell from looking at this if this -- you

20  had specifically asked about course sales projections,

21  and I don't know what all is included in this

22  projection.

23    Q.  What else do you sell?

24    A.  We have an unlimited subscription option.

25    Q.  For courses?

 1    A.  For activities.  We have a group sales option.

 2        But a sales projection by course, I am not aware

 3  of that.

 4    Q.  Let me see if I can ask it slightly differently.

 5        NetCE provides -- or, excuse me -- prepares

 6  projections for its sales; right?

 7    A.  They have prepared sales projections before, yes.

 8    Q.  Are you aware of any sales projections prepared

 9  by NetCE for any years past 2012?

10    A.  Not without speculating, no.

11    Q.  So you don't know?

12    A.  I don't know.

13    Q.  And I know I've said this a few times today, but

14  you're the person that I get to talk to about this, so

15  as the designated witness, talk about sales projections,

16  which is one of the categories you told me this morning

17  you were prepared to testify about.

18        For any sales projections beyond the one you're

19  looking at here in Exhibit 73, you don't know if any

20  such documents exist; is that correct?

21    A.  That is correct.

22    Q.  You mentioned the multiple sclerosis course and

23  the revenue associated with that.

24        That was in 2014; is that correct?

25    A.  The revenue from that course spans from its

 1   release to the current day.

 2       Q.  When was the course released?

 3       A.  That course was released in late 2013.

 4       Q.  And is it still being sold today?

 5       A.  That course was revised and continues to be

 6   offered in its revised form today.

 7       Q.  Is it a different course when it's revised?

 8       A.  It has a new course number.  It could have

 9   changes to the test and the faculty; so there are

10   changes.  We consider it a new course number.  But the

11   content -- the subject is the same.

12       Q.  So the title is the same, but the content may be

13   different depending on the course; is that correct?

14       A.  The content is updated as necessary based on

15   scientific advances.

16       Q.  Do you have courses that you do not update?

17       A.  If a course is no longer valuable to the company,

18   meaning it is not profitable or is no longer useful to

19   the customers, then it is no longer offered.

20       Q.  So you do have courses that are offered

21   originally and then are not offered at some point before

22   they're updated; is that correct?

23       A.  Some courses are allowed to expire without being

24   revised.

25       Q.  An average lifespan of a course is three years;

1  correct?

2     A.  The lifespan of a course before major revision is

3  three years.

4     Q.  If you take a look at interrogatory number 8,

5  that's in Exhibit 75.

6         You've seen this before?

7     A.  Yes.

8     Q.  You see in the second paragraph the reference to

9  the multiple sclerosis course?

10    A.  Yes.

11    Q.  It says, "In 2014, that course was featured in

12  booklets for nurses in various states.  Total revenue

13  for these booklets was $4.7 million."

14        Is that revenue over one year?

15    A.  That revenue is for two years.

16    Q.  What years?

17    A.  Since it's from the release of the catalog, the

18  catalogs in question were all released in 2014.

19    Q.  Which catalogs did this course appear in?

20    A.  California Nurses and Various States.  Additional

21  states fall under that cover.  Texas Nurses and Various

22  States, and Ohio Nurses.

23    Q.  In what years?

24    A.  The booklet was -- those three booklets and the

25  various covers were printed and mailed in early 2014,

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1    and they could be completed at any time until -- they

2    could still be completed today.

3        Q.  And for each of those three jurisdictions, if you

4    you will -- California Nurses in Various States, Texas

5    Nurses in Various States, and Ohio Nurses in Various

6    States -- did you also make available catalogs for the

7    year 2013?

8        A.  We also mailed catalogs in 2013, yes.

9        Q.  And did those catalogs include the multiple

10   sclerosis course?

11       A.  No.

12       Q.  And how did those catalogs perform relative to

13   the 2014 catalog?

14       A.  Without having the spreadsheets in front of me, I

15   can't answer that specifically; so I don't know.

16       Q.  Again, any reason to believe they performed any

17   differently during the years 2013 and the year 2014?

18       A.  I don't have any reason to believe that they

19   performed the same or differently.

20       Q.  What document would you have to look at to make

21   that -- to see how they performed?

22       A.  I would compare the 2014 cost versus revenue by

23   catalog report to the 2013 cost versus revenue by

24   catalog report.

25       Q.  And in 2015, did you have catalogs in those three

1   jurisdictions?

2      A.  Yes.

3      Q.  Did they include the MS article?

4      A.  No.

5      Q.  And how did those catalogs perform?

6      A.  Again, I can't say specifically; so I don't know.

7            (Exhibit No. 85 marked for identification.)

8   BY MR. WILSON:

9      Q.  I am going to mark a new lovely packet of

10  information as Exhibit 85.  Exhibit 85 begins with the

11  document labeled "Navigant 2."  And as before, as you

12  flip through this, if you see anything that seems out of

13  whack, you let me know; otherwise, we're going to assume

14  that these documents are what they claim to be.

15        I am going to turn -- take all the time that you

16  want, but I'll turn your attention to the foldout sort

17  of midway through Exhibit 85, which I believe is the

18  cost versus revenue by catalog spreadsheet that you just

19  described; is that correct?

20     A.  This is the 2014 cost versus revenue by catalog

21  spreadsheet, yes.

22     Q.  Do you see a 2013 version?

23     A.  I do not.

24     Q.  Do you see a 2015 version?

25            MR. ROSS:  Mark, what number is that?

 1   Sorry.

 2          MR. WILSON:  Sure.  I am not sure it has a

 3   number.  These were documents provided to us by John in

 4   relation to Navigant, I believe.

 5          THE WITNESS:  Yes, there is a 2015.

 6   BY MR. WILSON:

 7   Q.  Great.  Does that one have a number on it?

 8   A.  Nope.

 9   Q.  Okay.  Can you tell by looking at those two

10   documents how your catalogs performed in California,

11   Texas, and Ohio 2014 versus 2015?

12   A.  In California in 2015, there were slightly more

13   sales for the California booklet -- in 2015 compared to

14   2014.

15          For the Texas nursing booklet, there were more

16   sales -- it looks like more significantly -- I won't

17   qualify it.  There were more sales in 2014 than there

18   were in 2015.

19          And in Ohio, there were almost twice as many

20   sales in 2015 compared to 2014.

21   Q.  Is it fair to say that the sales by NetCE of

22   catalogs in California, Texas, and Ohio during 2014 and

23   2015 had nothing to do with the multiple sclerosis

24   article being present in the catalog in 2015?

25   A.  Could you repeat your question?

1    Q.  Fair to say that the sales of catalogs in 2014 in

2    California, Texas, and Ohio had nothing to do with the

3    presence of the multiple sclerosis article in those

4    catalogs?

5    A.  I cannot say that.

6    Q.  How much of any of the sales in 2014, now that

7    you've compared them to 2015 sales, were attributable to

8    the presence of the multiple sclerosis article in the

9    2014 catalogs in California, Texas, and Ohio?

10   A.  I don't know.

11   Q.  Can't tell, can you?

12   A.  That is not possible for me to determine.

13   Q.  How would anyone determine it?

14   A.  I don't know how someone would try to determine

15   that.

16            MR. KERN:  Calls for speculation.

17            MR. WILSON:  I agree.

18            THE VIDEOGRAPHER:  You don't have your mic

19   on.

20            MR. KERN:  Oh, sorry.

21   BY MR. WILSON:

22   Q.  Did any catalogs -- let me ask it this way.

23            Did NetCE offer any catalogs in 2013 through 2017

24   that were missing courses?

25   A.  I'm not sure what you mean by "missing courses."

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1      Q.  That didn't include the number of courses that
 2   that catalog called for?
 3      A.  We did not publish any partial catalogs.
 4      Q.  So every catalog from 2013 to the present
 5   published by NetCE had the full assortment of courses in
 6   it for NetCE's customers to review and take; is that
 7   correct?
 8      A.  We did not publish any catalogs with a course
 9   missing.
10              (Reporter clarification.)
11   BY MR. WILSON:
12      Q.  Can you point to any revenue that NetCE lost
13   because of the decision by NetCE not to publish the five
14   courses at issue in this case?
15      A.  In terms of lost revenue?
16      Q.  Yes, ma'am.
17      A.  We can only calculate that based on the example
18   of already-released courses.
19      Q.  But you just told me that all of your catalogs
20   had their full allotment of courses in them; right?
21      A.  All of the catalogs that we published between
22   2013 and 2017 included the number of courses that we
23   found necessary.
24      Q.  And so are you able to point to any revenue that
25   NetCE lost because one of these five courses wasn't in
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1   one of those catalogs?

 2      A.  That would require me to speculate about the

 3   value of those courses in relation to other courses, and

 4   I'm not able to do that.

 5      Q.  I know I sound like a broken record, but you're

 6   the person I get to talk to on that point, and you've

 7   been designated on this very topic.

 8         So as you sit here today, you're not able to

 9   provide me any testimony pointing to any revenue that

10   NetCE lost because of -- because one of these five

11   courses was not published by NetCE; correct?

12      A.  The evidence that we have is that similar -- a

13   similar product by the same author, whether it was

14   featured or as a standalone course, generated a certain

15   amount of revenue and to project that that is a good

16   example of what the five courses in question may have

17   brought in.

18      Q.  But in order to lose revenue, you have to not

19   have offered something where you otherwise would have to

20   make the money that you're -- that you're talking about;

21   right?

22      A.  I can't really speculate as to the value that

23   those courses would have brought to or diminished the

24   special offers, but I do know that, as a standalone

25   course, they weren't replaced at all.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 154

 1      Q.   And in interrogatory response number 8, you state

 2   that, "The individual net course revenue for the

 3   multiple sclerosis course was $84,000 in 2014."  That's

 4   in Exhibit 75.

 5      A.   That is the total individual net course revenue

 6   for the standalone course online and in print.

 7      Q.   The five courses at issue between NetCE and

 8   Elite, you can't predict with any certainty if those

 9   courses were included in any catalogs, whether their

10   presence there might have actually caused a decrease in

11   revenue for NetCE; correct?

12      A.   I can't speculate as to whether it would have

13   increased or decreased the value.

14      Q.   And is that because of the laundry list of

15   factors that affect how courses in catalogs perform in

16   this business?

17      A.   There are many factors that affect how our

18   special offer catalogs perform, and it's impossible to

19   predict all of the factors that come into play.

20      Q.   NetCE achieved revenues for sales of courses in

21   all of its catalogs between the years 2013 and 2017;

22   correct?

23      A.   I am not sure I understand.  Can you restate

24   that?

25      Q.   I think it's a very basic question.

1          NetCE realized revenues had sales, money was sent

2     to NetCE for sales of catalogs between the years 2013

3     and 2017; correct?

4          A.   Yes.

5          Q.   And those revenues are reflected in at least two

6     of the spreadsheets that we look at in Exhibit 85;

7     correct?

8          A.   The cost versus revenue by catalog spreadsheets

9     do reflect the revenue that came in from those catalogs.

10         Q.   And NetCE also realized revenue from individual

11    course sales for the years 2013 to 2017; correct?

12         A.   That's correct.

13         Q.   And which documents reflect those revenues?

14         A.   We have a few different reports that provide

15    information on sales by product and sales by course

16    available to us.

17         Q.   What is the best selling course by individual

18    course revenue that NetCE has ever sold?

19         A.   I don't know.

20         Q.   It would be reflected in those documents that you

21    just described?

22         A.   I'm not sure how far back the sales records -- I

23    am not sure that they go back to the inception of the

24    company.

25         Q.   The $84,000 in individual course revenue for the

1    multiple sclerosis course in 2014 that you've described

2    in interrogatory response number 8 --

3        A.  Yes.

4        Q.  -- is that typical or atypical for NetCE for an

5    individual course sale in a year?

6        A.  I think there may be a -- can I look through

7    these documents?

8        Q.  Yeah, take your time.

9        A.  On the courses scheduled for update 2016

10   document?

11       Q.  That's Navigant 2.  Yes?

12       A.  Yes.  This is only courses that were scheduled to

13   be updated in 2016, and it includes COPD, which was one

14   of the Jouria courses.  And it also includes multiple

15   sclerosis.

16            I just want to point out that this was created at

17   the beginning of 2016; so courses that were scheduled to

18   expire later in the year would gain additional revenue

19   throughout the year.  That was the case with multiple

20   sclerosis.  It was not scheduled to expire until very

21   late in the year.

22            But you can see here our examples of the

23   individual course revenue for courses scheduled to be

24   revised in 2016, and multiple sclerosis appears on the

25   second page, kind of middle -- middle of the -- middle

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

 1    of the road.

 2       Q.  And it shows a lifetime revenue of $67,272.15; is

 3    that correct?

 4       A.  As of the beginning of 2016, that was correct.

 5       Q.  And that's revenue that's attributable to this

 6    course, even as it's featured in the three catalogs that

 7    we mentioned -- or that you mentioned earlier in your

 8    testimony; correct?

 9       A.  That's right.  This doesn't include completions

10    as part of the special offer or any subscriptions.  If a

11    learner had a subscription and completed the course as

12    part of that, it doesn't include that revenue either.

13       Q.  There's no way for us to predict with any

14    certainty how much revenue any particular course is

15    worth for a special offer like you described; right?

16       A.  As we discussed, I am not able to ascertain the

17    value of the course specific in a special offer.

18       Q.  And if you're not able to, because you're the one

19    here testifying in response to these topics, who is?

20       A.  I'm not sure that anyone could predict or

21    determine the amount of weight that a single course in a

22    bundled course offering had on a participant's decision

23    to complete that special offer.  But there are ways that

24    you could calculate it for ease of determining revenue,

25    either based on the percent that a course is responsible

1  for the overall content of that booklet or some other

2  means that I'm not aware of.

3      Q.  Even if you could attribute it like you're

4  describing by some percentage that that course achieves

5  in a booklet or a catalog, in order to understand lost

6  revenue, you'd have to not just look at the revenue,

7  you'd have to back out of whatever revenue you attribute

8  to that course -- let me see if -- I'm confusing myself.

9  Let me see if I could do it a different way.

10         In reading NetCE's response to interrogatory

11  number 8, NetCE seems to be suggesting that it lost

12  $35 million in revenue as a result of what were the

13  seven courses at issue prior to two being dismissed.

14         Did I read that correctly?

15     A.  That is correct.

16     Q.  Now we're at five courses.

17         Is it fair to they that that calculation is now

18  $25 million?

19     A.  That seems reasonable, yes.

20     Q.  During the time period in question, though -- I

21  think we've established this -- NetCE had revenues and

22  achieved sales for all of the catalogs that it offered

23  throughout all of the different jurisdictions; correct?

24     A.  During the period of 2013 to 2017, there were

25  sales of catalogs in all of those years.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                              Page 159

```
 1      Q.  And there were individual course sales and
 2   special bundle sales and unlimited package sales for all
 3   of those course years; correct?
 4      A.  We did sell courses in other products those
 5   years, yes.
 6      Q.  And to find out lost revenues, you'd have to back
 7   out of this calculation the revenue that NetCE actually
 8   achieved in order to find out what, if anything, NetCE
 9   lost; isn't that true?
10      A.  I don't know about that.
11      Q.  Well, to award NetCE $25 million here would be
12   double-counting sales; isn't that correct?
13      A.  I don't know.
14      Q.  Well, that number is based off of a prediction
15   that each of these five courses at issue would have
16   performed the same as the multiple sclerosis course
17   performed in 2014; right?
18      A.  Between 2014 and 2016, yes.
19      Q.  But between 2014 and 2016 when the $5 million
20   number was achieved, because it was in a catalog in
21   three different jurisdictions one year, NetCE still had
22   catalog sales in those three jurisdictions?
23             MR. KERN:  Asked and answered.
24             THE WITNESS:  There were catalog sales in
25   those years.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1   BY MR. WILSON:

 2      Q.  So to determine what was actually lost, if

 3   anything, you'd have to back out of the number provided

 4   here, the actual sales achieved by NetCE; otherwise, you

 5   would be double counting; right?

 6              MR. KERN:  Asked and answered.

 7              THE WITNESS:  I don't know.

 8   BY MR. WILSON:

 9      Q.  Well, just --

10      A.  As a non-accountant, I am not totally sure how

11   that could be calculated in a meaningful way.

12      Q.  There would have to be some accounting made for

13   sales actually made during the relevant time period by

14   NetCE so that NetCE wasn't getting rewarded twice for

15   sales that it says it would have made.

16              MR. KERN:  Asked and answered.

17   BY MR. WILSON:

18      Q.  Right?

19              MR. KERN:  Asked and answered.

20              THE WITNESS:  I don't know.

21   BY MR. WILSON:

22      Q.  Does that make sense at all?

23              MR. KERN:  It's not a question.

24              THE WITNESS:  It's not really my area of

25   expertise.
```

1   BY MR. WILSON:

2      Q.  Well, again, you're the one I get to talk to on

3   the issue of damages.

4      A.  Yes, I am.

5      Q.  What revenue in this case is NetCE claiming it

6   lost because of Elite's conduct?

7      A.  NetCE is claiming, based on an example of a

8   course that we were able to publish that was also

9   commissioned from Dr. Jouria, that these courses would

10  have made similar amount of revenue to that example

11  course of multiple sclerosis.  That multiple sclerosis

12  course was featured in a few catalogs.  It was sold as a

13  standalone offering, and the total revenue from those

14  available versions of the course was about 4.7 million,

15  a little bit more.  And that's how we are determining

16  the damages insofar as lost revenue in this case.

17     Q.  In promoting that number, has NetCE taken into

18  account the actual revenue that it achieved during the

19  period in question?

20     A.  Have we taken it into consideration?

21     Q.  No.  Have you taken it into account?

22     A.  Into account.

23         I am not sure how that would be done; so, no, I

24  did not.

25     Q.  Well, even if you assume -- even though there's

1    no evidence to support this -- we've already covered

2    this -- that any of these five courses would have ended

3    up in the exact same catalogs as the MS course -- that

4    being California, Texas, and Ohio -- during the time

5    period in question, NetCE achieved revenues for sales of

6    other courses in catalogs in California, Texas, and

7    Ohio; right?

8              MR. KERN:  Asked and answered three times.

9              THE WITNESS:  That's correct.

10   BY MR. WILSON:

11     Q.  Doesn't it make sense that NetCE should have to

12   account for the revenue it actually made from sales in

13   calculating what it alleges it lost by not publishing

14   the five courses in question?

15             MR. KERN:  Asked and answered multiple

16   times, Mark.  You can't just keep grinding on her until

17   you get the answer you like.  We do have an expert

18   witness in this case.  You will have a chance to take

19   their deposition.

20             THE WITNESS:  I am not able to speculate

21   whether the amount of revenue from featured courses

22   would be more or less than that; so I'm not aware of a

23   way of making that calculation.

24   BY MR. WILSON:

25     Q.  And in calculating the $25 million number that

 1  you testified about, did NetCE take into account the

 2  fact that the $4.7 million number included sales of

 3  other courses in addition to the MS course?

 4    A.  When this calculation was made, it was unclear

 5  how to parse out the amount of value for an individual

 6  course in the special offer booklet; so the entire

 7  booklet revenue was included in that calculation.

 8        But, again, I understand that there may be a way

 9  that I am not aware of to attribute value to a partial

10  special offer, but I wasn't able to do that accurately

11  with the knowledge that I had.

12    Q.  So you attributed all of the revenue for those

13  catalogs, even though they included additional courses,

14  for purposes of calculating the number that you've

15  promoted here to us?

16    A.  In this calculation, it's the total revenue minus

17  the costs associated with the special offers, regardless

18  of how many courses were in that special offer.

19    Q.  How do you know whether the $4.7 million in

20  revenue -- whether that number was the result of one of

21  the other courses and not the MS course?

22    A.  I don't know the extent to which the revenue is

23  or is not attributable to the multiple sclerosis course.

24    Q.  In calculating the $25 million number that you've

25  promoted here today, did you take into account any of

1  the factors we discussed that influence how a course

2  might perform?

3     A.  I don't think it's possible to predict all of the

4  factors that can influence the components of a special

5  offer; so -- or how to quantify them; so they were not

6  considered in this calculation.

7     Q.  So in promoting the $25 million number that

8  you've talked about today, NetCE assumed that each of

9  these five courses at issue would have performed --

10  excuse me -- would have been included in the California

11  nurses catalog, the Texas nurses catalog, and the Ohio

12  nurses catalog and would have performed comparably with

13  whatever courses were also included in those catalogs as

14  the MS course and its other courses in those same

15  catalogs in 2014; is that correct?

16     A.  The multiple sclerosis course was chosen as the

17  example course because it was featured in three special

18  offers.  The COPD course, for example, was featured in,

19  I believe, two or three more special offers than that.

20  And the pressure ulcers course was featured in, I

21  believe, two special offers.

22        So it seemed to be a good medium ground for

23  determining potential lost revenue.  There's no

24  guarantee of which special offers it could have been in

25  more, it could have been in less.

1    Q.  And that would have directly influenced the

2  revenue that each of those courses would have achieved;

3  right?

4    A.  The total revenue for special offers would be

5  more if it was featured in more special offers and would

6  be less if it was featured in fewer special offers.

7    Q.  And there was no -- there's no evidence before us

8  that any of these courses would have been in any special

9  offers at all.

10    A.  The evidence that I have is that our intent, when

11  accepting the courses for development with a medical

12  writer who is paid a higher amount, was to feature each

13  of the courses.

14    Q.  How many times?

15    A.  That would be determined later; so I don't know.

16    Q.  And over what period of time would you feature

17  them?

18    A.  Courses can be featured at any time in their

19  life, and that includes after their revision; so there's

20  no real time period or limitation.

21    Q.  And you've had courses at NetCE that were written

22  by professional authors that performed worse than the

23  $4.7 million that you've talked about with regard to the

24  MS catalogs; correct?

25    A.  I don't know.

1    Q.  Not every course written by a professional author

2    has achieved $4.7 million in revenue at NetCE; right?

3    A.  I don't know.

4    Q.  Well, just looking at the document here, the

5    first page of Exhibit 85, it tells us that --

6    A.  This document includes professional writers and

7    clinicians; so professional writers -- for the most

8    part, the majority of these courses were authored by

9    clinicians, not professional writers.

10   Q.  Well, let's turn to the multiple sclerosis

11   article on page 2 of Exhibit 85.  It's Navigant 3, is

12   the Bates number.

13        It shows a lifetime revenue of $67,272.15 up

14   though, I understand, 2016; right?

15   A.  Early probably December 2015 or January 2016.

16   Q.  How is that number calculated?

17   A.  It was calculated with an internal tool we have,

18   sales by product.

19   Q.  So how do you explain the difference between the

20   $67,000 lifetime revenue figure in Exhibit 85 for

21   multiple sclerosis and your $4.7 million figure that

22   you're promoting here today?

23   A.  This amount is the lifetime revenue as of early

24   2016 for the individual standalone course.  It -- this

25   course expired towards the very end of 2016; so it

Case 0:15-cv-61165-WPD  Document 337-1  Entered on FLSD Docket 05/26/2018  Page 167 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                     Sarah Campbell on 11/14/2017                     Page 167

1    continued to gain revenue throughout that year.  And it

2    also discounts -- or it does not include any revenue

3    from the special offers in which it was featured or any

4    associated subscription products.

5        Q.  On a course level basis, has NetCE ever tried to

6    calculate revenues by course that take into account all

7    of the various places where a course might be offered?

8        A.  We have not had a need to try to separate

9    individual course revenue out of a total special offer

10   revenue until this time, as far as I know.

11       Q.  And have you done it here for this case?

12       A.  I have not, but we have talked to some experts

13   who may be able to make those calculations.

14            MR. KERN:  Mark, Kate, when you get a

15   chance, we could use a break.

16   BY MR. WILSON:

17       Q.  You're the person I get to talk to on this topic

18   because you've been designated.  No expert has been

19   designated for this topic.

20            So as we sit here today, can you say with any

21   certainty how much revenue NetCE lost because of its

22   decision not to publish these five courses?

23       A.  I can say that we use the multiple sclerosis

24   course as an example to calculate potential lost revenue

25   for each of these five courses, and that took into

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1  account our intent to feature these courses as well as

 2  the individual potential standalone course revenue, and

 3  that was our best way of calculating lost revenue in

 4  this case.

 5      Q.  Have you had catalogs that have performed worse

 6  than the catalogs did in California, Texas, and Ohio in

 7  2014?

 8      A.  Yes.

 9      Q.  How much revenue does NetCE achieve on sales in a

10  given year?

11      A.  Our general revenue -- I can give you a range --

12  is -- varies by year.  Do you have a specific year that

13  you're interested in?

14      Q.  '13 through '17.

15      A.  The range would be between 10 and 21.

16      Q.  So according to you, the losses associated with

17  not publishing these five courses are greater than the

18  overall revenue for any given year that NetCE has ever

19  achieved; is that correct?

20      A.  Can you repeat that?

21      Q.  The losses attributed by you to NetCE's decision

22  not the publish these five courses is greater than

23  NetCE's overall revenue for any year between 2013 and

24  2017?

25      A.  No.  My answer was by year.  So the range by year

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

 1    for each year annually was 10 to 21.

 2        Q.  And here you're saying the loss would be 25

 3    million, and that's greater than that range of revenue

 4    for an entire year achieved by NetCE.

 5        A.  For a single year, these courses would all have a

 6    minimum three-year life span, and they would potentially

 7    be featured and continue indefinitely.

 8        Q.  Can you take a look at NetCE's response to

 9    Elite's interrogatory number 8.  It's in Exhibit 75.  At

10    the bottom, it says, "$35 million of lost revenue

11    attributable entirely to Elite's infringement for the

12    first year of circulation of each course alone."

13            I understand that's 25 million now because we've

14    knocked off two articles; right?

15        A.  That's correct.

16        Q.  But that says it's for one year.  Did I read that

17    incorrectly?

18        A.  That is what it says.

19        Q.  And that's not right, is it?

20        A.  I don't know.

21        Q.  You just said that the $5 million was achieved

22    over a three-year period, on average, or maybe even

23    longer.  This says one year.

24            So it's not right, is it?

25        A.  No.  What I said is that the $4.7 million

```
 1   attributed to the special offers was over two years, and
 2   the individual net course revenue of 84,000 was over
 3   three years.
 4       Q.  And according to this verified interrogatory
 5   response, NetCE wants $25 million for one year alone,
 6   and "alone" is in italics.  I didn't do that.  NetCE
 7   did.
 8           How do you explain that?
 9       A.  The bulk of the revenue from a special offer
10   booklet occurs in the first year alone.  More than half,
11   and in some cases, substantially more than half.
12           But I can't tell you the percentage of that total
13   two-year revenue that occurred in the first year or
14   occurred in the second year.
15           MR. WILSON:  Let's take a break.
16           MR. KERN:  Thank you.
17           THE VIDEOGRAPHER:  The time is 4:04 p.m.,
18   and we're off the record.
19           (Off the record.)
20           THE VIDEOGRAPHER:  This is the beginning of
21   media number 4 in the deposition of Sarah Campbell.  The
22   time is 4:18 p.m., and we're back on the record.
23   BY MR. WILSON:
24       Q.  Ms. Campbell, I'm going to hand you what has
25   previously been marked as Exhibit 46 -- excuse me, 45.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1          Earlier today in your testimony, you talked about

 2    seeing some documents in discovery related to Dr.

 3    Jouria's relationship with Elite.  And you mentioned, I

 4    believe -- and correct me if I'm wrong -- that you saw

 5    some e-mails that showed the topics that Dr. Jouria was

 6    going to write on for Elite and also a reference to the

 7    agreements that Dr. Jouria had with NetCE.

 8          Do you recall that testimony?

 9    A.  I do.

10    Q.  Is Exhibit 45 one of the e-mails that you -- or

11    the e-mail that you were referencing in your testimony?

12    A.  This is not the e-mail I was referring to.

13    Q.  Well, if you take a look for a second at

14    Exhibit 45, you see down at the bottom of the first

15    page -- excuse me.  On the second page, you see an

16    e-mail from Tracey Foster to Dr. Jouria, dated

17    February 6, 2013, where Tracey says, "I was trying to

18    find your list of topics that you suggested, but since I

19    closed the job on elance, I cannot access your

20    suggestions.  Will you please send me the subjects

21    again, and then I will put them in the order we wish to

22    receive."

23          Do you see that?

24    A.  I do see that.

25    Q.  Below that e-mail is an e-mail from Dr. Jouria
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1   talking about the women and heart disease course.

2        There's no reference there to NetCE; right?

3   A.  There is no reference to NetCE.  That's right.

4   Q.  Turn to the first page of Exhibit 45.  Dr. Jouria

5   responds to Tracey Foster and says, "Here's the list."

6   And you see in that list the five courses at issue here

7   today:  chemotherapy, GERD, antimicrobial pharmacology,

8   traumatic brain injuries, and dementia versus depression

9   in the elderly.

10       Do you see that?

11  A.  I see those five subjects you just listed, yes.

12  Q.  No reference to NetCE; right?

13  A.  There is no reference to NetCE.

14  Q.  And then Ms. Foster responds to Dr. Jouria at the

15  top -- this is now in February -- February 6th

16  of 2013 -- and says, "Your list is perfect.  You can --

17  you can just proceed as listed."

18       Do you see that?

19  A.  I do.

20  Q.  Again, no reference to NetCE to this exhibit at

21  all; right?

22  A.  That's right.

23  Q.  Then you turn to Exhibit 46.

24       Before I get into specific questions, you said

25  earlier today that you had read the transcript from

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1    Dr. Jouria's deposition; correct?

2        A.   That's correct.

3        Q.   So you recall that Dr. Jouria confirmed at his

4    deposition that the first time he made Elite aware of

5    the fact that he had written for NetCE was in October of

6    2013.

7             Do you recall that?

8        A.   I don't specifically recall that from his

9    deposition, but I do recall seeing the e-mails in

10   Exhibit 46.

11       Q.   So this is the e-mail that you were talking about

12   earlier in your testimony; is that correct?

13       A.   Yes.

14       Q.   And what we see in Exhibit 46, if you turn to the

15   page that has an e-mail on it dated October 11th, 2013,

16   from Dr. Jouria to Michelle Franchi.

17       A.   Yes.

18       Q.   Middle of the page, there's an e-mail from

19   Dr. Jouria dated October 10, 2013, where, for the first

20   time, he's informing Elite that he's written courses for

21   NetCE.

22             Do you see that?

23       A.   I can see that he's informing them in that e-mail

24   that he's written courses for companies including NetCE.

25       Q.   Any reason to -- and this lines up with his

```
 1   testimony that you read as to when he first informed
 2   Elite about NetCE.
 3         So any reason to dispute anything that you're
 4   seeing in these exhibits --
 5              MR. KERN:  Vague.
 6   BY MR. WILSON:
 7     Q.  -- as it pertains to Dr. Jouria alerting Elite to
 8   his involvement with NetCE?
 9     A.  In the e-mail directly below that from Michelle,
10   she specifically asks if any of the courses were NetCE
11   courses, and I'm not sure why she would ask that
12   question if he hadn't conveyed that, but I don't know --
13   so I don't know if he --
14     Q.  Well, if she knew the answer, she wouldn't be
15   asking the question; right?
16              MR. KERN:  Lacks foundation.
17              THE WITNESS:  I don't know.
18   BY MR. WILSON:
19     Q.  Right.  If you fast forward two -- two pages in
20   Exhibit 46, you'll see an e-mail down at the bottom from
21   Dr. Jouria dated October 15, 2013, where he says, "I
22   looked through a contract for NetCE, and I did not sign
23   exclusive rights."
24         Do you see that?
25     A.  I do see that.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

1    Q.  So what we have here is Dr. Jouria suggesting to

2  Elite that he will write courses on the five topics

3  that -- from the subject matter of the courses at issue

4  in this case back in February of 2013.  And then through

5  his testimony, as corroborated by Exhibit 46 in his

6  e-mail informing Net- -- excuses me -- informing Elite

7  for the first time eight months later that he's also

8  written for NetCE, including a whole host of other

9  continuing education providers.

10        Do you see that?

11          MR. KERN:  Objection.  It's -- it's just --

12  Mark, it's just testimony and compound.  You're

13  testifying, and then you're saying correct the entire

14  day.  That question had five dependent clauses.  It asks

15  her to agree --

16          MR. WILSON:  If you have an objection --

17          MR. KERN:  -- the e-mail corroborates --

18          MR. WILSON:  You made your objection.  Thank

19  you.

20          MR. KERN:  -- testimony that he provided.

21          MR. WILSON:  Thank you.  Thank you.

22          MR. KERN:  You can't possibly answer that

23  question.  Ask a question.

24          MR. WILSON:  I appreciate you not speaking.

25  Make your objection, please.

```
 1              MR. KERN:  You are testifying, Mark, and

 2    asking her correct --

 3              MR. WILSON:  I am allowed to ask leading

 4    questions of this adverse witness.

 5              MR. KERN:  -- the entire day.

 6              MR. WILSON:  And that's how a deposition

 7    goes, John.  Maybe you should take a look at one

 8    sometime.

 9              MR. KERN:  That's pretty funny.  It's a

10    master class.

11    BY MR. WILSON:

12       Q.  So here what we have is Elite being informed for

13    the first time eight months later that Dr. Jouria is

14    working also with NetCE and other CE providers.

15          Do you see that?

16       A.  I can see that he's disclosing to them in October

17    that he's worked with other providers including NetCE,

18    but I don't know if he had conveyed that information

19    before that date or not.

20       Q.  Do you have any evidence to suggest that he had?

21       A.  In that e-mail that he received from Michelle

22    before that, she specifically inquires about whether the

23    courses in question were sold to NetCE, and I don't know

24    why she's asking that question.  You would have to ask

25    her.
```

    1      Q.   I appreciate that.

    2           But as you sit here, you have no evidence to

    3   dispute what Dr. Jouria testified about and what these

    4   documents corroborate, do you?

    5      A.   What he testified about in relation to?

    6      Q.   Informing Elite about his involvement with NetCE.

    7      A.   I don't have evidence either way.  But I

    8   understand that we're still receiving documents and

    9   information; so it could change.

   10      Q.   And then we saw an e-mail here on October 15th

   11   from Dr. Jouria to Michelle Franchi where he says, "I

   12   did not sign exclusive rights with NetCE."  We also

   13   talked earlier today about the fact that Dr. Jouria

   14   testified at his deposition that he refused to provide

   15   his contracts to Elite.

   16           Does this not indicate to you -- excuse me.

   17           Do you have any reason to dispute the statement

   18   by Dr. Jouria made to Elite about his contract?

   19      A.   I'm not sure what you're asking.  Could you

   20   rephrase?

   21      Q.   Let me see if I can.

   22           You recall reading Dr. Jouria's testimony from

   23   his deposition that he refused to provide Elite with a

   24   copy of his contracts with NetCE; correct?

   25      A.   That's correct.

1     Q.   And you have no reason to dispute that testimony;

2     right?

3     A.   I have no evidence, at this time, to dispute

4     that.

5     Q.   Indeed, if you'd flip one page forward in

6     Exhibit 46, Ms. Franchi, on October 28, 2013, writes an

7     e-mail to Dr. Jouria, and the first paragraph says, "I

8     asked you to send me the contracts with these other

9     companies, and you declined."  So we have Dr. Jouria

10    saying I didn't send them to her, and we have a

11    corroborating e-mail from Ms. Franchi saying, "You

12    didn't send them to me."

13         Do you have any reason to dispute what

14    Ms. Franchi is saying here?

15    A.   I have no evidence to dispute it at this time.

16    Q.   So the evidence that we do have, as it pertains

17    to Dr. Jouria's freelance writer agreements with NetCE,

18    is that he didn't inform Elite of his involvement with

19    NetCE until eight months after he started working with

20    them, and when he was asked to provide his contracts, he

21    declined.  And when Elite asked him what's in those

22    contracts, he said, "I did not sign exclusive rights."

23    A.   Are you asking if I acknowledge those things?

24    Q.   Given that evidence, which you don't dispute;

25    correct?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1    A.  I do not have -- I cannot tell whether or not

2  they were aware that he had a relationship with NetCE

3  prior to the dates of this e-mail.

4    Q.  So given that evidence, what basis do you have to

5  say that Elite intentionally interfered with any

6  contracts between Dr. Jouria and NetCE?

7              MR. KERN:  Asked and answered multiple times

8  this morning.

9              THE WITNESS:  So we were aware that there

10  was a relationship between Alpine and Elite.  We knew

11  that Alpine was in receipt of information that we were

12  working with Jouria in plan to develop specific courses

13  with him.  And we knew that Elite then developed these

14  courses in that same time period, and that led us to

15  conclude that they had the prior knowledge -- worked on

16  these courses.

17              And I can't say for sure if they released

18  these courses knowing that he had contracts with us and

19  not knowing what the content of those contracts were --

20  continued to work with them -- sorry.  Elite continued

21  to work with Jouria to develop the content that they

22  knew that he had worked with us to do.

23  BY MR. WILSON:

24    Q.  And the reason you're saying they knew it was

25  through the Alpine connection; is that correct?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

**Sarah Campbell on 11/14/2017**

```
 1      A.  We know that Alpine knew of his relationship with
 2   Jouria -- of NetCE's relationship with Jouria and our
 3   intent to develop these subjects.  But, also, this
 4   e-mail indicates that before they published some or all
 5   of these courses, they knew that we had a contract with
 6   Jouria as well.
 7      Q.  Were the freelance writer agreements what
 8   Dr. Jouria provided to Alpine?
 9      A.  I don't think so, no.
10      Q.  And as we sit here today, you have no evidence to
11   support your allegation that Alpine or McKissock shared
12   any information as it pertains to Dr. Jouria with Elite;
13   correct?
14      A.  As we sit here today, the -- we have testimony
15   from Dan Cremons that Alpine did not share the
16   information, but we don't have any evidence one way or
17   another from McKissock or a representative of McKissock.
18      Q.  Has NetCE sought such evidence as part of
19   discovery in this case?
20      A.  Not yet.
21      Q.  Just like we saw in Exhibit 45 with Elite,
22   Dr. Jouria also suggested courses in the subject matter
23   of the five courses at issue in this case to NetCE;
24   isn't that correct?
25      A.  Some of these course topics were suggested by
```

1    Jouria to NetCE.

2        Q.  Which ones were not?

3            I'm not -- I moved on from here.

4        A.  I thought you were talking about 45.

5        Q.  We see in -- let me see if I can make it a little

6    more simple.

7            We see in Exhibit 45 that Dr. Jouria suggested to

8    Elite that he wanted to write on a host of topics,

9    including the topics that -- that formed the basis of

10   the five courses at issue here between NetCE and Elite;

11   right?

12       A.  There are similar topics on this list, and in

13   question here, yes.

14       Q.  Dr. Jouria said to Elite, "Here is a list of

15   possible topics for future courses," and he suggested

16   chemotherapy, GERD, antimicrobial pharmacology,

17   traumatic brain injuries, and dementia versus depression

18   in the elderly; right?

19       A.  Those are included in this list.  That's correct.

20       Q.  And those are the five courses that Elite

21   published that NetCE is suing on; correct?

22       A.  Not exactly.

23       Q.  What's the difference?

24       A.  The courses in question that differ are cancer

25   and chemotherapy, which includes a component amount of

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                 Sarah Campbell on 11/14/2017                 Page 182

```
 1   cancer disease process, anti- -- nonantibiotic

 2   antimicrobial pharmacology, which would exclude

 3   antibiotics possibly because somebody was already

 4   offering a course on antibiotics.  And those two

 5   specifically stand out as differences when reviewing

 6   this list.

 7       Q.  You don't read these as shorthand for the same

 8   topics that form the basis of the articles written by

 9   Elite -- by Dr. Jouria for Elite?

10       A.  Sure.  Antimicrobial pharmacology would

11   essentially include antibiotics unless it specifically

12   indicated it didn't.

13       Q.  Ms. Foster responds in Exhibit 45, "You can

14   proceed as listed."  And we know that Dr. Jouria wrote

15   the courses for Elite that NetCE is accused of

16   infringement; right?

17       A.  I -- yes.

18       Q.  Any reason to believe, given what we know, that

19   this list is any different than what ultimately

20   resulted?

21       A.  I can tell you that the titles are not exactly

22   the same, and at least in the case of antimicrobial

23   pharmacology, a large portion of what is implied by that

24   title is excluded.

25       Q.  Now, talking about Dr. Jouria's work for NetCE,
```

1    Dr. Jouria suggested to NetCE that he would write

2    articles on subject matter from the basis of the five

3    courses that NetCE copyrighted and is asserting in this

4    case; correct?

5        A.  He was guided at least in the case of the

6    nonantibiotic antimicrobial pharmacology course to

7    exclude antibiotics because NetCE already offered a

8    course on that topic.  So at least in that case, he was

9    given some direction as to NetCE's interest in that

10   subject.

11       Q.  Take a look in -- in Exhibit 77, a document

12   labeled NETCEB3017.  We see an e-mail at the bottom from

13   Dr. Jouria to you on September 13th, 2012, where he

14   says, "I am thinking of developing a course on

15   nonantibiotic pharmacology."

16           Do you see that?

17       A.  I do, yes.

18       Q.  So Dr. Jouria suggested at least that topic;

19   correct?

20       A.  Well, actually, if you look at the e-mail

21   directly before that sent by me, I had said specifically

22   that we currently offer a course in antibiotics, and

23   that was his response to my feedback in that case.

24       Q.  So he said, "I can do an article on nonantibiotic

25   pharmacology"; is that right?

1    A.  That's right.

2    Q.  And if you look at Document -3041 in Exhibit 77,

3  you see at the top in an e-mail from Dr. Jouria on

4  July 9, 2012, to you.  He says, "I was also thinking

5  about writing a monograph on traumatic brain injuries."

6       Do you see that?

7    A.  I do.

8    Q.  So Dr. Jouria suggested the traumatic brain

9  injuries topic to NetCE; correct?

10    A.  That is correct.  I had indicated to him that we

11  were interested in neurology courses previously.

12    Q.  If you take a look at Exhibit 78, the document

13  NETCE5077, an e-mail dated September 24th, 2012,

14  Dr. Jouria writes again to you and asks you, "Do you

15  have any courses on the following," and he lists GERD.

16    A.  That is true.

17    Q.  So Dr. Jouria suggested writing an article on

18  GERD to NetCE; correct?

19    A.  That is one of the topics he suggested.

20    Q.  Take a look back at Exhibit 77, Document Number

21  NETCEB3006.  In an e-mail dated January 3rd, 2013,

22  Dr. Jouria writes to you and says, "I would like to

23  develop a new course and wanted to know if you had any

24  new course requests or needs.  Perhaps a chemotherapy

25  course."

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)            Sarah Campbell on 11/14/2017           Page 185

1          Do you see that?

2    A.  Yes.

3    Q.  So just like he did with Elite, he proposed

4  writing a course on chemotherapy.

5          Do you see that?

6    A.  I do.  We had indicated to him an interest in

7  neurology, pathology, and pharmacology; so that would

8  fall under that category, yes.

9    Q.  And if you take a look at Document -- Document

10  Number NETCEB3002, you see at the bottom an e-mail from

11  Dr. Jouria dated February 6, 2013, to you saying, "I

12  will be finishing up the cancer and chemotherapy and

13  GERD courses in a couple of weeks.  I wanted to see if

14  you had any interest in the following courses before I

15  submit an official proposal," and he mentions dementia

16  versus depression in the elderly.

17          Do you see that?

18    A.  I do, yes.

19    Q.  So Dr. Jouria suggested the topic of dementia

20  versus depression in the elderly to NetCE; correct?

21    A.  That is correct.

22    Q.  So what specifically did NetCE do after

23  Dr. Jouria made the suggestions and before contracting

24  with Dr. Jouria to determine whether they wanted

25  Dr. Jouria to write the articles he suggested?

1    A.  All courses that are developed for NetCE require

2    a formal proposal; so Dr. Jouria submitted formal

3    proposals for each of the five courses in question and,

4    in fact, for all of the courses he has submitted to us.

5    Those proposals were reviewed by the development

6    committee, and it was determined that we would issue a

7    contract for completion of the projects.

8         As -- I wanted to add, as part of the proposal

9    process, we do a general background -- not a formal

10   background check, but we do just an Internet search and

11   determine if the potential author has published on these

12   topics previously or has any problematic relationships.

13   Q.  And did you find anything related to Dr. Jouria

14   when you performed that background check?

15   A.  When we did the initial review of his background

16   and of his stated claims on his CV, we found some

17   evidence of a lawsuit with the entity that governs

18   foreign-trained physicians in the United States.  But I

19   don't recall when -- for which course proposal that was

20   determined -- that was discovered.

21   Q.  Did that discovery have any influence on NetCE's

22   decision not to go forward with the five courses at

23   issue here?

24   A.  No.

25   Q.  There were complaints received by NetCE related

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 187

1    to Dr. Jouria in conjunction with an earlier course he

2    had written for NetCE as well; isn't that correct?

3        A.  I received -- I am not sure what exactly you mean

4    by "complaint."

5        Q.  Someone who took one of his earlier courses wrote

6    in and said, "This author is unqualified to write this

7    course"; isn't that correct?

8        A.  It's possible, but I don't know for sure.

9            (Exhibit No. 86 marked for identification.)

10   BY MR. WILSON:

11       Q.  Handing you what I've marked as Exhibit 86.  It's

12   an e-mail from Erin to you in August of 2015, and it's

13   forwarding an e-mail from someone named Evan Hirsch,

14   H-I-R-S-C-H.

15           Have you seen this e-mail before?

16       A.  I have, yes.

17       Q.  Does this help refresh your recollection?

18       A.  I do recall receiving this e-mail from

19   Dr. Hirsch.

20       Q.  Dr. Hirsch complains about Dr. Jouria, doesn't

21   he?

22       A.  He complains that the biography for Dr. Jouria is

23   lacking.

24       Q.  It's not just the biography, is it?

25       A.  It's based on -- yes, it's based on the

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

1   biography.

2       Q.  This customer of NetCE's concludes by saying, "I

3   begin to wonder whether or not I will continue to

4   utilize NetCE at all"; right?

5       A.  Yes.  His last paragraph starts that way, yes.

6       Q.  Did this complaint about Dr. Jouria influence

7   NetCE's decision at all to not publish the five courses

8   at issue in this case?

9       A.  No.

10              (Exhibit No. 87 marked for identification.)

11  BY MR. WILSON:

12      Q.  Handing you what I've marked as Exhibit 87.  It's

13  an e-mail exchange in February of 2013 between you and

14  someone named John Jurica, J-U-R-I-C-A.  The Bates label

15  at the bottom is NETCEB5017.

16          Do you see at the top you wrote to Dr. Jurica on

17  February 13, 2013, and said, "Thanks for the heads up.

18  I did notice that this individual had some legal issues

19  regarding his license, but will definitely look into it

20  further"?  Does this help refresh your recollection as

21  to when you were investigating Dr. Jouria?

22      A.  I had already done an investigation into Jouria

23  when we initially started working with him, and that's

24  when I noticed the legal issues regarding his license.

25  When I received this e-mail from Dr. Jurica, I did some

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

 1  additional searching and continued working with Jouria

 2  in the meantime.

 3     Q.  Did you have concerns?

 4     A.  I had concerns based on this feedback from

 5  Dr. Jurica.  I also had concerns based on our initial

 6  investigation.

 7         But we had made a decision when we initially

 8  found the legal issues regarding his license to move

 9  forward with all of the courses currently in

10  development.

11     Q.  And then as you continued to move forward, you

12  discovered that, at least with some of the articles,

13  Dr. Jouria had plagiarized the content; is that correct?

14     A.  As we moved forward, I had concerns that the

15  content had un-sourced materials that could potentially

16  have been plagiarized, and in some cases, turned out to

17  require permission to reprint.

18     Q.  And to that -- did that discovery influence your

19  decision not to publish the five courses at issue here?

20     A.  No.

21     Q.  It's possible, is it not, that for the three

22  courses that Dr. Jouria submitted to you, that you did

23  not do the editing work like you did for the other two?

24  And I believe those three courses are a traumatic brain

25  injury course, a depression versus dementia course, and

1   a nonantibiotic antimicrobial pharmacology course;

2   right?

3       A.  Those courses had not entered into the editorial

4   process to the extent that GERD and cancer and

5   chemotherapy had.

6       Q.  It's possible, isn't it, that all three of those

7   articles are completely filled with plagiarized content?

8       A.  They may, or they may not.

9       Q.  You don't know?

10      A.  We haven't vetted the content to that level.

11      Q.  So for those three courses, at least, you haven't

12  undertaken any investigation as to what content NetCE

13  owns?

14      A.  All three of those courses have been run through

15  iThenticate, but we haven't done a manual comparison to

16  determine if the sources of any identified matches would

17  constitute plagiarism.  But we also believe that we own

18  all of the content as it was provided to us by

19  Dr. Jouria.

20      Q.  In NetCE's complaint, in particular, paragraph 71

21  of Exhibit 42, NetCE says that it is unable to use the

22  content Dr. Jouria submitted.

23          Why is that?

24      A.  Just one moment.  There's a lot of papers.

25      Q.  Let me ask it this way.

```
 1          Is NetCE able to use the content Dr. Jouria
 2     submitted to it?
 3        A.  We do not believe that we can use the content in
 4     these five courses for the purposes of providing to the
 5     public to issue continuing education credit.
 6        Q.  Why not?
 7        A.  These courses have been published by another
 8     company.
 9        Q.  And what is the issue with that?  You say you own
10     it.  Why can't you use it?
11        A.  The inherent value of the courses is, in our
12     minds, diminished by them being offered by another
13     company.  And, in addition, it introduces the
14     possibility of customer confusion about whether or not
15     Elite and NetCE are unique entities.  And it potentially
16     overlaps with courses that have beat us to market; so
17     customers could have already completed the same content,
18     making it less valuable to them in general.
19        Q.  It was a business decision made by NetCE not to
20     continue with these five courses; isn't that correct?
21        A.  It was a decision made by NetCE to halt course
22     development on these five courses until we could
23     determine what was going on with Elite and with Jouria,
24     and we are still doing that now.
25        Q.  Has NetCE considered continuing development of
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

 1   these five courses?

 2       A.   I have not considered that.

 3       Q.   I didn't ask if you had.

 4            Has NetCE?

 5       A.   NetCE has not considered that.

 6       Q.   Is it possible that NetCE will consider that?

 7       A.   No.

 8       Q.   Why not?

 9       A.   For the reasons that I detailed before about the

10   diminished value of these courses in light of their

11   already being offered, customer confusion, which is an

12   ongoing issue, and a disinclination to put additional

13   work into these courses when that value is -- inherently

14   already been stripped from them.

15       Q.   And what do you base your testimony that the

16   value has been stripped from these courses?

17       A.   There is a value in being the first to market.

18   There is a value in being the only provider of specific

19   content, and that cannot be regained at this point.

20       Q.   What do you base your belief that there's value

21   in being the first to market with certain content?

22       A.   We have feedback from customers that they have

23   confusion when a course has a similar or same title.

24   But, also, we have feedback from customers that they

25   wanted a specific topic, and they completed it with

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 193

```
 1   whatever provider had that topic at the time.

 2      Q.  So your testimony about diminished value relates

 3   to the subject matter of these particular courses; is

 4   that correct?  Titles, the topics, the subject matter?

 5      A.  These subjects specifically, that's true.

 6      Q.  In your -- NetCE's interrogatory responses, NetCE

 7   said that it -- that there was a market need for

 8   continuing education courses on the subject matters of

 9   the seven courses.

10         Now, it's five courses now, but at the time, it

11   was seven courses.  You're aware of that statement that

12   there was market need?

13      A.  Yes.

14      Q.  It's in interrogatory number 5.  That's the

15   complaint.  Wrong document.

16            MR. KERN:  Does she need to see it?

17            MR. WILSON:  No.

18   BY MR. WILSON:

19      Q.  What market need is NetCE referring to?

20      A.  Specifically, the areas of pharmacology and

21   advanced sciences.

22      Q.  What basis do you have to say there was a market

23   need at the time on the subject matters of these

24   courses?

25      A.  The ANCC had a requirement that certified nurses
```

1  complete a minimum number of hours in pharmacology, and

2  that that con- -- that continuing education was required

3  to be completed over the span of their certification in

4  order to maintain their standing as an advanced practice

5  or certified nurse.

6     Q.  Not all of the courses at issue here are in the

7  field of pharmacology; correct?

8     A.  As we discussed, two of the courses pertain

9  solely to pharmacology.  That would be the nonantibiotic

10  antimicrobial pharmacology course and the cancer and

11  chemotherapy course.

12        The other three courses in question contained

13  content or would contain content that fulfilled at least

14  partial pharmacology credit.

15     Q.  Did NetCE determine that there was a market need

16  for the five courses at issue based off of their subject

17  matter more specific than generally pharmacology?  I'm

18  just reading what you said in the interrogatory

19  response, and, obviously, I'll have some more questions

20  related to it.

21     A.  Then maybe I should read the interrogatory.

22     Q.  It's on page 7 of Exhibit 75.

23     A.  Oh, I got it.

24     Q.  Response to interrogatory number 5.  It's one

25  sentence down at the bottom.  It says, "At the time

 1    NetCE planners approved concepts for the seven courses,

 2    there was a market need for continuing education courses

 3    on the subject matters of the seven courses."

 4        A.  Okay.  Yes.  So when we say "subject matters,"

 5    that means that the subjects would address those needs

 6    in the market.  So not that they specifically needed to

 7    be on cancer and chemotherapy, for example, but that it

 8    would fulfill the need for pharmacology credit

 9    specifically.

10        Q.  There were lots of other continuing education

11    providers offering pharmacology courses at the time;

12    correct?

13        A.  Pharmacology courses, sure.  Yes.

14        Q.  So there wasn't a market need for pharmacology

15    courses.  There was a need at NetCE to offer

16    pharmacology courses; isn't that correct?

17        A.  No.  Certified nurses require a large number of

18    pharmacology credit, and, actually, a certain percentage

19    of those credits have to be completed through an ANCC

20    accredited provider; so whether or not other providers

21    were offering pharmacology credits, it could potentially

22    not meet the needs of those customers specifically.

23        Q.  Do you have any evidence and did you produce it

24    in this case to support your testimony about a market

25    need?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1     A.   The evidence that we have is knowledge of the

2   market in general but also feedback from customers

3   requesting additional pharmacology credits and

4   expressing difficulty obtaining all of the credits they

5   needed.

6     Q.   In the complaint, which is Exhibit 42, paragraph

7   69 -- it's on page 25 -- NetCE states, "NetCE's

8   competitive advantage and profitability for its courses

9   depends upon a first-to-market posture.  Elite's,

10  Alpine's, and Dr. Jouria's actions deprived NetCE of

11  this hard-fought advantage.  For NetCE to publish the

12  seven articles after Elite had done so would have

13  involved additional expenditures and investments that

14  the prospect for diminishing returns is no longer

15  justified."

16        Do you see that?

17    A.   I do.

18    Q.   And is the basis for that the same as what you

19  just testified about as to why NetCE can no longer use,

20  according to you, the courses Dr. Jouria provided

21  through you?

22    A.   My testimony, yes, would be the same in response

23  to that.

24    Q.   And that's related to the titles, the content,

25  the subject matter of these courses, if NetCE were to

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017
30(b)(6)                                                          Page 197

 1   publish them now, they would not be the first to market;

 2   is that correct?

 3       A.  That's correct.

 4       Q.  And then in Exhibit -- excuse me -- paragraph 69,

 5   it continues and says, "For NetCE to publish the seven

 6   articles after Elite had done so would have involved

 7   additional expenditures and investments that the

 8   prospect for diminishing returns is no longer

 9   justified."

10           And the basis for that is the same; is that

11   correct?

12       A.  That is correct.

13       Q.  Did NetCE do any analysis of the market prior to

14   contracting with Dr. Jouria to see if others had

15   published courses with the same titles or subject matter

16   as the five courses at issue here?

17       A.  The five courses at issue here represent general

18   medical topics that I would expect that other providers

19   have similar offerings on.  But the credit types and the

20   exact content I would expect to be different.

21       Q.  In your work on at least the GERD and cancer and

22   chemotherapy articles, what Dr. Jouria submitted to you

23   was never going to be published in its submitted form;

24   right?

25       A.  The GERD course and the cancer and chemotherapy

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 198 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                   Sarah Campbell on 11/14/2017                   Page 198

 1   course had been edited, and it was my expectation that

 2   the edited versions were the ones that would essentially

 3   be released.

 4       Q.  I believe you testified earlier that, at least

 5   with the GERD course, that the edits were significant;

 6   is that correct?

 7       A.  The edits --

 8              THE VIDEOGRAPHER:  Hold on.  We got to go

 9   off record.  The time is 5:12 p.m., and we're off the

10   record.

11              (Off the record.)

12              THE VIDEOGRAPHER:  The time is 5:13 p.m.,

13   and we're back on the record.

14   BY MR. WILSON:

15       Q.  The edits to the GERD course were significant;

16   correct?

17       A.  There were many edits to the GERD course, but

18   whether or not they were extensive is subjective, I

19   guess.

20       Q.  How would you qualify the edits to the GERD

21   course?

22       A.  Let me review.

23              There were many edits to the GERD course, and it

24   required significant work to bring it to NetCE's

25   standards and style, but it's not outside of the realm

 1    of possibility in course development for any of our

 2    courses.

 3        Q.  Fair to say that the edited versions of at least

 4    GERD and cancer and chemotherapy were different from the

 5    versions of those courses submitted to NetCE by

 6    Dr. Jouria; correct?

 7        A.  After we edited the courses, they were different

 8    than the drafts submitted by Jouria, yes.

 9        Q.  And then it makes sense, does it not, that, if

10    NetCE would have continued on and taken those courses

11    through the approval process -- the editing and approval

12    process and ultimately publishing them -- that the

13    courses would have looked -- contained different content

14    than the course -- similar course published by Elite;

15    correct?

16        A.  I would -- yes.  If we had completely edited the

17    content, there would have been more differences.  That's

18    correct.

19        Q.  So if your first-to-market advantage relates

20    specifically to content, the content that NetCE was

21    going to publish was never going to be the same as what

22    Elite published for these five courses; isn't that

23    correct?

24        A.  Well, I can't speak to the three courses that did

25    not go through the editorial process.  I don't know the

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1   extent of the changes that would have been necessary in

2   those cases.

3          In the case of GERD, even after editorial

4   changes, I would expect that some of the material would

5   be similar and the title and author, of course, would be

6   the same or similar.  And the same is true for cancer

7   and chemotherapy.

8      Q.  So having the same or similar title is a problem?

9   Is that your testimony?

10     A.  It could be part of customer confusion, but it's

11  not the only issue.  If there's a title that's the same

12  and it's a very basic title, that generally wouldn't

13  cause a problem if it was a different author.  But if

14  you have all of those components together -- the same

15  author, the same or similar title, and the same or

16  similar content -- that is a problem in terms of

17  confusion.

18     Q.  Do you have any evidence to support your

19  testimony on this point?

20     A.  Do I have any evidence that customers are

21  confused by the same or similar titles?  Yes.  We have

22  documented cases of customer confusion.

23     Q.  And have you produced that to us in this case?

24     A.  I don't know.

25     Q.  You said for the three courses that NetCE really

```
 1   didn't edit from Dr. Jouria that you don't know what
 2   would have been involved in getting those courses
 3   edited, approved, and published.  Yet in your complaint
 4   in paragraph 69, you say, "For all of the courses, it
 5   would have involved additional expenditures and
 6   investments that the prospect for diminishing returns is
 7   no longer justified."
 8        Can you explain your testimony in light of this
 9   allegation?
10   A.   I believe what I said was that I don't know the
11   extent to which this content would have required changes
12   to ameliorate issues with matches with third-party
13   sources.
14        I do know that the work that it would take to
15   ameliorate similarities between these courses and the
16   Elite courses in question would have been extensive
17   because, based on my review of the documents, the
18   similarities and the work that it would have taken to
19   remove those similarities were great, particularly --
20   particularly in light of the length of the courses and
21   the mass of the content.
22   Q.   And so NetCE made the business decision just to
23   stop; is that correct?  To not make that investment?
24   A.   We made the decision when we found the
25   infringement to stop development of all the Jouria
```

 1   courses in question and to try to determine what was

 2   happening with Elite and the copyright, and we're still

 3   doing that.

 4      Q.  What were the additional expenditures and

 5   investments that you would have had to make to get these

 6   courses ready to be published?

 7      A.  These courses would have had to have been

 8   essentially rewritten by editorial contractors or staff

 9   to the extent that we do not generally do for course

10   development.

11      Q.  Did you estimate how much that would have taken

12   for any of the five courses at issue?

13      A.  I have not attempted to estimate or speculate

14   about the cost involved.

15      Q.  What were the diminishing returns that you said

16   were no longer justified in the complaint?

17      A.  Because Elite had already gone to market with the

18   courses in question, we had been essentially beaten to

19   market, and the value of these courses, in light of

20   potential customer confusion and customers' lack of

21   interest in content they had already completed, made the

22   courses in question less valuable to NetCE.

23      Q.  Do you have any evidence that would support your

24   testimony that customers may not be interested like you

25   just described?

```
 1      A.  We do have evidence that customers experience

 2   confusion when there are the same or similar titles

 3   and --

 4      Q.  I think we covered that; right?  We already

 5   talked about that.

 6      A.  I thought so.

 7      Q.  And you said you didn't -- you don't know if

 8   you've produced it to us in this case.

 9      A.  I don't know if we have yet.

10      Q.  And mine is related to the second issue that you

11   described, which is that you said customers would not be

12   interested in completing content they've already

13   completed.

14          Do you have any evidence to support that

15   statement?

16      A.  We have had contact with customers who indicate

17   they are not interested in completing courses on topics

18   that they have already completed.

19      Q.  Have you had a situation like this before where

20   you were second to market with a topic?

21      A.  I don't know exactly.  I don't know.

22      Q.  I have to get to the bottom of what you're

23   talking about.

24          So what customer communications are you speaking

25   about then?
```

Case 0:15-cv-61165-WPD  Document 337-1  Entered on FLSD Docket 05/26/2018  Page 204 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                        Sarah Campbell on 11/14/2017

 1      A.  Customers can call us.

 2      Q.  I'm not asking if they can.  I know they can.  I

 3   am asking what specifically occurred.

 4      A.  Customers call us and e-mail us to request

 5   topics, and in those conversations, if they have already

 6   completed a course with another provider on a same or

 7   similar topic, they would not be interested in

 8   purchasing it from NetCE; so there are examples of that

 9   in our everyday interactions with customers.

10      Q.  And is it your understanding that, at the time

11   you contracted with Dr. Jouria to prepare these five

12   courses at issue between NetCE and Elite, that NetCE

13   would have been the first to market with courses in

14   these -- on these same topics with this same subject

15   matter?

16      A.  We did not have the expectation that these

17   courses -- or the course subjects, specifically -- would

18   be solely offered by NetCE.  However, we did have an

19   expectation that, for our audience, the amount of credit

20   and the value added by our accreditations would make

21   them desirable to our customers.

22      Q.  In NetCE's response to interrogatory number 4,

23   NetCE writes -- it's on page 7 of Exhibit 75 -- "The

24   seven courses at issue in this lawsuit are noteworthy in

25   particular because, at the time NetCE decided to develop

1    these courses, NetCE's continuing education provider

2    competitors, including Elite, did not have similarly

3    constructed courses in the seven courses' subject

4    matter."

5          You see that?

6    A.  I do see that.

7    Q.  What is the basis of that statement?  What did

8    you do to confirm that that was true?

9    A.  NetCE generally monitors competitors' offerings

10   and has a high-level knowledge of the areas that are

11   being offered by competitors in general.  And we knew

12   specifically the way that we offer courses and the

13   amount of credit being offered would have made these

14   unique -- unique in the meaning of the entire package

15   among the competitors that we were aware of.

16   Q.  What do you mean "the entire package"?

17   A.  I mean we have a course here, but what we're

18   selling is credit; so we have content, and that's

19   desirable.  We also, because of our accreditations and

20   approvals, are able to offer specific credits to

21   specific audiences.

22   Q.  You have competitors that have the exact same

23   accreditations and approvals; correct?

24   A.  I don't know -- I don't know if that's true.

25   Q.  Then how can you make that statement that

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1   yours -- your offering is unique?

 2       A.  Our knowledge of the market and competitors that

 3   we're aware of, among that group, I'm not aware of any

 4   that have the exact same approvals and accreditations

 5   that NetCE has.

 6       Q.  NetCE has competitors that are accredited through

 7   the ANCC; correct?

 8       A.  That's correct.

 9       Q.  You have competitors that are approved through

10   the NBCC?

11       A.  That's correct.

12       Q.  And you have creditors that are approved through

13   NASW?

14       A.  That's correct.

15       Q.  What other accrediting bodies have accredited

16   Elite -- excuse me -- have accredited NetCE?  And I'm

17   specifically looking at the nursing area where these

18   five articles were to be published.

19       A.  Well, we also have the ACCNE accreditation, which

20   is for physicians, and Jouria has -- one of Jouria's

21   courses was physician course in the past; so I would

22   expect that these would enter that market as well, at

23   least some of them.  We --

24       Q.  But Elite does not compete in a physician space,

25   does it?
```

1            MR. KERN:  Let the witness please finish her

2    answer.

3            THE WITNESS:  We also have approval through

4    surgical technologists, dental psychologists, other

5    mental health boards and state boards in any of those

6    professions.

7            In terms of Elite's accreditations and

8    approvals and their plans for the future -- I don't know

9    their total list of accreditations and approvals

10   currently or pending.

11   BY MR. WILSON:

12   Q.  Elite doesn't compete with NetCE for physician

13   continuing education credits; correct?

14   A.  I know that, as of today, they do not advertise

15   ACCM accreditation.

16   Q.  Going back to interrogatory number 4, it

17   doesn't -- your response that we were just reading

18   doesn't say anything about NetCE's accreditations or the

19   package that it can offer as it differs from its

20   competitors.  Indeed, it's equating itself with its

21   competitors, including Elite, and saying, "At the time,

22   our competitors did not have courses in the same subject

23   matters"; right?

24   A.  It actually says that they did not have

25   similarly -- similarly constructed courses in the seven

```
 1   subject matters.
 2      Q.  What does that mean, "similarly constructed
 3   courses"?
 4      A.  To my mind, that means that it did not offer this
 5   length and breadth of content, the type of credit, the
 6   materials in general in the same way that NetCE would
 7   have offered them.
 8      Q.  And what did you do to verify the statement
 9   you're making in this interrogatory response was
10   actually true?
11      A.  We have a general overarching knowledge of the
12   market and competitors, and we do just basic monitoring
13   of what's available in the marketplace.  And in our
14   knowledge of what competitors, that we're aware of, were
15   offering, they didn't offer these topics in the same way
16   that we intended to offer them.
17      Q.  Which competitors?
18      A.  We have a general knowledge of the courses
19   available from Elite from NurseCe4Less, from nurse.com,
20   from several other providers.  I don't have an
21   exhaustive list of all of the potential competitors or
22   other providers that we have a general knowledge of.
23      Q.  CEU Professor?
24      A.  I have heard of them, yes.
25      Q.  Is it a competitor?
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1   A.  Yes, in some ways.

 2   Q.  In nursing?

 3   A.  I don't know.

 4   Q.  CEUFast?

 5   A.  Yes.

 6   Q.  In nursing?

 7   A.  Yes.

 8   Q.  CNLA?

 9   A.  I don't know.

10   Q.  Corexcel?

11   A.  I don't know.

12   Q.  Lippincott's NursingCenter?

13   A.  Yes.

14   Q.  Nurse CEU?

15   A.  Yes.

16   Q.  Nursing Circles?  That's MyFreeCE.com.

17   A.  MyFreeCE?  Yes.

18   Q.  Nursing Spectrum, which is CE.nurse.com

19   A.  Yes.

20   Q.  Plexus Institute?

21   A.  I don't know.

22   Q.  Pri-Med, P-R-I, dash, M-E-D?

23   A.  Yes.

24   Q.  RN.com?

25   A.  Yes.
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1      Q.  RN.org?

 2      A.  I don't know.

 3      Q.  RnCeus.com?

 4      A.  I don't know.

 5      Q.  Uninursety, U-N-I-N-U-R-S-E-T-Y?

 6      A.  I don't know.

 7      Q.  Western Schools?

 8      A.  Yes.

 9      Q.  Wild Iris?

10      A.  Yes.

11      Q.  NurseCe4Less?

12      A.  Yes.

13      Q.  On Course Learning?

14      A.  Yes.

15      Q.  Strafford Publications?

16      A.  I don't know.

17      Q.  Gannett?

18      A.  Yes.

19      Q.  Which of these competitors were offering courses

20   on the same or similar topics as the five courses at

21   issue in this case?

22      A.  I don't know specifically by provider.

23      Q.  Tell me whatever you do know.

24      A.  I know that these providers offered continuing

25   education in major areas of healthcare.  Insomuch as
```

1   these courses covered major areas, I would expect that

2   those competitors offered some kind of activity on a

3   similar topic.  But I cannot say the length and breadth

4   of that material -- whether any of the topics or titles

5   appeared on each of them.

6       Q.  And how do you explain your testimony earlier

7   about what competitors were and weren't offering?

8       A.  All of our courses are developed and offered with

9   the benefit of a longer process for more credits, and

10  our knowledge of our competitors and their approvals or

11  accreditations led us to believe that they did not have

12  these courses provided in the same structure as we would

13  have provided them.

14      Q.  Are you aware of any competitors who have offered

15  or plan to offer similar courses or courses with

16  significant overlap as the five courses at issue between

17  NetCE and Elite?

18      A.  The only provider that I know that offered this

19  course content is Elite.

20      Q.  That's not what I asked.  Any competitors who

21  offered or plan to offer similar courses or courses with

22  the significant overlap as the five courses at issue

23  here?

24      A.  I don't know what you mean by "similar."  I am

25  taking that to mean the ways in which these courses are

 1    similar to the drafts that we receive from Jouria, and

 2    our investigation found that only Elite had published

 3    this content.

 4        Q.  Do you know of any competitors who plan to offer

 5    similar courses or courses with significant overlap?

 6        A.  I don't know any of our competitors' plans for

 7    the future.

 8        Q.  Are you aware of any competitors who did this in

 9    the past?

10        A.  Who did what in the past?  I'm sorry.

11        Q.  Offered or plan to offer similar courses or

12    courses with significant overlap.

13        A.  Again, using my definition of "similar" and

14    "overlap," my investigation found that only Elite had

15    published this content for continuing education credit.

16        Q.  What -- what investigation did you do to

17    determine this?

18        A.  When we first found the infringement, I did some

19    additional investigation to determine if Jouria had

20    possibly sold the content somewhere else or if it had

21    been published by another provider.  And I did

22    additional research in comparing dates of release to

23    determine when Elite had initially provided these

24    courses.  And when I did my research as discussed

25    before, I found that only Elite had published this

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1   content for continuing education credit.

 2      Q.  You mentioned earlier that NurseCe4Less had

 3   published a course called "head trauma."

 4      A.  That's correct.

 5      Q.  Was that course written by Dr. Jouria?

 6      A.  The course that I found on their Web site was

 7   written by Dr. Jouria.

 8      Q.  Was it similar to or have overlap with the

 9   traumatic brain injury course?

10      A.  It had overlap insomuch as the learning

11   objectives were similar or the same, in my recollection.

12   And that was the similarity that I was able to identify

13   based on my visual inspection.

14      Q.  I think you also testified earlier that there

15   were others published by NurseCe4Less -- or NurseCe4Less

16   on similar topics or with overlap in the subject matter;

17   is that correct?

18      A.  There were other courses published by

19   NurseCe4Less that appeared to the same or similar

20   learning objectives and may have addressed subjects that

21   were the same or similar to the five courses in

22   question.

23         But in terms of content, it was unclear whether

24   the degree of similarity matched the degree witnessed in

25   Elite's publications.

1      Q.  Regardless of whether the similarity matched,

2    according to you, the fact that NurseCe4Less had beaten

3    NetCE to market with these courses impacted the value of

4    these courses to NetCE; isn't that correct?

5      A.  I would not say that NurseCe4Less had, in the

6    same way, beaten NetCE to market.  Their courses were

7    shorter, and the content, at least in the case of the

8    head trauma course, was different in a way that Elite's

9    was not.

10     Q.  NetCE accused NurseCe4Less of committing

11   copyright infringement; correct?

12     A.  We sent them a cease and desist.  That's correct.

13     Q.  And you also included allegations against

14   NurseCe4Less in your California lawsuit; isn't that

15   correct?

16     A.  I believe so.

17     Q.  And in making these accusations against

18   NurseCe4Less, NetCE claimed that NurseCe4Less was

19   damaging it by its conduct; isn't that correct?

20     A.  That is correct.

21     Q.  So what was the damage that NurseCe4Less was

22   doing to NetCE?

23     A.  That --

24     Q.  And how was it any different from what you're

25   alleging against Elite?

 1     A.  So that was filed before we had additional

 2  information.  We gathered more information in the course

 3  of our suit, and NurseCe4Less took measures to stop

 4  providing the content in question and, therefore,

 5  limited the damages, which were already potentially less

 6  based on the extent of similarity compared to the issue

 7  of these five courses in Elite.

 8     Q.  So you believe that the content being offered by

 9  NurseCe4Less was similar enough to make allegations and

10  send a cease and desist letter, but the damage --

11  whatever that is, because you didn't answer that

12  question -- was less than whatever damage you say Elite

13  was performing on NetCE.  Is that your testimony?

14     A.  I am saying that the extent of similarity did not

15  reach that of Elite's, but there were similarities

16  enough that they had violated our copyright.

17     Q.  So I'll ask you again --

18     A.  So we requested that they cease and desist their

19  publication of our copyrighted materials, which they

20  did, to my knowledge.  And so the damages brought by

21  their providing those learning objectives before NetCE

22  were limited in a way that they were not by Elite's

23  publication of these five courses.

24     Q.  And I'll ask again.

25         What was the damage done to NetCE by

Case 0:15-cv-61165-WPD  Document 337-1  Entered on FLSD Docket 05/26/2018  Page 216 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 216

1   NurseCe4Less?

2      A.  They had violated our copyright.

3      Q.  Did you put a dollar figure on the harm being

4   caused?

5      A.  We had not gotten to that point, no.

6      Q.  In estimating the damage in this case caused by

7   Elite to NetCE, have you taken into account the damage

8   caused to NetCE by NurseCe4Less?

9      A.  I have not, and I am not sure how I would do

10  that.

11     Q.  So we're clear, the learning objectives that were

12  allegedly published by NurseCe4Less were in the head

13  trauma head injury course; is that correct?

14     A.  I don't recall specifically which course, but

15  my -- but I believe that is true.

16     Q.  If your competitors had competitive course

17  offerings with the same titles, that would impact the

18  value of the courses at issue here to NetCE; correct?

19            MR. KERN:  What's the -- you're asking a

20  hypothetical?  Is that a hypothetical question?

21            MR. WILSON:  If you have an objection, you

22  can make it.

23            MR. KERN:  Speculation.  Foundation.

24  Incomplete hypothetical.

25            THE WITNESS:  I don't know the extent to

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1   which it would, but --
 2   BY MR. WILSON:
 3      Q.  You testified earlier that you were aware and are
 4   aware of course offerings by your competitors in the
 5   same subject matters as the five courses at issue here;
 6   correct?
 7      A.  I believe I stated that I would expect that our
 8   competitors would have the same or similar subjects to
 9   the extent that these are general science subjects, and
10   I would expect there to be some overlap.
11          However, I am not aware of any competitors that
12   are offering 30-hour pharmacology courses specifically
13   on, for example, nonantibiotic antimicrobial
14   pharmacology in one activity.
15      Q.  And have you performed a market study to find out
16   if there are competitors offering courses in the same or
17   similar subject matters?
18      A.  We have not conducted a formal market study.
19      Q.  I didn't use the word "formal," but I appreciate
20   your answer.
21          Have you conducted any market study?
22      A.  We generally monitor our competitors at a high
23   level and are aware of the offerings that they have in a
24   general sense.  It's not something that's conducted and
25   documented as part of a formal process.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

1     Q.  Are you aware of competitors offering courses

2   with the same titles as any of the courses at issue

3   between NetCE and Elite?

4     A.  I would, again, expect the point to which these

5   titles, in some cases, are very basic that there would

6   be the same or similar titles offered, but I don't think

7   that reflects the extent of the content offered therein.

8     Q.  Does the fact that your competitors might have

9   courses with the same titles impact the worth of the

10  Dr. Jouria courses to NetCE?

11    A.  I don't know.  Not necessarily.

12    Q.  You don't know one way or the other?

13    A.  I don't know the extent that that impact would

14  have on non-released courses, no.

15            MR. WILSON:  Let's take a break.

16            THE VIDEOGRAPHER:  The time is 5:52 p.m.,

17  and we are off the record.

18            (Off the record.)

19            THE VIDEOGRAPHER:  This is the beginning of

20  media number 5 in the deposition of Sarah Campbell.  The

21  time is 6:12 p.m., and we are back on the record.

22  BY MR. WILSON:

23    Q.  If you take a look at the complaint, Exhibit 42,

24  and turn to paragraph 72.  It's on page 26.  NetCE says,

25  "Lastly, upon information and belief, sales of

1   Dr. Jouria's prior courses with NetCE may be depressed

2   due to the high profile character of his relationship

3   with Elite and customer confusion as to source."

4        Do you see that?

5   A.  I do see that.

6   Q.  I believe you've talked a little bit today about

7   your concern about customer confusion; right?

8   A.  I have spoken about that, yes.

9   Q.  And just to confirm, with specific reference to

10  this allegation in the complaint, there's no evidence to

11  support whether or not sales may be depressed because

12  NetCE never tried selling them; correct?

13  A.  We don't know if it -- if they were depressed.

14  This is speaking specifically about, I believe, the

15  prior courses -- the three courses of Dr. Jouria's --

16  Q.  Fair.

17  A.  -- that we have published.

18  Q.  Fair.  Do you have any evidence to support the

19  notion that any sales of prior courses were depressed by

20  any conduct of Elite?

21  A.  We do not have evidence of the sales being

22  depressed or increased due to the relationship with

23  Elite.

24  Q.  In Exhibit 73, which are the Alpine documents --

25  this is your copy here, ma'am -- the last document is a

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1   confidential settlement agreement and release between

2   NetCE and Alpine dated April 18, 2017.

3          Have you seen this document before?

4   A.  I have, yes.

5   Q.  If you turn to the last page -- excuse me.  That

6   document starts on page ALP- --

7   A.  -75.

8   Q.  -- -75.  If you turn to the last page, will you

9   tell me what page that is numbered?

10  A.  ALP80.

11  Q.  You see some signatures there.

12         Do you recognize the signature Dennis Meinyer?

13  A.  I do.

14  Q.  That's who signed this document on behalf of

15  NetCE?

16  A.  Yes, that's correct.

17  Q.  If you turn to paragraph 11 in the settlement

18  agreement, you'll see a settlement amount paid by Alpine

19  to NetCE of $150,000.

20         Do you see that?

21  A.  I do.

22  Q.  NetCE receive that money?

23  A.  Yes.

24  Q.  In your damage estimates against Elite in this

25  case, has NetCE taken into account the amount paid to it

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

```
 1   by Alpine?

 2      A.   That was not a consideration when analyzing the

 3   damages incurred from Elite.   That's correct.

 4               (Exhibit No. 88 marked for identification.)

 5   BY MR. WILSON:

 6      Q.   I'm handing what I've marked as Exhibit 88.

 7   Exhibit 88 is a declaration of Tracey Foster submitted

 8   to a court in California when this case was in

 9   California -- or at least part of this case was in

10   California.

11               Have you seen this declaration before?

12      A.   Yes.

13      Q.   In paragraph 7, Ms. Foster states, "After

14   learning of NetCE's allegations of infringement directed

15   to the courses listed in paragraph 3 above, Elite

16   removed from the customer-facing portion of its Web site

17   the links to the hosted course content on the Amazon

18   servers for the accused courses.   This means that, after

19   those access links were removed, when a customer

20   performed a search for continuing education courses on

21   either of Elite's Web sites, as described in paragraph 4

22   above, none of the courses listed in paragraph 3

23   appeared.   Specifically, Elite removed such access links

24   to the courses listed in paragraph 3ii to Vii in

25   July 2015 after having received a cease and desist
```

 1   letterer from NetCE but before NetCE filed its complaint

 2   in this matter."

 3           Do you see that?

 4   A.  I see that.

 5   Q.  Do you have any reason to dispute what Ms. Foster

 6   said in this declaration?

 7   A.  I don't know specifically how Elite's Web site is

 8   structured, but I can tell you that I continued to be

 9   able to access those courses after July 2015.

10   Q.  Well, if you look at paragraph nine, Ms. Foster

11   says, "I understand that NetCE believes the accused

12   courses remain available through Elite's Web site

13   because NetCE saved a, quote, direct link, end quote, to

14   those courses hosted on Elite's Amazon servers," and she

15   lists for traumatic brain injury two ways to get to it

16   according to those direct links.

17           Isn't that, in fact, what you had done there?

18   A.  No.

19   Q.  Take a look at NETCEB4498.  It's in Exhibit 76.

20   A.  Can you read the number again, please?

21   Q.  -4498.

22           MR. KERN:  Thank you.

23           THE WITNESS:  Thank you.

24   BY MR. WILSON:

25   Q.  Are those not -- does this document not reflect

1  the saved links that you were using in order to access

2  the courses from Elite?

3      A.  These are links that we discovered during our

4  investigation, but in addition to accessing these links,

5  we had done Google searches in which the courses came up

6  in the results and were accessible through Google

7  searches.

8      Q.  Do you know if Google was also searching archive

9  content on Amazon?

10     A.  I don't have knowledge about Google's algorithms

11  or the ways it gives links.

12              (Reporter clarification.)

13  BY MR. WILSON:

14     Q.  After July of 2015, did you try to access these

15  courses through Elite?  Not through a saved link but by

16  going onto Elite's Web site?

17     A.  This is Elite's Web site.

18     Q.  That's a saved link.  I am asking did you go in

19  organically into your Web browser, type in Elite's Web

20  site organically, fresh, and try to access the courses?

21     A.  So in addition to these Web sites that were

22  available in Elite's site, I did go and search their

23  course list, which I think is what you're getting at,

24  and I could see that the courses were removed from their

25  list but not from their Web site.

```
 1      Q.  And your statement that they were not removed

 2  from the Web site is because you were still accessing

 3  them through the --

 4              MR. KERN:  Which she's now said she wasn't

 5  four times.

 6  BY MR. WILSON:

 7      Q.  -- the links here shown in Exhibit -- on

 8  page 449?

 9      A.  So we continued to check these links, and I also

10  did a Google search for these courses, and they came up

11  in the Google search results and were accessible in that

12  way as well.

13      Q.  Was it all of the courses?

14      A.  All of the courses continued to be results on

15  Google.

16      Q.  Are you aware of a time when NetCE complained to

17  Elite about the archived link issue and access still

18  remaining through those archived links?

19      A.  I think we had more than one conversation with

20  them that we were continuing to be able to access the

21  course materials.  And I -- this is accessing the course

22  materials, but it also is accessing the course overview

23  page, which gives the option to add the course to the

24  cart, and that continued to be active even insofar as

25  the courses removed from the list on their general Web
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                    Sarah Campbell on 11/14/2017                    Page 225

 1  site.

 2     Q.  Did you try to take the course?  Pay for it?

 3     A.  I added it to the cart, but I did not submit

 4  payment.

 5     Q.  Are you aware of a time after NetCE complained to

 6  Elite when Elite disabled the archive links that NetCE

 7  was using, at least in part, to access these courses?

 8     A.  I know --

 9          MR. KERN:  Sorry.  Just so I understand the

10  question, the question is about them disabling the

11  archive link only; correct?  Okay.

12          THE WITNESS:  I know that, on April 4, 2016,

13  C.C. Chernev had been accessing these links as I

14  provided to her and was able to access them and

15  documented that access.  That was the last time we were

16  able to access them using these links.

17  BY MR. WILSON:

18     Q.  So, again, looking at Ms. Foster's statements and

19  her declaration that we just read, do you have any

20  reason to dispute what she's saying about archive links?

21     A.  Yes.  We were not only accessing them through

22  archive links.  We were also accessing them through

23  Google searches, and then Google results returned links

24  to live courses that allowed the courses to be added to

25  a cart for purchases.

1    Q.  But you don't know if you could actually purchase

2    them; correct?

3    A.  I know that they could be added to a cart.

4    Q.  That's not what I asked.

5         You don't know if they could actually be

6    purchased, do you?

7    A.  I did not try to purchase them; so I don't know

8    if they could or could not be purchased.

9    Q.  And you don't know how Google works such that you

10   were able to access them -- access these courses by

11   running a Google search; correct?

12   A.  I don't know how Google's algorithm works or what

13   types of links Google was providing in general.

14   Q.  And you didn't try to access them organically by

15   going directly, not through Google, to Elite's Web site

16   after July of 2015; correct?

17   A.  No, not correct.  We did go to the Elite Web

18   site, and we noted that those courses were not on their

19   course list, but we could still access them on their Web

20   site.

21   Q.  By accessing the Web site directly, not through

22   Google?

23   A.  We could still go to their Web site, and the

24   course was there.  Yes, that's true.

25   Q.  All of them?  All seven of them?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1     A.  All of the courses remained on the Web site.

2     Q.  Are you saying that those courses remained on

3   Elite's Web site through the archived links that you

4   were using to access them?

5     A.  We were able to access them through those links.

6   Whether those are archive links or not, I cannot speak

7   to Elite's processes.  And we were also able to access

8   them through Google.  Whether Google's links were

9   archive or not, they were live at the time that we

10  searched, and we were able to access the courses that

11  way.

12    Q.  So the -- other than the Google issue that you

13  described, you don't have reason to dispute anything

14  that Ms. Foster says in her declaration in the

15  paragraphs we just read, do you?

16    A.  In paragraph 7?

17    Q.  Yes.

18    A.  I don't have evidence of them removing the

19  customer-facing portions or not removing them.

20    Q.  And in paragraph 9?

21    A.  Do I dispute any of it?

22    Q.  Yes.

23    A.  Is that the question?

24    Q.  Yes.

25    A.  I don't know how Elite's customers purchase

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

1  courses from Elite.  It is generally possible that Elite

2  can send e-mails with links or provide links in other

3  ways that I am not aware of, and I don't know if that

4  content was archived or not.  And I don't know that they

5  were not offering the accused courses.

6     Q.  You don't know if they were either; is that

7  right?

8     A.  I don't know if they were or were not.  I don't

9  know -- I can tell you that those links were available

10  and that you could add the course to a cart for

11  purchase.

12     Q.  Take a look at Document Number NETCEB6146.  It's

13  going to be in Exhibit 76.

14          MR. KERN:  -6146.

15  BY MR. WILSON:

16     Q.  At the bottom, there's an e-mail from you to

17  Erin, dated August 13, 2015, saying, "It looks like

18  Elite has removed the courses in dispute from their Web

19  site."  That's in August of 2015.

20       So as of August 2015, you couldn't access them

21  through Elite's Web site; correct?

22     A.  When Erin had e-mailed me to ask if they were

23  removed, our initial review indicated that it looked

24  like they had been.  But additional investigation

25  reflected that it was not -- that they were not removed.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1    Q.  And that was the links that you had saved in the

2    Google issue that you described; is that correct?

3    A.  We were accessing them through those links and

4    also through Google searches.  That is correct.

5    Q.  In this e-mail, you also say, "We have been

6    stalling a bit to allow Jouria's claim to expire so we

7    can file with California as the jurisdiction."

8        Do you see that?

9    A.  I do see that.

10   Q.  What did you mean by that?  What were you doing

11   to stall?

12   A.  I think we were just not -- I don't want to

13   speculate; so I'm not sure.

14   Q.  It's your words.  It's your e-mail.  You're

15   telling your boss you were stalling.  I am asking you

16   what were you doing.

17   A.  I specifically?

18   Q.  You're testifying on behalf of NetCE.

19       What was NetCE doing to stall the litigation?

20           MR. KERN:  Mischaracterizes the e-mail which

21   does not, I believe, refer to the litigation.

22           THE WITNESS:  My understanding of what I've

23   written here is that we were not in a hurry to move

24   forward with the claim in Florida because we were hoping

25   to move to an appropriate jurisdiction in California.

 1    But my input into that and NetCE's input into that was

 2    guided by conversations with Counsel.

 3    BY MR. WILSON:

 4        Q.  So what was NetCE doing to stall a bit?

 5        A.  When I say "stalling," I mean that we were not in

 6    a hurry to respond because we were hoping that Jouria's

 7    claim in Florida would expire so we could move to what

 8    we believed to be the proper jurisdiction in California.

 9              MR. KERN:  I know the answer, if anyone

10    cares.

11              THE WITNESS:  Just to be -- I just want to

12    be clear too that Jouria had multiple suits happening or

13    multiple legal issues going on.  And he had, at some

14    point, filed for bankruptcy; so I'm not totally clear of

15    which claim is being referred to in this e-mail.  I

16    would have to look at the dates on both filings to make

17    that determination.

18              MR. WILSON:  Let's go off the record for

19    about two minutes.

20              THE VIDEOGRAPHER:  The time is 6:34 p.m.,

21    and we are off the record.

22              (Off the record.)

23              THE VIDEOGRAPHER:  The time is 6:38 p.m.,

24    and we're back on the record.

25              MR. WILSON:  Thank you.  I'm now passing the

Case 0:15-cv-61165-WPD Document 337-1 Entered on FLSD Docket 05/26/2018 Page 231 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)          Sarah Campbell on 11/14/2017          Page 231

 1   witness to Mr. Ross.

 2                        EXAMINATION

 3   BY MR. ROSS:

 4      Q.  Thank you, Ms. Campbell.  My name is Richard

 5   Ross.  I am, again, counsel for Dr. Jouria.

 6           Can you hear me okay?

 7      A.  I can, yes.  Can you hear me?

 8      Q.  I can.  Thank you.

 9           Court reporter, if you cannot hear me, please let

10   me know, and I will restate or rephrase the question.

11           Ms. Campbell, I'm going to continue with the

12   deposition now on behalf of Dr. Jouria.  You're still

13   under oath.  The only instruction I'd like to give you

14   is that I'd like to ask you not to speculate or guess as

15   to your answers or prognosticate as to future

16   conditions.  I'm just trying to seek facts regarding the

17   allegations in the matter and that which goes to claims

18   and defenses.  Do you understand that?

19      A.  I understand.

20      Q.  Thank you.  I might also go back over a little

21   bit what Mr. Wilson did, and please indulge me in doing

22   that, but I will attempt to be quite brief in our direct

23   examination of you.

24           Beginning with the copyright -- that NetCE

25   submitted, I believe it was your testimony that you

```
 1   submitted the unedited draft written by Dr. Jouria on

 2   behalf of NetCE; is that correct?

 3       A.  We submitted the drafts that we received from

 4   Jouria for copyright registration to the office of

 5   copyright.

 6       Q.  And those were unedited by you.  When I say you,

 7   I mean NetCE.

 8       A.  We, meaning NetCE, had made no edits to the

 9   versions that were submitted as specimens to the

10   copyright office.

11       Q.  Going to -- I think you have Exhibit 42 in front

12   of you, which is the amended counterclaim, and I believe

13   you have, as well, the attachments to that.  Do you have

14   the copyright registration that resulted from your

15   filings?  And that would be Exhibit B to that

16   Exhibit 42.

17       A.  I have the certificate of registration in Exhibit

18   A, yes.

19       Q.  Oh, Exhibit A, yes.  Thank you.

20           All right.  One of the interrogatory questions

21   that we asked of NetCE pertained to those copyright

22   applications, and in response -- supplemental response

23   to interrogatory number 5, NetCE states that

24   implementation --

25           (Reporter clarification.)
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                            Page 233

```
 1   BY MR. ROSS:
 2      Q.  Yes.  In response to first supplemental response,
 3   interrogatory number 5, NetCE states that,
 4   "Implementation coordinator Cory Camp filed the
 5   copyright applications for each of the seven courses at
 6   issue."
 7           Was that the C.C. person you were referring to
 8   earlier in your testimony?
 9      A.  No.  Cory Camp had submitted the copyright
10   registration for the three courses of Dr. Jouria's that
11   we did publish; so that would have been pressure ulcers,
12   COPD, and multiple sclerosis.  Cory Camp then left
13   NetCE, and that job to file copyright registration was
14   taken on by C.C. Cherev.  And the five -- the seven
15   courses were all submitted by C.C., not Cory Camp.
16      Q.  Okay.  So the response is incorrect in the name
17   of the person who filed the seven courses --
18      A.  The name --
19      Q.  -- Cory Camp?
20      A.  The name of that person is incorrect.
21      Q.  Okay.  Thank you.  The interrogatory response
22   goes on to say that NetCE's current knowledge of the
23   statements contained in the application and
24   registrations are true and correct.
25           So now I'd like to direct you to the certificates
```

 1   of registration, and Mr. Wilson pointed out some things

 2   that are -- that seemingly are not correct, and I just

 3   want to confirm with you on my direct.

 4          Number one, I believe you stated on your

 5   examination with Mr. Wilson that the works were not

 6   published, even though the registrations say they are

 7   published; correct?

 8      A.  The courses in question were not released to the

 9   public.

10      Q.  Okay.  Do you contend that they are published, or

11   do you contend that they were not published?

12              MR. KERN:  I'm just going to object,

13   Richard.  I'm sorry.  It's vague because, in this

14   context of a copyright application, publication is a

15   term of art.  It does not mean released to the public;

16   so your question is vague and ambiguous because we

17   haven't laid a proper foundation or defined what you

18   mean by published.

19   BY MR. ROSS:

20      Q.  Okay.  When NetCE filled out the application and

21   stated that the date of publication was the date on the

22   respective applications, was the -- the work that you

23   submitted published under that -- that legend date of

24   first publication?

25              MR. KERN:  Same objection.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

```
 1                THE WITNESS:  I am not a copyright lawyer,

 2    but our understanding of publication in this context,

 3    those dates were accurate.

 4    BY MR. ROSS:

 5       Q.  Okay.  Were the works -- so it's your position

 6    that the works were published?

 7       A.  We had --

 8                MR. KERN:  Same objection.

 9                THE WITNESS:  Sorry.

10                We had a work that could be copyrighted,

11    and, therefore --

12    BY MR. ROSS:

13       Q.  I'm not asking about copyrighted.  I am asking

14    about published.

15                MR. KERN:  Let her -- let her finish -- let

16    her finish answering Richard, please.  Thank you.

17                MR. ROSS:  I will, but I'd like her to

18    answer the question asked.

19                THE WITNESS:  Based on our understanding of

20    the term "publication" in this context, those dates are

21    accurate.

22    BY MR. ROSS:

23       Q.  Okay.  Where were the works published?

24       A.  Those works were in our -- in our possession in

25    our internal networks.
```

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                                    Page 236

 1     Q.  And is that the basis upon which you say the

 2   works were published?

 3     A.  That is, in essence, what --

 4     Q.  Is there any other essence?

 5     A.  Based on our understanding of the term

 6   publication in this context, yes.  The answer to your

 7   question is yes.

 8     Q.  So that is the only -- that is the only basis for

 9   your contention that the works are published?

10     A.  Based on my --

11     Q.  Am I understanding you correctly?

12     A.  Based on my understanding, we had a work in our

13   possession that met the copyright standards for

14   publication, and that is why we filed it with those

15   states.

16     Q.  Any other reason?

17     A.  No.

18     Q.  Under the section where it states "author,"

19   there's a section that says "author created," and the

20   word next to it says "text."

21        Do you see that?

22     A.  I do.

23     Q.  What does that mean to NetCE?

24     A.  That the specimen being provided is a text-based

25   specimen.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1      Q.  Any other reason why it states "text"?

 2      A.  No.

 3      Q.  Down one more, it states "a work made for hire."

 4   It says "yes."

 5          Do you know what that means?

 6      A.  I have a general understanding of that phrase as

 7   it's used in our freelance author agreements, and that's

 8   the context --

 9      Q.  What -- what is that understanding?

10      A.  That these were works made by an author with the

11   intent of them being the property of CE Resource or

12   NetCE.

13      Q.  Now, you stated that the works that were

14   copyrighted were the unedited drafts that Dr. Jouria

15   offered for NetCE.

16          What does NetCE contend are the works that

17   infringe those copyrights?

18      A.  The courses published by Elite with substantial

19   similarity to the courses that were copyrighted violated

20   the rights conferred as copyright holders.

21      Q.  So the courses published by Elite, is it NetCE's

22   contention that the revised articles that Dr. Jouria

23   submitted to Elite are not those works which NetCE

24   contends are infringing of the copyrighted works?

25      A.  I'm sorry.  Could you repeat that?
```

 1    Q.  Yes.  We have works that Dr. Jouria submitted to

 2   Elite, and then we have Elite publications.

 3        Do you understand those to be two different

 4   works, or do you understand those to be the same work?

 5    A.  I don't have substantial knowledge of Elite's

 6   processes for making changes; so I can't answer that.

 7    Q.  Okay.  Does NetCE typically revise -- strike

 8   that.

 9        Did NetCE revise, in any manner, the three

10   published articles that Dr. Jouria wrote for it?

11    A.  Yes.

12             MR. KERN:  I am going to interpose an

13   objection that Dr. Jouria has not yet in this case

14   produced for NetCE the documents that he submitted to

15   Elite; so this line of questioning is curious and

16   confounding because the witness has not had a chance

17   to -- or Counsel to review those, let alone to compare

18   them to the published versions.

19             MR. ROSS:  Aside from that not being a valid

20   objection, it's just not correct on the facts, but your

21   objection is noted.

22             MR. KERN:  They -- they -- they have not

23   been produced in the -- they have not been produced in

24   the proper format so that we can use them as evidence.

25             MR. ROSS:  Okay.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1    BY MR. ROSS:

 2        Q.  As part of your interrogatory responses, you

 3    identified a David Sains as an attorney.

 4            Do you know that name?

 5        A.  David Sains, yes.

 6        Q.  And who is that?

 7        A.  He is a lawyer who has advised and worked for

 8    NetCE in the past.

 9        Q.  Is he the individual who drafted the freelance

10    writer agreement at issue in this case?

11        A.  Yes.

12        Q.  Did Dr. Jouria have any input in drafting any of

13    the freelance writer agreements in this action?

14        A.  He had input insofar as the contract was

15    editable; so his name, how his name appeared, the topics

16    that were contracted, and the estimated deadlines were

17    all open to Dr. Jouria's input.

18        Q.  What about in paragraph 1 through 9 of the

19    freelance writer agreements?  Were those -- strike that.

20            1 through 10.  Were those written exclusively by

21    NetCE's attorney?

22        A.  Yes.

23        Q.  If you go to paragraph 9 in the freelance writer

24    agreements -- we will agree, will we not, Ms. Campbell,

25    that these freelance writer agreements are all the same

 1    in terms of paragraphs 1 through 10?

 2       A.  They are with the exception of the amount of

 3    compensation.

 4       Q.  Turn to paragraph number 9.  You have that

 5    available to you?

 6       A.  I do.

 7       Q.  Thank you.  The first sentence states, "The

 8    writer hereby understands and agrees that all articles

 9    approved for publication by CNE and that this agreement

10    shall belong exclusively to CNE."

11          What does "approved for publication" mean to

12    NetCE in this sentence?

13       A.  So we consider an article approved for

14    publication when we receive all of the components, we

15    verify that they're all present, and we confer payment

16    to the writer.

17       Q.  Did you pay Dr. Jouria upon submission of the

18    draft articles or upon publication?

19       A.  We paid Dr. Jouria when we were able to verify

20    that all the components were present, and that was an

21    indication that the articles were approved for

22    publication.

23       Q.  And that was in advance of publication; correct?

24       A.  That was before the courses were released to the

25    public.

```
 1      Q.  During Mr. Wilson's testimony, he directed you to

 2   a division planner document, and I can give you the

 3   Bates number if you want.

 4      A.  I have it here.

 5      Q.  Okay.  Thank you.  The one that he identified is

 6   titled "COPD"; correct?

 7      A.  That is correct.

 8      Q.  And that was one of the published articles that

 9   was authored by Dr. Jouria; correct?

10      A.  That's correct.

11      Q.  Okay.  In that document, which is the Bates

12   NETCEB29016 to -29020, you see a checkmark in the box

13   where it says "approved for publication with changes."

14      A.  I see that.

15      Q.  Correct?

16      A.  Yes.

17      Q.  Are there similar division planners for the other

18   two published articles that Dr. Jouria wrote, MS and

19   pressure ulcers?

20      A.  There are division planner evaluations and course

21   approval forms for all three of the published courses.

22      Q.  And do those division -- other two division

23   planner course approval forms have checkmarks that

24   indicate either "approved for publication" or "approved

25   for publication with changes"?
```

 1    A.  So this specimen or example is specifically for

 2  our surgical technologist division planner, and she has

 3  indicated that this course is approved for CSTs based on

 4  her evaluation.  That doesn't mean that it will be

 5  available to surgical technologists.  That requires

 6  additional work.  But it's her expert opinion that this

 7  content would be appropriate with her noted changes for

 8  surgical technologists.

 9    Q.  Thank you.  My question was, however:  For the

10  other two articles that were published, were those boxes

11  checked, either one, for "approved for publication" or

12  "approved for publication with changes"?

13    A.  I don't have all of the course approval forms in

14  front of me; so I don't want to speculate as to how they

15  were filled out by the planners.

16    Q.  Okay.  Do you have any documents for the seven

17  courses at issue where the boxes were checked "approved

18  for publication" or "approved for publication with

19  changes"?

20    A.  None of these courses were developed to the point

21  that they were presented to division planners to

22  determine if they were appropriate for those

23  professions.  We have --

24    Q.  So is that a no?

25    A.  We don't have any course approval forms for

1    unreleased courses.

2       Q.  So the the answer is no, you don't have any

3    documents.  You can't point to any documents that show

4    these boxes checked "approved for publication" for the

5    seven courses at issue.  I just want to understand if

6    those documents exist or not.

7       A.  I don't have any of these course approval forms

8    for any of the seven courses in question.

9       Q.  Also, in Mr. Wilson's direct testimony, he

10   identified another document, "overview of course of

11   development," and I believe that your testimony was that

12   the five articles that he was talking about were

13   somewhere between numbers 4 and 5.

14       Do you remember that testimony?

15       A.  I do.

16       Q.  And would the same be true for all seven

17   articles?

18       A.  The same would be true for all seven.

19       Q.  And I see on number 8, if you look at that

20   document, if you have it in front of you, that it says,

21   "Payment will be issued at this time," which is after

22   the faculty member -- in this case, Dr. Jouria -- signed

23   off on the manuscript -- an edited manuscript.

24       But Dr. Jouria was paid well before this time;

25   correct?

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

 1    A.  That's correct.

 2    Q.  Okay.  When was Dr. Jouria paid relative to the

 3  overview of course development?  What number was he paid

 4  at?

 5    A.  Dr. Jouria, in the cases of his drafts, was paid

 6  between steps 4 and 5.

 7    Q.  Okay.  And this is NETCEB Bates number 34857 and

 8  -8; correct?

 9    A.  That's correct.

10    Q.  You understand, do you not, that NetCE has sued

11  Dr. Jouria in part for breach of contracts?

12    A.  I understand that.

13    Q.  Okay.  What are the factual bases or factual

14  basis upon which NetCE claims that Dr. Jouria has

15  breached any of his seven contracts?

16    A.  When Dr. Jouria signed this freelance author

17  agreements with NetCE, he agreed that the works he was

18  creating were to be the property of NetCE.  But he also

19  provided the same or similar -- substantially similar

20  content to another company.

21    Q.  Any other basis?

22    A.  Not off the top of my head, no.

23    Q.  Well, this is your chance to speak.  You're

24  speaking for NetCE.  Top of the head, you know, works

25  for today, but I don't know what the top of your head

 1    will be tomorrow.

 2         So as you sit here today, is there any other

 3    basis upon which you contend that Dr. Jouria breached

 4    any of the other seven freelance writer agreements at

 5    issue in this case?

 6         I'm sorry.  Are you thinking?

 7    A.   I am reviewing the document.

 8    Q.   Okay.  Thank you.

 9    A.   I don't have reason to believe, based on the

10    evidence that I have, that he breached the content --

11    I'm sorry -- breached the contract in ways other than

12    those that I described.

13    Q.   You've only described one way.  You said that he

14    provided the same or substantially similar content to

15    another company.  Was there another way?  You just said

16    "those," and I just thought it was one way.  Did I

17    misunderstand?

18    A.   It's only that one way.

19    Q.   Okay.  Do you understand from the contracts that

20    Dr. Jouria was free to write similar topics for other

21    companies with different content?

22    A.   I understand from the agreement that Jouria could

23    write on similar topics that did not infringe upon

24    NetCE's copyright.

25    Q.   And what does NetCE believe the copyright covers?

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 246 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)                  Sarah Campbell on 11/14/2017                  Page 246

1     A.  The copyright covers all of the materials that

2   Jouria produced as a result of the writer agreement.

3     Q.  Going back to the freelance writer agreements,

4   paragraph 9 where we spoke about the first sentence

5   approved for publication, has that language been changed

6   in new freelance writer agreements, or do you still

7   maintain that same language?

8     A.  We haven't made any changes to that paragraph

9   with the exception of updating the company name to

10  NetCE.

11    Q.  For the three published articles that Dr. Jouria

12  wrote for NetCE -- multiple sclerosis, COPD, and

13  pressure ulcers -- you had a communication relationship

14  whereby you edited the drafts that he submitted and then

15  sent those back to him for his approval and signoff; is

16  that correct?

17    A.  Copies of the course were sent to Dr. Jouria in

18  the weeks immediately prior to release to the public.

19  That's correct.

20    Q.  And you -- did you ask him to sign off on the

21  final edited version before you published to the

22  consumer public?

23    A.  We did ask him to review the content to sign off

24  and to note any changes that he recommended prior to

25  release.

1    Q.  Did you ask Dr. Jouria to do that for any of the

2    seven articles at issue in this case?

3    A.  None of the seven courses in question had gotten

4    to the point that they were imminently being released;

5    so they had not been provided to Jouria for his final

6    review and approval.

7    Q.  Dr. Jouria asked you in e-mails, did he not, why

8    haven't you sent the edited versions to him so that he

9    could approve them finally?

10   A.  I don't recall that question specifically.

11   Q.  Did you ever tell Dr. Jouria that -- you or NetCE

12   of any of the qualms or questions that you had regarding

13   his medical certification or alleged plagiarism?

14   A.  No, I did not.

15   Q.  Why not?

16   A.  I chose not to discuss that with Dr. Jouria

17   because we had already made the decision that we would

18   move forward with the seven courses and, in fact, ten

19   courses in total, and I did not feel that that

20   information would improve the relationship or the

21   products as --

22   Q.  What do you mean "move forward"?

23   A.  I mean, even after our discovery of his issues

24   with the licensing, we had decided we would continue to

25   develop all of the courses we currently had.

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                    Page 248

1    Q.  But there was a point in time where you decided

2    not to develop the courses that you had; correct?

3    A.  That's correct.

4    Q.  And when you say "licensing," what do you mean by

5    that?

6    A.  We had knowledge of the legal issues that

7    Dr. Jouria had with the governing body for

8    foreign-educated physicians and his continued seeking of

9    or -- I don't want to speculate that he continued to

10   seek it, but he had not yet been licensed at that time

11   to practice in the United States.

12   Q.  NetCE dismissed two of the courses against Elite,

13   cardiovascular pharmacology and lymphatic immune system

14   articles; correct?

15   A.  That is correct.

16   Q.  Did NetCE dismiss those against Elite because

17   there was a determination made by NetCE that the

18   articles were not substantially similar to the articles

19   that Dr. Jouria wrote for NetCE?

20   A.  When we were able to evaluate the courses more

21   fully, we determined that the similarities, if there

22   were any, were not to the extent that they violated a

23   copyright.

24   Q.  Why haven't you dismissed those two articles

25   against Dr. Jouria?

```
 1    A.  I don't know.

 2    Q.  Well, if you determine that they're not

 3  substantially similar enough to support a claim for

 4  copyright infringement, are you going to dismiss those

 5  claims against Dr. Jouria --

 6              MR. KERN:  Objection --

 7  BY MR. ROSS:

 8    Q.  Please.

 9        Are you going to continue to prosecute those

10  against Mr. Jouria?

11              MR. ROSS:  Go ahead and state your

12  objection.

13              MR. KERN:  Sorry.  Objection.  Misstates

14  testimony, and vague as to you keep referring to the

15  course and not defining whether you're talking about

16  Elite's published course or the ones that Dr. Jouria

17  submitted.

18              If you --

19              MR. ROSS:  I am talking about --

20              MR. KERN:  If you understand the question.

21  BY MR. ROSS:

22    Q.  Do you understand the question, Ms. Campbell?

23    A.  Could you repeat it?  I'm sorry.

24    Q.  Sure.  I want to know if you're going to continue

25  to prosecute your claims of copyright infringement
```

 1   against Dr. Jouria for the cardiovascular pharmacology

 2   and the lymphatic immune systems course published by

 3   Elite.  Having said that, you don't find there is a

 4   substantial similarity in the content of the Elite

 5   publication -- those two Elite publications?

 6      A.  I believe that the titles that you mentioned were

 7   actually of the drafts that he had submitted to us, not

 8   to the courses that Elite had published.  And I don't

 9   know if we'll continue or not.  I don't know.

10      Q.  Well, you're NetCE today; so it's your position

11   that NetCE hasn't determined, as of today, if it's going

12   to continue to prosecute those claims?

13      A.  As of today, NetCE had not determined.

14      Q.  But NetCE, as of today, is continuing to

15   prosecute those claims.

16          You do understand that; correct?

17      A.  I understand.

18      Q.  Okay.  You testified a bit about a plagiarized

19   content.  Do you recall that with Mr. Wilson?

20      A.  Generally, yes.

21      Q.  What do you understand "plagiarized content" to

22   be?

23      A.  My --

24              MR. KERN:  Vague.

25              THE WITNESS:  My definition of plagiarism is

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

```
 1    content that is copyrightable that is reproduced without

 2    permission of the copyright holder.

 3    BY MR. ROSS:

 4       Q.  And I believe you mentioned that there were some

 5    tables or charts that you felt were plagiarized?

 6       A.  In our work on the courses that we did do

 7    editorial work on, we found that some or all of the

 8    tables required permission to reprint in order to

 9    legally include them in our published works.

10       Q.  How did you come to that conclusion that you

11    needed permission?

12       A.  When we are doing an editorial review, if there

13    is information that requires citations or sources and it

14    appears that that information is missing sources, our

15    editorial staff will go in search of that.  And during

16    that search, it was determined that the tables were the

17    same or similar to tables in other works to the extent

18    that they required that we contact those copyright

19    holders for permission.

20       Q.  Did you first verify whether or not there was any

21    copyright in those tables or charts?

22       A.  Yes.  As part of seeking copyright -- sorry.  As

23    part of seeking permission to reprint, you -- there is a

24    determination that you're seeking it from the copyright

25    holder.
```

1      Q.  But you're presuming that there's copyright in

2   tables and charts.  Is that true in your seeking?

3      A.  I am presuming that -- I'm sorry.  What was that?

4      Q.  Do you know whether or not tables or charts are

5   even copyrightable in the first instance?

6      A.  They are.

7      Q.  And how do you know that?

8      A.  We -- I have sought permission to reprint many

9   tables and charts in the past, and we also publish

10  copyrighted tables and charts that are our own work.

11     Q.  Have you ever obtained an opinion from legal

12  counsel on whether or not tables or charts are

13  copyrightable?

14     A.  I have not sought that opinion.

15     Q.  Okay.  And when I say "you," I mean NetCE.

16     A.  That's correct.

17     Q.  Okay.  Now, Dr. Jouria's articles were

18  extensively footnoted.

19         Would you agree with that statement?

20     A.  They're extensive -- they have many references.

21  They're provided in a work cited list at the end of the

22  course.  That is correct.

23     Q.  Okay.  And you do agree that you cannot

24  plagiarize public domain material; correct?

25     A.  If -- if content is free use for commercial

```
 1   entities, then NetCE is able to reprint them without

 2   seeking permission or violating a copyright.  But even

 3   if materials are generally free use for personal or lay

 4   public, they may not be for for-profit publishers.

 5       Q.  And did you get a legal opinion on that?

 6       A.  I did not seek an opinion on that.

 7       Q.  Isn't it true that public domain material is

 8   treated to be used for any reason, whether it's for

 9   profit or not for profit?

10            MR. KERN:  I am just going say this whole

11   line calls for legal opinion.

12   BY MR. ROSS:

13       Q.  Okay.  What is your understanding?

14       A.  When you -- did you say public domain or free

15   use?

16       Q.  Public domain.

17       A.  I don't want to speculate as to the legal meaning

18   of that term; so I will say I don't know.

19       Q.  Well, you accused my client of plagiarizing,

20   correct, in the complaint?

21       A.  We noted that sections of Jouria's materials were

22   plagiarized, yes.

23       Q.  What you mean, in fact, is that sections of his

24   articles were similar to sections of other references;

25   correct?
```

1      A.  In some cases, sections were the same or

2   minimally different than copyrighted materials.

3      Q.  And that's what you mean by "plagiarism," that

4   sections were the same or substantially similar?

5      A.  That's what my understanding of plagiarism is.

6      Q.  Okay.  You understand that Dr. Jouria is not a

7   publisher of articles; correct?

8      A.  I don't know --

9      Q.  He's an -- he's an author.

10     A.  I don't know all of Dr. Jouria's activities.

11     Q.  Do you know of a single publication that

12  Dr. Jouria published?

13     A.  I know that, for a time, he had a Web site where

14  he posted some of his works.

15     Q.  And you would consider that publishing -- being a

16  publisher?

17     A.  I know that some publishers only publish online.

18     Q.  Would you consider that of Dr. Jouria's postings

19  equivalent to being a publisher?

20     A.  I don't know.

21     Q.  Okay.  You also spoke of a Plagiarism X report.

22         Do you recall that during Mr. Wilson's

23  examination?

24     A.  Plagiarism Checker X.

25     Q.  Okay.  Thank you.  And you said you ran that

```
 1   report about two months ago; is that correct?

 2       A.  It was within the last two months, yes.

 3       Q.  Okay.  Do you remember if it was 30 days or

 4   60 days?

 5       A.  I don't remember specifically.

 6       Q.  And did you -- and that plagiarism report, did

 7   you run those for the two dismissed courses against

 8   Elite?

 9       A.  Yes.

10       Q.  And what was the degree of similarity -- the

11   numerical percentage, if you recall, for those two

12   articles?

13       A.  I don't remember.

14       Q.  Would you know if it was more or less than ten

15   percent similar?

16       A.  I don't know.

17       Q.  Do you recall the numerical percentages of

18   similarity on the reports for any of the articles?

19       A.  Not the specific numbers, no.

20       Q.  Okay.  Is there a reason why you didn't run that

21   report back in 2015 before you filed suit against

22   Dr. Jouria?

23       A.  At the time, I had done the visual side-by-side

24   comparison of the courses that I had access to and

25   determined that the similarities warranted what I
```

```
 1   believed to be substantial similarity.  The two courses

 2   that have since been dismissed in our dealings with

 3   Elite were not available to me in that format.

 4      Q.  Why didn't you run that report before you filed

 5   suit against Dr. Jouria, was the question.

 6      A.  I was not able to run it for the courses that I

 7   did not have access to the Elite content.

 8      Q.  For the two courses, but you had it for five;

 9   correct?

10      A.  For those two courses.

11          For the five courses that we continue to have an

12   issue with Elite, I believed that my visual side-by-side

13   comparison was sufficient to determine that the

14   similarity was significant.

15      Q.  So -- so you knew of the existence of the

16   Plagiarism Checker X software.  You simply chose not to

17   utilize it before you filed suit; is that correct?

18      A.  I knew that there was software generally

19   available to do plagiarism analysis, but we did not

20   engage that tool at that time.

21      Q.  Okay.  Why not?

22      A.  I believe --

23          MR. KERN:  Asked and answered.

24          THE WITNESS:  I believed that my

25   side-by-side comparison of the courses that I did have
```

1   access to was sufficient to determine that there was

2   significant similarity.

3   BY MR. ROSS:

4       Q.  Do you know what the standard is for copyright

5   infringement?

6       A.  I don't know the legal standards.

7       Q.  You have also alleged against Dr. Jouria a claim

8   under California Unfair Trade Practices and have

9   asserted an element of consumer confusion.

10          Are you aware of that?

11      A.  I am aware of that.

12      Q.  Are you aware of any actual customers being

13  confused based upon the conduct that Dr. Jouria engaged

14  in in submitting articles to Elite?

15      A.  I don't know.

16      Q.  You are aware or you're not aware of any actual

17  confusion?

18      A.  I -- I don't know specifically the courses that

19  have triggered customer confusion in the past.

20      Q.  Well, I am asking you right now.

21          Can you name any particular consumer who was

22  confused due to Dr. Jouria's writing articles for Elite?

23      A.  Not with the evidence that I've seen so far.

24      Q.  Well, you've seen e-mails.  Did you get a phone

25  call from a customer?  Did you get an e-mail from a

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

1   customer?

2      A.  There's -- there's customer confusion in terms of

3   our customers.  There's also customer confusion in terms

4   of their contact with Elite, and I haven't seen all of

5   the information from Elite yet about potential confusion

6   with his publication with them.

7      Q.  So you're not aware of any particular customer

8   who is actually confused, is that true, as you sit here

9   today?

10     A.  I don't know if the customers that we have

11  documented having confusion between NetCE and Elite were

12  triggered by the Jouria course or not.

13     Q.  Okay.  You filed suit in 2015.  It's now the end

14  of 2017.

15         Are you sure you're not aware of any customer

16  confusion resulting from Dr. Jouria's contributions to

17  Elite?

18     A.  I don't have all of the evidence from Elite; so I

19  don't know if they have experienced customer confusion

20  as a result of this publication.

21         And in terms of the information we have from our

22  own customers contacting NetCE, I can't say if the

23  courses that triggered the confusion were Jouria courses

24  or not.

25     Q.  Do you have any evidence that -- of a consumer

```
 1   who purchased an Elite publication authored by

 2   Dr. Jouria would otherwise have purchased a publication

 3   from NetCE?

 4       A.   I don't have evidence that they would or would

 5   not have.

 6       Q.   Can you point to any loss -- particular loss of

 7   sale because a customer purchased a Jouria article from

 8   Elite?

 9       A.   I don't have any ability to gather that

10   information in terms of lost sales.

11       Q.   So you cannot point to any lost sale; is that

12   true?

13       A.   I don't know.

14       Q.   You don't know if you could point to a lost sale?

15       A.   The -- again, the customer confusion that we have

16   documented between customers who are confused between

17   Elite and NetCE, I don't know if that confusion was

18   triggered by a Jouria course or not; so I'm unable to

19   make the conclusion of whether that resulted in a lost

20   sale or not.

21       Q.   Well, I'm asking you today.

22            So you cannot -- it's true that you cannot today

23   point to a lost sale resulting from a Jouria article

24   that was published by Elite?

25       A.   I don't have evidence of a lost sale or a gained
```

1   sale due to Elite's publications.

2      Q.  Is it NetCE's contention that it made

3   $4.7 million in the publication of the multiple

4   sclerosis Jouria article for it?

5      A.  We calculated that special offer bundles that

6   included the multiple sclerosis course were offered

7   in -- starting in 2014 made a total revenue of

8   $4.7 million.

9      Q.  So is that how much money Dr. Jouria generated

10  for NetCE for that one course?  Is that what you're

11  stating?

12     A.  I'm stating that our publications that included

13  the multiple sclerosis course in special offer bundles

14  generated a revenue of $4.7 million between 2014 and the

15  two years that followed it.

16     Q.  And how much of that amount do you ascribe to

17  Dr. Jouria's article?

18     A.  I did not attempt to parse out the courses from

19  the special offer bundle.  But, also, I just -- I want

20  to make a note that those courses were Jouria's works,

21  and they were insomuch that he presented us with the

22  drafts.  But they were NetCE's courses, and we did make

23  changes in formatting to those courses to meet our style

24  requirements.

25     Q.  Well, I don't exactly know what that means, but

```
 1   I'm just trying to find out how much money have you made

 2   off of Dr. Jouria's labor on the three published

 3   articles?

 4      A.  I don't know how to attribute the amount of labor

 5   spent on those articles to Jouria compared to the amount

 6   of labor that other persons spent preparing those

 7   courses -- those courses for release.

 8      Q.  Was it $4.7 million?

 9      A.  The special offer bundles that had the multiple

10   sclerosis course in them --

11      Q.  How many courses were in that bundle?

12      A.  It differed by bundle.

13      Q.  5?  10?  20?

14      A.  It was different in each special; so, for

15   example --

16      Q.  What was the range?

17      A.  The -- two to four.

18      Q.  So would you ascribe Dr. Jouria's contribution to

19   that 4.7 if it was due to be one-half of that and if it

20   was to be 25 percent of that?

21      A.  Again, I don't know what percentage of his work

22   and everyone else at NetCE's work could be attributed to

23   the release of those courses.

24      Q.  So when you claim $4.7 million, did you back out

25   everybody's else's contributions?
```

1     A.  Did I -- I'm sorry.

2     Q.  Did you back -- you're claiming $4.7 million for

3  one article, but now you're saying that that article was

4  a -- was a contribution of a number of people; correct?

5     A.  It is our business to develop courses, and so,

6  yes, other people worked on developing those courses.

7     Q.  Did you back out those people's contributions --

8  I assume NetCE employees or independent contractors?

9     A.  I'm sorry.  What do you mean by "back out"?

10     Q.  Well -- you know, I'll strike the question.

11        As you sit here today, do you know how much money

12  Dr. Jouria's articles made for NetCE?  Just his

13  articles, not bundles.

14     A.  The three courses that we were able to publish?

15     Q.  Yes.

16     A.  We do have information on the individual

17  standalone course revenue for those three courses, but

18  they'd been revised, and they continue to generate

19  revenue.

20     Q.  And in your interrogatory response to Elite's

21  interrogatory number 7, you state that $84,000 for the

22  multiple sclerosis article as an example for that time

23  period.  Although, I understand it might be different

24  today; correct?

25     A.  That estimate is correct for the three years of

```
 1   that multiple sclerosis course from the time it was
 2   released to the time that it was revised and issued --
 3   rereleased with a new course number.
 4      Q.  Okay.  And that was for three years of revenue
 5   generation; correct?
 6      A.  That's correct.
 7      Q.  And do you know how long Elite published its
 8   articles?
 9      A.  I don't know how long the -- all of the courses
10   were available.
11      Q.  Okay.  Do you know that they were not three
12   years?
13      A.  I don't know that.
14      Q.  You don't know at all how long they were
15   published?
16      A.  Honestly, Elite could continue to be accepting
17   payment today, and I would have no knowledge of it.
18      Q.  You have no knowledge whether they are or they're
19   not; correct?
20      A.  I haven't seen that information from Elite; so I
21   can't say whether or not they are.
22      Q.  Okay.  Also, you identified some unrealized costs
23   in the response to interrogatory number 8.  It wasn't 7.
24   It was number 8.  For example, you put 47 hours of your
25   time and miscellaneous NetCE employees, and you have
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1   $1,000.

 2        Do you recall that response?

 3   A.  I see that, yes.

 4   Q.  Okay.  You're paid a salary, are you not?

 5   A.  I am paid a salary, yes.

 6   Q.  Okay.  Were you given this $1,000 that you have

 7   ascribed to your 47 hours separate from your salary?

 8   A.  This would include my time but also other NetCE

 9   employees' time, and that information -- I'm sorry.

10   That amount would have been included in their hourly

11   compensation in addition to my receiving a yearly

12   salary.

13   Q.  Okay.  My question was:  Did you receive

14   $1,000 --

15        MR. KERN:  She answered your question.

16   BY MR. ROSS:

17   Q.  -- for your hours of time?

18        MR. ROSS:  She told me about other employees

19   and being --

20        MR. KERN:  She told you what comprised

21   $1,000, Richard.

22        MR. ROSS:  I want to know if she put that

23   $1,000 in her pocket.

24        THE WITNESS:  I did not get a $1,000 bonus

25   in addition to my salary --
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1   BY MR. ROSS:

 2      Q.  Okay.

 3      A.  -- for work on the lymphatic immune system

 4   course.

 5      Q.  Okay.  Did you get any of the amount put into

 6   your pocket for any of the time that you have identified

 7   in response to interrogatory number 8?

 8      A.  When you say "put into my pocket," do you mean in

 9   addition to my salary?

10      Q.  Yes.

11      A.  I did not receive any bonuses of compensation in

12   addition to my salary directly related to these courses.

13      Q.  One legend states "licensing fees to Nature

14   Publishing Group," $966 under the GERD heading.

15      A.  Yes.

16      Q.  Do you see that?

17      A.  I do.

18      Q.  What were the licensing fees?

19      A.  The portion of the content that had been already

20   been published by Nature Publishing that required us to

21   seek and pay for permission for reprint cost $966.

22      Q.  And what -- what was reprinted?  Was this a table

23   or a chart?

24      A.  I don't have the specific content in front of me;

25   so I don't want to speculate as to the exact content.
```

1    Q.  Did you do anything to verify whether or not

2  Nature Publishing Group had an issued copyright on the

3  component that you paid $966?

4    A.  When we -- when we were able to locate the

5  matching content, it had a copyright claim on it and a

6  place for us to request permission to reprint, and that

7  is the usual process we use for determining if

8  permission to reprint is necessary.

9    Q.  Did you confirm with any counsel to get legal

10  advice whether or not you had to pay any of these

11  licensing fees?

12    A.  I did not seek legal opinion for our permission

13  requests.

14    Q.  Okay.  You are aware that NetCE has withdrawn its

15  claim for attorneys' fees as damages in this case, are

16  you not?

17            MR. KERN:  Richard?  Richard?

18  BY MR. ROSS:

19    Q.  Certainly for the copyright infringement claim.

20  Let's narrow it to that.

21            MR. KERN:  Richard?  We're losing our

22  location.  We've basically just been kicked out and told

23  we have five minutes to leave.

24            MR. ROSS:  I'm almost done.

25            MR. KERN:  Okay.  Great.  Thank you.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

Sarah Campbell on 11/14/2017

30(b)(6)                                                                    Page 267

```
 1               THE WITNESS:  I don't recall that
 2   specifically.
 3   BY MR. ROSS:
 4     Q.  Okay.  You are aware that, even if NetCE prevails
 5   on the copyright infringement claimant, it cannot
 6   recover the attorneys' fees it's pertaining to its
 7   lawyers.  Are you aware of that?
 8     A.  I don't know specifically.
 9     Q.  Are you aware that, if Dr. Jouria or Elite
10   prevails on the copyright infringement claims, the court
11   may award Dr. Jouria and/or Elite its attorneys' fees in
12   connection with those claims?  Are you aware of that?
13     A.  I don't know.
14     Q.  Okay.  The damages that you claim have lost
15   revenue are based upon your sales records; correct?
16     A.  Yes.
17     Q.  And you had those sales records from when NetCE
18   was making those sales; correct?  So in 2012, 2013,
19   2014, et cetera.
20     A.  We have sales records for those years.
21     Q.  Is there any reason why NetCE waited until four
22   days ago to provide us spreadsheets on all those lost --
23   claims lost revenue based upon records that they've had
24   from the very beginning?
25     A.  I'm not aware of any specific reason.
```

1          MR. ROSS:  No further questions.  Thank you,

2   Ms. Campbell.

3          THE WITNESS:  Thank you.

4                  FURTHER EXAMINATION

5   BY MR. WILSON:

6     Q.  I do have one.  Sorry.

7          Just so we can clear up any issue, you had

8   mentioned earlier today that the MS course was sold in

9   three special bundle catalogs, and I believe you

10  mentioned California and various states, Texas and

11  various states, and was it Ohio in --

12    A.  Ohio, and they're not various states.  That is

13  Ohio only.

14    Q.  Okay.  How many other courses were in the

15  California special bundle catalog?

16    A.  Two other courses.

17    Q.  So three total?

18    A.  Yes.

19    Q.  And how many were in the Texas special bundle

20  catalog?

21    A.  One other, for a total of two.

22    Q.  And how many were in the Ohio special bundle

23  catalog?

24    A.  That catalog varies.  I can look at the

25  documentation.

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

```
 1          In 2014, the Ohio catalog contained three total

 2   courses, two in addition to the multiple sclerosis

 3   course.

 4               MR. WILSON:  That's all I have.

 5               THE VIDEOGRAPHER:  Okay.  The time is

 6   7:39 p.m., and we are off the record.

 7               THE REPORTER:  Mr. Ross, this is the

 8   reporter.  Would you like a copy of this?

 9               MR. ROSS:  Court reporter, please e-mail me

10   about the costs and then separate the costs of just my

11   direct, please.

12               THE REPORTER:  Okay.  I don't think we do

13   partial transcripts; so I can have my firm e-mail you,

14   but it would be just for the total of the entire

15   transcript.

16               MR. ROSS:  All righty.  Just e-mail me.

17               THE REPORTER:  Mr. Kern, did you want this?

18               MR. KERN:  Yes.

19          (The deposition concluded at 7:40 p.m.)

20

21

22

23

24

25
```

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2   STATE OF CALIFORNIA    )
                            ) ss.
 3   COUNTY OF SACRAMENTO   )

 4

 5       I, Kayla Knowles, hereby certify:

 6       I am a duly qualified Certified Shorthand Reporter in

 7   the State of California, holder of Certificate Number

 8   14071 issued by the Court Reporters Board of California

 9   and which is in full force and effect.  (Fed. R. Civ. P.

10   28(a)).

11       I am authorized to administer oaths or affirmations

12   pursuant to California Code of Civil Procedure, Section

13   2093(b) and, prior to being examined, the witness was

14   first duly sworn by me.  (Fed. R. Civ. P. 28(a),

15   30(f)(1)).

16       I am not a relative or employee or attorney or

17   counsel of any of the parties nor am I a relative or

18   employee of such attorney or counsel nor am I

19   financially interested in this action.  (Fed. R. Civ. P.

20   28).

21       I am the deposition officer that stenographically

22   recorded the testimony in the foregoing deposition and

23   the foregoing transcript is a true record of the

24   testimony given by the witness.  (Fed. R. Civ. P.

25   30(f)(1)).
```

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

1      Before completion of the deposition, review of the

2   transcript [  ] was [x] was not requested.  If

3   requested, any changes made by the deponent (and

4   provided to the reporter) during the period allowed are

5   appended hereto.  (Fed. R. Civ. P. 30(e)).

6

7   Dated: November 20, 2017

8

9

10   _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                           Index: $1,000..2012

---

### $

**$1,000**
264:1,6,
14,21,23,
24

**$150,000**
220:19

**$25**  158:18
159:11
162:25
163:24
164:7
170:5

**$35**  158:12
169:10

**$4.7**  147:13
163:2,19
165:23
166:2,21
169:25
260:3,8,14
261:8,24
262:2

**$5**  159:19
169:21

**$67,000**
166:20

**$67,272.15**
157:2
166:13

**$84,000**
154:3
155:25
262:21

**$966**
265:14,21
266:3

---

### -

**-24582**  77:24

**-29020**
241:12

**-3041**  184:2

**-3068**  47:1

**-3069**  46:25

**-395**  55:23,
24

**-4498**  222:21

**-6135**  42:21

**-6146**  228:14

**-7395**  54:15,
16

**-75**  220:7,8

**-8**  244:8

---

### 1

**1**  5:7  7:11,
13  36:10
239:18,20
240:1

**10**  34:8
85:24
93:13
101:13
168:15
169:1

173:19
239:20
240:1
261:13

**100**  16:11

**103**  34:18
39:1  41:13

**104**  39:1
41:13

**108**  41:15

**109**  41:18

**10:21**  45:11

**10:31**  45:14

**10:32**  45:21,
24

**11**  101:25
220:17

**11:18**  68:24

**11:24**  69:4

**11th**  84:6
173:15

**12:54**  117:25

**12th**  43:3

**13**  43:3
168:14
188:17
228:17

**13th**  183:13

**14**  5:1,9
130:5

**15**  34:8
84:14

141:3
174:21

**15-hour**
131:20

**15th**  131:14
177:10

**16th**  83:24
132:24

**17**  168:14

**17th**  85:7

**18**  83:25
220:2

---

### 2

**2**  9:19
10:23
11:15  12:4
13:7  69:3
149:11
156:11
166:11

**2,000**  130:8

**20**  7:8,11,
14  261:13

**2000-**  128:15

**2012**  14:5,
9,19
16:20,25
17:4  22:5
23:3,8
24:6,9
47:23
48:19
84:23,25

---

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                   Index: 2013..400

144:15
145:9
183:13
184:4,13
267:18

**2013**  14:7
17:22,25
18:22 21:9
23:6 83:24
84:1,6,8,
12,14
85:6,8
133:2
146:3
148:7,8,
17,23
149:22
151:23
152:4,22
154:21
155:2,11
158:24
168:23
171:17
172:16
173:6,15,
19 174:21
175:4
178:6
184:21
185:11
188:13,17
267:18

**2014**  145:24
147:11,18,
25 148:13,
17,22

149:20
150:11,14,
17,20,22
151:1,6,9
154:3
156:1
159:17,18,
19 164:15
168:7
260:7,14
267:19
269:1

**2015**  43:3
59:20
106:15,18
129:3
130:5
131:14,25
132:6,14
133:18
148:25
149:24
150:5,11,
12,13,18,
20,23,24
151:7
166:15
187:12
221:25
222:9
223:14
226:16
228:17,19,
20 255:21
258:13

**2016**  134:1
156:9,13,

17,24
157:4
159:18,19
166:14,15,
24,25
225:12

**2017**  5:1,9
128:16,17
132:24
133:2
151:23
152:22
154:21
155:3,11
158:24
168:24
220:2
258:14

**2018**  128:16

**20th**  84:24

**21**  168:15
169:1

**21st**  84:8

**24th**  184:13

**25**  169:2,13
196:7
261:20

**25th**  84:23

**26**  218:24

**28**  178:6

**2:12**  118:5

_____
**3**
_____

**3**  118:4
166:11
221:15,22

**30**  7:1
136:9,11,
12 255:3

**30(b)(6)**
5:17 7:3

**30-hour**
136:24
217:12

**31**  41:10

**32**  41:13

**34857**  244:7

**3ii**  221:24

**3rd**  184:21

_____
**4**
_____

**4**  36:10
41:5
170:21
204:22
207:16
221:21
225:12
243:13
244:6

**4.7**  161:14
261:19

**400**  16:11

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                              Index: 42..81

**42**  34:13
  36:11
  38:20  41:3
  53:5,10
  59:23
  69:23
  72:24
  82:22,23
  105:14
  190:21
  196:6
  218:23
  232:11,16

**449**  224:8

**45**  170:25
  171:10,14
  172:4
  180:21
  181:4,7
  182:13

**46**  170:25
  172:23
  173:10,14
  174:20
  175:5
  178:6

**47**  263:24
  264:7

**4:04**  170:17

**4:18**  170:22

_____
          **5**
_____

**5**  193:14
  194:24
  218:20

232:23
233:3
243:13
244:6
261:13

**54**  60:3,4

**55**  60:2,9
  69:23
  70:14
  72:23

**5:12**  198:9

**5:13**  198:12

**5:52**  218:16

_____
          **6**
_____

**6**  48:19
  85:24
  89:12
  92:12
  93:13
  98:21
  101:25
  105:3
  122:3
  124:9,18
  171:17
  185:11

**60**  44:14
  102:19
  103:11
  255:4

**60,000**  55:13

**61**  44:16

**69**  196:7

197:4
201:4

**6:12**  218:21

**6:34**  230:20

**6:38**  230:23

**6th**  172:15

_____
          **7**
_____

**7**  194:22
  204:23
  221:13
  227:16
  262:21
  263:23

**71**  190:20

**72**  218:24

**73**  44:9,25
  144:12
  145:19
  219:24

**74**  5:4  6:25
  7:4,6,14,
  17

**75**  5:5  9:9,
  16  85:21
  147:5
  154:4
  169:9
  194:22
  204:23

**76**  19:18,20
  20:21  21:7
  42:20
  120:4

129:22
130:2
131:13
132:21
222:19
228:13

**77**  45:16
  46:3,4,17
  183:11
  184:2,20

**78**  45:17
  46:3,6,17
  184:12

**79**  51:6,9
  52:14  58:8
  61:6,11
  63:22
  67:15

**7:39**  269:6

**7:40**  269:19

_____
          **8**
_____

**8**  147:4
  154:1
  156:2
  158:11
  169:9
  243:19
  263:23,24
  265:7

**80**  51:7,22
  57:24  84:5
  113:17

**81**  51:24,25
  57:6  64:19

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

**30(b)(6)**                                                                    **Index: 82..accused**

76:23

**82** 52:2,3
56:8 83:23

**83** 52:5,7,
14 54:3
61:6,11
63:22
67:15

**84** 79:12,
14,15
80:22
122:9,10,
11 123:10,
14 124:3
125:23

**84,000** 170:2

**85** 149:7,
10,17
155:6
166:5,11,
20

**86** 187:9,11

**87** 188:10,
12

**88** 221:4,6,
7

**8th** 85:6

─────────

**9**

─────────

**9** 184:4
227:20
239:18,23
240:4
246:4

**9:15** 5:2,10

**9th** 84:12

─────────

**A**

─────────

**a.m.** 5:2,10
45:11,14,
21,24
68:24 69:4

**ability** 90:8
259:9

**absent** 28:8
141:4

**accept** 79:2
81:15

**accepted**
76:6 78:23
79:4
81:14,20,
21 121:14
125:18
140:11

**accepting**
80:14
165:11
263:16

**access** 8:13
28:1 74:8
81:11
88:4,5
90:8 96:2
101:8
171:19
221:19,23
222:9
223:1,14,

20 224:17,
20 225:7,
14,15,16
226:10,14,
19 227:4,
5,7,10
228:20
255:24
256:7
257:1

**accessible**
223:6
224:11

**accessing**
105:22
223:4
224:2,21,
22 225:13,
21,22
226:21
229:3

**ACCM** 207:15

**ACCNE** 206:19

**account**
161:18,21,
22 162:12
163:1,25
167:6
168:1
216:7
220:25

**accountants**
27:22 29:1

**accounting**
28:20 29:1

135:6
160:12

**accreditation**
30:4 80:17
206:19
207:15

**accreditations**
204:20
205:19,23
206:4
207:7,9,18
211:11

**accredited**
195:20
206:6,15,
16

**accrediting**
206:15

**accuracy**
46:10
51:12
52:12

**accurate**
235:3,21

**accurately**
103:3
163:10

**accusations**
214:17

**accused**
182:15
214:10
221:18
222:11
228:5

253:19

**achieve**
168:9

**achieved**
154:20
158:22
159:8,20
160:4
161:18
162:5
165:2
166:2
168:19
169:4,21

**achieves**
158:4

**acknowledge**
113:6
178:23

**acknowledged**
94:11

**acknowledges**
19:12

**acquired**
18:8

**acquires**
48:13

**acquiring**
16:23

**acquisition**
13:12,20
17:5,13
18:4  22:15

**acted**   7:21

**action**   90:14
239:13

**actions**
125:11
196:10

**active**
224:24

**activities**
145:1
254:10

**activity**
211:2
217:14

**actual**
106:24
160:4
161:18
257:12,16

**ad**   9:6
10:6,8
36:21
47:21

**add**   62:23
186:8
224:23
228:10

**added**   56:17
63:10,15
204:20
225:3,24
226:3

**addition**
16:21
41:18
49:12

109:18
163:3
191:13
223:4,21
264:11,25
265:9,12
269:2

**additional**
14:16
24:3,11
32:25
33:18
39:21
63:15,21
64:13
74:23
75:18
85:12
86:11,19
88:8  94:11
96:12
97:13
101:13
106:8
107:12
110:23
112:3
116:7
126:18
134:20
135:6
147:20
156:18
163:13
189:1
192:12
196:3,13
197:7

201:5
202:4
212:19,22
215:1
228:24
242:6

**additions**
123:8

**address**
19:17
195:5

**addressed**
213:20

**ads**   47:18

**advance**
129:6
240:23

**advanced**
24:14,15
30:5 49:4
142:7
193:21
194:4

**advancement**
17:9

**advances**
146:15

**advantage**
196:8,11
199:19

**adverse**
176:4

**advertise**
207:14

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

**advertising**
  140:25

**advice**
  266:10

**advised**
  239:7

**affect**
  154:15,17

**afield**
  104:17

**agree**  9:15
  132:10
  151:17
  175:15
  239:24
  252:19,23

**agreed**  37:3
  112:20
  118:19
  244:17

**agreement**
  26:7,12
  28:9,18
  29:3,4,22
  34:20
  35:12
  37:20
  115:22
  220:1,18
  239:10
  240:9
  245:22
  246:2

**agreements**
  28:22,24

34:22,25
36:7,12
37:6,9
38:2,4,5,9
39:2,15,
19,25
40:5,15
79:11
171:7
178:17
180:7
237:7
239:13,19,
24,25
244:17
245:4
246:3,6

**agrees**  240:8

**ahead**  11:19
  26:2 64:1
  66:24 78:9
  91:12
  249:11

**alerting**
  174:7

**algorithm**
  226:12

**algorithms**
  223:10

**allegation**
  33:17,18
  35:4 37:8
  180:11
  201:9
  219:10

**allegations**
  9:20
  30:10,13,
  21 31:4,8,
  24 32:3,9,
  12,21
  33:11
  41:4,12,
  14,23
  42:5,11
  60:3,14
  214:13
  215:9
  221:14
  231:17

**alleged**  53:2
  70:17
  98:20
  247:13
  257:7

**allegedly**
  16:3 31:5
  44:19
  100:19
  125:13
  216:12

**alleges**
  162:13

**alleging**
  214:25

**Allen**  5:19

**allied**  24:17

**allotment**
  152:20

**allowed**

146:23
176:3
225:24

**ALP-**  220:6

**ALP60**  44:14

**ALP61**  44:16
  144:14

**ALP80**  220:10

**Alpine**  9:22
  10:3,15,20
  11:2,4,8,
  22,23
  12:5,9,10
  13:8,17,19
  14:1 16:23
  17:4 18:7
  21:11
  22:3,6,16
  24:21
  27:19
  28:14
  29:20,25
  31:1,3,4,
  21,23
  32:1,5,9,
  12,22
  33:13,14,
  15 41:7
  43:8 44:8,
  14,16,20
  45:3
  179:10,11,
  25 180:1,
  8,11,15
  219:24
  220:2,18

221:1

**Alpine's**
10:9 13:11
41:16,18
196:10

**already-released**
152:18

**Amazon**
221:17
222:14
223:9

**ambiguous**
25:24
28:10
66:20,23
234:16

**ameliorate**
201:12,15

**ameliorated**
103:18

**amended**
232:12

**American**
30:3

**amount** 41:17
100:5
135:4,6,20
137:15
140:24
142:10,13
153:15
157:21
161:10
162:21

163:5
165:12
166:23
181:25
204:19
205:13
220:18,25
240:2
260:16
261:4,5
264:10
265:5

**analysis**
66:15,25
67:5,10,
11,13,25
68:7,15,19
73:11,20
97:9,24
98:3 99:14
101:2,5,7,
13 102:2,
5,7,13,24
103:1,2,
15,19,20,
21 104:18
105:4,6,
14,15
108:22,24
109:2
111:13
112:1,2
116:3
134:3
142:17
197:13
256:19

**analyzed**
66:14
102:11

**analyzing**
221:2

**ANCC** 30:3
193:25
195:19
206:7

**and/or** 94:3
98:19
123:8
267:11

**anew** 104:24

**annually**
169:1

**answering**
25:20
235:16

**answers**
104:25
231:15

**anti-** 182:1

**antibiotics**
182:3,4,11
183:7,22

**antimicrobial**
49:24 52:8
53:25
54:17
55:21
61:24
72:14
73:22

74:18 85:3
119:8
121:13
136:11
142:22
172:7
181:16
182:2,10,
22 183:6
190:1
194:10
217:13

**apparent**
93:16

**apparently**
88:24
130:2

**appeared**
75:3 88:25
89:20,23
90:20,23
91:8,17
92:9 93:9
94:12
99:4,19
108:1,6
110:11
111:19
211:5
213:19
221:23
239:15

**appearing**
5:22

**appears**
73:18

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 279 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

**30(b)(6)**      Sarah Campbell on 11/14/2017      Index: application..articles

```
          83:10           approvals       April   47:23       57:7,20
         131:19           140:11          48:19               65:23 66:8
         156:24           205:20,23       83:24,25            69:7,9
         251:14           206:4           128:15,16           77:6 83:23
                          207:8,9         220:2               84:5,11
application               211:10          225:12              97:8,11
 69:14 84:7                                                   98:8
233:23                    approve         archive             108:15
234:14,20                 122:4,5,        43:12               109:14
                          13,21,22        223:8               111:5,8
applications              123:6,11        225:6,11,           120:8
 62:1                     124:10,13,      20,22               149:3
232:22                    14 247:9        227:6,9             150:24
233:5                                                         151:3,8
234:22                    approved        archived            166:11
                          76:4 78:4,      224:17,18           183:24
applies   66:4            11,13,20,       227:3               184:17
                          24 79:5,25      228:4               240:13
apportion                 80:4,8                              259:7,23
 135:2,6                  81:2            archives            260:4,17
                          124:11,21,      131:3,4            262:3,22
approached                22 125:10,
 36:17                    13,19           area   48:20       articles
                          143:12          49:16              36:13,14,
approaches                195:1           160:24             17 37:13
 16:22 27:3              201:3           206:17              48:24 66:4
                          206:9,12                           68:16
appropriately             240:9,11,      areas   13:11       69:18
 60:22                    13,21          24:11 30:7          87:24
                          241:13,24       70:4 88:22         88:15
approval                  242:3,11,       114:22             93:19,22
 76:21                    12,17,18        193:20             94:9,10
78:17                     243:4           205:10             102:13
79:17                     246:5           210:25             114:18
80:16                                     211:1              115:4
122:12                    approves                           116:23
199:11                    80:12 81:3     arrived   6:24      120:6,23
207:3                                                        169:14
241:21,23                 approving      art   234:15        182:8
242:13,25                 81:5 122:2
243:7                                    article   50:2
246:15                                   54:17
247:6                                    55:21
```

183:2
185:25
189:12
190:7
196:12
197:6,22
206:18
237:22
238:10
240:8,18,
21 241:8,
18 242:10
243:12,17
246:11
247:2
248:14,18,
24 252:17
253:24
254:7
255:12,18
257:14,22
261:3,5
262:12,13
263:8

**ascertain**
157:16

**ascribe**
260:16
261:18

**ascribed**
264:7

**asks** 94:22
174:10
175:14
184:14

**asserted** 8:5

41:6 53:17
257:9

**asserting**
53:1 183:3

**assigning**
113:13

**assistant**
58:22

**assortment**
152:5

**assume** 51:15
86:13
104:12
149:13
161:25
262:8

**assumed**
164:8

**assumes**
67:18,20
68:3 71:11

**assuming**
68:13

**attached**
44:13 53:5
104:19

**attachments**
232:13

**attempt**
109:22
231:22
260:18

**attempted**
95:24

105:20
106:8
202:13

**attention**
149:16

**attorney** 6:9
239:3,21

**attorneys'**
266:15
267:6,11

**attributable**
151:7
157:5
163:23
169:11

**attribute**
158:3,7
163:9
261:4

**attributed**
163:12
168:21
170:1
261:22

**atypical**
156:4

**audience**
81:6
124:16
125:6,17
139:2,5
204:19

**audiences**
125:7,12
126:8

205:21

**August**
128:17
187:12
228:17,19,
20

**authenticity**
46:10
51:13
52:13,16

**author** 26:4,
8,9 28:2
35:6 37:13
48:1,10
59:2 79:3
81:18
130:8
139:19
153:13
166:1
186:11
187:6
200:5,13,
15 236:18,
19 237:7,
10 244:16
254:9

**author's**
70:6,11

**authored**
62:5 166:8
241:9
259:1

**authors** 9:7
25:1,3,5,
11,17

26:13
48:15,16
165:22

**authors'**
27:17

**average**
146:25
169:22

**award**  159:11
267:11

**aware**  6:11
11:2,23
18:7 26:18
34:19,24
36:6,9
37:9 38:5,
8 39:1
40:23
45:2,5
50:1,4
52:25
62:16 72:4
115:24
116:2
145:2,8
158:2
162:22
163:9
173:4
179:2,9
193:11
205:15
206:3
208:14
211:14
212:8
217:3,4,

11,23
218:1
224:16
225:5
228:3
257:10,11,
12,16
258:7,15
266:14
267:4,7,9,
12,25

—————————

—————————
**B**

**back**  38:17
40:22
43:11
45:15,25
48:6,17
49:5 59:23
64:7 69:4
82:21,22
85:21
102:15,22
118:5,11
122:6
155:22,23
158:7
159:6
160:3
170:22
175:4
184:20
198:13
207:16
218:21
230:24
231:20

246:3,15
255:21
261:24
262:2,7,9

**background**
88:23
186:9,10,
14,15

**badly**  7:21

**ballpark**
83:12,14

**bankruptcy**
230:14

**base**  88:19
89:18
192:15,20

**based**  72:20
89:20 90:3
91:20,25
93:6 96:22
102:20
112:5
114:24,25
115:5,14
117:14
121:9,19
124:14
126:19
134:21,24
135:20
143:5
146:14
152:17
157:25
159:14
161:7

187:25
189:4,5
194:16
201:17
213:13
215:6
235:19
236:5,10,
12 242:3
245:9
257:13
267:15,23

**bases**  244:13

**basic**  48:21,
25 49:6,16
154:25
200:12
208:12
218:5

**basically**
91:23
266:22

**basis**  13:6
27:20
28:6,15
29:11
38:24
89:16 91:8
125:4
167:5
179:4
181:9
182:8
183:2
193:22
196:18
197:10

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                        Index: Bates..brain

205:7
236:1,8
244:14,21
245:3

**Bates** 19:23
20:13 21:8
42:21
46:12
50:22,23
51:16,20
54:4 77:1,
15,17,22
78:21
166:12
188:14
241:3,11
244:7

**beat** 191:16

**beaten**
202:18
214:2,6

**beating**
39:10

**began** 55:22

**begin** 188:3

**beginning**
5:6 51:11,
20 69:2
101:3
118:3
156:17
157:4
170:20
218:19
231:24

267:24

**begins** 54:14
55:24
79:15
149:10

**behalf** 5:23
6:18 10:15
220:14
229:18
231:12
232:2

**behavioral**
91:23,24

**belief**
12:13,21
23:14,18
34:19,24
35:3 39:7,
11 115:6,
15 192:20
218:25

**believed**
18:7 230:8
256:1,12,
24

**believes**
222:11

**belong** 62:4
240:10

**belonging**
112:7

**benefit** 8:1
211:9

**big** 16:12

34:13

**binders**
50:13,14,
20,24

**binds** 25:5

**biography**
187:22,24
188:1

**bit** 29:24
65:21
161:15
219:6
229:6
230:4
231:21
250:18

**blanks** 77:12

**blue** 51:1

**boards** 207:5

**bodies**
206:15

**body** 248:7

**bonus** 264:24

**bonuses**
265:11

**booklet**
127:21
128:1,6,8
129:2
130:18,23
134:17
135:7
147:24
150:13,15

158:1,5
163:6,7
170:10

**booklets**
128:2,22,
25 134:12
147:12,13,
24

**books** 74:5,8

**boss** 229:15

**bottom** 19:22
46:13
50:23
78:22
169:10
171:14
174:20
183:12
185:10
188:15
194:25
203:22
228:16

**bound** 127:21

**box** 79:25
122:15,22
123:11,14
241:12

**boxed** 103:6,
10

**boxes** 122:12
123:5
242:10,17
243:4

**brain** 51:9

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

58:9 61:22
72:12
73:23
74:20
84:21
110:22
114:8,15
119:9
120:18
135:24
172:8
181:17
184:5,8
189:24
213:9
222:15

**breach**
244:11

**breached**
244:15
245:3,10,
11

**breadth**
208:5
211:3

**break** 34:7
42:16
45:10
68:23
94:23
113:18
117:24
118:2
167:15
170:15
218:15

**bring** 121:9
198:24

**broad** 121:25
122:1

**broke** 69:6
118:19

**broken** 153:5

**brought** 32:8
33:12
89:24
153:17,23
215:20

**browser**
223:19

**build** 17:13

**bulk** 170:9

**bullet**
122:17,20
123:5,6,
10,13

**bundle**
127:23
159:2
260:19
261:11,12
268:9,15,
19,22

**bundled**
157:22

**bundles**
128:11
260:5,13
261:9
262:13

**business**
6:19 8:1
20:22,24
30:9 38:3
140:17
154:16
191:19
201:22
262:5

**butcher** 43:4

_____

**C**
_____

**C.C.** 58:22,
23 59:13,
14,19
83:20
225:13
233:7,14,
15

**calculate**
152:17
157:24
167:6,24

**calculated**
160:11
166:16,17
260:5

**calculating**
162:13,25
163:14,24
168:3

**calculation**
158:17
159:7
162:23

163:4,7,16
164:6

**calculations**
167:13

**California**
5:1 140:5
147:20
148:4
150:10,12,
13,22
151:2,9
162:4,6
164:10
168:6
214:14
221:8,9,10
229:7,25
230:8
257:8
268:10,15

**call** 6:25
8:7 45:19
57:8 62:19
121:1
204:1,4
257:25

**called** 36:1
41:5 66:10
67:5 70:3
79:16
152:2
213:3

**calling**
47:18
118:7

**calls** 26:23

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

151:16
253:11

**camera**   31:9

**Camp**  233:4,
  9,12,15,19

**Campbell**
  5:7,17
  6:1,8 7:19
  69:3 86:1
  118:4,15
  170:21,24
  218:20
  231:4,11
  239:24
  249:22
  268:2

**cancer**   49:22
  51:22
  57:24
  61:17
  62:14
  70:19 72:6
  74:25
  82:12 84:4
  95:15 98:8
  119:12
  136:9
  142:22
  181:24
  182:1
  185:12
  190:4
  194:10
  195:7
  197:21,25
  199:4
  200:6

**cardiovascular**
  49:22 50:2
  92:25
  93:21
  248:13
  250:1

**care**   50:9

**cares**   230:10

**cart**   224:24
  225:3,25
  226:3
  228:10

**case**   7:19
  8:8,9,12,
  17 10:10
  15:20 20:5
  27:21
  30:11
  32:3,6
  43:20
  50:3,6,7,
  10,11,15
  53:8,17,
  18,25
  56:13
  57:12
  58:2,11
  60:14,25
  63:5,18
  65:13
  72:19
  73:21
  74:25
  75:7,9
  87:11
  88:16
  89:15

92:16
93:20
94:15,18
95:8
101:20
102:14
104:24
105:17,23
113:5
120:16
125:15,23
131:5,9
133:13
137:24
143:25
152:14
156:19
161:5,16
162:18
167:11
168:4
175:4
180:19,23
182:22
183:4,5,8,
23 188:8
195:24
200:3,23
203:8
210:21
214:7
216:6
220:25
221:8,9
238:13
239:10
243:22
245:5

247:2
266:15

**cases**   70:5
  99:4
  111:14
  114:3
  134:10
  170:11
  189:16
  200:2,22
  218:5
  244:5
  254:1

**catalog**
  14:12
  127:23
  128:1,13
  129:14,21
  130:15
  131:3,4,
  10,15,16,
  19,20,24,
  25 132:3,
  6,11,13,19
  133:1,18,
  22,25
  138:10,15
  140:1,5,6
  141:3,6
  147:17
  148:13,23,
  24 149:18,
  20 150:24
  152:2,4
  155:8
  158:5
  159:20,22,

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

24 164:11,
12 268:15,
20,23,24
269:1

catalogic
  14:13
  133:8,11

catalogs
  128:10,23
  132:8,15,
  18 133:5,
  24 134:13,
  15,22,25
  136:25
  137:20
  138:1
  147:18,19
  148:6,8,9,
  12,25
  149:5
  150:10,22
  151:1,4,9,
  22,23
  152:3,8,
  19,21
  153:1
  154:9,15,
  18,21
  155:2,9
  157:6
  158:22,25
  161:12
  162:3,6
  163:13
  164:13,15
  165:24
  168:5,6

268:9

categories
  145:16

category
  49:21
  185:8

caught   96:1

caused
  154:10
  216:4,6,8

caveat   60:19

CE   5:8  6:18
  176:14
  237:11

CE.NURSE.COM
  209:18

Ce4less
  110:6

cease   111:23
  214:12
  215:10,18
  221:25

Center   30:4

certainty
  154:8
  157:14
  167:21

certificate
  232:17

certificates
  53:6  82:24
  233:25

certification

194:3
247:13

certified
  6:2  142:7
  193:25
  194:5
  195:17

cetera
  267:19

CEU   208:23
  209:14

CEUFAST
  209:4

chain   40:22

chance   95:1
  113:18
  162:18
  167:15
  238:16
  244:23

change   33:2
  68:23
  177:9

changed   64:3
  246:5

character
  219:2

characterizati
on   50:5

Charlotte
  6:9

chart   265:23

charts

251:5,21
252:2,4,9,
10,12

check   43:12
  77:13
  101:22
  186:10,14
  224:9

checked
  79:25
  122:22
  242:11,17
  243:4

Checker
  101:13,17
  102:5,7,9,
  13,24
  103:19
  104:10
  105:5,6
  108:22
  254:24
  256:16

checking
  99:8
  106:21
  107:21
  111:4

checklist
  77:5,8,10
  78:15,16,
  19,22
  82:14
  118:22
  119:16,22

checklists

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

**30(b)(6)**                                          Index: checkmark..clinicians

119:20

**checkmark**
  241:12

**checkmarks**
  241:23

**checks**  88:11
  95:18
  96:11,15,
  18

**chemotherapy**
  49:22
  51:23
  57:25
  61:17
  62:14
  70:20  72:6
  74:25
  82:13  84:4
  95:15  98:8
  119:12
  136:9
  142:23
  172:7
  181:16,25
  184:24
  185:4,12
  190:5
  194:11
  195:7
  197:22,25
  199:4
  200:7

**Cherev**
  233:14

**Chernev**
  58:22,23

59:13,14
83:21
225:13

**choice**
  136:23

**choose**  36:23

**chose**  36:24
  37:9  38:10
  142:4
  247:16
  256:16

**chosen**  137:2
  164:16

**chronic**
  79:18

**Circles**
  209:16

**circulation**
  169:12

**citations**
  62:19,23
  63:9
  251:13

**cite**  60:22

**cited**  252:21

**civil**  7:2

**claim**  27:21
  28:7,16
  29:11
  32:4,8
  33:12
  41:5,15
  42:13
  60:16

64:10
65:6,23
66:2  90:16
92:5
100:18
149:14
229:6,24
230:7,15
249:3
257:7
261:24
266:5,15,
19  267:14

**claimant**
  267:5

**claimed**
  100:10
  114:8
  214:18

**claiming**
  28:5  90:1
  92:2
  161:5,7
  262:2

**claims**  8:5
  43:23  53:1
  65:22
  88:19
  89:24  90:3
  100:9
  105:12
  186:16
  231:17
  244:14
  249:5,25
  250:12,15
  267:10,12,

23

**clarification**
  12:8
  100:12
  113:19
  115:9
  123:22
  152:10
  223:12
  232:25

**clarifications**
  123:9

**clarify**
  142:2,13

**clarity**
  128:2

**class**  176:10

**clause**  29:6

**clauses**
  175:14

**clear**  28:14
  29:9  63:8,
  20  71:3
  74:1  75:23
  88:15
  132:9
  216:11
  230:12,14
  268:7

**client**  50:9
  253:19

**clinicians**
  138:6
  166:7,9

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

close  25:20
  89:2
  143:16

closed  142:8
  171:19

CME  6:19

CNE  240:9,
  10

CNLA  209:8

coincidences
  11:25

coincidental
  11:24

Cole  5:20

collection
  19:21 21:2
  46:5,6

collectively
  119:3

comfortable
  54:22

comments
  123:19

commercial
  252:25

commissioned
  161:9

committee
  121:9
  123:20
  128:12,18
  186:6

committing
  214:10

communication
  246:13

communications
  203:24

companies
  35:22
  116:21
  140:17
  173:24
  178:9
  245:21

company
  16:16
  24:25
  26:20 27:2
  29:12
  85:11
  146:17
  155:24
  191:8,13
  244:20
  245:15
  246:9

company's
  23:15

comparably
  164:12

compare
  107:16
  148:22
  238:17

compared
  86:12 87:1

88:20
101:9
106:7
136:24
150:13,20
151:7
215:6
261:5

comparing
  95:12,17
  98:25
  99:17
  107:13
  212:22

comparison
  86:1,6
  87:2,4,23
  88:2,3,11,
  17 92:13,
  17 93:15,
  24 95:4,6,
  22 96:23
  97:15,18
  98:13,24
  99:20
  100:3,23
  101:6
  104:9
  106:1,2,6,
  9,12,17,19
  107:6,9
  108:11,20
  110:13
  111:1
  112:6
  190:15
  255:24

256:13,25

comparisons
  106:23,25
  107:11,12

compensation
  240:3
  264:11
  265:11

compete
  206:24
  207:12

competitive
  139:10
  196:8
  216:16

competitor
  208:25

competitors
  27:4 44:1
  205:2,11,
  15,22
  206:2,6,9
  207:20,21,
  22 208:12,
  14,17,21
  210:19
  211:2,7,
  10,14,20
  212:4,8
  216:16
  217:4,8,
  11,16,22
  218:1,8

competitors'
  205:9

212:6

**complained**
224:16
225:5

**complains**
187:20,22

**complaint**
8:7 9:21
32:21
34:14
38:20,25
53:5 59:24
69:22
72:23
82:22
105:20,25
187:4
188:6
190:20
193:15
196:6
201:3
202:16
218:23
219:10
222:1
253:20

**complaints**
186:25

**complete**
28:2 40:19
76:11
81:18
102:23
103:25
104:1

119:23
157:23
194:1

**completed**
59:5 74:16
103:18
119:16,18,
19 120:24
121:5
125:23
148:1,2
157:11
191:17
192:25
194:3
195:19
202:21
203:13,18
204:6

**completely**
190:7
199:16

**completing**
106:10
119:24
121:3
203:12,17

**completion**
143:2
186:7

**completions**
157:9

**compliance**
119:22

**component**

181:25
266:3

**components**
74:22
81:17
90:18
91:14
121:2
164:4
200:14
240:14,20

**compound**
32:16
175:12

**comprised**
264:20

**computer**
102:8
108:21

**con-**  194:2

**concepts**
195:1

**concern**
112:3
219:7

**concerns**
189:3,4,5,
14

**conclude**
111:12
179:15

**concluded**
86:9
269:19

**concludes**
188:2

**conclusion**
68:20 89:3
91:20 93:4
112:5
251:10
259:19

**conditions**
231:16

**conduct**
41:16,19
86:6 161:6
214:19
219:20
257:13

**conducted**
86:1
101:18
217:18,21,
24

**conducting**
92:13

**confer**
240:15

**conferred**
237:20

**confidential**
220:1

**confirm**
20:14,16
55:15
205:8
219:9
234:3

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                    Index: confirmed..content

266:9

confirmed
173:3

confirms
22:6

confounding
238:16

confused
104:17
200:21
257:13,22
258:8
259:16

confusing
158:8

confusion
191:14
192:11,23
200:10,17,
22 202:20
203:2
219:3,7
257:9,17,
19 258:2,
3,5,11,16,
19,23
259:15,17

conjunction
112:1
187:1

connection
179:25
267:12

conservative
136:23

consideration
161:20
221:2

considered
129:7,8,11
164:6
191:25
192:2,5

constitute
190:17

constructed
205:3
207:25
208:2

consumer
246:22
257:9,21
258:25

contact
48:15
203:16
251:18
258:4

contacted
37:3

contacting
258:22

contained
41:5
71:11,18
97:19
194:12
199:13
233:23
269:1

contend
24:22
234:10,11
237:16
245:3

contends
237:24

content   7:21
13:10
24:12,14
25:3,11
26:8 37:10
38:15,16
39:6,10
40:14
48:14 49:4
60:11
61:12
62:18
64:11,14,
20,22
65:8,12,
15,16,24,
25 66:2,8,
10 67:1,6
68:10
69:10,20
70:1
71:12,18
72:1,15,25
73:5,8,18
74:12
88:13,22
89:7,8,19
91:24 92:7
93:7 96:24
97:18

98:10
100:14
103:14
107:3,13,
16,17
109:2
110:6,11,
12 111:18
112:9
115:16
126:19
127:5
139:4
142:25
143:4,21
146:11,12,
14 158:1
179:19,21
189:13,15
190:7,10,
12,18,22
191:1,3,17
192:19,21
194:13
196:24
197:20
199:13,17,
20 200:16
201:11,21
202:21
203:12
205:18
208:5
211:19
212:3,15,
20 213:1,
23 214:7
215:4,8

218:7
221:17
223:9
228:4
242:7
244:20
245:10,14,
21 246:23
250:4,19,
21 251:1
252:25
256:7
265:19,24,
25 266:5

**contention**
236:9
237:22
260:2

**contents**
90:18

**context**
131:11
234:14
235:2,20
236:6
237:8

**contingent**
123:7

**continue**
33:8 91:4
95:21
97:10
119:2
129:9
143:24
169:7

188:3
191:20
231:11
247:24
249:9,24
250:9,12
256:11
262:18
263:16

**continued**
13:12
95:19
96:13
112:2
167:1
179:20
189:1,11
199:10
222:8
224:9,14,
24 248:8,9

**continues**
146:5
197:5

**continuing**
30:2 37:14
108:7
110:10
114:4
115:25
116:5,13,
24 126:7
127:5,6
140:12
175:9
191:5,25
193:8

194:2
195:2,10
205:1
207:13
210:24
212:15
213:1
221:20
224:20
250:14

**contract**
35:24 36:1
64:12
81:19
115:8,12,
16,23
117:15,22
121:6
138:2,5,9
143:18
174:22
177:18
180:5
186:7
239:14
245:11

**contracted**
115:20
127:4
128:19
136:14
138:14
204:11
239:16

**contracting**
143:9
185:23

197:14

**contractor**
29:5
119:15,18

**contractors**
27:23
28:20,25
29:1 47:19
75:2 202:8
262:8

**contracts**
29:5,6
35:25 36:2
177:15,24
178:8,20,
22 179:6,
18,19
244:11,15
245:19

**contractual**
41:6

**contribution**
261:18
262:4

**contributions**
258:16
261:25
262:7

**conversation**
38:12
224:19

**conversations**
15:13 23:4
43:16
115:14

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

204:5
230:2

**convey** 13:17

**conveyed**
24:18,19
174:12
176:18

**coordinator**
233:4

**COPD** 79:19
124:4
137:1
156:13
164:18
233:12
241:6
246:12

**copied** 60:5,
21 61:18
65:17 70:4
74:24
88:24
89:21 97:6
98:6
100:19
103:8
109:19
112:9

**copies** 36:7
52:24 54:1
71:6
246:17

**copy** 35:24
47:6
54:23,25
55:4

56:17,20
95:11
122:8
130:1
177:24
219:25
269:8

**copying**
94:1,3
95:10
98:17,18
103:3
112:13,14

**copyings**
103:3

**copyright**
8:4 53:1,
2,6,16,19
54:18
55:16,25
56:11
57:11,13
58:1,4,10,
13,17,25
59:18
60:16,19,
24 61:2,10
62:2,9,24
63:3,6,11,
16,21
64:4,6,9,
15 66:18
67:16
68:11,21
69:14,17
70:25
71:1,5,6,

20,22,25
72:2 82:23
83:4,7,24
84:6,7,13,
23 85:6,14
86:14,18,
21 90:1
100:9,18
105:13
108:3
112:7
202:2
214:11
215:16
216:2
231:24
232:4,5,
10,14,21
233:5,9,13
234:14
235:1
236:13
237:20
245:24,25
246:1
248:23
249:4,25
251:2,18,
21,22,24
252:1
253:2
257:4
266:2,5,19
267:5,10

**copyrightable**
251:1
252:5,13

**copyrighted**
94:2 98:18
107:4
183:3
215:19
235:10,13
237:14,19,
24 252:10
254:2

**copyrights**
237:17

**Corexcel**
209:10

**corner** 19:23

**corporate**
6:18 7:10

**correct**
6:19,20
7:11,12
8:25 9:1
12:6,14,23
15:6
16:14,17,
18 18:25
20:24
21:2,19
25:2 26:6,
10 28:23
29:15
31:1,6,24
32:5,15,23
33:20 34:1
35:1,2
36:8,18,20
38:22
39:15,19,

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                          Index: corrections..correspondence

| | | | |
|---|---|---|---|
| 20,25 | 111:5,6,23 | 162:9 | 219:12 |
| 40:2,9,18 | 112:11,12 | 164:15 | 220:16 |
| 44:20 | 114:19 | 165:24 | 221:3 |
| 45:4,9 | 117:17 | 168:19 | 225:11 |
| 46:20,22, | 118:22 | 169:15 | 226:2,11, |
| 23 47:10, | 119:1 | 171:4 | 16,17 |
| 11 48:14 | 120:11 | 173:1,2,12 | 228:21 |
| 49:1 50:3, | 122:18 | 175:13 | 229:2,4 |
| 10,18 | 125:20,21, | 176:2 | 232:2 |
| 53:3,4 | 24 126:1, | 177:24,25 | 233:24 |
| 61:12,13 | 9,22 | 178:25 | 234:2,7 |
| 62:10 | 129:10,15 | 179:25 | 238:20 |
| 63:23,24 | 131:21 | 180:13,24 | 240:23 |
| 64:4,5,23, | 132:5 | 181:19,21 | 241:6,7,9, |
| 24 65:9,10 | 133:22 | 183:4,19 | 10,15 |
| 66:1,3,5, | 134:23 | 184:9,10, | 243:25 |
| 6,10 69:11 | 135:18 | 18 185:20, | 244:1,8,9 |
| 70:11 | 136:2 | 21 187:2,7 | 246:16,19 |
| 71:5,8,20 | 137:13,18, | 189:13 | 248:2,3, |
| 72:3 74:3, | 19 138:1, | 191:20 | 14,15 |
| 4,6 76:1, | 11,15 | 193:4 | 250:16 |
| 3,5,9,21, | 139:5,8, | 194:7 | 252:16,22, |
| 22 77:7,12 | 12,23,24 | 195:12,16 | 24 253:20, |
| 78:1 79:7 | 140:18 | 197:2,3, | 25 254:7 |
| 80:9 81:2, | 141:1 | 11,12 | 255:1 |
| 20,25 | 142:21 | 198:6,16 | 256:9,17 |
| 82:5,10, | 145:20,21, | 199:6,15, | 262:4,24, |
| 11,15,20 | 24 146:13, | 18,23 | 25 263:5, |
| 88:17 | 22 147:1 | 201:23 | 6,19 |
| 90:2,7,15, | 149:19 | 205:23 | 267:15,18 |
| 23 91:21 | 152:7 | 206:7,8, | |
| 92:16,18 | 153:11 | 11,14 | **corrections** |
| 96:6 97:12 | 154:11,22 | 207:13 | 123:8 |
| 103:21 | 155:3,7, | 213:4,17 | |
| 106:3 | 11,12 | 214:4,11, | **correctly** |
| 108:11,15, | 157:3,4,8 | 12,15,19, | 158:14 |
| 24,25 | 158:15,23 | 20 216:13, | 236:11 |
| 109:3,9,15 | 159:3,12 | 18 217:6 | |
| | | | **correspondence** |
| | | | 47:22 |

30(b)(6)                                          Index: corroborate..courses

corroborate
  177:4

corroborated
  175:5

corroborates
  175:17

corroborating
  178:11

Cory  233:4,
  9,12,15,19

cost  14:12
  148:22,23
  149:18,20
  155:8
  202:14
  265:21

costs  163:17
  263:22
  269:10

counsel  5:13
  104:20
  230:2
  231:5
  238:17
  252:12
  266:9

Counsel's
  104:18

count  141:4

counter-
claimant
  5:16

counterclaim
  232:12

counting
  160:5

country
  141:24

couple  23:11
  96:5
  185:13

courses
  13:13,20
  14:16 17:8
  25:1,17
  27:8 28:1
  35:5,9,23
  38:10,19
  40:24
  48:24
  49:6,15,17
  50:17
  52:20,21
  53:3,7,8,
  14 54:19
  55:12,18
  58:17,21
  61:5,10,22
  62:2,17,20
  63:3,7,22
  64:8 66:19
  67:3,4,15
  68:2,20
  70:13,16,
  21,24
  71:4,19
  72:8,21
  73:3,6,9,
  13,17
  74:16,18
  75:24

76:12,14,
16,19,20
77:9,10,18
78:3,10,
18,19
80:9,10,22
81:1,9,12,
13,15,20,
21,25
82:1,2,4,
10,15,17,
18,19,24
83:3 86:3,
16 87:1,3
88:4,8,10,
14,21,23
89:9,13,
15,17,21,
22,23
91:18
92:3,10,
14,15,18,
24 93:5,8,
14,25
94:2,3,12
95:4,7,9,
20 96:6
98:15,18,
19 99:7,
24,25
100:2,7,22
101:4,9,
10,11,14
104:2
105:16,21
106:7,13,
16 107:6,
10,11,13,

14,16,24
108:8,9,
16,21,23
109:17,19,
25 110:10,
15,18,23,
25 111:13,
16,20
112:1,3,19
113:1,4,7,
9,12,22
114:4,11
115:1,13,
21,25
116:4
117:2,15,
23 118:16,
20 119:2,
6,7 120:24
121:7,11,
14 125:12,
22 126:3,
5,13,21,
22,23
127:1,4,8,
12,13,16,
18,25
128:3,19,
20,21,24
129:10,12
131:18
133:10
134:5,20
135:13
136:6,8
137:5,25
138:2,4,5
140:25

**30(b)(6)**       Index: courses'..covered

| | | | |
|---|---|---|---|
| 141:15,17, | 179:12,14, | 204:12,13, | 242:17,20 |
| 22 142:1, | 16,18 | 17,24 | 243:1,5,8 |
| 12,14,15, | 180:5,22, | 205:1,3,12 | 247:3,18, |
| 20,24,25 | 23 181:10, | 206:21 | 19,25 |
| 143:9,22, | 15,20,24 | 207:22,25 | 248:2,12, |
| 25 144:4, | 182:15 | 208:3,18 | 20 250:8 |
| 25 146:16, | 183:3 | 210:19,20 | 251:6 |
| 20,23 | 184:11,15 | 211:1,8, | 255:7,24 |
| 151:24,25 | 185:13,14 | 12,15,16, | 256:1,6,8, |
| 152:1,5, | 186:1,3,4, | 21,22,25 | 10,11,25 |
| 14,18,20, | 22 187:5 | 212:5,11, | 257:18 |
| 22,25 | 188:7 | 12,24 | 258:23 |
| 153:3,11, | 189:9,19, | 213:18,21 | 260:18,20, |
| 16,23 | 22,24 | 214:3,4,6 | 22,23 |
| 154:7,9, | 190:3,11, | 215:7,23 | 261:7,11, |
| 15,20 | 14 191:4, | 216:18 | 23 262:5, |
| 156:9,12, | 7,11,16, | 217:5,12, | 6,14,17 |
| 14,17,23 | 20,22 | 16 218:1, | 263:9 |
| 158:13,16 | 192:1,10, | 2,9,10,14 | 265:12 |
| 159:4,15 | 13,16 | 219:1,15, | 268:14,16 |
| 161:9 | 193:3,8,9, | 19 221:15, | 269:2 |
| 162:2,6, | 10,11,24 | 18,20,22, | |
| 14,21 | 194:6,8, | 24 222:9, | **courses'** |
| 163:3,13, | 12,16 | 12,14 | 205:3 |
| 18,21 | 195:1,2,3, | 223:2,5, | **court**  5:11, |
| 164:9,13, | 11,13,15, | 15,20,24 | 14 8:6 |
| 14 165:2, | 16 196:8, | 224:10,13, | 221:8 |
| 8,11,13, | 20,25 | 14,25 | 231:9 |
| 18,21 | 197:15,16, | 225:7,24 | 267:10 |
| 166:8 | 17 199:2, | 226:10,18 | 269:9 |
| 167:22,25 | 5,7,10,13, | 227:1,2,10 | |
| 168:1,17, | 22,24 | 228:1,5,18 | **cover**  147:21 |
| 22 169:5 | 200:25 | 233:5,10, | **coverage** |
| 172:6 | 201:2,4, | 15,17 | 127:8 |
| 173:20,24 | 15,16,20 | 234:8 | **covered**  11:4 |
| 174:10,11 | 202:1,6,7, | 237:18,19, | 93:8 140:2 |
| 175:2,3 | 12,18,19, | 21 240:24 | 143:7 |
| 176:23 | 22 203:17 | 241:21 | 162:1 |

30(b)(6)                                                              Index: covers..date

203:4
211:1

**covers**
147:25
245:25
246:1

**crawlable**
74:2

**created**
104:24
156:16
236:19

**creating**
244:18

**Credentialing**
30:4

**credit**  80:18
81:10
113:14
135:20
136:18
142:11,14,
16 143:1,
4,6,11,13
191:5
194:14
195:8,18
197:19
204:19
205:13,18
208:5
212:15
213:1

**creditors**
206:12

**credits**
140:12
195:19,21
196:3,4
205:20
207:13
211:9

**Cremons**
10:12,14
21:11,19
22:7 31:3,
13,21,23
32:11
43:16,24
44:8 45:8
144:13
180:15

**Cremons's**
11:4 30:24
44:23

**criteria**
102:20,21

**Crystal**  5:10

**CSTS**  242:3

**curious**
238:15

**current**
16:22 17:8
146:1
233:22

**cursory**
120:25

**Cusic**  5:10

**customer**

188:2
191:14
192:11
200:10,22
202:20
203:24
219:3,7
221:19
257:19,25
258:1,2,3,
7,15,19
259:7,15

**customer-facing**
221:16
227:19

**customers**
127:24
141:24
146:19
152:6
191:17
192:22,24
195:22
196:2
200:20
202:24
203:1,11,
16 204:1,
4,9,21
227:25
257:12
258:3,10,
22 259:16

**customers'**
202:20

**CV**  186:16

_____

**D**

_____

**damage**  42:5
214:21
215:10,12,
25 216:6,7
220:24

**damages**
41:17
42:11
161:3,16
215:5,20
221:3
266:15
267:14

**damaging**
214:19

**Dan**  10:12
11:4 21:11
22:7 30:6,
24 31:18,
20 43:16,
24 45:8
180:15

**dash**  209:22

**date**  5:9
35:17,18
82:25
83:13,17,
25 84:8,
13,24
85:4,7,18
176:19
234:21,23

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)      Sarah Campbell on 11/14/2017      Index: dated..Dennis

dated 130:4
  171:16
  173:15,19
  174:21
  184:13,21
  185:11
  220:2
  228:17

dates 83:8,
  9,10,16,
  17,19
  86:17
  115:5
  179:3
  212:22
  230:16
  235:3,20

daunting
  50:13

David 239:3,
  5

day 20:7
  55:9
  106:22
  107:13
  117:18
  142:10
  146:1
  175:14
  176:5

days 48:5
  255:3,4
  267:22

deadline
  104:11,12,
  13

deadlines
  239:16

dealings
  256:2

December
  84:24
  166:15

decide 81:6
  127:25

decided
  119:11
  126:9,20
  142:1
  144:3
  204:25
  247:24
  248:1

deciding
  124:6

decision
  123:21
  124:18
  125:16
  126:18
  141:19
  143:24
  152:13
  157:22
  167:22
  168:21
  186:22
  188:7
  189:7,19
  191:19,21
  201:22,24
  247:17

decisions
  30:9 67:11
  123:25
  124:19
  128:21

declaration
  221:7,11
  222:6
  225:19
  227:14

declined
  36:6 37:21
  178:9,21

decrease
  154:10

decreased
  154:13

defendant
  5:16

defenses
  231:18

deficiencies
  141:4

define 36:19
  78:7
  102:18

defined
  234:17

defining
  249:15

definite
  72:4

definition
  37:2

212:13
  250:25

definitive
  27:24
  29:17

definitively
  28:4,16,19
  115:11,17
  117:12

degree
  213:24
  255:10

deletions
  123:8

dementia
  52:4 56:9,
  12 61:23
  72:13
  73:21
  74:19
  83:22
  119:7
  120:18
  121:12
  136:10
  172:8
  181:17
  185:15,19
  189:25

demonstrates
  103:14

denied 31:4

Dennis 15:14
  17:25 18:5
  21:10,16

220:12

**Dennis's**
30:6

**dental**  125:9
207:4

**dentists**
125:8

**depend**  96:19

**depended**
96:16

**dependent**
73:19
175:14

**depending**
49:4
146:13

**depends**
36:19
196:9

**deponent**
31:1

**deposition**
5:7 7:1,7
10:10
30:25 36:3
39:23
44:23
59:15 69:3
102:3
118:4
162:19
170:21
173:1,4,9
176:6

177:14,23
218:20
231:12
269:19

**depressed**
219:1,11,
13,19,22

**depression**
52:3 56:9,
12 61:23
72:13
73:21
74:19
83:22
119:7
120:18
121:12
136:10
172:8
181:17
185:16,20
189:25

**deprived**
196:10

**describe**
114:25

**describing**
158:4

**designated**
7:9 85:13
135:20
145:15
153:7
167:18,19

**designation**
80:18

81:10

**desirable**
204:21
205:19

**desist**
111:23
214:12
215:10,18
221:25

**desperately**
12:18

**detailed**
23:8,13
192:9

**details**  29:7

**detection**
70:3

**determination**
12:25
89:10
93:12 97:3
108:2
109:4,11,
22 124:8
127:2
129:9
143:3
230:17
248:17
251:24

**determine**
64:13
66:16,25
67:14
68:2,15

73:11
86:20
95:25
96:12
98:6,15,22
99:15
101:14
103:2
107:18
109:5,17,
19 114:6
115:2
116:4
121:2
151:12,13,
14 157:21
160:2
185:24
186:11
190:16
191:23
194:15
202:1
212:17,19,
23 242:22
249:2
256:13
257:1

**determined**
86:17
97:20
98:24
106:14
112:11,17
126:21,25
129:18
165:15
186:6,20

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

248:21
250:11,13
251:16
255:25

**determining**
107:3
124:16
157:24
161:15
164:23
266:7

**develop**
39:6,9
40:15
126:5
179:12,21
180:3
184:23
204:25
247:25
248:2
262:5

**developed**
13:11
25:12
35:23
38:14
111:20
126:19
179:13
186:1
211:8
242:20

**developing**
24:12
37:10
127:10

141:25
142:12,15
143:24
183:14
262:6

**development**
13:10,21,
23 14:15,
16 15:23,
24 17:8
24:20
25:17 30:2
35:6 41:1
60:25
61:25
75:23
76:25
79:2,10
80:9,10
118:17,18,
24 119:5,
14 120:5,
8,9
122:18,21
129:12,19
138:18,19
143:8,20
165:11
186:5
189:10
191:22,25
199:1
201:25
202:10
243:11
244:3

**deviation**

63:19

**devices**
127:15

**differ**
181:24

**differed**
261:12

**difference**
56:3 60:6
84:2,9,15
85:1,9
112:24
166:19
181:23

**differences**
54:21
55:17
95:18
113:11
182:5
199:17

**differently**
145:4
148:17,19

**differs**
207:19

**difficult**
55:13
100:1
141:10

**difficulty**
105:22
196:4

**diligence**

61:3,7
64:13

**diminished**
153:23
191:12
192:10
193:2

**diminishing**
196:14
197:8
201:6
202:15

**direct**
127:23
128:22,25
222:13,16
231:22
233:25
234:3
243:9
269:11

**directed**
221:14
241:1

**direction**
27:2
104:18
183:9

**directly**
47:18,20
165:1
174:9
183:21
226:15,21
265:12

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

**disabled**
 225:6

**disabling**
 225:10

**disclose**
 25:18
 26:13

**disclosed**
 27:14,19
 28:8,14,17
 29:12,21
 30:22
 35:11

**disclosing**
 25:6,22
 26:9
 176:16

**disclosure**
 29:6

**discount**
 22:17
 130:22

**discounts**
 167:2

**discover**
 109:23

**discovered**
 85:25
 86:23
 106:14
 119:25
 133:24
 186:20
 189:12
 223:3

**discovery**
 10:5 11:10
 12:15
 30:19
 35:10,13
 40:18
 89:20
 101:24
 117:11
 133:15
 134:10
 171:2
 180:19
 186:21
 189:18
 247:23

**discuss**
 22:21
 247:16

**discussed**
 16:19
 17:23,24
 18:3 23:3
 29:24
 35:21
 102:6
 115:22
 144:6
 157:16
 164:1
 194:8
 212:24

**discussing**
 16:23

**discussions**
 8:20 13:8
 23:7 31:18

 104:23

**disease**   52:1
 57:7 79:19
 172:1
 182:1

**disinclination**
 192:12

**dismiss**
 248:16
 249:4

**dismissed**
 92:16
 94:8,10,13
 158:13
 248:12,24
 255:7
 256:2

**dispute**   19:9
 22:10
 37:24,25
 45:6
 46:10,14
 174:3
 177:3,17
 178:1,3,
 13,15,24
 222:5
 225:20
 227:13,21
 228:18

**disqualified**
 129:20

**disregard**
 103:11

**dissimilar**

 111:19

**diverse**
 125:6

**division**
 79:16
 80:16
 122:11
 123:9,24
 124:15
 125:9,10,
 14 126:19
 241:2,17,
 20,22
 242:2,21

**document**
 9:11 14:23
 20:4 21:7
 34:16
 42:20
 46:24
 48:1,18
 49:5 54:14
 77:22
 79:15,20,
 22 80:14
 101:10
 104:11
 120:2,4
 122:18
 123:10
 129:22
 131:12
 132:22
 144:14
 148:20
 149:11
 156:10

166:4,6
183:11
184:2,12,
20 185:9
193:15
219:25
220:3,6,14
222:25
228:12
241:2,11
243:10,20
245:7

**documentation**
10:7 14:15
24:20
132:25
133:7,23
268:25

**documented**
115:14
200:22
217:25
225:15
258:11
259:16

**documents**
10:5 11:6
13:19
14:10,12
15:24 19:8
20:3 30:16
38:21
44:13,24
46:4,11
47:12,14
51:13
52:17

53:11
80:21
85:18
87:14,16
100:24
101:19,23
125:23
130:24
131:9
133:14
135:17
145:20
149:14
150:3,10
155:13,20
156:7
171:2
177:4,8
201:17
219:24
238:14
242:16
243:3,6

**dollar**  216:3

**domain**
252:24
253:7,14,
16

**double**  160:5

**double-check**
83:11

**double-
counting**
159:12

**downloaded**
85:19

**draft**  54:1
63:13
77:10
78:23
81:16
95:13
97:4,19
118:21,24
119:16
120:23
143:17
232:1
240:18

**drafted**
239:9

**drafting**
239:12

**drafts**  52:22
53:19 64:5
68:21 71:1
76:7 83:9,
12,18
86:2,13
87:1 92:14
93:8,11
95:25
100:10
110:14
115:8,20
128:20
136:25
143:10,15
199:8
212:1
232:3
237:14
244:5

246:14
250:7
260:22

**draw**  112:13

**drew**  91:20

**driven**  91:24

**due**  61:3,7
64:13
132:7
219:2,22
257:22
260:1
261:19

**Duran**  14:5,
9,23 15:1,
19 16:2,7
17:11,12
18:1,5,6,
24 19:7,16
21:9,16
22:1,6,14,
22 24:4
27:14
29:25
31:21
33:18,21,
25 35:6
39:4 43:16
44:20

—————————
**E**
—————————

**e-mail**
19:11,17
21:8,9
35:14,17,

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

19  36:23
38:11
40:13,17,
21  43:2,
12,24
44:10
47:20
48:4,5
115:18,22
130:4
132:23
171:11,12,
16,25
173:11,15,
18,23
174:9,20
175:6,17
176:21
177:10
178:7,11
179:3
180:4
183:12,20
184:3,13,
21  185:10
187:12,13,
15,18
188:13,25
204:4
228:16
229:5,14,
20  230:15
257:25
269:9,13,
16

**e-mailed**
47:17,19
228:22

**e-mails**
19:21
20:17,21
40:22
43:7,15,
19,22
44:4,5,18
46:5,6,17
85:19
115:14
133:20
171:5,10
173:9
228:2
247:7
257:24

**earlier**  22:4
24:2,9
29:23
30:24  46:3
47:12  53:1
61:2  64:7
71:12
105:15
131:12
134:14
138:17
142:19
157:7
171:1
172:25
173:12
177:13
187:1,5
198:4
211:6
213:2,14
217:3

233:8
268:8

**early**  47:22
129:3
147:25
166:15,23

**ease**  157:24

**easily**
113:1,3

**easy**  120:17

**edit**  201:1

**editable**
239:15

**edited**  61:19
70:22
73:3,7
75:25
76:10
97:20
136:2
198:1,2
199:3,7,16
201:3
243:23
246:14,21
247:8

**editing**
130:9
135:15,21
136:3,7,
13,16
189:23
199:11

**editor**
120:10

123:20

**editorial**
27:22
28:24  29:5
52:23
56:17
58:21
70:21
71:7,23,25
75:1,15
76:11
80:11
119:15
121:1,14,
18  143:19
190:3
199:25
200:3
202:8
251:7,12,
15

**editors**
65:16
121:8

**edits**  63:16
71:2  95:14
198:5,7,
15,17,20,
23  232:8

**educate**
85:16

**educated**
137:14

**education**
5:19  6:10,
11  30:2

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
Sarah Campbell on 11/14/2017

30(b)(6)                                                  Index: effort..Elite

37:14
108:7
110:10
114:4
115:25
116:5,13,
24 126:7
127:5,6
140:12
175:9
191:5
193:8
194:2
195:2,10
205:1
207:13
210:25
212:15
213:1
221:20

**effort**  21:2

**elance**
171:19

**elderly**  52:4
56:9,12
61:23
72:13
73:22
74:19
119:8
121:12
172:9
181:18
185:16,20

**electronically**
59:7,11

**element**
257:9

**Elite**  5:19,
21 6:9,11,
14 7:20
8:6,8,10,
13 9:2,5,
15,21
10:1,3,16,
19,21
11:2,3,7,
16,23
12:5,13,21
13:12,13
18:8 27:21
28:7 30:6,
15,22
31:5,17
32:8,10,
22,25
33:12,13,
15,20
34:1,15,
19,24
35:8,15
36:8,11,
16,17
37:5,8,9,
19 38:1,3,
8,10,21
39:1,2,9,
14,18,24,
25 40:4
41:6,24
42:5,12
45:3
47:15,20
50:10,11,

16,18,22
51:1 53:2,
9 61:6
66:5 67:3
68:17
69:19
70:17
73:10
80:23
86:2,16,24
87:1,3,20
88:21
89:14,23
90:14
91:18
92:3,10,14
93:5,7
94:12
95:11
96:3,20
97:17 98:2
99:25
100:19,22
101:11
102:14
104:3
105:13,22
106:1,17
107:12,14,
17,21,25
108:4,11,
16 109:7,
18 110:12
112:18
113:1,9,12
115:6,13,
19 116:1,
17 118:21

120:7
126:4
129:14
131:9
132:5
133:19
134:5
154:8
171:3,6
173:4,20
174:2,7
175:2,6
176:12
177:6,15,
18,23
178:18,21
179:5,10,
13,20
180:12,21
181:8,10,
14,20
182:9,15
185:3
191:15,23
196:12
197:6
199:14,22
201:16
202:2,17
204:12
205:2
206:16,24
207:12,21
208:19
211:17,19
212:2,14,
23,25
214:25

Case 0:15-cv-61165-WPD Document 337-1 Entered on FLSD Docket 05/26/2018 Page 303 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

30(b)(6)          Sarah Campbell on 11/14/2017          Index: Elite's..ereader

215:7,12
216:7
218:3
219:3,20,
23 220:24
221:3,15,
23 223:2,
15 224:17
225:6
226:17
228:1,18
237:18,21,
23 238:2,
15 248:12,
16 250:3,
4,5,8
255:8
256:3,7,12
257:14,22
258:4,5,
11,17,18
259:1,8,
17,24
263:7,16,
20 267:9,
11

**Elite's**
8:13,17,25
9:10 33:2
85:22 88:8
106:7
113:6
161:6
169:9,11
196:9
207:7
213:25
214:8

215:15,22
221:21
222:7,12,
14 223:16,
17,19,22
226:15
227:3,7,25
228:21
238:5
249:16
260:1
262:20

**else's**
261:25

**emerging**
24:13

**employee**
35:15

**employees**
35:14
115:19
262:8
263:25
264:18

**employees'**
264:9

**encompass**
124:10

**end** 24:3
76:24
101:3
130:7
133:2,6
136:24
166:25

222:13
252:21
258:13

**endeavor**
109:1,12

**ended** 135:22
136:2,17
138:15
162:2

**ends** 47:1
77:10

**engage**
256:20

**engaged**
119:14
257:13

**enlists** 85:4

**ensure** 61:19
143:8

**ensuring**
74:22

**enter** 206:22

**entered**
190:3

**entering**
13:14

**entire** 68:11
99:4
100:10
106:22
135:4
163:6
169:4
175:13

176:5
205:14,16
269:14

**entirety**
81:16
87:17,24
97:5
108:23
109:20
134:22

**entities**
191:15
253:1

**entitled**
41:20
79:18
110:21
120:4

**entity** 6:21
140:11
186:17

**entrance**
17:9

**EPUB**
127:15,19

**equating**
207:20

**equivalent**
29:3
254:19

**equivalently**
137:6

**ereader**
127:15

Erin  14:2
  15:13
  17:18,25
  18:5 19:14
  21:10,16
  30:5 43:4,
  5,15
  187:12
  228:17,22

essence  70:4
  73:15
  78:10
  236:3,4

essential
  94:4 98:20

essentially
  99:8
  112:15
  182:11
  198:2
  202:8,18

established
  102:21
  158:21

estimate
  134:19
  202:11,13
  262:25

estimated
  134:21
  135:4
  239:16

estimates
  220:24

estimating

216:6

evaluate
  248:20

evaluation
  242:4

evaluations
  80:19
  241:20

Evan  187:13

eventually
  44:1

everybody's
  261:25

everyday
  204:9

evidence
  10:18
  11:7,14,
  20,21,25
  12:3,12,20
  13:1,5
  14:21,25
  15:5,10
  18:23 19:5
  29:20
  30:11,12,
  14,17,21
  32:9,10,20
  33:1,11,
  14,16,21,
  24 34:3
  38:8
  39:13,17,
  21,22
  40:4,13,23

45:7
  104:25
  110:5
  117:14,21
  131:17
  132:1
  133:21
  137:24
  153:12
  162:1
  165:7,10
  176:20
  177:2,7
  178:3,15,
  16,24
  179:4
  180:10,16,
  18 186:17
  195:23
  196:1
  200:18,20
  202:23
  203:1,14
  219:10,18,
  21 227:18
  238:24
  245:10
  257:23
  258:18,25
  259:4,25

evidenced
  46:12
  61:11

evolving
  30:17

exact  11:1
  19:17 29:7

35:18
  73:14
  83:13
  102:15,19
  162:3
  197:20
  205:22
  206:4
  265:25

examination
  6:6 231:2,
  23 234:5
  254:23
  268:4

examples
  111:10
  156:22
  204:8

exception
  240:2
  246:9

exchange
  15:6 19:11
  21:25
  38:11,18
  40:13
  188:13

exchanged
  14:10
  15:3,9,12
  18:12,17
  21:14
  22:11
  46:18
  104:19

exchanges

**30(b)(6)**                                                      **Index: exclude..expected**

115:18

**exclude**
109:1
182:2
183:7

**excluded**
182:24

**exclusive**
174:23
177:12
178:22

**exclusively**
239:20
240:10

**excuse**   7:1
8:9 9:16,
18 13:3
36:10
37:19
42:11
44:16
47:13
48:9,24
49:24 60:2
65:5 84:7
85:4,5
98:16
101:10
119:2
120:21
123:10
125:18
133:4
145:5
164:10
170:25

171:15
177:16
197:4
206:16
220:5

**excuses**
175:6

**exhaustive**
208:21

**exhibit**   5:4,
5 6:25
7:4,6,14,
17 9:9,16
19:18,20
20:21 21:7
34:13
36:10,11
38:20 41:3
42:20
44:9,25
45:16,17
46:4,6,17
51:6,7,9,
22,24,25
52:2,3,5,7
53:5,9,10
54:3 56:8
57:6,24
58:8 59:23
61:6,11
64:19
67:15
69:23
72:24
76:23
79:12,14,
15 80:22

82:22,23
83:23 84:5
85:21 94:1
98:16 99:2
105:14
120:3,4
122:6,10
123:10,14
124:3
125:23
129:22
130:2
131:13
132:21
144:12
145:19
147:5
149:7,10,
17 154:4
155:6
166:5,11,
20 169:9
170:25
171:10,14
172:4,20,
23 173:10,
14 174:20
175:5
178:6
180:21
181:7
182:13
183:11
184:2,12,
20 187:9,
11 188:10,
12 190:21
194:22

196:6
197:4
204:23
218:23
219:24
221:4,6,7
222:19
224:7
228:13
232:11,15,
16,17,19

**exhibits**
46:3 51:14
52:14
53:21
63:22
174:4

**exist**   145:20
243:6

**existed**   38:5

**existence**
256:15

**expect**
104:1,5
197:18,20
200:4
206:22
211:1
217:7,10
218:4

**expectation**
138:4,7
198:1
204:16,19

**expected**

Case 0:15-cv-61165-WPD  Document 337-1  Entered on FLSD Docket 05/26/2018  Page 306 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
30(b)(6)                    Sarah Campbell on 11/14/2017        Index: expenditures..featured

141:7

**expenditures**
196:13
197:7
201:5
202:4

**experience**
97:25
203:1

**experienced**
258:19

**expert**
162:17
167:18
242:6

**expertise**
109:10
160:25

**experts**
167:12

**expire**
146:23
156:18,20
229:6
230:7

**expired**
166:25

**explain**
10:25
166:19
170:8
201:8
211:6

**explicitly**

69:16

**explored**
105:7

**expressed**
17:12

**expressing**
196:4

**expression**
94:5 98:20
109:8

**expressive**
68:12

**extensive**
43:24
75:12
93:16
102:17,18
113:2
198:18
201:16
252:20

**extensively**
95:20
252:18

**extent**  99:18
103:2,3
104:22
108:4
163:22
190:4
200:1
201:11
202:9
215:6,14
216:25

217:9
218:7,13
248:22
251:17

---

**F**

---

**fact**  25:6
26:9 33:3
37:7 45:2
50:1 78:14
144:18
163:2
173:5
177:13
186:4
214:2
218:8
222:17
247:18
253:23

**factors**
137:17
138:22
154:15,17,
19 164:1,4

**facts**  67:18,
20 68:3,4,
13 71:11
231:16
238:20

**factual**
244:13

**faculty**  13:9
123:7
146:9
243:22

**fair**  21:18
23:20
74:12
117:4
132:1
150:21
151:1
158:17
199:3
219:16,18

**fall**  49:21
128:13
147:21
185:8

**false**  31:9,
10,24
32:12

**familiar**
116:19

**fashion**
47:16,17

**fast**  174:19

**faster**  20:8

**feature**
130:12,15
133:3
138:4,8
165:12,16
168:1

**featured**
89:14,23
91:17 92:9
128:22,24
129:2
133:9

**30(b)(6)**             Index: featuring..finishing

134:12
136:25
137:22,25
138:10,12
147:11
153:14
157:6
161:12
162:21
164:17,18,
20 165:5,
6,18 167:3
169:7

**featuring**
140:25

**February**
106:15,18
110:1,2
171:17
172:15
175:4
185:11
188:13,17

**federal** 7:2
89:24
90:14

**feedback**
123:23
124:15
183:23
189:4
192:22,24
196:2

**feel** 8:16
30:14 83:6
109:10

247:19

**fees**
265:13,18
266:11,15
267:6,11

**felt** 251:5

**fewer** 165:6

**field** 116:18
138:6
194:7

**fight** 117:17

**figure**
166:20,21
216:3

**file** 69:14
229:7
233:13

**filed** 34:14
38:21,24
90:13
105:12
106:1
215:1
222:1
230:14
233:4,17
236:14
255:21
256:4,17
258:13

**files**
127:15,19

**filing** 59:10
60:24

**filings**
230:16
232:15

**filled** 83:20
118:24
190:7
234:20
242:15

**final** 67:11,
13,25 75:8
76:21 83:9
115:22
124:16
125:16
143:10,15,
17 246:21
247:5

**finalized**
126:10

**finalizing**
127:1

**finally**
247:9

**financial**
8:13 14:11
17:7 18:9
19:12
21:10,18
22:3,5,14,
21 23:4,7

**financially**
138:23
139:8,12

**financials**
8:18,25

22:2

**find** 43:13
75:18 77:3
86:22
87:13
100:2
107:24
109:12
110:5,8
114:2
116:8
117:1
133:7,8
142:17
159:6,8
171:18
186:13
217:15
250:3
261:1

**finding**
68:10

**findings**
103:25
104:1
116:25

**fine** 34:6,9

**finish** 11:18
207:1
235:15,16

**finished**
130:5

**finishing**
119:21
185:12

**30(b)(6)**                                                                   Index: firm..free

firm  28:21
  269:13

first-to-
market  196:9
  199:19

five-hour
  130:10,18
  132:8

five-minute
  42:15

fixed  55:2

flip  20:2
  149:12
  178:5

flipped  99:7

flipping
  95:18

Florida
  34:15
  229:24
  230:7

flow  41:14

focus  33:2
  49:17

focused  49:2

focusing
  30:9

foldout
  149:16

folks  28:23

follow
  141:11

footnoted
  252:18

for-profit
  253:4

foreign-
educated
  248:8

foreign-
trained
  186:18

form  13:24
  14:23 15:2
  16:1 22:16
  28:15
  40:13
  76:25
  80:16
  83:20
  119:14
  144:18
  146:6
  182:8
  197:23

formal
  186:2,9
  217:18,19,
  25

format  55:1
  71:16
  127:11
  139:25
  238:24
  256:3

formats
  127:17

formatted
  55:4

formatting
  55:2
  103:17
  260:23

formed  181:9

forms  27:20
  28:6
  241:21,23
  242:13,25
  243:7

forward
  17:12
  37:10  41:1
  78:13
  80:15
  95:19
  96:11
  124:6,7
  142:1,4
  174:19
  178:5
  186:22
  189:9,11,
  14 229:24
  247:18,22

forwarding
  187:13

Foster
  171:16
  172:5,14
  182:13
  221:7,13
  222:5,10
  227:14

Foster's
  225:18

found  35:10
  43:15,17
  88:12
  97:17
  99:23
  103:16
  109:6
  110:9
  111:14
  116:9
  117:21
  129:11,18
  133:12
  152:23
  186:16
  189:8
  201:24
  212:2,14,
  18,25
  213:6
  251:7

foundation
  25:15,25
  78:6
  174:16
  216:23
  234:17

Franchi
  35:15
  173:16
  177:11
  178:6,11,
  14

free  66:13
  75:5

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 309 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017
30(b)(6)                                        Index: freelance..GERD

245:20
252:25
253:3,14

**freelance**
34:20,25
36:7,12
37:6 38:9
39:14,18
40:5 79:11
81:18
178:17
180:7
237:7
239:9,13,
19,23,25
244:16
245:4
246:3,6

**fresh** 223:20

**front** 6:24
9:9 44:24
46:15
50:12
52:10
53:15
59:25 69:7
77:9 80:3
81:13 82:4
99:24,25
100:23
102:16
108:16
113:9
148:14
232:11
242:14
243:20

265:24

**fulfill**
195:8

**fulfilled**
194:13

**full** 30:18
141:23
143:2
152:5,20

**fully** 75:25
76:10
248:21

**funny** 176:9

**future** 11:18
13:9 16:21
17:8 27:2
43:25
181:15
207:8
212:7
231:15

———————
G
———————

**gain** 8:13
156:18
167:1

**gained** 144:6
259:25

**Gannett**
210:17

**gap** 142:6,9

**gaps** 121:21

**garner**

137:16

**gastroesophage
al** 52:1
57:6

**gather** 259:9

**gathered**
215:2

**gave** 90:19
92:6

**general**
24:17
47:19 77:8
81:7
107:18
111:20
114:21
168:11
186:9
191:18
196:2
197:17
205:11
208:6,11,
18,22
217:9,24
224:25
226:13
237:6

**generally**
47:24
48:8,13,15
59:21
60:23
141:9
194:17
200:12

202:9
205:9
217:22
228:1
250:20
253:3
256:18

**generate**
262:18

**generated**
104:6
153:14
260:9,14

**generation**
263:5

**GERD** 51:25
57:8 61:17
62:12
63:5,9
64:2,19
65:1,6,11,
23 66:8,15
69:7,9
70:12,19
72:4 75:9,
14,16,20
76:18,24
77:19,21
78:21
82:12
84:11
95:14
97:8,16
106:15
108:7
119:21
120:9

30(b)(6)                                                      Index: germane..heading

121:17
129:1,13,
17 130:6
131:14,17
132:1,6,
11,15,16,
19 133:3,
9,16,22,23
135:15
141:3
172:7
181:16
184:15,18
185:13
190:4
197:21,25
198:5,15,
17,20,23
199:4
200:3
265:14

germane   27:1
113:14

give   16:10
27:24
29:17
42:22
51:20
55:11 65:2
100:5
108:18
130:10
168:11
231:13
241:2

Global   5:12

good   118:13
139:4,15
153:15
164:22

Goodwin
130:4
132:23

Google
113:25
114:1
223:5,6,8
224:10,11,
15 225:23
226:9,11,
13,15,22
227:8,12
229:2,4

Google's
223:10
226:12
227:8

governing
248:7

governs
186:17

grab   118:15

great   150:7
201:19
266:25

greater
137:23
168:17,22
169:3

grinding
162:16

ground
164:22

group   145:1
206:3
265:14
266:2

guarantee
138:12
164:24

guarantees
137:4

guess   121:15
198:19
231:14

guessing
131:20
140:6

guided   183:5
230:2

guys   94:24

—————————

H

—————————

H-i-r-s-c-h
187:14

half
170:10,11

halt   191:21

hand   34:12
46:2
170:24

handed   130:1

handing
19:20

79:14
187:11
188:12
221:6

Hang   42:17

happen   60:24
138:18

happened
75:20

happening
202:2
230:12

hard   11:25
30:16
33:1,14
42:8

hard-fought
196:11

harm   42:6,
12 216:3

harmed   41:19

haves   56:24

head   29:8
110:21
111:7
114:6,13
213:3
214:8
216:12,13
244:22,24,
25

heading
265:14

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                              Index: headings..immediately

| | | | |
|---|---|---|---|
| headings | history | 136:8,9, | identified |
| 91:21,22 | 14:13,14 | 11,12,24 | 13:15 |
| heads  188:17 | 16:21 17:6 | 194:1 | 64:20 66:9 |
| health  24:17 | 43:25 | 263:24 | 75:19 |
| 207:5 | 138:13 | 264:7,17 | 95:10 |
| healthcare | Hold  198:8 | huge  103:7 | 103:4 |
| 49:11 | holder  64:15 | hungry | 110:4,21 |
| 126:6 | 86:21 | 113:17 | 114:14 |
| 210:25 | 108:3 | hurry  229:23 | 127:24 |
| hear  55:9 | 251:2,25 | 230:6 | 142:5 |
| 231:6,7,9 | holders | Huseby  5:12 | 190:16 |
| heard  208:24 | 86:14,18 | hypothetical | 239:3 |
| heart  172:1 | 237:20 | 216:20,24 | 241:5 |
| helpful | 251:19 | | 243:10 |
| 49:10 65:3 | Honestly | ――――――― | 263:22 |
| 104:22,24 | 263:16 | I | 265:6 |
| 105:23 | honorarium | ――――――― | identifies |
| helping  21:1 | 121:3 | idea  139:9 | 73:14 |
| Hey  118:6 | hope  48:2 | 140:24 | identify |
| high  23:7 | 83:14 | identical | 53:21 70:4 |
| 217:22 | 139:6 | 36:14 67:6 | 74:23 |
| 219:2 | hoping  12:18 | 108:8,12 | 98:10 |
| high-level | 51:5 | 112:20,22 | 100:8 |
| 205:10 | 229:24 | identifiable | 110:18 |
| higher | 230:6 | 113:2 | 113:3,10 |
| 165:12 | host  175:8 | identification | 114:3 |
| highlighting | 181:8 | 5:4,5 | 213:12 |
| 47:7 | hosted | 19:18 | identifying |
| hire  237:3 | 221:17 | 45:16,17 | 74:12 |
| Hirsch | 222:14 | 51:6,7,24 | identity |
| 187:13,19, | hourly | 52:2,5 | 9:22 10:3 |
| 20 | 264:10 | 79:12 | 11:8,16 |
| | hours  130:7 | 149:7 | 12:5,14,22 |
| | 135:13,22 | 187:9 | 13:18 |
| | | 188:10 | Ignore  94:21 |
| | | 221:4 | immediately |

18:10 28:3
75:12
77:22
86:13
246:18

imminently
247:4

immune  92:25
93:21
248:13
250:2
265:3

impact
216:17
218:9,13

impacted
143:23
214:3

impermissibly
86:2 92:14

implementation
232:24
233:4

implied
182:23

importance
30:3

impossible
154:18

improve
247:20

in-depth
23:4 75:1

in-person
14:4 16:8,
19,20,25
22:22,24

inception
155:23

include
63:13 71:2
96:23
97:17,24
98:4
126:18
139:25
148:9
149:3
152:1
157:9,12
167:2
182:11
251:9
264:8

included
8:3,4
13:9,20,21
14:11 30:1
51:13
52:17 54:7
57:12
71:23 72:2
74:21,23
78:14
87:20 89:8
91:15 92:7
97:4 98:16
107:1
108:22
129:13,17,

20 135:1
143:16
144:21
152:22
154:9
163:2,7,13
164:10,13
181:19
214:13
260:6,12
264:10

includes
50:20 65:8
72:14
122:2
156:13,14
165:19
166:6
181:25

including
13:9 14:11
17:6 35:6
100:14,15
107:2
138:23
173:24
175:8
176:17
181:9
205:2
207:21

Incomplete
216:24

incorrect
32:2
233:16,20

incorrectly
169:17

increased
154:13
219:22

incurred
221:3

indefinitely
169:7

independent
47:18 75:2
119:15
262:8

index  14:14

indication
31:19
89:7,22
90:19,22
240:21

individual
128:3
134:24
135:7
154:2,5
155:10,17,
25 156:5,
23 159:1
163:5
166:24
167:9
168:2
170:2
188:18
239:9
262:16

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

**indulge**
  231:21

**influence**
  137:17
  139:11,16,
  19,23
  140:1,7,12
  164:1,4
  186:21
  188:6
  189:18

**influenced**
  31:19
  103:16
  165:1

**influences**
  139:7

**inform**
  178:18

**information**
  8:14 11:3,
  11,24
  12:16,17,
  24 13:9,24
  14:11,17,
  22 15:1,
  14,18 16:2
  17:6,7,16
  18:10,12,
  16,24
  19:12
  21:11,14,
  18,25
  22:3,5,11,
  14,21
  23:5,7,9

24:3,15,
18,21,23
26:15,19,
20 27:1,
10,13,15,
18,23
28:5,7,13,
17,23
29:10,21,
25 30:1,8,
21 31:5,20
32:1,10,
22,25
33:13,15,
19,25
34:4,19,24
35:3,5
39:4,8
40:2 43:23
44:6,14,
17,19,24
45:3,8,9
61:18
62:9,14
67:7 73:16
90:3 92:8
94:11,17
96:4 115:6
133:21
134:18
149:10
155:15
176:18
177:9
179:11
180:12,16
215:2
218:25

247:20
251:13,14
258:5,21
259:10
262:16
263:20
264:9

**informed**
  47:23
  174:1
  176:12

**informing**
  173:20,23
  175:6
  177:6

**infringe**
  237:17
  245:23

**infringement**
  8:3 85:25
  86:10
  88:20
  105:13
  119:25
  129:12
  134:10
  169:11
  182:16
  201:25
  212:18
  214:11
  221:14
  249:4,25
  257:5
  266:19
  267:5,10

**infringements**
  129:18
  133:25

**infringing**
  53:2 93:25
  237:24

**inherent**
  191:11

**inherently**
  192:13

**initial**
  96:19
  103:24
  119:10
  121:1
  130:5
  186:15
  189:5
  228:23

**initially**
  86:23
  105:19
  188:23
  189:7
  212:23

**injunctive**
  41:20

**injuries**
  172:8
  181:17
  184:5,9

**injury**  51:10
  58:9 61:23
  72:12
  73:23

**30(b)(6)**                                      **Index: input..intervention**

74:20
84:21
110:22
114:8,15
119:9
120:19
135:24
189:25
213:9
216:13
222:15

input  123:24
124:5
230:1
239:12,14,
17

inquires
176:22

insight  92:6

insomuch
210:25
213:10
260:21

inspection
213:13

instance
252:5

instances
109:24
112:10

Institute
209:20

instructed
58:25 59:5

instruction
83:21
231:13

instructions
59:4

intend  126:3

intended
56:19
133:6,17
139:2,5
208:16

intent  78:11
81:21
126:5
133:5
143:7,19,
22 165:10
168:1
180:3
237:11

intentional
38:7

intentionally
36:11
37:5,8,11
38:1 39:2
40:4 179:5

interactions
204:9

interchangeabl
y  57:22

interest
13:14,15
17:12
140:24

183:9
185:6,14
202:21

interested
24:12
48:16
127:10
168:13
184:11
202:24
203:12,17
204:7

interesting
139:2

interests
49:10

interfered
36:11
37:6,8
38:2 40:4
179:5

interference
38:7 41:5

interfering
37:12 39:3

internal
52:23
166:17
235:25

Internet
107:18
109:16,23
113:24
115:1
186:10

interpose
238:12

interrogatorie
s  9:10
85:23

interrogatory
9:19 10:4,
23 11:15
12:4 13:6
85:22,24
86:7 89:12
92:11,12,
19 93:13
98:21
101:25
105:3
147:4
154:1
156:2
158:10
169:9
170:4
193:6,14
194:18,21,
24 204:22
207:16
208:9
232:20,23
233:3,21
239:2
262:20,21
263:23
265:7

interrupt
40:20

intervention
67:12,14

68:1,6

introduce
  5:13

introduced
  102:2

introduces
  191:13

Investigate
  94:19

investigated
  86:14

investigating
  188:21

investigation
  86:25
  116:3
  188:22
  189:6
  190:12
  212:2,14,
  16,19
  223:4
  228:24

investment
  8:17 14:12
  17:7
  201:23

investments
  43:8
  196:13
  197:7
  201:6
  202:5

involved

196:13
197:6
201:2,5
202:14

involvement
  174:8
  177:6
  178:18

Iris  116:12
  210:9

irreparable
  42:6,12

irreparably
  41:19

ischemic
  131:15
  141:5

Island  140:6

issue  50:15,
  18 51:15
  59:15,18
  61:5 66:5
  67:3 68:16
  69:19
  70:16 73:9
  79:3 80:23
  81:1 82:24
  95:8 104:2
  105:17
  106:13
  115:13
  118:20
  120:6
  125:12,22
  126:4

134:5
135:13
143:1,4,
13,25
152:14
154:7
158:13
159:15
161:3
164:9
172:6
175:3
180:23
181:10
186:6,23
188:8
189:19
191:5,9
192:12
194:6,16
197:16,17
200:11
202:12
203:10
204:12,24
210:21
211:16,22
215:6
216:18
217:5
218:2
224:17
227:12
229:2
233:6
239:10
242:17
243:5

245:5
247:2
256:12
268:7

issued  62:13
  77:11
  118:25
  121:3
  243:21
  263:2
  266:2

issues  85:14
  99:11
  188:18,24
  189:8
  201:12
  230:13
  247:23
  248:6

issuing
  143:6

italics
  170:6

ithenticate
  67:5,8
  70:3
  73:14,17
  74:1,9,11,
  21 75:11,
  19 95:25
  96:2 97:2
  105:20
  106:8
  107:1,2
  190:15

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

| | | |
|---|---|---|
| **J** | 40:5,15,25 | 9,23 | 23 196:20 |
| | 46:5,6,19, | 117:11,19 | 197:14,22 |
| **J-u-r-i-c-a** | 21 47:10, | 120:22,24 | 199:6,8 |
| 188:14 | 13,15,23, | 121:4 | 201:1,25 |
| | 24 48:5, | 133:17 | 204:11 |
| **Jane** 126:14 | 18,25 | 134:9 | 206:20 |
| **Janice** 35:16 | 49:15 50:7 | 135:23 | 212:1,19 |
| | 52:21,23 | 136:14 | 213:5,7 |
| **January** | 53:20 55:1 | 138:3 | 218:10 |
| 85:6,7 | 57:3,4,17 | 156:14 | 230:12 |
| 130:5 | 58:7,16 | 161:9 | 231:5,12 |
| 131:14 | 60:5 64:2, | 171:5,7, | 232:1,4 |
| 166:15 | 12,16,21 | 16,25 | 237:14,22 |
| 184:21 | 65:7,24 | 172:4,14 | 238:1,10, |
| **Jassin** 5:8, | 66:9,18 | 173:3,16, | 13 239:12 |
| 24 9:2,5 | 67:2 68:18 | 19 174:7, | 240:17,19 |
| **Jessi** 5:15 | 72:7 76:7, | 21 175:1 | 241:9,18 |
| | 21 83:10, | 176:13 | 243:22,24 |
| **job** 171:19 | 18,23 | 177:3,11, | 244:2,5, |
| 233:13 | 84:5,12,22 | 13,18 | 11,14,16 |
| **John** 5:15 | 85:5 86:16 | 178:7,9 | 245:3,20, |
| 67:19 | 93:9 | 179:6,12, | 22 246:2, |
| 126:15 | 95:12,16, | 21 180:2, | 11,17 |
| 150:3 | 24 97:16, | 6,8,12,22 | 247:1,5,7, |
| 176:7 | 19 100:11 | 181:1,7,14 | 11,16 |
| 188:14 | 101:11 | 182:9,14 | 248:7,19, |
| **Jouria** 5:8, | 106:16 | 183:1,13, | 25 249:5, |
| 24 9:3,5 | 108:9,23 | 18 184:3, | 10,16 |
| 10:2,16,19 | 109:2,15, | 8,14,17,22 | 250:1 |
| 12:22 | 17,24 | 185:11,19, | 254:6,12 |
| 13:10,11, | 110:5,9,14 | 23,24,25 | 255:22 |
| 18 27:7 | 111:16 | 186:2,13 | 256:5 |
| 35:8,14 | 112:3 | 187:1,20, | 257:7,13 |
| 36:6,12, | 113:21 | 22 188:6, | 258:12,23 |
| 15,17 | 114:4,18 | 21,22 | 259:2,7, |
| 38:3,10 | 115:2,4,8, | 189:1,13, | 18,23 |
| 39:5,6,15, | 12,16,19, | 22 190:19, | 260:4,9 |
| 19,23,24 | 24 116:4, | 22 191:1, | 261:5 |

267:9,11

**Jouria's**
9:21 10:3,
21 11:8,16
12:5,13,21
13:22
34:20,25
36:3 37:20
38:9 39:1
60:10
63:12
69:25
72:20,24
96:24
102:2
171:3
173:1
177:22
178:17
182:25
196:10
206:20
219:1,15
229:6
230:6
233:10
239:17
252:17
253:21
254:10,18
257:22
258:16
260:17,20
261:2,18
262:12

**judgment**
75:4

**Julie** 130:4
131:13
132:23,25

**July** 184:4
221:25
222:9
223:14
226:16

**June** 132:24

**Jurica**
188:14,16,
25 189:5

**jurisdiction**
229:7,25
230:8

**jurisdictions**
148:3
149:1
158:23
159:21,22

**justified**
196:15
197:9
201:7
202:16

_____

**K**
_____

**Kate** 113:16
167:14

**Katy** 5:20

**Kayla** 5:11
6:3

**Kern** 5:15
11:17 12:8

15:7 17:1
18:18 19:1
20:10,13,
16 21:23
22:23
23:20,23
25:8,14,24
26:11,23
28:10
29:13,16
32:13,16
33:5 34:2,
5,7,10
40:7,10,19
42:15
47:1,3
50:5 66:20
67:17,20
68:3,6,9
71:10
77:24 78:5
79:8 89:4
90:10,16,
24 91:2,5,
11 94:21
95:1 96:8
100:21
104:16
105:18
106:4
113:16
125:25
151:16,20
159:23
160:6,16,
19,23
162:8,15
167:14

170:16
174:5,16
175:11,17,
20,22
176:1,5,9
179:7
193:16
207:1
216:19,23
222:22
224:4
225:9
228:14
229:20
230:9
234:12,25
235:8,15
238:12,22
249:6,13,
20 250:24
253:10
256:23
264:15,20
266:17,21,
25 269:17,
18

**kicked**
266:22

**kind** 80:17
89:2 95:18
137:2
156:25
211:2

**knew** 10:7
38:6 39:4,
14,18
40:14

30(b)(6)                                                           Index: knocked..left

61:18
71:13
76:18
97:25
126:23
143:10
174:14
179:10,13,
22,24
180:1,5
205:11
256:15,18

knocked
169:14

knowing
89:25
94:16 97:1
117:16
140:22
179:18,19

knowledge
7:25 27:6
37:11
42:8,10
61:3 83:7
90:4 143:5
163:11
179:15
196:1
205:10
206:2
208:11,14,
18,22
211:10
215:20
223:10
233:22

238:5
248:6
263:17,18

Knowles   5:11
6:3

———————
L
———————

label   77:1
188:14

labeled   21:8
42:21
46:24
77:22
120:2
132:22
144:14
149:11
183:12

labor   261:2,
4,6

lack   202:20

lacking
187:23

Lacks   78:6
174:16

laid   25:25
234:17

language
246:5,7

Lanier   5:15

large   38:13
94:4 98:19
182:23
195:17

Lastly
218:25

late   128:14
129:3
146:3
156:21

laundry
154:14

law   83:7

lawsuit   8:6,
24 20:24
88:20
89:24
186:17
204:24
214:14

lawyer   37:1
112:8
235:1
239:7

lawyers
133:3
267:7

lay   253:3

layouts
113:13

lead   52:12,
15 123:20
124:3
138:22

leading
176:3

learn   8:17,
24 9:5

learned   9:2,
21 10:3
11:8,16
12:5,13,21
46:21

learner
157:11

learners
127:22
128:4
137:23

learning
89:5,6,8,
18,19
91:15,22
92:1,6
93:6
111:14,15
114:11,13
210:13
213:10,20
215:21
216:11
221:14

leave   47:25
48:9 141:2
266:23

leaving   94:4
98:19

led   106:16
179:14
211:11

left   78:3
103:21
233:12

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

**legal** 26:18,
   23 37:2
   188:18,24
   189:8
   230:13
   248:6
   252:11
   253:5,11,
   17 257:6
   266:9,12

**legally**
   97:21
   251:9

**legend**
   234:23
   265:13

**length**
   96:16,18,
   19 132:7
   201:20
   208:5
   211:3

**Leonard**
   126:15

**let alone**
   238:17

**letter**
   111:23
   215:10

**letterer**
   222:1

**level** 23:8
   167:5
   190:10
   217:23

**library**
   49:12

**license**
   188:19,24
   189:8

**licensed**
   131:25
   248:10

**licensing**
   247:24
   248:4
   265:13,18
   266:11

**life** 165:19
   169:6

**lifespan**
   146:25
   147:2

**lifetime**
   157:2
   166:13,20,
   23

**light** 114:7,
   15 192:10
   201:8,20
   202:19

**likes** 47:25

**limitation**
   165:20

**limited** 12:9
   215:5,22

**line-by-line**
   87:23

**lines** 173:25

**link** 222:13
   223:15,18
   224:17
   225:11

**links**
   221:17,19,
   23 222:16
   223:1,3,4,
   11 224:7,
   9,18
   225:6,13,
   16,20,22,
   23 226:13
   227:3,5,6,
   8 228:2,9
   229:1,3

**Lippincott's**
   209:12

**list** 36:23
   38:13
   121:20
   154:14
   171:18
   172:5,6,16
   181:12,14,
   19 182:6,
   19 207:9
   208:21
   223:23,25
   224:25
   226:19
   252:21

**listed**
   172:11,17
   182:14

**221:15,22,
   24**

**listen** 81:24

**lists** 82:25
   84:8,13,24
   85:7
   184:15
   222:15

**literal** 94:1
   98:16
   99:2,22
   112:25

**literature**
   68:12

**litigation**
   5:12
   229:19,21

**littered**
   60:10
   69:25
   72:25
   73:2,7

**live** 225:24
   227:9

**locate** 44:18
   266:4

**located**
   43:14,19
   44:1,5
   46:13
   61:18
   62:11
   109:12

**location**

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

18:2
266:22

**locations**
51:18

**long**  30:5
95:20
106:19
117:18
263:7,9,14

**longer**  50:2,
6 53:8
88:6,16
89:15
96:17
146:17,18,
19 169:23
196:14,19
197:8
201:7
202:16
211:9

**looked**  31:9
87:16,17
90:13
106:6,20
111:4
133:20
138:17
174:22
199:13
228:23

**lose**  153:18

**losing**
266:21

**loss**  169:2

259:6

**losses**
168:16,21

**lost**  144:5
152:12,15,
25 153:10
158:5,11
159:6,9
160:2
161:6,16
162:13
164:23
167:21,24
168:3
169:10
259:10,11,
14,19,23,
25 267:14,
22,23

**lot**  11:25
55:9 68:22
82:9
121:24
190:24

**lots**  77:11
195:10

**lovely**  149:9

**lower**  136:24

**lubricating**
104:23

**lunch**  94:23
113:18
118:2

**lymphatic**
92:24

93:20
248:13
250:2
265:3

———————

**M**

———————

**M-e-d**  209:22

**made**  30:7
31:18
33:17
41:23
42:5,12
60:14
63:18 89:9
90:3 93:12
105:19
117:19
123:21
124:4,19,
20 129:8
134:4
139:22
140:4
141:19
143:20
160:12,13,
15 161:10
162:12
163:4
173:4
175:18
177:18
185:23
189:7
191:19,21
201:22,24
202:21

205:13
232:8
237:3,10
246:8
247:17
248:17
260:2,7
261:1
262:12

**mail**  59:8,9
128:22,25

**mailed**
59:10,12
127:22,24
128:11
129:2
147:25
148:8

**maintain**
27:10
194:4
246:7

**maintained**
20:22

**major**  44:1
147:2
210:25
211:1

**majority**
166:8

**make**  12:4,
24 25:14
28:13 30:8
35:4
56:18,19

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

75:23 87:8
93:4 97:2
100:23
108:2
109:4,10,
22 123:18,
25 126:18
127:2
128:21
137:14
143:3
144:3
148:6,20
153:20
160:22
162:11
167:13
175:25
181:5
201:23
202:5
204:20
205:25
215:9
216:22
230:16
259:19
260:20,22

**makes** 199:9

**making** 89:2
92:5 123:7
162:23
191:18
208:9
214:17
238:6
267:18

**man** 10:12

**man-** 120:22

**manner** 238:9

**manual**
102:1,7
103:1,20
105:4
190:15

**manuscript**
77:10
78:22 79:2
80:5
118:21,25
119:11,17,
20,22,23
122:4,14,
22 123:2,
7,14,19
124:10,11,
14,21
138:19
243:23

**manuscripts**
125:5,15,
20 126:18

**March** 14:5,
9,19
16:20,25
17:4 22:5
23:3 84:6,
8

**mark** 5:18
6:8 11:17
12:8 25:9
42:15,22
51:4 71:10

77:15
90:24
104:16
113:16
149:9,25
162:16
167:14
175:12
176:1

**marked** 5:4,5
19:18,20
34:12 44:9
45:16,17
46:2 51:6,
7,24 52:2,
5 79:12,14
149:7
170:25
187:9,11
188:10,12
221:4,6

**market** 13:15
14:17 17:9
24:11,13
27:3 30:1
39:10
43:25
141:1
191:16
192:17,21
193:7,12,
19,22
194:15
195:2,6,
14,24
196:2
197:1,13

202:17,19
203:20
204:13
206:2,22
208:12
214:3,6
217:15,18,
21

**marketed**
139:7

**marketing**
14:15

**marketplace**
208:13

**mass** 201:21

**master**
176:10

**match** 96:1
110:22

**matched**
213:24
214:1

**matches**
75:18
102:19
110:15,19
190:16
201:12

**matching**
266:5

**material**
52:13
63:14 75:5
86:23 98:6

112:15
200:4
211:4
252:24
253:7

**materially**
103:15

**materials**
16:6 24:10
43:8 52:21
53:15
59:7,20
60:18,20
61:1 62:3,
8,11,12,
16,20,23
63:2,10,21
69:15 74:6
86:20
87:20
97:20
100:18
108:4
117:10
131:6
144:13
189:15
208:6
215:19
224:21,22
246:1
253:3,21
254:2

**matter**  5:8
47:25 48:9
114:22
127:6

139:1
143:7
175:3
180:22
183:2
193:3,4
194:17
196:25
197:15
204:15
205:4
213:16
222:2
231:17

**matters**  7:10
139:11
193:8,23
195:3,4
207:23
208:1
217:5,17

**Mckissock**
11:2,9
12:10,14,
15 31:21
33:19,21,
25 180:11,
17

**meaning**  20:5
26:21
139:14,22
140:4
146:18
205:14
232:8
253:17

**meaningful**
160:11

**means**  78:6
125:1
158:2
195:5
208:4
221:18
237:5
260:25

**meant**  80:11

**meantime**
189:2

**measure**
99:20

**measures**
215:3

**media**  5:7
69:3 118:4
170:21
218:20

**medical**
48:21 49:1
138:2
165:11
197:18
247:13

**medicine**
126:16

**medium**
164:22

**meet**  24:13
30:4 141:1
142:6

143:8
195:22
260:23

**meeting**
14:4,6,18,
19 15:15
16:8,14,
20,25
17:5,22
18:11,23
22:18,22,
25 23:3,6,
8 24:6,10
128:12,14,
15,18
129:7

**meetings**
16:20 30:6
35:7

**Meinyer**
14:2,8
15:13,14,
19 17:11,
18,19,20,
25 19:14
220:12

**Meinyers**
19:9

**member**  123:7
243:22

**mental**  207:5

**mentioned**
24:2
116:14
121:11

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

145:22
157:7
171:3
213:2
250:6
251:4
268:8,10

**mentions**
185:15

**met** 10:13
17:3 18:1
143:21
236:13

**mic** 151:18

**Michael**
43:11

**Michelle**
35:15
173:16
174:9
176:21
177:11

**middle** 137:2
156:25
173:18

**midway** 79:24
122:12
149:17

**Mike** 14:5
17:12
18:1,5,6
19:16
21:9,12
29:25 30:6
31:18,21

33:21 35:6
39:4 43:16

**million**
147:13
158:12,18
159:11,19
161:14
162:25
163:2,19,
24 164:7
165:23
166:2,21
169:3,10,
13,21,25
170:5
260:3,8,14
261:8,24
262:2

**mind** 40:23
208:4

**minds** 191:12

**mine** 47:8
130:1
203:10

**minimal**
74:20
99:11

**minimally**
254:2

**minimum**
126:23
169:6
194:1

**minus** 47:7
163:16

**minute** 51:4

**minutes** 34:8
113:17
230:19
266:23

**miscellaneous**
263:25

**mischaracteriz
es** 15:8
229:20

**mispronouncing**
17:17 18:2

**missing**
151:24,25
152:9
251:14

**misstates**
15:7,8
19:1 40:11
79:8
105:18
106:4
249:13

**misunderstand**
245:17

**moment**
190:24

**money** 153:20
155:1
220:22
260:9
261:1
262:11

**monitor** 5:10
217:22

**monitoring**
208:12

**monitors**
205:9

**monograph**
57:18,19
184:5

**months** 59:22
101:18
104:7,8
175:7
176:13
178:19
255:1,2

**Moore** 5:18,
20

**morning** 6:25
145:16
179:8

**move** 37:10
57:5 78:13
124:6,7
141:12
142:4
189:8,11
229:23,25
230:7
247:18,22

**moved** 40:25
181:3
189:14

**moving** 17:12
80:14
96:11
104:23

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

multiple
  51:17 88:9
  96:21
  124:19
  134:11
  135:9
  136:19,22
  137:6,9
  145:22
  147:9
  148:9
  150:23
  151:3,8
  154:3
  156:1,14,
  19,24
  159:16
  161:11
  162:15
  163:23
  164:16
  166:10,21
  167:23
  179:7
  230:12,13
  233:12
  246:12
  260:3,6,13
  261:9
  262:22
  263:1
  269:2

Myfreece
  209:17

Myfreece.com.
  209:16

N

named  10:12
  43:11
  187:13
  188:14

names  25:1,3
  27:17 35:6
  116:19,21

narrow
  266:20

NASW   206:13

Nature
  265:13,20
  266:2

Navigant
  149:11
  150:4
  156:11
  166:11

NBCC   206:10

NDA  24:25
  27:16

necessarily
  20:17
  80:15
  86:14
  218:11

needed  75:16
  82:9 97:10
  195:6
  196:5
  251:11

negotiations

13:20

net  154:2,5
  170:2

Net-  37:19
  175:6

Netce  5:16
  6:19,21
  7:2,19,22
  8:9,12,16,
  24 9:16,20
  13:17
  14:20
  16:8,23
  17:3
  19:14,22
  20:5,6,17
  22:21
  24:4,22
  25:2,7,12,
  13,23
  26:7,9,10
  27:8,11,
  14,20
  28:5,14,17
  29:10,21
  30:22 31:5
  32:8
  33:12,19
  34:1,14,
  20,25
  35:22,23
  36:13,15
  37:13,20
  38:9,14
  39:15,19
  40:6
  41:16,19,

20 43:23,
  25 44:6,18
  46:5,7,12,
  18,21,22
  47:10,24
  48:13,25
  49:15
  50:15,21,
  23 51:1
  53:1,9,16
  59:24
  60:4,14,
  15,16,19
  61:6,7,10
  62:1,3,4,7
  64:9,10
  65:6,22,
  23,25
  66:5,15,25
  67:3,13,
  15,16,25
  68:2,11,
  15,16
  69:9,13,19
  70:2,14,
  16,17
  71:2,4,17
  72:2,11
  73:10 76:5
  79:6,16,22
  80:7,23
  81:1 82:2
  83:4,24
  84:6,12,22
  85:4,5
  86:2 87:1
  88:10
  92:2,13

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

| | | | |
|---|---|---|---|
| 97:5 100:9 | 159:7,8, | 193:6,19 | 237:12,15, |
| 102:1,3,14 | 11,21 | 194:15 | 16,23 |
| 104:3 | 160:4,14 | 195:1,15 | 238:7,9,14 |
| 105:12 | 161:5,7,17 | 196:7,10, | 239:8 |
| 106:1 | 162:5,11 | 11,19,25 | 240:12 |
| 108:10,23 | 163:1 | 197:5,13 | 244:10,14, |
| 109:7,9 | 164:8 | 199:5,10, | 17,18,24 |
| 111:21,22 | 165:21 | 20 200:25 | 245:25 |
| 112:7,19 | 166:2 | 201:22 | 246:10,12 |
| 113:1,23 | 167:5,21 | 202:22 | 247:11 |
| 114:8,15 | 168:9,18 | 204:8,12, | 248:12,16, |
| 115:3,12, | 169:4 | 18,23,25 | 17,19 |
| 13 116:1, | 170:5,6 | 205:9 | 250:10,11, |
| 6,24 | 171:7 | 206:5,6,16 | 13,14 |
| 118:20 | 172:2,3, | 207:12 | 252:15 |
| 120:7 | 12,13,20 | 208:6 | 253:1 |
| 125:2,24 | 173:5,21, | 211:17 | 258:11,22 |
| 126:3,4, | 24 174:2, | 214:3,4,6, | 259:3,17 |
| 20,21 | 8,10,22 | 10,18,22 | 260:10 |
| 129:8 | 175:8 | 215:13,21, | 262:8,12 |
| 132:12,16 | 176:14,17, | 25 216:7, | 263:25 |
| 134:3,4,5 | 23 177:6, | 8,18 | 264:8 |
| 136:2 | 12,24 | 218:3,10, | 266:14 |
| 141:16,19, | 178:17,19 | 24 219:1, | 267:4,17, |
| 22 142:17 | 179:2,6 | 12 220:2, | 21 |
| 143:24 | 180:18,23 | 15,19,22, | |
| 144:2,9,17 | 181:1,10, | 25 222:1, | **Netce's** 9:9, |
| 145:5,9 | 21 182:15, | 11,13 | 18 13:16 |
| 150:21 | 25 183:1, | 224:16 | 16:21 17:6 |
| 151:23 | 3,7 184:9, | 225:5,6 | 20:23 |
| 152:5,12, | 18 185:20, | 229:18,19 | 32:4,21 |
| 13,25 | 22 186:1, | 230:4 | 53:2 55:3 |
| 153:10,11 | 25 187:2 | 231:24 | 85:22,23 |
| 154:7,11, | 188:4 | 232:2,7,8, | 94:2 98:17 |
| 20 155:1, | 190:12,21 | 21,23 | 113:7 |
| 2,10,18 | 191:1,15, | 233:3,13 | 126:5 |
| 156:4 | 19,21,25 | 234:20 | 138:13 |
| 158:11,21 | 192:4,5,6 | 236:23 | 143:23 |
| | | | 152:6 |

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

158:10
168:21,23
169:8
180:2
183:9
186:21
188:2,7
190:20
193:6
196:7
198:24
204:22
205:1
207:18
221:14
230:1
233:22
237:21
239:21
245:24
260:2,22
261:22

NETCE22953
55:24

NETCE5077
184:13

NETCEB   19:24
77:23
244:7

NETCEB-
54:14

NETCEB22151
56:16

NETCEB22355
56:14

NETCEB22953
54:8

NETCEB24806
78:21

NETCEB29016
79:15
241:12

NETCEB3002
185:10

NETCEB3006
184:21

NETCEB3017
183:12

NETCEB3067
49:5

NETCEB3068
48:18

NETCEB3069
46:24  47:6

NETCEB3148
131:13

NETCEB3149
129:23
130:3

NETCEB34857
120:2
122:2,18,
21 123:13
124:18

NETCEB35072
21:8

NETCEB4498
222:19

NETCEB5017
188:15

NETCEB5264
48:2

NETCEB5322
132:23

NETCEB6135
42:24

NETCEB6146
228:12

NETCEB6284
58:3

NETCEB6974
57:13

NETCEB7-
55:22

NETCEB7395
54:7,10

NETCEB7757
58:12

network
85:20

networks
235:25

neurology
184:11
185:7

non-accountant
160:10

non-employee
28:19

non-released
218:14

nonantibiotic
49:24 52:7
53:25
54:16
55:21
61:24
72:14
73:22
74:18 85:3
119:8
120:20,21
121:13
136:11
142:22
182:1
183:6,15,
24 190:1
194:9
217:13

noncompetitor
116:20

nondisclosure
28:8,18
29:2,4,22

nonliteral
94:1 98:16
112:25

nonprofessiona
l   138:5

normal   75:20

Norman
126:15

notations
64:16
133:9

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

**note**  246:24
  260:20

**notebook**
  48:17

**notebooks**
  118:15

**noted**  99:8,
  10  226:18
  238:21
  242:7
  253:21

**notes**  87:8
  98:12

**noteworthy**
  204:24

**notice**  7:1
  188:18

**noticed**
  188:24

**noting**  95:17

**notion**  11:7
  39:23
  219:19

**November**
  5:1,9  43:3

**number**  5:7
  7:7  9:19
  10:23
  11:15  12:4
  13:7  19:23
  42:22
  50:23
  51:16,20
  52:14  54:4

65:2  69:3
73:24
77:15,17
78:21
85:24
89:12
92:12
93:13
98:21
101:25
103:6,11
105:3
108:18
118:4
120:11
122:7
129:22
136:23
137:17
141:2
146:8,10
147:4
149:25
150:3,7
152:1,22
154:1
156:2
158:11
159:14,20
160:3
161:17
162:25
163:2,14,
20,24
164:7
166:12,16
169:9
170:21

184:20
185:10
193:14
194:1,24
195:17
204:22
207:16
218:20
222:20
228:12
232:23
233:3
234:4
240:4
241:3
243:19
244:3,7
262:4,21
263:3,23,
24  265:7

**numbered**
  34:18
  220:9

**numbers**
  20:13
  46:13
  50:22
  56:17
  102:15
  243:13
  255:19

**numerical**
  255:11,17

**nurse**  194:5
  209:14

**nurse.com**

208:19

**Nursece4less**
  110:7,8,
  10,12,15,
  20,25
  111:8,13,
  23  112:4,6
  113:5
  114:2,7,18
  116:14,15
  208:19
  210:11
  213:2,15,
  19  214:2,
  5,10,14,
  18,21
  215:3,9
  216:1,8,12

**nurses**  24:15
  30:3,5
  126:24
  131:24
  132:3,6,13
  133:17
  140:5,6,7
  142:7,8
  147:12,20,
  21,22
  148:4,5
  164:11,12
  193:25
  195:17

**nursing**
  126:16
  127:9
  150:15
  206:17

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 328 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017
30(b)(6)                                    Index: Nursingcenter..offering

209:2,6,
16,18

Nursingcenter
209:12

—————
O
—————

oath  8:23
231:13

object  32:13
67:17 78:5
234:12

objection
15:7 19:1
21:23
25:15
26:23
28:10
40:7,10
50:5 66:20
67:19
175:11,16,
18,25
216:21
234:25
235:8
238:13,20,
21 249:6,
12,13

objections
26:11

objectives
89:6,8,18,
19 91:10,
15,22,24
92:1,6

93:6
111:14,16
114:12,13
213:11,20
215:21
216:11

obstruction
79:18

obstructive
79:18

obtain  32:25
53:17

obtained
62:15
63:4,6,8
69:10
70:6,11
76:13,15,
18 252:11

obtaining
196:4

occupational
24:16

occurred
21:22
137:12
170:13,14
204:3

occurs
170:10

October  14:7
17:22,25
18:22 21:9
23:6 84:23
173:5,15,

19 174:21
176:16
177:10
178:6

off-site
18:2

offending
70:5,15,
17,20,23
71:3,17
72:1,9

offer  126:6,
22 127:2,
11,22
128:10
129:2,21
130:23
134:12,15,
25 135:7
140:21
141:22
142:10
144:3
151:23
154:18
157:10,15,
17,23
163:6,10,
18 164:5
167:9
170:9
183:22
195:15
205:12,20
207:19
208:4,15,
16 211:15,

21 212:4,
11 260:5,
13,19
261:9

offered
126:24
146:6,19,
20,21
153:19
158:22
167:7
183:7
191:12
192:11
204:18
205:11,13
208:7
210:24
211:2,8,
14,18,21
212:11
215:8
218:6,7
237:15
260:6

offering
140:10
157:22
161:13
182:4
195:11,21
206:1
208:15
210:19
211:7
217:12,16
218:1

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

228:5

**offerings**
139:10
141:23
142:6
197:19
205:9
216:17
217:4,23

**offers**
134:19
135:5
153:24
163:17
164:18,19,
21,24
165:4,5,6,
9 167:3
170:1

**office**  14:20
53:16,19
54:18
55:16
56:1,11
57:11,14
58:1,4,10,
13,18 59:9
60:16,19
61:11
62:2,9,24
63:3,7,11
64:4,6,10
66:18
67:16
70:25
71:1,5,6,
20,22,25

72:3 83:4
232:4,10

**official**
185:15

**OH15**
130:12,15,
20,22
131:15,20,
23 141:3,6

**Ohio**
131:21,25
132:4,6,
11,12
133:17
141:3
147:22
148:5
150:11,19,
22 151:2,9
162:4,7
164:11
168:6
268:11,12,
13,22
269:1

**older**  43:7

**one-half**
261:19

**ongoing**
192:12

**online**
127:14,18
128:6
134:16
140:1
154:6

254:17

**open**  239:17

**opinion**
26:24 38:7
113:2
137:2
242:6
252:11,14
253:5,6,11
266:12

**option**  137:3
144:24
145:1
224:23

**options**
105:8
122:16

**orally**
24:18,19

**order**  24:12
56:7 57:5
99:12
128:9
153:18
158:5
159:8
171:21
194:4
223:1
251:8

**ordinary**
20:22,23

**organically**
223:19,20
226:14

**organization**
94:3 98:18

**original**
63:13 67:2
68:11,17
70:6,11
132:25
133:10

**originally**
130:21
146:21

**outcome**
105:22
138:21

**outline**  89:7
91:23
111:20

**outlines**
99:8

**outlining**
43:25

**outreach**
81:5

**outstanding**
134:20

**overarching**
208:11

**overlap**
90:20
91:14,17
211:16,22
212:5,12,
14 213:8,
10,16

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 330 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

217:10

overlapped
89:8

overlaps
191:16

overtures
117:19

overview
120:5,7,9
121:25
122:1,17,
20 138:17
224:22
243:10
244:3

overwhelming
99:21

owned  7:22
60:19
109:8
112:9

owners  16:8,
16 62:18

ownership
35:9 65:7
68:7
103:10

owns  66:17
67:16
68:2,11
190:13

———————
**P**
———————

P&l  14:11

P-r-i  209:22

p.m.  117:25
118:5
170:17,22
198:9,12
218:16,21
230:20,23
269:6,19

package
159:2
205:14,16
207:19

packet
119:23
144:12
149:9

packets
118:23

pages  16:5,
9,11 80:5
88:3,11
95:17
96:5,10
106:20
111:4
122:14
174:19

paid  62:13
135:23
138:3,7
165:12
220:18,25
240:19
243:24
244:2,3,5
264:4,5

266:3

paper  51:2

papers
190:24

paragraph
34:18
36:10 37:5
41:15,18
60:2,3,4,9
69:23
70:14
72:23
85:24 99:5
147:8
178:7
188:5
190:20
196:6
197:4
201:4
218:24
220:17
221:13,15,
21,22,24
222:10
227:16,20
239:18,23
240:4
246:4,8

paragraphs
38:25
41:13
227:15
240:1

paraphrasing
94:4 98:19

99:11

parens  133:6

parentheses
133:1,2,5

parse  163:5
260:18

parsed
110:12

part  20:21,
24 23:10
35:12
50:2,6,7,
10,11 53:8
64:2
74:14,15
75:19
77:18
78:14,16
79:1 80:8,
16,17
88:16
89:15,21
93:20
94:14
96:22
99:13
102:14
107:20,23
117:9
118:22
131:25
133:12
137:23
157:10,12
166:8
180:18

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

186:8
200:10
217:25
221:9
225:7
239:2
244:11
251:22,23

**partial**
143:1,4
152:3
163:9
194:14
269:13

**participant's**
157:22

**parties**  5:23
62:8 63:2
64:22,25
65:9 66:1
72:15,16,
17

**parts**  60:15
64:9 65:11
67:14
68:2,16,17
88:9
96:20,21
109:21
110:13

**party**  28:9
107:4,15

**passages**
70:5,15,
17,20,23
71:3,17

72:1,4,9
74:24 94:4
98:19
107:19,24
108:1

**passing**
230:25

**past**
118:21,24
145:9
206:21
212:9,10
239:8
252:9
257:19

**path**  97:11
138:19

**pathology**
185:7

**pay**  81:18
225:2
240:17
265:21
266:10

**payment**
77:11 79:3
118:25
225:4
240:15
243:21
263:17

**PDF**  131:15

**PDFS**  74:5,8
96:2
101:9,11

105:22

**pending**
112:3
119:10
207:10

**Pentecost**
43:11

**people**  26:19
131:21
138:6
139:15,16
262:4,6

**people's**
262:7

**percent**
101:14
102:19,24
103:11
108:19
157:25
255:15
261:20

**percentage**
102:25
103:9
158:4
170:12
195:18
255:11
261:21

**percentages**
103:5
255:17

**perfect**
51:21

74:11,13
172:16

**perfectly**
122:16

**perform**
88:16
106:12,19
110:25
116:3
136:21
137:18
138:23
140:21
141:6
148:12
149:5
154:15,18
164:2

**performed**
61:7
67:13,25
68:15
95:4,7
101:2,16
104:18
108:21
137:5
142:17
148:16,19,
21 150:10
159:16,17
164:9,12
165:22
168:5
186:14
217:15
221:20

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

**30(b)(6)** Sarah Campbell on 11/14/2017 Index: performing..place

performing
215:13

performs
139:12,23
140:2,8,13

period 46:16
52:11
141:15,21,
25 158:20,
24 160:13
161:19
162:5
165:16,20
169:22
179:14
262:23

permanently
41:19

permission
60:22
61:4,20,21
62:7,13,15
64:14,21
65:1,14,
18,20 66:7
69:13,14,
20 70:6,11
76:13
97:22 98:2
189:17
251:2,8,
11,19,23
252:8
253:2
265:21
266:6,8,12

permissions
62:11,18
63:1,4,9
64:1 69:10
76:15,17
97:10

person 14:10
15:3,9,19
23:16
102:11
145:14
153:6
167:17
233:7,17,
20

personal
31:14
67:11,14
68:1,6
103:1
253:3

persons
261:6

pertain
32:4,22
92:15
194:8

pertained
232:21

pertaining
267:6

pertains
33:13
44:23
55:19

56:11
80:25
112:18
174:7
178:16
180:12

pharmacology
24:14 30:2
49:3,18,
23,25 50:2
54:1,17
55:21
61:24
72:14
73:22
74:19
92:25
93:21
119:9
121:13
127:7
142:6,11,
14,16,25
143:1,6,
10,13
172:7
181:16
182:2,10,
23 183:6,
15,25
185:7
190:1
193:20
194:1,7,9,
10,14,17
195:8,11,
13,14,16,
18,21

196:3
217:12,14
248:13
250:1

pharmacology-
oriented
142:21

pharmacotherap
eutic 143:6

phone 118:7
257:24

phrase 237:6

phrases
108:5

phrasing
99:12

physical
24:16

physically
58:19

physician
125:10
206:21,24
207:12

physicians
125:8
186:18
206:20
248:8

pick 76:23

piece 28:16

pieces 51:1

place 14:18,

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

19,20 15:6
20:4 24:25
26:8,13
28:25
50:12
58:24
86:22
266:6

places
107:19
167:7

plagiarism
70:3 73:25
97:9
101:12,16
102:5,7,9,
12,23
103:10,14,
19 104:5,
10 105:6,
11 108:22
190:17
247:13
250:25
254:3,5,
21,24
255:6
256:16,19

plagiarize
252:24

plagiarized
60:10
61:20
62:16
66:2,10
67:1
68:10,17

70:1
71:12,18
72:1,15,25
73:4,8,12,
19 74:12,
24 75:5,6
96:25
97:3,6,18,
22 98:7,10
100:14
109:3
189:13,16
190:7
250:18,21
251:5
253:22

plagiarizing
253:19

Plaintiff
5:24

plan   79:16
179:12
211:15,21
212:4,11

planned
133:11,24

planner
80:12,16
122:11
123:9,20,
24 124:3,
15 125:9,
10 241:2,
20,23
242:2

planner's

81:8

planners
27:25
80:19
121:8,19
123:24
125:14
126:11,12,
19 195:1
241:17
242:15,21

planning
61:21
133:3

plans   16:21
17:9 27:2
43:25
133:1
207:8
212:6

play   88:6
154:19

Plexus
209:20

pocket
264:23
265:6,8

point   43:18
77:20
86:25
100:1
111:22
113:3
122:20
123:6,13,

18 144:2,
5,17
146:21
152:12,24
153:6
156:16
192:19
200:19
216:5
218:4
230:14
242:20
243:3
247:4
248:1
259:6,11,
14,23

pointed
234:1

pointing
153:9

points
122:17
123:5

portion
95:23
103:19
109:14
182:23
221:16
265:19

portions
65:7
100:8,18
109:5
227:19

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

position
  235:5
  250:10

possession
  235:24
  236:13

possibility
  16:23
  22:17
  95:10
  191:14
  199:1

possibly   8:4
  36:1 86:21
  175:22
  182:3
  212:20

post   47:18

posted   9:6
  10:1 47:20
  254:14

postings
  254:18

posture
  196:9

potential
  22:15
  110:15,19
  164:23
  167:24
  168:2
  186:11
  202:20
  208:21
  258:5

potentially
  39:8,11
  75:18 99:6
  103:16,22,
  23 107:3
  138:25
  139:18
  140:9
  141:16
  169:6
  189:15
  191:15
  195:21
  215:5

practice
  24:15 30:5
  121:6
  142:7
  194:4
  248:11

Practices
  257:8

preceding
  77:22

predict
  137:10
  154:8,19
  157:13,20
  164:3

prediction
  137:15
  159:14

prefer   75:6

preference
  48:20

premarked
  6:24 9:8

preparation
  80:25

prepare
  144:9,18
  204:11

prepared
  7:13
  145:7,8,17

prepares
  145:5

preparing
  82:9 261:6

preprinted
  93:1

presence
  151:3,8
  154:10

present   9:20
  11:21
  81:17
  121:2
  150:24
  152:4
  240:15,20

presented
  76:8
  242:21
  260:21

pressure
  164:20
  233:11
  241:19

246:13

presuming
  252:1,3

pretty   12:19
  16:12 75:1
  113:17
  176:9

prevails
  267:4,10

previous
  35:7 72:20
  95:15

previously
  34:12
  93:20
  170:25
  184:11
  186:12

Pri-med
  209:22

priced
  138:24

primarily
  46:18

print   13:24
  15:2 16:1
  24:18,20
  87:6,7
  127:14,18,
  20 134:17
  154:6

print-only
  74:5

printed   19:8

59:12 76:8
82:6 86:24
87:10,20
147:25

prior  28:3
60:22 63:6
70:23
75:13
82:14
116:5
117:19
134:9
158:13
179:3,15
197:13
219:1,15,
19  246:18,
24

problem
37:18
43:12
117:8
200:8,13,
16

problematic
114:7,14
186:12

procedure
7:2

proceed
172:17
182:14

process
58:24
61:25
62:22

63:17,19
74:11,14,
15,17
75:16,17,
20  76:11
79:2,10
80:11,17,
18  81:19
96:22 99:7
119:5
121:6
143:8,20
182:1
186:9
190:4
199:11,12,
25 211:9
217:25
266:7

processes
14:14
15:24 17:8
121:20
227:7
238:6

produce
104:5
131:4
133:12
195:23

produced
15:20,21
20:5,23
46:12
50:21,25
87:10
101:20

104:21
131:9
200:23
203:8
238:14,23
246:2

product
137:16
153:13
155:15
166:18

production
20:14 21:2
51:19
87:21
104:11
105:1

products
159:4
167:4
247:21

profession
80:13 81:8
124:12
127:3

professional
5:19 6:9,
11 138:10,
14 165:22
166:1,6,7,
9

professionals
49:11
126:6

professions

81:10
124:6
126:25
207:6
242:23

Professor
208:23

profile
219:2

profit  253:9

profitability
196:8

profitable
146:18

prognosticate
231:15

program  67:4
70:3
73:14,17
74:1 102:8
103:4
104:6

prohibit
26:4,8

prohibiting
27:7 38:3

prohibits
25:5,11,22
29:6

project
153:15

projection
144:18,22
145:2

**30(b)(6)**           Index: projections..providing

projections
  144:9,15,
  20 145:6,
  7,8,15,18

projects
  186:7

promise   77:3

promoted
  139:7
  163:15,25

promoting
  161:17
  164:7
  166:22

proof   15:4

proof/
documentation
  133:4

proper   25:25
  230:8
  234:17
  238:24

property
  237:11
  244:18

proportion
  108:19

proposal
  185:15
  186:2,8,19

proposals
  125:16,18,
  19,21
  126:11,12,

14 186:3,5

proposed
  185:3

prosecute
  249:9,25
  250:12,15

prospect
  196:14
  197:8
  201:6

protect
  28:22

protectable
  109:8

protected
  109:8

protection
  29:3

protections
  27:15
  28:18
  29:12

proven   41:17

provide   19:7
  29:22 36:7
  62:19
  73:16
  103:5
  141:23
  153:9
  155:14
  177:14,23
  178:20
  228:2

267:22

provided
  9:15,16
  13:19,24
  14:1,4,6,
  8,13,22
  15:1,24
  17:5,16
  18:9 19:21
  22:14
  24:4,7,10
  29:25
  33:19 34:1
  36:22
  38:12,15,
  16 43:8,20
  44:2
  52:13,22
  55:18
  64:12,15
  65:25 66:9
  87:15,16
  100:11,15
  101:20,24
  103:13
  115:1,20
  116:4,23
  117:21
  122:1
  127:8
  131:7
  133:15
  144:13
  150:3
  160:3
  175:20
  180:8
  190:18

196:20
  211:12,13
  212:23
  225:14
  236:24
  244:19
  245:14
  247:5
  252:21

provider
  37:15
  116:5,24
  192:18
  193:1
  195:20
  204:6
  205:1
  210:22
  211:18
  212:21

providers
  114:5
  115:25
  116:10,17
  117:1
  175:9
  176:14,17
  195:11,20
  197:18
  208:20,22
  210:24

providing
  30:15
  116:6
  191:4
  215:4,21
  226:13

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

proximate
  41:16

psychologists
  207:4

public   75:13
  76:8  82:7
  121:10
  124:9
  191:5
  234:9,15
  240:25
  246:18,22
  252:24
  253:4,7,
  14,16

publication
  28:3  60:22
  68:10
  76:2,4,6
  77:7  78:4,
  11,17,20,
  24  79:4,6,
  25  80:4,8,
  12  81:2,3,
  14,15
  82:10,25
  83:25
  84:8,13,24
  85:7  97:21
  115:5
  122:3,5,
  13,23
  123:3,11
  124:22
  125:13,19
  215:19,23
  234:14,21,

24  235:2,
20  236:6,
14  240:9,
11,14,18,
22,23
241:13,24,
25  242:11,
12,18
243:4
246:5
250:5
254:11
258:6,20
259:1,2
260:3

publications
  210:15
  213:25
  238:2
  250:5
  260:1,12

publish   35:8
  61:2  78:11
  81:21
  126:20
  152:3,8,13
  161:8
  167:22
  168:22
  188:7
  189:19
  196:11
  197:1,5
  199:21
  233:11
  252:9
  254:17

262:14

published
  13:13,21
  37:13
  38:19  61:1
  81:7,20,25
  82:2,5,19
  83:3  86:2,
  20  88:21
  89:14
  92:3,14
  96:20,21
  97:12
  106:17
  107:19,21,
  24  109:17,
  24  110:6
  113:22
  114:18
  116:20
  125:6,21
  130:16
  134:9
  141:16,18
  152:5,21
  153:11
  180:4
  181:21
  186:11
  191:7
  197:15,23
  199:14,22
  201:3
  202:6
  206:18
  212:2,15,
  21,25
  213:3,15,

18  216:12
219:17
234:6,7,
10,11,18,
23  235:6,
14,23
236:2,9
237:18,21
238:10,18
241:8,18,
21  242:10
246:11,21
249:16
250:2,8
251:9
254:12
259:24
261:2
263:7,15
265:20

publisher
  254:7,16,
  19

publishers
  107:20
  253:4
  254:17

publishing
  36:13
  114:4
  140:15
  162:13
  168:17
  199:12
  254:15
  265:14,20
  266:2

pulmonary
  79:19

punctuation
  99:6

purchase
  226:1,7
  227:25
  228:11

purchased
  226:6,8
  259:1,2,7

purchases
  225:25

purchasing
  204:8

pure   91:5

purely
  142:24

purpose
  39:10

purposes
  163:14
  191:4

pursuant   7:2

pursuing
  7:19 8:8,
  9,12

put   34:13
  137:20
  141:20
  171:21
  192:12
  216:3
  263:24
  264:22
  265:5,8

Q

qualify   67:8
  150:17
  198:20

qualitative
  97:3 108:2

qualms
  247:12

quantified
  73:23

quantify
  73:2
  108:14
  164:5

quantitative
  99:20

question
  12:9 14:24
  23:12
  25:9,21
  26:1 28:11
  32:16,18
  33:4,5
  39:16
  51:12
  52:12,16
  53:14
  56:10
  57:10
  60:15 64:7
  65:21,22
  66:22

  67:22
  71:10,11
  74:9 81:24
  83:7,16
  90:9 91:13
  94:21,22
  96:9 98:22
  101:15
  104:25
  110:11
  115:21
  147:18
  150:25
  153:16
  154:25
  158:20
  160:23
  161:19
  162:5,14
  174:12,15
  175:14,23
  176:23,24
  181:13,24
  186:3
  194:12
  201:16
  202:1,18,
  22 213:22
  215:4,12
  216:20
  225:10
  227:23
  231:10
  234:8,16
  235:18
  236:7
  242:9
  243:8

  247:3,10
  249:20,22
  256:5
  262:10
  264:13,15

questioning
  238:15

questions
  12:18 21:5
  23:18 46:7
  68:13
  172:24
  176:4
  194:19
  232:20
  247:12
  268:1

quick   45:21

quickly
  120:15

quote   24:2,3
  222:13

R

ramifications
  26:18

ran   254:25

range   16:10
  65:3 68:12
  168:11,15,
  25 169:3
  261:16

reach   137:22
  215:15

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

| | | | |
|---|---|---|---|
| **reached** | **realized** | 133:19 | 220:22 |
| 10:19 | 155:1,10 | 192:9 | 240:14 |
| 46:22 | | | 264:13 |
| 47:10,15 | **realm** 198:25 | **recall** 8:22 | 265:11 |
| | **reason** 7:16, | 35:18,21 | |
| **read** 9:13 | 23,24 8:2 | 62:21 87:9 | **received** |
| 10:9 11:6 | 19:9 21:21 | 100:6 | 16:7 19:8, |
| 30:24 | 22:10,13 | 106:9 | 13 53:19 |
| 31:3,7,10 | 31:12,14 | 110:4,17, | 54:25 |
| 32:11 36:3 | 32:2 | 23 111:10, | 57:2,4,16, |
| 44:22 | 37:24,25 | 11 113:11, | 18 58:7,15 |
| 69:23 73:3 | 42:4 45:6 | 14 114:3, | 59:1 62:17 |
| 99:1 | 46:10,14 | 10,16,17, | 64:1 72:7 |
| 115:15 | 51:12 | 20 131:8, | 76:7 77:11 |
| 122:5 | 140:19 | 10,11 | 81:16 |
| 158:14 | 148:16,18 | 171:8 | 83:9,12,18 |
| 169:16 | 173:25 | 173:3,7,8, | 93:9,11 |
| 172:25 | 174:3 | 9 177:22 | 94:11 |
| 174:1 | 177:17 | 186:19 | 95:13,16 |
| 182:7 | 178:1,13 | 187:18 | 97:4,19 |
| 194:21 | 179:24 | 216:14 | 110:14 |
| 222:20 | 182:18 | 247:10 | 118:21,25 |
| 225:19 | 222:5 | 250:19 | 176:21 |
| 227:15 | 225:20 | 254:22 | 186:25 |
| | 227:13 | 255:11,17 | 187:3 |
| **reading** 41:4 | 236:16 | 264:2 | 188:25 |
| 121:8 | 237:1 | 267:1 | 221:25 |
| 123:20 | 245:9 | | 232:3 |
| 158:10 | 253:8 | **receipt** | |
| 177:22 | 255:20 | 59:21 | **receiving** |
| 194:18 | 267:21,25 | 179:11 | 28:9 177:8 |
| 207:17 | | | 187:18 |
| | **reasonable** | **receive** | 264:11 |
| **ready** 76:2,8 | 158:19 | 81:11 | |
| 94:23,24 | | 97:10 | **recently** |
| 97:11 | **reasons** 8:8 | 115:3,7 | 92:16 |
| 202:6 | 122:15 | 125:5 | 104:9 |
| | 123:15 | 126:17 | |
| **real** 45:21 | 129:14 | 171:22 | **recognize** |
| 165:20 | 132:4 | 212:1 | 46:16 47:7 |
| | | | 79:20 |

220:12

recollection
 21:13
 130:17,19
 187:17
 188:20
 213:11

recommendation
 124:4,5

recommended
 246:24

record
 45:12,13,
 15,22,23,
 25 68:25
 69:1,4
 118:1,5,12
 153:5
 170:18,19,
 22 198:9,
 10,11,13
 218:17,18,
 21 230:18,
 21,22,24
 269:6

records
 155:22
 267:15,17,
 20,23

recover
 267:6

refer  6:21
 26:25
 107:2
 127:23
 229:21

reference
 24:6 105:4
 147:8
 171:6
 172:2,3,
 12,13,20
 219:9

referenced
 29:23

references
 55:3 63:14
 75:17
 252:20
 253:24

referencing
 105:5
 171:11

referred
 230:15

referring
 27:1
 44:10,15
 48:1 72:25
 105:10
 171:12
 193:19
 233:7
 249:14

reflect
 52:20
 65:11
 155:9,13
 222:25

reflected
 61:6 67:15

119:13
155:5,20
228:25

reflecting
 50:23

reflects
 78:19
 83:25
 218:7

reflux  52:1
 57:6

refresh
 21:13
 130:19
 187:17
 188:20

refused
 177:14,23

regained
 192:19

regard  21:25
 165:23

registration
 53:6 59:22
 61:2 62:2
 70:24
 71:19
 82:23
 83:25
 84:7,13,23
 85:6
 232:4,14,
 17 233:10,
 13 234:1

registrations

53:17
59:21
63:21
85:15
233:24
234:6

reject
 123:14
 124:14

rejected
 122:15
 123:15
 125:9
 138:19

relate  32:4
 43:7 53:7

related
 14:17
 22:15 31:4
 42:5,11
 43:15
 52:21
 63:22
 85:14
 115:1
 127:7
 171:2
 186:13,25
 194:20
 196:24
 203:10
 265:12

relates
 193:2
 199:19

relation

150:4
153:3
177:5

relations
41:6

relationship
11:1,22
13:12
17:14
40:24
117:20
124:1
171:3
179:2,10
180:1,2
219:2,22
246:13
247:20

relationships
116:9
186:12

relative
148:12
244:2

release
137:7
146:1
147:17
212:22
220:1
246:18,25
261:7,23

released
81:23 82:6
124:9
127:13

129:20
135:19
140:23
142:15
144:6,7
146:2,3
147:18
179:17
198:3
234:8,15
240:24
247:4
263:2

releasing
75:13

relevant
160:13

relief   41:20
90:16

rely   35:3

relying
28:15
29:11

remain
222:12

remained
227:1,2

remaining
92:23
136:6
224:18

remarkable
93:16

remediate

74:24 75:3

remember
35:19
110:20
114:21
122:7
243:14
255:3,5,13

remove   70:17
71:17
201:19

removed
70:5,14,
20,23 71:4
221:16,19,
23 223:24
224:1,25
228:18,23,
25

removing
227:18,19

repeat   14:24
17:1 25:8
32:18
39:16
67:22 95:5
150:25
168:20
237:25
249:23

repeatedly
31:8

rephrase
177:20
231:10

replace
132:16

replaced
131:14
132:12,20
133:18
141:5
142:16
153:25

report   67:6
102:10,16
103:13
148:23,24
254:21
255:1,6,21
256:4

reporter
5:11,14
6:2 100:12
113:19
115:9
123:22
152:10
223:12
231:9
232:25
269:7,8,9,
12,17

reports
103:16
104:6
105:9
155:14
255:18

represent
46:11 47:8

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

50:24
126:16
197:17

**representative**
180:17

**representing**
5:17,19,21
6:9

**represents**
50:14

**reprint**
61:4,21
62:12
64:14
65:14,18
70:6 97:23
189:17
251:8,23
252:8
253:1
265:21
266:6,8

**reprinted**
265:22

**reproduced**
251:1

**request**
23:20
204:4
266:6

**requested**
62:7 65:18
69:20
123:8
128:3

215:18

**requesting**
69:13
196:3

**requests**
184:24
266:13

**require**  61:4
62:19
67:11
137:11
144:7
153:2
186:1
189:17
195:17

**required**
63:19
64:14 68:7
121:5
194:2
198:24
201:11
251:8,18
265:20

**requirement**
142:7
193:25

**requirements**
143:21
260:24

**requires**
59:9 73:20
242:5
251:13

**rereleased**
263:3

**research**
85:12
97:13
106:24
107:2
109:23
115:1
116:7,25
117:22
212:22,24

**researching**
106:23

**reserve**
126:17

**reserved**
129:6

**Resource**  5:8
6:18,19
237:11

**respect**
85:13 89:1

**respective**
234:22

**respond**
230:6

**responded**
9:7 10:2,
6,8 47:21
131:13

**responds**
172:5,14
182:13

**response**
9:19 10:4
27:25
85:23 86:7
89:12
92:11,19,
21 98:21
105:3
124:20
154:1
156:2
157:19
158:10
169:8
170:5
183:23
194:19,24
196:22
204:22
207:17
208:9
232:22
233:2,16,
21 262:20
263:23
264:2
265:7

**responses**
9:10,15
85:22
193:6
239:2

**responsible**
21:1
157:25

**restate**
154:23

30(b)(6)                                    Index: result..rewritten

231:10

**result**  41:16
  111:25
  112:2
  158:12
  163:20
  246:2
  258:20

**resulted**
  94:17
  182:20
  232:14
  259:19

**resulting**
  258:16
  259:23

**results**
  101:20
  102:12
  223:6
  224:11,14
  225:23

**return**  14:11
  17:7  96:3

**returned**
  76:20
  225:23

**returns**
  196:14
  197:8
  201:6
  202:15

**reuse**  69:10

**revenue**
  14:12

134:18,20,
21,24
135:2,6
137:16,23
140:23
145:23,25
147:12,14,
15 148:22,
23 149:18,
20 152:12,
15,24
153:9,15,
18 154:2,
5,11
155:8,9,
10,18,25
156:18,23
157:2,5,
12,14,24
158:6,7,12
159:7
161:5,10,
13,16,18
162:12,21
163:7,12,
16,20,22
164:23
165:2,4
166:2,13,
20,23
167:1,2,9,
10,21,24
168:2,3,9,
11,18,23
169:3,10
170:2,9,13
260:7,14
262:17,19

263:4
267:15,23

**revenues**
  143:23
  144:9
  154:20
  155:1,5,13
  158:21
  159:6
  162:5
  167:6

**reverse**  56:7
  57:5

**review**  28:1,
  2 56:2
  75:7,8,11
  87:19
  99:21
  103:24
  105:11,21,
  23 113:21
  114:24
  119:11,17,
  20,23
  120:25
  121:1,15
  123:19
  124:4
  130:6
  131:8
  152:6
  186:15
  198:22
  201:17
  228:23
  238:17
  246:23

247:6
251:12

**reviewed**
  90:5
  114:19
  120:10
  121:8,17
  125:14,15
  126:15
  139:14
  186:5

**reviewing**
  87:25
  120:15
  182:5
  245:7

**reviews**
  80:12

**revise**
  238:7,9

**revised**
  146:5,6,7,
  24 156:24
  237:22
  262:18
  263:2

**revision**
  147:2
  165:19

**rewarded**
  160:14

**reword**  66:23

**rewrite**  75:3

**rewritten**

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

65:16
75:10
202:8

**Rhode**  140:6

**Richard**  5:22
  18:1,6
  30:6 45:19
  51:17
  77:18
  118:6,9
  231:4
  234:13
  235:16
  264:21
  266:17,21

**right-hand**
  19:23

**rights**  53:3
  90:1 92:2
  100:9,19
  112:7
  174:23
  177:12
  178:22
  237:20

**righty**
  269:16

**rip**  52:6

**RN.COM**
  209:24

**RN.ORG**  210:1

**Rnceus.com**
  210:3

**road**  137:2

157:1

**Roseville**
  14:20 18:3

**Ross**  5:22
  42:22,25
  51:16,21
  67:19,21
  77:15,19
  118:8,10,
  13 149:25
  231:1,3,5
  233:1
  234:19
  235:4,12,
  17,22
  238:19,25
  239:1
  249:7,11,
  19,21
  251:3
  253:12
  257:3
  264:16,18,
  22 265:1
  266:18,24
  267:3
  268:1
  269:7,9,16

**rule**  7:2

**run**  67:4
  73:13,17
  95:24 97:2
  106:8
  190:14
  255:7,20
  256:4,6

**running**
  74:21
  226:11

**runs**  128:13

**Runthrough**
  75:1

_____

_____

**S**

_____

**Sacramento**
  5:1

**Sains**  239:3,
  5

**salary**
  264:4,5,7,
  12,25
  265:9,12

**sale**
  134:18,22
  144:2
  156:5
  259:7,11,
  14,20,23,
  25 260:1

**sales**  134:4,
  25 137:11
  144:10,14,
  18,20
  145:1,2,6,
  7,8,15,18
  150:13,16,
  17,20,21
  151:1,6,7
  154:20
  155:1,2,
  11,15,22

158:22,25
159:1,2,
12,22,24
160:4,13,
15 162:5,
12 163:2
166:18
168:9
218:25
219:11,19,
21 259:10
267:15,17,
18,20

**sales-wise**
  140:21

**Sarah**  5:7,17
  6:1 11:19
  20:10
  23:23 26:1
  33:6 69:3
  90:11
  94:21
  118:4
  170:21
  218:20

**satisfied**
  82:14

**satisfy**  21:5

**saved**  85:19
  222:13
  223:1,15,
  18 229:1

**scan**  107:1,
  2

**schedule**  7:6

121:7
128:11,16
131:3,5,
10,16
133:1,8,11
134:1

**scheduled**
129:1,5
130:18,20,
21,23,25
131:18,19
132:2,3,8,
19 141:4
156:9,12,
17,20,23

**Scholar**
114:1

**Schools**
210:7

**science**
24:14
49:4,6,16
217:9

**sciences**
48:21 49:1
193:21

**scientific**
146:15

**sclerosis**
134:11
135:9
136:19,22
137:6,9
145:22
147:9

148:10
150:23
151:3,8
154:3
156:1,15,
20,24
159:16
161:11
163:23
164:16
166:10,21
167:23
233:12
246:12
260:4,6,13
261:10
262:22
263:1
269:2

**search** 74:5
75:17
86:19
186:10
221:20
223:22
224:10,11
226:11
251:15,16

**searched**
227:10

**searches**
74:2
107:18
113:25
114:1
223:5,7
225:23

229:4

**searching**
107:14
109:16,19
189:1
223:8

**secret** 24:22
25:2,4
26:16,17,
22 27:1,
11,20
28:6,7,15
29:11
32:4,7
33:12
43:23
44:6,19

**secrets** 7:25
8:1 24:23

**section**
103:8
236:18,19

**sections**
54:2 60:5
61:4 64:17
66:11 73:4
75:3,15
88:4,25
89:13,22
91:9,16
92:9 93:9,
10 97:6
99:10
107:20
108:5
109:21

253:21,23,
24 254:1,4

**seek** 60:21
61:21
64:25
65:14
97:22
231:16
248:10
253:6
265:21
266:12

**seeking**
248:8
251:22,23,
24 252:2
253:2

**seemingly**
234:2

**selected**
37:3 83:19

**sell** 144:23
159:4

**selling**
155:17
205:18
219:12

**sells** 139:20

**send** 21:10
22:7
126:12
128:6
171:20
178:8,10,
12 215:10

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

228:2

sense  160:22
  162:11
  199:9
  217:24

sentence
  9:19 60:3,
  9 69:24
  70:2 72:24
  194:25
  240:7,12
  246:4

sentences
  108:5

separate
  130:18
  167:8
  264:7
  269:10

separated
  51:1

September
  183:13
  184:13

series  50:12
  53:6

served  102:3

servers
  221:18
  222:14

Services
  5:12

set  133:25

sets  93:14
  128:12

setting
  128:16

settlement
  220:1,17,
  18

share  10:15,
  20 24:24
  26:19,20
  39:25 40:1
  45:3
  180:15

shared  11:3
  14:10
  15:18
  17:24
  24:21
  27:14
  30:22
  31:25 32:9
  33:19,25
  35:5 39:8
  44:19
  45:8,9
  180:11

sharing  31:5
  32:22
  33:13,15
  34:4

short  46:16
  130:8

shorter
  214:7

shorthand

6:2 182:7

show  39:17
  47:6 130:1
  243:3

showed
  102:16
  135:17
  171:5

showing
  108:17

shown  80:21
  224:7

shows  31:23
  32:12
  157:2
  166:13

side  88:9
  96:6

side-by-side
  86:1,6
  87:2,4
  88:3,17
  92:13
  93:15,24
  95:22
  97:15
  98:12
  100:3
  101:6
  105:15
  106:2,6,12
  107:6,9
  108:10,17,
  20 110:13
  111:1

112:6
  255:23
  256:12,25

sign  174:22
  177:12
  178:22
  246:20,23

signal  79:3

signature
  220:12

signatures
  220:11

signed
  220:14
  243:22
  244:16

significant
  82:13
  88:25
  89:13
  90:20
  91:9,17
  92:9 95:23
  102:17,18
  103:9
  130:9
  198:5,15,
  24 211:16,
  22 212:5,
  12 256:14
  257:2

significantly
  150:16

signoff
  246:15

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

| 30(b)(6) | Sarah Campbell on 11/14/2017 | | Index: similar..slightly |
|---|---|---|---|

similar
  36:14
  39:10
  66:12 67:6
  73:19 75:4
  88:6,13,22
  90:7 92:4
  93:10
  99:9,16
  100:2
  103:15
  109:6,14
  110:6
  111:15
  114:11
  139:11
  153:12,13
  161:10
  181:12
  192:23
  197:19
  199:14
  200:5,6,8,
  15,16,21
  203:2
  204:7
  210:20
  211:3,15,
  21,24
  212:1,5,
  11,13
  213:8,11,
  16,19,21
  215:9
  217:8,17
  218:6
  241:17
  244:19

245:14,20,
23 248:18
249:3
251:17
253:24
254:4
255:15

similarities
  65:15 67:8
  73:14
  88:12
  89:25 91:9
  93:14
  95:10
  98:24
  99:23
  102:17
  106:14
  108:14,17
  112:25
  201:15,18,
  19 215:15
  248:21
  255:25

similarity
  94:1 98:17
  99:2,3,19
  100:5
  101:14
  102:25
  108:1,19
  109:13
  213:12,24
  214:1
  215:6,14
  237:19
  250:4

255:10,18
256:1,14
257:2

similarly
  205:2
  207:25
  208:2

simple  181:6

simply
  256:16

single  95:21
  144:2
  157:21
  169:5
  254:11

sir  42:24

sit  8:23
  11:14
  12:3,12,20
  15:5 18:22
  29:9 30:20
  32:7,20,24
  33:10,16,
  24 39:13,
  17,20 40:3
  45:7 54:13
  55:19
  108:13
  115:11
  133:16
  153:8
  167:20
  177:2
  180:10,14
  245:2
  258:8

262:11

site  87:5
  96:3
  107:22
  110:12
  113:24
  213:6
  221:16
  222:7,12
  223:16,17,
  20,22,25
  224:2
  225:1
  226:15,18,
  20,21,23
  227:1,3
  228:19,21
  254:13

sites  221:21
  223:21

sitting  28:4
  72:11
  100:17
  114:17
  137:10

situation
  27:7 128:5
  203:19

slate  141:23

slated  121:7

slightly
  119:13
  123:4
  124:17
  138:3,7

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                      Index: small..specifically

145:4
150:12

**small**  103:8

**software**
74:10
105:8,21
256:16,18

**sold**  35:11
86:16
146:4
155:18
161:12
176:23
212:20
268:8

**solely**  194:9
204:18

**solicit**
36:16,20

**solicited**
40:14

**soliciting**
36:13,25
37:4

**sort**  9:7
66:15
73:10 98:9
131:19
134:3
149:16

**sought**  61:2,
20 62:11
63:15,20
64:21
65:20 66:7

98:1
180:18
252:8,14

**sound**  153:5

**Sounds**  32:17

**source**
65:17,18
66:14 67:7
73:16,20
98:1,7
109:3,20
140:11
219:3

**sources**
13:22
60:6,21
63:14
66:12,13
67:9
100:16
190:16
201:13
251:13,14

**sourcing**
73:5

**space**  206:24

**span**  169:6
194:3

**spans**  145:25

**speak**  17:20
19:3
59:14,17
199:24
227:6
244:23

**speaking**
175:24
203:24
219:14
244:24

**speaks**  96:8

**special**
127:22
128:10
129:2,21
130:23
134:12,15,
19,25
135:5,7
153:24
154:18
157:10,15,
17,23
159:2
163:6,10,
17,18
164:4,17,
19,21,24
165:4,5,6,
8 167:3,9
170:1,9
260:5,13,
19 261:9,
14 268:9,
15,19,22

**specific**
16:4 47:25
48:9,10
56:4 62:16
64:16 65:2
80:13
81:4,5,8

82:1
100:23
107:8
114:20
124:12
127:5
141:1
157:17
168:12
172:24
179:12
192:18,25
194:17
205:20,21
219:9
255:19
265:24
267:25

**specifically**
27:17 29:2
30:7 33:15
35:22
38:13 39:5
40:14 45:8
48:1 49:3,
18 58:25
59:18
62:21 73:3
84:3,10,
16,17
85:2,10
87:18
90:18
92:22
95:12
97:21
100:1
105:10

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

106:6,9
110:1,24
111:11
113:15,25
114:10,16
116:18
124:2
127:7,9
128:3
141:8,11
142:4
144:20
148:15
149:6
173:8
174:10
176:22
182:5,11
183:21
185:22
193:5,20
195:6,9,22
199:20
204:3,17
205:12
206:17
210:22
216:14
217:12
219:14
221:23
222:7
229:17
242:1
247:10
255:5
257:18
267:2,8

specifics
100:6
113:10

specimen
236:24,25
242:1

specimens
59:10,12
71:19,21,
24 232:9

Spectrum
209:18

speculate
18:19 42:7
84:18
137:11
153:2,22
154:12
162:20
202:13
229:13
231:14
242:14
248:9
253:17
265:25

speculating
55:7
145:10

speculation
42:9 84:20
144:8
151:16
216:23

spend 107:5,
7

spent 106:22
107:13
261:5,6

spoke 22:17
246:4
254:21

spoken 219:8

spot 88:11
95:18
96:11,15,
17 99:7
106:20
111:4

spreadsheet
149:18,21

spreadsheets
14:13
148:14
155:6,8
267:22

spring
128:12,14,
18 129:3,7

stack 16:12

staff 121:1
202:8
251:15

stage 143:18

stages 74:17

stall
229:11,19
230:4

stalling
229:6,15

230:5

stand 182:5

standalone
134:16
153:14,24
154:6
161:13
166:24
168:2
262:17

standard
99:15,18
257:4

standards
143:5,9
198:25
236:13
257:6

standing
10:22 13:7
194:4

stands 9:20

start 96:21

started
96:22
178:19
188:23

starting
54:10
58:12
260:7

starts 19:23
37:5 47:3
54:8

**30(b)(6)**                                          **Index: state..subjects**

56:14,16
57:13 58:3
128:17
188:5
220:6

**state** 89:13
102:1
154:1
207:5
249:11
262:21

**stated** 86:7
186:16
217:7
234:4,21
237:13

**statement**
10:22 12:4
13:6 19:8
89:16
103:12
177:17
193:11
203:15
205:7,25
208:8
224:1
252:19

**statements**
38:25
225:18
233:23

**states** 34:19
85:25
102:1
147:12,20,

21,22
148:4,5,6
186:18
196:7
221:13
232:23
233:3
236:15,18
237:1,3
240:7
248:11
265:13
268:10,11,
12

**stating**
260:11,12

**status** 76:25
118:17,18
119:14

**statuses**
118:24

**stay** 117:18

**step** 80:25
120:11
122:2,3
123:18
124:9,18,
20

**steps** 77:5
78:12
82:13 98:6
119:19
121:21,24
244:6

**stipulation**

5:23

**stop** 119:5,
11 120:8
121:20
129:19
201:23,25
215:3

**stopped**
82:15
129:12
142:15
143:16

**Strafford**
210:15

**straightforwar
d** 12:19

**strategies**
14:17
24:3,11
30:1

**strides** 30:7

**strike** 238:7
239:19
262:10

**stripped**
192:14,16

**stroke**
131:15
141:5

**strong** 83:6

**structure**
211:12

**structured**
222:8

**struggling**
114:24

**study**
217:15,18,
21

**stuff** 16:12

**style** 55:3
198:25
260:23

**subject** 7:10
47:25
48:9,10
114:21
127:6
139:1,11
143:7
146:11
175:3
180:22
183:2,10
193:3,4,8,
23 194:16
195:3,4
196:25
197:15
204:14
205:3
207:22
208:1
213:16
217:5,17

**subjective**
198:18

**subjects**
127:9
142:5

171:20
172:11
180:3
193:5
195:5
204:17
213:20
217:8,9

**submission**
59:19,22
63:6 77:6
240:17

**submissions**
60:5 71:24
96:24

**submit** 53:16
58:17,19
59:1,7
62:8
185:15
225:3

**submitted**
36:15
53:18
54:11,17
56:15
57:2,10,
12,16
58:1,3,7,
10,13,21,
23 60:16,
18 61:10
62:1,4,24
63:10,12
64:3,5,9,
21 65:7
67:16

68:21
70:24
71:1,4,6,
21,24
72:2,7
82:2 83:23
84:12,22
97:5,16
108:9
111:16
113:22
120:22,25
186:2,4
189:22
190:22
191:2
197:22,23
199:5,8
221:7
231:25
232:1,3,9
233:9,15
234:23
237:23
238:1,14
246:14
249:17
250:7

**submitting**
58:25 63:2
71:18
257:14

**subpar** 105:8

**subscription**
144:24
157:11
167:4

**subscriptions**
157:10

**substantial**
65:15
89:25 91:9
237:18
238:5
250:4
256:1

**substantially**
36:14 39:9
75:10 90:7
92:4 99:5
142:8
170:11
244:19
245:14
248:18
249:3
254:4

**sue** 94:20

**sued** 244:10

**suffered**
41:16

**sufficient**
256:13
257:1

**suggest**
176:20

**suggested**
38:10
171:18
180:22,25
181:7,15
183:1,18

184:8,17,
19 185:19,
25

**suggesting**
158:11
175:1

**suggestions**
171:20
185:23

**suing** 90:2,6
181:21

**suit** 215:3
255:21
256:5,17
258:13

**suits** 230:12

**supplemental**
232:22
233:2

**support**
11:7,15
12:4,13,21
14:21,25
18:24
30:12,21
32:9,21
33:11,17
37:7 40:17
130:24
162:1
180:11
195:24
200:18
202:23
203:14

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.

219:11,18
249:3

**supported**
24:19

**supporting**
133:21

**supports**
39:23

**surgical**
81:4 124:3
207:4
242:2,5,8

**suspect**
54:11 55:8
61:13,16
72:19,21

**swathes** 94:2
98:17

**swear** 5:14

**switched**
99:13

**sworn** 6:2
10:19 16:3
19:7

**system**
248:13
265:3

**systems**
92:25
93:21
250:2

**— T —**

**table** 265:22

**tables**
65:14,17,
19 66:8
97:24
98:1,4
251:5,8,
16,17,21
252:2,4,9,
10,12

**taking**
211:25

**talk** 18:14
22:19
23:16
44:22
51:19
55:10
85:15
145:14,15
153:6
161:2
167:17

**talked** 27:19
44:8 59:19
68:22
141:18
142:19
164:8
165:23
167:12
171:1
177:13
203:5

219:6

**talking**
6:15,22
24:5
35:13,20
43:5 46:4
68:4,9
69:6 74:2
80:10 88:7
130:16
153:20
172:1
173:11
181:4
182:25
203:23
243:12
249:15,19

**talks** 92:12

**tape** 68:23

**TBI** 58:9
120:18
121:12

**technical**
102:1
105:4

**technologist**
124:3
242:2

**technologists**
81:4 207:4
242:5,8

**telephonically**
5:23

**telling**

25:12 27:7
31:13
229:15

**tells** 166:5

**ten** 65:4,5,
9 130:7
135:22
247:18
255:14

**ten-hour**
130:22
134:8,11
135:11,12,
15,18,23,
25

**term** 78:5
234:15
235:20
236:5
253:18

**terminology**
79:1,6,9
80:19

**terms** 11:20
24:10
37:20 38:4
39:11,14,
18,24
47:24 48:8
57:22 67:5
80:14
81:10,22
98:5 100:6
103:9
104:11
108:18

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 353 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017
30(b)(6)                                                    Index: test..time

109:21
111:18
115:23
121:4
128:10
152:15
200:16
207:7
213:23
240:1
258:2,3,21
259:10

**test**  146:9

**testified**
6:4 10:1,
14 19:2
31:25 40:1
45:2 47:14
64:20
71:12
100:3
111:2
163:1
177:3,5,14
196:19
198:4
213:14
217:3
250:18

**testify**
7:10,13,16
68:7
85:14,17
145:17

**testifying**
32:17
157:19

175:13
176:1
229:18

**testimony**
8:23 10:20
11:5,6
14:22 15:8
16:3 19:1
23:15 24:9
30:25
31:22
32:11 36:4
37:23
40:11
44:23
56:21
79:5,8
92:1 96:8
105:18
106:4
130:25
153:9
157:8
171:1,8,11
173:12
174:1
175:5,12,
20 177:22
178:1
180:14
192:15
193:2
195:24
196:22
200:9,19
201:8
202:24
211:6

215:13
231:25
233:8
241:1
243:9,11,
14 249:14

**tests**  113:6,
7

**Texas**  147:21
148:4
150:11,15,
22 151:2,9
162:4,6
164:11
168:6
268:10,19

**text**  74:2
94:2 95:12
96:12,13
98:5,17,25
236:20
237:1

**text-based**
236:24

**texts**  95:17

**theater**
90:25 91:5

**therapy**
24:16,17

**thing**  57:19
75:14

**things**  17:1
104:23
137:12
138:18

178:23
234:1

**thinking**
183:14
184:4
245:6

**third-part**
8:7

**third-party**
34:14
59:24
61:12
62:9,18
64:20
65:8,12
69:15,20,
22 201:12

**thought**
75:16
109:13
130:10
136:22
181:4
203:6
245:16

**three-year**
169:6,22

**time**  5:9
15:10 20:8
30:16
37:25
38:20,24
39:7,12
43:17
45:11,14,
21,24

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

46:16
52:11
54:21
55:13
64:1,18
68:24 69:4
75:22
81:15 86:9
90:4,5
94:19 96:4
105:12,25
107:5,7
108:19
111:22
117:25
118:5
119:3
126:20
141:15,21
144:17
148:1
149:15
156:8
158:20
160:13
162:4
165:16,18,
20 167:10
170:17,22
173:4,20
175:7
176:13
178:3,15
179:14
193:1,10,
23 194:25
195:11
198:9,12

204:10,25
207:21
218:16,21
224:16
225:5,15
227:9
230:20,23
243:21,24
248:1,10
254:13
255:23
256:20
262:22
263:1,2,25
264:8,9,17
265:6
269:5

timeline
81:22

times  23:11
40:11
90:25
91:4,6
145:13
162:8,16
165:14
179:7
224:5

timing
139:22

title  91:21
146:12
182:24
192:23
200:5,8,
11,12,15

titled  241:6

titles
49:19,20
114:20,21
182:21
193:4
196:24
197:15
200:21
203:2
211:4
216:17
218:2,5,6,
9 250:6

today  7:13,
17 8:23
11:14
12:3,12,20
15:5 18:22
21:4 28:4
29:9 30:20
32:7,20,24
33:10,16,
24 39:13,
17,20 40:3
45:7 46:3
47:12
54:13
55:19
59:15
72:11
100:4,8,17
103:25
108:13
111:2
114:17
115:11

130:6
133:16
137:10
145:13
146:4,6
148:2
153:8
163:25
164:8
166:22
167:20
171:1
172:7,25
177:13
180:10,14
207:14
219:6
244:25
245:2
250:10,11,
13,14
258:9
259:21,22
262:11,24
263:17
268:8

Today's  5:9

told  15:16
16:17 17:2
19:2 59:5
145:16
152:19
264:18,20
266:22

tomorrow
245:1

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**

**tool** 74:13
  96:1,2
  102:9
  166:17
  256:20

**top** 29:7
  48:4
  122:11
  172:15
  184:3
  188:16
  244:22,24,
  25

**topic** 85:17
  88:22
  153:7
  167:17,19
  183:8,18
  184:9
  185:19
  192:25
  193:1
  203:20
  204:7
  211:3

**topics** 7:7,
  11,13,17
  23:15
  36:23,24
  37:3 38:6,
  13 40:24
  47:24
  48:8,20
  88:6 91:13
  110:6,11
  114:5
  142:5

  157:19
  171:5,18
  175:2
  180:25
  181:8,9,
  12,15
  182:8
  184:19
  186:12
  193:4
  197:18
  203:17
  204:5,14
  208:15
  210:20
  211:4
  213:16
  239:15
  245:20,23

**tortious**
  41:5

**total** 147:12
  154:5
  161:13
  163:16
  165:4
  167:9
  170:12
  207:9
  247:19
  260:7
  268:17,21
  269:1,14

**totally**
  160:10
  230:14

**Tracey**
  171:16,17
  172:5
  221:7

**tracking**
  25:17

**trade** 7:25
  24:22,23
  25:2,4
  26:16,17,
  22,25
  27:11,20
  28:6,15
  29:11
  32:4,7
  33:11
  43:23
  44:6,19
  257:8

**trademark**
  59:9

**transcript**
  10:9
  172:25
  269:15

**transcripts**
  269:13

**transfer**
  15:4,10

**trauma**
  110:21
  111:7
  114:6,7,14
  213:3
  214:8
  216:13

**traumatic**
  51:9 58:9
  61:22
  72:12
  73:23
  74:20
  84:21
  110:22
  114:8,15
  119:9
  120:18
  135:24
  172:8
  181:17
  184:5,8
  189:24
  213:9
  222:15

**treated**
  253:8

**trial** 41:17

**trigger**
  125:11

**triggered**
  257:19
  258:12,23
  259:18

**true** 8:12
  9:23,24,25
  30:20 31:9
  33:10
  48:13,15
  55:4
  61:14,15,
  16 69:12
  70:13

Case 0:15-cv-61165-WPD Document 337-1 Entered on FLSD Docket 05/26/2018 Page 356 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

**30(b)(6)**                Index: truth..unedited

80:20
81:11 82:3
88:18
93:19,22,
24 94:8,
10,15
135:24
136:4
139:17,20
140:20
159:9
184:16
193:5
200:6
205:8,24
208:10
216:15
226:24
233:24
243:16,18
252:2
253:7
258:8
259:12,22

truth   6:3,4
31:13

Tuesday   5:1

turn   34:18
42:20 60:2
118:16
149:15,16
166:10
172:4,23
173:14
218:24
220:5,8,17
240:4

turned
189:16

Turning
69:22

two-year
170:13

type   208:5
223:19

types   197:19
226:13

typical
156:4

typically
238:7

———————

U

———————

U-n-i-n-u-r-s-
e-t-y   210:5

Uh-huh   48:3

ulcers
164:20
233:11
241:19
246:13

ultimately
136:1
182:19
199:12

un-sourced
189:15

unable   88:5
190:21
259:18

unaltered
57:3

unchanged
94:5 98:20

unclear   56:3
163:4
213:23

understand
6:17 7:9
10:14,16,
17 11:10
13:25
23:21 26:1
28:11
30:10
50:17,19
56:21
65:20
66:22 69:9
81:19
104:10
134:3
140:14
154:23
158:5
163:8
166:14
169:13
177:8
222:11
225:9
231:18,19
238:3,4
243:5
244:10,12
245:19,22
249:20,22

250:16,17,
21 254:6
262:23

understanding
9:6 22:2
26:21
36:21
38:11
47:20 55:5
103:1
104:13
105:10
115:7
204:10
229:22
235:2,19
236:5,11,
12 237:6,9
253:13
254:5

understands
240:8

undertake
73:10
78:12

undertaken
190:12

underway
102:3

unedited
57:17
58:6,15
59:1
232:1,6
237:14

Case 0:15-cv-61165-WPD   Document 337-1   Entered on FLSD Docket 05/26/2018   Page 357 of 360

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

30(b)(6)                                                    Index: Unfair..vis-à-vis

Unfair   257:8

Uninursety
   210:5

unique   93:7
   191:15
   205:14
   206:1

United
   186:18
   248:11

unknown/unsure
   132:15

unlimited
   144:24
   159:2

unpublished
   25:3

unqualified
   187:6

unrealized
   263:22

unreleased
   137:16
   243:1

update
   146:16
   156:9

updated   18:9
   22:3
   146:14,22
   156:13

updating
   246:9

usual   62:22
   63:17,19
   119:13
   266:7

utilize
   28:20
   188:4
   256:17

utilized
   70:2

─────────────
        V
─────────────

vague   21:23
   25:24
   28:10
   66:20,23
   174:5
   234:13,16
   249:14
   250:24

valid   238:19

valuable
   146:17
   191:18
   202:22

Van   5:18

Vanallen
   5:20

variations
   100:7

varied   100:5

varies
   168:12
   268:24

variety
   48:20 60:6

vary   102:25

verbatim
   93:1
   122:19

verified
   170:4

verify   208:8
   240:15,19
   251:20
   266:1

version
   53:15,18
   54:16
   56:14,15,
   16 57:2,3,
   13,16,17
   58:2,6,11,
   12 95:13,
   16 109:7
   149:22,24
   246:21

versions
   50:20,25
   55:20 59:1
   71:23
   102:2
   104:19
   125:7,8
   161:14
   198:2
   199:3,5
   232:9
   238:18
   247:8

versus   14:12
   56:9,12
   61:23
   68:10
   72:13
   73:21
   74:19
   83:22
   136:10
   148:22,23
   149:18,20
   150:11
   155:8
   172:8
   181:17
   185:16,20
   189:25

verticals
   24:16

vetted
   190:10

view   37:2,
   11 90:17,
   18 103:13

Vii   221:24

violated
   112:6
   215:16
   216:2
   237:19
   248:22

violating
   253:2

vis-à-vis
   66:17

DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.
Sarah Campbell on 11/14/2017

visible
  93:15

visual  86:1
  87:2 92:13
  93:23
  95:22
  99:13,20
  101:5
  106:5
  110:13
  111:1
  213:13
  255:23
  256:12

volume  16:1

_____

        W

wait  63:18
  94:22

waited
  267:21

waiting
  121:14

wanted  130:6
  181:8
  184:23
  185:13,24
  186:8
  192:25

wanting  39:6

warning
  130:11

warranted
  255:25

ways  107:14
  157:23
  209:1
  211:25
  222:15
  223:11
  228:3
  245:11

web  74:2
  87:5 96:3
  107:21
  113:24
  213:6
  221:16,21
  222:7,12
  223:16,17,
  19,21,25
  224:2,25
  226:15,17,
  19,21,23
  227:1,3
  228:18,21
  254:13

week  33:1
  104:15

weeks  134:2
  185:13
  246:18

weight
  157:21

Western
  210:7

whack  149:13

wide  121:22

Wild  116:12

210:9

Wileczek
  18:1,6

Wilson  5:18
  6:7,8
  12:2,11
  15:11
  17:10
  18:21
  19:3,6,19
  20:20
  21:24 23:1
  24:1
  25:10,19
  26:5,14
  27:5 28:12
  29:14,19
  32:14,19
  33:7 34:11
  40:8,16
  41:2
  42:17,19,
  24 43:1
  45:10,18
  46:1 47:2,
  4,5 50:8
  51:8,17,
  22,25
  52:3,6,9
  66:21
  67:23,24
  68:4,8,14
  69:5 71:14
  77:17,21
  78:2,8
  79:13
  89:11

90:12,21
91:1,3,7,
19 94:25
95:2 96:14
100:13
101:1
105:2,24
106:11
113:20
115:10
117:24
118:6,9,
11,14
126:2
149:8
150:2,6
151:17,21
152:11
160:1,8,
17,21
161:1
162:10,24
167:16
170:15,23
174:6,18
175:16,18,
21,24
176:3,6,11
179:23
187:10
188:11
193:17,18
198:14
207:11
216:21
217:2
218:15,22
221:5

**30(b)(6)**                                                            Index: Wilson's..writers

222:24
223:13
224:6
225:17
228:15
230:3,18,
25 231:21
234:1,5
250:19
268:5
269:4

**Wilson's**
241:1
243:9
254:22

**winter** 129:3

**wished** 121:9

**withdrawn**
266:14

**witnessed**
213:24

**women** 172:1

**word** 6:14
84:17
95:22
99:12
101:10
123:2
141:4
217:19
236:20

**wording**
123:17

**words** 55:13
68:1,8

79:5 80:8
81:13 91:1
123:4
130:8
229:14

**work** 35:21,
22 39:5
68:12
70:21
71:23
72:20
74:20,23
75:2 82:9,
14,16,18
83:15
86:11 98:9
119:11,15,
18 120:24
121:3,4,
18,24
128:8
130:11
132:4
135:21
143:16
179:20,21
182:25
189:23
192:13
197:21
198:24
201:14,18
234:22
235:10
236:12
237:3
238:4
242:6

251:6,7
252:10,21
261:21,22
265:3

**worked** 35:8
39:7 40:25
116:12
117:1
176:17
179:15,22
239:7
262:6

**working**
17:13
116:9
138:6
176:14
178:19
179:12
188:23
189:1

**works** 60:10
69:25
72:24 73:1
74:10
97:25
108:6
128:7
226:9,12
234:5
235:5,6,
23,24
236:2,9
237:10,13,
16,23,24
238:1,4
244:17,24

251:9,17
254:14
260:20

**worse** 137:8
141:6
165:22
168:5

**worth** 157:15
218:9

**write** 48:19
51:5
136:15
171:6
175:2
181:8
183:1
185:25
187:6
245:20,23

**writer**
34:20,25
36:7,12
37:6 38:9
39:14,18
40:5
138:2,3,
10,15
165:12
178:17
180:7
239:10,13,
19,23,25
240:8,16
245:4
246:2,3,6

**writers**

**DR. JASSIN JOURIA vs. CE RESOURCE, INC., ET AL.**
**Sarah Campbell on 11/14/2017**

138:6
166:6,7,9

**writers'**
79:11

**writes**  48:19
178:6
184:14,22
204:23

**writing**
25:6,13,23
26:8,10
27:8 110:9
184:5,17
185:4
257:22

**written**
37:14
52:21
58:24
109:15
165:21
166:1
173:5,20,
24 175:8
182:8
187:2
213:5,7
229:23
232:1
239:20

**wrong** 37:17
171:4
193:15

**wrote** 43:11
48:4,6,25
49:5,15

115:24
182:14
187:5
188:16
238:10
241:18
246:12
248:19

—————————
Y
—————————

**year** 21:12
128:13
131:25
132:18,24
147:14
148:7,17
156:5,18,
19,21
159:21
167:1
168:10,12,
18,23,25
169:1,4,5,
12,16,23
170:5,10,
13,14

**yearly**
264:11

**years** 35:7
145:9
146:25
147:3,15,
16,23
148:17
154:21
155:2,11

158:25
159:3,5,25
170:1,3
260:15
262:25
263:4,12
267:20

**yellow**
118:17

**yes-or-no**
33:4 71:16
90:9