UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 15-61165-CIV-WPD

DR. JASSIN JOURIA,                    .
                                      .
              Plaintiff,              . Fort Lauderdale, Florida
                                      . May 31, 2018
              v.                      . 9:00 a.m.
                                      .
CE RESOURCE, INC. D/B/A CME           .
RESOURCE AND NET CE,                  .
                                      .
              Defendant.              .
. . . . . . . . . . . . . . . . . .

CE RESOURCE, INC. D/B/A CME           .
RESOURCE AND NET CE,                  .
                                      .
              Plaintiff,              .
                                      .
              v.                      .
                                      .
 DR. JASSIN JOURIA,                   .
                                      .
              Defendant.              .
. . . . . . . . . . . . . . . . . .

                        - - - - -

     Transcript of Trial Testimony of Dr. Jassin Jouria had

        before the Honorable William K. Dimitrouleas,

           United States District Judge, and a Jury.

                        - - - - -

                       VOLUME 2

                        - - - - -

Proceedings recorded by mechanical stenography, transcript
produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

**APPEARANCES:**

For the Dr. Jouria:    Richard S. Ross, Esq.
                       Law Offices of Richard S. Ross, Esq.
                       915 Southeast 2nd Court
                       Fort Lauderdale, Florida  33301

For the CE Resource:   John P. Kern, Esq.
                       David I. Holtzman, Esq.
                       Daniel P. Kappes, Esq.
                       Holland & Knight, LLP
                       50 California Street
                       Suite 2800
                       San Francisco, CA  94111
                            and
                       Philip E. Rothschild, Esq.
                       Holland & Knight, LLP
                       515 E. Las Olas Boulevard
                       Suite 1200
                       Fort Lauderdale, Florida  33301

Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       299 E. Broward Blvd., Room 205F
                       Fort Lauderdale, Florida 33301
                       (954)769-5657/mjsfcs@aol.com

                       -  -  -  -  -

```
 1                    THURSDAY, MAY 31, 2018, 9:00 A.M.

 2              (The Judge entered the courtroom)

 3         THE COURT:  Please be seated.

 4         All right.  We're back on the record.

 5         Counsel are present.

 6         I guess we need to get Dr. Jouria back on the stand.

 7         Anything to come before the Court before we bring the

 8   jury in?

 9         MR. KERN:  Thank you, your Honor.  Just one thing.  An

10   open-ended question inviting your perspective and Mr. Ross'

11   also.  I'm thrilled that the pace of trial is about twice what

12   I had expected, and I think there's a reasonable likelihood

13   that we wrap up with witnesses today, and we're in a position

14   to move towards closing and a discussion of jury instructions.

15   And because it seems that Dr. Jouria's position in this case is

16   so heavily dependent on an interpretation of the law, I wonder,

17   because of the desire to avoid jury confusion, if -- how you

18   plan on staging any kind of discussion about jury instructions

19   or submissions of legal arguments that might influence a ruling

20   you would make to curtail the scope of closing arguments?  If

21   that's something that's typical or if that's something we need

22   to consider in advance.

23         THE COURT:  When the testimony's done, we'll do a

24   charge conference, and I'll hear arguments on the different

25   proposed instructions, and I'll rule.  I'll give the jury a
```

| | |
|---|---|
| 1 | copy of the instructions after I've read them to them when they |
| 2 | go back to deliberate. |
| 3 | As far as closing arguments go, we'll -- I'll ask you |
| 4 | how much time you want for closing arguments, and I'll either |
| 5 | agree to that amount of time or I'll cut it down. |
| 6 | **MR. KERN:**  Okay.  But your Honor would not be |
| 7 | inclined, then, to limit the scope of closing arguments based |
| 8 | on rulings regarding the anticipated jury instructions? |
| 9 | **THE COURT:**  No, we'll do a charge conference before |
| 10 | closing. |
| 11 | **MR. KERN:**  Okay.  Thank you, your Honor. |
| 12 | **THE COURT:**  So you'll know what my ruling's going to |
| 13 | be on the jury instructions before closing. |
| 14 | **MR. KERN:**  Okay.  I understand that now.  Thank you. |
| 15 | **THE COURT:**  In that regard, have you all submitted |
| 16 | either a disk with the jury instructions on it or submitted it |
| 17 | in Word Perfect email so that I can edit the jury instructions |
| 18 | that you've jointly proposed and separately proposed? |
| 19 | *(Discussion had off the record between counsel)* |
| 20 | **MR. KERN:**  We have filed it, your Honor.  And we could |
| 21 | provide a Word copy that you can manipulate.  Absolutely, we |
| 22 | could do that.  We could send an email and have that taken care |
| 23 | of right now. |
| 24 | **THE COURT:**  Okay. |
| 25 | How about verdict forms?  Have you all submitted a |

1   proposed verdict form?

2          **MR. KERN:**  We have, your Honor.

3          **MR. ROSS:**  Yes, your Honor.

4          **THE COURT:**  Where is that?  Was it separately from the

5   proposed jury instructions?

6          **MR. KERN:**  They were, I believe, filed separately.  We

7   also can email those separately if you like.

8          **THE COURT:**  Yeah, maybe email them in case I want to

9   change the verdict form.

10         Anything further before I bring the jury out?

11         **MR. KERN:**  No, your Honor.

12         **MR. ROSS:**  No, your Honor.

13         **THE COURT:**  All right.  If we have all the jurors,

14  let's bring them out.

15         **COURTROOM SECURITY OFFICER:**  All rise.

16         *(The jury entered the courtroom)*

17         **THE COURT:**  And we have all the jury back.

18         Did everyone follow my admonition not to discuss the

19  case or allow it to be discussed in your presence?

20         All right.  I think we're ready to resume direct

21  examination.

22         Mr. Kern, you may proceed.

23         **MR. KERN:**  Thank you, your Honor.

24         Good morning.

25         **THE JURORS:**  Good morning.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

JOURIA - DIRECT/KERN

| 1 | DIRECT EXAMINATION (CONTINUED) |
| 2 | BY MR. KERN: |
| 3 | Q.  Dr. Jouria, before we left off yesterday, we were |
| 4 | discussing the contracts between you and NetCE, and I wanted to |
| 5 | pick up there, but first with a little -- just as a little bit |
| 6 | of a warmup to refresh some of the points we had made. |
| 7 | You admit that you wrote articles for NetCE, correct? |
| 8 | A.  Yes, sir. |
| 9 | Q.  And the freelance writer agreements that you entered into |
| 10 | with NetCE are Trial Exhibits 275, 276, 278, 285, and 286, is |
| 11 | that correct? |
| 12 | A.  That's correct. |
| 13 | Q.  I believe you also testified yesterday that you were paid |
| 14 | by NetCE, and that those payments are reflected in Exhibits 171 |
| 15 | for Traumatic Brain Injury, 172 for GERD, 174 for |
| 16 | Non-Antibiotic, 175 for Cancer and Chemo, and 177 for |
| 17 | Depression and Dementia, correct? |
| 18 | A.  Yes, sir, that's correct. |
| 19 | Q.  Okay.  And do you agree that you submitted articles to |
| 20 | NetCE under each of those freelance writer agreements? |
| 21 | A.  Yes. |
| 22 | Q.  Terrific.  Thank you for confirming. |
| 23 | And if I could ask you to please pull out Trial |
| 24 | Exhibit 275.  It's the freelance writer agreement for Cancer |
| 25 | and Chemotherapy.  Let me know when you have that. |

JOURIA - DIRECT/KERN

1  A.  Yes, sir.

2  Q.  Okay.  And as I had you do yesterday, could you please read

3  aloud from paragraph 5 in Exhibit 275, the first sentence and

4  then subparagraph D.

5       **MR. ROSS:**  Objection.  Asked and answered.

6       **THE COURT:**  Sustained.

7  BY MR. KERN:

8  Q.  Very well, Dr. Jouria, I'll move on.

9       Could I show you, please, Plaintiff's Exhibit 288.

10 And if you have some trouble locating it, I'm happy to

11 approach.

12 A.  It's on the screen.  That's fine.

13 Q.  Oh, terrific.  Okay.

14      And at your deposition, you testified that this

15 article was the article you submitted to NetCE under the Cancer

16 and Chemotherapy freelance writer agreement.  Is that still

17 correct?

18 A.  Yes, sir.

19 Q.  Did NetCE ever tell you in writing that it rejected this

20 article?

21 A.  No, sir.

22 Q.  Did NetCE ever put in an email that it rejected this

23 article?

24 A.  No, sir.

25 Q.  Did NetCE ever tell you in person that it rejected this

JOURIA - DIRECT/KERN

1    article?

2    A.  No, sir.

3    Q.  Did NetCE ever tell you over the phone that it rejected

4    this article?

5    A.  No, sir.

6    Q.  Dr. Jouria, I'm now gonna ask you to look at, please, Trial

7    Exhibit 277, an article entitled "Gastroesophageal Reflux

8    Disease."

9         At your deposition, you testified that this article is

10   the article you submitted to NetCE under the GERD contract, is

11   that still correct?

12   A.  Yes, sir.

13   Q.  And with respect to the GERD article, did NetCE ever tell

14   you in writing that it rejected this article?

15   A.  No, sir.

16   Q.  Did NetCE ever put in an email that it rejected this

17   article?

18   A.  No, sir.

19   Q.  Did NetCE ever tell you in person that it rejected this

20   article?

21   A.  No, sir.

22   Q.  Did NetCE ever tell you over the phone that it rejected

23   this article?

24   A.  No, sir.

25   Q.  And would you agree --

28

JOURIA - DIRECT/KERN

1        **MR. KERN:**  Could we pull up the freelance writer

2   agreement for GERD, please?  That would be 276.

3        Thank you, Patrick.

4   BY MR. KERN:

5   Q.  Would you agree that paragraph 5, Subparagraph D, is the

6   same for GERD as it was for Cancer and Chemotherapy?

7   A.  It's the same for all five courses, yes, sir.

8   Q.  Thank you, Dr. Jouria.

9        **MR. KERN:**  Thanks, Dan.

10  BY MR. KERN:

11  Q.  Dr. Jouria, when we left off yesterday, I was just asking

12  you about the contracts with Elite, and I'm fairly certain we

13  did not get those into evidence.  So, if I could ask you to

14  look at what we have marked for identification purposes as 2

15  and 3, and they're two different contracts with Elite.

16       Do you have those handy?

17       *(Plaintiff's Exhibits 2 and 3 marked for*

18  *identification)*

19  A.  No, sir.

20  Q.  I'll furnish those.

21       **MR. KERN:**  Your Honor, is it okay if I approach?

22       **THE COURT:**  Yes.

23       **MR. KERN:**  Thank you.

24       **MR. ROSS:**  Do you have a copy for me?

25       **MR. KERN:**  Certainly.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

JOURIA - DIRECT/KERN

```
 1              MR. ROSS:   Thank you.

 2              MR. KERN:   There's 3.  I'll get you 2.

 3              (Discussion had off the record between counsel)

 4              MR. ROSS:   Thank you.

 5              MR. KERN:   You're welcome.

 6   BY MR. KERN:

 7   Q.  Two and 3.

 8   A.  Thank you.

 9   Q.  Okay?

10   A.  Okay.

11              MR. KERN:   I'll lay a foundation and then ask that

12   these be moved into evidence.

13   BY MR. KERN:

14   Q.  Dr. Jouria, what is in Exhibit 2?

15   A.  Uhm, an independent contractor agreement between myself and

16   Elite Professional Education.

17   Q.  Okay.  And can you turn to page 8 of your agreement, and

18   the Bates label in the lower right-hand corner is

19   Jouria0000814?

20   A.  Sure.

21   Q.  Do you agree that that's your signature?

22   A.  Yes, sir.  It's an electronic version of it, but it's mine.

23   Q.  Thank you.

24              And then could you turn to --

25              MR. KERN:   Your Honor, I guess I'll -- I'm gonna do
```

JOURIA - DIRECT/KERN

1   both and then ask that they both go into evidence.

2   BY MR. KERN:

3   Q.  So, if you don't mind, Dr. Jouria, could you turn to

4   identified Exhibit 3?  And then tell the ladies and gentlemen

5   of the jury, what is this?

6   A.  Independent contractor agreement between myself and Elite

7   Professional Education.

8   Q.  Okay.  And could you turn to the last page of this marked

9   IRCE19920?

10  A.  Okay.

11  Q.  Let me know when you're there.

12  A.  Yes, sir.

13  Q.  Okay.  And is that your signature?

14  A.  Yes, it is.

15  Q.  Okay.

16       **MR. KERN:**  Your Honor, at this time, I'd like for

17  Exhibits 2 and 3 to be moved into trial evidence.

18       **MR. ROSS:**  Your Honor, with respect to Number 2, we

19  object for relevance.  I don't know the relevance between

20  Dr. Jouria's relationship with Elite and the claims at issue.

21  I also object to Exhibit 2 because it's unsigned.  It's a draft

22  version.

23       And with respect to Exhibit Number 3, relevance.

24       **THE COURT:**  Overruled.  Two and 3 will be received.

25       *(Plaintiff's Exhibits 2 and 3 admitted into evidence)*

1          **MR. KERN:**  Thank you, your Honor.

2          And if I could ask Patrick to publish Exhibit 2 for

3    the jury.

4    BY MR. KERN:

5    Q.  Dr. Jouria, if you look at Exhibit 2, what is the date on

6    this agreement?

7    A.  November 8th, 2013.

8    Q.  And what does this agreement do?

9    A.  It enters myself and Elite into a contract to provide a

10   medical research article.  I can't tell the topic, but....

11   Q.  Could I ask you, please, to turn to page 9 of this

12   agreement, and you'll see the Bates Number 815 in the corner?

13   A.  Yes, sir.

14   Q.  Okay.  So, does the Bates number in the lower right-hand

15   corner, Jouria815 -- does that indicate to you that these are

16   documents you produced in this litigation?

17   A.  I believe so.  I honestly don't know.

18   Q.  That's fine.  If you don't know, I'm happy to get an "I

19   don't know."  I don't want you to speculate.

20          Would you agree that this is a contract between you

21   and Elite?

22   A.  Yes.

23   Q.  Okay.  And to your knowledge, is Elite a continuing

24   education publishing company or provider?

25   A.  Yes, sir.  That's fair.

JOURIA - DIRECT/KERN

1  Q.  And this is the same Elite that we've referred to at other

2  times in the trial?

3  A.  Yes, sir.

4  Q.  And if you look at Exhibit A, what is the topic that you're

5  writing -- what is the topic you've signed a contract to

6  provide research for?

7  A.  On this one, it's traumatic brain injuries.

8  Q.  Okay.  And then if you would turn the page a bit to the

9  page marked 12 on the bottom, but also in the lower right-hand

10  corner 818?

11  A.  Okay.

12          **MR. KERN:**  Thank you, Patrick.

13  BY MR. KERN:

14  Q.  What is the topic that you've contracted with Elite to

15  write on here?

16  A.  Depression vs. Dementia in the Elderly Patient:  Part I.

17  Q.  Okay.  And can you flip one page to 819.  What is the topic

18  you've agreed to write on here?

19  A.  Depression vs. Dementia in the Elderly Patient:  Part II.

20  Q.  And if you flip one page to 820, could you read the topic

21  that you've contracted with Elite to write on here?

22  A.  Cancer and Chemotherapy:  Part I.

23  Q.  And flip one more page to Jouria821, and tell the jury what

24  topic you've agreed to write on for Elite here?

25  A.  Cancer and Chemotherapy:  Part II.

JOURIA - DIRECT/KERN

1  Q.  And then flip one more page to 822 and tell the ladies and

2  gentlemen of the jury what you've contracted to write for here?

3  A.  Non-Antibiotic Antimicrobial Pharmacology:  A Comprehensive

4  Review:  Part I.

5  Q.  And then one more page, Dr. Jouria, what have you agreed

6  to -- pardon me -- what have you contracted with Elite to write

7  on here?

8  A.  Non-Antibiotic Antimicrobial Pharmacology:  A Comprehensive

9  Review, Part II.

10 Q.  And then one more page to 824, what is the topic you've

11 agreed to write an article for Elite here?

12 A.  Gastroesophageal Reflux Disease, commonly referred to as

13 GERD.

14 Q.  Okay.  Having now looked at the exhibits that have your

15 signature and the different topics, is it the case that, in

16 fact, you signed one master independent contract agreement with

17 Elite that had multiple exhibits that you signed listing the

18 specific article topics?

19        **MR. ROSS:**  Objection, form, as to master contract.

20        **THE COURT:**  Overruled.

21 A.  I'm not sure what -- master -- I don't know what that

22 means, but it looks like, yes, they're independent exhibits

23 with the respective title for each course.

24 Q.  Okay.  Yeah, I think --

25 A.  I mean, I guess so.

JOURIA - DIRECT/KERN

1  Q.  Yeah, that's what it looks like.  Thank you very much.

2       And then if I could have you flip to Trial Exhibit 3

3  and just collect a little bit more information about this.

4  Take a moment to look at it and the extent to which it's

5  different or the same than 2.

6  A.  Okay.

7  Q.  And tell me what's the date on this contract?

8  A.  November 8th, 2013.

9  Q.  Okay.  Is that the same date as on Exhibit 2?

10 A.  Yes, sir.

11 Q.  Okay.  And I'm sorry to make you do this, but could you

12 just take some time and compare Exhibit 3 with the -- what I

13 refer to as the master contract in Exhibit 2, and just let me

14 know when you've had a chance to review them.  And the question

15 I'm gonna ask you is:  Aren't these, in fact, the same, only

16 Exhibit 3 is the signed version?  But take your time.  I don't

17 want you to feel rushed.

18      **MR. ROSS:**  Objection.  Documents speak for themselves.

19      **THE COURT:**  Overruled.

20 A.  I would agree with that.

21 Q.  Okay.  And thank you, Dr. Jouria.

22      Could you look at Exhibit 3, then, which is the signed

23 version of the independent contractor agreement between you and

24 Elite, and read the first sentence of paragraph 6?

25 A.       "Contractor acknowledges and agrees that the

1              foregoing is an exclusive transfer of the right,

2              title, and interest in and to the curriculum, and

3              that contractor may not personally use the

4              curriculum, or sell, give, or loan the curriculum to

5              any third party, without company's express written

6              permission."

7    Q.   Okay.  So, this is a contract between you and Elite, where

8    you are agreeing that whatever topics that we listed earlier,

9    whatever articles we referred to earlier, you're transferring

10   the right to those articles to Elite.  Is that your read of

11   paragraph 6?

12            **MR. ROSS:**  Objection.  That's not what the document

13   says.  It says "curriculum."

14            **THE COURT:**  Overruled.

15   A.   Could you repeat the question?

16   Q.   Absolutely.  And maybe it was -- it was a little bit of a

17   sloppy question.

18            What do you think you're doing in paragraph 6?

19   A.   I submit an article based on the specific topic, and once I

20   submit that, then Elite owns it.

21   Q.   Okay.  At the time that you executed this contract with

22   Elite, November 8th, 2013, did you believe that NetCE had

23   rejected the five articles at issue in this trial?

24   A.   I did.

25            **MR. KERN:**  Could we -- Patrick, could you publish a

JOURIA - DIRECT/KERN

1  trial exhibit from yesterday, Exhibit 11?  And I wanted to --

2  in case it's not --

3  BY MR. KERN:

4  Q.  Do you have it handy?

5  A.  Yes, sir.

6  Q.  Oh, terrific.

7  A.  The email chain?

8  Q.  Yes.  Thanks so much.

9  A.  I do.

10  Q.  Great.  I don't have to fumble around, look awkward.  Thank

11  you.

12  A.  Sure.

13       **MR. KERN:**  Thanks.

14  BY MR. KERN:

15  Q.  Take a minute to review this email chain.

16       *(Pause)*

17  A.  Okay.

18  Q.  Okay.  Please turn to page 4.

19       **MR. KERN:**  And could we publish that for the jury,

20  page 4?  Thanks.

21  BY MR. KERN:

22  Q.  And what's the date on that email?

23  A.  On -- there's a couple of dates.

24  Q.  You're right.  I should have been more clear.

25       At the bottom, there's an email from you to William

1    Cook at a different CE provider at 4:14 p.m.  What's the date

2    of that email?

3    A.  Friday, September 11th, 2015.

4    Q.  Okay.  And in that email, you're telling Mr. Cook -- can

5    you read the first two sentences?

6    A.      "I understand, Will.  To be honest, I'm not

7         certain if the courses are rejected."

8    Q.  And when you said that to Mr. Cook, you were referring to

9    the five NetCE articles?

10   A.  Yes, sir.

11   Q.  So, is it true, then, in September 2015, you were not

12   certain if that CE had rejected the five at issue articles?

13           **MR. ROSS:**  Objection.  Leading.

14           **THE COURT:**  Overrule.

15   A.  Can you repeat the question?

16   Q.  Is it true that in September of 2015, you were not certain

17   if NetCE had rejected the five at issue articles?

18   A.  That's correct.  I was not certain.  Based on everything

19   that was happening at the time, it just seemed kind of

20   contradictory to the previous thought that there was no

21   communication and all of a sudden there was.  So, that caused a

22   little bit of confusion.

23   Q.  So, to make certain I understand the time line, in 2013,

24   when you signed contracts with Elite, you believed NetCE had

25   rejected the articles, and in 2015, you were not certain, is

JOURIA - DIRECT/KERN

1   that correct?

2   A.   That's correct.

3   Q.   Okay.

4        **MR. KERN:**   Could I ask the Court, at this time, I'd

5   like to show counsel NC7, a document we have marked for

6   identification purposes.   And may I also furnish a copy to the

7   witness?

8        *(Plaintiff's Exhibit NC7 marked for identification)*

9        **THE COURT:**   Okay.

10       *(Discussion had off the record between counsel)*

11  BY MR. KERN:

12  Q.   Here, sir.

13  A.   Thank you.

14  Q.   Dr. Jouria, before I ask that this be entered into

15  evidence, can you tell me what this is?

16  A.   Sure.

17       Email communication between myself and Ms. Sarah

18  Campbell.

19  Q.   And what's the date on the top email?

20  A.   Friday, October 24th, 2014.

21  Q.   And would you agree that all of the emails on this chain

22  span between October 7th and October 24th, 2014?

23  A.   Yes, sir.

24  Q.   And do you recognize your email address,

25  Jassinjouria@yahoo.com?

JOURIA - DIRECT/KERN

1   A.   Yes, sir.

2   Q.   Okay.

3        **MR. KERN:**   Your Honor, at this time, I would like to

4   ask that NC7 be moved into trial evidence.

5        **MR. ROSS:**   No objection.

6        **THE COURT:**   Seven will be received.

7        *(Plaintiff's Exhibit NC7 admitted into evidence)*

8   BY MR. KERN:

9   Q.   Mr. Jouria, could you read your email to NetCE on

10  October 7th, 2014, the first paragraph?

11  A.   The one at 12:42 p.m.?

12  Q.   Yes, the one addressed to Sarah Campbell.

13  A.        "Dear Director of Development, I have been trying

14       to contact Ms. Sarah Campbell regarding some courses

15       I have authored for NetCE.  I believe that some

16       courses are still pending publication, and I wanted

17       to get a status update on them, if possible.  I may

18       have an outdated email address.

19            "Also, I'm inquiring if there's a need for any

20       additional courses, as I am interested in writing on

21       additional topics.

22            "Please let me know if you have any questions or

23       concerns.

24            "Give my best to Ms. Campbell.

25            "Regards, Jassin Jouria."

JOURIA - DIRECT/KERN

1   Q.  Okay.  And can you read Ms. Campbell's response on

2   October 24th, first paragraph only?

3   A.       "Dr. Jouria, thank you for checking in.  We are

4        working diligently on your additional courses (still

5        in development) and hope to have several more

6        published in the coming weeks and months.  Now, our

7        focus is on the GERD course, which may be featured in

8        an upcoming mailing."

9   Q.  Thank you for doing that.

10  A.  Yes, sir.

11  Q.  And what is the date on Sarah Campbell's email to you, the

12  one you just read?

13  A.  October 24th, 2014.

14  Q.  Isn't that almost a year after you contracted with Elite to

15  write on the same topics?

16  A.  Yes, sir.

17  Q.  And isn't this a year before you tell Mr. William Cook that

18  you're not certain if the articles have been rejected?

19  A.  Yes, sir.

20  Q.  And by the time that you wrote this email to Sarah

21  inquiring on the status, October 7th, 2014, you already had

22  sold the articles to Elite, correct?

23  A.  That's not correct.

24  Q.  Okay.  Please clarify.

25  A.  I didn't sell the same article.

JOURIA - DIRECT/KERN

1   Q.  Do you believe -- did you believe in 2014, when you wrote

2   to Sarah Campbell, that NetCE had expressly rejected the five

3   articles at issue in this trial?

4   A.  I was under the impression that due to the lack of

5   communication, that there was no real interest in publishing

6   them.  So, I believed that, yes, that was a form of rejection.

7   Q.  Okay.  Well, help me reconcile then, because a year later,

8   you told Mr. Cook you did not know if the articles had been

9   rejected.

10  A.  Sure.  And I understand where the confusion comes from.

11       Once I received the cease-and-desist letter, it became

12  apparent that there was still an interest in publishing those

13  courses.  And so, I wasn't sure.  I wasn't sure if they were

14  planning on publishing or not.

15  Q.  Okay.  Can I ask you to look at Trial Exhibit 284, please.

16  It's the article you submitted to NetCE entitled

17  "Non-Antibiotic Antimicrobial Pharmacology."  Let know when you

18  have that.

19  A.  284?

20  Q.  Yes, sir.

21  A.  Okay.

22  Q.  And you testified at your deposition that this is the

23  article you submitted to NetCE.  I'm just confirming, is that

24  still correct?

25  A.  Yes, sir.

JOURIA - DIRECT/KERN

1    Q.   Thank you.

2         And sorry to belabor this, but same questions as to

3    the other ones.  Did NetCE ever tell you in writing that it

4    rejected this article?

5    A.   No, sir.

6    Q.   Did NetCE ever put in an email that it rejected this

7    article?

8    A.   No, sir.

9    Q.   Did NetCE ever tell you in person that it rejected this

10   article?

11   A.   No, sir.

12   Q.   Did NetCE ever tell you over the phone that it rejected

13   this article?

14   A.   No, sir.

15   Q.   And, in fact, when you checked in with Sarah in 2014 as to

16   the status, she told you they were still working on it,

17   correct?

18   A.   That's correct.

19   Q.   Okay.  Could you turn, please, to Trial Exhibit 289.  This

20   is the article you submitted to NetCE, Depression and Dementia.

21   Let me know when you have it in front of you.

22   A.   Okay.

23   Q.   At your deposition, you testified that this is the article

24   you submitted to NetCE under the freelance writer agreement, is

25   that still correct?

JOURIA - DIRECT/KERN

1    A.  Yes, sir.

2    Q.  Okay.  And same four questions.  Did NetCE ever tell you in

3    writing that it had rejected the article?

4    A.  No, sir.

5    Q.  Did NetCE ever tell you in an email it had rejected the

6    article?

7    A.  No, sir.

8    Q.  Did NetCE ever tell you in person that it had rejected the

9    article?

10    A.  No, sir.

11    Q.  Did NetCE ever tell you over the phone it had rejected the

12    article?

13    A.  No, sir.

14    Q.  Dr. Jouria, could I ask you to look at the Elite contracts

15    again.  I just don't want there to be any loose ends.  Could

16    you look at Exhibit 2, Trial Exhibit 2?

17    A.  Sure.

18        Okay.

19    Q.  Thanks.

20        And I'm just gonna read off a series of page numbers

21    so we can do these en masse.  But I want you to look at the

22    signature on the following, and then I'm gonna ask you can you

23    confirm that this is your signature.

24        Okay.  So, it's the -- I'm gonna use the actual page

25    numbers at the lower middle, is that all right?

JOURIA - DIRECT/KERN

1  A.  Sure.

2  Q.  Okay.  So, page 9, page 12, page 13, page 14, 15, 16, 17,

3  18 -- can you confirm that those are your signatures?

4  A.  Yes, they are.

5  Q.  And can you confirm -- I understand we have a dispute about

6  whether it's the same article or not, so I'm gonna phrase this

7  question very carefully -- can you confirm that these are your

8  signatures agreeing to write courses for Elite that are on the

9  same topics as the five articles at issue in this trial?

10  A.  So, they weren't courses I was supposed to write for them.

11  It was subject matter.

12  Q.  Okay.

13  A.  Quite a distinction.

14  Q.  I'll adopt your language without agreeing to it.  I'll

15  adopt it for the question.  And I appreciate you clarifying.

16          Would you agree that the pages I listed reflect your

17  signature and agreement to contract with Elite to provide

18  writings in the same subject matter as the five articles at

19  issue in this trial?

20  A.  Yes, sir.

21  Q.  Thank you, Dr. Jouria.

22          Did you draft the contract with Elite or did they

23  draft it?

24  A.  They drafted it.

25  Q.  Okay.

JOURIA - DIRECT/KERN

```
 1   A.  I believe.

 2   Q.  Did you have --

 3   A.  I didn't.

 4   Q.  Oh, I'm sorry.

 5   A.  I don't know if they did, but I didn't.

 6   Q.  Oh, gotcha.  Okay.  That's -- I appreciate the

 7   clarification.

 8        Did you have an opportunity to review it before you

 9   signed it?

10   A.  Yes, sir.

11   Q.  Okay.  Did NetCE draft the freelance writer agreements or

12   did you?

13   A.  NetCE did.

14   Q.  Okay.  And did you have an opportunity to review the

15   freelance writer agreements?

16   A.  I did.

17   Q.  Dr. Jouria, early in your -- well, we may have touched on

18   these yesterday in your testimony, but it's neither here nor

19   there.  Let me change the question.

20        Can I show you, please, trial exhibits which reflect

21   your submissions to Elite, and I'll have you pull them out, and

22   we can talk about them.  Those would be Trial Exhibits 22, 23,

23   24, 25, 26, 27, 28, 29.  So, 22 through 29.

24   A.  Okay.

25   Q.  Okay.  I think you have those in front of you?
```

JOURIA - DIRECT/KERN

1   A.  I don't believe I have those.

2   Q.  Let me make certain you have a copy.  One moment.

3   A.  Okay.

4        MR. KERN:  May I approach, your Honor?

5        THE COURT:  Okay.

6        MR. KERN:  You don't have a copy.

7   A.  I think these are NetCE's.

8        MR. KERN:  Yeah, you're right.

9        (Discussion had off the record between counsel)

10  A.  Thank you.

11       MR. KERN:  Thank you.

12       Thanks, Dan.

13  BY MR. KERN:

14  Q.  Dr. Jouria, I'm showing you Trial Exhibits 22 to 29.  At

15  your deposition -- pardon me -- deposition, you previously

16  identified these as the articles you submitted to Elite.  Is

17  that still the case?

18       MR. ROSS:  Objection.  Form.  It's an improper use of

19  the deposition testimony.

20       THE COURT:  Overruled.

21  A.  Can I pull up the deposition?

22  Q.  Certainly.  And if you'd like, I could point you to a page

23  and paragraph number?

24  A.  Sure.

25  Q.  It's the deposition page 246, lines 10 through 24.  And we

JOURIA - DIRECT/KERN

1   also have a videotape clip, if you prefer that.  We can show it

2   to the jury.

3   A.  I think the writing will suffice, just refresh my memory.

4   Q.  Terrific.

5          **MR. KERN:**  Can I approach and furnish him with a copy

6   of the transcript?

7          **THE COURT:**  Okay.

8          **MR. KERN:**  Thank you.

9          *(Discussion had off the record between counsel)*

10         **MR. KERN:**  Thank you.  I've got it.  Thank you.

11         *(Discussion had off the record between counsel)*

12  BY MR. KERN:

13  Q.  246, line 10.  You say just keep the copy.

14  A.  Okay, great.  Thank you.

15  Q.  You're welcome.

16         *(Discussion had off the record between counsel)*

17  BY MR. KERN:

18  Q.  And if it helps, Dr. Jouria -- and please take your time --

19  the deposition exhibit numbers are on the bottom right-hand

20  corner of the trial exhibits, so you'll be able to match that

21  with what you're reading in the transcript.

22  A.  Okay.

23         *(Pause)*

24  A.  Okay.

25  Q.  Okay.

JOURIA - DIRECT/KERN

1   A.  So, can I just clarify -- could you repeat your question,

2   and I'll answer it for you?

3   Q.  I'd be happy to.  Thanks for doing that.

4        My question was:  Dr. Jouria, I'm showing you Trial

5   Exhibits 22 through 29.  At your deposition, under oath, you

6   previously identified these documents as articles submitted to

7   Elite.  Do you -- can you confirm that they are today?

8   A.  So, I cannot confirm, and I'll explain why.  At the

9   deposition -- reading this refreshes my memory -- in that 15-

10  to 20-second period, at first glance, the way the question was

11  phrased, I had no reason to dispute that those were the

12  articles that I submitted.  However, sitting here today, still

13  under oath, as it stands, they don't appear to be the articles

14  I submitted to Elite.  And I can explain why.

15  Q.  Please.

16  A.  The articles I explained -- I submitted to Elite had

17  substantial red lines on them, which I don't see any of that

18  here.

19  Q.  Okay.  So, the initial documents you submitted to Elite had

20  red lines?

21  A.  Yes.

22  Q.  And who generated those red lines?

23  A.  The red lines are part of my revisions.

24  Q.  Your revisions to what?

25  A.  To the original document.

JOURIA - DIRECT/KERN

1   Q.   What was the original document?

2   A.   The original document that was prepared for Elite.

3   Q.   So, where is the original document you prepared for Elite

4   if these are not the original documents you prepared for Elite?

5   A.   I don't know.

6   Q.   What explains the 180-degree change in your testimony

7   between then and now, as you had ample time at the deposition

8   to review these, and these were proffered by Elite's own

9   counsel?

10  A.   So, I think the word "ample time" -- or phrase "ample time"

11  is a little misconstrued.

12  Q.   But it was a ten-hour deposition, Dr. Jouria.

13  A.   And there were several things discussed in that ten-hour

14  deposition.  At the presentation of this stack of articles,

15  that range from 40 to 80,000 words per document, and the

16  phrasing of the question by counsel was:  Do I have any reason

17  to believe that they're not?  Well, I didn't.  Did I look

18  through each document extensively?  I was gonna take the

19  several hours it probably would have taken to look through them

20  to verify.  I just didn't have a reason to believe that they

21  weren't.

22  Q.   So, your testimony, then, is, you submitted documents to a

23  company you hope to sell an article to which were redlined.

24  A.   Can you rephrase that question?

25  Q.   You submitted documents to a company you were selling

JOURIA - DIRECT/KERN

1   articles to in red line form.

2   A.   I -- I wrote revisions to their article that I submitted

3   them originally, per their request.

4   Q.   I understand, Dr. Jouria.  I understand that you submitted

5   articles to them originally, and they asked you to make

6   revisions, which you then made in red line, correct?

7   A.   Red line, sometimes purple, depending on what kind of

8   revisions were done -- deletions, additions.

9   Q.   And that's a process I'm familiar with, so I understand the

10  nature of your testimony.  But I didn't ask you:  Are these a

11  revised version of the documents you submitted to Elite?  I

12  asked you:  Are these the documents you submitted to Elite?

13  A.   These are not.

14  Q.   Okay.  What are those?

15  A.   I don't know.

16  Q.   Okay.  You don't know today.

17  A.   I don't know what these documents are *(indicating)*.

18  Q.   Okay.  Where are the original versions you submitted to

19  Elite if those are not they?

20  A.   I don't know.

21  Q.   Okay.  Well, they were asked for in the litigation.  They

22  were pretty crucial documents requested in the litigation by

23  all parties.  You testified at your deposition that you

24  produced them and that these are they.

25  A.   We produced them.  These are not them.

51

JOURIA - DIRECT/KERN

1  Q.  You produced them in the case, and these are not them.

2  A.  We produced them.  I know we have copies of them.  These

3  are not them.

4  Q.  This is shocking news.

5        **MR. ROSS:**  Objection.  Move to strike.

6        **THE COURT:**  Sustain.

7  A.  I'm not sure what to tell you.

8        **MR. KERN:**  I'd like to play an excerpt from the

9  deposition to impeach the witness, please.  It's deposition

10 page 46, lines 10 through 24.

11       **THE COURT:**  That's what he just read?

12       **MR. KAPPES:**  He didn't read it.  He didn't read it.

13 Read it out loud.

14       **MR. KERN:**  He didn't read it, your Honor.

15       **THE COURT:**  That's what he just read to himself.

16       **MR. KERN:**  Correct.

17       **THE COURT:**  All right.  Go ahead.

18       *(Video playing)*

19       **MR. ROSS:**  Excuse me, are you planning on playing the

20 videotape?

21       **MR. KERN:**  Yes.

22       **MR. ROSS:**  Your Honor, may we have a sidebar?

23       **THE COURT:**  No.

24       **MR. ROSS:**  I'm gonna object to the videotape on the

25 basis that it was never noticed.  The notice of deposition was

JOURIA - DIRECT/KERN

1   not noticed for videotape.  There was a contention before the

2   deposition, where they -- NetCE wanted to use a videographer in

3   addition to a stenographer.  We objected.  The parties agreed

4   that -- because everybody had flown in to town, that we would

5   permit the deposition to proceed with the videographer without

6   waiving our rights to contest usage of the videograph *(sic)*,

7   and this is contrary to that agreement.

8            **THE COURT:**  All right.  So, you're contesting it now.

9            **MR. ROSS:**  Yes.

10           **THE COURT:**  Overruled.

11           **MR. KERN:**  Thank you, your Honor.

12           And for clarification purposes, your Honor, counsel

13  for Elite is asking the questions, not counsel for NetCE.

14           *(The following is the video that was played)*

15           "Dr. Jouria, can you identify this stack of

16      documents in Exhibits 48 through 57 as the initial

17      set of articles you submitted to Elite?

18      *"(No response)*

19           "I'll represent to you that these are -- it's our

20      understanding that these are the articles you first

21      submitted to Elite on these topics.  Do you have any

22      reason to disagree with that?

23           "I don't.  I see the same two-part series that

24      was -- you know, it looks like that's it, yeah.  I

25      have no reason to dispute that.

JOURIA - DIRECT/KERN

1        "Do you have any reason to doubt that you

2    submitted these articles to Elite?

3       "No."

4    **MR. KERN:**  At this time, I'd like to share with

5  counsel NC134, which is marked for identification purposes.

6  And after I furnish a copy to Mr. Ross, your Honor, may I

7  furnish one to the witness?

8       *(Plaintiff's Exhibit NC134 marked for identification)*

9       **THE COURT:**  All right.

10  A.  Thank you.

11  Q.  Please take a moment to look through this email chain.

12  Don't feel rushed.  Let me know when you've had a chance.

13  A.  Okay.

14       *(Pause)*

15  A.  Okay.

16  Q.  Please read the email address in the "from" line on the

17  first email.

18  A.  Jassinjouria@yahoo.com.

19  Q.  Okay.  And is that your email address on November 10th,

20  2013?

21  A.  Yes, sir.

22  Q.  Okay.  Do you recognize this email exchange with Elite?

23  A.  I do.

24  Q.  Okay.

25       **MR. KERN:**  Your Honor, at this time, I'd like to move

JOURIA - DIRECT/KERN

1    NC134 into trial evidence and publish to the jury.

2              **MR. ROSS:**  No objection.

3              **THE COURT:**  134 will be received.

4              *(Plaintiff's Exhibit NC134 admitted into evidence)*

5    BY MR. KERN:

6    Q.  Dr. Jouria, who is your email to, the top email?

7    A.  Michelle Franchi.

8    Q.  Who is Michelle Franchi?

9    A.  I don't know her exact title.  I know she's part of Elite's

10   curriculum team, I would -- be my best guess.

11   Q.  Would she be -- is it fair to say that she's similar to --

12   she's Elite's version of Sarah Campbell?

13   A.  I guess that's probably a fair statement.

14   Q.  Okay.  And as far as you know, she worked for Elite during

15   the time of this email exchange?

16   A.  Yes, sir.

17   Q.  Can you turn, please, to page 8 on exhibit -- Trial

18   Exhibit 134.  And it's marked in the lower right-hand corner as

19   at ELT1310.

20   A.  Thank you.

21              *(Pause)*

22   A.  Okay.

23   Q.  Okay.  And can you read your email to Michelle at the top?

24   A.  Sure.

25              "Hi, Michelle.  The following courses had content

JOURIA - DIRECT/KERN

```
 1        sold specifically to NetCE:  Cancer and Chemotherapy:
 2        Part I; Cancer and Chemotherapy:  Part II;
 3        Depression vs. Dementia in the Elderly Patient:
 4        Part I; Depression vs. Dementia in the Elderly
 5        Patient:  Part II; Gastroesophageal Reflux Disease or
 6        GERD; Non-Antibiotic Antimicrobial Pharmacology, A
 7        Comprehensive Review:  Part I; Non-Antibiotic
 8        Antimicrobial Pharmacology, A Comprehensive Review:
 9        Part II."
10   Q.  Thank you.  That's enough.
11        And you provided her this email -- this information in
12   response to her email below, is that true?
13   A.  I believe so, yes.
14   Q.  And in that email, she says:
15        "Please specifically cull out any courses that
16        have any content also sold specifically to NetCE,"
17        correct?
18   A.  That's correct.
19   Q.  Can you turn to page 7 of this trial exhibit?  It's the
20   previous -- yeah, the previous page, and look at an email from
21   Michelle Franchi, October 11th, 2013, at 12:32 p.m.  Do you see
22   that?
23   A.  October 11, 2013, you said?
24   Q.  Yes, sir.
25   A.  12:31 p.m.?
```

JOURIA - DIRECT/KERN

1   Q.  Yes, sir.

2   A.  Yes, I do.

3   Q.  Okay.  And do you see where she says:  "For the NetCE

4   courses, what percentage of content in the course was

5   overlapping"?

6   A.  Yes, sir.

7   Q.  And please read your response email from 12:52 p.m. on the

8   same page.

9   A.      "I don't think I signed exclusive rights.  I will

10          have to check.  Approximately 40 to 50 percent of the

11          content is the same.  I don't have an electronic copy

12          of the contract on hand.  Jassin."

13  Q.  And please turn to page 4 of Trial Exhibit 134, and that

14  would be ELT1306.

15  A.  Thank you.

16          Okay.

17  Q.  And do you see where Michelle Franchi says to you:

18          "If the overlap is really that (sic) -- as small

19          as you say, is it possible to receive three updated

20          courses per week, starting next Tuesday,

21          November 5th?"

22  A.  Yes.

23  Q.  Please turn to page 3 in Trial Exhibit 134, ELT1305.  Do

24  you see that email that you sent to Michelle Franchi?

25  A.  Yes.

JOURIA - DIRECT/KERN

1   Q.  Isn't it true that at 8:01 p.m., you responded to Michelle

2   Franchi that the TBI course you submitted to Elite contained

3   15 percent shared content with the course you provided to

4   NetCE?

5   A.  Yes.

6   Q.  And for the Depression and Dementia course you supplied to

7   Elite, that it contained 15 and ten percent shared content,

8   Parts I and II, with the content you provided for NetCE?

9   A.  Yes, sir.

10  Q.  And for the Cancer and Chemotherapy, Parts I and II -- this

11  is number 7 and 8 in your email -- that the course you supplied

12  to Elite contained 25 and 15 percent shared content with the

13  content you supplied to NetCE?

14  A.  Yes, sir.

15  Q.  And for the nonantibiotic course, numbers 9 and 10 on your

16  email, that the courses you supplied to NetCE contained

17  ten percent shared contents with the articles you supplied to

18  NetCE?

19  A.  Yes, sir.

20  Q.  And for the GERD course, that the content you supplied to

21  NetCE -- pardon me -- to Elite contained 30 percent shared

22  content with the content you had supplied to NetCE?

23  A.  Yes, sir.

24  Q.  And do you agree that Elite ultimately paid you for the

25  courses they received from you?

JOURIA - DIRECT/KERN

1   A.  Yes, sir.

2   Q.  I'm gonna show you premarked Exhibits NC114, 129, and 130,

3   and I will provide them to Mr. Ross.

4        *(Plaintiff's Exhibits NC114, NC129, and NC130 marked*

5   *for identification)*

6        **MR. KERN:**  And if his Honor permits, I would approach

7   and let the witness review them before asking them to be moved

8   into evidence.

9        **THE COURT:**  Okay.

10  A.  Thank you.

11  Q.  Dr. Jouria, do 114, 129, and 130 simply reflect invoicing

12  from you and/or your LLC to Elite for payment under these

13  articles?

14  A.  Yes, sir.

15  Q.  Okay.

16       **MR. KERN:**  Your Honor, could we move these into trial

17  evidence, please?

18       **MR. ROSS:**  No objection, your Honor.

19       **THE COURT:**  114, 129, and 130 will be received.

20       *(Plaintiff's Exhibits NC114, NC129 and NC130 admitted*

21  *into evidence)*

22       **MR. KERN:**  And, Patrick, can you publish these to

23  the -- I don't think we have these.  They're just invoices.

24  It's okay.

25       **MR. JUSTESEN:**  I can.

JOURIA - DIRECT/KERN

1          **MR. KERN:**  It's okay.  I just like TV.  I'll ask a

2    different question.

3    BY MR. KERN:

4    Q.  These -- the entity listed on here, MedCreds, is that your

5    LLC?

6    A.  Yes, sir.

7    Q.  Okay.  And it looks like these are not all of the payments

8    you received from Elite, is that correct?

9    A.  That's correct.

10   Q.  Okay.  And is that simply because some records were

11   missing?

12   A.  Uhm --

13   Q.  Or maybe you don't know.

14   A.  I don't know.  That's not all of them, though.

15   Q.  Okay.  I don't think I need to belabor the point.

16          **MR. KERN:**  Could I show Mr. Ross, please, NC167, yet

17   another trial exhibit -- or identified exhibit, hoping to be a

18   trial exhibit.  And, your Honor, could I furnish the witness a

19   copy also?

20          *(Plaintiff's Exhibit NC167 marked for identification)*

21          **THE COURT:**  Okay.

22          **MR. KERN:**  This is simply Dr. Jouria's responses to

23   interrogatories.  Mr. Ross had asked that it be moved into

24   evidence.

25   A.  Thank you.

JOURIA - DIRECT/KERN

1      **MR. ROSS:**  No objection, your Honor.

2      **THE COURT:**  167 will be received.

3      **MR. KERN:**  Thank you.

4      *(Plaintiff's Exhibit NC167 admitted into evidence)*

5      **MR. KERN:**  Patrick, could we publish for the jury

6   page 8, please.

7   BY MR. KERN:

8   Q.  Dr. Jouria, do you know what interrogatory responses are?

9   A.  Yes, sir.

10  Q.  Can you, in your own words, describe them for the jury?

11  A.  Questions from your client to me regarding the case.

12  Q.  And then the responses would be what?

13  A.  My response, my replies.

14  Q.  Okay.  Could you read -- can you read where it begins --

15  the top of page 8, read that for the jury, please?

16  A.      "I declare under penalty of perjury that the

17         foregoing is true and correct.  Executed on

18         August 14, 2017."

19  Q.  Okay.  So, does that mean that you declare under penalty of

20  perjury that the answers you provide in Trial Exhibit 167 are

21  true?

22  A.  To the best of my knowledge, yes.

23  Q.  Okay.  Can you please turn to page -- to the preliminary

24  statement.

25      **MR. KERN:**  Patrick, could you show the jury page 2.

JOURIA - DIRECT/KERN

1   BY MR. KERN:

2   Q.   And, Dr. Jouria, could you please read paragraph 4 in this

3   preliminary statement that you provided in this case?

4   A.   Sure.

5          "To the extent plaintiff relies on documents in

6        responding to these interrogatories, defendant is

7        made aware that plaintiff's records contained in his

8        computer have been compromised in that his computer

9        'crashed' and documents might have been lost.

10       Plaintiff is attempting to recompile documents from

11       his crashed computer."

12   Q.   Okay.  And it may be a little confusing for the jury,

13   because at that time, you were the plaintiff, and we were the

14   defendant, but in this paragraph, the word "plaintiff" means

15   Dr. Jouria, correct?

16   A.   That's correct.

17   Q.   And the word "defendant" means who?

18   A.   NetCE, I believe.

19   Q.   That's correct.

20          So, you're letting NetCE know that your computer

21   crashed, documents may have been lost, and that you're

22   attempting to restore them, is that correct?

23   A.   That's correct.

24   Q.   Okay.  And the date on this -- so that I don't get lost --

25   you would agree is August 14th, 2017.

62

JOURIA - DIRECT/KERN

1   A.  Yes.

2   Q.  Dr. Jouria, when you made this statement on August 14th,

3   2017, hadn't you already thrown away your computer?

4   A.  I threw away my computer on -- the week before June 9th,

5   2017.

6   Q.  So, when you made this statement, two months later, on

7   August 14th, you had already thrown away your computer.

8   A.  I don't know if that statement was made on the 14th.  But

9   it was obviously signed on the 14th.

10  Q.  Let's go to page 8 again.

11       Do you see where it says:  "I declare under penalty of

12  perjury that the foregoing is true and correct.  Executed on

13  August 14th, 2017"?

14  A.  Yes.

15       I may have supplied my answer prior to that day,

16  though.  Those interrogatories were filled out in -- over a

17  period of time.

18  Q.  Could you please turn to page 7 of your interrogatory

19  responses, response number 12?  On page 7, do you see that?

20  A.  The box that Patrick outlined?  Is that it?

21  Q.  That's correct.

22  A.  Yes.

23  Q.  Could you read the last sentence beginning with "as

24  plaintiff's"?

25  A.       "As plaintiff's computer has crashed, he might

```
 1            supplement this response with the version of the
 2            seven courses he submitted to Elite, if the versions
 3            are ultimately recovered."
 4    Q.  In your answer, you stated you might supplement your
 5    responses with additional documents, correct?
 6    A.  Yes.
 7    Q.  So, you intended to produce documents from a computer that
 8    was in a landfill?
 9    A.  So, whatever documents were uploaded into a Google drive,
10    essentially, that's what I was trying to recompile.
11    Q.  Okay.  That's not what your response says, though.  Your
12    response talks about a laptop that has crashed.
13    A.  The laptop did crash, and it was thrown away.  That's
14    correct.
15    Q.  Okay.
16            MR. KERN:  No further questions, your Honor.  Pass the
17    witness.
18            THE COURT:  Cross-examination.
19    BY MR. KERN:
20    Q.  Thank you, Dr. Jouria.
21    A.  You're welcome.
22            MR. ROSS:  Thank you, your Honor.
23                        CROSS-EXAMINATION
24    BY MR. ROSS:
25    Q.  Dr. Jouria, based on the independent contractor agreements
```

1  with Elite, did you have an understanding whether you had any

2  authority or control to modify Elite's publications?

3  A.  I had no authority or control, no.

4  Q.  Was Elite, by your understanding, able to publish whatever

5  it wanted?

6  A.  Yes, sir.

7  Q.  And did you have any authority to tell it what to publish

8  or what not to publish in terms of your content?

9  A.  No, sir.

10 Q.  So, were you a partner, did you consider yourself a partner

11 of Elite?

12 A.  No, sir.

13 Q.  Did you consider yourself a joint venturer of Elite?

14 A.  No, sir.

15 Q.  Did you profit share with Elite in any way?

16 A.  No, sir.

17 Q.  Your compensation was simply by your independent contractor

18 agreements?

19 A.  That is correct, yes, sir.

20 Q.  Are you an officer of Elite?

21 A.  No, sir.

22 Q.  Do you have any relationship with Elite other than as a

23 freelance writer?

24 A.  No, sir.

25 Q.  Okay.  If you review NetCE's Exhibit Number 2, if you have

1  that in front of you?

2  A.  Exhibit Number 2... I don't know if I have that.  I'm sure

3  I do.  I just have a... what is it in reference to?  I'm sorry.

4  Q.  The independent contractor agreement between you and Elite.

5  A.  Elite.  Okay.

6          *(Pause)*

7          *(Discussion had off the record between counsel)*

8          **MR. ROSS:**  Your Honor, may I approach and give another

9  copy to the witness?

10  A.  Sorry.  I think I found it.  It's on the bottom here.  I

11  have Exhibit Number 3 and Exhibit Number 2.

12  Q.  Thank you.

13          Please refer to Exhibit Number 2.

14          During your direct examination, Mr. Kern had you

15  identify certain topics that you wrote articles on for Elite.

16  Do you recall that, Dr. Jouria?

17  A.  Yes.

18  Q.  But there were additional topics that you also wrote for

19  Elite that's contained in Exhibit 2, are there not?

20  A.  Yes, sir, that's correct.

21  Q.  Okay.  If you look at Jouria Exhibit Number -- or Bate

22  stamp Number 814, it's from --

23  A.  Sorry.

24          *(Pause)*

25  A.  Okay.

JOURIA - CROSS/ROSS

1    Q.   What is the subject matter of 814?

2    A.   Thyroid disorders.

3    Q.   Did you ever write an article for NetCE for thyroid

4    disorders?

5    A.   No, sir.

6    Q.   Please refer to Jouria 816.

7    A.   Okay.

8    Q.   What is the subject matter on that page?

9    A.   Women and heart disease.

10   Q.   Did you ever write an article for NetCE covering the

11   subject matter of women and heart disease?

12   A.   No, sir.

13   Q.   Please go to the next page, 817.

14        And can you read the subject matter of the curriculum

15   for that document?

16   A.   Preventable adverse events.

17   Q.   Did you ever write an article for NetCE covering the

18   subject matter of preventable adverse events?

19   A.   No, sir.

20   Q.   Please go to Jouria 825.

21        **MR. KERN:**  Your Honor, if it would speed things along,

22   NetCE will stipulate on the record that Dr. Jouria wrote

23   articles for Elite outside of the articles at issue here.

24   That's not in contention, if that would speed things along,

25   we're happy to make that stipulation.

1        **THE COURT:**  Okay.

2    BY MR. ROSS:

3    Q.  Very quickly, then if you look at the remaining three

4    courses -- the basics of pathophysiology, electrolytes and

5    acid-based disorders, and macular degeneration, on Jouria

6    Numbers 825 through 827 -- it's true, is it not, that you did

7    not write articles for NetCE covering those subject matters?

8    A.  That's true, yes, sir.

9    Q.  Thank you.

10        Regarding the documents that were entered into

11    evidence purporting to be your submissions to Elite -- okay,

12    and I believe your testimony, what -- these documents were not

13    the documents that you submitted to Elite, because the

14    documents you submitted to Elite had red-lined versions,

15    correct?

16    A.  That's correct.

17    Q.  Do you recall during the course of discovery when I asked

18    you in response to a NetCE request to produce to me the

19    articles that you wrote for Elite?

20    A.  Yes, sir.

21    Q.  And did you produce to me documents containing redlines and

22    underlines and color changes?

23    A.  Yes, sir.

24    Q.  Okay.  And do you know that we produced that information to

25    Elite?

1   A.  Yes, sir.

2   Q.  And do you know that we produced that information to Elite

3   in a PDF format?

4   A.  Yes, sir.

5   Q.  And do you recall that Elite -- that NetCE contested the

6   production in a PDF format and they wanted it in a metadata

7   format?

8   A.  Yes, sir.

9   Q.  And do you recall that we had to hire an expert to convert

10  the file from your text base to metadata?

11  A.  Yes, sir.

12  Q.  And did you recall that we produced that metadata file to

13  NetCE?

14  A.  Yes, sir.

15  Q.  Did all of those files contain the redline versions?

16  A.  Yes, sir.

17  Q.  Are you absolutely certain that the documents marked 22,

18  23, 24, 25, 26, 27, 28, and 29 are not your submissions to

19  Elite?

20  A.  Because none of the red-line versions or markup is here,

21  they are not the versions that I submitted to Elite.

22          **MR. ROSS:**  Your Honor, based upon your prior ruling,

23  we move to strike those exhibits.

24          **THE COURT:**  Deny.

25

1   BY MR. ROSS:

2   Q.  Please refer to NetCE Exhibit 134, which was the email

3   chain between you and Elite's representative, Michelle Franchi.

4   A.  Exhibit 134?

5   Q.  Yes, sir.

6   A.  Okay.

7   Q.  On direct examination, Mr. Kern asked you about the shared

8   content percentage?

9   A.  Yes, sir.

10  Q.  Was that shared content fact content?

11  A.  That was a rough estimate on the references.

12  Q.  Based upon the references.

13  A.  *(Witness nodding head affirmatively)*

14  Q.  And did those references contain medical facts?

15  A.  Yes, sir.

16  Q.  And did those references contain public domain information?

17  A.  Yes, sir.

18  Q.  Were those references based upon your research into open

19  access or free public domain materials?

20  A.  Yes, sir.

21  Q.  I'd like to direct your attention to NetCE Exhibit 129,

22  which is your MedCred invoice.

23  A.  Okay.  Sure.

24  Q.  You don't dispute that Elite paid you for your services, do

25  you?

JOURIA - CROSS/ROSS

1    A.  No, sir.

2    Q.  But that invoice has $4,500 for the article.  Do you know

3    if that's a correct number?

4    A.  Uhm --

5    Q.  Well, let me strike that.

6           Do you know if Elite paid you $4,500 for that

7    amount --

8    A.  I believe so.

9    Q.  -- for that work?

10   A.  Yes.

11   Q.  Please now refer to Exhibit Number 167, your interrogatory

12   responses.

13   A.  Okay.

14   Q.  Can you explain, please, when you first started to have

15   problems with your laptop computer?

16   A.  Sure.  So, uhm, the laptop's a Dell from, I believe I

17   bought it in 2007.  I started having problems with it probably

18   the latter half of 2016, uhm, still able to access it.  But,

19   uhm, you getting the blue screen, the crashes and upload, in

20   the middle of doing a certain project, it would just sort of

21   crash and so you'd sometime lose some data, sometimes you

22   wouldn't.

23          So, at that time I had to start transferring whatever

24   I had on that laptop's hard drive onto an online shared drive.

25   Q.  And what was the online shared drive.

JOURIA - CROSS/ROSS

1   A.  It was Google Drive.

2   Q.  You didn't review the files, though, that you uploaded to

3   Google Drive, you just parked them there.

4   A.  Exactly.  Yes, sir.

5   Q.  And when you responded in your interrogatories that you

6   were attempting to recompile documents from your crashed

7   computer, you meant that you were attempting to recompile the

8   files from that crashed computer that you had uploaded to

9   Google Drive.

10  A.  That's correct.  I was uploading files from the computer's

11  hard drives to Google in folders, so I don't know what came

12  across and what didn't.

13  Q.  And in preparing your responses to these interrogatories,

14  is that what you meant that you said you were attempting to

15  recompile the documents?

16  A.  Yes, sir.

17  Q.  You were going to the Google Drive.

18  A.  Yes, sir.

19  Q.  And you moved to Indiana, did you not?

20  A.  Yes, sir.

21  Q.  When did you move to Indiana?

22  A.  We flew up to Indiana on Friday, June 9, 2017.

23  Q.  And by June 9th, 2017, was your computer accessible at all?

24  A.  No.  No, sir.

25  Q.  It was completely inoperable, correct?

JOURIA - REDIRECT/KERN

1    A.  That's correct.

2    Q.  And you discarded your computer, correct?

3    A.  Yes, sir.

4    Q.  As you discarded other household items when you moved?

5    A.  We discard everything.

6    Q.  Did you use your best efforts to upload every file that you

7    could?

8    A.  Yes, sir.

9    Q.  Okay.  Do you know of any files that were not able to be

10   uploaded that pertained to this case at all?

11   A.  I don't believe so.  I think we, I think we submitted

12   everything that was asked for.  I believe we were able to

13   access everything that was asked for.

14   Q.  Okay.  But did you review the files, though, subsequent on

15   the Google hard drive?

16   A.  Not all of them.

17   Q.  Okay.

18        **MR. ROSS:**  No further questions, your Honor.

19        **THE COURT:**  Redirect?

20        **MR. KERN:**  Thank you, your Honor, one moment.

21                    **REDIRECT EXAMINATION**

22   BY MR. KERN:

23   Q.  Dr. Jouria, just so I'm clear, you threw away your computer

24   on June 9th, 2017, correct?

25   A.  No.  I flew out to Indiana on June 9th.  I threw out the

JOURIA - REDIRECT/KERN

1   computer a couple of days probably before that.  I don't know

2   the exact day.  I apologize.

3   Q.  And I asked you how you could reconcile that date with

4   statement number 4.

5          **MR. KERN:**  Could we see Trial Exhibit 18 -- 167,

6   please.

7          **THE COURT REPORTER:**  I'm sorry, 18....

8          **MR. KERN:**  167.

9          Paragraph 4 in the preliminary statement?

10  BY MR. KERN:

11  Q.  Do you see where you say:  "Plaintiff is attempting to

12  recompile documents from his crashed computer"?  Do you see

13  that?

14  A.  So --

15  Q.  I just want to know if you saw it.

16  A.  Yes.

17  Q.  Are you on the same page?  Okay.  Because then I had some

18  questions about that.

19  A.  Sure.

20  Q.  And we all agree that the date of these interrogatory

21  responses is August 14th, 2017.  That's at least the date

22  they're signed, correct?

23  A.  Sure.  Yes, sir.

24  Q.  You testified earlier that you believe you provided the

25  answers, however, to these responses earlier in time.

JOURIA - REDIRECT/KERN

1   A.   Possibly.

2   Q.   Okay.  Well, does it surprise you to learn that NetCE

3   didn't even request and serve these interrogatories until July

4   of 2017?

5   A.   It doesn't surprise me.

6   Q.   Okay.  So, then, by the time we asked you this question,

7   and most certainly by the time you answered the question, the

8   computer already was gone, correct?

9   A.   The computer -- the actual computer, yes, was gone.

10  Q.   Okay.  You testified earlier that you had no power to

11  modify the content you submitted to Elite, is that correct?

12  A.   That's correct.

13  Q.   But didn't you also testify that you submitted revisions to

14  Elite?

15  A.   So, I'll be happy to clarify, just so the jury's clear.

16          Once I submitted my subject matter to Elite, and they

17  accepted it, then I was no longer able to make revisions.

18  Q.   But prior to that, you could make revisions.

19  A.   Sure, I can submit whatever I wanted.

20  Q.   And that's why you've discussed red lines here, because

21  those were revisions that you provided to Elite.

22  A.   Sure, revisions, additions, deletions.

23  Q.   Okay.  You still haven't really made clear what they're

24  revisions to.  What are those revisions to?

25  A.   The original research that was conducted for the previous

JOURIA - REDIRECT/KERN

```
 1    five courses that were submitted to NetCE, I used those same
 2    references to create similar subject matter and revised that
 3    subject matter.
 4    Q.  You mentioned -- your counsel mentioned, and you affirmed
 5    his testimony, that you hired a forensics expert to produce
 6    some documents to my client in this case.
 7    A.  Yes, sir.
 8    Q.  And that those documents were versions of the courses that
 9    had red lines, correct?
10    A.  Yes, sir.
11    Q.  Okay.  And so, I'll go back and ask the question now for
12    the third or fourth time.  Where are the versions of the
13    courses -- if 22 through 29 are not they, where are the
14    versions of the courses that you originally submitted to Elite?
15    A.  Sure.  And I'll answer to the best of my ability, Mr. Kern.
16             I don't know.  I have no idea how that process was
17    done --
18    Q.  Okay.  You knew at your deposition, though, when you swore
19    under oath that 22 through 29 were the versions, and today you
20    said that you're -- the words were absolutely certain.  And I'm
21    wondering is there a difference between "absolutely certain"
22    and "penalty of perjury"?
23             MR. ROSS:  Objection.  Argumentative.
24             THE COURT:  Sustain.
25    A.  I'm --
```

1          **MR. ROSS:**  Don't answer.  Don't answer.

2    BY MR. KERN:

3    Q.  Dr. Jouria, did you have a chance to review your deposition

4    transcript after it was created?

5    A.  I don't know if I had a chance, but I didn't review it.

6    Q.  You did or did not?

7    A.  Did not.

8    Q.  You did not.  Okay.

9          You did have a chance to review it.

10   A.  I did.  I'm sure I did.  I just didn't do it.

11   Q.  Did you make any corrections to the deposition transcript

12   in draft form when you recognized that you had answered, as you

13   testified today, incorrectly about the origin of Trial

14   Exhibits 22 through 29?

15   A.  I just recognized it during Sarah's -- Sarah Campbell's

16   testimony yesterday.

17   Q.  Just yesterday.

18   A.  Just yesterday.

19   Q.  Okay.

20          **MR. KERN:**  No further questions.

21          **THE COURT:**  Thank you, Doctor.  You may step down.

22          *(Witness excused)*

23                              -  -  -  -  -

24

25

```
1                    INDEX OF WITNESSES

2   PLAINTIFF'S WITNESS                    PAGE

3   Jassin Jouria
    Direct by Mr. Kern (Continued)          25
4   Cross by Mr. Ross                       63
    Redirect by Mr. Kern                    72
5

6                    -  -   -   -   -

7

8

9                    INDEX OF EXHIBITS

10  PLAINTIFF'S EXHIBITS:           MARKED       RECEIVED

11  NC2 and NC3                       28            30
    NC7                               38            39
12  NC 134                            53            54
    NC114, NC129, and NC130           58            58
13  NC167                             59            60

14                   -  -   -   -   -

15

16

17

18

19

20               C E R T I F I C A T E

21   I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23

24
        /S/Francine C. Salopek              10-11-18
25   Francine C. Salopek, RMR-CRR       Date
     Official Court Reporter
             FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
                          (954)769-5657
```

**COURTROOM SECURITY**
**OFFICER: [1]** 24/14
**MR. JUSTESEN: [1]** 58/24
**MR. KAPPES: [1]** 51/11
**MR. KERN: [55]**
**MR. ROSS: [27]**
**THE COURT REPORTER: [1]** 73/6
**THE COURT: [41]**
**THE JURORS: [1]** 24/24

**$**
**$4,500 [2]** 70/2 70/6

**'**
**'crashed' [1]** 61/9

**/**
**/S/Francine [1]** 77/24

**1**
**10 [4]** 46/25 47/13 51/10 57/15
**10-11-18 [1]** 77/24
**10th [1]** 53/19
**11 [2]** 36/1 55/23
**114 [2]** 58/11 58/19
**11th [2]** 37/3 55/21
**12 [3]** 32/9 44/2 62/19
**1200 [1]** 21/10
**129 [4]** 58/2 58/11 58/19 69/21
**12:31 [1]** 55/25
**12:32 p.m [1]** 55/21
**12:42 [1]** 39/11
**12:52 p.m [1]** 56/7
**13 [1]** 44/2
**130 [3]** 58/2 58/11 58/19
**134 [7]** 54/3 54/18 56/13 56/23 69/2
 69/4 77/12
**14 [2]** 44/2 60/18
**14th [7]** 61/25 62/2 62/7 62/8 62/9
 62/13 73/21
**15 [3]** 44/2 48/9 57/7
**15 percent [2]** 57/3 57/12
**15-61165-CIV-WPD [1]** 20/4
**16 [1]** 44/2
**167 [5]** 60/2 60/20 70/11 73/5 73/8
**17 [1]** 44/2
**171 [1]** 25/14
**172 [1]** 25/15
**174 [1]** 25/15
**175 [1]** 25/16
**177 [1]** 25/16
**18 [4]** 44/3 73/5 73/7 77/24
**180-degree [1]** 49/6

**2**
**20-second [1]** 48/10
**2007 [1]** 70/17
**2013 [7]** 31/7 34/8 35/22 37/23 53/20
 55/21 55/23
**2014 [7]** 38/20 38/22 39/10 40/13
 40/21 41/1 42/15
**2015 [4]** 37/3 37/11 37/16 37/25
**2016 [1]** 70/18

**2017 [10]** 60/18 61/25 62/3 62/5
 62/13 71/22 71/23 72/24 73/21 74/4
**2018 [2]** 20/7 22/1
**205F [1]** 21/13
**22 [8]** 45/22 45/23 46/14 48/5 68/17
 75/13 75/19 76/14
**23 [2]** 45/22 68/18
**24 [4]** 45/23 46/25 51/10 68/18
**246 [2]** 46/25 47/13
**24th [4]** 38/20 38/22 40/2 40/13
**25 [4]** 45/23 57/12 68/18 77/3
**26 [2]** 45/23 68/18
**27 [2]** 45/23 68/18
**275 [3]** 25/10 25/24 26/3
**276 [2]** 25/10 28/2
**277 [1]** 27/7
**278 [1]** 25/10
**28 [3]** 45/23 68/18 77/11
**2800 [1]** 21/7
**284 [2]** 41/15 41/19
**285 [1]** 25/10
**286 [1]** 25/10
**288 [1]** 26/9
**289 [1]** 42/19
**29 [8]** 45/23 45/23 46/14 48/5 68/18
 75/13 75/19 76/14
**299 [1]** 21/13
**2nd [1]** 21/3

**3**
**30 [1]** 77/11
**30 percent [1]** 57/21
**31 [2]** 20/7 22/1
**33301 [3]** 21/3 21/10 21/13
**38 [1]** 77/11
**39 [1]** 77/11

**4**
**40 [2]** 49/15 56/10
**46 [1]** 51/10
**48 [1]** 52/16
**4:14 p.m [1]** 37/1

**5**
**50 [1]** 21/6
**50 percent [1]** 56/10
**515 [1]** 21/9
**53 [1]** 77/12
**54 [1]** 77/12
**57 [1]** 52/16
**58 [2]** 77/12 77/12
**59 [1]** 77/13
**5th [1]** 56/21

**6**
**60 [1]** 77/13
**63 [1]** 77/4

**7**
**72 [1]** 77/4
**769-5657/mjsfcs [1]** 21/14
**7th [3]** 38/22 39/10 40/21

**8**
**80,000 [1]** 49/15

**814 [2]** 65/22 66/1
**815 [1]** 31/12
**816 [1]** 66/6
**817 [1]** 66/13
**818 [1]** 32/10
**819 [1]** 32/17
**820 [1]** 32/20
**822 [1]** 33/1
**824 [1]** 33/10
**825 [2]** 66/20 67/6
**827 [1]** 67/6
**8:01 p.m [1]** 57/1
**8th [3]** 31/7 34/8 35/22

**9**
**915 [1]** 21/3
**94111 [1]** 21/7
**954 [1]** 21/14
**9:00 [2]** 20/7 22/1
**9th [4]** 62/4 71/23 72/24 72/25

**A**
**a.m [2]** 20/7 22/1
**ability [1]** 75/15
**above [1]** 77/22
**above-entitled [1]** 77/22
**absolutely [5]** 23/21 35/16 68/17
 75/20 75/21
**accepted [1]** 74/17
**access [3]** 69/19 70/18 72/13
**accessible [1]** 71/23
**acid [1]** 67/5
**acid-based [1]** 67/5
**acknowledges [1]** 34/25
**across [1]** 71/12
**addition [1]** 52/3
**additions [2]** 50/8 74/22
**address [4]** 38/24 39/18 53/16 53/19
**addressed [1]** 39/12
**admit [1]** 25/7
**admitted [5]** 30/25 39/7 54/4 58/20
 60/4
**admonition [1]** 24/18
**adopt [2]** 44/14 44/15
**advance [1]** 22/22
**adverse [2]** 66/16 66/18
**affirmatively [1]** 69/13
**affirmed [1]** 75/4
**agree [12]**
**agreement [15]**
**agreements [6]** 25/9 25/20 45/11
 45/15 63/25 64/18
**agrees [1]** 34/25
**allow [1]** 24/19
**almost [1]** 40/14
**aloud [1]** 26/3
**amount [2]** 23/5 70/7
**ample [3]** 49/7 49/10 49/10
**and/or [1]** 58/12
**answer [6]** 48/2 62/15 63/4 75/15
 76/1 76/1
**answers [2]** 60/20 73/25
**Antibiotic [6]** 25/16 33/3 33/8 41/17
 55/6 55/7

79

**A**

anticipated **[1]** 23/8
Antimicrobial **[5]** 33/3 33/8 41/17
  55/6 55/8
aol.com **[1]** 21/14
apologize **[1]** 73/2
apparent **[1]** 41/12
APPEARANCES **[1]** 21/1
appreciate **[2]** 44/15 45/6
approach **[6]** 26/11 28/21 46/4 47/5
  58/6 65/8
Approximately **[1]** 56/10
Aren't **[1]** 34/15
Argumentative **[1]** 75/23
arguments **[6]** 22/19 22/20 22/24
  23/3 23/4 23/7
article **[38]**
articles **[33]**
attempting **[6]** 61/10 61/22 71/6 71/7
  71/14 73/11
August **[6]** 60/18 61/25 62/2 62/7
  62/13 73/21
August 14 **[1]** 60/18
August 14th **[5]** 61/25 62/2 62/7
  62/13 73/21
authored **[1]** 39/15
authority **[3]** 64/2 64/3 64/7
avoid **[1]** 22/17
aware **[1]** 61/7
awkward **[1]** 36/10

**B**

base **[1]** 68/10
basics **[1]** 67/4
basis **[1]** 51/25
Bate **[1]** 65/21
Bates **[3]** 29/18 31/12 31/14
beginning **[1]** 62/23
begins **[1]** 60/14
belabor **[2]** 42/2 59/15
believe **[19]**
believed **[2]** 37/24 41/6
below **[1]** 55/12
blue **[1]** 70/19
Blvd **[1]** 21/13
bottom **[4]** 32/9 36/25 47/19 65/10
bought **[1]** 70/17
Boulevard **[1]** 21/9
box **[1]** 62/20
brain **[2]** 25/15 32/7
Broward **[1]** 21/13

**C**

CA **[1]** 21/7
California **[1]** 21/6
Campbell **[6]** 38/18 39/12 39/14
  39/24 41/2 54/12
Campbell's **[3]** 40/1 40/11 76/15
Cancer **[9]** 25/16 25/24 26/15 28/6
  32/22 32/25 55/1 55/2 57/10
carefully **[1]** 44/7
caused **[1]** 37/21
CE **[7]** 20/8 20/9 20/11 20/12 21/4
  37/1 37/12

cease **[1]** 41/11
cease-and-desist **[1]** 41/11
certify **[1]** 77/21
chain **[5]** 36/7 36/15 38/21 53/11
  69/3
chance **[5]** 34/14 53/12 76/3 76/5
  76/9
charge **[2]** 22/24 23/9
check **[1]** 56/10
checked **[1]** 42/15
checking **[1]** 40/3
Chemo **[1]** 25/16
Chemotherapy **[8]** 25/25 26/16 28/6
  32/22 32/25 55/1 55/2 57/10
CIV **[1]** 20/4
claims **[1]** 30/20
clarification **[2]** 45/7 52/12
clarify **[3]** 40/24 48/1 74/15
clarifying **[1]** 44/15
clear **[4]** 36/24 72/23 74/15 74/23
client **[1]** 61/17 75/6
clip **[1]** 47/1
closing **[7]** 22/14 22/20 23/3 23/4
  23/7 23/10 23/13
CME **[2]** 20/8 20/11
collect **[1]** 34/3
color **[1]** 67/22
commonly **[1]** 33/12
communication **[3]** 37/21 38/17 41/5
company **[3]** 31/24 49/23 49/25
company's **[1]** 35/5
compare **[1]** 34/12
compensation **[1]** 64/17
Comprehensive **[4]** 33/3 33/8 55/7
  55/8
compromised **[1]** 61/8
computer **[21]**
computer's **[1]** 71/10
concerns **[1]** 39/23
conducted **[1]** 74/25
conference **[2]** 22/24 23/9
confirm **[6]** 43/23 44/3 44/5 44/7 48/7
  48/8
confirming **[2]** 25/22 41/23
confusing **[1]** 61/12
confusion **[3]** 22/17 37/22 41/10
contact **[1]** 39/14
contain **[3]** 68/15 69/14 69/16
contained **[7]** 57/2 57/7 57/12 57/16
  57/21 61/7 65/19
containing **[1]** 67/21
content **[17]**
contention **[2]** 52/1 66/24
contents **[1]** 57/17
contest **[1]** 52/6
contested **[1]** 68/5
contesting **[1]** 52/8
CONTINUED **[2]** 25/1 77/3
continuing **[1]** 31/23
contract **[13]**
contracted **[5]** 32/14 32/21 33/2 33/6
  40/14
contractor **[8]** 29/15 30/6 34/23
  34/25 35/3 63/25 64/17 65/4

contracts **[5]** 25/4 28/12 28/15 37/24
  43/14
contradictory **[1]** 37/20
contrary **[1]** 52/7
control **[2]** 64/2 64/3
convert **[1]** 68/9
Cook **[5]** 37/1 37/4 37/8 40/17 41/8
copies **[1]** 51/2
copy **[12]**
corner **[6]** 29/18 31/12 31/15 32/10
  47/20 54/18
corrections **[1]** 76/11
counsel **[16]**
COURT **[8]** 20/1 21/3 21/11 21/12
  21/12 22/7 38/4 77/25
courtroom **[2]** 22/2 24/16
covering **[3]** 66/10 66/17 67/7
crash **[2]** 63/13 70/21
crashed **[7]** 61/21 61/21 62/25 63/12
  71/6 71/8 73/12
crashes **[1]** 70/19
create **[1]** 75/2
created **[1]** 76/4
Cross **[3]** 63/18 63/23 77/4
Cross-examination **[2]** 63/18 63/23
CRR **[2]** 21/11 77/25
crucial **[1]** 50/22
cull **[1]** 55/15
curriculum **[6]** 35/2 35/4 35/4 35/13
  54/10 66/14
curtail **[1]** 22/20
cut **[1]** 23/5

**D**

D/B/A **[2]** 20/8 20/11
Dan **[2]** 28/9 46/12
Daniel **[1]** 21/5
data **[1]** 70/21
date **[12]**
dates **[1]** 36/23
David **[1]** 21/5
Dear **[1]** 39/13
declare **[3]** 60/16 60/19 62/11
defendant **[5]** 20/10 20/16 61/6 61/14
  61/17
degeneration **[1]** 67/5
degree **[1]** 49/6
deletions **[2]** 50/8 74/22
deliberate **[1]** 23/2
Dell **[1]** 70/16
Dementia **[7]** 25/17 32/16 32/19
  42/20 55/3 54/4 57/6
Deny **[1]** 68/24
dependent **[1]** 22/16
depending **[1]** 50/7
deposition **[24]**
Depression **[7]** 25/17 32/16 32/19
  42/20 55/3 55/4 57/6
Depression vs **[4]** 32/16 32/19 55/3
  55/4
describe **[1]** 60/10
desire **[1]** 22/17
desist **[1]** 41/11
development **[2]** 39/13 40/5

## D

**difference [1]** 75/21
**diligently [1]** 40/4
**Dimitrouleas [1]** 20/19
**direct [6]** 24/20 25/1 65/14 69/7 69/21 77/3
**Director [1]** 39/13
**disagree [1]** 52/22
**discard [1]** 72/5
**discarded [2]** 72/2 72/4
**discovery [1]** 67/17
**discuss [1]** 24/18
**discussed [3]** 24/19 49/13 74/20
**discussing [1]** 25/4
**discussion [10]** 22/14 22/18 23/19 29/3 38/10 46/9 47/9 47/11 47/16 65/7
**disease [5]** 27/8 33/12 55/5 66/9 66/11
**disk [1]** 23/16
**disorders [3]** 66/2 66/4 67/5
**dispute [4]** 44/5 48/11 52/25 69/24
**distinction [1]** 44/13
**DISTRICT [4]** 20/1 20/2 20/20 21/12
**DIVISION [1]** 20/3
**Doctor [1]** 76/21
**document [9]** 35/12 38/5 48/25 49/1 49/2 49/3 49/15 49/18 66/15
**documents [30]**
**domain [2]** 69/16 69/19
**doubt [1]** 53/1
**DR [4]** 20/5 20/15 20/18 21/2
**Dr. [37]**
**Dr. Jouria [34]**
**Dr. Jouria's [3]** 22/15 30/20 59/22
**draft [5]** 30/21 44/22 44/23 45/11 76/12
**drafted [1]** 44/24
**drive [9]** 63/9 70/24 70/24 70/25 71/1 71/3 71/9 71/17 72/15
**drives [1]** 71/11

## E

**early [1]** 45/17
**edit [1]** 23/17
**education [3]** 29/16 30/7 31/24
**efforts [1]** 72/6
**Elderly [4]** 32/16 32/19 55/3 55/4
**electrolytes [1]** 67/4
**electronic [2]** 29/22 56/11
**Elite [81]**
**Elite's [5]** 49/8 54/9 54/12 64/2 69/3
**ELT1305 [1]** 56/23
**ELT1306 [1]** 56/14
**ELT1310 [1]** 54/19
**email [39]**
**emails [1]** 38/21
**en [1]** 43/21
**en masse [1]** 43/21
**enters [1]** 31/9
**entitled [3]** 27/7 41/16 77/22
**entity [1]** 59/4
**Esq [6]** 21/2 21/2 21/4 21/5 21/5 21/8
**essentially [1]** 63/10

**estimate [1]** 69/11
**events [2]** 66/16 66/18
**everybody [1]** 52/4
**everyone [1]** 24/18
**evidence [16]**
**examination [7]** 24/21 25/1 63/18 63/23 65/14 69/7 72/21
**excerpt [1]** 51/8
**exchange [2]** 53/22 54/15
**exclusive [2]** 35/1 56/9
**Excuse [1]** 51/19
**excused [1]** 76/22
**executed [3]** 35/21 60/17 62/12
**exhibit [51]**
**Exhibit 11 [1]** 36/1
**Exhibit 134 [3]** 54/18 56/13 56/23
**Exhibit 167 [1]** 60/20
**Exhibit 18 [1]** 73/5
**Exhibit 2 [8]** 29/14 30/21 31/2 31/5 34/9 34/13 43/16 43/16
**Exhibit 275 [2]** 25/24 26/3
**Exhibit 277 [1]** 27/7
**Exhibit 284 [1]** 41/15
**Exhibit 288 [1]** 26/9
**Exhibit 289 [1]** 42/19
**Exhibit 3 [5]** 30/4 34/2 34/12 34/16 34/22
**Exhibit A [1]** 32/4
**exhibits [21]**
**Exhibits 171 [1]** 25/14
**Exhibits 2 [1]** 30/17
**Exhibits 22 [4]** 45/22 46/14 48/5 76/14
**Exhibits 275 [1]** 25/10
**Exhibits 48 [1]** 52/16
**Exhibits NC114 [1]** 58/2
**expected [1]** 22/12
**expert [2]** 68/9 75/5
**explain [3]** 48/8 48/14 70/14
**explained [1]** 48/16
**explains [1]** 49/6
**express [1]** 35/5
**expressly [1]** 41/2
**extensively [1]** 49/18
**extent [2]** 34/4 61/5

## F

**fact [4]** 33/16 34/15 42/15 69/10
**facts [1]** 69/14
**featured [1]** 40/7
**file [3]** 68/10 68/12 72/6
**filed [2]** 23/20 24/6
**files [6]** 68/15 71/2 71/8 71/10 72/9 72/14
**filled [1]** 62/16
**fine [2]** 26/12 31/18
**flew [2]** 71/22 72/25
**flip [5]** 32/17 32/20 32/23 33/1 34/2
**FLORIDA [5]** 20/2 20/6 21/3 21/10 21/13
**flown [1]** 52/4
**focus [1]** 40/7
**folders [1]** 71/11
**foregoing [4]** 35/1 60/17 62/12 77/21

**forensics [1]** 75/5
**form [7]** 24/1 24/9 33/19 41/6 46/18 50/1 76/12
**format [3]** 68/3 68/6 68/7
**forms [1]** 23/25
**FORT [5]** 20/3 20/6 21/3 21/10 21/13
**foundation [1]** 29/11
**fourth [1]** 75/12
**Franchi [7]** 54/7 54/8 55/21 56/17 56/24 57/2 69/3
**Francine [2]** 21/11 77/24 77/25
**Francisco [1]** 21/7
**free [1]** 69/19
**freelance [9]** 25/9 25/20 25/24 26/16 28/1 42/24 45/11 45/15 64/23
**Friday [3]** 37/3 38/20 71/22
**front [3]** 42/21 45/25 65/1
**fumble [1]** 36/10
**furnish [6]** 28/20 38/6 47/5 53/6 53/7 59/18

## G

**Gastroesophageal [3]** 27/7 33/12 55/5
**generated [1]** 48/22
**gentlemen [2]** 30/4 33/2
**GERD [9]** 25/15 27/10 27/13 28/2 28/6 33/13 40/7 55/6 57/20
**glance [1]** 48/10
**gonna [10]** 27/6 29/25 34/15 43/20 43/22 43/24 44/6 49/18 51/24 58/2
**Google [7]** 63/9 71/1 71/3 71/9 71/11 71/17 72/15
**gotcha [1]** 45/6
**great [2]** 36/10 47/14

## H

**half [1]** 70/18
**hand [6]** 29/18 31/14 32/9 47/19 54/18 56/12
**handy [2]** 28/16 36/4
**happy [5]** 26/10 31/18 48/3 66/25 74/15
**head [1]** 69/13
**hear [1]** 22/24
**heart [2]** 66/9 66/11
**heavily [1]** 22/16
**help [1]** 41/7
**helps [1]** 47/18
**Hi [1]** 54/25
**hire [1]** 68/9
**hired [1]** 75/5
**Holland [2]** 21/6 21/9
**Holtzman [1]** 21/5
**honest [1]** 37/6
**honestly [1]** 31/17
**Honor [34]**
**Honorable [1]** 20/19
**hope [2]** 40/5 49/23
**hoping [1]** 59/17
**hour [2]** 49/12 49/13
**hours [1]** 49/19
**household [1]** 72/4

## I

**I'll [21]**
**I'm [30]**
**I've [2]**  23/1 47/10
**idea [1]**  75/16
**identification [8]**  28/14 28/18 38/6 38/8 53/5 58/8 58/5 59/20
**identified [4]**  30/4 46/16 48/6 59/17
**identify [2]**  52/15 65/15
**II [8]**  32/19 32/25 33/9 55/2 55/5 55/9 57/8 57/10
**impeach [1]**  51/9
**impression [1]**  41/4
**improper [1]**  46/18
**INC [2]**  20/8 20/11
**inclined [1]**  23/7
**incorrectly [1]**  76/13
**independent [8]**  29/15 30/6 33/16 33/22 34/23 63/25 64/17 65/4
**INDEX [2]**  77/1 77/9
**Indiana [4]**  71/19 71/21 71/22 72/25
**indicate [1]**  31/15
**indicating [1]**  50/17
**influence [1]**  22/19
**information [5]**  34/3 55/11 67/24 68/2 69/16
**initial [2]**  48/19 52/16
**injuries [1]**  32/7
**Injury [1]**  25/15
**inoperable [1]**  71/25
**inquiring [2]**  39/19 40/21
**instructions [9]**  22/14 22/18 22/25 23/1 23/8 23/13 23/16 23/17 24/5
**intended [1]**  63/7
**interest [3]**  35/2 41/5 41/12
**interested [1]**  39/20
**interpretation [1]**  22/16
**interrogatories [6]**  59/23 61/6 62/16 71/5 71/13 74/3
**interrogatory [4]**  60/8 62/18 70/11 73/20
**inviting [1]**  22/10
**invoice [2]**  69/22 70/2
**invoices [1]**  58/23
**invoicing [1]**  58/11
**IRCE19920 [1]**  30/9
**issue [8]**  30/20 35/23 37/12 37/17 41/3 44/9 44/19 66/23
**it wanted [1]**  64/5
**items [1]**  72/4

## J

**JASSIN [6]**  20/5 20/15 20/18 39/25 56/12 77/3
**Jassinjouria [2]**  38/25 53/18
**John [1]**  21/4
**joint [1]**  64/13
**jointly [1]**  23/18
**JOURIA [45]**
**Jouria's [3]**  22/15 30/20 59/22
**Jouria0000814 [1]**  29/19
**Jouria815 [1]**  31/15
**Jouria821 [1]**  32/23
**Judge [2]**  20/20 22/2

**July [1]**  74/3
**June [5]**  62/4 71/22 71/23 72/24 72/25
**June 9th [3]**  62/4 72/24 72/25
**jurors [1]**  24/13
**jury [26]**
**jury's [1]**  74/15

## K

**Kappes [1]**  21/5
**keep [1]**  47/13
**Kern [11]**  21/4 24/22 36/3 36/14 54/5 65/14 69/7 73/10 75/15 77/3 77/4
**Knight [2]**  21/6 21/9
**knowledge [1]**  31/23 60/22

## L

**label [1]**  29/18
**lack [1]**  41/4
**ladies [2]**  30/4 33/1
**landfill [1]**  63/8
**language [1]**  44/14
**laptop [3]**  63/12 63/13 70/15
**laptop's [2]**  70/16 70/24
**Las [1]**  21/9
**latter [1]**  70/18
**LAUDERDALE [5]**  20/3 20/6 21/3 21/10 21/13
**law [2]**  21/2 22/16
**lay [1]**  29/11
**Leading [1]**  37/13
**learn [1]**  74/2
**legal [1]**  22/19
**letter [1]**  41/11
**letting [1]**  61/20
**likelihood [1]**  22/12
**limit [1]**  23/7
**line 10 [1]**  47/13
**lined [1]**  67/14
**lines [8]**  46/25 48/17 48/20 48/22 48/23 51/10 74/20 75/9
**lines 10 [2]**  46/25 51/10
**litigation [3]**  31/16 50/21 50/22
**LLC [2]**  58/12 59/5
**LLP [2]**  21/6 21/9
**loan [1]**  35/4
**lose [1]**  70/21
**lost [3]**  61/9 61/21 61/24
**loud [1]**  51/13
**lower [5]**  29/18 31/14 32/9 43/25 54/18

## M

**macular [1]**  67/5
**mailing [1]**  40/8
**manipulate [1]**  23/21
**marked [13]**
**markup [1]**  68/20
**masse [1]**  43/21
**master [4]**  33/16 33/19 33/21 34/13
**match [1]**  47/20
**materials [1]**  69/19
**matter [11]**  44/11 44/18 66/1 66/8 66/11 66/14 66/18 74/16 75/2 75/3

77/22
**matters [1]**  67/7
**mean [2]**  33/25 60/19
**means [3]**  33/22 61/14 61/17
**meant [2]**  71/7 71/14
**mechanical [1]**  20/24
**MedCred [1]**  69/22
**MedCreds [1]**  59/4
**medical [2]**  31/10 69/14
**memory [2]**  47/3 48/9
**metadata [3]**  68/6 68/10 68/12
**Michelle [9]**  54/7 54/8 54/23 54/25 55/21 56/17 56/24 57/1 69/3
**middle [2]**  43/25 70/20
**mine [1]**  29/22
**minute [1]**  36/15
**misconstrued [1]**  49/11
**missing [1]**  59/11
**mjsfcs [1]**  21/14
**modify [2]**  64/2 74/11
**moment [4]**  34/4 46/2 53/11 72/20
**months [2]**  40/6 62/6
**morning [2]**  24/24 24/25
**move [7]**  22/14 26/8 51/5 53/25 58/16 68/23 71/21
**moved [7]**  29/12 30/17 39/4 58/7 59/23 71/19 72/4
**MR [7]**  36/3 36/14 54/5 73/10 77/3 77/4 77/4
**Mr. [14]**
**Mr. Cook [1]**  37/4 37/8 41/8
**Mr. Jouria [1]**  39/9
**Mr. Kern [4]**  24/22 65/14 69/7 75/15
**Mr. Ross [4]**  53/6 58/3 59/16 59/23
**Mr. Ross' [1]**  22/10
**Mr. William [1]**  40/17
**Ms. [4]**  38/17 39/14 39/24 40/1
**Ms. Campbell [1]**  39/24
**Ms. Campbell's [1]**  40/1
**Ms. Sarah [2]**  38/17 39/14
**multiple [1]**  33/17

## N

**nature [1]**  50/10
**NC [1]**  77/12
**NC114 [4]**  58/2 58/4 58/20 77/12
**NC129 [3]**  58/4 58/20 77/12
**NC130 [3]**  58/4 58/20 77/12
**NC134 [4]**  53/5 53/8 54/1 54/4
**NC167 [4]**  59/16 59/20 60/4 77/13
**NC2 [1]**  77/11
**NC3 [1]**  77/11
**NC7 [5]**  38/5 38/8 39/4 39/7 77/11
**neither [1]**  45/18
**NET [2]**  20/9 20/12
**NetCE [62]**
**NetCE's [2]**  46/7 64/25
**news [1]**  51/4
**nodding [1]**  69/13
**Non [6]**  25/16 33/3 33/8 41/17 55/6 55/7
**Non-Antibiotic [6]**  25/16 33/3 33/8 41/17 55/6 55/7
**nonantibiotic [1]**  57/15

**N**

**none [1]**  68/20
**notice [1]**  51/25
**noticed [2]**  51/25 52/1
**November [5]**  31/7 34/8 35/22 53/19 56/21
**November 10th [1]**  53/19
**November 5th [1]**  56/21
**November 8th [3]**  31/7 34/8 35/22
**number [17]**
**number 12 [1]**  62/19
**Number 2 [1]**  30/18
**Number 3 [1]**  30/23
**number 4 [1]**  73/4
**number 7 [1]**  57/11
**Number 814 [1]**  65/22
**Number 815 [1]**  31/12
**numbers [5]**  43/20 43/25 47/19 57/15 67/6
**numbers 9 [1]**  57/15

**O**

**oath [3]**  48/5 48/13 75/19
**object [3]**  30/19 30/21 51/24
**objected [1]**  52/3
**objection [12]**
**October [9]**  38/20 38/22 38/22 39/10 40/2 40/13 40/21 55/21 55/23
**October 11 [1]**  55/23
**October 11th [1]**  55/21
**October 24th [4]**  38/20 38/22 40/2 40/13
**October 7th [3]**  38/22 39/10 40/21
**officer [1]**  64/20
**Offices [1]**  21/2
**Official [2]**  21/12 77/25
**Oh [4]**  26/13 36/6 45/4 45/6
**Olas [1]**  21/9
**online [2]**  70/24 70/25
**open [2]**  22/10 69/18
**open-ended [1]**  22/10
**opportunity [2]**  45/8 45/14
**origin [1]**  76/13
**original [7]**  48/25 49/1 49/2 49/3 49/4 50/18 74/25
**originally [3]**  50/3 50/5 75/14
**outdated [1]**  39/18
**outlined [1]**  62/20
**overlap [1]**  56/18
**overlapping [1]**  56/5
**Overrule [1]**  37/14
**Overruled [6]**  30/24 33/20 34/19 35/14 46/20 52/10
**owns [1]**  35/20

**P**

**p.m [6]**  37/1 39/11 55/21 55/25 56/7 57/1
**pace [1]**  22/11
**page [39]**
**page 12 [1]**  44/2
**page 13 [1]**  44/2
**page 14 [1]**  44/2
**page 2 [1]**  60/25

**page 246 [1]**  46/25
**page 3 [1]**  56/23
**page 4 [3]**  36/18 36/20 56/13
**page 46 [1]**  51/10
**page 7 [3]**  55/19 62/18 62/19
**page 8 [5]**  29/17 54/17 60/6 60/15 62/10
**page 9 [2]**  31/11 44/2
**pages [1]**  44/16
**paragraph [11]**  26/3 28/5 34/24 35/11 35/18 39/10 40/2 46/23 61/2 61/14 73/9
**paragraph 4 [2]**  61/2 73/9
**paragraph 5 [2]**  26/3 28/5
**paragraph 6 [3]**  34/24 35/11 35/18
**pardon [3]**  33/6 46/15 57/21
**parked [1]**  71/3
**part [15]**
**Part I [5]**  32/16 33/4 55/2 55/4 55/7
**Part II [6]**  32/19 32/25 33/9 55/2 55/5 55/9
**parties [2]**  50/23 52/3
**partner [2]**  64/10 64/10
**Parts [2]**  57/8 57/10
**Parts I [2]**  57/8 57/10
**party [1]**  35/5
**Pass [1]**  63/16
**pathophysiology [1]**  67/4
**Patient [4]**  32/16 32/19 55/3 55/5
**Patrick [8]**  28/3 31/2 32/12 35/25 58/22 60/5 60/25 62/20
**Pause [6]**  36/16 47/23 53/14 54/21 65/6 65/24
**payment [1]**  58/12
**payments [2]**  25/14 59/7
**PDF [2]**  68/3 68/6
**penalty [4]**  60/16 60/19 62/11 75/22
**pending [1]**  39/4
**percent [6]**  56/10 57/3 57/7 57/12 57/17 57/21
**percentage [2]**  56/4 69/8
**Perfect [1]**  23/17
**period [2]**  48/10 62/17
**perjury [4]**  60/16 60/20 62/12 75/22
**permission [1]**  35/6
**permit [1]**  52/5
**permits [1]**  58/6
**person [4]**  26/25 27/19 42/9 43/8
**personally [1]**  35/3
**perspective [1]**  22/10
**pertained [1]**  72/10
**Pharmacology [5]**  33/3 33/8 41/17 55/6 55/8
**Philip [1]**  21/8
**phone [4]**  27/3 27/22 42/12 43/11
**phrase [2]**  44/6 49/10
**phrased [1]**  48/11
**phrasing [1]**  49/16
**pick [1]**  25/5
**plaintiff [7]**  20/6 20/13 61/5 61/10 61/13 61/14 73/11
**plaintiff's [16]**
**plan [1]**  22/18
**planning [2]**  41/14 51/19

**play [1]**  51/8
**played [1]**  52/14
**playing [2]**  51/18 51/19
**point [2]**  46/22 59/15
**points [1]**  25/6
**position [2]**  22/13 22/15
**power [1]**  74/10
**prefer [1]**  47/1
**preliminary [3]**  60/23 61/3 73/9
**premarked [1]**  58/2
**prepared [3]**  49/2 49/3 49/4
**preparing [1]**  71/13
**presence [1]**  24/19
**present [1]**  22/5
**presentation [1]**  49/14
**preventable [2]**  66/16 66/18
**problems [2]**  70/15 70/17
**proceed [2]**  24/22 52/5
**proceedings [2]**  20/24 77/22
**process [2]**  50/9 75/16
**produce [4]**  63/7 67/18 67/21 75/5
**produced [9]**  20/25 31/16 50/24 50/25 51/1 51/2 67/24 68/2 68/12
**production [1]**  68/6
**Professional [2]**  29/16 30/7
**proffered [1]**  49/8
**profit [1]**  64/15
**project [1]**  70/20
**proposed [5]**  22/25 23/18 23/18 24/1 24/5
**provide [6]**  23/21 31/9 32/6 44/17 58/3 60/20
**provided [6]**  55/11 57/3 57/8 61/3 73/24 74/21
**provider [2]**  31/24 37/1
**public [2]**  69/16 69/19
**publication [1]**  39/16
**publications [1]**  64/2
**publish [9]**  31/2 35/25 36/19 54/1 58/22 60/5 64/4 64/7 64/8
**published [1]**  40/6
**publishing [3]**  31/24 41/5 41/12 41/14
**pull [4]**  25/23 28/1 45/21 46/21
**purple [1]**  50/7
**purporting [1]**  67/11
**purposes [4]**  28/14 38/6 52/12 53/5

**Q**

**question [17]**
**questions [9]**  39/22 42/2 43/2 52/13 60/11 63/16 72/18 73/18 76/20
**quickly [1]**  67/3

**R**

**range [1]**  49/15
**read [25]**
**reading [2]**  47/21 48/9
**ready [1]**  24/20
**recall [5]**  65/16 67/17 68/5 68/9 68/12
**receive [1]**  56/19
**received [9]**  30/24 39/6 41/11 54/3 57/25 58/19 59/8 60/2 77/10

83

**R**

**recognize [2]** 38/24 53/22
**recognized [2]** 76/12 76/15
**recompile [6]** 61/10 63/10 71/6 71/7 71/15 73/12
**reconcile [2]** 41/7 73/3
**record [11]** 22/4 23/19 29/3 38/10 46/9 47/9 47/11 47/16 65/7 66/22 77/22
**recorded [1]** 20/24
**records [2]** 59/10 61/7
**recovered [1]** 63/3
**red [11]** 48/17 48/20 48/22 48/23 50/1 50/6 50/7 67/14 68/20 74/20 75/9
**red-line [1]** 68/20
**red-lined [1]** 67/14
**Redirect [3]** 72/19 72/21 77/4
**redline [1]** 68/15
**redlined [1]** 49/23
**redlines [1]** 67/21
**refer [5]** 34/13 65/13 66/6 69/2 70/11
**reference [1]** 65/3
**references [6]** 69/11 69/12 69/14 69/16 69/18 75/2
**referred [3]** 32/1 33/12 35/9
**referring [1]** 37/8
**reflect [3]** 44/16 45/20 58/11
**reflected [1]** 25/14
**Reflux [3]** 27/7 33/12 55/5
**refresh [2]** 25/6 47/3
**refreshes [1]** 48/9
**rejected [24]**
**rejection [1]** 41/6
**relationship [2]** 30/20 64/22
**relevance [3]** 30/19 30/19 30/23
**relies [1]** 61/5
**remaining [1]** 67/3
**rephrase [1]** 49/24
**replies [1]** 60/13
**Reporter [3]** 21/11 21/12 77/25
**represent [1]** 52/19
**representative [1]** 69/3
**request [3]** 50/3 67/18 74/3
**requested [1]** 50/22
**research [4]** 31/10 32/6 69/18 74/25
**RESOURCE [5]** 20/8 20/9 20/11 20/12 21/4
**respective [1]** 33/23
**responded [2]** 57/1 71/5
**responding [1]** 61/6
**response [10]** 40/1 52/18 55/12 56/7 60/13 62/19 63/1 63/11 63/12 67/18
**responses [9]** 59/22 60/8 60/12 62/19 63/5 70/12 71/13 73/21 73/25
**restore [1]** 61/22
**resume [1]** 24/20
**review [16]**
**revised [2]** 50/11 75/2
**revisions [12]**
**Richard [2]** 21/2 21/2
**right-hand [5]** 29/18 31/14 32/9 47/19 54/18
**rights [2]** 52/6 56/9

**rise [1]** 24/15
**RMR [2]** 21/11 77/25
**RMR-CRR [1]** 77/25
**Room [1]** 21/13
**Ross [7]** 21/2 21/2 53/6 58/3 59/16 59/23 77/4
**Ross' [1]** 22/10
**Rothschild [1]** 21/8
**rough [1]** 69/11
**rule [1]** 22/25
**ruling [2]** 22/19 68/22
**ruling's [1]** 23/12
**rulings [1]** 23/8
**rushed [2]** 34/17 53/12

**S**

**Salopek [3]** 21/11 77/24 77/25
**San [1]** 21/7
**Sarah [9]** 38/17 39/12 39/14 40/11 40/20 41/2 42/15 54/12 76/15
**Sarah's [1]** 76/15
**saw [1]** 73/15
**scope [2]** 22/20 23/7
**screen [2]** 26/12 70/19
**second [1]** 48/10
**selling [1]** 49/25
**send [1]** 23/22
**sentence [3]** 26/3 34/24 62/23
**sentences [1]** 37/5
**September [3]** 37/3 37/11 37/16
**September 11th [1]** 37/3
**series [2]** 43/20 52/23
**serve [1]** 74/3
**services [1]** 69/24
**seven [2]** 39/6 63/2
**share [2]** 53/4 64/15
**shared [9]** 57/3 57/7 57/12 57/17 57/21 69/7 69/10 70/24 70/25
**shocking [1]** 51/4
**sic [2]** 52/6 56/18
**sidebar [1]** 51/22
**signature [6]** 29/21 30/13 33/15 43/22 43/23 44/17
**signatures [2]** 44/3 44/8
**signed [10]** 32/5 33/16 33/17 34/16 34/22 37/24 45/9 56/9 62/9 73/22
**sloppy [1]** 35/17
**small [1]** 56/18
**sometime [1]** 70/21
**Southeast [1]** 21/3
**SOUTHERN [1]** 20/2
**span [1]** 38/22
**specific [2]** 33/18 35/19
**speculate [1]** 31/19
**speed [2]** 66/21 66/24
**stack [2]** 49/14 52/15
**staging [1]** 22/18
**stamp [1]** 65/22
**stand [1]** 22/6
**stands [1]** 48/13
**starting [1]** 56/20
**stated [1]** 63/4
**statement [8]** 54/13 60/24 61/3 62/2 62/6 62/8 73/4 73/9

**STATES [3]** 20/1 20/20 21/12
**status [3]** 39/17 40/21 42/16
**stenographer [1]** 52/3
**stenography [1]** 20/24
**step [1]** 76/21
**stipulate [1]** 66/22
**stipulation [1]** 66/25
**Street [1]** 21/6
**subject [11]** 44/11 44/18 66/1 66/8 66/11 66/14 66/18 67/7 74/16 75/2 75/3
**submissions [4]** 22/19 45/21 67/11 68/18
**submit [3]** 35/19 35/20 74/19
**submitted [37]**
**subparagraph [2]** 26/4 28/5
**subparagraph D [2]** 26/4 28/5
**subsequent [1]** 72/14
**substantial [1]** 48/17
**sudden [1]** 37/21
**suffice [1]** 47/3
**Suite [2]** 21/7 21/10
**supplement [2]** 63/1 63/4
**supplied [8]** 57/6 57/11 57/13 57/16 57/17 57/20 57/22 62/15
**surprise [2]** 74/2 74/5
**Sustain [2]** 51/6 75/24
**Sustained [1]** 26/6
**swore [1]** 75/18

**T**

**take [7]** 34/4 34/12 34/16 36/15 47/18 49/18 53/11
**taken [2]** 23/22 49/19
**talk [1]** 45/22
**talks [1]** 63/12
**TBI [1]** 57/2
**team [1]** 54/10
**tell [22]**
**telling [1]** 37/4
**ten percent [2]** 57/7 57/17
**ten-hour [2]** 49/12 49/13
**terms [1]** 64/8
**terrific [4]** 25/22 26/13 36/6 47/4
**testified [9]** 25/26 26/14 27/9 41/22 42/23 50/23 73/24 74/10 76/13
**testify [1]** 74/13
**testimony [9]** 20/18 45/18 46/19 49/6 49/22 50/10 67/12 75/5 76/16
**testimony's [1]** 22/23
**text [1]** 68/10
**thank [42]**
**Thanks [7]** 28/9 36/8 36/13 36/20 43/19 46/12 48/3
**think [14]**
**thought [1]** 37/20
**threw [3]** 62/4 72/23 72/25
**thrilled [1]** 22/11
**thrown [3]** 62/3 62/7 63/13
**THURSDAY [1]** 22/1
**thyroid [2]** 66/2 66/3
**time [25]**
**times [1]** 32/2
**title [3]** 33/23 35/2 54/9

## T

**top [4]**  38/19 54/6 54/23 60/15
**topic [9]**  31/10 32/4 32/5 32/14 32/17 32/20 32/24 33/10 35/19
**topics [9]**  33/15 33/18 35/8 39/21 40/15 44/9 52/21 65/15 65/18
**touched [1]**  45/17
**towards [1]**  22/14
**town [1]**  52/4
**transcript [7]**  20/18 20/24 47/6 47/21 76/4 76/11 77/21
**transfer [1]**  35/1
**transferring [2]**  35/9 70/23
**traumatic [2]**  25/15 32/7
**trial [33]**
**trouble [1]**  26/10
**true [9]**  37/11 37/16 55/12 57/1 60/17 60/21 62/12 67/6 67/8
**Tuesday [1]**  56/20
**TV [1]**  59/1
**twice [1]**  22/11
**two-part [1]**  52/23
**typical [1]**  22/21

## U

**uhm [6]**  29/15 59/12 70/4 70/16 70/18 70/19
**ultimately [2]**  57/24 63/3
**underlines [1]**  67/22
**understand [8]**  23/14 37/6 37/23 41/10 44/5 50/4 50/4 50/9
**understanding [3]**  52/20 64/1 64/4
**UNITED [3]**  20/1 20/20 21/12
**unsigned [1]**  30/21
**upcoming [1]**  40/8
**update [1]**  39/17
**updated [1]**  56/19
**upload [2]**  70/19 72/6
**uploaded [4]**  63/9 71/2 71/8 72/10
**uploading [1]**  71/10
**usage [1]**  52/6

## V

**venturer [1]**  64/13
**verdict [3]**  23/25 24/1 24/9
**verify [1]**  49/20
**version [7]**  29/22 30/22 34/16 34/23 50/11 54/12 63/1
**versions [10]**  50/18 63/2 67/14 68/15 68/20 68/21 75/8 75/12 75/14 75/19
**video [2]**  51/18 52/14
**videograph [1]**  52/6
**videographer [2]**  52/2 52/5
**videotape [4]**  47/1 51/20 51/24 52/1
**VOLUME [1]**  20/22

## W

**waiving [1]**  52/6
**warmup [1]**  25/6
**week [2]**  56/20 62/4
**weeks [1]**  40/6
**welcome [3]**  29/5 47/15 63/21
**William [3]**  20/19 36/25 40/17
**witness [10]**  38/7 51/9 53/7 58/7

59/18 63/17 65/9 69/13 76/22 77/2
**witnesses [2]**  22/13 77/1
**women [2]**  66/9 66/11
**wonder [1]**  22/16
**wondering [1]**  75/21
**word [5]**  23/17 23/21 49/10 61/14 61/17
**words [3]**  49/15 60/10 75/20
**work [1]**  70/9
**worked [1]**  54/14
**working [2]**  40/4 42/16
**WPD [1]**  20/4
**wrap [1]**  22/13
**write [14]**
**writer [9]**  25/9 25/20 25/24 26/16 28/1 42/24 45/11 45/15 64/23
**writing [7]**  26/19 27/14 32/5 39/20 42/3 43/3 47/3
**writings [1]**  44/18
**written [1]**  35/5
**wrote [8]**  25/7 40/20 41/1 50/2 65/15 65/18 66/22 67/19

## Y

**yahoo.com [2]**  38/25 53/18
**you'd [2]**  46/22 70/21